## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| STATE OF TEXAS<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF LABOR, JULIE A. SU, IN HER OFFICIAL CAPACITY AS UNITED STATES SECRETARY OF LABOR, THE WAGE AND HOUR DIVISION OF THE DEPARTMENT OF LABOR AND JESSICA LOOMAN IN HER OFFICIAL CAPACITY AS ADMINISTRATOR OF THE WAGE AND HOUR DIVISION.,<br><br>*Defendants.* | CIVIL ACTION NO. _____ |

---

## PLAINTIFF'S COMPLAINT

---

### I.   Introduction

1.   The Fair Labor Standards Act ("FLSA") requires employers to pay overtime compensation (the "Overtime Rule") but exempts several categories of employees, including "any employee employed in a bona fide executive, administrative, or professional capacity … as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor]." 29 U.S.C. § 213(a)(1) ("the EAP Exemption").

2.   The statute defining the EAP Exemption refers only to duties, not salary.

3.   Yet, for decades, Defendants and their predecessors at the Department of Labor ("DOL") have adopted rules that add a minimum salary requirement to the EAP Exemption.

4.   In other words, under Defendants' rules, an "employee employed in a bona fide executive, administrative, or professional capacity" is nevertheless *not* exempt from the Overtime Rule if the employee does not make a certain minimum salary.

5.   In 2017, this Court permanently enjoined Defendants' Final Rule (the "2016 Rule") which increased the minimum salary for the EAP Exemption. *Nevada v. U.S. Dep't of Labor*, 218 F. Supp.3d 520 (E.D. Tex. 2016) (preliminarily enjoining 2016 Rule) (*Nevada I*) (Mazzant, J.); *Nevada v. U.S. Dep't of Labor,* 275 F. Supp.3d 795 (E.D. Tex. 2017) (permanently invalidating 2016 Rule) (*Nevada II*) (Mazzant, J.).

6.   The Court held that the minimum salary for the EAP Exemption "essentially make[s] an employee's duties, functions, or tasks irrelevant if the employee's salary falls below the new minimum salary level." *Nevada II*, 275 F. Supp.3d at 806.

7.   The Court therefore held unlawful the Department's attempt to "make salary rather than an employee's duties determinative of whether a 'bona fide executive, administrative, or professional capacity employee' should be exempt from overtime pay." *Id*. at 807.

8.   The Court also held unlawful the 2016 Rule's automatic updating mechanism that increased the minimum salary every three years going forward. *Id*. at 808.

9.   Consequently, the Court concluded that the 2016 Rule was invalid. *Id.*

10.  Defendants have issued a new Final Rule (the "2024 Rule") that has the same problems that the Court identified in the 2016 Rule. "Defining & Delimiting the Exemptions for Exec., Professional, Outside Sales, & Computer Emp.," 89 Fed. Reg. 32842 (Apr. 26, 2024) (to be codified at 29 C.F.R. pt. 541).

11.   The 2024 Rule increases the EAP Exemption minimum salary requirement from $684 per week ($35,568 annually) to $844 per week ($43,888 annually), starting on July 1, 2024, and to $1,128 per week ($58,656 annually) starting on January 1, 2025. *Id.* at 32971 (adding 29 C.F.R. § 541.600(a)(1), (a)(2)).

12.   Defendants themselves estimate that approximately 1 million exempt employees currently make at least $684 per week but less than $844 per week, and approximately 3 million exempt employees currently make at least $844 per week but less than $1,128 per week. 89 Fed. Reg. at 32843.

13.   Thus, Defendants admit that, on July 1, 2024, the Final Rule will classify approximately one million employees who are "employed in a bona fide executive, administrative, or professional capacity" as non-exempt based on their salary, not their bona fide job duties.

14.   Some of the employees who the 2024 Rule will classify as non-exempt on July 1, 2024 are employed by the State of Texas. Exhibit A.

15.   Defendants further admit that, on January 1, 2025, the Final Rule will classify approximately three million more employees who are "employed in a bona fide executive, administrative, or professional capacity" as non-exempt based on their salary, not their bona fide job duties. 89 Fed. Reg. at 32843.

16.   Some of employees who the 2024 Rule will classify as non-exempt on January 1, 2025 are employed by the State of Texas. Exhibit A.

17.   The Court should set aside the 2024 Rule's minimum salary level because, like the 2016 Rule, it "would exclude so many employees who perform exempt duties, [which shows that

Defendants] fail[ed] to carry out Congress's unambiguous intent. Thus, the Final Rule does not meet *Chevron* step one and is unlawful." *Nevada II*, 275 F. Supp. at 807.

18.   The Court should also set aside the 2024 Rule's minimum salary level because, like the 2016 Rule, it does not meet *Chevron* step 2. Even "[i]f Congress was ambiguous about what specifically constituted an employee subject to the EAP exemption, Congress was clear that the determination should involve at least a consideration of an employee's duties[, and] [n]othing in Section 213(a)(1) allows the Department to make salary rather than an employee's duties determinative of whether a 'bona fide executive, administrative, or professional capacity' employee should be exempt from overtime pay." *Id.* at 807–08. But the 2024 Rule makes salary rather than an employee's duties determinative of whether the employee is subject to the EAP Exemption.

19.   The 2024 Rule also mandates automatic updates on July 1, 2027 and every three years thereafter. 89 Fed. Reg. at 32971 (adding 29 C.F.R. §§ 541.600(a)(3)).

20.   The 2024 Rule's automatic updating mechanism is unlawful for the same reasons that the automatic updating mechanism in the 2016 Rule was unlawful. *Id.* at 808.

21.   The Final Rule's January 1, 2025 minimum salary increase is also arbitrary and capricious because it fails to provide a reasoned explanation for changing its methodology for determining the new minimum salary and fails to recognize the reliance interests of employers who had no reason to think that Defendants would change that methodology.

22.   Texas has other arguments against the 2024 Rule, but the Court may be bound by precedent to reject those arguments.

23.   One such argument is that Defendants are not authorized to add a minimum salary level to the EAP Exemption at all. The Court disagreed. *Nevada II*, 275 F. Supp.3d at 805 n.5 ("The Court recognizes *Wirtz* [*v. Miss. Publishers Corp.*, 364 F.2d 603 (5th Cir. 1966)] is controlling and stands for the proposition that the Department has the authority to implement a salary-level test.").

24.   Three members of the Supreme Court recently disagreed, opining that DOL cannot add a minimum salary level to the EAP Exemption and inviting a challenge. *Helix Energy Solutions Group, Inc. v. Hewitt*, 598 U.S. 39, 63 (Gorsuch, J., dissenting) 67–68 (2023) (Kavanaugh, J., dissenting).

25. The Fifth Circuit is currently hearing a case concerning whether the FSLA allows Defendants to add a minimum salary level to the EAP Exemption, and whether *Wirtz* is controlling. *Mayfield v. U.S. Dep't of Labor*, No. 23-50724 (5th. Cir.). The Fifth Circuit requested paper copies of the briefs on April 30, 2024, suggesting that oral argument will be scheduled soon.

