UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | |
| v. | § | CIVIL NO. 4:24-CV-499-SDJ |
| | § | |
| UNITED STATES DEPARTMENT | § | |
| OF LABOR, ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

The State of Texas challenges a rule issued by the United States Department of Labor (the "Department") that raises the minimum salary at which executive, administrative, and professional ("EAP") employees are exempt from overtime pay under the Fair Labor Standards Act ("FLSA")—thereby changing the exemption statuses of millions of employees. *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees, 89 Fed. Reg. 32842 (Apr. 26, 2024) (to be codified at 29 C.F.R. pt. 541) (the "2024 Rule").[1] Texas contends that the 2024 Rule's changes to the salary level for the EAP-employee exemption ("EAP Exemption") exceeds the Department's authority under the FLSA and is otherwise unlawful.

---

[1] Defendants include the Department; Julie A. Su, in her official capacity as Acting U.S. Secretary of Labor; the Wage and Hour Division of the Department; and Jessica Looman, in her official capacity as Administrator of the Wage and Hour Division. Defendants will be collectively referenced herein as the "Department."

The subject matter is familiar to the Court. In 2017, the Court permanently enjoined a similar Department regulation, the "2016 Rule,"[2] concluding that it increased the minimum salary for the EAP Exemption to a level that "essentially ma[de] an employee's duties, functions, or tasks irrelevant if the employee's salary f[ell] below the new minimum salary level," and unlawfully "ma[de] salary rather than an employee's duties" the determinative factor for the EAP Exemption. *Nevada v. U.S. Dep't of Lab.*, 275 F.Supp.3d 795, 806–07 (E.D. Tex. 2017) (Mazzant, J.) ("*Nevada II*").[3]

Before the Court is Texas's Motion for Temporary Restraining Order and/or Preliminary Injunction and/or to Postpone the Effective Date of the 2024 Rule ("Injunctive Relief Motion"). (Dkt. #2). Because the Court concludes that the 2024 Rule is likely unlawful and therefore Texas is likely to succeed on the merits, and Texas otherwise meets the requirements for a preliminary injunction, the motion will be granted.

## I. BACKGROUND

Enacted in 1938, the FLSA, 29 U.S.C. § 201 *et seq.*, generally requires covered employers to pay their employees at least the federal minimum wage for all hours worked and requires overtime pay to employees who work more than forty hours in a

---

[2] Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 81 Fed. Reg. 32391 (May 23, 2016) (the "2016 Rule").

[3] The Court first preliminarily enjoined the 2016 Rule, finding that it was likely unlawful and that the movants, a coalition of States, otherwise met the requirements for injunctive relief. *Nevada v. U.S. Dep't of Lab.*, 218 F.Supp.3d 520, 526–33 (E.D. Tex. 2016) (Mazzant, J.) ("*Nevada I*").

week. *Id.* § 206 (minimum wage); *id.* § 207 (overtime). Among a number of exemptions from minimum wage and/or overtime requirements, Congress created the EAP Exemption for "any employee employed in a bona fide executive, administrative, or professional capacity," as those "terms are defined and delimited" by agency regulations. *Id.* § 213(a)(1). There is no mention in the statute of any minimum salary for this exemption or, for that matter, of any compensation level associated with the EAP Exemption.

### A. The EAP Exemption from 1938–2004

Notwithstanding the fact that the FLSA's language providing for the EAP Exemption makes no mention of any minimum salary component or requirement, the Department has considered salary in some capacity since the FLSA's inception. In 1938, the Department's initial rule included a $30 per week minimum salary level for executive and administrative employees to be exempt from overtime requirements. 89 Fed. Reg. at 32844. In 1940, the Department amended the rule by implementing a three-part test to determine whether an employee falls within the EAP Exemption. Under the test, an employee is exempt from overtime requirements if: (1) his job duties primarily involve executive, administrative, or professional duties ("duties test"); (2) he is paid a predetermined and fixed salary ("salary-basis test"); and (3) his salary exceeds the minimum weekly amount set by the Department ("salary-level test"). 29 C.F.R. §§ 541.100 (executive), 541.200 (administrative), 541.300 (professional). This test is still in effect today.

Initially, the salary thresholds were deliberately set low by the Department, as they were designed to "screen[] out the obviously nonexempt employees." Harry

Weiss, *Report and Recommendations on Proposed Revisions of Regulations, Part 541*, 7–8 (1949) (the "Weiss Report"); *see also* Harold Stein, "*Executive, Administrative, Professional . . . Outside Salesman" Redefined* 21 (1940) (the "Stein Report") (noting that in some industries, the salary threshold "is an exceedin[g]ly small protection, indeed no protection at all"). As the Department noted, "[i]n an overwhelming majority of cases . . . personnel who did not meet the salary requirements would also not qualify under other sections of the regulations as the Divisions and the courts have interpreted them," i.e., the duties test. Weiss Report at 8. Thus, the Department's view was that, while the salary test, set at a sufficiently low level, could serve as a proxy for identifying workers who also would not meet the duties test, the Department could not adopt a test "based on salary alone." *Id.* at 23. Courts reached a similar conclusion, recognizing that, although salary information could be a "pertinent criterion" in "most cases," "a person might be a bona fide executive in the general acceptation of the phrase, *regardless of the amount of salary which he receives.*" *Walling v. Yeakley*, 140 F.2d 830, 832–33 (10th Cir. 1944) (emphasis added); *see also id.* at 832 (observing that, "[o]bviously, the most pertinent test for determining whether one is a bona fide executive is the duties which he performs").

In 1949, the Department developed a two-tiered structure in which employees could satisfy either a "long" test (combining a more rigorous duties test with a lower salary level) or a "short" test (combining a less rigorous duties test and a higher salary level). Defining and Delimiting the Terms "Any Employee Employed in a Bona Fide Executive, Administrative, Professional or Local Retailing Capacity, or in the

4

Capacity of Outside Salesman," 14 Fed. Reg. 7705, 7705–07 (Dec. 24, 1949). The Department retained the long and short duties tests for the next five decades, but it updated the applicable salary levels in 1958, 1963, 1970, and 1975.

