# EXHIBIT 1

## DECLARATION OF CHIRAG SHAH

I, CHIRAG SHAH, declare as follows:

1.      I am over the age of 18 and competent to make this declaration.

**2.**      I am the Executive Vice President of Federal and Political Affairs & Counsel of the American Hotel and Lodging Association (AHLA). AHLA is the leading voice representing every segment of the hotel industry including major chains, independent hotels, management companies, REITs, bed and breakfasts, industry partners, and more. AHLA represents a dynamic hotel industry in all 50 states and the District of Columbia, which consists of more than 64,000 properties, 33,000 of which are small businesses, that generate over $83 billion in tax revenue at the local, state, and federal levels. The lodging industry is vital to the nation's economic health, supporting nearly 8.3 million jobs, equivalent to 1 in 25 jobs in the country, and generating $300 billion in annual sales from 5.6 million guest rooms across the United States.

3.      AHLA represents the interests of its members in regulatory matters relating to employment and participates in strategic litigation such as the present suit challenging the U.S. Department of Labor's 2024 Overtime Rule.

4.      The statements in this declaration are true and within my personal knowledge and/or my review of AHLA's records.

5.      When the 2024 Rule was first proposed, AHLA surveyed its membership as to the impact the proposed Rule would have on their operations. 90% of AHLA's surveyed members expressed concerns about anticipated increases to labor costs (encompassing payroll, federal and state unemployment taxes, insurance, and 401(k) contributions), with 70% anticipating reclassifying workers, 60% anticipating reducing hours and career development opportunities to reduce potential overtime costs, and 51% anticipating position consolidation. AHLA's surveyed

members also expressed concerns about the forced reclassifications of workers (67% of surveyed members) and staffing changes (66%) that would ensue, and many members also worry about anticipated resulting staff turnover (43%), lower job satisfaction (44%), and loss of employee benefits (32%) that would accompany such an update to the salary threshold.

6.     According to DOL's own data, as of January 1, 2025, the EAP threshold in the 2024 Overtime Rule will exceed the 2023 median annual wage for first-line supervisors of housekeeping and janitorial workers (defined as those who "directly supervise and coordinate work activities of cleaning personnel in hotels, hospitals, offices, and other establishments") by more than $12,000. *See* DOL Bureau of Labor Statistics Occupational Handbook, available at: https://www.bls.gov/ooh/about/data-for-occupations-not-covered-in-detail.htm#371011.

7.     Thousands of AHLA's members that employ workers in Texas and across the United States who were exempt prior to July 1, 2024, but are now non-exempt solely because of the 2024 Overtime Rule's July 1, 2024 increase in the EAP salary threshold, or will lose their exempt status as of January 1, 2025 because of the Rule's scheduled increase in the EAP salary threshold.

8.     With respect to those workers whose exempt status will be impacted by the 2024 Rule, AHLA's member companies must either increase these workers' salaries or reclassify them as non-exempt under the FLSA. As non-exempt employees, the company would then to either (a) pay these workers overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit these worker's hours to no more than forty hours per week and thus forego their services. Once paid, AHLA's member companies have no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

9.     In addition, AHLA members have expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers, and determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. AHLA members will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule. Reclassification of AHLA members' employees as non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

10.     AHLA again surveyed its membership as to the impact of the final 2024 Overtime Rule on their employees. Of those surveyed, almost half of AHLA's membership responded that 25-100% of their employees will be impacted by the 2024 Overtime Rule.

11.     AHLA surveyed its membership as to the impact of the final 2024 Overtime Rule on their employees. When asked what challenges they foresee in implementing this rule, close to 70% of respondents stated that they expect increased payroll costs, and salary increases to maintain exempt status. Over half of respondents stated that they expect this rule will force changes in the way tasks and operations are staffed.

12.     AHLA surveyed its membership as to the impact of the final 2024 Overtime Rule on their employees. Over 80% of respondents stated that they believe the three year automatic updates would harm their business operations.

13.     One AHLA member directly harmed by the 2024 Rule—one of many such examples—is Fairbrook Hotels. The harms Fairbrook Hotels has suffered and will continue to suffer as a result of the 2024 Overtime Rule are set forth in the declaration of Vinay Patel,

CEO/President, Fairbrook Hotels. Mr. Patel's Declaration is attached to this declaration as Exhibit A.

14.     During the rulemaking on the 2024 Overtime Rule, AHLA submitted comments detailing its concerns, and the concerns of its members, with the then-proposed Rule. A copy of these comments is attached to this Declaration as Exhibit B.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED on this 18th day of July, 2024.


_____    7/18/2024
     CHIRAG SHAH

# EXHIBIT A

## DECLARATION OF VINAY PATEL

I, Vinay Patel, declare as follows:

      1.      I am over the age of 18 and competent to make this declaration.

      2.      I am the President/CEO of Fairbrook Hotels, which is in the business of owning and operating midscale hotels in the Mid-Atlantic area outside of Washington DC.

      3.      The statements in this declaration are true and within my personal knowledge and/or my review of  Fairbrook Hotel's records.

      4.      Fairbrook Hotels is currently a member of AHLA (American Hotel and Lodging Association).

      5.      Fairbrook Hotels is an employer subject to the Fair Labor Standards Act, and the rule entitled "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees," 89 Fed. Reg. 32842, which was published by the U.S. Department of Labor ("DOL" or "the Department") on April 24, 2024 ("the 2024 Overtime Rule").

      6.      Fairbrook Hotels employs approximately 35 workers who were exempt under the FLSA prior to July 1, 2024, insofar as they primarily performed executive, administrative, and/or professional duties; were paid on a salary basis; and who earned at least $684 per week ($35,558 per year). Many of these employees routinely worked more than forty hours in a given workweek.

      7.      The 2024 Overtime Rule increases the EAP exemption to $1,128 per week ($58,656 per year) as of January 1, 2025.

      8.      Fairbrook Hotels employs approximately 35 workers are exempt under the FLSA insofar as the primarily perform executive, administrative, and/or professional duties; are paid on a salary basis; and earn at least $684 per week ($35,558 per year but less than $1,128 per week

($58,656 per year). Many of these employees routinely work more than forty hours in a given workweek.

9.      As of January 1, 2025, with respect to these workers, Fairbrook Hotels must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, Fairbrook Hotels will then have to either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and forego their services. Again, once paid, Fairbrook Hotels has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

10.     In addition, Fairbrook Hotels has expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers and determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. Fairbrook Hotels will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule.

11.     Reclassification of Fairbrook Hotels employees as non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED on this 15th day of July 2024.

_____
Vinay Patel

# EXHIBIT B



November 7, 2023

Jessica Looman
Principal Deputy Administrator
Wage and Hour Division
U.S. Department of Labor
Room S-3502
200 Constitution Avenue NW
Washington, DC 20210

Re:     Proposed Rulemaking, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees, 29 CFR Part 541 (RIN: 1235-AA39)

Dear Ms. Looman:

The American Hotel & Lodging Association ("AHLA") submits these comments in opposition to the above-referenced Notice of Proposed Rulemaking ("Proposed Rule") published in the Federal Register on September 8, 2023. The proposed increase in exemption salary thresholds, as well as the proposed automatic future increases, would create significant hardships for employers across the country both in the hospitality industry and generally. The effects of the recent pandemic underscore the need to conduct thorough analyses and make circumstantial decisions about salary thresholds, rather than relying on a pre-determined schedule that functions on autopilot as the Department of Labor ("Department") proposes. The Proposed Rule would adversely affect the community of employees it seeks to benefit. For these and the reasons that follow, AHLA urges the Department to abandon the Proposed Rule.

AHLA has served the hospitality industry for over 110 years and is the sole national association representing all segments of the U.S. lodging industry, including hotel owners, REITs, chains, franchisees, management companies, independent properties, state hotel associations, bed and breakfasts, and industry suppliers. Headquartered in Washington, D.C., AHLA focuses on advocacy, communications support, and workforce development programs for an industry that advances long-term career opportunities for employees, invests in local communities across the country, and hosts more than one billion guests in American hotels every year. AHLA proudly represents a dynamic hotel industry of more than 62,000 properties, 33,000 of which are small businesses, that generate nearly $75 billion in tax revenue at the local, state, and federal levels. The lodging industry is vital to the nation's economic health, supporting nearly 8.3 million jobs, equivalent to 1 in 25 jobs in the country, and generating $300 billion in annual sales from 5.6 million guest rooms across the United States.

The Fair Labor Standards Act ("FLSA") requires that employers pay employees at least a minimum hourly wage set by statute and an "overtime" rate of one and one-half times an employee's regular rate of pay for any hours the employee works over forty in a workweek. The FLSA exempts from the overtime pay requirements certain classes of employees, including those



working in a "bona fide executive, administrative and professional" capacity ("EAP") "as such terms are defined and delimited from time to time by regulations" issued by the Department. Under the current regulations the EAP exemption applies to employees who: (1) are paid on a salaried basis; (2) are paid at or above the minimum salary threshold of $684/week ($35,568 annually); and (3) have primary duties of executive, professional or administrative positions. *See* 29 C.F.R. Part 541.

Through the Proposed Rule, the Department is currently proposing to update the EAP exemption test by increasing the minimum salary level to $1,059[1] per week ($55,068 annually) from $684 ($35,568) by adopting a different methodology than that which it has followed since 2004 when adjusting the salary level thresholds. Specifically, the new methodology proposes to utilize data from the 35th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census Region (currently, the South) (hereinafter, "35th Percentile"), rather than the 20th percentile. The Department is also proposing to update the Highly Compensated Employee ("HCE") test by increasing that threshold from $107,432 to $143,988 per year, which is the 85th percentile of full-time salaried workers nationally (hereinafter, "85th Percentile"). Finally, the Proposed Rule would establish an automatic updating mechanism for the standard salary level and the HCE total annual compensation requirement,[2] which update would occur triennially.

