# EXHIBIT 3

## DECLARATION OF SARAH DAVIES

I, Sarah Davies, declare as follows:

1.     I am over the age of 18 and competent to make this declaration.

2.     I am the General Counsel of the International Franchise Association (IFA). As General Counsel of IFA, I am responsible for, among other things, analysis of legal and federal policy matters that affect franchisors, franchisees, and the franchise model more broadly. This includes, for example, analysis of regulations such as the final rule that is the subject of this case, and its potential impact on the franchise business model, including direct and indirect costs it may impose on IFA members.

3.     IFA is the world's oldest and largest organization representing franchising worldwide. IFA represents all aspects of the franchise business model, with more than 1,200 franchise brands, more than 10,000 franchise business owners, and more than 600 industry suppliers who support the franchise sector. For over 60 years, IFA has worked through its government relations, public policy, media relations and educational programs to advocate for the protection, promotion and enhancement of franchising and the approximately 790,000 franchise establishments that support nearly 8.4 million direct jobs, $825.4 billion of economic output for the U.S. economy, and almost three percent of the Gross Domestic Product. IFA members include franchise companies in over 300 different industries, individual franchisees, and companies that support franchising in marketing, technology solutions, development, operations, and more. Among its advocacy efforts, IFA participates in strategic litigation such as the present suit challenging the U.S. Department of Labor's 2024 Overtime Rule.

4.     The statements in this declaration are true and within my personal knowledge and/or my review of IFA's records.

5.     Many of IFA's members employ workers who were exempt prior to July 1, 2024, but are now non-exempt solely because of the 2024 Overtime Rule's July 1, 2024 increase in the EAP salary threshold, or will lose their exempt status as of January 1, 2025 because of the Rule's scheduled increase in the EAP salary threshold. One identified IFA member in this district in Carrolton, Texas is DASE Blinds, a co-plaintiff in this lawsuit, DASE attests that they have several currently exempt employees who will lose their exempt status if the Rule remains in effect. Many more IFA members in Texas and around the country have reported the same or similar harms resulting from the 2024 Rule.

6.     With respect to those workers whose exempt status will be impacted by the 2024 Rule, IFA's member company must either increase these workers' salaries or reclassify them as non-exempt under the FLSA. As non-exempt employees, the company would then to either (a) pay these workers overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit these worker's hours to no more than forty hours per week and thus forego their services. Once paid, IFA's member company has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

7.     In addition, IFA members have expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers, and determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. IFA members will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule. Reclassification of IFA members' employees as

non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

8.     Many of IFA member companies are directly harmed by the 2024 Rule. Examples of how the 2024 Overtime Rule harms IFA member companies—a fraction of many examples— are set forth in declarations by numerous IFA members attached to this Declaration as Exhibits A-I.

9.     Additionally, IFA surveyed its membership as to the impact of the 2024 Rule on their business's operations. Many of IFA member companies employ workers who will be affected by the 2024 Rule when it is fully implemented. Unsurprisingly, the impact of the 2024 Rule's increase in the EAP exemption salary threshold varies regionally, with up to 25% of survey respondents in New York indicating that they were adversely affected by the Rule, while franchisees in Louisiana, Florida, and Texas reporting that between 50% to 100% of their employees were significantly impacted by the Rule.

10.     During the rulemaking on the 2024 Overtime Rule, IFA signed comments submitted by the Partnership to Protect Workplace Opportunity (PPWO). PPWO is a coalition of a diverse group of associations and stakeholders representing employers in the private, nonprofit, and public sectors with millions of "white collar" exempt employees across the country in almost every impacted by the 2024 Overtime Rule. PPWO's comments detailed its concerns, and the concerns of its coalition members, with the then-proposed Rule. A copy of these comments is attached to this Declaration as Exhibit J.

*[Signature page follows.]*

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED on this 18th day of July, 2024.


_____

Sarah Davies

# EXHIBIT A

## DECLARATION OF DAVID BOUCHER

I, David Boucher, declare as follows:

1.      I am over the age of 18 and competent to make this declaration.

2.      I am the President of Bhooshay Enterprises of Ohio, LLC, which is in the business of providing haircuts in the Cincinnati, Ohio area.

3.      The statements in this declaration are true and within my personal knowledge and/or my review of Bhooshay Enterprises of Ohio, LLC's records.

4.      Bhooshay Enterprises of Ohio, LLC is currently a member of the International Franchise Association – IFA.

5.      Bhooshay Enterprises of Ohio, LLC is an employer subject to the Fair Labor Standards Act, and the rule entitled "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees," 89 Fed. Reg. 32842, which was published by the U.S. Department of Labor ("DOL" or "the Department") on April 24, 2024 ("the 2024 Overtime Rule").

6.      Bhooshay Enterprises of Ohio, LLC employs approximately 6 workers who were exempt under the FLSA prior to July 1, 2024, insofar as they primarily performed executive, administrative, and/or professional duties; were paid on a salary basis; and who earned at least $684 per week ($35,558 per year). Many of these employees routinely worked more than forty hours in a given workweek. In addition, these employees are also heavily tipped employees. If Tips are added into their base salary, they exceed the new July 2024 and January 2025 requirements to maintain their exempt status. Therefore, we suggest that tips that are paid by the employer should be included in the 'salary' calculations.

7.     As of July 1, 2024, as a direct result of the increase in the EAP salary threshold increase contained in the 2024 Overtime Rule, approximately 15% of our employees have lost their exempt status. They continue to perform exactly the same duties and continue to be paid on a salary basis. However, they are paid less than $844 per week ($43,888 per year).

8.     With respect to these workers, Bhooshay Enterprises of Ohio, LLC must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, we must now either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and thus forego their services. Once paid, Bhooshay Enterprises of Ohio, LLC has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

9.     The 2024 Overtime Rule increases the EAP exemption to $1,128 per week ($58,656 per year) as of January 1, 2024.

10.     Bhooshay Enterprises of Ohio, LLC employs approximately 2 workers are exempt under the FLSA insofar as the primarily perform executive, administrative, and/or professional duties; are paid on a salary basis; and earn at least $844 per week ($43,888 per year) but less than $1,128 per week ($58,656 per year). Many of these employees routinely work more than forty hours in a given workweek.

11.     As of January 1, 2025, with respect to these workers, Bhooshay Enterprises of Ohio, LLC must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, we will then have to either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and forego their services. Again, once paid, Bhooshay

2

Enterprises of Ohio, LLC has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

12.    In addition, Bhooshay Enterprises of Ohio, LLC has expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers and determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. Bhooshay Enterprises of Ohio, LLC will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule.

13.    Reclassification of Bhooshay Enterprises of Ohio, LLC's employees as non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED on this 9th day of July, 2024.

_____
David Boucher, President & Managing Member
Bhooshay Enterprises of Ohio, LLC

# EXHIBIT B

## DECLARATION OF Amanda G. Donovan

I, Amanda G. Donovan declare as follows:

1.      I am over the age of 18 and competent to make this declaration.

2.      I am the owner of L & L ARTS, LLC dba Sport Clips Haircuts which is in the business of being a barber shop/beauty salon.

3.      The statements in this declaration are true and within my personal knowledge and/or my review of L & L ARTS, LLC's records.

4.      L & L ARTS, LLC is currently a member of International Franchise Association (IFA).

5.      L & L ARTS, LLC is an employer subject to the Fair Labor Standards Act, and the rule entitled "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees," 89 Fed. Reg. 32842, which was published by the U.S. Department of Labor ("DOL" or "the Department") on April 24, 2024 ("the 2024 Overtime Rule").

6.      L & L ARTS, LLC employs approximately six workers who were exempt under the FLSA prior to July 1, 2024, insofar as they primarily performed executive, administrative, and/or professional duties; were paid on a salary basis; and who earned at least $684 per week ($35,558 per year). Many of these employees routinely worked more than forty hours in a given workweek.

7.       As of July 1, 2024, as a direct result of the increase in the EAP salary threshold increase contained in the 2024 Overtime Rule, approximately 6 of L & L ARTS, LLC's employees have lost their exempt status. The continue to perform exactly the same duties and

continue to be paid on a salary basis. However, they are paid less than $844 per week ($43,888 per year).

8.      With respect to these workers, L & L ARTS, LLC must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, L & L ARTS, LLC must now either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and thus forego their services. Once paid, L & L ARTS, LLC has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

9.      The 2024 Overtime Rule increases the EAP exemption to $1,128 per week ($58,656 per year) as of January 1, 2025.

10.     L & L ARTS, LLC employs approximately six workers are exempt under the FLSA insofar as the primarily perform executive, administrative, and/or professional duties; are paid on a salary basis; and earn at least $844 per week ($43,888 per year) but less than $1,128 per week ($58,656 per year). Many of these employees routinely work more than forty hours in a given workweek.

11.     As of January 1, 2025, with respect to these workers, L & L ARTS, LLC must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, L & L ARTS, LLC will then have to either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and forego their services. Again, once paid, L & L ARTS, LLC has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

2

12.    In addition, L & L ARTS, LLC has expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers, and determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. L & L ARTS, LLC will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule.

13.    Reclassification of L & L ARTS, LLC employees as non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED on this 9th day of July, 2024.


*/s/ Amanda G. Donovan*
Amanda G. Donovan
L & L ARTS, LLC dba Sport Clips Haircuts

# EXHIBIT C

## DECLARATION OF Val Hill

I, Val Hill, declare as follows:

1.      I am over the age of 18 and competent to make this declaration.

2.      I am Managing Member of Sport Clips ("Lee Hill Investments"), which is in the business of providing men's haircuts.

3.      The statements in this declaration are true and within my personal knowledge and/or my review of Lee Hill Investments records.

4.      Sport Clips is currently a member of [International Franchise Association.

5.      Lee Hill Investments, LLC is an employer subject to the Fair Labor Standards Act, and the rule entitled "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees," 89 Fed. Reg. 32842, which was published by the U.S. Department of Labor ("DOL" or "the Department") on April 24, 2024 ("the 2024 Overtime Rule").

6.      Lee Hill Investments, LLC employs approximately 75 workers who were exempt under the FLSA prior to July 1, 2024, insofar as they primarily performed executive, administrative, and/or professional duties; were paid on a salary basis; and who earned at least $684 per week ($35,558 per year). Many of these employees routinely worked more than forty hours in a given workweek.

7.       As of July 1, 2024, as a direct result of the increase in the EAP salary threshold increase contained in the 2024 Overtime Rule, approximately 65 of Lee Hill Investments, LLC's employees have lost their exempt status. The continue to perform exactly the same duties and continue to be paid on a salary basis. However, they are paid less than $844 per week ($43,888 per year).

8. With respect to these workers, Lee Hill Investments, LLC must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, Lee Hill Investments, LLC must now either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and thus forego their services. Once paid, Lee Hill Investments, LLC has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

9. The 2024 Overtime Rule increases the EAP exemption to $1,128 per week ($58,656 per year) as of January 1, 2025.

10. Lee Hill Investments, LLC employs approximately 75 workers are exempt under the FLSA insofar as the primarily perform executive, administrative, and/or professional duties; are paid on a salary basis; and earn at least $844 per week ($43,888 per year) but less than $1,128 per week ($58,656 per year). Many of these employees routinely work more than forty hours in a given workweek.

