# EXHIBIT 4

## DECLARATION OF DOUG KANTOR

I, Doug Kantor, declare as follows:

     1.     I am over the age of 18 and competent to make this declaration.

     2.     I am the General Counsel of the National Association of Convenience Stores (NACS). NACS represents more than 1,300 retailer and 1,600 supplier members in over 50 countries and, domestically, within all fifty states, including every county in Texas. NACS advances the role of convenience stores as positive economic, social, and philanthropic contributors to the communities they serve. The U.S. convenience store industry, with more than 150,000 stores selling fuel, food and merchandise, has about 160 million customer transactions daily. NACS serves the convenience and fuel retailing industry by, among other things, working to protect the best interests of the convenience and fuel retailing industry before Congress and federal agencies. Additionally, NACS is the advocate for convenience stores in the courts and participates in strategic litigation such as the present suit challenging the U.S. Department of Labor's 2024 Overtime Rule.

     3.     The statements in this declaration are true and within my personal knowledge and/or my review of NACS's records.

     4.     Many of NACS's members in Texas and throughout the United States employ workers who were exempt prior to July 1, 2024, but are now non-exempt solely because of the 2024 Overtime Rule's July 1, 2024 increase in the EAP salary threshold, or will lose their exempt status as of January 1, 2025 because of the Rule's scheduled increase in the EAP salary threshold.

     5.     With respect to those workers whose exempt status will be impacted by the 2024 Rule, NACS's members must either change these workers' compensation or reclassify them as non-exempt under the FLSA. As non-exempt employees, the company would then either (a) pay

these workers overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit these worker's hours to no more than forty hours per week and thus forego their services. Once paid, NACS's members have no ability to recoup higher wages or overtime paid to employees, nor can NACS's members recover the loss of the services employees would have provided when needed. Such loss of service can lead to lost customers and lost customer goodwill which cannot be compensated by a later monetary decision.

6.      In addition, NACS members have expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers, and determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. NACS members will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule. Reclassification of NACS members' employees as non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

7.      Two examples of the many NACS member companies directly harmed by the 2024 Rule are DK Retail, a subsidiary of Delek US Holdings, and St. Romain Oil Company.  The harm these NACS members have suffered and will continue to suffer as a result of the 2024 Overtime Rule are set forth in the declarations of Anthony Miller, President of DK Retail (attached to this Declaration as Exhibit A) and Anne Marie St. Romain, co-owner, co-Chief Executive Officer, and Chief Financial Officer of St. Romain Oil Company (attached to this Declaration as Exhibit B).

8.    During the rulemaking on the 2024 Overtime Rule, NACS submitted comments detailing its concerns, and the concerns of its members, with the then-proposed Rule. A copy of NACS's comments is attached to this Declaration as Exhibit C.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED on this 17 th day of July, 2024.

_____
Doug Kantor

# EXHIBIT A

## DECLARATION OF ANTHONY MILLER

I, Anthony Miller, declare as follows:

1.      I am over the age of 18 and competent to make this declaration.

2.      I am the President of DK Retail (Southwest Convenience Stores) a subsidiary of Delek US Holdings, which is in the business of convenience retail stores

3.      The statements in this declaration are true and within my personal knowledge and/or my review of Delek US Holdings records.

4.      Delek US Holdings is currently a member of National Association of Convenience Stores.

5.      Delek US Holdings is an employer subject to the Fair Labor Standards Act, and the rule entitled "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees," 89 Fed. Reg. 32842, which was published by the U.S. Department of Labor ("DOL" or "the Department") on April 24, 2024 ("the 2024 Overtime Rule").

6.      Delek US Holdings employs approximately 110 workers who were exempt under the FLSA prior to July 1, 2024, insofar as they primarily performed executive, administrative, and/or professional duties; were paid on a salary basis; and who earned at least $684 per week ($35,558 per year) but less than $844 per week ($43,888 per year). Many of these employees routinely worked more than forty hours in a given workweek.

7.      With respect to these 110 workers, in order to maintain profitable stores and to keep stores open, Delek US Holdings was required to increase their salary as of July 1 to at least $43,888 per year so as to maintain their exempt status. Once paid, Delek US Holdings has no ability to recoup the higher wages paid to these employees.