26.   But even if precedent requires the Court to uphold Defendants' general statutory authority to add a minimum salary requirement to the EAP Exemption, the Court should nevertheless set aside the specific minimum salary requirements in the 2024 Rule for the same reasons it set aside the minimum salary requirements in the 2016 Rule.

## II.  Parties

27.   Plaintiff the State of Texas is subject to the 2024 Rule because it is an employer that pays a salary of less than $844 a week and less than $1,128 a week to certain of its employees working in a bona fide EAP capacity.

28. Defendant United States Department of Labor is the federal agency responsible for supervising the formulation, issuance, and enforcement of rules, regulations, policies, and forms by the Wage and Hour Division ("WHD"). See 29 U.S.C § 204(a).

29.  Defendant Julie A. Su is the United States Secretary of Labor ("Secretary"). She is authorized to issue, amend, and rescind the rules, regulations, policies, and forms of DOL and WHD. She is sued in her official capacity.

30.  Defendant Wage and Hour Division is the Division within DOL that is responsible for formulating, issuing, and enforcing the new overtime rule. See U.S.C. § 204(a); 29 C.F.R. § 541.1; 89 Fed. Reg. at 32842.

31.  Defendant Jessica Looman is the Administrator of the WHD and she is responsible for the rules and regulations formulated, issued, and enforced by the WHD, including the new overtime rule. She is sued in her official capacity.

### III. Jurisdiction and Venue

32.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this suit concerns authority under the Constitution of the United States, the Fair Labor Standards Act, and the Administrative Procedure Act. This Court also has jurisdiction to compel an officer of the United States or any federal agency to perform his or her duty pursuant to 28 U.S.C. § 1361.

33.  Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. § 1391(e) because the United States, several of its agencies, and several of its officers in their official capacity are Defendants; a substantial part of the events or Case or omissions giving rise to Plaintiffs' claims occurred in this District; and the Plaintiff State of Texas is an employer of workers in this District.

34.  The Court is authorized to award relief under the APA, 5 U.S.C. §§ 701–06, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

## IV. Legal Background

### A.  The Fair Labor Standards Act and the EAP Exemption

35.  The Fair Labor Standards Act ("FLSA") requires employers to pay non-exempt employees 1.5 times their base hourly wage for all time worked beyond 40 hours in a workweek (the "Overtime Rule"). 29 U.S.C. § 207.

36.  The FLSA has many exemptions from the overtime rule.

37.  Those "exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 89 (2018).

38.  The exemption at issue in this case, Section 213(a)(1), provides that hourly pay and overtime rules "shall not" apply to "any employee employed in a bona fide executive, administrative, or professional capacity … as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor]." 29 U.S.C. § 213(a)(1).

39.  This exemption is commonly referred to as the "EAP Exemption."

40.  The statute delegates defining and delimiting "such terms" to the Secretary of Labor without any limitations—other than those limitations inherent in the words "defined," "delimited," and "such terms."

41.  Unlike other exemptions, the EAP Exemption does not exempt employees from hourly pay and overtime pay based on compensation. *See* 29 U.S.C. § 213(a)(17) (exempting a "computer systems analyst, computer programmer, software engineer, or other similarly skilled worker… who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $27.63 an hour"); (a)(19) (exempting a professional baseball player "who is compensated pursuant to a contract that provides for a weekly salary for services … at a rate that is not less than a weekly salary equal to the minimum wage").

42.  The EAP Exemption exempts employees acting in a "bona fide executive, administrative, or professional capacity," *regardless of compensation.*

## V.  Regulatory History

43.  Despite the statute's lack of a compensation requirement for the EAP Exemption, DOL's regulations since 1940 have added a minimum salary that employees must make before qualifying for the EAP exemption.

44.  The minimum salary requirements are currently found at 29 C.F.R. §§ 541.100(a)(1) (executives), 541.200(a)(1) (administrative employees), and 541.300(a)(1) (professionals).

45.  DOL has increased these minimum salary levels from time to time since 1940. 5 Fed. Reg. 4077 (Oct. 15, 1940); 14 Fed. Reg. 7705 (Dec. 24, 1949); 14 Fed. Reg. 7730 (Dec. 28, 1949); 23 Fed. Reg. 8962 (Nov. 18, 1958); 28 Fed. Reg. 9505 (Aug. 30, 1963); 35 Fed. Reg. 883 (Jan 22, 1970); 40 Fed. Reg. 7091 (Feb. 19, 1975); 69 Fed. Reg. 22122 (April 23, 2004); 81 Fed. Reg. 32391 (May 23, 2016) (stayed by this Court and never effective); 84 Fed. Reg. 51230 (Sept. 27, 2019).

46.  From 1950 to 2004, DOL had two minimum salary levels.

47.  Employees who spent less than 20% of their time on non-EAP duties were exempt under the "long duties" test at a certain minimum salary level. An example of such an employee is a retail a store manager who occasionally works the cash register.

48.  Employees who spent less than 80% of their time on EAP duties, but whose "primary duty" was nevertheless EAP duty were exempt under the "short duties" test at a higher salary level than the "long duties" test. An example of such an employee is an assistant manager at a retail establishment who supervises and directs other employees (exempt work) and has management as his or her primary duty, even if he or she spends more than half of his or her time running a cash register (nonexempt work).

49. The minimum salary for the EAP Exemption for "long duties" was smaller than the one for "short duties."

50. As stated in the preamble to the 2024 Rule, "From 1958 until 2004, the regulations in place generally set the long test salary level at a level designed to exclude from exemption approximately the lowest paid 10 percent of salaried white-collar employees who performed EAP duties in lower-wage areas and industries and set the short test salary level significantly higher." 89 Fed. Reg. 32845.

51. The "short duties" salary level was approximately "49 percent of a contemporaneous long test salary level. The short test salary ratio of 149 percent is the simple average of the 15 historical ratios of the short test salary level to the long test salary level." 89 Fed. Reg. at 32845 n.53.

52. This chart shows the minimum salary levels before 2004:

**Table 2. History of Weekly Standard Salary Thresholds for EAP Exemptions**

| Enactment | Executive (Long) | Administrative (Long) | Professional (Long) | All EAP (Short) | Implementation Period |
|---|---|---|---|---|---|
| 1938 | $30 | $30 | — | — | |
| 1940 | $30 | $50 | $50 | — | 9 days |
| 1949 | $55 | $75 | $75 | $100 | 32 days |
| 1958 | $80 | $95 | $95 | $125 | 76 days |
| 1963 | $100 | $100 | $115 | $150 | 31 days |
| 1970 | $125 | $125 | $140 | $200 | 30 days |
| 1975 | $155 | $155 | $170 | $250 | 41 days |

Congressional Research Service, Overtime Exemptions in the Fair Labor Standards Act for Executive, Administrative, and Professional Employees, October 31, 2017.

53. DOL did not change the minimum salary level for the EAP Exemption between 1975 and 2004.

54. DOL got rid of the separate minimum salary levels in 2004. As the Preamble to the 2024 Rule notes, the 2004 Rule "eliminated the separate long and short tests and replaced them with a single standard test. The Department set the standard salary level at $455 per week, which was equivalent to the 20th percentile of weekly earnings of fulltime salaried workers in the lowest wage Census Region (the South) and in the retail industry nationally. The Department paired the new standard salary level test with a new standard duties test for executive, administrative, and professional employees, respectively, which was substantially equivalent to the short duties test used in the two-test system…. [T]he new standard salary level was comparable to the lower long test salary level used in the two-test system." 89 Fed. Reg. at 32845.