The Department changed the test's structure in 2004 by discarding the long and short duties tests and replacing them with a single "standard" duties test—which was akin to the short duties test—and setting a single standard salary level at $455 per week ($23,660 annually). *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122, 22126 (Apr. 23, 2004) (the "2004 Rule"). According to the Department, the $455 standard salary level was "equivalent to the 20th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census Region (the South) and in the retail industry nationally." 89 Fed. Reg. at 32845. This new salary level was ostensibly "comparable to the lower long test salary level used in the two-test system (i.e., if the Department's long test salary level methodology had been applied to contemporaneous data)." *Id.*

## B. The 2016 Rule

In 2016, the Department again changed the rule. Relevant here, the 2016 Rule retained the single-test structure but (1) increased the salary level from $455 per week to $913 per week (or from $23,660 annually to $47,476 annually) and (2) implemented a mechanism to automatically update the salary level triennially. 81 Fed. Reg. at 32393, 32440. The new salary level of $913 represented a jump from the 20th percentile to the 40th percentile of weekly earnings of full-time salaried workers in the South. As the 2024 Rule notes,

5

The Department explained that the increase in the standard salary level was needed because, in moving from a two-test to a one-test system, the 2004 rule exempted lower-salaried employees performing large amounts of nonexempt work who had historically been, and should continue to be, covered by the overtime compensation requirement. Since the standard duties test was equivalent to the short duties test, the Department asserted that a salary level in the short test salary range— traditionally 130 to 180 percent of the long test salary level—was necessary to address this effect of the 2004 rule.

89 Fed. Reg. at 32863 (footnote omitted).

Twenty-one states and a multitude of business organizations challenged the 2016 Rule in this Court. Ruling for the challengers, the Court first preliminarily enjoined the 2016 Rule, finding that the challengers were likely to show that the Rule was unlawful and that they would be irreparably injured if the Rule went into effect. *Nevada I*, 218 F.Supp.3d at 526–33. The Court later granted summary judgment for the challengers and held that the 2016 Rule was invalid. *Nevada II*, 275 F.Supp.3d at 805–08.

The Court explained that "Congress defined the EAP [E]xemption with regard to duties. In other words, Congress unambiguously intended the exemption to apply to employees who perform 'bona fide executive, administrative, or professional capacity' duties." *Id.* at 805. The Court went on to hold that, contrary to the FLSA's plain text and Congressional intent, the 2016 Rule "ma[de] overtime status depend predominately on a minimum salary level, thereby supplanting an analysis of an employee's job duties." *Id.* at 806; *see also id.* at 807 ("By raising the salary level in this manner, the Department effectively eliminate[d] a consideration of whether an employee performs 'bona fide executive, administrative, or professional capacity' duties."). Because the Department was without power to displace the FLSA's duties-

6

based test with an exclusive or predominant salary-level test, the Court concluded that the 2016 Rule—including the automatic-update mechanism—was invalid. *Id.* at 807–08.

## C. The 2019 Rule

Three years later, the Department tried again, ultimately promulgating its 2019 Rule. *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 84 Fed. Reg. 51230 (Sept. 27, 2019) (the "2019 Rule"). The Department began by acknowledging the problems with its 2016 Rule, as identified and explained by this Court in *Nevada I* and *Nevada II*. Observing that it had "long used a salary level test as part of its method for defining and delimiting [the EAP Exemption]," the Department reaffirmed that the test should only be used to help identify and screen out "obviously nonexempt employees." *Id.* at 51237. The Department also recognized, "[a]n approach that emphasizes salary alone, irrespective of employee duties, would stand in significant tension with the [FLSA]." *Id.* The Department went on to explain why a "salary only" approach to the EAP Exemption runs afoul of the FLSA: "Section 13(a)(1) [of the enabling statute] directs the Department to define and delimit employees based on the 'capacity' in which they are employed. Salary is a helpful indicator of the capacity in which an employee is employed, especially among lower-paid employees. But it is not 'capacity' in and of itself." *Id.*

The Department then candidly admitted its errors in the 2016 Rule. It explained:

> By excluding from exemption, without regard to their duties, 4.2 million workers who would have otherwise been exempt because they passed the salary basis and duties tests established under the 2004 final rule, the 2016 final rule was in tension with the [FLSA] and with the Department's longstanding policy of setting a salary level that does not 'disqualify[] any substantial number of' bona fide executive, administrative, and professional employees from exemption.

*Id.* at 51238. The Department further conceded that "[a] salary level set that high does not further the purpose of the [FLSA], and is inconsistent with the salary level test's useful, but limited, role in defining the EAP exemption." *Id.*

The Department then "reexamined the 2016 final rule in light of [this Court's *Nevada I* and *Nevada II* decisions] and the salary level's historical purpose." *Id.* The Department explained that the *Nevada I* and *Nevada II* decisions "underscore[] that except at the relatively low levels of compensation where EAP employees are unlikely to be found, the salary level is not a substitute for an analysis of an employee's duties." *Id.* Instead, salary level is, "at most, an indicator of those duties." *Id.* The Department went on to conclude that, "[f]or most white collar, salaried employees, *the exemption should turn on an analysis of their actual functions, not their salaries, as Congress instructed*." *Id.* (emphasis added). "The salary level test's primary and modest purpose is to identify potentially exempt employees by screening out obviously nonexempt employees." *Id.*

Eschewing the 2016 Rule's dramatic changes to the EAP Exemption, the 2019 Rule retained the 2004 Rule's methodology for calculating the standard salary level, setting the salary level equal to the 20th percentile of weekly earnings of full-time salaried workers in the South based on contemporary data. This update raised the salary level from $455 per week to $684 per week (or from $23,660 annually to

$35,568 annually). Notably, unlike the 2016 Rule, the 2019 Rule did not include a mechanism to automatically increase the standard salary level.

The 2019 Rule has been challenged as an unlawful exercise of administrative power in *Mayfield v. United States Department of Labor*, No. 1:22-CV-792-RP, 2023 WL 6168251 (W.D. Tex. Sept. 20, 2023). The *Mayfield* plaintiffs argue that the Department's use of any salary component in defining and delimiting the terms of the EAP Exemption is unauthorized by the FLSA. Rejecting this argument, the *Mayfield* court upheld the 2019 Rule. The court first explained that the Fifth Circuit's controlling decision in *Wirtz v. Mississippi Publishers Corp.*, 364 F.2d 603 (5th Cir. 1966), established the Department's ability to use salary in promulgating rules concerning the EAP Exemption. *See Mayfield*, 2023 WL 6168251, at *3. The court further concluded that, even if *Wirtz* were not controlling, the Department's implementation of the salary test squared with the EAP Exemption's text. *See id.* at *4–6. The *Mayfield* decision is on appeal before the Fifth Circuit.

**D. The 2024 Rule and the Present Action**

The Department's 2024 Rule reflects a return to the unlawful approach it adopted in the 2016 Rule. The 2024 Rule makes three changes to the salary aspect of the test for the EAP Exemption, each of which Texas challenges as exceeding the Department's statutory authority. *First*, the 2024 Rule raises the salary level from $684 per week to $844 per week (or from $35,568 annually to $43,888 annually) starting on July 1, 2024. 89 Fed. Reg. at 32854. Like the 2004 and 2019 Rules, this change updates the salary level to the 20th percentile of weekly earnings of full-time salaried workers in the South and/or retail industry nationally based on

contemporary data. *Id.* at 32855. The Department anticipates "approximately 1 million employees" will become non-exempt—i.e., eligible for overtime pay—as a result of this change. *Id.* at 32843.