AHLA supports the Department's decision to not make any changes to the duties test at this time. AHLA also supports the continued inclusion of incentive compensation toward each salary threshold. However, AHLA has concerns with the following provisions, which comprise most of the proposed rule: 1) the proposed level for the standard salary test; 2) the proposed level for the HCE test; and 3) the proposal to automatically update salary thresholds every three years barring unforeseen economic or other circumstances.

**Proposed Minimum Salary Threshold and Methodology**

AHLA and its members firmly disagree with the Department that the salary threshold is due for another increase, or that a new methodology is needed to set that increase. As the Department is aware, the agency last increased the salary threshold less than four years ago. The existing threshold remains appropriate as a factor in distinguishing exempt from nonexempt employees, and adequately meets the needs of its stakeholders. Additionally, as AHLA expressed in its comments in response to the proposed changes to the EAP exemptions in 2015 as well as its response to the 2018 RFI, methods which result in higher thresholds would be damaging to businesses and employees in both the hotel and lodging industry and the U.S. economy as a whole (for more details see both comments at Exhibits A and B, respectively). The Department should refrain from turning a time of economic uncertainty into an opportunity to fix what is not broken.

The Department's proposal to increase the salary threshold departs from the methodology the agency has followed for the entire 85-year history of the FLSA. Until now, the Department has based the minimum salary threshold on the bottom *20th percentile* of the salaried population in

---

[1] The Department has cautioned that the final number may be significantly higher since it will be based off of then current wage data.

[2] AHLA does not address the special salary levels for American Samoa and the motion picture industry in this comment.

73540613;1



the lowest-wage geographic area of the country and industry in the economy (which, since 2004, have been the South and the retail industry, respectively). This approach recognizes that too high a threshold would have significant negative consequences on businesses, nonprofits, governments and employees in lower-wage regions and industries, particularly given the significant differences in wages and costs of living, and costs of doing business, between geographic regions and industries.

The proposed methodology would prevent many employees who meet the duties test from qualifying for the EAP exemptions. This conflicts with the original and long-standing objective of the salary threshold, which is to screen out those employees whose pay is so low that they obviously would not qualify as executives, administrative or professional employees in any region, census division, state, or metropolitan statistical area.

In theory and in practice, setting the minimum salary threshold at the bottom 35th Percentile would have a disproportionate and significant negative impact on the hotel and lodging industry, an industry in which profit margins are slim and salaries for front-line managers and supervisors are often below the new salary threshold requirement. The Department's own estimates also reflect that the salary level increase would potentially affect a disproportionately high number of EAP workers in the leisure and hospitality industry in year one alone as compared with all affected workers. As demonstrated by Table 25 of the Proposed Rule, the leisure and hospitality industry would encompass 21.1% of total potentially affected workers, second only to agriculture, forestry and fishing (22.1%).

By way of example, and of particular concern to the hospitality industry, the salary threshold at the proposed methodology would be well above both the average and median national wages for first-line housekeeping supervisors for the first time ever.[3] In fact, the new salary threshold would be at the *75th percentile* of compensation for these supervisors. Therefore, even after clearly meeting the duties test that would otherwise qualify them for exemption from overtime pay requirements, all but 25% of first line housekeeping supervisors across the country would nevertheless have to be designated as non-exempt employees purely based on the increased salary threshold. Exhibit C.

The Department's proposal to drastically increase the salary threshold would leave the hospitality industry with costs it may be unable to absorb. It would likely force hospitality businesses across the country to reclassify at least 35% of the workforce from salaried to hourly, eliminate middle management positions, cut workers' hours, consolidate jobs, and create considerable upward pressure across the entire party scale that will be particularly detrimental to small businesses. Employers in the hospitality industry would need to pass the increased labor costs on to hotel guests, or reduce their workforces, or both. COVID-19 related layoffs have already caused the industry's employment to drop by 217,000 employees compared to pre-pandemic levels.

---

[3] BLS Code 37-1011, defined as those who "directly supervise and coordinate work activities of cleaning personnel in hotels, hospitals, offices, and other establishments."



AHLA member feedback demonstrates the severity of such a change: 90% of AHLA's surveyed members expressed concerns about anticipated increases to labor costs (encompassing payroll, federal and state unemployment taxes, insurance, and 401(k) contributions), with 70% anticipating reclassifying workers, 60% anticipating reducing hours and career development opportunities to reduce potential overtime costs, and 51% anticipating position consolidation. AHLA's surveyed members also expressed concerns about the forced reclassifications of workers (67% of surveyed members) and staffing changes (66%) that would ensue, and many members also worry about anticipated resulting staff turnover (43%), lower job satisfaction (44%), and loss of employee benefits (32%) that would accompany such an update to the salary threshold.

Moreover, updating the methodology as proposed exceeds the Department's statutory authority because it would put unprecedented weight on employees' salaries to the exclusion of their duties. Increasing the threshold to the 35th Percentile would effectively render the duties test of Section 213(a)(1) irrelevant and categorically exclude from exemption many managers who perform "bona fide executive, administrative, or professional" duties, based on salary level alone. In invalidating the 2016 Final Rule which sought to raise the threshold to the 40th percentile of weekly earnings of full-time salaried workers in the lowest wage region of the country, the Court in *Nevada v. U.S. Department of Labor* expressly held that an executive agency rule such as this that shifts outsized weight on the salary test is beyond the scope of the Department's authority.[4] The proposal to effectively confer overtime eligibility based on salary level alone to a substantial amount of employees who would otherwise be exempt is beyond the Department's authority.

Finally, the proposed updated salary test would not give effect to Congress' unambiguous intent to screen out nonexempt employees. Over the years, the methodology has produced a minimum salary level that is intentionally low. The salary level is solely intended to be a floor under which no employee may be found to be exempt from overtime pay obligations. The Department has acknowledged that in using this methodology, "[a]ny new figure recommended should also be somewhere near the lower end of the range of prevailing salaries for these employees."[5] The Department's proposal to amend that threshold to the 35th Percentile is objectively not the low end of the salary range as that has been understood since 2004, and it would encompass an inflated proportion of employees performing EAP duties. In the hospitality industry alone, this figure could cover 75% or more of individuals in lower-wage states— effectively converting the salary level from a floor into a ceiling. Exhibit C.

AHLA maintains that an increase in the EAP salary threshold is not necessary at this time.  As to any future increases, the Department should utilize the traditionally applied methodology. For example, increasing the EAP salary threshold now would raise it to $822 per week based on current wage data, an increase well below the Department's proposal. Utilizing the traditional methodology for any future increase would account for the increased living, food, and travel costs that Americans have shouldered in recent years. If and when the standard salary threshold requires a revision, the current methodology serves the intended purpose.

---

[4] *See Nevada v. U.S. Department of Labor,* 275 F.Supp.3d 795, 806 (E.D. Tex. 2017).
[5] *Id.*, citing Harry Weiss, *Report and Recommendations on Proposed Revisions of Regulations, Part 541*, at 11–12 (1949).



**Highly Compensated Exemption Threshold and Methodology**

AHLA is similarly concerned with the Department's proposal to increase the HCE threshold, and disagrees that a change to the methodology used to determine that threshold is warranted. AHLA believes that the current methodology and ensuing threshold accurately encompasses all eligible individuals within all geographic regions.

The Department's 2004 Final Rule included a Highly Compensated Employee (HCE) test, the purpose of which was to accurately determine exempt status by pairing a reduced duties requirement with a higher compensation level. That compensation level started at $100,000 and remained there until 2019. Although the $100,000 figure exceeded the annual earnings of approximately 93.7% of salaried workers at the time when initially promulgated, and it appears to have been selected arbitrarily, this figure remained the benchmark for fifteen years until the 2019 Final Rule. The 2019 Final Rule revised the methodology for the HCE test to the 80th percentile of full-time salaried worker earnings nationwide, resulting in a HCE threshold of $107,432 per year. In the current proposal the Department would increase the HCE threshold to the 85th Percentile, which amounts to $143,988 in 2022 dollars.[6]

AHLA believes the current $107,432 threshold continues to serve the purpose of the HCE test and does not require adjustment now. The proposed increase would significantly limit the use of the HCE exemption for employers in low-wage regions and industries, and impose burdens on employers who will need to perform duties tests to determine the exemption status of swaths of high-level, highly paid employees in the hospitality and lodging industry.

There is no need to raise this salary threshold at this time. If in the future the Department decides to increase the HCE threshold, it should do so using the same methodology as it used in the 2019 Final Rule, which would benefit employees without overburdening employers. This would amount to $125,268 annual compensation using current figures.[7] [8] In the alternative, any increase to the HCE threshold should employ a methodology consistent with that used for the increase in the EAP salary level, and which uses the same reference population. In other words, for any future increases, the Department should revise the HCE level methodology using compensation levels for salaried workers *in the lowest wage Census region* (the South) instead of nationally. Such a method would both account for inflation and help ensure lower wage regions and industries are not disproportionately and negatively impacted as they compete for business and talent.

**Automatic Updates to the Salary Threshold**

AHLA is supportive of the Department's intent to effectuate more regular updates to the salary thresholds in accordance the FLSA's requirement that DOL update the terms "executive, administrative and professional employee" from "time to time" through a regulatory process governed by the Administrative Procedure Act (APA). From 1940-1975, the Department fulfilled this obligation updating these terms and the salary threshold on average every 7 years by notice

---

[6] In the invalidated 2016 Final Rule, the Department articulated a different methodology to set the HCE threshold at the 90th percentile of full-time salaried workers generally ($134,004 in 2016).
[7] Figure taken from Proposed Rule, pages 29, 89, and 207-208.
[8] The Department notes in the Proposed Rule that a salary increase would use figures that are current at the time of publishing a Final Rule.