11. As of January 1, 2025, with respect to these workers, Lee Hill Investments, LLC must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, Lee Hill Investments, LLC will then have to either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and forego their services. Again, once paid, Lee Hill Investments, LLC has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

12. In addition, Lee Hill Investments, LLC has expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers, and

determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. Lee Hill Investments, LLC will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule.

13.      Reclassification of Lee Hill Investments, LLC employees as non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED on this 9th day of July, 2024.

_____
Val Hill

# EXHIBIT D

## DECLARATION OF Jared Lee

 I, Jared Lee, declare as follows:


1.      I am over the age of 18 and competent to make this declaration.

2.      I am owner of Sport Clips Franchise ("Lee Hill Investments, LLC"), which is in the business of providing haircuts and related hair care services

3.      The statements in this declaration are true and within my personal knowledge and/or my review of Lee Hill Investments LLC's records.

4.      Lee Hill Investments, LLC is currently a member of Internation Franchise Association.

5.      Lee Hill Investments, LLC is an employer subject to the Fair Labor Standards Act, and the rule entitled "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees," 89 Fed. Reg. 32842, which was published by the U.S. Department of Labor ("DOL" or "the Department") on April 24, 2024 ("the 2024 Overtime Rule").

6.      Lee Hill Investments, LLC employs approximately 75 workers who were exempt under the FLSA prior to July 1, 2024, insofar as they primarily performed executive, administrative, and/or professional duties; were paid on a salary basis; and who earned at least $684 per week ($35,558 per year). Many of these employees routinely worked more than forty hours in a given workweek.

7.       As of July 1, 2024, as a direct result of the increase in the EAP salary threshold increase contained in the 2024 Overtime Rule, approximately 75 of Lee Hill Investments LLC's employees have lost their exempt status. The continue to perform exactly the same duties and

continue to be paid on a salary basis. However, they are paid less than $844 per week ($43,888 per year).

8.    With respect to these workers, Lee Hill Investments, LLC must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, Lee Hill Investments, LLC must now either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and thus forego their services. Once paid, Lee Hill Investments, LLC has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

9.    The 2024 Overtime Rule increases the EAP exemption to $1,128 per week ($58,656 per year) as of January 1, 2025.

10.    Lee Hill Investments, LLC employs approximately 75 workers they are exempt under the FLSA insofar as they primarily perform executive, administrative, and/or professional duties; are paid on a salary basis; and earn at least $844 per week ($43,888 per year) but less than $1,128 per week ($58,656 per year). Many of these employees routinely work more than forty hours in a given workweek.

11.    As of January 1, 2025, with respect to these workers, Lee Hill Investments, LLC must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, Lee Hill Investments, LLC will then have to either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and forego their services. Again, once paid, Lee Hill Investments, LLC has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

12.     In addition, Lee Hill Investments, LLC has expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers, and determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. Lee Hill Investments, LLC will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule.

13.     Reclassification of Lee Hill Investments, LLC employees as non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED on this 10th day of July, 2024.


_____
Jared Lee

# EXHIBIT E

## DECLARATION OF MARK MANSFIELD

I, Mark Mansfield, declare as follows:

1.      I am over the age of 18 and competent to make this declaration.

2.      I am President of NextQuest, Inc. ("NextQuest"), which is in the business as an independent franchisee of Sport Clips Haircuts, a hair salon business for Men and Boys.

3.      The statements in this declaration are true and within my personal knowledge and/or my review of NextQuest's records.

4.      Mark Mansfield is currently a member of International Franchise Association (IFA)

5.      NextQuest is an employer subject to the Fair Labor Standards Act, and the rule entitled "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees," 89 Fed. Reg. 32842, which was published by the U.S. Department of Labor ("DOL" or "the Department") on April 24, 2024 ("the 2024 Overtime Rule").

6.      NextQuest employs approximately 5 workers who were exempt under the FLSA prior to July 1, 2024, insofar as they primarily performed executive, administrative, and/or professional duties; were paid on a salary basis; and who earned at least $684 per week ($35,558 per year). Many of these employees routinely worked more than forty hours in a given workweek.

7.      As of July 1, 2024, as a direct result of the increase in the EAP salary threshold increase contained in the 2024 Overtime Rule, approximately 1 of NextQuest's employees have lost their exempt status. The continue to perform exactly the same duties and continue to be paid on a salary basis. However, they are paid less than $844 per week ($43,888 per year).

8.    With respect to these workers, NextQuest must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, NextQuest must now either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and thus forego their services. Once paid, NextQuest has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

9.    The 2024 Overtime Rule increases the EAP exemption to $1,128 per week ($58,656 per year) as of January 1, 2025.

10.    NextQuest employs approximately 4 workers are exempt under the FLSA insofar as the primarily perform executive, administrative, and/or professional duties; are paid on a salary basis; and earn at least $844 per week ($43,888 per year) but less than $1,128 per week ($58,656 per year). Many of these employees routinely work more than forty hours in a given workweek.

11.    As of January 1, 2025, with respect to these workers, NextQuest must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, NextQuest will then have to either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and forego their services. Again, once paid, NextQuest has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

12.    In addition, NextQuest has expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers, and determine whether it makes sense as a business matter to increase their salary; incur the costs of

2

overtime pay; or limit their hours to forty per week and forego their services. NextQuest will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule.

13.    Reclassification of NextQuest's employees as non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED on this 9th day of July, 2024.

Mark Mansfield

3

# EXHIBIT F

## DECLARATION OF TODD RICKER

I, Todd Ricker, declare as follows:

1.      I am over the age of 18 and competent to make this declaration.

2.      I am President of Sport Clips Haircuts ("GRQ SPORTS INC."), which is in the business of franchisee of Sport Clips Haircuts

3.      The statements in this declaration are true and within my personal knowledge and/or my review of GRQ Sports Inc.'s records.

4.      GRQ Sports Inc. is currently a member of IFA.

5.      GRQ Sports Inc. is an employer subject to the Fair Labor Standards Act, and the rule entitled "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees," 89 Fed. Reg. 32842, which was published by the U.S. Department of Labor ("DOL" or "the Department") on April 24, 2024 ("the 2024 Overtime Rule").

6.      GRQ Sports Inc. employs approximately 20 workers who were exempt under the FLSA prior to July 1, 2024, insofar as they primarily performed executive, administrative, and/or professional duties; were paid on a salary basis; and who earned at least $684 per week ($35,558 per year). Many of these employees routinely worked more than forty hours in a given workweek.

7.      As of July 1, 2024, as a direct result of the increase in the EAP salary threshold increase contained in the 2024 Overtime Rule, approximately 10 of GRQ Sports Inc.'s employees have lost their exempt status. The continue to perform exactly the same duties and continue to be paid on a salary basis. However, they are paid less than $844 per week ($43,888 per year).

8.      With respect to these workers, GRQ SPORTS INC. must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, GRQ

SPORTS INC. must now either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and thus forego their services. Once paid, GRQ SPORTS INC. has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

9.     The 2024 Overtime Rule increases the EAP exemption to $1,128 per week ($58,656 per year) as of January 1, 2025.

10.     GRQ SPORTS INC. employs approximately 10 workers are exempt under the FLSA insofar as the primarily perform executive, administrative, and/or professional duties; are paid on a salary basis; and earn at least $844 per week ($43,888 per year) but less than $1,128 per week ($58,656 per year). Many of these employees routinely work more than forty hours in a given workweek.

11.     As of January 1, 2025, with respect to these workers, GRQ SPORTS INC. must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, GRQ SPORTS INC. will then have to either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and forego their services. Again, once paid, GRQ SPORTS INC. has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

12.     In addition, GRQ SPORTS INC. has expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers, and determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. GRQ SPORTS INC.

will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule.

13.     Reclassification of GRQ SPORTS INC.'s employees as non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED on this 11th day of July, 2024.

_____
Todd Ricker

# EXHIBIT G

# DECLARATION OF WILLIAM VOEGTLE

I, WILLIAM VOEGTLE, declare as follows:

1.      I am over the age of 18 and competent to make this declaration.

2.      I am President of Voegtle Enterprises Inc. which is in the business of haircare and related haircare products.

3.      The statements in this declaration are true and within my personal knowledge and/or my review of Voegtle Enterprises Inc's records.

4.      Voegtle Enterprises is currently a member of IFA is an employer subject to the Fair Labor Standards Act, and the rule entitled "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees," 89 Fed. Reg. 32842, which was published by the U.S. Department of Labor ("DOL" or "the Department") on April 24, 2024 ("the 2024 Overtime Rule").

5.      Voegtle Enterprises Inc. employs approximately 14 workers who were exempt under the FLSA prior to July 1, 2024, insofar as they primarily performed executive, administrative, and/or professional duties; were paid on a salary basis; and who earned at least $684 per week ($35,558 per year). Many of these employees routinely worked more than forty hours in a given workweek.

6.       As of July 1, 2024, as a direct result of the increase in the EAP salary threshold increase contained in the 2024 Overtime Rule, approximately 14 of Voegtle Enterprises's employees have lost their exempt status. The continue to perform exactly the same duties and continue to be paid on a salary basis. However, they are paid less than $844 per week ($43,888 per year).

7.      With respect to these workers, Voegtle Enterprises Inc. must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, Voegtle Enterprises Inc. must now either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and thus forego their services. Once paid, Voegtle Enterprises Inc. has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

8.      The 2024 Overtime Rule increases the EAP exemption to $1,128 per week ($58,656 per year) as of January 1, 2024.

9.      Voegtle Enterprises Inc. employs approximately 2 workers are exempt under the FLSA insofar as the primarily perform executive, administrative, and/or professional duties; are paid on a salary basis; and earn at least $844 per week ($43,888 per year) but less than $1,128 per week ($58,656 per year). Many of these employees routinely work more than forty hours in a given workweek.

10.     As of January 1, 2025, with respect to these workers, Voegtle Enterprises Inc. must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, Voegtle Enterprises Inc. will then have to either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and forego their services. Again, once paid, Voegtle Enterprises Inc. has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

11.     In addition, Voegtle  Enterprises Inc.  has expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers, and

determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. voegtle enterprises inc will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule.

12.     Reclassification of voegtle enterprises inc employees as non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED on this 7th day of July, 2024.


/s/ William Voegtle
William Voegtle

# EXHIBIT H

## DECLARATION OF MATTHEW WANSTREET

I, Matthew Wanstreet, declare as follows:

1.  I am over the age of 18 and competent to make this declaration.

2.  I am President of SportClips Company Stores (SportClips, Inc.) which is in the business of salons/haircuts.

3.  The statements in this declaration are true and within my personal knowledge and/or my review of SportClips's records.

4.  SportClips, Inc. is currently a member of IFA.

5.  SportClips, Inc. is an employer subject to the Fair Labor Standards Act, and the rule entitled "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees," 89 Fed. Reg. 32842, which was published by the U.S. Department of Labor ("DOL" or "the Department") on April 24, 2024 ("the 2024 Overtime Rule").

6.  SportClips, Inc. employs approximately 82 workers who were exempt under the FLSA prior to July 1, 2024, insofar as they primarily performed executive, administrative, and/or professional duties; were paid on a salary basis; and who earned at least $684 per week ($35,558 per year). Many of these employees routinely worked more than forty hours in a given workweek.