8.    The 2024 Overtime Rule increases the EAP exemption to $1,128 per week ($58,656 per year) as of January 1, 2025.

9.    Delek US Holdings employs approximately 223 workers are exempt under the FLSA insofar as the primarily perform executive, administrative, and/or professional duties; are paid on a salary basis; and earn at least $844 per week ($43,888 per year) but less than $1,128 per week ($58,656 per year). Many of these employees routinely work more than forty hours in a given workweek.

10.    As of January 1, 2025, with respect to these workers, Delek US Holding must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, Delek US Holdings will then have to either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and forego their services provided to customers. Again, once paid, Delek US Holdings has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

11.    In addition, Delek US Holdings has expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers and determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. Delek US Holdings will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule.

12.    Reclassification of Delek US Holdings' employees as non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED on this 9th day of July, 2024.

Anthony L. Miller

# EXHIBIT B

## DECLARATION OF ANNE MARIE ST. ROMAIN GAUTHIER

I, ANNE MARIE ST. ROMAIN GAUTHIER, declare as follows:

1.     I am over the age of 18 and competent to make this declaration.

2.     I am a Co-owner, Co-Chief Executive Officer and Chief Financial Officer of ST. ROMAIN OIL St. Romain Oil Company, which is operates convenience stores and sells fuel.

3.     The statements in this declaration are true and within my personal knowledge and/or my review of St. Romain Oil Company's records.

4.     St. Romain Oil Company is currently a member of NACS, the National Association of Convenience Stores.

5.     St. Romain Oil Company is an employer subject to the Fair Labor Standards Act, and the rule entitled "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees," 89 Fed. Reg. 32842, which was published by the U.S. Department of Labor ("DOL" or "the Department") on April 24, 2024 ("the 2024 Overtime Rule").

6.     St. Romain Oil Company employs approximately 325 workers who were exempt under the FLSA prior to July 1, 2024, insofar as they primarily performed executive, administrative, and/or professional duties; were paid on a salary basis; and who earned at least $684 per week ($35,558 per year). Many of these employees routinely worked more than forty hours in a given workweek.

7.     The 2024 Overtime Rule increases the EAP exemption to $1,128 per week ($58,656 per year) as of January 1, 2025.

8.     St. Romain Oil Company employs approximately 9 workers who are exempt under the FLSA insofar as the primarily perform executive, administrative, and/or professional

duties; are paid on a salary basis; and earn at least $844 per week ($43,888 per year) but less than $1,128 per week ($58,656 per year). Many of these employees routinely work more than forty hours in a given workweek.

9.      As of January 1, 2025, with respect to these workers, St. Romain Oil Company must either increase their salary or reclassify them as non-exempt under the FLSA. As non-exempt employees, St. Romain Oil Company will then have to either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and forego their services. Again, once paid, St. Romain Oil Company has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

10.     In addition, St. Romain Oil Company has expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers, and determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. St. Romain Oil Company will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule.

11.     Reclassification of St. Romain Oil Company's employees as non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED on this 3rd day of July, 2024.

ANNE MARIE ST. ROMAIN GAUTHIER

2

# EXHIBIT C

**COMMENTS BY**

**THE NATIONAL ASSOCIATION OF CONVENIENCE STORES**

**REGARDING PROPOSED REVISIONS OF THE FAIR LABOR STANDARDS ACT'S**

**SECTION 13(a)(1) REGULATIONS**

**(RIN 1235-AA39**)

————————————————

The National Association of Convenience Stores ("NACS") is an international nonprofit trade organization representing more than 1,300 retailer and 1,600 supplier members in over 50 countries.  The convenience store industry has more than 150,000 stores nationwide selling fuel, food, and merchandise, posting over $900 billion in total sales for 2022 and employing more than 2.4 million employees.

NACS and its members have a strong interest in the requirements governing the application of the exemptions set forth in Section 13(a)(1) of the Fair Labor Standards Act, because those provisions have a substantial impact upon the industry.  This is particularly the case as to the "executive" exemption, because many industry employers rely upon that exemption for first- and second-line managerial employees at thousands of individual, freestanding establishments.  NACS therefore welcomes the opportunity to submit comments in response to the Notice of proposed rulemaking published by the U.S. Department of Labor ("USDOL" or "Agency") on September 8, 2023 at 88 Federal Register 62152, Regulatory Information Number (RIN) 1235–AA39.