55. The preamble to the 2024 Rule further states that DOL stated in 2004 that "the shift to setting the salary level based on 'the lowest 20 percent of salaried employees in the South, rather than the lowest 10 percent' of EAP employees was made, in part, 'because of the proposed change from the 'short' and 'long' test structure.'" *Id.*

56. In 2016, DOL adopted the Rule that this court found invalid.

57. As the Preamble to the 2024 Rule states, the 2016 Rule "retained the single-test system introduced in 2004 but increased the standard salary level and provided for regular updating. Specifically, the 2016 rule … increased the standard salary level from the 2004 salary level of $455 to $913 per week, the 40th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census Region (the South) [and] added a mechanism to automatically update the [minimum salary level for the EAP Exemption] every 3 years." *Id.* at 32846.

58. DOL justified changing the methodology from the 20th to the 40th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census Region by asserting that the 2004

level should have been set to the short-duty salary instead of the long-duty salary. "[T]he increase in the standard salary level was needed because, in moving from a two-test to a one-test system, the 2004 rule exempted lower-salaried employees performing large amounts of nonexempt work who had historically been, and should continue to be, covered by the overtime compensation requirement. Since the standard duties test was equivalent to the short duties test, the Department asserted that a salary level in the short test salary range—traditionally 130 to 180 percent of the long test salary level—was necessary to address this effect of the 2004 rule." 89 Fed. Reg. at 32863.

59.   Thus, DOL argued that the 2016 Rule was based on older rules—not its statutory authority.

60.   The Court invalidated the 2016 Rule because it "would exclude so many employees who perform exempt duties, [which shows that Defendants] fail[ed] to carry out Congress's unambiguous intent. Thus, the Final Rule does not meet *Chevron* step one and is unlawful," *Nevada II*, 275 F. Supp. at 807, and because, further, it did not meet *Chevron* step 2. Even "[i]f Congress was ambiguous about what specifically constituted an employee subject to the EAP exemption, Congress was clear that the determination should involve at least a consideration of an employee's duties[, and] [n]othing in Section 213(a)(1) allows the Department to make salary rather than an employee's duties determinative of whether a 'bona fide executive, administrative, or professional capacity' employee should be exempt from overtime pay." *Id*. at 807–08.

61.   The Court described a permissible minimum salary requirement for the EAP Exemption. "While the plain meaning of Section 213(a)(1) [the EPA Exemption] does not provide for a salary requirement, the Department has used a permissible minimum salary level as a test for *identifying* categories of employees Congress intended to exempt. The Department sets the minimum salary level as a floor to 'screen[ ] out the obviously nonexempt employees, making an analysis of duties

in such cases unnecessary.' Harry Weiss, Report and Recommendations on Proposed Revisions of Regulations, Part 541, at 7–8 (1949). Further, the Department acknowledges that in using this method, '[a]ny new figure recommended should also be somewhere near the lower end of the range of prevailing salaries for these employees.' *Id.*" *Nevada II* at 806.

62. The Court held that the 2016 Rule was not such a permissible minimum salary requirement. "[T]he Department create[d] a Final Rule that makes overtime status depend predominately on a minimum salary level, thereby supplanting an analysis of an employee's' job duties. The Department estimates 4.2 million workers currently ineligible for overtime, and who fall below the minimum salary level, will automatically become eligible under the Final Rule without a change to their duties…. Because the Final Rule would exclude so many employees who perform exempt duties, the Department fails to carry out Congress's unambiguous intent." *Id.* at 806–07.

63. The 2016 Rule was not a permissible salary requirement because it was not "somewhere near the lower end of the range of prevailing salaries" and did not "screen out the obviously nonexempt employees." Rather, it made 4.2 million employees with EAP duties eligible for overtime without a change in their duties.

64. The Court did not consider whether the 2016 Rule was invalid because it increased the percentile level of weekly earnings of full-time salaried workers in the South from 20th to 40th, because it did (or did not) correct supposed errors in the 2004 Rule, or because the 2016 Rule was justified by earlier rules. *Any* percentile would have failed unless it resulted in a salary level "somewhere near the lower end of the range of prevailing salaries" and that "screen[ed] out the obviously nonexempt employees," regardless of how the percentage was supposedly derived.

65.   The Court also invalidated the 2016 Rule's automatic updating mechanism for the same reasons. Nothing in the FLSA even arguably authorizes DOL to automatically update the minimum salary based entirely on indexing tied to average salary levels, with no taking account of actual duties performed in setting the new salary cutoff. *Id.* at 808.

66.   DOL did not appeal the Court's ruling.

67.   Thus, the 2004 Rule's minimum salary levels remained in effect until DOL issued a new Rule in 2019.

68.   As the preamble to the 2024 Rule notes, "The 2019 rule … raised the standard salary level from the 2004 salary level of $455 to $684 per week, the equivalent of the 20th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census Region (the South) and/or in the retail industry nationally." 89 Fed. Reg. at 32846.

69.   Thus, the 2019 Rule used the 2004 Rule's methodology, applied to 2019 salary data.

## VI.  The 2024 Rule

70.   The 2024 Rule does three things to the minimum salary level for the EAP Exemption.

71.   *First*, it raises the level from $684 per week ($35,568 annually) to $844 per week ($43,888 annually) starting on July 1, 2024. 89 Fed. Reg. 32971 (adding 29 C.F.R. § 541.600(a)(1)).

72.   The July 1 increase is similar to the 2019 Rule's increase in that it uses the 2004 Rule's methodology, applied to 2024 salary data. As the preamble to the 2024 Rule explains, "The initial update to the standard salary level … will take place on July 1, 2024, and will use the methodologies in place at that time (i.e., the 2019 rule methodologies [based on the 20th percentile of weekly earnings of fulltime salaried workers in the lowest wage Census Region (currently the South) and in the retail industry nationally]), resulting in a $844 per week standard salary level." 89 Fed. Reg. at 32843.

73.  According to Defendants, the July 1, 2024 "initial update" "reflect[s] earnings growth." 89 Fed. Reg. at 32842. In other words, it reflects 23.4% inflation since 2019.

74.  Defendants admit, "The Department estimates that in Year 1, approximately 1 million employees who earn at least $684 per week but less than $844 per week will be impacted by the initial update applying current wage data to the standard salary level methodology from the 2019 rule." 89 Fed. Reg. at 32843.

75.  *Second*, the 2024 Rule raises the level from $844 per week ($43,888 annually) to $1,128 per week ($58,656 per year) starting on January 1, 2025. 89 Fed. Reg. 32971 (adding 29 C.F.R. § 541.600(a)(2)).

76.  The $1,128 number is based on the 35th percentile of weekly earnings of fulltime salaried workers in the lowest wage Census Region (currently the South) and in the retail industry nationally. 89 Fed. Reg. at 32842.