*Second*, the 2024 Rule raises the salary level from $844 per week to $1,128 per week (or from $43,888 annually to $58,656 annually) starting on January 1, 2025. *Id.* at 32971. This increase is due to a departure from the 2004 Rule's metric. Starting January 1, 2025, the salary level will be based off the 35th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census Region and/or retail industry nationally—not the 20th percentile, as it has been since 2004. *Id.* at 32842, 32845. The Department expects that this change will result in an additional three million people becoming non-exempt. *Id.* at 32843.

*Third*, like the 2016 Rule, the 2024 Rule implements a mechanism to automatically increase the salary level triennially based on contemporary earnings data. The first automatic change—which would not require Notice and Comment—will occur on July 1, 2027. *Id.* at 32971. The Department estimates that these automatic updates will result in millions more employees becoming non-exempt.[4] *Id.* at 32940.

Texas filed the present Injunctive Relief Motion to stop the 2024 Rule from going into effect. Texas asserts that it will be directly affected by the Rule, as it employs individuals who are currently exempt from overtime but who will become

---

[4] According to the Department, the salary increases will affect 4.3 million workers in Year 1; 4.1 million in Year 2; 3.8 million in Year 3; 4.8 million in Year 4; 4.6 million in Year 5; 4.3 million in Year 6; 5.4 million in Year 7; 5.1 million in Year 8; 4.8 million in Year 9; and 6 million in Year 10. 89 Fed. Reg. at 32940.

non-exempt due to the Rule's increases to the salary level. Texas requests that the Court preliminarily enjoin the Rule or postpone its effective date.

## II. LEGAL STANDARD

### A. Preliminary Injunction

A party seeking a preliminary injunction[5] must establish "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)).[6] The last two factors merge when the Government is the defendant. *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).

"A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008) (cleaned up).

### B. Standard of Review

Under the Supreme Court's decision in *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), for decades

---

[5] Since Defendants "received notice, made an appearance, and the issues have been fully briefed and argued by the parties," the Court need not address Texas's Motion for a Temporary Restraining Order. *Texas v. Becerra*, 577 F.Supp.3d 527, 537 (N.D. Tex. 2021).

[6] These factors also govern motions to stay pursuant to 5 U.S.C. § 705. *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 241–42 (5th Cir. 2023), *rev'd on other grounds*, 144 S.Ct. 1540 (2024).

courts have sometimes been required "to defer to 'permissible' agency interpretations of the statutes those agencies administer—even when a reviewing court reads the statute differently." *Loper Bright Enters. v. Raimondo*, 603 U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2024 WL 3208360, at *6 (June 28, 2024). Today, the Supreme Court did away with this requirement, holding that "*Chevron* is overruled." *Id.* at *22. The Court made clear that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* The exercise of such independent judgment, the Court explained, is rooted in the "solemn duty" imposed on courts under the Constitution to "say what the law is." *Id.* at *9 (citing *United States v. Dickson*, 15 Pet. 141, 162, 40 U.S. 141, 10 L.Ed. 689 (1841) (Story, J.); *Marbury v. Madison*, 1 Cranch 137, 177, 5 U.S. 137, 2 L.Ed. 60 (1803)); *see also id.* ("The Framers [] envisioned that the final 'interpretation of the laws' would be 'the proper and peculiar province of the courts.'") (quoting The Federalist No. 78, at 525 (J. Cooke ed. 1961) (A. Hamilton)).

The exercise of independent judicial judgment to decide legal questions, the Court observed, is also embodied in the Administrative Procedure Act ("APA"), which "directs that '[t]o the extent necessary to decision and when presented, [a] reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Loper Bright*, 2024 WL 3208360, at *12 (quoting 5 U.S.C. § 706). Likewise, under the APA, a reviewing court is required to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." *Id.*

(quoting § 706(2)(A)). "The APA thus codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment." *Id.*

The *Loper Bright* Court recognized that a statute may authorize an agency to exercise a degree of discretion, and "some statutes 'expressly delegate[]' to an agency the authority to give meaning to a particular statutory term." *Id.* at *13. The Court went on to instruct that, when a statute delegates discretionary authority to an agency, "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* at *14. Courts "fulfill[] that role by recognizing constitutional delegations, fix[ing] the boundaries of [the] delegated authority, and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Id.* (cleaned up). "By doing so, a court upholds the traditional conception of the judicial function that the APA adopts." *Id.*

In the analysis that follows, the Court carefully follows *Loper Bright*'s controlling guidance and the APA.

### III. TEXAS IS ENTITLED TO INJUNCTIVE RELIEF

#### A. Texas is Likely to Succeed on the Merits.

"To assess the likelihood of success on the merits, [courts] look to standards provided by the substantive law." *Janvey*, 647 F.3d at 596 (cleaned up). Relying on the APA, Texas argues that the Department's changes to the EAP Exemption in the 2024 Rule are "in excess of statutory jurisdiction" and are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (Dkt. #1 at 32–35)

(citing 5 U.S.C. § 706(2)(A), (C)); *see id.* § 706(2) (requiring courts to "hold unlawful and set aside" such agency actions).[7] At this stage, Texas need not prove that it will ultimately succeed on its claim. Instead, it need only establish that it is *likely* to succeed. *See Byrum*, 566 F.3d at 446 ("A plaintiff is not required to prove its entitlement to summary judgment in order to establish a substantial likelihood of success on the merits for preliminary injunction purposes." (cleaned up)).

As explained below, Texas has made the requisite showing that it is likely to succeed, and thus preliminary injunctive relief is appropriate.

### i. Statutory Construction

"Administrative agencies are creatures of statute." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117, 142 S.Ct. 661, 211 L.Ed.2d 448 (2022). Accordingly, they "must point to explicit Congressional authority justifying their decisions." *Inhance Techs., L.L.C. v. U.S. EPA*, 96 F.4th 888, 893 (5th Cir. 2024); *see also VanDerStok v. Garland*, 86 F.4th 179, 187 (5th Cir. 2023) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)). To determine whether a statute granted an agency the authority it claims, the Court looks to the statute's text. *VanDerStok*, 86 F.4th at 188 ("How do we know when an agency has exceeded its statutory authority? Simple: the plain language of the statute

---

[7] Texas has also asserted claims that the 2024 Rule is invalid and/or may not be applied to Texas under the major questions doctrine, the non-delegation doctrine, and the Tenth Amendment. *See* (Dkt. #1). The Injunctive Relief Motion is not premised on any of these theories, and therefore they are not considered herein.

tells us so."); *see also BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004) (explaining that statutory interpretation "begins with the statutory text, and ends there as well if the text is unambiguous").