73540613;1



and comment regulation. AHLA believes the Department should continue with this flexible approach, which both complies with the FLSA and allows the Department to account for economic circumstance by holding off updates, as the Obama Administration did in 2016. At that time, the Administration waited to propose changes to the 2004 regulation so as not to exacerbate the ongoing economic instability caused by the 2008 financial crisis.

The Department's current proposed rule, in contrast, would impose frequent automatic updates, without any accompanying analysis or opportunity for public comment. This approach violates both the FLSA and Section 553(c) of the APA. Moreover, DOL's proposal is simply unwise policy— particularly in light of economic events in the last two decades, such as the 2008 financial crisis, the COVID-19 pandemic, and subsequent inflation. In each of these circumstances, updates would have exacerbated the economic turmoil. Moreover, the automatic updates will place undue burden on employers generally and specifically in the hotel and lodging industry. AHLA estimates that by 2030 such an automatic updating mechanism would result in a substantially inflated EAP threshold of $78,408, which is more than double the current threshold.

AHLA finds particularly problematic that such an automatic updating mechanism would effectively take away the opportunity for the public to comment via the formal notice and comment process. No changes to the EAP or HCE tests should be made without first giving the public notice of potential changes, guaranteeing interested stakeholders a chance to share with the Department how those changes will impact them, and providing employers with sufficient time to understand and implement those changes. The opportunity for notice and comment will help ensure that the knowledge, expertise, and vital input of interested stakeholders will be considered before moving forward with increases. The proposal to automatically update the salary thresholds without a preceding opportunity for the public to comment is drastic and troublesome.

While the Department proposes a public comment period within the automatic updating mechanism, such proposal is insufficient to allay these concerns because a notice and comment period would only be allowed when an automatic update is paused due to the Department proposing to either change the salary level methodology and/or change the automatic updating mechanism. The Department provides no notice and comment period concerning the regularly automated updates it proposes to take place in three-year increments.

Further, the Department lacks the authority to establish regular, automatic intervals for updating the salary thresholds. The Department acknowledged this fact in 2004, when it explained that "nothing in the legislative or regulatory history … would support indexing or automatic increases."[9] In addition, the FLSA specifically mandates the Department to define and delimit the terms "bona fide executive, administrative and professional" "from *time to time* by regulations." Nothing in the unambiguous language confers authority upon the Department to implement automatic updates for the salary thresholds. Indeed, automatic salary threshold updates were included as part of the 2016 Final Rule, which was struck down as an invalid overreach of the Department's authority. Automatic updates to the salary thresholds would abolish the ordinary rulemaking process and constitute an abuse of the Department's statutory discretion to define and

---

[9] 69 FR 22121.

73540613;1



delimit the exemptions. There is no precedent or authority for the Department to abdicate its role by building in an automatic updating mechanism to change salary levels every three years.

AHLA firmly believes that the Proposed Rule is too inflexible. The hospitality industry and economy as a whole are still recovering from the impacts of the pandemic and the economic uncertainty that accompanied it, and the current economy is very vulnerable due to persistent high inflation, supply chain disruptions, and workforce shortages. The Department will inevitably face many situations where an automatically-scheduled update is not economically viable or wise due to existing market conditions. The Department's proposal to inject such rigidity into a dynamic and ever-adapting economy is an unwise exercise likely to trigger the unintended consequences of uncertainty and instability for businesses and workers, which will only contribute to greater uncertainty across the economy.

Furthermore, the economy and labor markets are generally characterized by regular fluctuations even without extraordinary stressors like a pandemic. The Department should understand the need for flexibility and avoid adopting a rubric too rigid to adapt to shifting and unpredictable economic conditions. Indeed, the Department declined to adopt automatic updating in the 2019 Final Rule because it "believe[d] that it is important to preserve the Department's flexibility to adapt to different types of circumstances."[10] It should follow suit here.

The Department tries to address the inflexibility issue by proposing a pause mechanism that allows it to temporarily delay a scheduled automatic update "where unforeseen economic or other conditions warrant." AHLA commends the Department for acknowledging that unforeseen circumstances may impact salary thresholds. However, the pause mechanism fails to provide the flexibility necessary to combat general economic and COVID-19-exacerbated concerns because the Department only proposes a 120-day pause and fails to define what constitutes an "unforeseen economic or other conditions." Such a rigidly brief pause, available under only vague circumstances, would leave AHLA and the rest of the Proposed Rule's stakeholders with more questions than answers, and sacrifice the certainty and stability[11] the Department seeks.

Notwithstanding the potential for widespread economic uncertainty that would render such automatic updates unwise or impractical, regular increases within that short timeframe will also pose a major economic and administrative burden on employers. An automatic updating mechanism in the Final Rule, particularly one where employers would not know the actual amount of the increase until just a few months before it automatically goes into effect, would increase administrative costs and create uncertainty in financial modeling and planning. It is a time-consuming, resource-intensive, and costly process for employers in the hospitality industry and generally to undertake such frequent reviews of employee classifications based on the frequent changes to the tests. With each such review, changes to compensation rates, benefits packages, training opportunities, and the overall organizational structure of the employer's operations must take place, in addition to adjustments to timekeeping and recordkeeping requirements for reclassified workers. An employer must also communicate all changes to affected employees. This

---

[10] 84 FR 51252.
[11] *See* Proposed Rule, pages 31, 119, and 225.



process should not be imposed on employers in such short intervals. In fact, 83.6% of surveyed AHLA members anticipate harm to their business operations if automatic updates remain part of the Final Rule. AHLA therefore believes that increases should not occur more than from time to time as significant changes to the economy occur, and no more frequently than every five years. This approach would be consistent with historical precedent. Indeed, the Department acknowledged in its 2015 Proposed Rule that, historically, the shortest period of time between salary level increases was five years.[12]

AHLA urges the Department not to pursue the proposed automatic update. In line with historical precedent, AHLA strongly believes that the public must be provided an opportunity for comment *before* the implementation, particularly given the magnitude of any future increases in salary thresholds. It would be imprudent to strip employers of their rights to be heard as to the economic, administrative, and intangible impacts of a salary threshold increase, and it would likewise do an injustice to the employees who could be negatively impacted by future increases.

**Implementation Timeline**

The Department has proposed requiring employers to comply with the new threshold within 60 days of government publication of a final rule. AHLA believes this is an unreasonable time frame for implementation, particularly given the magnitude of the increase. We recommend instead that DOL provide at least one year for implementation for any future rulemaking related to the overtime threshold. In a recent member survey, 81% of respondents said they expected significant challenges in complying with the new rule within 60 days and 72% said they would need a year or more to comply. While the 2019 Final Rule provided only 90 days for compliance, that rule followed DOL's failed attempt to increase the threshold in 2016. As such, employers had already prepared for a significant change and had three years to envision and plan for necessary changes.

**Conclusion**

The Proposed Rule would hurt the community of employees that it seeks to benefit by making it prohibitively expensive for employers to comply, which would result in layoffs of current employees, labor shortages for employers who cannot afford to retain their current workforce, and increased litigation. AHLA urges the Department to abandon this proposal and affirm the current salary thresholds and manual updates to those thresholds as established under the 2019 Final Rule.

Thank you for the opportunity to comment on this Proposed Rule. AHLA looks forward to working with you on this issue moving forward.

Sincerely,

Chirag Shah
Executive Vice President, Federal and Political Affairs & Counsel
American Hotel & Lodging Association

---

[12] 80 FR 38515.

# EXHIBIT A



September 4, 2015


Mary Ziegler, Director
Division of Regulations, Legislation and Interpretation
Wage and Hour Division
U.S. Department of Labor
200 Constitution Avenue, N.W., Room S-3502
Washington, DC  20210

Re:    Comments on Proposed Rulemaking Regarding the Exemptions for Executive,
       Administrative, Professional, Outside Sales, and Computer Employees (80 Fed. Reg.
       38,515, July 6, 2015), RIN: 1235-AA11

Dear Ms. Ziegler:

The American Hotel & Lodging Association ("AH&LA") submits these comments in response
to the above referenced Notice of Proposed Rulemaking ("Proposed Rule") published in the
Federal Register on July 6, 2015.  Serving the hospitality industry for more than a century,
AH&LA is the sole national association representing all segments of the 1.8 million-employee
U.S. lodging industry, including hotel owners, REITs, chains, franchisees, management
companies, independent properties, state hotel associations, and industry suppliers.  The lodging
industry is vital to this nation's economic health, generating $155.5 billion in annual sales from
4.9 million guest rooms.

AH&LA supports the Department of Labor's ("DOL's") stated aim of simplifying the tests for
defining exempt employees.  AH&LA believes that simplification and greater clarity regarding
the contours of the tests benefit both employers and employees by allowing them to more easily
determine whether an employee qualifies as exempt.  AH&LA also specifically supports DOL's
suggestion that incentive income counts in determining whether an employee received the
minimum salary level required to establish exemption status under 29 C.F.R. Part 541.

Nonetheless, AH&LA does have concerns regarding some of the potential changes set forth in
the Proposed Rule.  While the lodging industry supports a fair and equitable working
environment for both employees and employers, it is concerned that DOL's proposal raises the
salary threshold for the white collar exemptions too high, too fast.  The majority of jobs offered
in the lodging industry already have starting wages above the minimum wage and employers
have the flexibility to set salary parameters that foster a strong team environment, which allow
for good benefits, higher pay, and workable schedules.  Meddling in this employer-employee
balance will increase business costs and create instability.