7.  As of July 1, 2024, as a direct result of the increase in the EAP salary threshold increase contained in the 2024 Overtime Rule, approximately 82 of SportClips Inc's employees have lost their exempt status. The continue to perform exactly the same duties and continue to be paid on a salary basis. However, they are paid less than $844 per week ($43,888 per year).

8.  With respect to these workers, SportClips, Inc. must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, SportClips Inc. must

now either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and thus forego their services. Once paid, SportClips Inc. has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed causing financial harm.

9.      The 2024 Overtime Rule increases the EAP exemption to $1,128 per week ($58,656 per year) as of January 1, 2025.

10.     SportClips Inc. employs approximately 6 workers are exempt under the FLSA insofar as the primarily perform executive, administrative, and/or professional duties; are paid on a salary basis; and earn at least $844 per week ($43,888 per year) but less than $1,128 per week ($58,656 per year). Many of these employees routinely work more than forty hours in a given workweek.

11.     As of January 1, 2025, with respect to these workers, SportClips Inc., must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, SportClips Inc. will then have to either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and forego their services. Again, once paid, SportClips Inc. has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

12.     In addition, SportClips Inc. has expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers, and determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. SportClips Inc. will

also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule.

13.    Reclassification of SportClips Inc. employees as non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED on this 11th day of July, 2024.

Matthew Wanstreet

# EXHIBIT I

## DECLARATION OF KAREN WEDDEL

I, KAREN WEDDEL, declare as follows:

1.     I am over the age of 18 and competent to make this declaration.

2.     I am President of PS92SK, LP, which is in the business of men's haircutting.

3.     The statements in this declaration are true and within my personal knowledge and/or my review of PS92SK, LP's records.

4.     PS92SK, LP dba Sport Clips is currently a member of IFA.

5.     PS92SK, LP dba Sport Clips is an employer subject to the Fair Labor Standards Act, and the rule entitled "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees," 89 Fed. Reg. 32842, which was published by the U.S. Department of Labor ("DOL" or "the Department") on April 24, 2024 ("the 2024 Overtime Rule").

6.     PS92SK, LP employs TWO (2) workers who were exempt under the FLSA prior to July 1, 2024, insofar as they primarily performed executive, administrative, and/or professional duties. They were paid on a salary basis and earned at least $684 per week ($35,558 per year). These employees often worked more than forty hours in a workweek.

7.      As of July 1, 2024, as a direct result of the increase in the EAP salary threshold increase contained in the 2024 Overtime Rule, ONE (1) of PS92SK, LP's employees has lost his/her exempt status. They continue to perform the same duties and continue to be paid on a salary basis. However, they are paid less than $844 per week ($43,888 per year).

8.     With respect to these workers, PS92SK, LP must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, PS92SK, LP must now either (a) pay them overtime at time-and-a-half their regular rate for hours worked in excess

of forty in a given workweek; or (b) limit their hours to no more than forty hours per week and thus forego their services. Once paid, PS92SK, LP has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

9.      The 2024 Overtime Rule increases the EAP exemption to $1,128 per week ($58,656 per year) as of January 1, 2025.

10.     PS92SK, LP employs ONE (1) worker who is exempt under the FLSA insofar as he/she primarily performs executive, administrative, and/or professional duties. They are paid on a salary basis and earn at least $844 per week ($43,888 per year) but less than $1,128 per week ($58,656 per year). This employee often works more than forty hours in any given workweek.

11.     As of January 1, 2025, with respect to this worker, PS92SK, LP must either increase his/her salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, PS92SK, LP will then have to either (a) pay them overtime at time-and-a-half their regular rate for hours worked in excess of forty in a given workweek; or (b) limit their hours to no more than forty hours per week and forego their services. Again, once paid, PS92SK, LP has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

12.     In addition, PS92SK, LP has expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers and determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. PS92SK, LP will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule.

13.     Reclassification of PS92SK, LP's employees as non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED on this 10th day of July, 2024.


Karen Weddel
Karen Weddel

3

# EXHIBIT J



PARTNERSHIP TO PROTECT
**WORKPLACE OPPORTUNITY**

November 7, 2023

*Submitted via www.regulations.gov*

Amy DeBisschop
Director
Division of Regulations, Legislation, and Interpretation
Wage and Hour Division
U.S. Department of Labor
200 Constitution Avenue, N.W.
Room S-3502
Washington, DC 20210

> **RE:    Proposed Rule Defining and Delimiting the Exemption for Executive, Administrative, Professional, Outside Sales, and Computer Employees RIN 1235-AA39; 88 Fed. Reg. 62152 (September 8, 2023)**

Dear Ms. DeBisschop:

The Partnership to Protect Workplace Opportunity ("PPWO") submits these comments on the Department of Labor ("DOL" or "the Department")'s proposal to raise the salary threshold for the executive, administrative, professional, outside sales, and computer employee exemptions (the "EAP exemption") from the overtime requirements of the Fair Labor Standards Act ("FLSA") (the "Proposed Rule"). The PPWO is a coalition of a diverse group of associations and other stakeholders representing employers from the private, nonprofit, and public sector with millions of "white collar" employees across the country in almost every industry who will be affected by the proposed changes.

The PPWO's members believe that employees and employers alike are best served with a system that promotes maximum flexibility in structuring employee hours, career advancement opportunities for employees, and clarity for employers in classifying their employees under the FLSA. Unfortunately, as we describe below, if implemented as written, the Proposed Rule will result in large numbers of employees being reclassified as non-exempt, with significant consequences for both the reclassified employees and their employers. By way of example, the PPWO is deeply concerned that such reclassification will:

Partnership to Protect Workplace Opportunity
November 7, 2023
Page 2

- Harm the ability of employers to provide, and employees to take advantage of, remote work and flexible scheduling options which have become increasingly popular since being introduced during the pandemic and also help alleviate the growing childcare crisis;

- Limit career advancement opportunities for employees;

- Reduce employee access to a variety of additional benefits, including incentive pay;

- Limit employers' ability to provide employees with mobile devices and remote electronic access, further limiting employee flexibility;

- Result in employees in the same job classification (for the same employer) being classified and treated differently based on regional cost-of-living differences, facility profitability, or other factors that impact budget;

- Force employees to be reassigned or let go as employers make operational changes needed to achieve the organization's mission under new pay and staffing paradigms;

- Trigger declines in employee morale, particularly in cases where peers remain exempt since exempt status is often seen as a higher status;

- Increase FLSA litigation based on off-the-clock and regular rate of pay claims; and

- Introduce other legal and operational issues, such as increased administrative costs.

Moreover, given the Department's proposal to increase the salary level on a triennial basis, these are not one-time issues. Rather, these issues will recur repeatedly, as employers decide with each salary threshold increase whether continued classification of an employee as exempt is worth the annual salary increase.

As a preliminary matter, the Department itself recognizes that the exemptions are premised on the belief that "exempted workers typically earn salaries well above the minimum wage and are presumed to enjoy other privileges to compensate them for their long hours of work. These include, for example, above-average fringe benefits and better opportunities for advancement, setting them apart from nonexempt workers entitled to overtime pay."[1] Yet, because the Proposed Rule would increase the salary level by nearly 70 percent, from $35,568 annually to $60,209 annually,[2] and

---

[1] 88 Fed. Reg. 62154.

[2] At the outset, the PPWO objects to the Department's intentional lack of clarity as to what exactly it is proposing to set as the salary threshold for the EAP exemption. Although its press release claims that the Proposed Rule will increase the salary threshold to $1,059 per week, or $55,068 annually—itself an increase of almost 55 percent—the Department buries in a footnote the fact that assuming a final rule is promulgated in the first quarter of 2024, the salary threshold would in fact be $1,158 per week, or $60,209 annually, an increase of $24,641 per year. *See* 88 Fed. Reg. 62153 n. 3. While a final rule propounded in, say, the second quarter of 2024 would likely include an even higher threshold, these comments proceed from the assumption that the Department will issue a final rule in that first quarter, and use the Department's own prediction as to the likely amount of the threshold in a final rule issued at that time.

Partnership to Protect Workplace Opportunity
November 7, 2023
Page 3

increase the highly-compensated exemption ("HCE") from $107,432 per year to $143,988 per year (an increase of 34 percent), it would have the perverse effect of forcing many employers to take away the benefits and opportunities for advancement for those employees who will lose exempt status.

Due to these significant impacts the Proposed Rule likely will have on employers, the regulated community made hundreds of requests to extend the comment period to allow additional time to evaluate the consequences of this rulemaking. In rejecting those requests, the Department relied primarily on its assertion that it had engaged in "listening sessions" on the EAP exemption last year. These sessions are, of course, not part of the regulatory record. More important, these "listening sessions" did not include actual, concrete proposals upon which stakeholders could comment. "An" increase to the salary level is meaningless for analytical purposes; only when a dollar figure is attached can meaningful and valuable analysis take place. Furthermore, none of the points raised by employers during the listening sessions are reflected in the Proposed Rule.

Coupling the surprisingly high proposed salary level with its effort to permanently index that salary level, it is clear that the Department's belief that 60 days is sufficient for comment is erroneous. If the Department was interested in obtaining the best possible information with which to assess the impact of its proposal, it would have given additional time for comment. Indeed, by denying the request for additional time in which to comment, the Department deprived the PPWO and others of the chance to provide crucial information to the agency, including hard data that would have been highly pertinent to its decision-making.

Finally, it bears note that the Department has propounded the Proposed Rule during a time of intense economic uncertainty, in which employers are experiencing extreme inflationary pressure in the marketplace. The Proposed Rule, which will dramatically increase costs for employers, could not come at a worse time.

At a time when more and more workers seek additional flexibility in their schedules and an ownership stake in their work, the Department's proposal will return us to a 1940s mentality of clock-punching for all but the most highly paid employees. As detailed below, this result is bad for employees, bad for employers, and bad for the economy. We urge the Department to reconsider its decision to proceed with such a disruptive rulemaking.

Before turning to analysis of the Proposed Rule, a brief review of the Department's recent history on this topic is instructive.