In portions of this discussion, NACS will refer to historical USDOL documents relating to the Section 13(a)(1) exemptions and revisions of the Regulations at Part 541. These reports were produced by Harold Stein in 1940 ("Stein Report"), Harry Weiss in 1949 ("Weiss Report"), and Harry S. Kantor in 1958 ("Kantor Report").  Page numbers in these citations refer to the corresponding location in the actual report, rather than to any reproduction of the report.

1.    **The Salary Level**

USDOL proposes to increase the threshold salary for exempt status to $1,059 per week.  However, it also suggests that, under its contemplated methodology, the figure might even be $1,158 per week by the time any regulatory changes become final.  88 Fed. Reg. 62152-53 at n. 3.  Either level will be devastating to NACS' membership.

To begin with, even a figure of $1,059 per week will represent another $377 per week added to the $229-per-week rise that went into effect in 2020, *i.e.*, after just 4 years, the percentage adjustment is higher (54%) than it was in 2020 after 16 years (50%).    The percentage strikes NACS as excessive under the current economic circumstances.

The adverse impact that such a substantial change will have upon the industry is starkly revealed when one considers first- and second-line managerial employees in convenience stores.  For example, convenience-store companies employ a substantial number of Store Managers at a weighted-mean salary of about $54,414 annually.  For

Assistant Store Managers, the median/mean is about $37,374 annually. Obviously, then, raising the threshold even to $1,059 per week would put a large number of industry employers to the difficult choice between increasing salaries versus abandoning the exemption for Store Managers and for those Assistant Store Managers who qualify for exempt status. The challenge will be particularly acute in small businesses within the industry comprised of between 11 and 20 stores where those weighted-mean salaries are slightly lower, $50,144 and $36,456 respectively.

Throughout the history of the Section 13(a)(1) exemptions, the salary threshold has been set to "serve as a guide to the classification [of exempt employees] and *not as a barrier to their exemption*." Weiss Report at 15 (emphasis added).[1] It is especially relevant that Mr. Weiss's statement was made with specific reference to "the executives of small establishments". *Id.* Establishing a dollar-level test that would cause thousands of these employees to change from exempt status to nonexempt status overnight *for that reason alone* will erect precisely such a barrier to the exemption of many employees. It will also represent a departure from USDOL's expressed concerns in 2004 (and, for that matter, in prior decades) that an increased salary not impose a disproportionate hardship upon retailing. *See, e.g.*, 69 Fed. Reg. 22170-71 (April 23, 2004).

NACS is of course mindful that the role of the salary-level test is to *assist* in drawing a line between employees who are properly treated as exempt and those who are not. We also realize that, wherever the threshold is set, some employees who meet the tests for exempt status will fall below it.

Nevertheless, for decades, USDOL has assiduously tried to avoid that effect to the maximum extent it can. It has been especially careful about this where retailing is concerned. The relatively-lower salaries prevailing among those workers are the result of financial and economic characteristics, rather than being a reflection of any allegedly "borderline" nature of the duties they perform. In other words, failing to weight these retailing-specific financial and economic factors heavily thereby transforms the salary level into the *only* test for exempt status as to a disproportionately-high number of retail employees – and even more so in certain geographic areas – and it does so without appreciably advancing the distinctions called for in applying the exemptions.

This is at least as true in the convenience-store segment of retailing as it is of any others, as the above compensation data illustrate. A figure as great as $1,059 will therefore operate as a "barrier to [the] exemption" of thousands of industry employees without facilitating the effectiveness of the line-drawing to be done. We continue to question how USDOL continues to ignore the flaws in its data set let alone the unfounded percentile applied, which are discussed herein.

## A. The Status and Pay Components of the Relevant Employees

For one thing, the entire discussion of the percentile selected is tainted by USDOL's continued and repeated reliance upon data said to have to do with "full-time nonhourly

---

[1] Though the focus for the past few decades has been a question of tolerance (how many employees will be barred), whether any minimum salary level is appropriate at all is questionable. *See Helix Energy Solutions Group, Inc. v. Hewitt*, 598 U.S. 39, 67-68 (2023) (Kavanaugh, J., dissenting opinion in which Alito, J. joined).

workers".  It is difficult to see how USDOL's data set could assist in identifying an appropriate proxy in any way with respect to the *relevant* compensation paid to the *relevant* workers.  The employees to whom this information actually relates might be largely or entirely commissioned; or paid on a day-rate basis, a job-rate basis, or a piece-rate basis; or paid a salary for 40 hours; or paid on a fluctuating-workweek basis; or paid via a combination of these methods; or paid in a variety of other unspecified ways.  NACS further understands that the data could include overtime pay, commissions, and other kinds of income.  Finally, these data are self-reported and are therefore not subject to verification.