77.  Defendants claim that the 35th percentile was "built on lessons learned in the Department's most recent rulemakings to more effectively define and delimit employees employed in a bona fide EAP capacity. Specifically, the Department's intent in the NPRM was to fully restore the salary level's screening function and account for the switch in the 2004 rule from a two-test system to a one-test system for defining the EAP exemption, while also updating the standard salary level for earnings growth since the 2019 rule." 89 Fed. Reg. at 32862.

78.  Defendants claim, "updating the salary level for wage growth since the 2019 rule produces a salary level of $844 per week, and fully restoring the salary level's historic screening function would result in a salary level of $942 per week, equivalent to the 25th percentile of full-time salaried worker earning in the South (i.e., the long test level). Accordingly, the increase from the 25th

14

percentile to the 35th percentile is to account for the shift to a one-test system." 89 Fed. Reg. at 32873

79.    Thus, just as in 2016, Defendants justify the 35th percentile number by appealing to the authority of prior rules, rather than statutory authority.

80.    Defendants essentially argue, as they did in the 2016 Rule, that the 2004 Rule used bad math when it eliminated the two duties tests with the two different minimum salary levels.

81.    Defendants' choice of the 35th percentile seems to be based on nothing more than the fact that the "short duties" salary level used to be approximately 149% of the "long duties" salary level, and 35 is close enough to 149% of 20 (it is actually 175% of 20). But the 2004 Rule's 20th percentile level was based on an entirely different salary base than the pre-2004 "long duties" salary base, making this comparison irrelevant.

82.    Defendants do not justify the new percentile with any statutory authority.

83.    "The Department estimates that …  approximately 3 million employees who earn at least $844 per week but less than the new standard salary level of $1,128 per week will be impacted by the subsequent application of the new standard salary level [starting on January 1, 2025]." 89 Fed. Reg. at 32843.

84.    *Third*, the 2024 Rule mandates automatic updates on July 1, 2027 and every three years thereafter based on the 35th percentile of weekly earnings of fulltime salaried workers in the lowest wage Census Region and in the retail industry nationally. 89 Fed. Reg. 32971 (adding 29 C.F.R. §§ 541.600(a)(3), 541.607(b)(1)).

## VII. Legal Analysis

**A. The Court should set aside the 2024 Rule's minimum salary levels for the same reasons it set aside the minimum salary levels in the 2016 Rule.**

85. When this Court set aside the minimum salary levels in the 2016 Rule, it was unconcerned about how DOL came up with that number.

86. Instead, the Court held that the minimum salary for the EAP Exemption—however derived—"essentially make[s] an employee's duties, functions, or tasks irrelevant if the employee's salary falls below the new minimum salary level." *Nevada II*, 275 F. Supp.3d at 806.

87. The Court therefore held unlawful the Department's attempt to "make salary rather than an employee's duties determinative of whether a 'bona fide executive, administrative, or professional capacity employee' should be exempt from overtime pay." *Id.* at 807.

88. Defendants themselves estimate that approximately 1 million exempt employees currently make at least $684 per week but less than $844 per week, and approximately 3 million exempt employees currently make at least $844 per week but less than $1,128 per week. 89 Fed. Reg. at 32843.

89. Thus, Defendants admit that, on July 1, 2024, the Final Rule will classify approximately one million employees who are "employed in a bona fide executive, administrative, or professional capacity" as non-exempt based on their salary, not their bona fide job duties.

90. Defendants further admit that, on January 1, 2025, the Final Rule will classify approximately three million more employees who are "employed in a bona fide executive, administrative, or professional capacity" as non-exempt based on their salary, not their bona fide job duties. 89 Fed. Reg. at 32843.

91.   The Court should set aside the 2024 Rule's minimum salary level because, like the 2016 Rule, it "would exclude so many employees who perform exempt duties, [which shows that Defendants] fail[ed] to carry out Congress's unambiguous intent. Thus, the Final Rule does not meet *Chevron* step one and is unlawful." *Nevada II*, 275 F. Supp. at 807.

92.   The Court should also set aside the 2024 Rule's minimum salary level because, like the 2016 Rule, it does not meet *Chevron* step 2. Even "[i]f Congress was ambiguous about what specifically constituted an employee subject to the EAP exemption, Congress was clear that the determination should involve at least a consideration of an employee's duties[, and] [n]othing in Section 213(a)(1) allows the Department to make salary rather than an employee's duties determinative of whether a 'bona fide executive, administrative, or professional capacity' employee should be exempt from overtime pay." *Id*. at 807–08. But the 2024 Rule makes salary rather than an employee's duties determinative of whether the employee is subject to the EAP Exemption.

93.   Just as with the 2016 Rule, the 2024 Rule establishes a "significant increase [that] would essentially make an employee's duties, functions, or tasks irrelevant if the employee's salary falls below the new minimum salary level, and "entire categories of previously exempt employees who perform bona fide executive, administrative, or professional capacity duties would now qualify for the EAP exemption based on salary alone." 275 F. Supp. 3d at 806 (citing the Department's 2016 Rule which estimated that 4.2 million workers would have lost their exempt status solely because of the increased salary threshold).

**B.    The 2024 Rule's minimum salary level should be set aside because it is arbitrary and capricious.**

94.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency acts arbitrarily and capriciously when it departs sharply from prior practice without reasonable explanation or disregards either alternatives to its action or the affected communities' reliance on the prior rule. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

95.    Defendants' use of the 20th percentile of weekly earnings of fulltime salaried workers in the lowest wage Census Region, and in the retail industry nationally, is arbitrary and capricious. It bears no relation to the statutory requirement that "any employee employed in a bona fide executive, administrative, or professional capacity" is exempt from the Overtime Rule, regardless of salary.

96.    Thus, the current rule's (the 2019 Rule) minimum salary level is arbitrary and capricious because it uses the irrelevant 20th percentile methodology. But it will soon expire. The minimum salary level set by the new rule (the 2024 Rule) on July 1, 2024 is arbitrary and capricious for the same reason.

97.    The minimum salary level that kicks in on January 1, 2025, based on the 35th percentile of weekly earnings of fulltime salaried workers in the lowest wage Census Region, and in the retail industry nationally, is also arbitrary and capricious for that reason—it bears no relation to the statutory requirement that "any employee employed in a bona fide executive, administrative, or professional capacity" is exempt from the Overtime Rule, regardless of salary.

98.    The January 1, 2025 minimum salary level is arbitrary and capricious for additional reasons.

99. *First*, it is based on an invalid mathematical formula applied to the arbitrary and capricious 20th percentile rule and pre-2004 practice. Defendants essentially argue, as they did in the 2016 Rule, that the 2004 Rule used bad math when it eliminated the two duties tests with the two different minimum salary levels. Defendants' choice of the 35th percentile seems to be based on nothing more than the fact that the "short duties" salary level used to be approximately 149% of the "long duties" salary level, and 35 is close enough to 149% of 20 (it is actually 175% higher). But the 2004 Rule's 20th percentile level was based on an entirely different salary base than the pre-2004 "long duties" salary base, making this comparison irrelevant.