The FLSA exempts from overtime requirements "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Congress chose not to define any of the operative terms—i.e., the terms "bona fide," "executive," "administrative," "professional," and "capacity." Instead, it delegated to the Secretary the authority to "define[] and delimit[]" those terms. *Id.* The current three-part test described above—which considers salary, method of payment, and duties—is the Secretary's definition and delimitation of the terms. The question before the Court is whether the text of the EAP Exemption authorizes the Secretary to increase the minimum salary level as the 2024 Rule would, changing the exemption statuses of millions of employees.

Courts construe undefined terms in accordance with their "ordinary meaning" at the time the statute was enacted. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566, 132 S.Ct. 1997, 182 L.Ed.2d 903 (2012). Dictionary definitions often serve to inform a term's ordinary meaning. *United States v. Radley*, 632 F.3d 177, 182–83 (5th Cir. 2011). An examination of the ordinary meaning of the EAP Exemption's undefined terms shows that the Exemption turns on an employee's functions and duties, requiring only that they fit one of the three listed, i.e., "executive," "administrative," or "professional capacity." The exemption does not turn on compensation.

To begin, at the time the FLSA was enacted, "capacity" was defined as "[o]utward condition or circumstances; relation; character; position; as in the *capacity* of a mason or carpenter." Webster's New Int'l Dictionary 396 (2d ed. 1934).[8] The ordinary meaning of this term suggests a functional inquiry into the nature of an employee's duties within his workplace and industry, rather than his compensation. The Supreme Court's analysis of the same term, albeit in the context of another FLSA exemption, supports the Court's view of the ordinary meaning of "capacity" in the EAP Exemption. Construing the FLSA's outside-salesman exemption, the Court observed as follows concerning the term "capacity:" "[t]he statute's emphasis on the 'capacity' of the employee counsels in favor of a functional, rather than a formal, inquiry, one that views an employee's responsibilities in the context of the particular industry in which the employee works." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 161, 132 S.Ct. 2156, 183 L.Ed.2d 153 (2012). In short, the term "capacity" looks to an employee's role in their workplace and industry.

The words "executive," "administrative," and "professional" are consistent with the function-based inquiry required by the EAP Exemption's use of the term "capacity." As this Court previously explained, each of those words focuses on "a person's performance, conduct, or function." *Nevada II*, 275 F.Supp.3d at 804. One contemporary dictionary defined the term "executive" to mean "[d]esigned or fitted for, or pert[aining] to, execution, or carrying into effect," or as "[e]ffectual, active, or

---

[8] *See also* 2 The Oxford Eng. Dictionary 89 (1933) (defining "capacity" as "holding power. . . . [A] position which enables, or renders capable. . . . Position, condition, character, relation.").

16

skillful in execution." Webster's New Int'l Dictionary 892 (2d ed. 1934).[9]
"Administrative" was defined as "[o]f or pertaining to administration, esp[ecially]
management; executive." Webster's New Int'l Dictionary 34 (2d ed. 1934).[10] And
"professional" was defined as "[o]f or pertaining to a profession, esp[ecially] a learned
or skilled profession," or as "[c]haracteristic of or conforming to the technical or
ethical standards of a profession or an occupation regarded as such." Webster's New
Int'l Dictionary 1976 (2d ed. 1934).[11]

The plain meaning of these terms makes clear that the proper inquiry into
whether someone works in an executive, administrative, or professional capacity
must turn on that person's function and duties. Each definition describes tasks or
conduct—e.g., "carrying into effect," "management," "conforming to the technical . . .
standards," and likewise focuses on the nature of a person's "performance,"
"learning," and "skills," among other, similar attributes. Glaringly absent from these
definitions is any mention of salary. Put simply, in the EAP Exemption, "Congress

---

[9] *See also* 3 The Oxford Eng. Dictionary 395 (1933) (defining "executive" as one
"[c]apable of performance; operative . . . Active in execution, energetic. . . . Apt or skillful in
execution. . . . Pertaining to execution; having the function of executing or carrying into
practical effect").

[10] *See also* 1 The Oxford Eng. Dictionary 118 (1933) (defining "administrative" as
"[p]ertaining to, dealing with, the conduct or management of affairs; executive. . . . Of the
nature of stewardship, or delegated authority. . . . An administrative body; company of men
entrusted with management").

[11] *See also* 8 The Oxford Eng. Dictionary 1428 (1933) (defining "professional" as a
person "[e]ngaged in one of the learned or skilled professions, or in a calling considered
socially superior to a trade or handicraft. . . . That follows an occupation as his (or her)
profession, life work, or means of livelihood. . . . That is trained and skilled in the theoretic
or scientific parts of a trade or occupation. . . . that raises his trade to the dignity of a learned
profession").

elected to exempt employees based on the capacity in which they are employed. It's their duties and not their dollars that really matter." *Hewitt v. Helix Energy Sols. Grp., Inc.*, 15 F.4th 289, 315 (5th Cir. 2021) (en banc) (Jones, J., dissenting).[12]

Finally, as this Court previously explained, "[t]he fact that 'bona fide' modifies the terms executive, administrative, and professional capacity suggests the exemption should apply to those employees who, in good faith, perform actual executive, administrative, or professional capacity duties." *Nevada II*, 275 F.Supp.3d at 805. As with its construction of the other EAP Exemption terms, the Court's reasoning was premised on the ordinary meaning of "bona fide" when the FLSA was enacted. *Id*. at 804–05 (noting that "bona fide" was defined to mean "[i]n good faith, with sincerity; genuinely") (quoting 1 The Oxford Eng. Dictionary 980 (1933)).[13]

The "bona fide" requirement is part of a phrase in the EAP Exemption, "'employee *employed in* a bona fide . . . capacity,' [that] emphasizes a focus on the employee's actual duties," rather than the employee's compensation. *Hewitt*, 15 F.4th at 314 (Jones, J., dissenting). Consistent with this understanding, Fifth Circuit cases have often characterized the EAP Exemption "as applying to those 'working in' a bona fide executive, administrative or professional capacity when describing the statute." *Id*. at 314 n.20 (citing *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326,

---

[12] The majority opinion did not address the salary-level test under the EAP Exemption. Instead, it only considered whether an employee was a "highly compensated employee" when he was not paid on a "salary basis," as the regulation requires. *Hewitt*, 15 F.4th at 293.

[13] *See also* Webster's New Int'l Dictionary 305 (2d ed. 1934) (defining "bona fide" as "[i]n or with good faith; without fraud or deceit; genuine").