American Hotel & Lodging Association
September 4, 2015
Page 2

As an industry that fosters long-term career opportunities for its employees, with good jobs and benefits, the lodging industry believes that if the proposed changes become final, they will greatly interfere with day-to-day business practices and restrict employee and employer flexibility. As a result, this will create unintended consequences that will ultimately harm the very employees that the rule purports to help. For example, the proposed changes will hinder the industry's ability to continue to grow and create jobs and will stymie the career advancement for many employees.

The lodging industry employs people from all walks of life: the working parent who needs a flexible schedule to pick up a child from daycare, the student who is taking night classes to receive an advanced degree or the aspiring actor who works two jobs to make ends meet. The lodging industry attracts those searching to achieve the American Dream, a dream so often realized in our industry, whether it's the front desk agent or dishwasher who easily works their way up the ladder to earn a position in management, running a property or even a chain in just a matter of years. AH&LA has grave concerns that the jobs of these hardworking employees will be devalued and opportunities lost if the changes in the Proposed Rule become final.

For these reasons, and many others, this letter addresses aspects of the Proposed Rule for which AH&LA's members have specific comments or concerns.

**I.      DOL's Proposed Salary Level Is Too High And Will Cause Significant Harm To Employees, Employers And The Economy As A Whole**

AH&LA strongly opposes DOL's proposal to more than double the minimum salary level needed to qualify as exempt. This drastic increase in the salary level is unnecessary and will have severe consequences for many employees and employers in the lodging industry. In light of the negative effect the proposed changes will have on the lodging industry and, in turn, the nation's economic health, AH&LA urges DOL to reconsider its proposal.

**A.      DOL's proposed methodology for determining the salary level is arbitrary and lacks transparency.**

AH&LA submits that DOL's proposal to set the minimum salary level based on the 40th percentile of all full-time salaried employees is arbitrary, lacks transparency, and is lacking in foundation. As such, AH&LA urges DOL to utilize the methodology it used in 2004 in setting the standard salary level for exempt employees.

There is no historic precedent for DOL's 40th-percentile approach. It is a completely arbitrary percentage threshold that was chosen because DOL believes that a certain number of employees should be entitled to overtime. *See* 80 Fed. Reg. 38,529 ("The proposed increase in the standard salary level would increase the number of overtime-eligible white collar salaried employees who meet the duties test and earn less than the proposed salary level to approximately 25 percent.").

American Hotel & Lodging Association
September 4, 2015
Page 3

In addition to being arbitrary, past precedent reflects that the 40th percentile is too high a level. For example, the Kantor Report from 1958 noted that the objective of setting a salary level to reflect exemption status would be met if set at points near the lower end (10%) of the current range of salaries for those in the lowest wage regions, smallest-sized establishment group, smallest-sized city group, or lowest-wage industries using data that DOL had collected at that time.  DOL utilized this approach to set the level in 1958.  *See* 80 Fed. Reg. 38,525.  And in 2004, DOL used Current Population Survey data that included most salaried workers and set the level at the bottom 20th percentile of the salaried population in the South and the retail industry. Both of these approaches recognized that there are significant geographic and industry-specific differences such that a "one size fits all" approach set too high could have significant consequences on lower-wage geographic areas and in lower-wage industries.  That is why, historically, such approaches were used and why AH&LA believes that the 2004 methodology should continue to be used.

DOL's main explanation for proposing to use the 40th percentile, and declining to use the 2004 methodology, is that the 2004 methodology did not account for the elimination of the long test and DOL needs to correct for a "mismatch."  *See* 80 Fed. Reg. 38529.  But the 2004 DOL rule did provide for the elimination of the long test; the threshold from the 1958 Kantor percentage approach rose from 10% to 20% under the 2004 approach.

AH&LA also requests that DOL refrain from adopting the methodology of using the 40th percentile of all full-time salaried employees to determine further increases in the salary threshold.  Using this methodology will lead to exponential increases in the salary needed to qualify as exempt.  For example, if the Final Rule sets the minimum salary level needed to qualify as $50,440, AH&LA anticipates there will be relatively few salaried employees making less than this amount going forward.  Consequently, the next time an increase occurs (automatic or otherwise), if DOL uses the 40th percentile of full-time salaried employees to set the new level, it will be significantly higher than $50,440, because the initial increase of $50,440 for the base salary level will now serve as the "floor" of those full-time salaried workers examined to determine the increase.

Given these deficiencies, AH&LA urges DOL to abandon its proposed methodology and to instead adopt the methodology it used in 2004 when setting the appropriate salary level for exemption status.

> **B.      DOL's 2004 methodology better accounts for regional difference in the economy and would cause less economic harm to businesses.**

As discussed above, AH&LA believes that the proposed salary threshold of $50,440 in 2016 does not properly consider the impact that this salary level would have on businesses in low cost of living areas of the country.  It is not necessary nor does it make business sense to require the same minimum salary level for an exempt hotel manager in New York City as for a manager in rural Georgia.  Indeed, the United States Government recognizes that wages for similar jobs

American Hotel & Lodging Association
September 4, 2015
Page 4

differ across the country and accounts for these differences in setting the General Schedule pay rates based on location.  In contrast with the methodology DOL used in 2004, DOL's proposed methodology does not sufficiently account for these differences, and as a result will unfairly raise labor costs in rural and other areas of the country where the cost of living is low.

Setting a minimum standard salary level at $50,440 will not only be devastating to lodging operations in areas with a low cost of living, but also to thousands of small businesses that operate hotels and motels.  Many small businesses in this industry operate under very low margins and cannot afford additional labor costs.  They lack the pricing power to raise their prices without a loss in sales and do not have the scale to spread costs over a large infrastructure.  As a result, they will be forced to cut back staff and/or raise rates.  Consequently, AH&LA implores DOL to consider the consequences that the proposed salary increase will have on small businesses and the communities they serve.[1]  In light of the impact on small businesses and businesses operating in low-cost areas of the country, AH&LA believes that the methodology DOL used in 2004 should again be adopted by DOL because it better accounts for regional differences and would cause less economic harm to these businesses than the proposed 40th percentile methodology.

     **C.**     **The proposed increase in the salary level will have negative consequences on employee compensation, status, benefits, and career opportunities.**

DOL's proposal to set the minimum salary level at $50,440 will simply be too high a level for the lodging industry to bear without severe repercussions for employees as well.  For example, one hotel management company that operates over 30 hotels in multiple states estimates that 90% of its managers have base salaries below the proposed threshold.  Other hotels indicate that at least half of all managers will be affected as a result of the salary level increase if it becomes final.  That means significant adjustments will have to be made to absorb costs.

A number of AH&LA members have noted that in order to offset the increased labor costs that will result if the proposed changes become final, they will look to increase automation and off-shoring of back-office positions.  For example, employers in this industry will look to more self-service options such as at check-in and check-out.  This will result in a number of employees losing their jobs.

It is possible that some businesses in the lodging industry will try to pass on some of the increased costs to consumers, but raising prices to cover the artificially increased labor costs will result in a loss of sales and, in turn, a loss of jobs.  In particular, as discussed above, these

---

[1] Even DOL acknowledges that setting a minimum salary level too high may prevent employers from properly classifying even senior managers as exempt.  *See* 80 Fed. Reg. 38,516 at 38,532 (using too high a percentile of nationwide salary "could have a negative impact on the ability of employers in low-wage regions and industries to claim the EAP exemptions for employees who have bona fide executive, administrative, or professional duties as their primary duty").

American Hotel & Lodging Association
September 4, 2015
Page 5

increased costs will be particularly hard for small businesses.  Accordingly, employers in the lodging industry, both large and small, will respond to the increased costs imposed by new regulations mirroring the Proposed Rule by cutting the wages, benefits and hours of their employees.

Some AH&LA members will undoubtedly increase the compensation level of certain managers and other employees in order to keep them properly classified as exempt.  To keep labor costs neutral, however, these members have informed AH&LA that they plan on reducing the incentive compensation these employees receive.[2]

The majority of the AH&LA members who have provided feedback on the Proposed Rule stated that they will respond to the increased salary level by reclassifying employees to non-exempt status.  In the lodging industry it is simply not realistic for an exempt employee's salary to go from $35,000 to $50,440 in a year's time.  Particularly hard hit will be managers and assistant managers.  For example, multiple members stated that they will likely reclassify at least 50% of their managers as non-exempt.  One employer stated that it will eliminate all entry-level management positions.  Another employer said it will likely eliminate the positions of a third of its exempt managers and give increased responsibility to the remaining two-thirds.  Thus, AH&LA is confident that changes to the minimum salary level will serve to eliminate many middle-management positions in the lodging industry.  This will be a great loss to the country because these middle-management positions are key steps on the ladder of professional success, especially for many individuals who do not have college degrees.

For many of these employees, reclassification to non-exempt status will mean the loss of benefits, flexibility, status and career opportunities they previously enjoyed.  Below is a list of some consequences that reclassified employees will likely face.

### 1.    Impact on professional status and flexible hours

AH&LA understands that many of its members' employees view being classified as exempt as an indicia of professional status and career achievement.  Being reclassified will be seen by many as a step back in their careers and as a devaluation of their roles in the organization.  Additionally, many of the managers and assistant managers who will be reclassified will be demoralized because they will now have to "punch a time clock."[3]

---

[2] Several AH&LA members stated that they resent being forced to cut incentive compensation because incentive compensation is a key motivator for employees to exceed expectations.  Additionally, reducing the availability of incentive compensation curtails the ability of employers to reward their star employees.  AH&LA notes that if a Final Rule does allow incentive compensation to count toward the increased salary level, these concerns may be mitigated.