I.  **The Department's Prior Attempt to Impose a Similar Formula to Increase and Index the EAP Exemption Salary Threshold Demonstrates that the Proposed Rule Is Unlikely to Withstand Judicial Scrutiny.**

In 2016, the Department promulgated a final rule (the "2016 Final Rule") which pegged the EAP exemption threshold to the 40th percentile of weekly earnings for full-time salaried workers in the lowest wage Census Region (the South). That rule raised the minimum salary level

for the EAP exemption to $913 per week, or $47,476 annually—more than double the then-existing threshold.[3] The 2016 Final Rule was challenged in the U.S. District Court for the Eastern District of Texas.[4] The court enjoined and later vacated the rule, concluding that its unprecedentedly high minimum salary threshold essentially negated the "duties test" for the exemption in contravention of the FLSA. As the court explained:

> Specifically, the Department's authority is limited to determining the essential qualities of, precise signification of, or marking the limits of those "bona fide executive, administrative, or professional capacity" employees who perform exempt duties and should be exempt from overtime pay. ***With this said, the Department does not have the authority to use a salary-level test that will effectively eliminate the duties test as prescribed by Section 213(a)(1)*** … Nor does the Department have the authority to categorically exclude those who perform "bona fide executive, administrative, or professional capacity" duties based on salary level alone. ***In fact, the Department admits, "[T]he Secretary does not have the authority under the FLSA to adopt a 'salary only' test for exemption."***

> \*\*\*

> The Final Rule more than doubles the Department's previous minimum salary level, increasing it from $455 per week ($23,660 annually) to $913 per week ($47,476 annually). ***This significant increase would essentially make an employee's duties, functions, or tasks irrelevant if the employee's salary falls below the new minimum salary level. As a result, entire categories of previously exempt employees who perform "bona fide executive, administrative, or professional capacity" duties would now qualify for the EAP exemption based on salary alone.***[5]

In simplest terms, the court found that the 2016 Final Rule's salary threshold—which was significantly less than the salary level set forth in the Proposed Rule—violated the FLSA by "essentially mak[ing] an employee's duties, functions or tasks irrelevant" for a wide swath of workers, in contravention of clear Congressional intent.[6, 7] That the Department now expects the adoption of an even higher threshold only a few years later to pass muster is at best optimistic, and at worst disingenuous. As set forth below, for the same reasons that the 2016 Final Rule was found to be unlawful, a final rule that materially resembles that which the Department has proposed is

---

[3] It also increased the so-called "highly-compensated exemption" ("HCE") to $134,000 annually—an increase of 34 percent, and, as the Proposed Rule does, included a triennial automatic escalator clause.
[4] *See Nevada v. U.S. Department of Labor*, 275 F. Supp. 3d 795 (E.D. Tex. 2017) (holding that 2016 Final Rule exceeded DOL's authority under FLSA).
[5] *Id.* at 805 (emphases added).
[6] *Id.* at 806.
[7] Subsequent to the invalidation of the 2016 Final Rule, the Department promulgated a final rule in 2019 which raised the salary threshold to the current $684 per week or $35,568 annually, and increased the HCE to its current $107,432 per year.

highly likely to meet a similar fate. The Department should abandon this ill-timed and unnecessary effort.

II.    **The Minimum Salary Level Proposed by the Department Is Excessively High to Satisfy its Gatekeeper Function, Is Inappropriately Disruptive to Employers with National Operations, and Will Harm the Very Employees the Department Purports to Protect.**

The proposed salary level, which would be higher than the exempt salary levels set under state law in almost every state in the union, is far too high to effectuate its historical "gatekeeping" purpose. It will force employers to make classification decisions that ignore regional economic differences and will cause significant disruption in the workplace. The wage costs, administrative expenses, and intangible consequences of the Department's proposal will be significant, particularly when considered against the fact that if the Department's estimate of impact is correct—which it is not—some 85 percent of the employees potentially impacted by this rulemaking will see no change in compensation and no change in hours worked.[8]

A.    **The Department's Proposed Minimum Salary Is Too High to Achieve Its Historical, Gatekeeping Purpose.**

The Department has long recognized the "salary level's historic function of screening obviously non-exempt employees from the exemption, a 'principle [that] has been at the heart of the Department's interpretation of the EAP exemption for over 75 years.'"[9] That is, the salary level should be set at a level at which the employees below it clearly would not meet any duties test; above the level, employees would still need to meet a duties test in order to qualify for exemption. In setting the proposed level as high as it has, however, the Department has turned this analysis on its head. The Department seems to be setting the salary level at a point at which all employees above the line would be exempt, turning the salary level from its historical role as a screening device into the *de facto* sole test and a mechanism for greatly limiting the ability of employers to avail themselves of these exemptions. Indeed, built into the Department's (erroneous) assumption that litigation will decrease as a result of this rulemaking is the belief that employees above the line will be more clearly exempt.[10] That has never been the Department's goal in setting the salary level.

Such a dramatic departure from the historical purpose of the salary level will have far-reaching consequences. The Department's proposed minimum salary level will force employers to reclassify positions that clearly meet the duties test where the nature of the industry (*e.g.*, non-

---

[8] *See* 88 Fed. Reg. 62195 (roughly 85 percent of workers potentially impacted by salary level change do not usually work overtime).

[9] *Id.* at 62165 (citing *Defining and Delimiting the Exemption for Executive, Administrative, Professional, Outside Sales, and Computer Employees; Final Rule*, 84 Fed. Reg. 51230, 51241 (September 27, 2019)).

[10] *See id.* at 62157 ("The Department has long recognized that the salary level test is a useful criterion for identifying bona fide EAP employees and providing a practical guide for employers and employees, thus tending to reduce litigation…").

profit, or many employers in the health care industry)[11] or the regional economy cannot justify a salary increase.

Where 1.6 million positions that meet the duties test will need to be reclassified (or have their salaries increased) as a result of the salary level, the new salary level ceases to function as a gatekeeper. The Department should reconsider its proposal and, to the extent that an increase to the minimum salary level is deemed to still be appropriate, that salary level should be set in accordance with the historical purpose of the salary level test—to exclude clearly non-exempt employees from further analysis.

> ### B.    The Department's Proposed Minimum Salary Level Fails to Account for Regional Economic and Market Differences.

Despite the Department's suggestion to the contrary, the methodology for determining the salary threshold set forth in the Proposed Rule fails to account for regional differences.[12]

As the Department is well aware, the federal government considers geographic variations when setting the compensation levels for its own employees. Among some of the highest compensation levels set by the federal government are those in California and New York.[13] Setting a salary level that approximates the minimum level determined in some of the highest-cost regions in the country demonstrates just how far removed from the historical role of the salary level test the Department's proposed salary level is.

The Department's own estimate suggests that under the Proposed Rule, fully one-quarter of salaried workers will have their exemption status determined by the salary test alone.[14] While this may be true on a national basis, it is equally true that a much higher proportion of workers in lower-wage areas and those outside of large metro areas will be classified as exempt (or not) based solely on the salary threshold; there are substantial pay differences based on geographical region and pay differences between larger and smaller cities that are unlikely to be related to differences in job duties. Indeed, one estimate suggest that for many jobs, including occupations in which the Department assumes (based on dated and faulty data, discussed below) that the vast majority of workers in such jobs pass the duties test, the Proposed Rule's increased salary threshold is not a "gatekeeper" but rather the alpha-and-omega of their exempt status.[15]

---

[11] It bears particular note that the Proposed Rule neglects to consider the practical impact of its draconian increases on those employers who cannot offset higher wages or additional overtime by simply raising their prices. For example, non-profits often rely on donations and grants to maintain their revenues; these sources of income will not be increased simply because the Department raises the EAP exemption threshold. Similarly, health-care employers often largely depend on reimbursements from Medicare, Medicaid, and private insurance which, again, are unlikely to increase simply because the Department adjusts its regulations.

[12] *See* 88 Fed. Reg. 62167.

[13] For example, in 2023. the federal government provides a locality pay differential of 36.16 percent for employees in the New York metropolitan areas and 44.15 percent for employees in the San Francisco area.

[14] *See* 88 Fed. Reg. 62158.

[15] *See* Stephen G. Bronars, Ph.D. & Deborah K. Foster, Ph.D., Edgeworth Economics, "Regional Implications of DOL's White-Collar Exemption Notice of Proposed Rulemaking" (Oct. 24, 2023), available at:

Partnership to Protect Workplace Opportunity
November 7, 2023
Page 7

For example, in ten job categories in which the Department assumes employees are highly likely (90 to 100 percent) to pass the duties test, between 24 and 40 percent of them on a national basis will fail to meet the Proposed Rule's increased salary threshold.[16] With respect to employees in the South and Midwest Census regions, that range increases to 28 to 48 percent—almost half.[17] And with respect to employees working in the South and Midwest regions outside large metro areas, somewhere between 34 and 70 percent of workers will fail to meet the increased salary threshold.[18]

This effective elimination of the exemption for certain low-cost-of-living areas of the country makes clear that the Department is once again exceeding its statutory authority. Congress directed the Department to define and delimit the terms in the statute; it cannot possibly have meant that the Department should effectively eliminate the exemption in certain regions. But because the minimum salary has been proposed at such a high level, that is precisely what the Department is doing. The South and Midwest will be placed at a competitive disadvantage to other regions; employers in urban areas will be able to maintain exempt employees at a rate that far exceeds rural areas.

These facts are especially troubling insofar as the Department's impact calculations rely on outdated and flawed data. The Department's predictions as to the probability of employees passing the duties test are based on a 1999 study of the General Accounting Office, which itself relied upon information provided by DOL in the 1990s—more than three decades ago.[19] The Census Bureau has since updated occupation classifications on several occasions during this time to reflect the realities of the 21st century workforce; nevertheless, the Department continues to apply 1999 probability ranges that may bear little to no resemblance to jobs in the current labor market.

Nor will the impact of the proposed salary level simply be limited to employers in the lower-cost-of-living regions in the country. Many employers with national operations will be impacted as well. Because the cost of living varies greatly throughout the country, employers often have different salaries for the same job position depending on where the employee works, similar to how the federal government operates. The job duties are precisely the same. The only thing that differs is location.

For example, an employee in New York City will have a higher cost of living than an employee working in Knoxville, Tennessee. Accordingly, the employer may provide the employee in New York with a higher salary than the employee with the same job title and job responsibilities in Knoxville. With the Department's proposed increase to the minimum salary

---

https://www.edgewortheconomics.com/publication-6501 (last visited October 20, 2023). Indeed, over 100 million people—more than 30 percent of the U.S. population—live in the South and Midwest but not within large metro areas. For these individuals, the Proposed Rule's salary threshold exceeds the 40th percentile of full-time salaried pay, and one-third of them in jobs which the Department predicts will routinely pass the duties test will not satisfy the salary threshold. *See id.*

[16] *See id.*
[17] *See id.*
[18] *See id.*
[19] *See* 88 Fed. Reg. 62188.

level, that employer may now need to decide whether the economics of the Knoxville location justify an increase to the new salary level or whether the Knoxville position will need to be reclassified as non-exempt. This again demonstrates the Department's significant departure from the traditional role of the salary test. In too many of these instances, salary, rather than job duties, will determine exempt status, in contravention of both the text and the purpose of the FLSA.

C.    **The Department's Proposed Minimum Salary Will Negatively Impact the Ability of Employees to Work in Part-Time Capacities.**

The Department's proposed increase to the minimum salary level will negatively impact the ability of employers to provide part-time exempt positions. Although the current regulatory scheme does not permit part-time exempt employees on a *pro rata* basis, the PPWO believes that such an adjustment is necessary under the proposed salary level to ensure that these types of positions can remain exempt and, therefore, continue to be offered.

Because it is not clear from the Department's statements in the preamble that it fully understands this issue, we provide the following example. Under the current regulations, an employee who performs tasks that clearly meet one or more of the exemption duties tests can be classified as exempt so long as his or her salary exceeds $35,568 per year. Thus, a part-time employee working a 50 percent schedule can qualify as exempt so long as they work in a position that has a full-time salary of approximately $72,000 per year. This is true not because the full-time equivalent salary is $72,000, but because the half-time salary of $36,000 is still in excess of the regulatory minimum.