We also note that USDOL's tendency to use nonhourly as though it means salary, and to use salary as though it means a traditional salary, are confusing and even misleading at times.  The concepts of "salary" and "salary basis" have a very specific meaning under the pertinent exemptions.  *See, e.g.*, 29 C.F.R. § 541.602.  Whether an employee is paid on a "salary basis" is itself an indicator of exempt status, independently of the salary's amount.  By contrast, it appears that, in many if not most instances, USDOL is not referring to "salary" or "salaried" in the exemption-related sense.  This has likely led to flaws in USDOL's analysis, in part because juxtaposing "nonhourly paid" compensation with compensation on a "salary basis" as that phrase relates to the exemptions is necessarily an apples-and-oranges proposition.  Indeed, the Agency's entire approach to this aspect of the requirement further promotes the inaccurate hourly/nonexempt versus salary/exempt dichotomy.

NACS believes that the setting of a salary level should be based upon reasonably contemporaneous data and statistics relating to *salaries* (as defined by the regulations) of *salaried-exempt* employees (limited to only to those exemptions at hand that actually require an employee be paid on a salary basis).  The salary level was established in this way from at least as early as 1949, based upon the view that "[a]ctual data showing the increases in the prevailing minimum salary levels of bona fide executive, administrative and professional employees .  .  . would be the best evidence of the appropriate salary increases for the revised regulations."  Weiss Report at 12.  Wages and earnings among nonexempt employees were relied upon only where "no direct evidence was available or where the available data were fragmentary . . . ."  *Id.*

This was also the case in 1958, when USDOL's decisions were informed by information that included "salaries paid to employees who qualified for exemption." Kantor Report at 6.  These figures included "tabulations of salaries grouped by major geographic regions, by number of employees in the establishment, by size of city, and by broad industry groups."  *Id.*  This "most direct evidence of actual salaries paid", "obtained as a by-product of the Divisions' regular investigation program rather than as a special statistical survey," was judged to "reflect[] the salary patterns with reasonable accuracy."  *Id.*  28 Fed. Reg. 7002 (July 9, 1963); 35 Fed. Reg. 883, 884-85 (Jan. 22, 1970).

USDOL suggests that employing statistics derived from internal data that are directly relevant to current salary levels as they relate to the application of the exemptions is undesirable, though it has sufficient confidence in the data to apply "probability codes to determine the group of salaried employees who pass the duties test". 88 Fed. Reg. at 62166 fn. 179.  Whatever uncertainties there might be as to the above-referenced internal evaluations carried out by USDOL personnel with deep experience in such matters, the alternative uncertainties arising from the Agency's

current reliance upon "all full-time nonhourly workers", though different in nature, are almost certainly more problematic on the whole. *Id.* at 62166.

The Agency should return to the compelling practice of predicating the salary level to the maximum extent possible upon data "which only include[s] exempt workers". *Id.* Notably, even the more reasonable increase in 2020 was based upon the tainted data – as we pointed out in response to the proposed rule at that time: Whatever methodology, percentile, etc. is used now or in future updates, the data must be representative.

## B. The Relevant Employees Limited by Geography and Industry

USDOL remains committed to a single standard salary level for nationwide application. Though many NACS members are small, local businesses, other multi-store members have a combination of urban and rural locations or locations in adjacent states and might at times send Store Managers or Assistant Store Managers to different nearby locations, and large multi-store members have regional or district employees that can be called upon to work in a variety of geographical areas or perform a fair amount of work remotely. Therefore, while NACS does not oppose continuing with a single standard, and recognizes that the Agency focused on workers in the South as the lowest-wage Census Region (88 Fed. Reg. at 621166), it urges USDOL to weigh more heavily, and consistent with most of its predecessors, the fact that what it has proposed might tend to eliminate employees who are "obviously nonexempt", Weiss Report at 18, reasonably well in high-income industries will at the same time be a "barrier to the[] exemption", Weiss Report at 15, of disproportionately-many employees who meet the duties tests but who work in relatively low-income industries. Such a threshold impermissibly shortcuts the qualitative determination called for under the exemptions for employees in the lower-wage industries.