100. *Second*, the January 1, 2025 minimum salary level disregards the affected communities' reliance on the prior rule and will make millions of employees non-exempt, requiring either increases in salaries or overtime pay and additional paperwork.

101. The Court found it unnecessary to address arguments that the minimum salary level is arbitrary and capricious when it set aside the 2016 Rule.

**C. The 2024 Rule should be set aside for other reasons that are foreclosed in this Court by precedent.**

102. Texas has other arguments against the minimum salary level in the 2024 Rule that are contrary to precedent that binds this court. Texas makes those arguments to preserve them on appeal.

**1. Defendants lack statutory authority to add a minimum salary requirement to the EAP Exemption.**

103. Defendants lack statutory authority to add *any* minimum salary requirement to the EAP Exemption—a requirement that, in this case, Defendants admit will exclude millions of employees who are exempt even though they are "employed in a bona fide executive, administrative, or professional capacity."

104. At least for now, this Court reviews claims challenging an agency's assertion of rulemaking power under the framework set forth in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

105. The first step is to determine whether Congress has directly and unambiguously spoken to the precise question at issue. *Id.* at 842. If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. However, if Congress has not directly addressed the precise question at issue, then the Court must proceed to step-two and determine "whether the agency's interpretation is based on a permissible construction of the statute," and thus deserving of deference. *Id.* at 843. And, in cases where Congress has "explicitly left a gap for the agency to fill," the agency's regulation is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–844. Thus, *Chevron* applies only when Congress has left a gap for the agency to fill and there is ambiguity in the statute. *Id.* at 842.

106. There is nothing in the EAP Exemption that implies gap-filling authority to impose minimum salary rules.

107. Nor is there any ambiguity in the EAP Exemption's terms.

108. The EAP does not mention compensation levels, so there is no ambiguity about whether it may set minimum salary levels. *See Clean Water Action v. EPA*, 936 F.3d 308, 313 n.10 (5th Cir. 2019) ("[A]gencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions.").

109. The ordinary meaning of the EAP Exemption is that the Secretary is limited to promulgating rules concerning the duties that an employee must perform to be deemed exempt.

110. And the fact that Congress delegated authority to "define and delimit" the terms "bona fide executive … capacity" tells us nothing as to whether those operative terms—objectively construed—entail authorization to impose minimum salary rules. The text does not address salaries at all. Statutory silence is no basis for giving Chevron deference. *See Contender Farms, LLP v. U.S. Dep't of Agric.*, 779 F.3d 258, 272 (5th Cir. 2015) ("[A]n [] agency does not receive deference … merely by demonstrating that 'a statute does not expressly negate the existence of a claimed [] power…'").

111. Both the ordinary meaning and the structure of the Act confirm that the Secretary is authorized only to promulgate regulation concerning the duties an employee must perform to be deemed exempt. As such, the Department's statutory argument fails at Chevron Step One. *See Chamber of Comm. v. U.S. Dep't of Lab.*, 885 F.3d 360, 369 (5th Cir. 2018) ("Where the text and structure of a statute unambiguously foreclose an agency's statutory interpretation, the intent of Congress is clear, and 'that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'") (citing *Chevron*, 467 U.S. at 842–43).

112. Under the ordinary meaning, the Department's minimum salary rule is unlawful. The FLSA's text confers exempt status on "any employee employed in a bona fide executive, administrative, or professional *capacity.*" 29 U.S.C. § 213(a)(1) (emphasis added). The operative terms "executive, administrative, [and] professional" all "relate to a person's performance, conduct, or function without suggesting salary." *Nevada I*, 218 F.Supp.3d at, 529.

113. The statute's use of the term "capacity" after "executive," administrative," and "professional" confirms that the EAP Exemption focuses on an employee's duties or functions.

To be employed in the "capacity" of an "executive," for example, means to work in the role of an executive—i.e., to perform executive duties in one's position.

114. The term "bona fide" simply emphasizes the focus on the employee's functional duties. By using "bona fide," Congress intended the EAP Exemption to apply to employees who were genuinely performing EAP "tasks" in their employment, but to deny it to those who were merely given a job title without commensurate duties.

115. To be sure, the statute delegates authority for the Secretary to "define and delimit" the operative terms of the EAP Exemption. But that authority is cabined by the statute's text when read as a whole. The "define and delimit" authority is simply authorization for the Secretary to explain the objective meaning of the operative terms Congress chose within the confines of their ordinary meaning—rather than a power to assign meaning.

116. The other statutory exemptions from the Overtime Rule refers to employees who are employed in specific trades, occupations, or in certain types of employment. *See* 29 U.S.C. § 213(a)(5) (fisherman exemption); 29 U.S.C. § 213(a)(19) (baseball exemption). *See Addison v. Holly Hill Fruit Products*, 322 U.S. 607, 617 (1944) (emphasizing that Congress "dealt with exemptions in detail and with particularity, enumerating [them] … based on different industries, on different occupations … on size and on areas [of production]."). This pattern confirms that Congress's focus was on the nature of an employee's work—not on how much an employee is paid.

117. Congress knows how to include a salary level when it wants—and it omits salary language from the EAP Exemption. Unlike the EAP Exemption, section 213(a)(19) says baseball players must be paid a salary level equal or greater than what they would be earning if working "40 hours" a week at "minimum wage." That Congress imposed a minimum salary requirement for the

baseball player exemption but not in the EAP Exemption shows that Congress did not intend to impose minimum salary requirements on EAP employees. *See Addison*, 322 U.S. at 614 (holding that DOL abused its discretion in "defin[ing] and delimit[ing]" the scope of an exemption: "Where Congress wanted to make [an] exemption depend on size [of the business], as it did in two or three instances not here relevant, it did so by appropriate language.").

118. Congress is explicit in imposing other compensation requirements throughout the rest of the FLSA. Unlike here, Congress determined the major policy question and explicitly authorized those requirements. The Secretary thus cannot 'discover' the same authority for himself in the "define and delimit" authority under the EAP Exemption. For example, when Congress wanted a minimum wage, it said so in express terms. See 29 U.S.C. § 206(a) (requiring that nonexempt employees must be paid at least "$7.25 an hour"). It makes no sense to infer a roving power for the Secretary to dictate minimum salary rules for EAP employees—especially when Congress has explicitly enumerated compensation requirements in other parts of the statute.

119. Justices Kavanaugh and Alito recently noted that regulations setting minimum compensation for the EAP Exemption

> may be inconsistent with the Fair Labor Standards Act…. Recall that the Act provides that employees who work in a "bona fide executive ... capacity" are not entitled to overtime pay. 29 U.S.C. § 213(a)(1). The Act focuses on whether the employee performs executive duties, not how much an employee is paid or how an employee is paid. So it is questionable whether the Department's regulations— which look not only at an employee's duties but also at how much an employee is paid and how an employee is paid—will survive if and when the regulations are challenged as inconsistent with the Act…. [T]he statutory question remains open for future resolution in the lower courts and perhaps ultimately in this Court.

*Helix Energy Solutions Group, Inc. v. Hewitt*, 598 U.S. 39, 67–68 (2023) (Kavanaugh, J., dissenting).