331–33 (5th Cir. 2000) (recognizing the exemption applies to employees "*working in a bona fide executive, administrative or professional capacity*" (emphasis added))); *Faludi v. U.S. Shale Sols., L.L.C.*, 950 F.3d 269, 273 (5th Cir. 2020) (same); *Cowart v. Ingalls Shipbuilding, Inc.*, 213 F.3d 261, 266 (5th Cir. 2000) (same). Thus, the "bona fide" requirement points to Congress's intent that the EAP Exemption apply only to employees who genuinely perform EAP "tasks" in their employment and to deny the Exemption to employees who merely enjoy a lofty job title without commensurate EAP duties.[14]

*   *   *

The plain text of the EAP Exemption allows the Department to define and delimit[15] the Exemption's operative terms, all of which concern an employee's duties—not his salary. Since the ordinary meaning of the EAP Exemption focuses

---

[14] Fifth Circuit precedent reflects a similar construction regarding the seaman exemption, which applies to "any employee *employed as* a seaman." 29 U.S.C. § 213(b)(6) (emphasis added); *see, e.g.*, *Dole v. Petroleum Treaters, Inc.*, 876 F.2d 518, 523 (5th Cir. 1989) (recognizing that the "italicized words mean something" and are not "mere tautology"; instead they "warn us to look to what the employees do" rather than "rest on a matter of a name, or the place of their work" (quoting *Walling v. W.D. Haden Co.*, 153 F.2d 196, 199 (5th Cir. 1946)).

[15] While the Secretary has "broad latitude to 'define and delimit'" the EAP Exemption, *Wirtz*, 364 F.2d at 608, the definition and delimitation cannot be at odds with the text. *See Inhance Techs.*, 96 F.4th at 893 (explaining that agencies "must point to explicit Congressional authority justifying their decisions"); *see also Nat'l Pork Producers Council v. U.S. EPA*, 635 F.3d 738, 753 (5th Cir. 2011) ("[C]ourts are not obliged to stand aside and rubberstamp their affirmance of administrative decisions that they deem inconsistent with the statutory mandate or that frustrate the congressional policy underlying a statute. . . . [A]n agency's authority is limited to what has been authorized by Congress." (cleaned up)).

19

solely on duties, any rule implementing the EAP Exemption—including the 2024 Rule—must likewise center on duties.[16]

### ii. The 2024 Rule's Salary Changes Likely Fall Outside of Congress's Grant of Authority.

Texas is likely to succeed on its claim that the 2024 Rule's changes to the minimum salary level contravene the plain text of the EAP Exemption and that the 2024 Rule therefore impermissibly exceeds the Department's authority to define and delimit the EAP Exemption.

As explained herein, *see supra* Part III.A.i, the EAP Exemption mandates that "any employee employed in a bona fide executive, administrative, or professional capacity" be exempted from the overtime requirements. 29 U.S.C. § 213(a)(1). This language turns on consideration of an employee's duties, not her salary. In this regard, the Court notes that the Fifth Circuit has concluded that the Department's creation of a salary-level component falls within the bounds of the EAP Exemption's statutory text when appropriately set. *See Wirtz*, 364 F.2d at 608 (rejecting the argument that "the minimum salary requirement is not a justifiable regulation under [the FLSA]," and concluding the then-applicable salary threshold was not "arbitrary

---

[16] It's worth noting that judicial concern about the Department's creation of a salary component to determine the application of the EAP Exemption is not new. To the contrary, courts were wary of the Department's use of a salary-based test from the veritable get-go. As one court observed not long after the introduction of the salary test, although salary information could be a "pertinent criterion" in "most cases," "a person might be a bona fide executive in the general acceptation of the phrase, *regardless of the amount of salary which he receives.*" *Yeakley*, 140 F.2d at 832–33 (emphasis added); *see also id.* at 832 (observing that, "[o]bviously, the most pertinent test for determining whether one is a bona fide executive is the duties which he performs"). Then, as now, courts recognized that the duties test is the predominant consideration, and that the Exemption may apply to any number of employees "regardless of the amount of salary" that they receive. *Id.*

or capricious"). But, as this Court concluded in *Nevada II*, *Wirtz*'s approval of the Department's salary thresholds that were in effect over fifty years ago[17] cannot be extended to bless *any and all* salary thresholds adopted by the Department. *See Nevada II*, 275 F.Supp.3d at 805 & n.5. Indeed, the Department itself has recognized that, notwithstanding *Wirtz*, it has no authority to adopt a "salary only" test for the EAP Exemption. Specifically, the Department has stated that, "[a]n approach that emphasizes salary alone, irrespective of employee duties, would stand in significant tension with the [FLSA]." 84 Fed. Reg. at 51237. Tension indeed. By any measure, a salary requirement that effectively displaces the only EAP Exemption test authorized by statutory text, i.e., the duties test, flatly contravenes the Department's authority under the FLSA.

Which brings the Court to the substance of the 2024 Rule. As the New York Yankees' (inarguably) best catcher is reported to have said, this is "déjà vu all over again." *United States v. Lee*, 966 F.3d 310, 323 (5th Cir. 2020) (quoting Yogi Berra). In its 2024 Rule, the Department once again seeks to implement sweeping changes to the EAP Exemption's regulatory framework, designed on their face to effectively displace the FLSA's duties test with a predominant, if not exclusive, salary-level test.[18] On July 1, the 2024 Rule will increase the salary level from $684 per week to

---

[17] At that time, the relevant salary level was $100 per week.

[18] The Department's response to the injunctive relief motion focuses primarily on the July 1 change, explaining that it is "not addressing the merits" of the January 1 change or the triennial update mechanism because those changes can be "comprehensively addressed through summary-judgment briefing." (Dkt. #22 at 30). However, as explained below, *see*

$844 per week.[19] 89 Fed. Reg. at 32971. Further, where the 2016 Rule attempted to dramatically raise the salary threshold level for the EAP Exemption from the 20th percentile to the 40th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census region (the South) and/or in the retail industry nationally, the 2024 Rule similarly raises the salary threshold level from the 20th percentile to the 35th percentile on January 1. *Id.* Likewise, imitating the 2016 Rule, the 2024 Rule puts in place a mechanism that automatically updates the minimum salary requirements to even higher levels every three years. *Id.* at 32973. According to the Department, in the first year that the 2024 Rule is effective, more than four million employees all over the country will lose their exempt status. *See id.* at 32901, Table 4. In succeeding years, millions more employees will lose their exempt status. *See id.*; *id.* at 32940.

Thus, when the 2024 Rule goes into effect, the Department calculates that one million exempt employees will wake up on July 1 non-exempt—i.e., entitled to overtime pay. *Id.* at 32843. On January 1, the same thing will happen to another three million employees. *Id.* Then, on July 1, 2027, and every three years thereafter, millions more employees will have their statuses changed. Nothing about these employees' jobs will have changed. Their duties and salaries will be identical both before and after the increases. Rather, the only changes determining their statuses

---

*infra* Part IV.B, all aspects of the 2024 Rule are ripe for review. The Court thus considers all relevant changes in this discussion.