[3] The proposed changes may also impact the morale of employees who are not reclassified.  For example, it is not fair that a front desk manager's salary is increased overnight from $35,000 to $50,440 so that he can remain exempt, when it took the general manager at the same hotel years of hard work to get to a

American Hotel & Lodging Association
September 4, 2015
Page 6

One of the many perks of exempt status is the flexibility it gives employees in work arrangements.  Many exempt employees appreciate that exempt status provides them with the flexibility of coming in late, leaving work early, determining the timing and duration of meal and break periods, and otherwise setting their own schedules to better address work-life balance issues while still receiving a minimum level of pay each week.  For example, exempt employees have the ability to respond to unexpected events like needing to pick up a sick child at school without the fear of losing pay as a result of their time away from work.  In contrast, non-exempt employees paid by the actual hours worked may still have the flexibility in their schedule, but it often comes with an associated loss of income when they are away from work.  Additionally, in an effort to effectively monitor the time non-exempt employees are working and prevent off-the-clock work, many employers do not provide non-exempt employees the same opportunity to work remotely and during non-traditional hours that exempt employees receive.  As such, reclassification may have a negative impact on employee morale.

### 2.    Impact on total compensation and benefit packages

Reclassifications caused by the increase in minimum salary level needed to qualify as exempt will result in reclassified employees receiving reduced overall compensation packages.  Exempt employees like the peace of mind of knowing that they will receive a minimum level of compensation each week.  Being reclassified to non-exempt status means a loss of this guaranteed salary.  Employers in the lodging industry may reduce employee hours to avoid overtime or lower hourly rates so that operations are able to remain generally cost neutral.

Additionally, some employees converted to non-exempt status will be ineligible for certain benefits such as increased vacation, life insurance, long-term disability insurance, and certain supplemental incentive compensation initiatives offered only to exempt employees.  Indeed, some benefits such as short-term and long-term disability are not always offered to the non-exempt population and/or result in additional employee costs for such benefits.

### 3.    Impact on training opportunities, career growth, and positions in middle management

Employees converted to non-exempt status will miss out on after-hours manager training programs and other programs that would foster career progression and greater opportunities for future increases in income.  Reduced opportunity for career growth will, in turn, affect employee morale, engagement, and lead to higher turnover in employment.  AH&LA members believe that the proposed changes will impact upward mobility and that if the changes go into effect, it will become increasingly difficult for those who are not college educated to stay in the middle class.

---

position where he is paid $55,000.  Making such arbitrary and drastic changes to the required salary level sends the wrong message to employees because it devalues the skill and hard work that many exhibited to get to their current salary level.

American Hotel & Lodging Association
September 4, 2015
Page 7

Additionally, those managers who will be reclassified as non-exempt will need to be more mindful of the hours they are spending so as not to incur undue overtime. This will mean that they will lose the ability to use their own discretion in deciding whether to work extra hours to better learn the business and analyze how to make sales grow. For many, this loss of freedom and ability to spend their time as they see fit will result in delayed career progression.

In short, if the proposed changes become final, it will impede the career growth and future prosperity of thousands of hard-working employees in the lodging industry; and will result in negative consequences in both the short and long term for this nation's economy.

**4.      Less tolerance and time to establish satisfactory performance**

To the extent that an employer decides to raise salary levels to preserve exemption status for certain employees, a significant increase to the salary threshold may reduce the opportunity for employees, especially managers, in the lodging industry to establish sufficient performance. The higher salary levels required may translate into greater demands placed on employees and reduced tolerance for anything less than meeting expected performance standards and targets. For example, employees who take a longer amount of time to learn how to effectively manage the food and beverage department of a hotel may be terminated at a quicker pace because they are not covering the higher labor costs associated with the higher salary. Additionally, many managers who remain exempt will be expected to work even harder to manage their operations if other employee positions were reduced in order to keep payroll in line.

**II.      Income, Such As Performance Bonuses And Commissions, Should Be Considered In Determining Whether An Employee Satisfies The Increased Compensation Requirement**

If an employee is receiving a certain amount of income, the form of the income received, e.g., base salary, bonus or commission, should not change the exemption determination. Thus, AH&LA supports allowing incentive compensation to be counted in determining whether the minimum salary threshold is met. Allowing companies to include supplemental incentive compensation in determining whether the minimum salary level is satisfied will have the added benefit of encouraging companies to provide bonuses and other opportunities that allow exempt employees to share and potentially profit from a company's overall performance.

AH&LA does not support placing a limit on the amount of supplemental compensation that may be considered in determining whether the base salary level is satisfied. AH&LA also is opposed to DOL's suggested approach that in order to qualify for inclusion in the base salary level calculation, supplemental compensation would have to be paid on a monthly or more frequent basis. Many supplemental compensation programs in the lodging industry are not structured to be paid with such frequency and it would place a significant administrative burden on employers to calculate and pay incentive compensation on a monthly or more frequent basis. AH&LA

American Hotel & Lodging Association
September 4, 2015
Page 8

encourages DOL to consider allowing employers to count all incentive compensation that is paid during a year in determining whether the minimum salary level is met.[4]

AH&LA notes that as a practical matter, it is not clear what would happen if an employee does not earn the anticipated supplemental compensation and thus does not satisfy the minimum salary requirement for exempt status.[5]  For the proposed approach regarding the inclusion of supplemental compensation to have any practical effect, DOL must allow catch-up or true-up payments to be made.  Allowing true-up payments helps ensure that exempt employees are receiving the guaranteed income they anticipated and is consistent with the historical salary basis approach of ensuring guaranteed income.  In short, if a Final Rule prohibits true-up payments, DOL will in effect be rendering the concept of counting supplemental compensation toward the salary level of limited value. Without the ability to make a true-up payment, employers will not be able to rely on supplemental payments to employees in order to satisfy the exemption test without fear of noncompliance if incentive compensation is not actually earned.

## III.    Increases To Salary Levels Should Take Place No More Frequently Than Every Five Years

AH&LA strongly opposes annual increases to salary levels.  It would be an unprecedented and significant administrative burden to annually adjust the minimum salary level for exempt employees.  In addition, annual increases will hamper an employer's ability to budget and provide merit increases, a significant tool and motivator in the workforce, if annual increases must be automatically provided to preserve exemption status.  Moreover, any consideration given to a salary increase should be based on an individualized evaluation of economic conditions rather than an automatic arbitrary formula.  DOL should have the capacity to decide when it is appropriate to raise the salary level; it should not need to build in some automatic review process that may not be appropriate for a given economic climate.  Such an approach is inconsistent with past precedent and is a waste of government resources.  Indeed, not even Congress has mandated that an automatic review process be built into the FLSA to determine if minimum wage should be increased.

Thus, AH&LA proposes that increases to the base salary level for the white collar exemptions occur not more often than every five years.  This approach is consistent with historical precedent.  Indeed, DOL acknowledges in the Proposed Rule that the shortest period of time between salary level increases was five years.  *See* 80 Fed. Reg. 38,526.  Moreover, DOL previously rejected suggestions to annually increase salary levels.  *See* 80 Fed. Reg. 38,537, 538.  Although DOL

---

[4] Considering all incentive compensation paid within a year to count toward the salary level is consistent with the time frame utilized for the current highly compensated test.  *See* 29 C.F.R. § 541.601.

[5] DOL suggests in the Proposed Rule that true-up payments would not necessarily be appropriate in this context.  *See* 80 Fed. Reg. 38,535.  AH&LA disagrees with DOL's assessment and sees no basis for distinguishing the use of true-up payments outside of the context of highly compensated employees.  *See* 29 C.F.R. § 541.601(b)(2) (discussing the permissible use of true-up payments).

American Hotel & Lodging Association
September 4, 2015
Page 9

suggests that a break with historical precedent is necessary to ensure "that the salary level does not become obsolete over time," this goal can still be achieved through increasing the minimum salary level every five years.

To the extent that a Final Rule adopts a mechanism to routinely and automatically update the salary levels, DOL should provide notice of the amount of the increase to employers at least one year in advance. AH&LA members conduct financial planning months in advance and need a year's warning to adequately prepare for changes. For example, in addition to having to determine whether the change in the minimum salary level warrants any reclassifications, employers must determine new compensation rates for affected employees, and whether there needs to be any resultant changes to benefits eligibility, incentive compensation programs, training opportunities, and the company's overall organizational structure. A cost analysis will have to be conducted to make appropriate business decisions. Timekeeping and recordkeeping practices will have to be developed and implemented for the reclassified population (which may not necessarily lend itself to a "one size fits all" approach) and training provided to both employees and managers with regard to such procedures. Employers will also need time to ensure that any changes are properly communicated to the affected employees. As such, a 60-day notice period is an unreasonably short period of time for employers to conduct necessary planning, implement any resulting changes, and ensure timely compliance. AH&LA requests that DOL consider a notice period of one year.

AH&LA also urges DOL to consider the fact that if salary levels are annually increased, there can be no certainty in exemption status, which in turn creates instability as far as an employee's overall compensation and benefit package. Employers frequently tie supplemental compensation, vacation entitlements and benefit opportunities to exemption status. If every year there is a possibility of having exemption status change, employers are likely to reduce compensation and benefit opportunities available to numerous exempt employees in order to cover the administrative cost associated with the annual changes.

Finally, if DOL includes annual rate increases in a Final Rule, DOL should do so on a calendar year basis because like many employers, AH&LA members' business operations are tied to annual calendars. Further, adjusting the salary level mid-calendar year may create issues in terms of year-end bonuses and fringe benefits. For example, if an exempt employee needs to be converted to non-exempt midyear, he or she may lose eligibility for a bonus and fringe benefits that he or she was counting on when the year began.

## IV.    The Duties Test Should Not Be Revised

AH&LA encourages DOL not to revise the standard duties test. Indeed, AH&LA believes that any changes to the duties test will not simplify the workplace for employers and workers, but rather will do just the opposite. The below comments focus on why changing the duties test and, in particular, changing the duties test for the executive exemption, would not be a productive use of the DOL's resources and would harm employers, employees, and the economy as a whole if implemented.