Under the Department's proposed minimum salary level, that employee would no longer qualify for exemption. Instead, in the first year under the Department's proposal, an employee working a 50 percent schedule would need to be working in a position earning more than $120,500 on a full-time basis. Obviously, without a *pro rata* provision, the number of employees who will be eligible for part-time exempt employment will be significantly limited. This limitation will have a disproportionate impact on women in the workplace, and, in particular, will likely impact mothers who may be seeking to re-enter the workplace as professionals, but not on a full-time basis. Similarly, older workers looking to pursue a phased retirement would likely be disadvantaged by the Department's increased minimum salary level.

If the Department fails to implement a *pro rata* provision, the proposed increase to the minimum salary level will create two classes of employees performing the same work: full-time exempt employees and part-time non-exempt employees. Employers will be unable (for practical purposes) to take a consistent approach to a job because it simply is not feasible to reclassify entire positions as non-exempt due to the issues related to part-time employees. As a result, however, individuals working side-by-side would be subject to different rules and obligations simply because one is a full-time employee, and one is a part-time employee. Although fairness, and the nature of their work, should dictate that such colleagues be treated the same, the Department's proposed salary level would all but require the part-time employee to be treated differently. Teamwork, productivity, and morale will undoubtedly suffer.

In addition to the likely stigma associated with the different classification decisions based on full-time vs. part-time, the Department's proposed salary level would deprive employers of the ability to offer the types of flexible work and scheduling opportunities that are crucial to meeting the demands of the modern workplace. Punching a clock is not conducive to allowing employees to build their schedules around their personal or family needs and preferences. Many job-sharing and part-time opportunities, as well as seasonal positions, will be diminished if an employer cannot classify those positions as exempt.

If the Department permitted the salary to be pro-rated, however, employers would be far more likely to allow such arrangements. We therefore urge the Department to add a *pro rata* provision to the regulations, regardless of the salary level ultimately adopted in a final rule.

### D.  The Department's Proposed Salary Level Will Negatively Impact Employee Compensation, Flexibility, and Morale.

In creating conditions in which employees must be reclassified to non-exempt status, the Department's proposed salary level will negatively impact many employees' ability to earn incentive compensation. When employees are converted to non-exempt status, they often find that they have lost their ability to earn incentive pay. Under existing rules for calculating overtime rates for hourly workers, many incentive payments must be included in a non-exempt employee's "regular rate" (*i.e.*, the base rate for overtime) of pay. Faced with the difficult calculation (and recalculation) of these overtime rates—sometimes looking back over every pay period in a year—employers often simply forgo these types of incentive payments to nonexempt employees rather than attempt to perform the required calculations.

Although reclassification as a non-exempt employee often has such economic consequences for an employee, reclassification is not limited to those economic consequences. The change to non-exempt status means that many employees also will lose the ability to structure their time to address needs such as attending their child's school activities or scheduling doctors' appointments. Many other employees will lose the opportunity to work from home or remotely, as it can be difficult for employers to track employees' hours in those situations. Employers may also cease providing employees with mobile devices, as any time spent checking them would now have to be accounted for.

In addition, employees often view reclassifications to non-exempt status as "demotions." Particularly where other employees within the same organization will continue to be exempt (due to regional economic variations or full-time status), it is easy to see why. The non-exempt employee will now need to account for their time in a way they have not had to previously, and in a way that their exempt co-workers do not. In addition, because of the increased attention that must be paid to the hours worked by the non-exempt employee, they are likely to be at a competitive disadvantage to the exempt employee in the same role. Many training opportunities will now become compensable time under the FLSA and where those opportunities would put the non-exempt employee into an overtime situation, their access to those opportunities may be limited; the same is not so for their exempt colleague.

Similarly, the non-exempt employee may be limited in their ability to "get it done" now that they must record and account for all hours worked. These types of intangibles—being known as someone who "just gets the job done"—are often considered in whether an employee receives a promotion, bonus, or training opportunity. As a result of the Department's dramatically increased proposed minimum salary level, career advancement may become more a function of where an employee *sits* than what they actually *do*.

The importance of this issue is worth repeating here: the Department fails to sufficiently acknowledge the reality that many workers view their exempt status as a symbol of their success within the company. In fact, even when all other aspects of the work remain the same and even when their overall compensation increases with the addition of overtime pay, employees frequently view the transition from exempt to non-exempt as a demotion. Far from being enthusiastic, members of the PPWO have described reclassified employees as feeling like they were being disciplined and distraught over being reclassified.

**E.    Any Increase in the EAP Exemption Salary Threshold Should Be Phased in Over Time and the Department Should Provide an Extended Effective Date.**

Despite the numerous negative impacts that would result from increasing the salary to the Department's suggested level, should it nevertheless decide to increase the salary, the PPWO believes the Department should do so incrementally.[20] Specifically-identified interim levels, spread out over the course of several years, will ensure a smooth and compliant transition and will allow employers the necessary time to adjust their budgets, revenues, and work flows to minimize disruption. As currently proposed, the Department's minimum salary level would increase almost 70 percent in an extraordinarily short amount of time.

In addition, due to the rapid nature of the required increase, employers may make classification decisions today that they would not make if the increase was phased in over multiple years. A gradual and previously specified increase would allow employers the ability to prepare for the changes in a way that makes more economic sense. It also would allow employers to determine with additional certainty how many overtime hours are actually being worked by employees in the $35,568 to $60,209 range. Currently, because many of these exempt employees do not record their time, employers are faced with an information deficit. Without information regarding these hours, employers will need to guess at how many hours are worked; those guesses will almost certainly account for more overtime than will actually be worked, resulting in a net loss of income to impacted employees.[21]

---

[20] Additionally, if the minimum salary level is increased from its current level, the Department should ensure that such an increase is consistent with 2004 levels. In 2004, the Department set the minimum salary level at an amount which at that time represented the 20th percentile for salaried employees in the South geographic region and retail industry. While adjusting the 2004 data for inflation would be consistent with the FLSA, it would be equally consistent to use the 2004 methodology and exclude higher wage mid-Atlantic states in the South Census Region, the inclusion of which results in a higher minimum salary level than would otherwise be the case.

[21] Assuming that an employer attempts to compensate a reclassified employee at approximately the same level as prior to the reclassification, any new salary will be based on an understanding of how many overtime hours will be worked.

By allowing a gradual increase, an employer can begin gathering the necessary data to ensure as smooth a transition as possible and to therefore minimize the monetary impact on both the employee and the business. Although many of the same issues will exist with respect to morale, flexibility, and opportunity, a gradual, phased-in implementation of the new minimum salary would reduce the financial disruption experienced by both employers and employees.

Additionally, given the dramatic increase proposed to the standard salary level, employers will need a significant period of time to comply with these new requirements. It is simply not reasonable to expect employers to assess the impact, plan, and implement appropriate and affordable changes to employees' exempt status, salaries, and job structures all within the time frames the Department has provided, especially when its own estimates indicate that 3.4 million employees nationwide will be impacted by the nearly 70 percent increase in the minimum salary threshold.

Employers will need to familiarize themselves with the final regulation, analyze their workforce, and determine how to comply. This process will require employers to identify all exempt employees earning a salary less than the new required level; evaluate whether to comply by providing a salary increase or reclassifying some or all of such employees to non-exempt; decide whether to pay reclassified employees on an hourly or salaried basis; and draft new compensation plans for reclassified employees. Employers will also need to evaluate whether they need to limit the hours employees work; whether they can still afford to pay bonuses; what adjustments are necessary to benefit plans; and how they will set the new hourly rates or salaries. Finally, employers will need time to communicate the changes to employees and implement the changes.

For these reasons, the PPWO requests that regardless of what new salary level the Department chooses, it set an effective date for 12 to 18 months after publication of the final rule.

F.    **The Department Should Not Increase the Minimum Required Salary for Application of the Highly Compensated Employee Exemption.**

For many of the same reasons discussed above with respect to the standard salary level, the Department should not increase the minimum salary required for application of the HCE exemption. When the Department last adjusted the HCE in 2019, it provided for an increase of roughly 7.4 percent over the existing standard. The Proposed Rule would increase the current standard to $143,988, a 34 percent increase, and would increase the gap in real dollars between the standard level and the HCE exemption from roughly $71,900 to almost $89,000.

Increasing the HCE threshold—and increasing the gap between the standard salary threshold and the HCE threshold—will require employers to dedicate significant resources on administrative, human resources, and legal efforts to determine more precisely whether an employee meets exempt status for employees who (by definition) earn in excess of $140,000.

---

Should that understanding be higher than the actual number of overtime hours worked after reclassification, the affected employee will earn less than he or she did prior to reclassification.

Employers will be faced with the task of reviewing the basis on which each employee was accorded exempt status, including employees for whom the exempt status decision was made a decade ago and who may be among the most highly paid employees in the company. The specific reasons why each position is classified as exempt will need to be revisited, and there may not be sufficient records explaining whether an employee is exempt pursuant to application of the HCE test or whether the exempt status is based on application of the standard exempt criteria. A significant amount of administrative effort will be needed to determine that an employee who had been classified as exempt through application of the HCE test remains exempt under application of the standard duties test.

Moreover, although the sample size is significantly smaller, the issues associated with raising the standard threshold discussed at length above remain the same: for example, regional variations within the same business may result in different employees in the same classification being treated differently from an exemption perspective based almost entirely on the location in which they work. In addition, when HCE employees must be reclassified as non-exempt, the issues associated with that reclassification are compounded by the increased compensation level and status of such positions within the business. These employees are likely to have various levels of advanced education and have come to expect to be treated as salaried professionals.

The reasons raised with respect to the Proposed Rule's increase in the standard salary threshold apply in equal force to the HCE threshold. Both counsel the Department to withdraw and rethink the rule in its entirety.

### G.   The Proposed Rule Will Have a Devastating Impact on the Economy of Puerto Rico; the Current Salary Threshold There Should Be Maintained.

The Proposed Rule would apply the new, increased salary threshold for the standard exemption to a number of U.S. territories, most notably, Puerto Rico. This despite the fact that Congress has made clear its intent that the economy of Puerto Rico merits special treatment with respect to the EAP salary threshold, and that in 2019, the Department, cognizant of this fact, elected not to increase the threshold for Puerto Rico and other territories. The Department should adopt a similar approach in this rulemaking, and absent direction from Congress, maintain the existing salary threshold for these territories generally and Puerto Rico specifically.

The current salary threshold for Puerto Rico is a special salary level most recently reaffirmed in the Department's 2019 final rule, $455 per week (reflecting the rate then in effect when the Department overhauled the overtime regulations in 2004). As such, the Proposed Rule would increase the standard salary level by a staggering $703 per week—an increase of over 150 percent from its current level.