NACS recognizes that some such effect is an outcome of having a single salary threshold. But then this is the product of a structure that USDOL itself formulated and embraced in the past and, unnecessarily, proposes to maintain. Because the Agency has made that choice, its responsibilities can be adequately carried out *only* by significantly limiting that effect, that is, by setting the salary rate near the *lower* end of the appropriate scale. It is for this very reason that USDOL has set a lower-end salary in the past, and the Agency must do so again. Whatever nationwide figure is established must be set so as to, as Mr. Kantor put it, exclude a relatively small percentage "of those in the lowest-range region, or in the smallest size establishment group, or in the smallest-sized city group, or in the lowest-wage industry of each of the categories . . . ." Kantor Report at 6-7.

Putting aside that the Agency's entire construct in selecting a percentile in the South rests upon a flawed data set, there is serious reason to doubt that the 35th percentile has actually accounted for other varying characteristics. USDOL appears to have considered only three industries to be "low-wage" ones: "Leisure and hospitality, other services, and public administration." 88 Fed. Reg. at 62196-97. What these labels actually encompass is indefinite, but they do *not* include retailing, which is set forth separately throughout the tables. Indeed, narrowing the inquiry to this extent fails to give "appropriate consideration . . . to the fact that the same salary cannot operate with equal effect as a test in high-wage and low-wage industries . . . in an economy as complex and diversified as that of the United States." Kantor Report at 5. Retailing has of course been explicitly considered a lower-wage category in repeated salary-level rulemakings, and elsewhere in the proposed rule the Agency's own data indicates that it

will be among the top affected industries: "As a percent of payroll, transfers and costs would be highest in [agriculture industries], education, and retail trade (Table 27)." 88 Fed. Reg. at 62216. "Retail trade" represents the third-highest percentage in the entire list.  *See Id.*

It is also true that information related to the salaries of exempt employees has historically been used to establish a salary level "near the lower end" of the range so modeled.  *See*, *e.g.*, Weiss Report at 12.  This is especially warranted as to a relatively lower-wage industry such as that comprising NACS' membership.

Furthermore, the *amount* set is not and has never been the only compensation-oriented consideration or limitation.  Instead, in pertinent part an exempt employee must also be paid on a "salary basis", which itself plays a role in distinguishing exempt employees from nonexempt ones.  Weiss Report at 24.  This too militates in favor of restraint in setting the salary level, in that the *qual*itative *nature* of the employee's compensation already facilitates defining and delimiting exempt status.

Finally, NACS reminds the Agency that the impact will not be limited to those employees whose salaries would have to be raised to maintain the exemption.  There would also be a "ripple effect" throughout the rest of the workforce, both exempt and nonexempt.  Salary increases cause by the threshold rise must be worked-into the salary levels of more-highly-paid exempt employees in order to avoid compression in the compensation structure.  Many voluntary and legally-required benefits are tied to or at least sensitive to those salary levels, as are legally-mandated employer contributions.

Inelastic consumer spending and low profit margins in the industry simply will not support the absorption of more than a small fraction of yet-another large salary increase and the related costs so as to squeeze industry employers to (in some cases perhaps beyond) the breaking-point.  Even so, there will also unavoidably be a resulting higher cost to consumers of the industry's goods and services.  The adverse effects will be even greater in relatively lower-wage geographical regions.

### C. This is Not a Salary Level for a "Short" Test

In selecting the 35th percentile, USDOL has made much of the elimination of the "long" test in 2004.  Essentially the Agency argues that the salary should be close to what the pre-2004 "short" test would have produced as applied to contemporaneous data – but the short test no longer exists anymore than the long test does.  Since 2004 there has been one standard test that is *not* equivalent to the pre-2004 short test. Indeed, the executive exemption, of particular importance in the retail industry, is notably more difficult to meet. 29 C.F.R. § 541.100.  To the extent the two-test system still has any limited relevancy to the current inquiry, it is that the salary level should be closer to what the pre-2004 long test would have produced.  This would have the desired effect of screening out the "obviously" nonexempt while minimizing the impact on truly exempt workers that happen to be paid lower wages due to circumstances that the Agency has recognized, in theory if not always in practice,[2] since the salary level was first contemplated.