120. Justice Gorsuch similarly noted:

> Helix Energy does not just dispute the proper application of various regulations. It contends those regulations are inconsistent with and unsustainable under the terms of the statute on which they are purportedly based. While [the regulations] focus on an employee's *salary*, Helix Energy submits, the statute requires attention to the employee's *duties*…. see generally 29 U.S.C. § 213(a)(1). Understandably, the Court refuses to entertain this larger statutory argument because Helix Energy failed to raise it earlier in the litigation…. Helix Energy forfeited such a foundational argument…

*Id.* at 63 (Gorsuch, J., dissenting) (citations omitted, emphasis in original).

121. But two Texas district courts, including this court, have held that the FLSA does empower DOL to set minimum salary levels. *Nevada II*, 275 F. Supp.3d at 805 n.5 ("The Court recognizes *Wirtz* [*v. Miss. Publishers Corp.*, 364 F.2d 603 (5th Cir. 1966)] is controlling and stands for the proposition that the Department has the authority to implement a salary-level test."); *Mayfield v. U.S. Dep't of Labor*, ___ F. Supp.3d ___, 2023 WL 6168251, at *3 (W.D. Tex., Sep. 20, 2023) ("At the outset, any challenge to the Department's general authority in this area is foreclosed by [*Wirtz*]."); *4 ("But even assuming *Wirtz* employed some other standard, the Department's authority to adopt a salary-level test passes muster under the more modern, two-step *Chevron* framework.").

122. *Mayfield* is on appeal. *Mayfield v. U.S. Dep't of Labor*, No. 23-50724. Among the issues in the appeal are whether the FSLA allows Defendants to add a minimum salary level to the EAP Exemption, and whether *Wirtz* is controlling. The Fifth Circuit requested paper copies of the briefs on April 30, 2024, suggesting that oral argument will be scheduled soon.

123. *Wirtz* is not controlling. The plaintiff in *Wirtz* argued that "the minimum salary requirement is not a justifiable regulation under [the EAP Exemption] because [it is] not rationally related to the determination of whether an employee is employed in a bona fide executive * * * capacity." *Wirtz*, 364 F.2d at 608. The Fifth Circuit disagreed, stating that the regulation was not

"arbitrary or capricious" because the Secretary has "broad latitude to 'define and delimit' the meaning of the term 'bona fide executive * * * capacity." *Id.*

124. That conclusory announcement does not control Texas's arguments presented here. *See Ochoa-Salgado v. Garland*, 5 F.4th 615, 619 (5th Cir. 2021) ("[T]he rule of orderliness applies where (1) a party raises an issue and (2) a panel gives that issue reasoned consideration.")

125. *Wirtz* did not address whether a minimum salary rule is precluded by the ordinary meaning of the statutory text—which is, under the Supreme Court's modern jurisprudence, the first step in "reviewing an agency's construction of a statute." *See Nevada I*, 218 F.Supp.3d at 528. For that matter, *Wirtz* engaged in zero statutory construction before broadly deferring to the Secretary. Rather, *Wirtz* applied only an arbitrary and capricious standard.

126. *Wirtz* also did not address whether the Department's claimed minimum salary rulemaking authority violates the major questions doctrine. No party invoked the major questions doctrine. And therefore, this Court has never given the issue reasoned consideration.

127. Defendants emphasize that the minimum salary levels in the 2024 is based on older rules— not its statutory authority. But rules—even old rules—do not establish the limits of agency power. Statutes do. "[A]n agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Agencies do not gain authority via adverse possession of authority not granted by statute. Agencies cannot engage in a course of conduct giving rise to actual or apparent authority. Agencies cannot prove authority to act by proving a course of dealing.

**2. Finding a power to add a minimum salary requirement to the EAP Exemption is foreclosed by the Major Questions Doctrine.**

128. If it were unclear whether the statue gives Defendants the authority to add a minimum salary requirement to the EAP Exemption—it is not---then the Major Question Doctrine would require the Court to find that Defendants have no such power.

129. The Major Questions Doctrine requires that an agency must point to "clear congressional authorization" when it claims highly consequential rulemaking authority. *See West Virginia v. EPA*, 597 U.S. 697, 722–23 (2022). The major questions doctrine's requirement of a clear statement supersedes *Chevron* when it applies.

130. The major questions doctrine is based on "two overlapping and reinforcing presumptions"—that Congress "intends to make major policy decisions itself" and that Congress should make those choices under a "separation of powers-based" default that forbids it from delegating "major lawmaking authority." *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc).

131. Defendants admit the 2024 Rule will affect four million employees and "estimate[] that total annualized direct employer costs over the first 10 years will be $803 million with a 7 percent discount rate." 89 Fed. Reg. at 32843.

132. The political and economic implications of the Department's assertion of an open-ended power to raise minimum salary requirements as high as the Secretary may deem fit demonstrate that the Major Question Doctrine applies. *See West Virginia*, 597 U.S. at 735 ("[I]t is not plausible that Congress gave EPA the authority to adopt on its own such a regulatory scheme…. A decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to a clear delegation from that representative body.").

**3.   If the statute gives Defendants the power to add a minimum salary requirement to the EAP Exemption, it violates the Nondelegation Doctrine because it provides no intelligible principle for how it should be set.**

133. If the Court were nevertheless to find that the statute authorizes Defendants to set a minimum salary level for the EAP Exemption, the statute would violate the Non-Delegation Doctrine because it provides no intelligible principle for how to set the minimum salary.

134. The Constitution forbids Congress from delegating its lawmaking powers. *See Whitman v. Am. Trucking Assoc.*, 531 U.S. 457, 472 (2001).

135. The Nondelegation Doctrine requires that Congress must provide an "intelligible principle" to cabin and guide the exercise of administrative discretion. See *Panama Refining Co. v. Ryan*, 293 U.S. 388, 429–30 (1935).

136. If Defendants' authority is not limited to clarifying the duties that an employee must perform to qualify for the EAP Exemption, then there is no text-based intelligible principle controlling that discretion.

137. The EAP Exemption lacks anything providing direction for how the Secretary should go about setting the minimum salary level.

138. If the EAP Exemption really does grant Defendants the power to set a minimum salary level—it does not—then "the Congress has declared no policy, has established no standard, has laid down no rule" on how to set it, which violates the Nondelegation Doctrine. *Panama Refining*, 293 U.S. at 430.

139. Because there is no intelligible principle guiding Defendants' putative authority to add a minimum salary requirement to the EAP Exemption, Defendants can pick any number they please and could exclude all employees from the EAP Exemption by setting the minimum to one million dollars, or whatever number would exclude all employees from the EAP Exemption.

**4. The Overtime Rule is unconstitutional as applied to Texas and the States. *Garcia* should be overruled.**

140. The FSLA was enacted in 1938. Fair Labor Standards Act of 1938, Pub. L. 75-718, 52 Stat. 1060 (codified at 29 U.S.C 201).

141. As originally enacted, FLSA did not apply to employees of the States or the States' political subdivisions. 52 Stat. at 1060 § 3(d) ("'Employer' … shall not include the United States or any State or political subdivision of a State.").