[19] Although the Department attempts to distinguish the July 1 change because it accords with the Department's prior practice, the fact remains that one million employees will become non-exempt on account of this salary change alone.

and making them non-exempt will be increases to the minimum salary level in the Acting Secretary's definition and delimitation of the EAP Exemption.[20]

If this sounds like something the Department itself has already admitted cannot be reconciled with the FLSA's text or the Department's own "longstanding policy," that's because it is. Winding our time machine back just a few years, here is what the Department said in 2019 about similar, dramatic changes regarding salary thresholds it attempted to implement in the 2016 Rule that this Court invalidated:

> By excluding from exemption, without regard to their duties, 4.2 million workers who would have otherwise been exempt because they passed the salary basis and duties tests established under the 2004 final rule, the 2016 final rule was in tension with the [FLSA] and with the Department's longstanding policy of setting a salary level that does not disqualify[] any substantial number of bona fide executive, administrative, and professional employees from exemption.

84 Fed. Reg. at 51238 (cleaned up). The Department further conceded that "[a] salary level set that high does not further the purpose of the [FLSA], and is inconsistent with the salary level test's useful, but limited, role in defining the EAP exemption." *Id.*[21] The Department has also previously acknowledged that it has no "specific

---

[20] In direct contravention of the FLSA's requirement that duties be the primary (if not sole) consideration, the Department acknowledges that the 2024 Rule will mean that "firms will no longer be required to apply the duties test to the 8.7 million employees earning above the current standard salary level of $684 and less than the new standard salary level of $1,128." 89 Fed. Reg. at 32910.

[21] Although the 2016 Rule set the salary level at the 40th percentile of weekly earnings of full-time salaried workers in the South and/or in the retail industry nationally, and this Rule retains the 20th percentile metric for the July 1 change and increases the metric to the 35th percentile for the January 1 change, the fact remains that millions of employees' statuses will be changed due to the increases to salary level alone. Thus, even though these increases are not as "high" as those in the 2016 Rule, the rationale for finding these changes unlawful remains the same: status cannot turn on salary. Period.

Congressional authorization" to implement an "automatic updating" mechanism, or for that matter "a salary level or salary basis test." 81 Fed. Reg. at 32431.

The Department was right when it reached these conclusions about the limits of its authority.[22] And while the Acting Secretary may have had a profound change of heart since then, the Court hasn't. The application of a salary threshold for the EAP Exemption only comports with the Department's authority under the FLSA, if at all, to the extent such threshold serves as a plausible proxy for the categories of employees otherwise exempted by the duties test. To understand why this is so, one need only look to the FLSA's unambiguous text. Congress created the EAP Exemption for "*any employee* employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1) (emphasis added). It is axiomatic that courts give meaning to every word in a statute and that we understand Congress to "mean what it says." *Loughrin v. United States*, 573 U.S. 351, 358, 134 S.Ct. 2384, 189 L.Ed.2d 411 (2014) (explaining that it is a "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute" (cleaned up)); *see also Simmons v. Himmelreich*, 578 U.S. 621, 627, 136 S.Ct. 1843, 195 L.Ed.2d 106 (2016) ("[W]e presume Congress says what it means and means what it says.").

The EAP Exemption says "any employee" who meets the duties test is entitled to the Exemption—not "most" employees who meet the duties test (plus a salary

---

[22] Notably, in the 2019 Rule, the Department acknowledged that the 2016 Rule was at odds with the FLSA's purpose because "it would have newly disqualified 4.2 million workers from exemption simply because of their salaries, regardless of their duties." 84 Fed. Reg. at 51241. The 2024 Rule would disqualify millions more based on their salaries alone. *See supra* note 3.

threshold) or "some" employees who meet the test (plus a salary threshold). And as the Court has already explained, *see supra* Part III.A.i, the terms and phrasing of the FLSA-authorized duties test make clear it has nothing to do with compensation, only the tasks, duties, and functions of the employee. That means a Department-invented test, untethered to the text of the FLSA, that systematically deprives employees of the EAP Exemption when they otherwise meet the FLSA's duties test, is necessarily unlawful.[23]

That's precisely the concern with the 2024 Rule. The Court concludes that the 2024 Rule likely is not based on a permissible construction of Section 213(a)(1). As was true of the 2016 Rule, the salary level thresholds imposed under the 2024 Rule "effectively eliminate" consideration of whether an employee performs "bona fide executive, administrative, or professional capacity" duties in favor of what amounts to a salary-only test. *See Nevada II*, 275 F.Supp.3d at 807. And, as this Court previously held, "[n]othing in Section 213(a)(1) allows the Department to make salary rather than an employee's duties determinative of whether a 'bona fide executive, administrative, or professional capacity' employee should be exempt from overtime

---

[23] In the 2024 Rule, the Department acknowledges that, "[i]nevitably, any attempt to pair a single salary level with the current duties test will result in some employees who perform substantial amounts of nonexempt work being exempt, and some employees who perform almost exclusively exempt work being nonexempt. But such a result is inherent in setting any salary level." 89 Fed. Reg. at 32870. This reasoning is in tension with the Department's concessions that any salary test must be limited to a "modest" role as compared to the statutorily-authorized duties test, 84 Fed. Reg. at 51238, serving only as a proxy to "screen[] out the obviously nonexempt employees," Weiss Report at 8. The salary-level test's inherent under- and over-inclusion of employees who perform EAP duties heightens the Court's concern that the test is at odds with the EAP Exemption's mandate that "*any employee*" who works in an EAP capacity must be exempt from overtime. 29 U.S.C. § 213(a)(1) (emphasis added).

pay." *Id.* at 807. In sum, since the EAP Exemption requires that exemption status turn on duties—not salary—and the 2024 Rule's changes make salary predominate over duties for millions of employees, the changes exceed the authority delegated by Congress to define and delimit the relevant terms. Therefore, these changes to the minimum salary level are likely "in excess of statutory jurisdiction." 5 U.S.C. § 706(2)(C).[24]

## B. The 2024 Rule Will Irreparably Harm Texas.

The Court next considers whether Texas will suffer irreparable harm absent an injunction. "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey*, 647 F.3d at 600. Texas, as an employer of employees who would become non-exempt if the 2024 Rule goes into effect, asserts that it will have to (1) raise its employees' salaries, (2) pay one-and-a-half times the employees' rates for any time worked over forty hours, or (3) prohibit the employees from working over forty hours in a week.

Although the first two injuries are economic, they still are likely unrecoverable, as "federal agencies generally enjoy sovereign immunity for any monetary damages." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). For this reason, "complying with [an agency order] later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance

---

[24] Texas also argues that the 2024 Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of Section 706(2)(A) of the APA. However, the Court need not address that argument herein, as the Court's conclusion that the Department likely exceeded its authority is sufficient to warrant preliminary injunctive relief.

costs." *Id.* (quoting *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)). Thus, if the 2024

Rule is not enjoined now but is set aside at a later juncture, Texas will likely be unable

to recover any of the costs that it should not have incurred in the first place. This

includes both the increased wages it would be forced to pay to newly non-exempt

employees, as well as the administrative costs of actually implementing the Rule

statewide.