American Hotel & Lodging Association
September 4, 2015
Page 10

**A.    Changing the duties test will lead to increased litigation and years of transition and uncertainty.**

As a general matter, understanding any new or different requirements that apply to the workforce, and what changes need to be implemented from a business standpoint, will impose significant administrative and compliance costs on employers. Specifically, changes to the duties test will require employers to dedicate significant amounts of time and expert resources to review and make determinations regarding their employees. AH&LA members are extremely concerned about the cost that would be imposed on them if the duties test changed.

AH&LA believes that revisions to the duties test will also result in an unnecessary period of transition and legal uncertainty. Revising the duties test would diminish the value of the legal precedent regarding the duties test that has developed over the past ten years. Revising the duties test likely will trigger an increase in litigation as employers and employees try to decipher and apply the revised test. For all these reasons, changing the current duties test will have a significant negative effect on employers, especially for small business owners, and thus AH&LA urges DOL not to revise the current duties test.

**B.    A duties test requiring employees to spend a strict quantitative percentage of time on exempt work is not workable as a practical matter.**

In 2004, DOL specifically eliminated the requirement that an employee not spend more than a certain percentage of his or her time on non-exempt duties not directly and closely related to exempt work. In eliminating this percentage limitation on non-exempt duties, DOL noted that percentage time tests create complexity and impose burdens on employers, such as significant monitoring requirements. DOL also noted that "[w]hen employers, [and] employees, as well as Wage and Hour Division investigators applied the 'long' test exemption criteria in the past, distinguishing which specific activities were inherently a part of an employee's exempt work proved to be a subjective and difficult evaluative task that prompted contentious disputes." 69 Fed. Reg. 22,122 at 22,127. Similar concerns of complexity and burdensomeness arise with regard to California's "more than 50 percent" duties test, which, like the "long test," requires an analysis of whether more than a certain percentage of time is spent on non-exempt duties.

AH&LA strongly opposes any effort to revise the duties test that would impose any type of time percentage threshold similar to the old "long test" or California's test. Imposing such a quantitative element would create an administrative nightmare as tracking this kind of minutiae is both inefficient and extremely difficult in the lodging industry. For example, AH&LA members with operations in California note that rather than providing clarity, requiring employees to break down how they spend their time is very subjective. AH&LA members with operations in California also have informed AH&LA that they have struggled to find fair, reliable methods of tracking all of the various activities their managers and assistant managers perform. Indeed, as a practical matter, it is virtually impossible to manage and track how much

American Hotel & Lodging Association
September 4, 2015
Page 11

time managers in this industry are spending on particular duties, especially considering that exempt and non-exempt work can be intertwined in the lodging industry.[6]

Hotels and other establishments in the lodging industry are fluid, service-oriented environments. Managers/supervisors are expected to exceed the service level that guests expect.  The Head of Food and Beverage should not put her exemption status at risk because she elects to take time away from her primary duty and deliver a drink to a special guest.  Likewise, if several guests unexpectedly all want to check out at the same time, the hotel's manager should not have restrictions placed on him that cause him to question whether he should pitch in with the storing of bags in an effort to keep guests happy and the hotel functioning smoothly.   Requiring managers to note how much time was spent on such tasks detracts from the manager's primary duty of managing the hotel's employees and would cause customer service to suffer.  Moreover, there is no practical and cost-effective way for an employer to quantify a manager's time and duties at such a micro level.  Managers and assistant managers typically operate independently, without immediate direct supervision.  An employer cannot "police" these employees to monitor and observe compliance with a strict 50% rule.  Thus, despite having a clear expectation (based, for example, upon job descriptions and training) that a manager should spend a certain amount of his or her time performing exclusively management duties, a manager could simply claim that he or she spent the majority of his or her work hours during a week performing non-exempt duties. Imposing such a strict 50% quantitative standard effectively eliminates an employer's ability to have certainty with regard to its classification decisions and negatively impacts operations and business planning. To extrapolate that threat nationwide could be devastating to employers, particularly in the hotel and lodging industry.

### C.    The elimination of the concurrent duties test would impose undue costs and administrative burden on the hotel and lodging industry.

AH&LA also strongly opposes any change to the "concurrent duties" test under the current FLSA regulations.  In the hotel and lodging industry, all employees, regardless of their job title, pitch in to serve customers even though they are still maintaining their management role while doing so.  Customer service is dynamic in nature and the operations ability to remain flexible so customer needs are continuously and consistently met is what generates a positive guest experience.  The management role is not predominately compromised of providing such service.  For example, if a Director of Front Office Operations (who oversees the entire front desk team) needs to temporarily assume a front desk role so guests can be checked in efficiently due to the absence of an associate scheduled to work who needs to leave early to care for a sick child, the Director is not being evaluated on his or her performance related to the check in of these guests; nor is it the Director's most critical function.  Rather, even when checking in guests, the Director remains responsible for the overall success of the hotel's front desk operations and finding a way to provide guests with a great experience.  In short, when an exempt manager makes the decision

---

[6] For example, in the course of checking out a guest, a manager may need to resolve a dispute on behalf of the company and interpret company policy in the course of resolving the dispute.

American Hotel & Lodging Association
September 4, 2015
Page 12

that he or she needs to perform non-exempt duties to help the operation run smoothly, the manager's primary duty continues to be managing his or her staff and the operations of their department.

Eliminating the concurrent duties also would hinder exempt managers in their ability to lead by example. This loss will impact the quality of the guest experience, and employee morale will be damaged. For example, non-exempt employees often need and want the assistance of their exempt managers. Indeed, both employees and guests would negatively view a manager if the manager did not step in and help when needed.

AH&LA also would like DOL to especially consider the impact of any changes to the concurrent duties test on small businesses. In small hotels the day-to-day activities of a manager and department head are even more varied and complicated. Accordingly, changing the concurrent duties test will have a disproportionate impact on small establishments and small business owners who need to maximize efficiency to remain in business.

> **D.**     **Any change to the duties test would need to first be vetted through formal notice and provide an opportunity for the public to comment on specific proposed changes.**

To the extent that DOL determines that it is appropriate to modify the duties test under 29 C.F.R. Part 541, DOL should not implement any changes without first proposing specific language that would give the public notice and opportunity for comment, especially given the significant economic impact such changes will have on operations. Any changes to the duties test with without providing the public with the opportunity to formally vet proposed changes would violate the spirit and purpose of the notice and comment requirements under the Administrative Procedures Act. *See Small Refiner Lead Phase-Down Task Force v. U.S. Envtl. Prot. Agency*; 705 F.2d 506, 549 (D.C. Cir. 1983) (vacating EPA's change to regulatory definition under the Clean Air Act because EPA's "general notice that it might make unspecified changes in the definition of small refinery" was "too general to be adequate. Agency notice must describe the range of alternatives being considered with reasonable specificity. Otherwise, interested parties will not know what to comment on, and notice will not lead to better-informed agency decisionmaking."); *see also Prometheus Radio Project v. FCC*, 652 F.3d 431, 450 (3d Cir. 2011) (stating that "the opportunity for comment must be a meaningful opportunity. That means enough time with enough information to comment and for the agency to consider and respond to the comments." (citation and internal quotation marks omitted)).

Without first setting forth the specific changes to the duties test in a notice of proposed rulemaking, employers will not have "fair notice" of any change or the ability to comment on the economic costs associated with changes. *See Long Island Care At Home, LTD. v. Coke*, 551 U.S. 158, 174 (2007) ("The object, in short, is one of fair notice."); *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005) (stating that purposes of APA's notice and comment requirements are "(1) to ensure that agency

American Hotel & Lodging Association
September 4, 2015
Page 13

regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review"). Thus, AH&LA believes that any change to the duties test without fair notice and opportunity to comment would violate the APA.[7]

For all of the above reasons, AH&LA believes that the duties test should remain "as is." Changes to the duties test are not necessary and will likely harm employers, employees, and the overall economy.

## V.    Implementation Costs Will Be Significantly Higher Than DOL Estimates

DOL has asked for input with regard to the implementation costs of its proposal. The employers that AH&LA has spoken to about this issue overwhelmingly believe that DOL has significantly underestimated the time and costs that will be involved to implement changes associated with the new rule, especially for employers in the hospitality industry. The changes to the white collar exemptions will require employers in the hospitality industry to engage in a comprehensive review of the affected employees' compensation, benefits, and work schedules. Employers may need to revise job descriptions and wage statements, and communicate the changes to the affected employees and their respective supervisors. These employees and supervisors will need to undergo training on recording and monitoring their time. The final rule will also require payroll adjustments and verification that all of the changes are correctly made.[8] All of this will take longer than the one hour that DOL predicts.[9] For example, one AH&LA member reported that its compensation team already spent well over six hours per affected employee assessing the potential changes to their exempt status, crafting potential communications, meeting with business partners, and making adjustments to test its payroll system. This is not an aberration. Based on feedback from its members, AH&LA estimates that the adjustment costs will be approximately four to seven hours per affected employee.

AH&LA members also believe that DOL underestimates the amount of time that management will spend per week scheduling and monitoring the amount of time each affected employee works. Rather than the additional five minutes per week that DOL predicts, AH&LA members have informed AH&LA that they estimate the additional "managerial costs" will be closer to 25 minutes to an hour a week.

---

[7] Additional laws may potentially be implicated if DOL fails to give fair notice, including but not limited to the Paperwork Reduction Act and the Unfunded Mandate Reform Act of 1995.

[8] Certain AH&LA members with smaller operations report that the new rule may cause them to need to hire more payroll and compliance staff and possibly upgrade their timekeeping system to help them manage the changes.

[9] DOL's estimate does not appear to account for large employers who operate more than one timekeeping, accounting and payroll system.