When the Department last attempted to raise the EAP salary exemption in Puerto Rico to the standard rate, Congress took decisive action to prevent it from doing so. Specifically, when the Department proposed extending the standard rate to Puerto Rico in its 2015 proposed rule,

Congress responded by enacting the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") which, among other things, provided that the then-proposed increase in the standard salary level would have no force or effect in Puerto Rico unless and until the Department provided a determination that applying this salary level would have no negative impact on the economy of Puerto Rico.[22] When the Department next updated the EAP salary level in 2019, it recognized "Congress's apprehension with increasing the salary level in Puerto Rico," and, in light of the "current economic climate," set a special salary level that mirrored that which was applied under PROMESA.[23]

The Proposed Rule would apply the new salary level in Puerto Rico simply because it is in "accordance with the Department's longstanding practice, and in the interest of applying the FLSA uniformly to all employees subject to the Federal minimum wage,"[24] despite the fact that "the salary levels for the U.S. territories have not changed since 2004, and it understands that U.S. territories face their own economic challenges," and that these increases "will be more pronounced" in these territories."[25] The Proposed Rule would make these changes even though, as the Department expressly recognizes, "data are not available to conduct a full analysis of impacts in the territories."[26]

The Proposed Rule would increase the salary exemption threshold in Puerto Rico by more than 150 percent—effectively eliminating the functions of the duties test throughout the territory. Moreover, the proposed salary level would surpass the 90th percentile of Puerto Rico's wage distribution, effectively eliminating the availability of the exemption entirely. The Department admits it has no data or analysis to support this effort, and has not made any attempt to engage in such analysis. As such, its attempt to wreak devastating economic consequence in the interest of "consistency" because it claims that this is the Department's "longstanding practice" should be rejected and omitted in any final rule the Department promulgates.

III.    **The Proposed Rule's "Indexing" Provisions Violate the FLSA and the APA, Are Contrary to Congressional Intent and the Department's Own Prior Position, and Fail to Contemplate Its Practical Economic Impacts.**

As it did in the failed 2016 Final Rule, the Department again proposes to automatically adjust the EAP exemption salary threshold on a triennial basis. As it lacked the statutory basis under the FLSA to do so then, it so does now. Similarly, as it then lacked the capacity to adjust the minimum salary thresholds without complying with the notice-and-comment requirements of the APA as expressly required by the FLSA, it again lacks that capacity. Finally, just as its prior effort failed to contemplate the practical economic impact of an auto-escalation provision, its current effort again fails to do so. For each of these reasons the Department should abandon any effort to automatically increase the EAP salary threshold in any final rule.

---

[22] *See* 48 U.S.C. § 2193.
[23] 84 Fed. Reg. 51246.
[24] 88 Fed. Reg. 62175.
[25] *Id.*at 62175, 62192.
[26] *Id.* at 62192.

**A.**    **The FLSA Does Not Permit the Department to Adopt Automatic Indexing of the EAP Exemption Salary Level.**

First and foremost, the Department lacks the statutory authority under the FLSA to automatically index the EAP exemption salary threshold. The plain terms of 29 U.S.C. § 213(a)(1) authorize the Secretary of Labor to "define[] and delimit[]" the meaning of the executive, administrative, or professional categories "from time to time by regulations."[27] To be sure, this authorizes the Secretary to revise the regulations setting forth the functions encompassed within a "bona fide executive, administrative, or professional" capacity. But even if increasing the Department's long-standing salary threshold by almost 70 percent bears some plausible connection to changes in duties performed by exempt employees today—and it does not—there is no reasoned basis to conclude that automatic revisions to the threshold, which will be triggered only three years after a new threshold is set, will have anything to do with changes in duties. To the contrary, the indexing provision in the Proposed Rule is tied exclusively to a percentile of average salary levels for salaried employees, in a specific part the country, regardless of duties. Thus, the indexing provision in the Proposed Rule is utterly unmoored from the focus on the duties an employee performs that Congress specified in the FLSA and intended to serve as the lodestar for the Secretary to use in updating these regulations.

In light of this fact, it is perhaps unsurprising that the Department has previously expressly disclaimed that it has the authority to use indexing when setting the salary level under the FLSA's overtime provisions. In 2004, the DOL stated that adopting a method of automatic increases is "contrary to congressional intent and inappropriate"[28] and that "the Department [found] nothing in the legislative or regulatory history that would support indexing or automatic increases."[29] DOL further explained that such an action is not only contrary to Congressional intent, but would disproportionately impact lower-wage geographic regions and industries:

> [S]ome commenters ask the Department to provide for future automatic increases of the salary levels tied to some inflationary measure, the minimum wage or prevailing wages. Other commenters suggest that the Department provide some mechanism for regular review or updates at a fixed interval, such as every five years. Commenters who made these suggestions are concerned that the Department will let another 29 years pass before the salary levels are again increased. The Department intends in the future to update the salary levels on a more regular basis, as it did prior to 1975, and believes that a 29-year delay is unlikely to reoccur. The salary levels should be adjusted when wage survey data and other policy concerns support such a change. ***Further, the Department finds nothing in the legislative or regulatory history that would support indexing or automatic increases.*** Although an automatic indexing mechanism has been adopted under some other statutes, Congress has not adopted indexing for the Fair Labor Standards Act. In

---

[27] 29 U.S.C. § 213(a)(1).
[28] 69 Fed. Reg. 22172.
[29] *Id.* at 22171.

1990, Congress modified the FLSA to exempt certain computer employees paid an hourly wage of at least 6½ times the minimum wage, but this standard lasted only until the next minimum wage increase six years later. In 1996, Congress froze the minimum hourly wage for the computer exemption at $27.63 (6½ times the 1990 minimum wage of $4.25 an hour). In addition, as noted above, *the Department has repeatedly rejected requests to mechanically rely on inflationary measures when setting the salary levels in the past because of concerns regarding the impact on lower wage geographic regions and industries. This reasoning applies equally when considering automatic increases to the salary levels. The Department believes that adopting such approaches in this rulemaking is both contrary to congressional intent and inappropriate.*[30]

At no point since Congress authorized the Department to issue regulations delimiting the FLSA's section 13(a)(1) exemption has Congress granted the Department the authority to index its salary test. Congress could have provided such authority if it desired the Department to have it; Congress has permitted indexing expressly in other statutes, including the Social Security Act (which preceded the passage of the FLSA and was amended to add indexing in 1975) and the Patient Protection and Affordable Care Act. Congress clearly knows how to expressly authorize indexing when that is what it wants, including in the labor context.[31] Yet Congress, despite full knowledge of the fact that the Department has increased the salary level required for exemption on an irregular schedule, has never amended the FLSA to permit the Department to index the salary level.

The Proposed Rule cannot avoid the plain fact that neither 29 U.S.C. § 213(a)(1) specifically or the FLSA generally contain language explicitly or implicitly suggesting that the Department is empowered to automatically update the salary threshold. Undeterred, the Department relies only upon the purported "broad authority" of the Secretary,[32] and appears to take the position that Congress has implicitly left a "gap"[33] for DOL to fill. Based solely upon this attenuated reasoning, the Department concludes that it may set adjustments to the salary threshold on autopilot because Congress has failed to expressly *prohibit* them from doing so. This puts it exactly backwards. Courts "do not merely presume that a power is delegated if Congress does not

---

[30] *Id.* at 22171-72 (emphases added).

[31] *See, e.g.,* 29 U.S.C. § 1083(c)(7)(D)(vii) (indexing amount of excess employee compensation related to minimum funding standards for single-employer defined benefit pension plans); *cf.* 16 U.S.C. § 497c(b)(3) (indexing ski area permit rental charges); 43 U.S.C. § 1337(a)(3)(C)(vii) (indexing oil and gas leases).

[32] 88 Fed. Reg. 62178.

[33] *Id.* This interpretation wholly ignores the fact that Congress has not indexed the minimum wage, 29 U.S.C. § 206, the hourly wage for computer employees, 29 U.S.C. § 213(a)(17), or the annual compensation for "nonprofit parents," 29 U.S.C. § 213(b)(24). Therefore, far from leaving a "gap" for the Department to fill, the absence of express statutory language authorizing indexing in section 213(a)(l), especially in light of other provisions elsewhere in the United States Code, firmly establishes that Congress never authorized indexing to evade the requirement to define and delimit the EAP exemption "from time to time by regulation."

expressly withhold it, as then 'agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.'"[34]

The Department cannot support its overbroad interpretation of the Secretary's authority "merely by demonstrating that 'a statute does not expressly *negate* the existence of a claimed administrative power (*i.e.*, when the statute is not written in 'thou shalt not' terms).'"[35] Surely, "Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."[36] The Department's attempt to evade future rulemaking requirements by automatically indexing future overtime increases finds no support in the FLSA. This alone should doom the effort.

**B.**     <u>**Automatic Indexing of the Salary Threshold Violates the Administrative Procedure Act's Notice-and-Comment Requirements.**</u>

The FLSA likewise prohibits the Department from bypassing the regulatory processes required under the statute for updating the salary threshold—an independent, if not unrelated, reason the Proposed Rule's automatic indexing provision is unlawful.

With certain exceptions that are not relevant here, the Administrative Procedure Act (APA) mandates that agency rules having the force and effect of law must go through the notice and comment process.[37] The "notice-and-comment provisions of the APA enable the agency promulgating a rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated."[38] The Proposed Rule's indexing provision fails to comply with requirements of the APA that are expressly incorporated in 29 U.S.C. § 213(a)(1) of the FLSA. Under that provision, the only power granted to the Secretary by Congress is the authority to define and delimit the exemption "by regulations" promulgated expressly "*subject to* subchapter II of chapter 5 of title 5 [the rulemaking requirements imposed by the APA]" (emphasis added).[39]

The Proposed Rule's indexing provision will force the salary level test to automatically adjust every three years, thus evading notice and comment on the change and other APA requirements explicitly required by the text of the FLSA. The only support for this proposition comes in the Department's summary conclusion that since it has only sporadically updated the EAP threshold in the past, an automatic update would be a more "viable and efficient" means of increasing the salary threshold going forward. But the APA's notice and comment provisions must be followed regardless of whether an agency finds them inconvenient.[40] Nor can the Department

---

[34] *Contender Farms L.L.P. v. U.S. Dep't of Agriculture*, 779 F.3d 258, 269 (5th Cir. 2015)(quoting *Texas v. U.S. Department of the Interior*, 497 F.3d at 502); *accord La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act ... unless and until Congress confers power upon it").

[35] *Id.* (quoting *Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc; emphasis in the original)).

[36] *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

[37] *See* 5 U.S.C. § 553(b), (c).

[38] *Global Van Lines, Inc. v. ICC*, 714 F.2d 1290, 1299 n.9 (5th Cir. 1983).

[39] 29 U.S.C. § 213(a)(1).

[40] *See U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979) (discussing 5 U.S.C. § 553(b)(B)).

avoid its APA obligations simply because they take time and resources; an agency cannot "exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress has enacted into law'" no matter how difficult the issue it seeks to address.[41]

The DOL cannot lawfully put the salary level test on autopilot and effectively immunize itself from the procedural obligations of the APA. Indeed, in prior rulemaking efforts, the DOL took a position consistent with the APA that changes to the salary level test should be data dependent. "The salary levels should be adjusted when wage survey data and other policy concerns support such a change."[42] Now, the salary level will mechanically adjust every three years without any rulemaking under the APA, without examination of the necessity or justification for an increase, and without any input from the public, the regulated community, or any other affected parties.

Any increase in the salary threshold must be based upon the comments submitted and the actual facts and information existent at the time of the increase, and the importance of notice-and-comment on those adjustments should not be understated. In 2004, the comment process resulted in increases to both the proposed standard salary level and the proposed HCE salary level and in 2016 the comment process resulted in decreases to the standard salary level and the HCE salary level. The Department is not omniscient on these issues, and automatic increases to the salary level are inconsistent with both its statutory authority and with its long-held understanding of the salary level's purpose of serving a gatekeeper function. Finally, adjusting the salary level ignores utterly the importance of the duties test in determining the metes and bounds of the EAP exemption: put simply, how can it be the case that an employee is "clearly exempt" on December 31 and "clearly non-exempt" on January 1 of the following year because of the rate of inflation or some other indexing calculation? A gate need not replaced on an annual basis to ensure that it functions properly; only when it approaches the end of its usefulness does it need to be "fixed."