---

[2] In 2016 the Agency looked to the 40th percentile in setting the salary level and was enjoined nationwide in *Nevada v. United States Department of Labor*, 218 F.Supp.3d 520 (E.D. Tex.

Against this background, NACS recommends the following:

◇     The proposed level is ill-founded and too high, and the entire proposal should be withdrawn;

◇     USDOL should conduct an entirely new evaluation and should make a different proposal on the basis of the internal, exemption-specific information (as updated, if need be) and analysis to which it has referred in the current explanation;

◇     USDOL should publish a detailed report on both the contents and results of the exemption-specific analysis to which the proposals refer and upon which the new proposal will presumably be based; and

◇     USDOL should return to the 20% guideline selected in 2004 and should apply it to the array of reasonably-current salaries paid on a "salary basis" to exempt employees in *both* the lowest geographical *and* industry sectors, rather than to composite figures which represent a combination of high-wage and low-wage geographical and/or industry sectors (it should be focused in on circumstances where the low-wage factors *overlap*).

2.     Proposed Automatic Update[3]

NACS acknowledges that the minimum salary level should be revisited occasionally, and it supported USDOL's approach in 2019 of doing so *approximately* every four years and then making any changes *through* notice-and-comment rulemaking. *See* 84 Fed. Reg. 10914-15.   Nonetheless, USDOL's current proposal to update the salary level on a *set* schedule with a *set* formula should not be adopted.   With all due respect, this is the equivalent of an exempt administrative-employee opting to make a rote program ill-equipped to handle decisions that they were entrusted to make – using their discretion and independent judgment weighing various factors differently in different circumstances.   The Agency has stated its intentions more clearly than in 2016, but at bottom the fact that it easily reduced entire white-collar exemption rulemakings for the

---

Nov. 22, 2016).   In that case, Judge Mazzant found that raising the minimum salary level to $913 per week, constituted an unlawful exercise of authority by USDOL because such a high minimum salary level would supplant the duties test, thus exceeding its delegated authority from Congress.   The Court also found that the salary was not a permissible construction of the FLSA because "Congress did not intend salary to categorically exclude an employee with EAP duties from the exemption." *Id.* at 531.   While NACS recognizes that USDOL is proposing a lower percentile in this rulemaking, it believes further reduction is necessary to overcome the same flaws underlying the 2016 Final Rule.

[3] The proposed rule includes a severability clause. *See* 88 Fed. Reg. at 62238 (proposal to add clause at 29 C.F.R. § 541.5).   However, particularly given the intertwined nature of the various revisions in the proposed rule, the clause does not further the Agency's purpose and should be withdrawn.

foreseeable future to less than 500 words, 88 Fed. Reg. 62240, demonstrates just how formulaic it is, and unlikely to past muster under the Administrative Procedure Act.

Focusing on the policy reasons though for why the Agency should abandon this tactic, it is fraught with the very-real potential for unforeseen and unintended consequences. The explanation makes multiple references to historically-uneven and sometimes-long intervals between adjustments in the salary levels as well as the perceived need to keep the figure "up to date". *See* 88 Fed. Reg. at 62176-79. But surely past administrative inaction, which could be improved upon, is an insufficient justification for such an extreme and unprecedented change. Moreover, and importantly, there is no particular harm to having an "out of date" figure for a period. While not ideal because of the overemphasis that the Agency has placed on this one component to the exemptions, no one will inadvertently *become* exempt if the figure lags.

NACS is concerned that USDOL has expressed no intention to undertake substantive salary re-evaluations regularly *in the future*. There is no assurance that the underlying determinations leading to the coming figure will go un-reconsidered indefinitely, thus leaving whatever the figure is in five, ten, or even twenty years simply to the cumulative impact of applying what amounts to *a standard formula*".