142. In 1974, Congress amended the FLSA. Fair Labor Standards of 1974, Pub. L. 93-259, 88 Stat. 55 (Apr. 8, 1974).

143. "Employer" is now defined to include "a public agency." 29 U.S.C. § 203(d).

144. "Public agency" is now defined to include "the government of a State or political subdivision thereof" and "a State, or a political subdivision of a State." 29 U.S.C. § 203(x).

145. The FLSA now reads, "Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, *or is employed in an enterprise engaged in commerce or in the production of goods for commerce*, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1) (emphasis added).

146. The FLSA now defines "Enterprise engaged in commerce or in the production of goods or commerce" as "an enterprise that is an activity of a public agency." 29 U.S.C. § 203(s)(1)(C).

147. The FLSA defines "enterprise" as "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose." 29 U.S.C. § 203(r)(1). And "the activities performed by any person or persons in connection with

28

the activities of a public agency shall be deemed to be activities performed for a business purpose." 29 U.S.C. § 203(r)(2)(C).

148. Thus, after the 1974 amendments, the FLSA defines almost everything a state does, and everything a subdivision of a state does, as "commerce" and then subjects them to the overtime rule (with the EAP Exemption).

149. The only employees of a State or a subdivision of a State who are not subject to the FLSA are state employees who are not subject to the civil service laws of the State, political subdivision, or agency which employs him; and who (I) holds a public elective office of that State, political subdivision, or agency, (II) is selected by the holder of such an office to be a member of his personal staff, (III) is appointed by such an officeholder to serve on a policymaking level, (IV) is an immediate adviser to such an officeholder with respect to the constitutional or legal powers of his office, or (V) is an employee in the legislative branch or legislative body of that State, political subdivision, or agency and is not employed by the legislative library of such State, political subdivision, or agency. Such people are excluded from the FSLA's definition of "employee." 29 U.S.C. § 203(e)(1), (3).

150. In 1976, the Supreme Court held in *National League of Cities v. Usery*, 426 U.S. 833 (1976), that the Tenth Amendment limited Congress's power under the Commerce Clause to apply FLSA's minimum wage and overtime protections to the States. The Court recognized that "[o]ne undoubted attribute of state sovereignty is the States' power to determine the wages which shall be paid to those whom they employ in order to carry out their governmental functions, what hours those persons will work, and what compensation will be provided where these employees may be called upon to work overtime." *Id.* at 845.

151. The Overtime Rule's coercive effect and impact on the States' ability to perform integral governmental functions were particularly troubling to the Court. *Id*. at 849–51. It held that the Federal Government does not have the authority to usurp the policy choices of the States as to how they structure the pay of State employees or how States allocate their budgets. *Id*. at 846–48. The Federal Government cannot dictate the terms on which States hire employees. *Id*. at 849. And it cannot force States to cut services and programs to pay for the Federal Government's policy choices related to wages. *Id*. at 855. To permit the Federal Government to manage State employment relationships would be to trample upon the principles of federalism by regulating the States as States. *Id*. at 842, 845. "If Congress may withdraw from the States the authority to make those fundamental employment decisions upon which their systems for performance of these functions must rest, we think there would be little left of the States' separate and independent existence." *Id*. at 851 (quotations omitted).

152. The *Usery* court held "that insofar as the [1974] amendments operate to directly displace the States′ freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by Art. I, s 8, cl. 3 [the Interstate Commerce Clause]." *Id*. at 852.

153. Almost a decade later, however, the Supreme Court backed away from its decision in *Usery*, overruling it in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985).

154. The *Garica* Court, "reject[ed], as unsound in principle and unworkable in practice, a rule of state immunity from federal regulation that turns on a judicial appraisal of whether a particular governmental function is 'integral' or 'traditional.' Any such rule leads to inconsistent results." *Garcia* at 546–47.

155. The Court continues, "If there are to be limits on the Federal Government's power to interfere with state functions—as undoubtedly there are—we must look elsewhere to find them." *Id*. at 547. The Court found the limit in "[t]he political process [which] ensures that laws that unduly burden the States will not be promulgated." *Id*. at 556.

156. That holding is wrong. The limit is in fact found in the limitation of the commerce power to regulating "commerce," not "government," and the Tenth Amendment's "confirm[ation] that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States*, 505 U.S. 144, 157 (1992). For instance, "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program. It matters not whether policymaking is involved, and no case-by-case weighing of the burdens or benefits is necessary; such commands are fundamentally incompatible with our constitutional system of dual sovereignty." *Printz v. United States*, 521 U.S. 898, 935 (1997). Thus, states and their officers cannot be required to comply with the FSLA.

157. The decision was 5-4. Dissenting, Justice Rehnquist stated that the Tenth Amendment principle "will, I am confident, in time again command the support of a majority of this Court." *Garcia*, 469 U.S. at 580 (Rehnquist, J., dissenting).

158. Moreover, DOL's setting of a minimum salary level without statutory authority or intelligible principle to guide the setting, and the "automatic indexing" in the final rule, demonstrates that the political process provides states with no protection from administrative and executive overreach where the rule-makers nefariously use the rules to shield themselves from the political process.

159. Over three decades of experience since *Garcia* has cast serious doubt on the Court's optimistic reliance on mere politics to protect our federalist system from Federal dominance. Subsequent Commerce Clause, Tenth Amendment, and Eleventh Amendment decisions call the continuing validity of *Garcia* into question. *See, e.g.*, *West v. Anne Arundel Cnty., Md.*, 137 F.3d 752, 757–58 (4th Cir. 1998) (Wilkerson, J.), superseded on other grounds as stated in *Morrison v. Cnty. of Fairfax, Va.*, No. 14-2308, --- F. 3d ---, 2016 WL 3409651 (4th Cir. June 21, 2016).

160. Additionally, the FLSA commandeers, coerces, and subverts the States by mandating how they structure the pay of State employees and, thus, they dictate how States allocate a substantial portion of their budgets. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 582 (2012) ("The threatened loss of over 10 percent of a State's overall budget, in contrast, is economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion.").

161. *Garcia* should be overruled.

162. When the Court set aside the 2016 Rule, it held that *Garcia* controlled the case and that FSLA applied to the States. *Nevada II*, 275 F. Supp.3d at 802–03.

## VIII.  Claims for Relief

**COUNT 1**
**Violation of APA 5 U.S.C. 706(2)(C):**
**In Excess of Statutory Jurisdiction of Authority**

342. All foregoing allegations are repeated and realleged as if fully set forth herein.

343. Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be…in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

344. The EAP Exemption is unambiguous: it refers to an employee's duties, not an employee's salary.

345. The 2024 Rule's minimum salary level is therefore contrary to the unambiguous meaning because it is not near the lower end of the range of prevailing salaries for EAP employees, because it essentially makes an employee's duties, functions, or tasks irrelevant if the employee's salary falls below the new minimum salary level, because entire categories of previously exempt employees who perform "bona fide executive, administrative, or professional capacity" duties would now qualify for the EAP exemption based on salary alone, and because it makes overtime status depend predominately on a minimum salary level, thereby supplanting an analysis of an employee's job duties.