The Department acknowledges that implementation of the Rule will impose

significant costs. As explained in the 2024 Rule,

> Based on the economic impact analysis of this final rule, the Department
> determined that Year 1 costs for state and local governments would total
> $197.7 million, of which $98.9 million are direct employer costs and
> $98.8 million are payroll increases. In subsequent years, state and local
> governments may experience payroll increases of as much as $183.7
> million (in year 10 of the rule).

89 Fed. Reg. at 32968–69. Notably, the "direct employer costs" include "[r]egulatory

familiarization,"[25] "[a]djustment," and "[m]anagerial"[26] costs. *Id.* at 32969. At least

some of these costs would be incurred by Texas. *See* (Dkt. #31-1) (declaration of Texas

agent stating that eighty-eight employees would be impacted by the Rule on July 1

---

[25] As to familiarization costs, the Department admits that it "assumes that all entities
will incur some regulatory familiarization costs, even if they do not employ exempt workers,
because all entities will need to confirm whether this rulemaking affects their employees."
89 Fed. Reg. at 32908.

[26] The 2024 Rule specifically contemplates "ongoing managerial costs because the
employer may spend more time developing work schedules and closely monitoring an
employee's hours to minimize or avoid paying that employee overtime. For example, the
manager of a newly nonexempt worker may have to assess whether the marginal benefit of
scheduling the worker for more than 40 hours exceeds the marginal cost of paying the
overtime premium." 89 Fed. Reg. at 32910. This admission conflicts with the Department's
contention that the "wage growth update does not require any employer to raise any
employee's salary or to prohibit any employee from working overtime hours." (Dkt. #22 at 20).

and nearly 4,000 employees will be impacted on January 1); *see also* (Dkt. #31-1 ¶ 8) ("[T]he fiscal impact of the increased salaries required to maintain the state employees at their hourly exempt status may require the affected agencies to rebalance their biennium budget requests between the additional personnel costs and away from programs and services. . . . [T]here is no guarantee that the new non-exempt positions will be funded. Should the rule go into effect . . . it will have a significant economic impact on the agencies that provide health services, legal services, criminal justice, transportation, and protect the environmental quality in our State and its citizens.").

The third injury—loss of labor—is likewise irreparable. Prohibiting employees from working over forty hours in a week deprives Texas of the benefit of the additional labor those employees otherwise would have performed. Future monetary relief (presuming Texas would be able to recover such relief) is an inadequate substitute for services that need to be performed today.

The Department counters that only eighty-eight of Texas's employees will become non-exempt on July 1, and that any compliance costs would be de minimis. As to Texas's effected employees, the Court notes that the Department does not contest that at least some of Texas's employees would become non-exempt on July 1 if the Rule goes into effect—meaning that Texas would be required to pay them overtime for any hours they work over forty. The Department's Rule forces Texas to pay its effected employees time-and-a-half for their overtime, increase their salaries to the minimum salary level to return them to non-exempt status, or forbid them from

28

working more than forty hours in a week. This certainly accounts for at least a portion (however small) of the $98.8 million in payroll increases the Department anticipates.

Nor is the Court persuaded by the Department's assertion that Texas's compliance costs will be "de minimis," particularly given the Department's estimate that such costs will amount to $98.9 million for state and local governments in the *first year* of the Rule's implementation. Although it is unclear precisely what portion of this nearly $100 million bill Texas must pay, the Department could not seriously contend that Texas will incur *no* expenses—or even de minimis expenses—as a result of the Rule, particularly given that Texas is the second largest government employer among the States.[27] And so long as a plaintiff shows that it is likely to suffer more than de minimis harm, "it is not so much the magnitude but the irreparability that counts." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (cleaned up). In this regard, based on the record before the Court at this time, including the Department's analysis and estimates of the 2024 Rule's impact, it appears that the Rule will compel Texas to expend unrecoverable taxpayer dollars or forego unrecoverable labor, as well as impose unrecoverable "[r]egulatory familiarization," "[a]djustment," and "[m]anagerial" costs. 89 Fed. Reg. at 32969. As the Fifth Circuit has explained, unrecoverable harm is irreparable harm. *See Janvey*, 647 F.3d at 600. Texas has thus met the irreparable-harm prong of the preliminary injunction analysis.

---

[27] *See* U.S. Census Bureau, *2023 Annual Survey of Public Employment and Payroll (ASPEP): State Government Employment & Payroll Data* column C (2023), https://www.census.gov/programs-surveys/apes/data/datasetstables/2023.html.

## C. The Balance of Equities and the Public Interest Favor Texas.

The final preliminary injunction considerations—the balance of equities and the public interest—also weigh in favor of enjoining the 2024 Rule. As the Supreme Court has explained, "[t]hese factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. When balancing the equities, the Court "looks to the relative harm to both parties if the injunction is granted or denied." *Nuziard v. Minority Bus. Dev. Agency*, —— F.Supp.3d ——, No. 4:23-CV-00278-P, 2024 WL 965299, at *45 (N.D. Tex. Mar. 5, 2024) (citing *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 460 (5th Cir. 2016)). And when evaluating public interests, the Court must be particularly mindful of the public consequences of an injunction. *Id.* at *46.

As explained above, Texas has shown that the 2024 Rule is likely an unlawful exercise of agency power. And the "public interest is in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021) (cleaned up). In other words, "there is generally no public interest in the perpetuation of unlawful agency action." *Id.* at 560 (cleaned up).

On the other hand, the Department argues that the public interest and the balance of equities favor denying injunctive relief and letting the 2024 Rule go into effect. It contends that the increase to the salary level will "return overtime protections to many low-wage employees who gained those protections under the 2019 EAP Rule, only to lose them as wages grew approximately 23% in the intervening five years." (Dkt. #22 at 32). But this admission serves only to underscore that the 2024 Rule is designed to operate as a salary-only test for the EAP Exemption,

30

which is precisely the reason the Court suspects the Rule to be unlawful. Again, the public interest is not served by the implementation of a rule that is likely unlawful.

Finally, the Court expects that this case will be resolved in a matter of months through summary-judgment practice. Thus, if the 2024 Rule is ultimately determined to be lawful, then a preliminary injunction will only delay the effective date of the Rule for a short time. Such a limited delay does not alter the balance of equities, which otherwise favors the entry of a preliminary injunction.

\*       \*       \*

In sum, Texas has established that all factors weigh in favor of granting a preliminary injunction. Texas is likely to succeed in showing that the 2024 Rule is an unlawful exercise of power, Texas will be irreparably harmed absent an injunction, and the balance of equities and the public interest favor preventing unlawful agency action.