American Hotel & Lodging Association
September 4, 2015
Page 14

With regard to DOL's estimate that the regulatory familiarization costs will be approximately one hour per establishment, AH&LA members also believe that this number is too low. One member stated, "There is not a single government regulation that can be read and fully understood in one hour." Other AH&LA members note that there are several individuals in each of their establishments (e.g. HR employees, finance, legal, executive management) that will need to read and be familiar with the new rules. Accordingly, AH&LA believes that it will take at least four hours per establishment to become familiar with the Final Rule.

In short, any change to the FLSA regulations will involve a large amount of resources and time to ensure that it is implemented properly. Before issuing the Final Rule, DOL should take into account that the implementation costs will be significantly higher than it estimated.[10]

## VI.     Effective Date Of Final Rule

AH&LA urges DOL to give employers sufficient time to review the Final Rule issued and to implement it in a manner that does not unduly disrupt operations and allows for timely compliance. AH&LA respectfully submits that one calendar year is a reasonable period to do so.

## VII.     Conclusion

AH&LA thanks DOL for the opportunity to provide comments on the Proposed Rule but respectfully requests that DOL reevaluate its proposal given the significant consequences that a final rule mirroring the proposal would have on the lodging industry. If you have any questions with regard to AH&LA's comments, please contact Corrie Fischel Conway or Russell Bruch at Morgan, Lewis and Bockius LLP.[11]

Sincerely,

Brian C. Crawford
Vice President, Government & Political Affairs

---

[10] *Cf. Michigan v. E.P.A.*, 135 S. Ct. 2699, 2707 (2015) (finding that the E.P.A. unreasonably deemed cost irrelevant when it decided to regulate power plants).

[11] Ms. Conway and Mr. Bruch are located at 1111 Pennsylvania Ave., NW, Washington, DC. They can be reached at 202.739.3000.

# EXHIBIT B

September 22, 2017

**Submitted via regulations.gov**

Ms. Melissa Smith
Director of the Division of Regulations, Legislation, and Interpretation
Wage and Hour Division
U.S. Department of Labor
Room S–3502, 200 Constitution Avenue, N.W.
Washington, DC 20210

> Re:    Defining and Delimiting the Exemption for Executive, Administrative, Professional, Outside Sales, and Computer Employees; Request for Information (RIN 1235-AA20) (29 CFR Part 541)

Dear Ms. Smith:

The American Hotel & Lodging Association (AHLA) respectfully submits the following comments in response to the above-referenced Request for Information (RFI) regarding Executive, Administrative, and Professional (EAP) exemptions to overtime pay under the Fair Labor Standards Act (FLSA).[1] The RFI was published by the Department of Labor's (DOL or Department) Wage and Hour Division (WHD) in the Federal Register on July 25, 2017. Serving the hospitality industry for more than a century, AHLA is the sole national association representing all segments of the U.S. lodging industry, including iconic global brands, hotel owners, REITs, franchisees, management companies, independent properties, bed and breakfasts, state hotel associations, and industry suppliers.  The lodging industry is one of the nation's largest employers.  With nearly 8 million employees in cities and towns across the country, the hotel industry provides $75 billion in wages and salaries to our associates and generates $600 billion in economic activity from the 5 million guestrooms at the more than 52,000 lodging properties nationwide.

As detailed in the comments we filed in response to DOL's 2015 Notice of Proposed Rulemaking (NPRM), our members and their employees would have been severely and negatively impacted by an increase to the EAP exemption salary threshold of the magnitude proposed in the NPRM and contained in the related 2016 Final Rule.[2] Such an increase deviates drastically from past policy and methodology and would have required wide-spread reclassification of employees whose primary duties are executive, administrative, and professional in nature. As the court noted in *Nevada v. Department of Labor*, DOL lacks authority under the FLSA to disqualify these employees from the exemption based on salary alone.[3]

---

[1] AH&LA also joins the comments submitted by the Partnership to Protect Workplace Opportunity.
[2] AH&LA 2015 Comments on DOL's NPRM - https://www.regulations.gov/document?D=WHD-2015-0001-4639
[3] AH&LA, along with numerous other associations and organizations, was a plaintiff in the lawsuit challenging the 2016 Final Rule, filed in the US District Court for the Eastern District of Texas, Sherman Division.

Below, we respond to the questions posed by the Department in its RFI. Throughout these comments, we refer to the results of a survey AHLA sent out to its members seeking their input on the overtime requirements, 2016 Final Rule, and 2017 RFI.

In these comments, AHLA urges DOL to set a new standard salary level for exempt employees by applying the methodology the Department used in 2004 and to keep in place the existing duties test. We advocate against automatic updates to the salary threshold and against tying the threshold to inflation. While we support the use of incentive pay to calculate whether an employee meets the minimum salary threshold, AHLA opposes limiting the percentage of incentive income that can apply to that threshold and opposes the requirement that those payments occur on a monthly (or more frequent) basis. We also provide information on the effect the 2016 Final Rule and subsequent nullification of that rule had on the hospitality industry. We hope these responses assist the Department in establishing the most appropriate overtime requirements possible, which abides by Congress' original intent of the FLSA and also provides sufficient protections for employees and clarity for employers.

**Responses to Request for Information**:

*1. In 2004 the Department set the standard salary level at $455 per week, which excluded from the exemption roughly the bottom 20 percent of salaried employees in the South and in the retail industry. Would updating the 2004 salary level for inflation be an appropriate basis for setting the standard salary level and, if so, what measure of inflation should be used? Alternatively, would applying the 2004 methodology to current salary data (South and retail industry) be an appropriate basis for setting the salary level? Would setting the salary level using either of these methods require changes to the standard duties test and, if so, what change(s) should be made?*

AHLA believes it would be most appropriate for DOL to update the EAP salary threshold by applying the 2004 methodology to current salary data. By using this methodology, DOL will be continuing the original objective of the salary threshold of providing employers and DOL with an easily applied bright-line rule that protects employees whose compensation is such that they obviously cannot meet the duties test and should not be exempt from overtime pay.

Eighty nine percent (89%) of respondents to our survey believe a new minimum salary threshold is needed in place of the salary set by the 2016 Final Rule. Fifty-two percent (52%) of respondents believe applying the 2004 methodology to current salary data would be the most appropriate method to establish a new threshold. Our calculations indicate such a figure would have been approximately $30,000 annually in 2016. This rate is more aligned with past increases and could be absorbed by the hospitality industry without significant and negative repercussions to the industry and/or economy.

The Department should not use inflation as a means of determining a minimum salary threshold. DOL has avoided using inflation in the past and, instead, has used formulas to set the salary threshold; AHLA does not believe DOL should deviate from that approach. Additionally,

2

attempting to discern which inflationary measure is the most appropriate for the salary threshold would further complicate the rulemaking process and invites future disputes and delays when DOL will next want to update the salary threshold. Finally, national inflationary measures will not necessarily align with the economic realities of lower-cost regions or industries. Using a national inflationary measure could result in a threshold that is either too high or too low for certain regions or industries, creating significant burdens on the economy.

*2. Should the regulations contain multiple standard salary levels? If so, how should these levels be set: by size of employer, census region, census division, state, metropolitan statistical area, or some other method? For example, should the regulations set multiple salary levels using a percentage based adjustment like that used by the federal government in the General Schedule Locality Areas to adjust for the varying cost-of-living across different parts of the United States? What would the impact of multiple standard salary levels be on particular regions or industries, and on employers with locations in more than one state?*

AHLA does not believe multiple-standard salary levels would be appropriate or necessary for determining overtime eligibility under the FLSA. The objective of the salary threshold is to screen out the obviously nonexempt employees: those who should be and are entitled to overtime pay. By applying the 2004 methodology to current salary data, the salary threshold would be set for the lowest wage areas and industries in the country, effectively accomplishing the objective of the salary test and making numerous salary thresholds unnecessary. The obviously nonexempt employees would be screened out in all regions, census divisions, states, and metropolitan statistical areas and for employers of all sizes.

Additionally, the FLSA permits states to impose more stringent overtime pay requirements, including higher salary thresholds, when it is deemed that doing so is in the best interest of the state's workforce and economy. We believe states are in a better position to assess their own workforce and economy and to determine if such adjustments are necessary.

We also believe that by setting multiple-standard levels by region, DOL would complicate compliance, invite litigation, and make future updates more onerous. Many AHLA members have employees in multiple states and regions. Creating multiple federal levels throughout the nation would complicate compliance for these multi-state/multi-region employers and invite ligation over which salary threshold applies to employees that are mobile, on temporary assignment, or move from one jurisdiction to the next. In addition, recalculating regional salary levels and boundaries will further complicate future updates to the regulations governing the EAP exemptions as increases in regional costs of living are dynamic and will vary over time.

*3. Should the Department set different standard salary levels for the executive, administrative and professional exemptions as it did prior to 2004 and, if so, should there be a lower salary for executive and administrative employees as was done from 1963 until the 2004 rulemaking? What would the impact be on employers and employees?*

3

Ninety-five percent (95%) of AHLA members that responded to our survey felt DOL should not set different salary levels for the different EAP exemptions. In today's economy and workforce, executive, administrative, and professional employees often have various overlapping roles within their company, and the distinction between those positions is less clear than it was in the past. Therefore, the duties associated with those positions are significantly more blurred. The focus of the EAP exemptions should remain on whether the totality of responsibilities of the employee results in exempt primary duties, regardless of the quantity of time the employee spends working under a particular exemption. Requiring employers to determine which of these exemptions the employee spends more of his or her time devoted to would be needlessly burdensome, complicate compliance, and invite unnecessary litigation without providing any additional protections for employees.

*4. In the 2016 Final Rule the Department discussed in detail the pre-2004 long and short test salary levels. To be an effective measure for determining exemption status, should the standard salary level be set within the historical range of the short test salary level, at the long test salary level, between the short and long test salary levels, or should it be based on some other methodology? Would a standard salary level based on each of these methodologies work effectively with the standard duties test or would changes to the duties test be needed?*

The changes made to the FLSA overtime requirements in 2004 obviated the need for the distinction between the long and short test salary levels. DOL adjusted the minimum salary threshold to make up for the elimination of the long/short test structure. The methodology used in 2004 was appropriate for the original intent of the salary threshold: to screen out obviously nonexempt employees. AHLA believes that methodology and reasoning still applies today.

AHLA does not believe changes to the duties test are necessary to effectively determine exemption status. DOL has not articulated any justification for making changes, which would require employers to dedicate significant amounts of time and resources to review and make determinations about their employees' overtime eligibility. AHLA members are extremely concerned about the cost and burden that would come with such changes. Specifically, AHLA opposes any effort by DOL to revise the duties test in a manner that imposes a time percentage similar to the old long test, or the test used by the state of California. Imposing such a quantitative element would create an administrative nightmare, as tracking this kind of minutiae in an employee's day-to-day responsibilities is both inefficient and extremely difficult in the lodging industry.

Additionally, changes to the duties test will likely result in a period of transition and legal uncertainty. Revising the duties test would diminish the value of the legal precedent clarifying the duties test that has developed over the past 10 years, in which the hospitality industry, as well as the rest of the employer community, has relied on to understand the complexities of the FLSA's overtime requirements. Altering the duties test will likely trigger an increase in litigation as employers and employees try to decipher and apply the new test.

4

Several respondents to our survey requested, however, that DOL provide greater *clarity* on the application of certain aspects to the duties test. AH&LA and its members believe DOL should provide any additional clarification through examples issued in a new regulation and guidance via the opinion letter process, rather than changes to the duties test itself.

*5. Does the standard salary level set in the 2016 Final Rule work effectively with the standard duties test or, instead, does it in effect eclipse the role of the duties test in determining exemption status? At what salary level does the duties test no longer fulfill its historical role in determining exempt status?*

In *Nevada v. Department of Labor*, the judge determined that the salary level established by the 2016 Final Rule created a *de facto* salary-only test to determine overtime eligibility for many employees that would otherwise meet the duties test. Effectually, the salary threshold set by DOL in 2016 would have nullified the need for and role of the duties test in many cases. AHLA strongly agrees with the court's opinion. As stated previously in these comments, the original intent of the salary threshold was to set a floor for exempt status; the salary threshold is meant to screen out those employees who are obviously eligible for overtime and should not be exempt under the FLSA.

While there are various methods by which the Department could set a salary level that fits within the above parameters, DOL need look no further than its 2004 methodology. That methodology fits within historic norms and, as the judge suggested in the *Nevada v. Department of Labor* case, would align with the Department's authority under the FLSA. We urge the Department to simply apply the 2004 methodology, rather than submit employers and employees to a lengthy attempt to find an alternative, which may ultimately not survive scrutiny by the courts.

*6. To what extent did employers, in anticipation of the 2016 Final Rule's effective date on December 1, 2016, increase salaries of exempt employees in order to retain their exempt status, decrease newly non-exempt employees' hours or change their implicit hourly rates so that the total amount paid would remain the same, convert worker pay from salaries to hourly wages, or make changes to workplace policies either to limit employee flexibility to work after normal work hours or to track work performed during those times? Where these or other changes occurred, what has been the impact (both economic and non-economic) on the workplace for employers and employees? Did small businesses or other small entities encounter any unique challenges in preparing for the 2016 Final Rule's effective date? Did employers make any additional changes, such as reverting salaries of exempt employees to their prior (pre-rule) levels, after the preliminary injunction was issued*?

AHLA members made several changes to their workforce following the announcement of the 2016 Final Rule. Forty percent of respondents in our survey made some form of a change to their

workforce policies. Over sixty percent (60%) reclassified at least one worker. Forty-three percent (43%) raised the salaries of at least one worker to a figure above the 2016 Final Rule's salary threshold, and 31% changed the work hours or employment provisions for entry-level managers. Additionally, 5% of respondents lowered the starting salary for new positions in order to comply with the new threshold. Out of the respondents, 40% initiated the changes after the 2016 Final Rule was announced, but 80% delayed implementation of all or some of those changes following the preliminary injunction halting implementation of the 2016 Final Rule. Half of our respondents did not reverse changes, however, once they were implemented.

Following implementation of these changes, fifty one percent (51%) of respondents said they saw a noticeable dip in employee morale. Forty-seven percent (47%) said there was a reduction in professional development opportunities. Twenty-seven percent (27%) said there was diminished workplace autonomy, and forty seven percent (47%) said less flexibility was offered to employees. One respondent said they increased training in scheduling in order to make directors conscious of how they're using their managers.

AHLA members are not able to provide accurate data on costs, since implementation was limited as a result of the court's preliminary injunction against the 2016 Final Rule. Some members noted, however, that as a result of some of the changes they did implement, they had to reduce staff and increase costs for customers.

*7. Would a test for exemption that relies solely on the duties performed by the employee without regard to the amount of salary paid by the employer be preferable to the current standard test? If so, what elements would be necessary in a duties-only test and would examination of the amount of non-exempt work performed be required?*

AHLA does not believe a duties-only test would be appropriate for the overtime requirements under the FLSA. In order to compensate for the bright line the salary threshold provides, the Department would have to significantly restructure the overtime regulations. This would inevitably result in increased litigation, compliance challenges, and costs as employers and employees struggle to understand the changes and new requirements. Additionally, moving to a duties-only test would undoubtedly result in a more rigid duties test, potentially one including a quantitative element on the amount of time an exempt employee can spend on nonexempt duties. Such changes will likely result in excessive burdens on the hospitality industry, including new and onerous recordkeeping requirements and increased litigation costs.

*8. Does the salary level set in the 2016 Final Rule exclude from exemption particular occupations that have traditionally been covered by the exemption and, if so, what are those occupations? Do employees in those occupations perform more than 20 percent or 40 percent non-exempt work per week?*

Had it gone into effect, the 2016 Final Rule's salary level would have excluded from exemption middle-management positions in the hospitality industry. Many of these positions are well-

6

paying jobs with substantial responsibility and authority in the workplace. These positions are seen as key steps in the ladder of professional development and success. As explained in AHLA's 2015 Comments, multiple AHLA members stated they were likely to reclassify at least 50% of their managers as nonexempt in order to absorb the costs of complying with the 2016 Final Rule. One member said they will eliminate all entry-level management positions; another said they will eliminate a third of their exempt managers and give increased responsibilities to the remaining two-thirds. This is a great loss to the hospitality industry and the nation's workforce.

*9. The 2016 Final Rule for the first time permitted non-discretionary bonuses and incentive payments (including commissions) to satisfy up to 10 percent of the standard salary level. Is this an appropriate limit or should the regulations feature a different percentage cap? Is the amount of the standard salary level relevant in determining whether and to what extent such bonus payments should be credited?*

AHLA supports allowing incentive compensation to be counted in determining whether the minimum salary threshold is met. Allowing such supplemental incentive compensation in overtime eligibility determination will encourage companies to provide bonuses and other opportunities that allow exempt employees to share and potentially profit from a company's overall performance. That said, AHLA does not support limiting the amount of supplemental compensation that may be considered when determining if the salary threshold has been met.

AHLA also opposes the suggestion that supplemental compensation would have to be paid on a monthly or more frequent basis in order to be included in the salary-level calculation. Many supplemental compensation programs in the lodging industry are not structured to be paid with such frequency. This requirement would place a significant administrative burden on employers to calculate and pay incentive compensation on a monthly or more frequent basis.

*10. Should there be multiple total annual compensation levels for the highly compensated employee exemption? If so, how should they be set: by size of employer, census region, census division, state, metropolitan statistical area, or some other method? For example, should the regulations set multiple total annual compensation levels using a percentage based adjustment like that used by the federal government in the General Schedule Locality Areas to adjust for the varying cost-of-living across different parts of the United States? What would the impact of multiple total annual compensation levels be on particular regions or industries?*

AHLA believes multiple levels for the highly compensated employee exemption would result in the same difficulties as discussed in our response to Question 2. Multiple thresholds would complicate compliance, invite litigation, and make future updates far more onerous.

*11. Should the standard salary level and the highly compensated employee total annual compensation level be automatically updated on a periodic basis to ensure that they remain effective, in combination with their respective duties tests, at identifying exempt employees? If so, what mechanism should be used for the automatic update, should automatic updates be delayed during periods of negative economic growth, and what should the time period be between updates to reflect long term economic conditions?*

Considering the significant economic impact such changes have on the economy and the operations of the hospitality industry, DOL should not implement any changes to the overtime requirements and regulations automatically. Doing so would result in increased burdens on employers during economic downturns, hampering the economy even more. In our member survey, 85% of respondents called on DOL not to automatically update the salary threshold. The same percentage believe DOL should evaluate economic circumstances and seek input from stakeholders before raising the salary threshold.

Input from stakeholders is vital, and no changes should be made to any area of the FLSA's overtime requirements without first proposing specific language being considered, giving the public notice of the potential changes, and providing the public with an opportunity to comment. Any changes made without undergoing the formal notice-and-comment process would violate the Administrative Procedures Act and would jeopardize the economic prosperity of the American workforce and hospitality industry, one of the most vital and successful industries in the US economy.

**Conclusion**:

The American Hotel & Lodging Association thanks you for the opportunity to respond to this Request for Information. We look forward to working with the Department of Labor on this immensely important workplace issue.

Sincerely,

Brian C. Crawford
Vice President, Government & Political Affairs

8

# EXHIBIT C



**First Line Housekeeping Supervisors, United States**

*Annual Wage*