Current regulatory processes also require the Department to follow the Regulatory Flexibility Act and to undertake a detailed economic and cost analysis of any proposed update. An automatic update mechanism would allow the Department to announce a new salary level on a predetermined schedule in the *Federal Register* without notice-and-comment, without a Regulatory Flexibility Act analysis, and without any of the other regulatory requirements established by various Executive Orders. Each of those regulatory requirements is intended to force the agency to consider the consequences of its proposed actions and to ensure that the regulatory actions it takes are carefully crafted and well-supported before being implemented.

Where, as here, an agency has reversed longstanding regulatory policy, the Supreme Court has made clear that the agency is required to acknowledge, explain and justify its reversal, and such explanation must take into account the strong reliance interests of the regulated community concerning the original regulation.[43] With respect to its automatic indexing provision, the

---

[41] *See Brown & Williamson*, 529 U. S. at 125 (internal citations omitted)

[42] 69 Fed. Reg. 22171.

[43] *See Encino Motorcars, LLC v. Navarro,* 136 S. Ct. 2117 (2016) (vacating DOL's reversal of policy with regard to the "service advisors" exemption from the FLSA's overtime requirements); *see also Util. Air Reg. Grp. v. EPA*, 134

Proposed Rule does not even attempt such a justification. For these reasons, the FLSA's requirement that salary changes be subject to APA procedures separately and distinctly prohibits the Department from imposing the automatic indexing provision of the Proposed Rule.

### C.    The Proposed Rule Fails to Account for the Practical and Economic Impact of Triennial Automatic Increases.

The Department proposes to determine the new salary level every three years by indexing it to certain data sets collected by the Bureau of Labor Statistics (BLS); specifically, the Proposed Rule would increase the standard salary level for the white collar exemption to the 35th percentile of the pay distribution of full-time, non-hourly workers in the lowest-wage Census region of the country (currently, the South), and, thereafter, update that threshold every three years using that same formula using the most recent quarterly data from the BLS Current Population Survey.

As a practical matter, updating salary levels based solely on arcane BLS data (the utility and accuracy of which is, as discussed previously, highly questionable) will make it difficult, if not impossible, for employers and employees to determine with precision any updated salary level in advance of the Department's publishing it in the *Federal Register*. As a result, indexing the salary level will not make compliance with the exemption requirements easier; instead, indexing will create uncertainty and administrative and compliance difficulties, as employers likely will need to conduct frequent reconsiderations of the classification for employees whose status will potentially depend upon the responses to a survey conducted several years prior which are now reflected in a BLS data set. This serves only to increase costs on employers and takes dollars way from employee wages. More to the point, indexing with reference to a percentile of earnings will, by its very operation, dramatically increase the salary level in very short order, pushing it far beyond its "gatekeeper" level (and to a level already found to be unlawfully high). Finally, indexing fails wholly to account for costs associated with salary "compression" as salaries that are raised to maintain the exemption for some employees will exert direct pressure to raise wages for others.

### 1.    Employers Will Incur Significant and Ongoing Costs to Continuously Reassess Exemptions, and Determine Whether to Increase Wages or Reclassify Employees.

As a threshold matter, automatically increasing the minimum salary level will create an unsustainable floor and ongoing instability and uncertainty in employers' carefully calibrated compensation strategies and budgeting models. Employers operate on varying fiscal calendars. Preparing for frequent increases presents challenges in terms of budgeting and implementation, and puts an undue burden upon employers who must in an extremely limited time period comply with state notice requirements, reprogram compensation systems, and conduct additional training, as well as conduct the necessary legal and compliance review to determine if reclassification is

---

S. Ct. 2427, 2446 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").

appropriate. Additionally, employers must contend not only with the costs of increased wage rates, but also must incur the additional expense of routine classification analysis, decision-making, and implementation of changes in response to each new salary level when it is announced.

The automatic escalation of the EAP exemption salary threshold will create a cycle of continuing uncertainty. After each new salary threshold is announced, employers will engage in an unavoidable last-minute rush to identify which employees will get a salary increase and remain exempt, and which employees will be reclassified to non-exempt status. In other words, the efforts of Year One implementation would have to be repeated triennially in perpetuity. These cost and time obligations are dramatically understated in the required economic analysis accompanying the Proposed Rule. The financial impact, however, is enormous, including not only the costs of increased salaries or potential overtime pay, but also employer's costs in conducting the classification analysis which often include outside consultants, the decision-making process, and implementation of any changes in response to the new salary level when it is reset. Beyond these financial impacts, as discussed elsewhere in these comments, transitioning employees from exempt to non-exempt status requires careful planning and implementation to avoid undermining employee morale.

Likewise, the Department underestimates the costs of the rulemaking with respect to compliance efforts. Regulatory familiarization, adjustment, and managerial costs are all dramatically understated. Contrary to the Department's suggestions, compliance with the proposed rule would not be as simple as reviewing the salary level and making a one-time decision. Due to the many, varied issues identified within these comments, the time and effort associated with complying with the proposed rule will be immense as employers determine which positions will remain exempt, which will be reclassified as non-exempt, and how the employer will implement the conversion to non-exempt status, including adjustments to time and attendance systems and associated administrative issues.

Finally, the Department fails to account for these costs on a recurring basis. As noted above, the same compliance review activities that take place in Year One will be repeated on a triennial basis, as different groups of employees increasingly fall below the newly-indexed salary minimum, and be subject to an ongoing cost/benefit analysis to determine whether their employer should increase their salary to maintain the exemption, reclassify them as non-exempt, or otherwise change the terms and conditions of their employment.

**2.** **Automatic Indexing Will Result in a Dramatic, Upward Spiral of the Salary Threshold as Employees Are Either Reclassified as Non-Exempt and/or Salaries Are Increased to Maintain Exempt Status.**

Should increases be tied to the 35th percentile, the minimum salary level will quickly skyrocket, entirely destabilizing Congressional intent that the salary should not be set at a level that excludes many employees who obviously meet the white-collar duties tests. As noted previously, by increasing the minimum salary level from $35,568 to over $60,000, employers will either have to either: (a) reclassify employees as non-exempt, meaning they will be excluded from

the BLS non-hourly data set; or (b) increase employee salaries to meet the new minimum salary requirement (thus raising the level of the target percentile upon which the base salary level is determined). If, as the Proposed Rule suggests, these increases are tied to a percentile of earnings, the net effect of these phenomena will be disproportionate increases in the salary threshold.

The purpose of the salary test, as stated by the Department in the Proposed Rule, is to "help[] differentiate between exempt and nonexempt employees"[44] by setting a salary level at an amount that is slightly lower than the dividing line between exempt and nonexempt employees. That is, the salary level is intended to be set at a level that is over-inclusive of potentially non-exempt employees. As explained above, the Department does not adequately establish why the 35th percentile meets these standards in the first instance. That notwithstanding, the Proposed Rule's escalator provision, which permanently ties the salary level to the 35th percentile of full-time salaried workers, will only compound the Department's error.

The relevant data for calculating the percentile to which the Proposed Rule ties the exemption consists of the total weekly earnings for all full-time, non-hourly paid employees, based on workers who respond to the survey. According to BLS, "total weekly earnings" includes overtime pay, commissions, and tips. Respondents are asked whether they are paid hourly; they are not asked whether they are paid a salary, earn commissions, or are paid another way. In other words, the data is based upon a worker's response that he or she is not paid hourly and includes in the "salary" threshold elements of compensation that are not salary.

The overwhelming majority of affected employees, in the Department's estimate, will be reclassified as non-exempt. Most of these employees will be converted to an hourly method of payment, although some will undoubtedly become "salaried, non-exempt" employees. Because the workers who will be converted to an hourly method of payment will no longer respond to the CPS Survey question as being paid "non-hourly," they will drop out of that BLS data set. The effect of this exclusion from the data set is dramatic; as one economic analysis states:

> Using the same methodology for the approximately 12 million full-time, non-hourly employees in the South Census region, where the salary threshold is determined, there are an estimated 1.4 million affected workers who earn between $684 and $1,059 per week and are expected to pass the duties test. *If those workers are all reclassified to hourly employees, they will fall out of the distribution of workers that serve as the basis for the 35th percentile… The 35th percentile of the resulting distribution after workers are reclassified is $1,154. For comparison, $1,154 is the 40th percentile of the current distribution. Effectively, the Department's automatic update mechanism would increase the salary threshold by approximately 9.1% to the current 40th percentile within three years even if there was not ANY wage growth.* If the recent inflation trend continues (13.6% over three years), the 9.1% increase due to the automatic update

---

[44] 88 Fed. Reg. 62225.

methodology would cause the threshold to reach $1,311 per week or about $68,175 per year.[45]

Put more simply, the number of workers who respond that they are not paid hourly will decrease as workers who fail the salary test in year one (and subsequent years) are reclassified as non-exempt. If the 35th percentile test is adopted, in the years following the proposal, the salary level required for exempt status likely will be so high as to effectively eliminate entirely the availability of the exemptions in low-wage regions and industries.

3. **The Proposed Rule Fails to Adequately Account for the Expense of Salary Compression to Employers; Raising Employee Wages to Maintain the Exemption Creates Upward Pressure to Increase Salaries Across the Workforce.**

Finally, the Proposed Rule fails to adequately consider the economic cost of avoiding salary compression for those employees who are already paid more than the proposed minimum salary level. Where employees below the proposed salary minimum have their salaries raised to meet the new minimum, employees above the new minimum will likewise need to have their salaries raised to account for the relative value of the work being performed.

Higher levels of education, skill, experience, responsibility, and seniority should (and currently do) correspond to increased compensation. Employers thus attempt to avoid actual or perceived disparity between job titles and comparative compensation. Employees with higher positions, more job responsibility, and better qualifications than others expect to be paid accordingly. If an employer fails to do so, the salary compression will negatively impact employee morale in the workplace.

Take for instance a group of employees who currently are below the proposed minimum salary level. Assuming that the employees currently earn $900 per week and their supervisors earn $1,200 per week, the decision to raise the employees' salary to $1,160 per week to continue their exempt classification does not simply impact those employees. Their supervisors—although not legally required to be paid more to be treated as exempt—nevertheless will need to be paid more to maintain morale and avoid salary compression.

The increased costs to employers to avoid salary compression are not considered in the Department's economic analysis. Similarly, the Department fails to address the difficulty of addressing the salary compression issue, as well as its impact on the determination on whether to reclassify a position to non-exempt as a result of the increased minimum salary level. These are real administrative expenses. The decision on classification cannot be made in a vacuum; it must consider the impact on other positions from a salary compression standpoint. The Department's proposal, however, does not adequately account for any of these significant costs.

---

[45] *See* Stephen G. Bronars, Ph.D. & Deborah K. Foster, Ph.D., Edgeworth Economics, "Important Implications of DOL's Proposed Automatic Updating Mechanism" (Oct. 26, 2023), available at: https://www.edgewortheconomics.com/publication-6501 (last visited October 20, 2023).

For all these reasons, the PPWO opposes any indexing of the salary level. No methodology, identified by the Department or not, can overcome the Department's lack of authority to automatically increase the salary level in the manner proposed. Nor does any methodology cure the logistical and operational issues—and associated expense—that comes with an ongoing redefinition of exempt status. The Department should withdraw the proposal to index the minimum salary level.

\* \* \*.

The Proposed Rule is fundamentally flawed on numerous levels. It adopts a methodology for increasing the EAP salary threshold that is unsupported in law or fact. It raises the threshold almost immediately to a level beyond which it serves its purpose as intended by Congress, and which has been found to be unlawfully high. It compounds these errors by including an automatic escalator provision in contravention of the FLSA and the APA, which, setting aside that fatal flaw, will serve only to compound underlying errors in the Department's initial salary level determination. Finally, it fails to accurately reflect the costs imposed on employers for implementation and compliance with the rule, and the dramatically increased costs associated with a rapidly escalating threshold. For all these reasons, as discussed above, the Department should withdraw its proposal.

Respectfully submitted,

### <u>National Organizations</u>

ACA International
AICC, The Independent Packaging Association
Air Conditioning Contractors of America
American Association of Advertising Agencies (4A's)
American Bakers Association
American Bankers Association
American Bus Association
American Car Rental Association
American Foundry Society
American Frozen Food Institute
American Hotel & Lodging Association
American Pipeline Contractors Association
American Road & Transportation Builders Association
American Society of Association Executives
American Society of Travel Advisors (ASTA)
American Staffing Association
American Supply Association
American Trucking Associations
AmericanHort

Partnership to Protect Workplace Opportunity
November 7, 2023
Page 23

Amusement & Music Operators Association
Associated Builders and Contractors
Associated Equipment Distributors
Associated General Contractors
College and University Professional Association for Human Resources
Construction Industry Round Table
Consumer Technology Association
Electronic Transactions Association
Energy Marketers of America
FMI–The Food Industry Association
Foodservice Equipment Distributors Association
Global Cold Chain Alliance
Heating, Air-conditioning, & Refrigeration Distributors International
HR Policy Association
IAAPA, The Global Association for the Attractions Industry
IHRSA–The Health & Fitness Association
Independent Electrical Contractors
Independent Insurance Agents & Brokers of America
Independent Lubricant Manufacturers Association
International Bottled Water Association
International Foodservice Distributors Association
International Franchise Association
International Warehouse Logistics Association
Irrigation Association
ISSA, the Worldwide Cleaning Industry Association
Job Creators Network
Manufactured Housing Institute
Manufacturers' Agents Association for the Foodservice Industry (MAFSI)
MEMA, the Vehicle Suppliers Association
National Apartment Association
National Association of College and University Business Officers
National Association of College Stores
National Association of Convenience Stores
National Association of Electrical Distributors
National Association of Home Builders
National Association of Independent Colleges and Universities
National Association of Landscape Professionals
National Association of Manufacturers
National Association of Mutual Insurance Companies
National Association of Professional Insurance Agents
National Association of Theatre Owners
National Association of Wholesaler-Distributors
National Automobile Dealers Association
National Beer Wholesalers Association

National Club Association
National Confectioners Association
National Cotton Ginners Association
National Council of Chain Restaurants
National Council of Farmer Cooperatives
National Demolition Association (NDA)
National Federation of Independent Business
National Funeral Directors Association
National Grain and Feed Association
National Grocers Association
National Lumber & Building Material Dealers Association
National Marine Distributors Association
National Multifamily Housing Council (NMHC)
National Newspaper Association
National Public Employer Labor Relations Association
National Ready Mixed Concrete Association
National Restaurant Association
National Retail Federation
National RV Dealers Association (RVDA)
National Small Business Association (NSBA)
National Stone, Sand & Gravel Association
National Tooling and Machining Association
National Utility Contractors Association
National Wooden Pallet & Container Association
NATSO, Representing America's Travel Plazas and Truckstops
Outdoor Power Equipment and Engine Service Association
PEI–Petroleum Equipment Institute
Portland Cement Association
Power & Communication Contractors Association
Precision Machined Products Association
Precision Metalforming Association
PRINTING United Alliance
Restaurant Law Center
Saturation Mailers Coalition
Service Station Dealers of America and Allied Trades
SIGMA: America's Leading Fuel Marketers
Small Business & Entrepreneurship Council
Textile Care Allied Trades Association
The Transportation Alliance
The US Chamber of Commerce
Tire Industry Association
TRSA – The Linen, Uniform and Facility Services Association
Workspace Solutions Association

## State Organizations

Alaska Chamber of Commerce
Arizona Chamber of Commerce and Industry
Business & Industry Association of NH
Georgia Chamber of Commerce
Greater North Dakota Chamber of Commerce
Idaho Chamber Alliance
Illinois Chamber of Commerce
Indiana Chamber of Commerce
Iowa Association of Business and Industry
Kentucky Chamber of Commerce
Montana Chamber of Commerce
NC Chamber
Oregon Business and Industry
Pennsylvania Chamber of Business and Industry
Pennsylvania Food Merchants Association
South Carolina Chamber of Commerce
Tennessee Chamber of Commerce and Industry
Texas Association of Business
Texas Cotton Ginners' Association
Virginia Beer Wholesalers Association
Virginia Chamber of Commerce
Wisconsin Manufacturers and Commerce
Wyoming Construction Coalition
Wyoming State Chamber

## Local Organizations

Aiken Chamber (SC)
Anderson County Chamber of Commerce (TN)
Apache Junction Area Chamber of Commerce (AZ)
Ashland Area Chamber of Commerce (OH)
Barrow County Chamber of Commerce (GA)
Barry County Chamber and Economic Development Alliance (MI)
Bay Area Chamber of Commerce (MI)
Beverly Hills Chamber of Commerce (CA)
Boise Metro Chamber of Commerce (ID)
Box Elder Chamber of Commerce (UT)
Brea Chamber of Commerce (CA)
Bristol Chamber of Commerce (TN)
Buckeye Valley Chamber of Commerce (AZ)

Buellton Chamber of Commerce (CA)
Cabarrus Regional Chamber of Commerce (NC)
Cambria Regional Chamber (PA)
Campbell County Chamber of Commerce (WY)
Canby Area Chamber of Commerce (OR)
Central Fairfax Chamber of Commerce (VA)
Chamber of Catawba County (NC)
ChamberWest (UT)
ChamberWest (VA)
Chattanooga Chamber of Commerce (TN)
Cheyenne Chamber of Commerce (WY)
Chino Valley Chamber of Commerce (CA)
Cleveland-Bolivar County Chamber of Commerce (MS)
Cobb Chamber (GA)
Columbia Chamber of Commerce (SC)
Davis Chamber of Commerce (UT)
DeKalb Chamber of Commerce (IL)
Eau Claire Area Chamber of Commerce (WI)
Gateway Chambers Alliance (CA)
Glendale Chamber of Commerce (AZ)
Grand Rapids Chamber (MI)
Great Falls Area Chamber of Commerce (MT)
Greater Coachella Valley Chamber of Commerce (CA)
Greater Flagstaff Chamber of Commerce (AZ)
Greater High Desert Chamber of Commerce (CA)
Greater Irmo Chamber of Commerce (SC)
Greater Lawrence Chamber, Inc. (IN)
Greater Mankato Growth, Inc. (MN)
Greater Miami Chamber of Commerce (FL)
Greater Niles Chamber of Commerce (MI)
Greater Omaha Chamber (NE)
Greater Oro Valley Chamber of Commerce (AZ)
Greater Phoenix Chamber (AZ)
Greater Reading Chamber Alliance (PA)
Greater Scranton Chamber of Commerce (PA)
Greater Sioux Falls Chamber of Commerce (SD)
Greenville Chamber of Commerce (SC)
Halifax County Chamber of Commerce (VA)
Harrisburg Regional Chamber (PA)
Helena Area Chamber of Commerce (MT)
Henderson Chamber of Commerce (NV)
Henderson County Chamber of Commerce (NC)
Joliet Region Chamber of Commerce & Industry (IL)
Kearney Area Chamber of Commerce (NE)

Kingsport Chamber of Commerce (TN)
Knoxville Chamber of Commerce (TN)
Lake Havasu Area Chamber of Commerce (AZ)
Lakeland Chamber (FL)
Lansing Regional Chamber (MI)
Las Vegas Chamber of Commerce (NV)
Lincoln Chamber of Commerce (NE)
Loudoun Chamber of Commerce (VA)
Lynchburg Regional Business Alliance (VA)
Marshall Area Chamber of Commerce (MN)
McLean County of Chamber of Commerce (IL)
Meridian Chamber of Commerce (ID)
Mobile Chamber of Commerce (AL)
Moore County Chamber of Commerce (NC)
Murray County Chamber of Commerce (GA)
Murrieta/Wildomar Chamber of Commerce (CA)
Nashville Area Chamber of Commerce (TN)
Newton Chamber of Commerce (GA)
North Tampa Bay Chamber (FL)
Norwalk Chamber of Commerce (CA)
Orangeburg County Chamber of Commerce (SC)
Palm Desert Area Chamber of Commerce (CA)
Palos Verdes Peninsula Chamber of Commerce (CA)
Pasadena Chamber of Commerce (CA)
Pocatello-Chubbuck Chamber of Commerce, Inc. (ID)
Prattville Area Chamber of Commerce (AL)
Prescott Valley Chamber of Commerce (AZ)
Queen Creek Chamber of Commerce (AZ)
Rancho Cordova Area Chamber of Commerce (CA)
Riverton Chamber of Commerce (WY)
Robins Regional Chamber (GA)
Rocky Mount Area Chamber of Commerce (NC)
Roseburg Area Chamber of Commerce (OR)
Roseburg Area Chamber of Commerce (OR)
Salt Lake Chamber of Commerce (UT)
San Diego Regional Chamber of Commerce (CA)
Santa Barbara South Coast Chamber of Commerce (CA)
Sauk Valley Area Chamber of Commerce (IL)
Schuylkill Chamber of Commerce (PA)
Shoals Chamber of Commerce (AL)
Simpsonville Area Chamber of Commerce (SC)
South Tampa Chamber of Commerce (FL)
Springfield Area Chamber of Commerce (OR)
Stayton Sublimity Chamber of Commerce (OR)

Partnership to Protect Workplace Opportunity
November 7, 2023
Page 28

Stuart/Martin County Chamber of Commerce (FL)
Tampa Bay Chamber (FL)
The Chamber Grand Forks/East Grand Forks (ND)
Torrance Area Chamber of Commerce (CA)
Union County Chamber of Commerce (NC)
Upstate Chamber Coalition (SC)
Valley Industry & Commerce Association (CA)
Waukesha County Business Alliance (WI)
West Ventura County Business Alliance (CA)
Western DuPage Chamber of Commerce (IN)
Wilmington Chamber of Commerce (NC)
Yorba Linda Chamber of Commerce (CA)
Yuma County Chamber of Commerce (CA)

Of counsel:

James A. Paretti, Jr.*
Littler Mendelson, P.C.
Workplace Policy Institute
815 Connecticut Avenue, NW
Washington, DC 20006
jparetti@littler.com

*Not admitted in the District of Columbia; practice is limited to matters and proceedings before federal courts and agencies.