Implementing the indexing proposal would mean that USDOL had effectively abandoned its responsibility for and practice of making substantive judgments about the inflationary effects of increases in the salary level, including as to lower-wage sectors such as the retail industry and small business. *See, e.g.*, 69 Fed. Reg. at 22168; 40 Fed. Reg. 7091 (Feb. 19, 1975). The impact would be especially pronounced in a period of high inflation and could in fact contribute to a serious inflationary spiral. Nor would this effect be limited to the amount of the jump in the minimum salary itself; that move would also spark increases in:

- Salaries already paid *above* the minimum level so as to avoid compression in compensation scales among exempt employees; and

- Compensation and benefits of a non-salary nature that are directly or indirectly keyed to the salaries of exempt employees.

If there were nevertheless to be some proposed indexing procedure in the future, then it would be wise to include these features:

A.    A Per-Revision "Cap" Or "Maximum"

We recommend that additional safeguards be put in place to protect against drastic increases (or decreases) in the salary level. Specifically, a cap of no more than five percent of the prior salary level aligns with the annualized increase in the salary level over the exemptions' history.

B.    A "Safety Valve" For Exceptional or Unforeseen Circumstances

There could also be times of national emergency, episodes of extraordinarily high unemployment, or a host of other exigencies that would render automatic salary indexing undesirable and untenable for at least some period. The day might well come when the actual or threatened effects of the indexing mechanism should not be permitted to persist

or occur.  For instance, there might again be a period of high inflation comparable to or even worse than that of the late 1970s, or conceivably there might someday even be a period of prolonged and exacerbated *de*flation.  In fact, we still are observing the fallout from the pandemic that became a nationwide emergency just months after the last increase.

NACS previously recommended that the Secretary of Labor or the Wage and Hour Administrator be expressly authorized to modify or suspend any "update" procedure for such reasons, in such ways, and for such periods as are justified under the circumstances and are expressly articulated.  USDOL has provided itself some flexibility as to the timing of an increase. 88 Fed. Reg. at 62240.  We suggest though that a postponement of 120 days would be insufficient for the Agency to determine a better course to propose, go through a meaningful rulemaking process, and issue a final rule.  A period of 180 or more would be more appropriate.  Of course, the fact that such an exception should be provided for is yet another illustration of why the mechanism is ill-advised in the first place.

### C.    A More Remote Lookback

Furthermore, by initially increasing the minimum salary level to the 35th percentile of the data set, USDOL will also skew that very data in favor of substantial increases when future adjustments are made.  For example, assuming for the moment that the 35th percentile of "full-time nonhourly workers" in 2024 is the projected $1058 per workweek, employers will overwhelmingly (1) convert employees who are currently paid on a salary basis at a lower rate to nonexempt, hourly-paid ones; and/or (2) increase the salaries of employees who will remain exempt to at least $1058 per workweek, along with raising the salaries of more-highly-paid employees to prevent or mitigate compression.  The first option will necessarily reduce the proportion of "nonhourly" workers, and the second will increase the amount which those remaining are paid.

Accordingly, if USDOL moves forward with this aspect of the proposal and intends to look at the 35th percentile, we suggest that it look not to the "four quarters preceding" as it proposes but the preceding "six quarters" or those quarters minus the two most recent – essentially minimizing the weight given to recent changes that are likely to be made preemptively for budgetary reasons.

### 3.    Total Annual Compensation Requirement

USDOL likewise proposes using the same tainted data set to increase the total annual compensation required under the highly-compensated employees exemption. 88 Fed. Reg. at 62159.  This variation of the exemptions, in addition to requiring that the exempt worker meet the salary basis test and salary level threshold, currently requires at least $107,432 in total annual compensation based on the 80th percentile figure in 2019. 29 C.F.R. 541.601.

If the current figure is outdated, then at most the proposed rule provides support for using the 80th percentile ($125,268).  The Agency now is proposing the 85th percentile (generating a threshold of at least $143,988). *See* 88 Fed. Reg. at 62159.  As with selecting the 35th percentile instead of 40th, selecting the 85th percentile instead of 90th is unlikely to be a sufficient enough change in approach to overcome the flaws of the 2016 Final Rule.

4.    The Effective Date

It cannot be overemphasized the amount of time that is needed to implement any FLSA-related change.  Indeed, even though knowing how to approach the changes might become incrementally easier with each update, much of the work must be done from the ground up each time.  NACS submits, as it has in the past, that at least a twelve-month notice is necessary before any forthcoming change takes effect – whether a stand-alone increase or an automated one.  In many instances, much of the analysis of labor costs must occur *before* operating budgets can be set for an employer's *next* fiscal year.

As a preliminary matter, employers must evaluate how the changes might affect their workforces in the near and intermediate terms, including determining who can continue to be treated as exempt and what the resulting cost will be of salary increases. Employers must engage in the below practices to effectively plan and respond to any proposed increase in the minimum salary level.

A.    Fundamental Considerations

For those employees remaining exempt, employers must consider whether an increase would be necessary given the employee's specific pay components, particularly:

- Traditional salary;
- Total-compensation-based guarantee;[4]
- Time-based guarantee;[5] and/or
- Any combination of these and other components available.

---

[4] In each rulemaking USDOL continues to portray the "salary basis" as requiring a traditional salary when it only requires a "guarantee" that is paid on a "salary basis". As we have submitted each time since 2015, an employer can meet the salary basis test based 100% on other forms of payment as long as the guarantee is a predetermined amount set high enough to meet or exceed the minimum "salary" level.  The 10% credit as a standalone provision is misleading and should be withdrawn.  This clarification is important to NACS members that may have Store Managers or others meeting the guarantee, both qualitatively and quantitatively.

[5] Employees subject to the reasonable relationship test (*i.e.*, those with a guarantee related to a day, shift, or hourly rate) will need to be evaluated based on the new minimum "salary" level.  The figures $330 and $1,100 would better reflect the 1.5 to 1 ratio permitted and consistent with prior rulemakings. *Compare* 88 Fed. Reg. at 62240; 29 C.F.R. 541.605(b) (2019); 29 C.F.R. § 541.605(b) (2004).  A more restrictive ratio than 1.5-to-1 has never been subject to notice and comment (was not included in a proposed rule) and is not sufficiently highlighted in this proposed rule to consider it as subject to notice and comment.  Though the ratio is not a rigid test, USDOL has created confusion by making unnecessary revisions to it. *See*, WHD Opinion Letter, FLSA 2018-25 (Nov. 8, 2018) (confirming that it is not a rigid test but rejecting a ratio of 1.8-to-1).

Page 9 of 10

For those employees reclassified as nonexempt, the analysis is even more complex:

- Evaluate the application of overtime-only FLSA exemptions, particularly 7(i) for commissioned-employees of retail establishments;
- Adopt fluctuating-workweek pay plans, day-rate pay plans, or "9/80" pay plans to minimize the cost of overtime; and
- Redesign or eliminate incentive pay components that could require complex overtime calculations

### B.     Additional Considerations

Unfortunately, there can be implications well beyond the "affected" employees and work to be done well beyond making the initial decision to increase pay or reclassify. To illustrate, often employers must:

- Determine what changes in pricing may be needed to offset labor costs;
- Determine what immediate workforce reductions may be required;
- Determine what hiring freezes or delayed or canceled promotions are necessary;
- Determine whether to reduce compensation of nonexempt employees to offset exempt-employee increases;
- Determine whether to combine or eliminate positions and place greater levels of responsibility and work upon the remaining, more-highly-paid positions falling within the exemptions; and
- Reassess the job duties of other exempt-classified employees to ensure that changes made have not undercut their exempt status.
- Develop communication plans to explain to employees (especially adversely-affected ones) that these changes were the result of the Agency's revisions;
- Deal with substantial, pervasive, adverse morale effects with regard to employees who are no longer treated as exempt;
- Adjust payroll schedules and wage notices for reclassified employees, including evaluating the timing of payments and state requirements regarding the communication of changes well before the work begins under the new terms; and
- Bear the substantial quantitative and qualitative costs that working-through all of these considerations entails.

Most employers cannot feasibly implement the kinds of changes that any Final Rule will necessitate (both directly and indirectly), without taking steps that are ultimately detrimental to employee interests. Any suggestions to the contrary simply do not adequately account for the realities facing almost all affected employers. While USDOL might attempt to provide some guidance, experience has shown that it cannot address in a succinct manner the myriad of circumstances to which the FLSA principles must apply. In the end, a longer implementation period will help ensure compliance going forward – particularly regarding those employees reclassified as nonexempt.

Accordingly, with respect to any increase to the minimum salary threshold and/or total annual compensation figure, whether the result of an individual rulemaking or an automated process, NACS recommends a period of at least twelve months from publication of the exact dollar figure to it taking effect.