346. Moreover, if Congress were ambiguous about what specifically constituted an employee subject to the EAP exemption, Congress was clear that the determination should involve at least a consideration of an employee's duties. Nothing in the EAP Exemption allows the Department to make salary rather than an employee's duties determinative of whether a "bona fide executive, administrative, or professional capacity" employee should be exempt from overtime pay.

347. The automatic increases to the minimum salary level are likewise in excess of authority granted to DOL.

348. The 2024 Rule's minimum salary level is in excess of the authority Congress granted to DOL and is therefore unlawful, should be declared invalid, should be set aside, and in violation of the APA, 5 U.S.C. § 706(2)(C).

**COUNT 2**
**Violation of APA 5 U.S.C. 706(2)(A):**
**Arbitrary, Capricious, Abuse of Discretion, Not in Accordance with Law**

349. All foregoing allegations are repeated and realleged as if fully set forth herein.

350. Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A).

351. A court may hold that an agency action is arbitrary and capricious when the agency has failed to consider relevant evidence or articulate a satisfactory explanation for its action.

352. The 2024 Rule's July 1, 2024 minimum salary level is arbitrary and capricious because it is based on the 20th percentile of weekly earnings of fulltime salaried workers in the lowest wage Census Region, and in the retail industry nationally, which bears no relation to the statutory requirement that "any employee employed in a bona fide executive, administrative, or professional capacity" is exempt from the Overtime Rule, regardless of salary.

353. The 2024 Rule's January 1, 2025 minimum salary level is arbitrary and capricious because it is based on the 35th percentile of weekly earnings of fulltime salaried workers in the lowest wage Census Region, and in the retail industry nationally, which bears no relation to the statutory requirement that "any employee employed in a bona fide executive, administrative, or professional capacity" is exempt from the Overtime Rule, regardless of salary.

354. It is also arbitrary and capricious because it is based an invalid mathematical formula applied to the arbitrary and capricious 20th percentile rule and pre-2004 practice. Defendants essentially argue, as they did in the 2016 Rule, that the 2004 Rule used bad math when it eliminated the two duties tests with the two different minimum salary levels. Defendants' choice of the 35th percentile seems to be based on nothing more than the fact that the "short duties" salary level used to be approximately 149% of the "long duties" salary level, and 35 is close enough to 149% of 20 (it is actually 175% higher). But the 2004 Rule's 20th percentile level was based on an entirely

different salary base than the pre-2004 "long duties" salary base, making this comparison irrelevant.

355. The January 1, 2025 minimum salary level disregards the affected communities' reliance on the prior rule and will make millions of employees non-exempt, requiring either increases in salaries or overtime pay and additional paperwork.

356. The 2024 Rule's minimum salary level is in arbitrary and capricious and is therefore unlawful, should be declared invalid, should be set aside, and in violation of the APA, 5 U.S.C. § 706(2)(A).

## COUNT 3
### Violation of APA 5 U.S.C. 706(2)(C):
### In Excess of Statutory Jurisdiction of Authority

357. All foregoing allegations are repeated and realleged as if fully set forth herein.

358. The EAP Exemption does not authorize DOL to add any minimum salary level.

359. The 2024 Rule's minimum salary level is in excess of the authority Congress granted to DOL and is therefore unlawful, should be declared invalid, should be set aside, and in violation of the APA, 5 U.S.C. § 706(2)(C).

## COUNT 4
### Major Questions Doctrine

360. All foregoing allegations are repeated and realleged as if fully set forth herein.

361. Alternatively, if there is any ambiguity about whether the EAP Exemption authorizes DOL to add a minimum salary level, the Major Questions Doctrine mandates that the authority does not exist because such authority must be clearly stated.

## COUNT 5
### Non-Delegation Doctrine

362. All foregoing allegations are repeated and realleged as if fully set forth herein.

363. Alternatively, if the EAP Exemption unambiguously authorizes DOL to add a minimum salary level, it does so without any intelligible principle on how to choose the number and violates the Nondelegation Doctrine.

## COUNT 6
### Tenth Amendment

364. All foregoing allegations are repeated and realleged as if fully set forth herein.

365. The Tenth Amendment states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or the people." U.S. Const. amend X.

366. The Tenth Amendment is a barrier to Congress's power under the Commerce Clause to apply the FLSA to the States and the 29 C.F.R. Part 541 salary basis test and compensation levels.

367. Enforcing the FLSA and the 2024 Rule's minimum salary level against the States infringes upon state sovereignty and federalism by dictating the wages that States must pay to those whom they employ in order to carry out their governmental functions, what hours those persons will work, and what compensation will be provided where these employees may be called upon to work overtime.

368. FLSA and the new overtime rule commandeer, coerce, and subvert the States by mandating how they structure the pay of State employees and, thus, they dictate how States allocate a substantial portion of their budgets.

369. Further, as a result of the new overtime rules and the accompanying damage to State budgets, States will be forced to eliminate or alter employment relationships and cut or reduce services and programs. Left unchecked, DOL's salary basis test and compensation levels will wreck State budgets.

370. The new overtime rule regulates the States as States and addresses matters that are indisputable attributes of State sovereignty (employment relationships, services, functions, and budgets). Compliance with the overtime rule directly impairs the States' ability to structure integral operations in areas of traditional governmental functions and there is no federal interest that justifies State submission.

371. To the extent *Garcia* can be read to hold otherwise, it should be overruled.

372. Because the new rules and regulations are not in accordance with the law as articulated above, they are unlawful, should be declared invalid, should be set aside, and are in excess of the authority Congress granted to DOL and is therefore in violation of the APA, 5 U.S.C. § 706(2)(C).

## IX.  DEMAND FOR RELIEF

Texas respectfully requests that the Court:

a.  Issue preliminary injunctive relief against Defendants delaying the effective date of the 2024 Rule's minimum salary level under 5 U.S.C. § 705 until the Court can consider full briefing on the Rule's and enjoining them from enforcing the 2024 Rule's minimum salary level.

b.  Issue permanent injunctive relief against Defendants enjoining them from enforcing the 2024 Rule,

c.  Declare that the 2024 Rule's minimum salary level violates the Administrative Procedure Act;

d.  Set aside the 2024 Rule's minimum salary level;

e.  Grant Plaintiffs an award of attorneys' fees and other litigation costs reasonably incurred in this action; and

f.  Grant Plaintiffs such other relief as the Court deems just and proper and as justice so

requires.

Date: June 3, 2024

Respectfully submitted.

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**RYAN D. WALTERS**
Chief, Special Litigation Division

*/s/ KATHLEEN HUNKER*

**KATHLEEN HUNKER**
Special Counsel
Tex. State Bar No. 24118415

**SUSANNA DOKUPIL**
Special Counsel
Tex. State Bar No. 24034419

**GARRETT GREENE**
Special Counsel
Tex. State Bar No. 24096217

**MUNERA AL-FUHAID**
Special Counsel
Tex. State Bar No. 24094501

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Ryan.Walters@oag.texas.gov
Munera.Al-fuhaid@oag.texas.gov
Susanna.Dokupil@oag.texas.gov
Kathleen.Hunker@oag.texas.gov

**COUNSEL FOR STATE OF TEXAS**