## IV. SCOPE OF RELIEF

### A. Geographic Limits

Having concluded that Texas has sufficiently established the four requirements for injunctive relief, the Court now must consider the proper scope of such relief. The Court is guided by general principles of equity that apply when fashioning preliminary relief. Typically, such relief should not be "'more burdensome to the defendant than necessary to [redress]' the plaintiff's injuries." *Labrador v. Poe*, ––– U.S. –––, 144 S.Ct. 921, 923, ––– L.Ed.2d ––– (2024) (Gorsuch, J., concurring) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)); *see also Gill v. Whitford*, 585 U.S. 48, 68, 138 S.Ct. 1916, 201 L.Ed.2d 313

(2018) ("[A] remedy must . . . be limited to the inadequacy that produced the injury in fact that the plaintiff has established." (cleaned up)). Because the Court is granting relief based on Texas's likelihood of success on its APA claim, the Court is also guided by 5 U.S.C. § 705, which states that the Court "may," under certain "conditions[,] . . . and to the extent necessary to prevent irreparable injury, . . . issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." Section 705 provides the Court with substantial discretion to fashion a preliminary remedy appropriate to the circumstances of each case. It neither requires nor prohibits relief that is nationwide in scope.[28]

Here, the only party before the Court is the State of Texas, in its capacity as an employer, suing to prevent the 2024 Rule from going into effect.[29] Texas has put

---

[28] Fifth Circuit precedent supports the Court's authority to enter universal relief postponing the effective date of the 2024 Rule under Section 705. *See, e.g.*, *Braidwood Mgmt., Inc. v. Becerra*, —— F.4th ——, 2024 WL 3079340, at *13–14 (5th Cir. June 21, 2024) (explaining that vacatur under Section 706 is the "default remedy for unlawful agency action," and that Section 706 has "nationwide effect, is not party-restricted, and affects persons in all judicial districts equally" (cleaned up)); *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (explaining that "the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action"). However, the Court does not read this precedent to mean that it *must* enter universal relief any time it finds a regulation likely violates the APA. Indeed, the plain language of Section 705 indicates wide discretion to enter tailored relief. *See* 5 U.S.C. § 705 (emphasizing the authority of reviewing courts to use differing tools, including but not limited to the postponement of the effective date of an agency action, as may be necessary "to prevent irreparable injury").

[29] A second case challenging the 2024 Rule is also before this Court: *Plano Chamber of Commerce v. United States Department of Labor*, Cause No. 4:24-CV-468 (E.D. Tex.). The plaintiffs in that case, a coalition of Texas and national trade associations and businesses, have not moved for preliminary injunctive relief.

on evidence of its own injuries as an employer, but has not otherwise offered any evidence of injuries to other entities or individuals. Under the circumstances, a preliminary injunction focused on Texas comports with the procedural posture of the case and the record before the Court, and will preserve Texas's rights while fully insulating it from harm. *See Braidwood Mgmt.*, 2024 WL 3079340, at *16–17 (affirming district court's judgment insofar as it enjoined the defendants from enforcing the preventive-care mandates against the plaintiffs it found had standing and reversing its entry of universal remedial relief); *Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) (affirming district court's entry of preliminary injunction as to fourteen plaintiff states and reversing as to entry of nationwide preliminary injunction). Moreover, limiting injunctive relief to Texas is not "unwieldy," nor will it cause confusion "for geographic reasons," since it is limited to a single employer, the State of Texas, that has identified employees who would be affected by the 2024 Rule on July 1. *Braidwood Mgmt.*, 2024 WL 3079340 at *16 (finding party-restricted injunction to be appropriate where all plaintiffs resided in two neighboring counties). For these reasons, relief tailored to avoiding irreparable injury to Texas, and maintaining the status quo as to Texas, is appropriate.

## B. Substantive Limits

The Department argues that any injunctive relief should only address the July 1 salary increase, as the other changes—the January 1 increase and the automatic updating mechanism—will not go into effect until after the Court could consider the merits on motions for summary judgment. Essentially, the Department argues that

the January 1 increase and the automatic updating mechanism changes are not ripe for consideration. The Court disagrees.

"A challenge to administrative regulations is fit for review if (1) the questions presented are 'purely legal one[s],' (2) the challenged regulations constitute 'final agency action,' and (3) further factual development would not 'significantly advance [the court's] ability to deal with the legal issues presented.'" *Texas v. United States*, 497 F.3d 491, 498–99 (5th Cir. 2007) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2002)). Here, the only questions are legal ones—specifically, whether the Department's changes to the EAP Exemption rule comport with the statute, or whether the Department is without authority to make such changes. The regulations also constitute final agency action, "as they are final rules that were promulgated through a formal, notice-and-comment rulemaking process after announcement in the *Federal Register*." *Id.* at 499. Although some provisions of the Rule will not go into effect for some time, the Rule itself has all the characteristics of a final agency action. Finally, no further factual development is needed to adjudicate this case.

Since the 2024 Rule is ripe for review, the Court finds it appropriate to enjoin all provisions of the 2024 Rule that are likely to be held unlawful—specifically, the changes to the salary-level component of the EAP Exemption rule. Notwithstanding the Department's argument that the Court will likely reach a decision on the merits before January 1, the fact remains that Texas has shown that these provisions are likely unlawful and that Texas will be irreparably harmed if they go into effect.

Therefore, those provisions should be preliminarily enjoined until the Court can issue a merits decision.

## V. CONCLUSION

It is therefore **ORDERED** that Texas's Motion for Preliminary Injunction, (Dkt. #2), is **GRANTED**. Defendants are hereby **RESTRAINED** and **ENJOINED** from implementing and enforcing against the State of Texas, as an employer, the following provisions: (1) the July 1, 2024, salary level change, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees, 89 Fed. Reg. 32842, 32971 (Apr. 26, 2024) (to be codified at 29 C.F.R. § 541.600(a)(1)); (2) the January 1, 2025, salary level change, *id.* (to be codified at 29 C.F.R. § 541.600(a)(2)); and (3) the automatic triennial salary level change mechanism, *id.* at 32971, 32973 (to be codified at 29 C.F.R. §§ 541.600(a)(3), 541.607(b)(1)), pending further order of the Court.

The Court has considered the issue of security pursuant to Rule 65(c) of the Federal Rules of Civil Procedure and determines that Defendants will not suffer any financial loss that warrants the need for Texas to post security. The Fifth Circuit has held that a district court has the discretion to "require no security at all." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). After considering the facts and circumstances of this case, the Court finds that security is unnecessary and exercises its discretion not to require the posting of security here.

**So ORDERED and SIGNED this 28th day of June, 2024.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE