# EXHIBIT 5

## DECLARATION OF BRADLEY MANNION

I, BRADLEY MANNION, declare as follows:

1.      I am over the age of 18 and competent to make this declaration.

2.      I am the Director of Labor, Health, and Safety at the National Association of Home Builders ("NAHB"), a federation comprised of over 600 state and local home builders' associations, representing more than 140,000 members involved in single- and multi-family home building and remodeling, as well as property management, design, housing finance, building product manufacturing, and other aspects of residential and light commercial construction.

3.      Among NAHB's purposes are to help its members provide decent, safe, and affordable housing, to educate its members on their legal and regulatory risks, and to advocate for reasonable labor, health, and safety laws and regulations.

4.      The statements in this declaration are true and within my personal knowledge and/or my review of NAHB's records.

5.      Among other things, the 2024 Overtime Rule increases the EAP exemption to $1,128 per week ($58,656 per year) as of January 1, 2025.

6.      During the rulemaking on the 2024 Overtime Rule, NAHB submitted comments detailing its concerns, and the concerns of its members, with the then-proposed Rule. A copy of NAHB's comments is attached hereto as Exhibit A.

7.      Many of NAHB's members, as well as its affiliated state and local builders' associations, employ workers who were i) exempt prior to July 1, 2024, but are now non-exempt solely because of the 2024 Overtime Rule's July 1, 2024 increase in the EAP salary threshold, or ii) will lose their exempt status as of January 1, 2025 because of the Rule's scheduled increase in

the EAP salary threshold. Each of these members will suffer the harms outlined in Paragraphs 8, 9, and 10 of this Declaration with respect to their own employees.

8. For example, I have spoken with multiple local NAHB builders' associations which have expressed that their employees would lose their exempt status by January 1, 2025, due solely to the 2024 Overtime Rule's increase in the EAP salary threshold. The duties performed by these employees will not have materially changed, nor will their status as being paid on a salary basis; the only change affecting their exempt status is the EAP salary threshold increase. These associations must now increase certain employees' salary or pay them overtime.

9. Moreover, during an informative webinar that NAHB conducted pertaining to the 2024 Overtime Rule, NAHB members expressed concern about the impact the 2024 Overtime Rule would have on their businesses.

10. NAHB's members have been or will be required to either increase the salary of those employees who have lost their exempt status solely because of the 2024 Overtime Rule or reclassify them as non-exempt under the FLSA. With respect to employees who have lost their exempt status because of the 2024 Overtime Rule, these members are forced to either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and forego their services. Once paid, NAHB's members have no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

11. Additionally, NAHB's members have expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers, and determine whether it makes sense, as a business matter, to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. These members will

also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule.

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED on this 17th day of July, 2024.

_____

Bradley Mannion

# EXHIBIT A

Executive Office
James W. Tobin III
President & Chief Executive Officer
jtobin@nahb.org

November 7, 2023

The Honorable Julie A. Su
Acting Secretary
U.S. Department of Labor
200 Constitution Avenue, NW
Washington, D.C. 20210

**RE: Comments on RIN 1235-AA39; Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees; Notice of Proposed Rulemaking**

Dear Acting Secretary Su:

On behalf of the more than 140,000 members of the National Association of Home Builders of the United States (NAHB), I am pleased to submit the following comments on the Department of Labor's (DOL or the Department) Notice of Proposed Rulemaking (NPRM) on "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees" that was published in the Federal Register on Sept. 8, 2023 (DOL Overtime Proposal).[1] As an interested stakeholder in this regulatory activity, NAHB is concerned that the proposed changes will have a substantial adverse impact on regulated employers and small businesses, including home builders and specialty trade contractors.

NAHB is a Washington, D.C.-based trade association whose members are involved in home building, remodeling, multifamily construction, property management, subcontracting, design, housing finance, building product manufacturing and other aspects of residential and light commercial construction. NAHB is affiliated with more than 600 state and local home builders' associations around the country. NAHB's builder members construct about 80 percent of the nation's new housing units annually, making housing a large engine of economic growth in the country.

DOL's proposed rule to amend its overtime regulations will result in a substantial financial impact on the home building industry.  Equally troubling is the fact that DOL has not fully considered the impacts or recognized that the proposed changes will result in undue hardship and place a large economic burden on businesses in certain low-cost areas.  In an effort to better quantify and explain these challenges, NAHB, along with many other stakeholders, requested extensions to the comment deadline.[2] Unfortunately, DOL declined those requests,[3] thereby precluding NAHB from providing the full array of information and data necessary to fully support these comments.

In NAHB's view, the limited timeframe for stakeholders to review the DOL Overtime Proposal, economic analysis and supporting documentation, generate feedback and collect and analyze data from affected

---

[1] 88 Fed. Reg. 62,152.

[2] On Sept. 14, NAHB filed an extension request of 60 days to the comment deadline (https://www.regulations.gov/comment/WHD-2023-0001-0091). Additionally, NAHB joined more than 100 organizations as a member of the Partnership to Protect Workplace Opportunity to request a 60-day extension of the comment period (https://www.regulations.gov/comment/WHD-2023-0001-0165).  DOL denied this request on Oct. 10, 2023 (https://www.regulations.gov/document/WHD-2023-0001-1785).

[3] https://www.regulations.gov/document/WHD-2023-0001-1785.

The Honorable Julie A. Su
November 7, 2023
Page 2

entities, and prepare comments placed unnecessary constraints on all interested parties. As there is no legislative, court-ordered or other such deadline associated with today's rulemaking, it is unclear why the Department is so interested in swift action. Unfortunately, by adhering to an arbitrary timeline, NAHB respectfully submits that the rulemaking record will not represent the best available information and evidence needed to support the agency's rule.

NAHB is also a member of the Partnership to Protect Workplace Opportunity (PPWO), a coalition that is made up of a diverse group of associations, businesses, and other stakeholders representing employers with millions of employees across the country in almost every industry. PPWO has been dedicated to advocating the interests of its members in the regulatory debate on changes to the Fair Labor Standards Act (FLSA) overtime regulations. The Partnership's members believe that employees and employers alike are best served with a system that promotes maximum flexibility in structuring employee hours, career advancement opportunities for employees, and clarity for employers when classifying employees. The PPWO has also responded to the DOL Overtime Proposal with a careful and thorough analysis based on the principle that any changes need to work for both employers and employees. In addition to these comments, NAHB adopts and incorporates by reference the PPWO comments.

In short, NAHB is opposed at this time to the Overtime Proposal because DOL has not sufficiently justified the need for this update. If DOL insists on completing this action, NAHB strongly urges the agency to consider alternatives to the proposed "one-size-fits-all" approach to overtime rules, which is inappropriate for many industries and different regions of the country. Further, establishing automatic updates every three years, without the opportunity for public comment from the regulated community, would likely cause greater harm to the employees it purports to benefit, as employers must constantly adjust their business practices to compensate for the changing salary levels and, in doing so, may have to take steps to reduce or minimize workplace flexibility and other benefits. Accordingly, NAHB recommends DOL withdraw the proposed updates to the rule at this time.

I.    **Background**

According to the Fair Labor Standards Act (FLSA), which – due to the courts' broad interpretation of the term interstate commerce – covers nearly every workplace, employers must pay non-exempt employees at least the federal minimum wage for all hours worked and overtime pay at time and one-half the regular rate of pay for all hours over 40 hours in a workweek. However, the FLSA does provide a number of exemptions.

For the purposes of this proposed rulemaking, Section 13(a)(1) of the FLSA provides an exemption from both minimum wage and overtime pay for employees employed as bona fide executive, administrative, professional and outside sales employees (i.e., white collar employees). Additionally, Section 13(a)(17) exempts certain computer employees.

Currently, to qualify for this exemption, employees generally must:

1)    Be salaried, meaning that employees are paid a predetermined fixed salary that is not subject to reduction because of variations in the quality or quantity of work performed (i.e., the "salary basis test");

The Honorable Julie A. Su
November 7, 2023
Page 3

2) Be paid more than the specified threshold, which currently requires employees be paid on a salary basis at not less than $684 per week or the equivalent of $35,568 annually for full-time employees. (i.e., the "salary level test"); and

3) Primarily perform executive, administrative, or professional duties, as defined by the DOL's implementing regulations at 29 CFR Part 541 (i.e., the "duties test").[4]

Notably, job titles alone do not determine exempt status,[5] so in order for an exemption to apply, an employee's specific job duties and salary must meet all the requirements of the Department's implementing regulations. In doing so, the employer bears the burden of establishing the applicability of any exemption from the FLSA's pay requirements.[6]

DOL has proposed increasing the salary and compensation levels (i.e., salary level test) three times over the course of roughly eight years – each with varying results.[7] For the roughly 11 years prior, the Department both attempted to and successfully increased the salary level for exempt EAP employees once.[8] Each separate rulemaking has, in one way or another, aimed to ensure that the FLSA's intended overtime protections are fully implemented and simplify the identification of overtime-protected and exempt employees.

DOL last increased the standard salary level from $455 per week to $684 per week, an increase of $229/week, effective Jan. 1, 2020. Under this rulemaking, an executive, administrative, or professional employee must be paid at least $35,568 in total annual compensation for a full year in order to meet the standard salary level for exemption; to be eligible for the highly compensated employee (HCE) exemption, such an employee must earn at least $107,432 in total annual compensation.[9]

DOL's Overtime Proposal updates the salary and compensation level using the lowest 35th percentile of weekly earnings of full-time salaried workers from the lowest-wage Census Region (currently the South). Using 2022 data in the rulemaking, DOL has proposed to increase the standard salary exemption to $1,059

---

[4] 29 CFR § 541.700.

[5] 29 CFR § 541.2.

[6] 88 Fed. Reg. at 62,157.

[7] DOL first proposed regulations increasing the salary level in 2015, and then again in 2016 and 2019. However, NAHB and other business groups filed suit against the Department in response to its 2016 rulemaking to update the salary level from $23,660 to $47,476 (https://kchba.org/nahb-business-groups-sue-block-overtime-rule/). On Nov. 22, the U.S. District Court for the Eastern District of Texas issued a preliminary injunction blocking the final rule from going into effect. The current 2019 salary increase, which went into effect on Jan. 1, 2020, was appropriate and does not need to be changed once again.

[8] Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, U.S. Department of Labor, 69 Fed Reg. 22,122 (April 23, 2004).

[9] Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, U.S. Department of Labor, 84 Fed. Reg. 51,230, 51,231 (Sept. 27, 2019) (effective Jan. 1, 2020). It should also be noted NAHB supported this rulemaking – both when it was proposed in 2019 and issued as a final rule later that year. Specifically, NAHB supported the Department's adoption of the longstanding methodology from the 2004 rulemaking that is generally accepted by employers and for proposing periodic updates to the salary levels using the same methodology, assuming the Department engaged in stakeholder input for every update (https://www.regulations.gov/comment/WHD-2019-0001-59135).

The Honorable Julie A. Su
November 7, 2023
Page 4

($55,068 per year for a full-year worker). DOL further projects that the salary could be as high as $60,209 in the first quarter of 2024, by applying a growth rate to the 35th percentile of weekly earnings in the South. The proposed rule also sets the HCE total annual compensation level at the annualized value of the 85th percentile of weekly wages of all full-time salaried employees ($143,988 per year as of 2022). The Department also has proposed changes to the methodologies for setting both the standard and HCE salary levels.

In addition to increasing the standard salary levels for exemption status and HCE, the Department is proposing to update the standard and HCE salary levels automatically every three years using the same methodologies for both compensation thresholds. Importantly, the proposed rule does not include any specific regulatory revisions to the standard duties test.[10]

If implemented as proposed, DOL estimates that in year one, 3.4 million currently exempt workers would become entitled to minimum wage and overtime protection under the FLSA,[11] with the first-year cost to businesses being $2.24 to $2.43 billion in direct and payroll costs.[12]  Time burdens will include: 1 hour for regulatory familiarization; 75 minutes per affected worker for adjustment; and 10 minutes per week scheduling and monitoring each worker.[13]  In addition to the direct costs, the proposed rule will also transfer income from employers to employees in the form of higher earnings, with the average annualized transfers estimated by DOL to be $1.3 billion with automatic updating and $868.2 million without automatic updating.[14]

## II.    DOL has not sufficiently demonstrated the need to increase the salary threshold at this time.

The Department explains that its decision to engage in this rulemaking is to 1) address the concern that lower-salaried employees performing large amounts of nonexempt work historically were not considered bona fide EAP employees and thus should be entitled to overtime compensation[15] and 2) keep the earnings thresholds up to date in the United States and across U.S. territories.[16] While these may be laudable goals, the Department has not provided sufficient or compelling data to support its reasoning or the need to conduct this rulemaking at this time. In fact, in many aspects, it does the opposite.  For example, in regard to the proposed salary levels for U.S. territories, DOL openly states it lacks the data to conduct an analysis of the impact of these changes.[17]  DOL has an obligation to share its facts and reasoning *prior* to making any changes, including a full analysis of the impacts that may accrue to both employers and employees.  As the Department's economic impact analysis dramatically underestimates the rulemaking's cost burden on employers, and DOL has not clearly demonstrated the need for an updated rule, NAHB believes this effort should be abandoned.

---

[10] NAHB has previously supported DOL's decision to keep the "duties test" unchanged and does so again in this proposed rule because it is a straightforward test that has worked well for employers when assessing their regulatory compliance.
[11] 88 Fed. Reg. at 62,154.
[12] 88 Fed. Reg. at 62,237.
[13] 88 Fed. Reg. at 62,230.
[14] 88 Fed. Reg at 62,223.
[15] 88 Fed. Reg. at 62,163.
[16] 88 Fed. Reg. at 62,159.
[17] 88 Fed. Reg. at 62,192.

The Honorable Julie A. Su
November 7, 2023
Page 5

### III.    The Proposed Salary Levels Will Have Significant Adverse Effects

a.   DOL has not fully considered the proposal's impact on employers and employees.

The latest increase to the standard salary levels was less than four years ago.  Coupled with the proposed change in methodology used by DOL, many businesses will struggle to reach the new salary level without reducing or taking away other employee benefits.  For businesses in residential construction that are able to increase the salary levels of affected employees, these actions may lead to the unintended consequence of adjusting other aspects of their businesses in order to offset these costs.

In an effort to better identify and quantify the challenges the proposed rule creates, NAHB recently included a set of special questions that focused on overtime issues in its monthly industry Housing Market Index (HMI) survey.[18]  Responses were collected in August 2023, prior to the Sept. 8, 2023, publication of the proposed rule.  The questions focused on the role of construction supervisors – whose duties typically assigned to this role qualify for the administrative exemption under the FLSA, along with the effect the 2020 salary level increase had on their businesses and their potential response if a new salary level is finalized.  According to the data, 71 percent of the respondents reported having a construction supervisor on payroll.  The respondents also reported that 87 percent of construction supervisors were paid with a salary, in contrast to an hourly wage. Additionally, 75 percent of respondents indicated their workforce would be affected if the salary level increase was as high as the roughly $60,000 salary adjustment suggested by the proposal.

In relation to the 2020 increases, 94 percent of respondents stated the increase to $35,568 did not affect anyone on their payroll.  However, Figure 1 shows the steps that were taken in response to the 2020 increase, along with the steps businesses will likely take in response to another increase.

---

[18] Housing Market Index: Special questions on Special Questions Price Reduction, Incentives to Bolster Sales and/or Limit Cancellations and DOL Overtime Rule, National Association of Home Builders, Economics and Housing Policy Group (August 2023).

The Honorable Julie A. Su
November 7, 2023
Page 6

**Figure 1**. **Question on Salary Level Increase for 2020 and 2023 DOL Overtime Proposals (August 2023 HMI)**

**How did your company respond to the 2020 increase in the overtime threshold? How is it likely to respond now if the threshold is raised to the level you indicated earlier?**



The Honorable Julie A. Su
November 7, 2023
Page 7

Given the difference between the responses to the 2020 standard and the potential responses to the 2023 proposal, NAHB recommends the Department withdraw the proposed rule. While NAHB appreciated the series of regional listening sessions conducted on this issue in 2022,[19] the short span of time allowed between rulemakings, which was discussed during these sessions, will result in undue burden for employers to reorient themselves with new salary level thresholds and conduct internal analyses on the best approach for each employee, likely negatively impacting employees overall.

     b.   DOL has not fully considered the proposal's impact on the economy.

Looking specifically at home building, the industry relies on an array of specialty trade contractors and employees to meet the nation's housing needs.  If finalized, this proposed rule will have severe ramifications that DOL has not even considered, with the direct impact it will have both on workers and consumers.  Figure 2 presents the likely response to a salary level increase from affected respondents:

**Figure 2. Question on Effect of Salary Level Increase Under 2023 DOL Overtime Proposal (August 2023 HMI)**

**If the threshold is raised to the level you indicated earlier, what effect is it likely to have on your business?**



---

[19] DOL conducted a series of separate regional listening sessions for employers and employees to solicit feedback on possible revisions to the overtime regulations between May and June 2022. Several NAHB members participated on the employer-focused listening sessions.

The Honorable Julie A. Su
November 7, 2023
Page 8

A frequently overlooked component of new regulations is the impact such regulations have on downstream users of products and services. As shown in Figure 2, half of the NAHB members responding to the survey indicated the DOL Overtime Proposal would result in higher home prices for consumers. NAHB regularly updates data on how increases in the cost of housing impact home buyers.[20] NAHB has developed a "Priced Out" model to account for a changing economic environment. The updated 2023 model provides estimates for the United States and 300 metropolitan areas. The 2023 estimates show that nationally, 96.5 million out of the 132.5 million total households in the U.S—73%—already cannot afford to buy the median-priced new home, based on their incomes and standard underwriting criterion. A $1,000 increase in the price would price out an additional 140,436 households.

The dramatic surge in the salary threshold that has been proposed is unlikely to result in an increase in workers' take-home pay. Rather, it would force business owners to restructure their workforce to compensate by scaling back on pay and benefits, as well as taking other steps such as cutting workers hours to avoid the overtime requirements. The impacts are not confined to just construction supervisors; other residential construction occupations in executive, administrative, and professional positions will be affected as well. Although DOL contends that this rule will ensure that the FLSA's overtime protections are appropriately applied, the agency has taken an overly broad approach that will result in problems and unintended consequences that have not even been explored. Unless and until DOL fully considers and monetizes all of the impacts the proposed rule will have on residential construction and other industries, NAHB strongly urges DOL not to finalize this rule.

      c.   The DOL Overtime Proposal will have a disproportional impact across the country.

Despite the recognition that wages and cost of living vary across the nation, the DOL Overtime Proposal treats all employees the same by setting a standard pay threshold that would apply universally. NAHB believes this is the wrong approach and one that will inappropriately result in a larger impact in areas with lower wages and costs of living.

NAHB's analysis of data from the Bureau of Labor Statistics (BLS) shows that, in total, approximately 92,000 construction supervisors would be potentially affected in some way by increasing the annual overtime threshold from $35,568 to $55,068, and approximately 137,000 would be impacted by increasing it from $35,568 to $60,209. This represents 16 to 24 percent of total employment for that occupation class in the sector, who would no longer be eligible for the exemption and may be overtime-eligible under the DOL Overtime Proposal. These large numbers are due to the substantial increase in the salary threshold in the proposed rule.

NAHB produced these estimates by using state-level data on First-Line Supervisors of Construction Trades and Extraction Workers from the BLS Occupational Employment Statistics (OES), along with NAHB's short

---

[20] Na Zhao, Ph.D., NAHB Priced-Out Estimates for 2023, National Association of Home Builders, Economics and Housing Policy Group, March 2023 (available at https://www.nahb.org/-/media/NAHB/news-and-economics/docs/housing-economics-plus/special-studies/2023/special-study-nahb-priced-out-estimates-for-2023-march-2023.pdf) (Accessed Oct. 12, 2023).

The Honorable Julie A. Su
November 7, 2023
Page 9

term-forecast for inflation and payroll employment to project the OES results forward to 2024.  Details are provided in the note on the bottom of Attachment 1.[21]

Figure 3 shows the numbers of construction supervisors, in both residential and nonresidential building, who would be affected by changing the overtime standard from $35,568 per year to $55,068 per year in each state.

**Figure 3.  First-Line Supervisors of Construction Trades Workers Potentially Impacted by Changing the Overtime Threshold From $35,568 to $55,068 in 2024.**



Source: NAHB Estimates

The count of construction supervisors affected depends in part on the size of the population in each state, but the impact is disproportionately strong in states with lower cost-of-living, which tend to be concentrated in the South.  The state with the largest number of supervisors affected is Texas, followed by Florida, North Carolina, Virginia, Tennessee, Georgia and Alabama.  Attachment 1 also shows the number of construction supervisors affected by changing the threshold to $60,209 and also includes a breakdown for supervisors affected in residential categories within the overall construction industry.

---

[21] First-Line Supervisors of Construction Trades Workers Potentially Impacted by Changing the Overtime Threshold From $35,568 to $55,068 or $60,209 in 2024 (Attachment 1).

The Honorable Julie A. Su
November 7, 2023
Page 10

While NAHB's analysis focuses on construction supervisors, it is important to keep in mind that the DOL Overtime Proposal would affect multiple occupations in the construction and housing sectors.  Due to the short comment period, NAHB has not been able to complete an analysis of the impacts on other construction support staff.  It is likely that others will also be impacted in the housing industry who fall within the executive, administrative, professional, and computer employee exemption, for example, sales representatives, administrative staff (i.e., accounting, human resources, designers, engineers, estimators, etc.), and local trade association employees. [22]

The DOL Overtime Proposal is a "one-size-fits-all" standard. Given the potential broad impact of the proposed rule, an obvious issue concerns the fact that wage amounts vary greatly from location to location, as well as among business sectors.  As the analysis above shows, construction wages are very regional.  What one construction supervisor makes in Tennessee is different than what one earns in California— sometimes wages varying significantly.

There are a variety of factors involved in the DOL Overtime Proposal that it appears the agency has not considered when making its proposed changes.  NAHB urges DOL to consider the varied geographic areas in the United States and its territories and recognize that not all areas have the same wage and living costs.  An overtime regulation that factors in these differences and is more tailored to existing economic realities would be beneficial to employers and employees.

      d.   The DOL Overtime Proposal will reduce worker morale, recruitment and retention.

The DOL Overtime Proposal will likely create problems for both employers and employees.  As noted above, a majority of NAHB members surveyed acknowledged that they would take steps to minimize employees' opportunity for overtime work.  NAHB's survey also showed a negative impact on employees, as employers are likely to switch their employees from a salary to an hourly wage.  The effect of this is that employees will view their new "non-exempt" status as a demotion, and perhaps even lose money if converted to hourly status.  These employees will also lose the workplace flexibility that comes with being a salaried employee.

As evidenced by NAHB member testimony during the Department's regional listening sessions in 2022, the construction industry is facing a severe workforce shortage in all aspects of the business – including workers in executive, administrative and professional capacities. In fact, the BLS Jobs Openings and Labor Turnover report determined there were 431,000 job openings in construction as of September 2023 – an increase of roughly 56,000 from one month earlier. Therefore, businesses oftentimes must offer incentives

---

[22] It should be noted that NAHB's position has been that home building individuals who work under a variety of titles (i.e., project manager, field manager, construction manager, construction supervisor) and at various levels perform work that qualifies under the administrative exemption under the FLSA (*see* Letter from William P. Killmer, National Association of Home Builders, to Alexander Passantino, U.S. Department of Labor, Wage and Hour Division (October. 31, 2008) (Attachment 2)). DOL has also indicated that it shares this position.  In January 2009, DOL issued Opinion Letter FLSA2009-29, stating that the project supervisor position is exempt from the FLSA's minimum wage and overtime requirements as an employee employed in a bona fide administrative capacity, provided that the salary basis requirement is met. That letter was withdrawn on March 2, 2009; however, the Department issued Opinion Letter FLSA2018-10, which reproduces the verbatim text of Opinion Letter FLSA2009-29 (*see* letter from Bryant L. Jarrett, U.S. Department of Labor, Wage and Hour Division, (January 5, 2018) (Attachment 3).

The Honorable Julie A. Su
November 7, 2023
Page 11

such as quality health insurance and other benefits to be competitive and able to recruit and retain a talented workforce. NAHB believes the proposed salary level, in combination with the lasting supply chain disruptions experienced over the past several years, would severely harm many business' abilities to offer these incentives, remain competitive, and stay in business.

IV.     **The Department Should Reconsider Implementing a Three-Year Automatic Update to the Exempt Salary Levels**

According to the DOL Overtime Proposal, the Department states the implementation of an automatic updating mechanism to occur every three years for both the standard and HCE salary levels would ensure that the levels keep pace with changes in employee earnings and thus remain effective in helping determine exemption status.[23] Further, DOL believes the triennial salary level updates avoids the potential burden that possible changes to the tests for exemption on an annual or biennial basis would cause and argues that this frequency is also consistent with the interval chosen in the 2016 rulemaking.[24]

DOL's reasoning and justification is misplaced. DOL's proposed automatic adjustment removes the ability of impacted stakeholders, both employers and employees, to comment on proposed changes, and completely ignores the protections afforded by the Administrative Procedure Act (APA).[25] Moreover, NAHB strongly disagrees with the Department's reasoning because while annual or biennial changes would be chaotic, many businesses may still struggle to adjust to increases occurring every three years. Further, automatic increases that are dependent on fluctuating data do not provide businesses with a clear, predictable salary level, and the amount in which these thresholds automatically update could vary greatly depending on the economic conditions at the time. As a result, employers who may have been paying employees less than the proposed level of roughly $55,000 in 2023 could be paying significantly more in response to subsequent automatic updates to meet the exempt salary level. These are all reasons that demonstrate the importance of stakeholder input in the regulatory process and should not be given short shrift by an automatic update.[26]

At the same time, the DOL Overtime Proposal is unclear on whether the Department would recognize, when updating the standard and HCE salary levels, that any subsequent and/or automatically-updated level may potentially be lower than the salary level from three years prior. Without a set calculation, and given fluctuations in wages throughout individual regions, it is plausible that the salary level could decrease. While NAHB anticipates the Department will not lower the salary levels from previous updates, nevertheless, NAHB questions DOL's authority to implement automatic updates in the first instance. Accordingly, if DOL moves forward with finalizing this proposed rule, it should remove the automatic update provision. If the agency deems it appropriate to reexamine the salary thresholds in the future, it should engage in notice and comment rulemaking and accept public comments, data, and other

---

[23] 88 Fed. Reg. at 62,178.
[24] 88 Fed. Reg. at 62,179.
[25] 5 U.S.C. §§ 551-559. NAHB also questions whether the agency even has the authority to implement automatic increases when it has consistently published prior proposed increases using the notice and comment rulemaking procedures set forth in the APA.
[26] NAHB does not believe DOL has the authority to impose automatic updates without going through the notice and comment rulemaking process as set forth in the Administrative Procedure Act.

The Honorable Julie A. Su
November 7, 2023
Page 12

information from the regulated community to ensure its approach is supported by evidence in the rulemaking record.

**V.     Conclusion**

While NAHB supports the goal that all employees should be compensated fairly, NAHB is concerned the significant change proposed for the salary threshold will reduce job-advancement opportunities, hours, and employment flexibility – particulary for full-time construction supervisors – leading to construction delays, increased costs, and less affordable housing for consumers.  NAHB is opposed at this time to DOL's Overtime Proposal and strongly urges the agency to withdraw the proposal because it is unnecessary and unsupported by evidence in the record.  Alternatively, if DOL intends to move forward, NAHB recommends the agency consider alternatives to its proposed "one-size-fits-all" approach to overtime rules, because as currently written, DOL inappropriately seeks to broadly apply this rulemaking to various industries and different regions of the country without proper consideration of those regional differences or the impacts that may accrue.

NAHB appreciates DOL's consideration of its comments and welcomes the opportunity to engage with the Department to find workable soultions for implementing the exemption from minimum wage and overtime pay for executive, administrative, professional, outside sales, and computer employees.  Please contact NAHB's Director of Labor, Safety & Health Policy, Brad Mannion, at (202) 266-8265 or via email at bmannion@nahb.org if you have any questions or require any additional information.

Sincerely,

James W. Tobin III
President & Chief Executive Officer
National Association of Home Builders
    of the United States



**First-Line Supervisors of Construction Trades Workers Potentially Impacted by Changing the Overtime Threshold From $35,568 to $55,068 or $60,209 in 2024**

| State | Industry / Sub-industry | Total Employed | #Workers Under $35,568 | #Workers Under $55,068 | Impacted by $35,568 to $55,068 | #Workers Under $60,209 | Impacted by $35,568 to $60,209 |
|---|---|---|---|---|---|---|---|
| Alabama | Construction | 10,025 | 221 | 3,005 | 2,784 | 3,952 | 3,731 |
| Alabama | Residential Building Construction | 1,298 | 221 | 668 | 447 | 785 | 564 |
| Alabama | Specialty Trade Contractors | 5,007 | 0 | 1,535 | 1,535 | 2,010 | 2,010 |
| Alabama | Residential Trade Contractors | 1,705 | 0 | 523 | 523 | 684 | 684 |
| Alabama | All Residential Categories | 3,003 | 221 | 1,191 | 970 | 1,469 | 1,248 |
| Alaska | Construction | 1,648 | 0 | 44 | 44 | 119 | 119 |
| Alaska | Residential Building Construction | 154 | 0 | 0 | 0 | 41 | 41 |
| Alaska | Specialty Trade Contractors | 741 | 0 | 8 | 8 | 46 | 46 |
| Alaska | Residential Trade Contractors | 291 | 0 | 3 | 3 | 18 | 18 |
| Alaska | All Residential Categories | 445 | 0 | 3 | 3 | 59 | 59 |
| Arizona | Construction | 15,043 | 2 | 1,826 | 1,824 | 2,812 | 2,810 |
| Arizona | Residential Building Construction | 2,163 | 0 | 238 | 238 | 436 | 436 |
| Arizona | Land Subdivision | 41 | 2 | 6 | 4 | 8 | 6 |
| Arizona | Specialty Trade Contractors | 8,263 | 0 | 1,058 | 1,058 | 1,656 | 1,656 |
| Arizona | Residential Trade Contractors | 4,208 | 0 | 539 | 539 | 843 | 843 |
| Arizona | All Residential Categories | 6,412 | 2 | 783 | 781 | 1,287 | 1,285 |
| Arkansas | Construction | 4,090 | 0 | 1,430 | 1,430 | 1,830 | 1,830 |
| Arkansas | Residential Building Construction | 247 | 0 | 109 | 109 | 159 | 159 |
| Arkansas | Specialty Trade Contractors | 2,060 | 0 | 689 | 689 | 907 | 907 |
| Arkansas | Residential Trade Contractors | 922 | 0 | 309 | 309 | 406 | 406 |
| Arkansas | All Residential Categories | 1,169 | 0 | 418 | 418 | 565 | 565 |
| California | Construction | 57,339 | 14 | 166 | 152 | 3,673 | 3,659 |
| California | Residential Building Construction | 7,099 | 0 | 99 | 99 | 775 | 775 |
| California | Land Subdivision | 144 | 14 | 67 | 53 | 71 | 57 |
| California | Specialty Trade Contractors | 36,062 | 0 | 0 | 0 | 2,107 | 2,107 |
| California | Residential Trade Contractors | 20,018 | 0 | 0 | 0 | 1,170 | 1,170 |
| California | All Residential Categories | 27,261 | 14 | 166 | 152 | 2,016 | 2,002 |
| Colorado | Construction | 17,031 | 0 | 1,910 | 1,910 | 2,942 | 2,942 |
| Colorado | Residential Building Construction | 2,194 | 0 | 246 | 246 | 350 | 350 |
| Colorado | Specialty Trade Contractors | 10,128 | 0 | 1,328 | 1,328 | 1,900 | 1,900 |
| Colorado | Residential Trade Contractors | 5,315 | 0 | 697 | 697 | 997 | 997 |
| Colorado | All Residential Categories | 7,509 | 0 | 943 | 943 | 1,347 | 1,347 |
| Connecticut | Construction | 4,883 | 0 | 577 | 577 | 812 | 812 |
| Connecticut | Residential Building Construction | 453 | 0 | 21 | 21 | 67 | 67 |
| Connecticut | Specialty Trade Contractors | 2,771 | 0 | 438 | 438 | 596 | 596 |
| Connecticut | Residential Trade Contractors | 1,295 | 0 | 205 | 205 | 278 | 278 |
| Connecticut | All Residential Categories | 1,748 | 0 | 226 | 226 | 345 | 345 |
| Delaware | Construction | 2,091 | 0 | 248 | 248 | 362 | 362 |
| Delaware | Residential Building Construction | 432 | 0 | 56 | 56 | 93 | 93 |
| Delaware | Specialty Trade Contractors | 1,020 | 0 | 130 | 130 | 190 | 190 |
| Delaware | Residential Trade Contractors | 509 | 0 | 65 | 65 | 95 | 95 |
| Delaware | All Residential Categories | 941 | 0 | 121 | 121 | 188 | 188 |
| District of Columbia | Construction | 1,081 | 0 | 0 | 0 | 44 | 44 |
| District of Columbia | Residential Building Construction | 123 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | Specialty Trade Contractors | 576 | 0 | 0 | 0 | 17 | 17 |
| District of Columbia | Residential Trade Contractors | 83 | 0 | 0 | 0 | 2 | 2 |
| District of Columbia | All Residential Categories | 206 | 0 | 0 | 0 | 2 | 2 |
| Florida | Construction | 48,539 | 0 | 11,773 | 11,773 | 17,292 | 17,292 |
| Florida | Residential Building Construction | 9,015 | 0 | 1,491 | 1,491 | 2,281 | 2,281 |
| Florida | Land Subdivision | 370 | 0 | 46 | 46 | 63 | 63 |
| Florida | Specialty Trade Contractors | 25,253 | 0 | 7,391 | 7,391 | 10,232 | 10,232 |
| Florida | Residential Trade Contractors | 15,637 | 0 | 4,577 | 4,577 | 6,336 | 6,336 |
| Florida | All Residential Categories | 25,022 | 0 | 6,114 | 6,114 | 8,680 | 8,680 |



**First-Line Supervisors of Construction Trades Workers Potentially Impacted by Changing the Overtime Threshold From $35,568 to $55,068 or $60,209 in 2024**

| State | Industry / Sub-industry | Total Employed | #Workers Under $35,568 | #Workers Under $55,068 | Impacted by $35,568 to $55,068 | #Workers Under $60,209 | Impacted by $35,568 to $60,209 |
|---|---|---|---|---|---|---|---|
| Georgia | Construction | 18,072 | 79 | 3,519 | 3,440 | 4,895 | 4,816 |
| Georgia | Residential Building Construction | 1,020 | 79 | 400 | 321 | 464 | 385 |
| Georgia | Specialty Trade Contractors | 9,365 | 0 | 1,997 | 1,997 | 2,999 | 2,999 |
| Georgia | Residential Trade Contractors | 3,367 | 0 | 718 | 718 | 1,078 | 1,078 |
| Georgia | All Residential Categories | 4,387 | 79 | 1,118 | 1,039 | 1,542 | 1,463 |
| Hawaii | Construction | 2,462 | 0 | 13 | 13 | 73 | 73 |
| Hawaii | Residential Building Construction | 350 | 0 | 13 | 13 | 27 | 27 |
| Hawaii | Specialty Trade Contractors | 1,494 | 0 | 0 | 0 | 53 | 53 |
| Hawaii | Residential Trade Contractors | 629 | 0 | 0 | 0 | 22 | 22 |
| Hawaii | All Residential Categories | 979 | 0 | 13 | 13 | 49 | 49 |
| Idaho | Construction | 3,997 | 0 | 1,098 | 1,098 | 1,442 | 1,442 |
| Idaho | Residential Building Construction | 824 | 0 | 272 | 272 | 317 | 317 |
| Idaho | Specialty Trade Contractors | 1,803 | 0 | 528 | 528 | 717 | 717 |
| Idaho | Residential Trade Contractors | 1,249 | 0 | 366 | 366 | 497 | 497 |
| Idaho | All Residential Categories | 2,073 | 0 | 638 | 638 | 814 | 814 |
| Illinois | Construction | 11,313 | 0 | 890 | 890 | 1,412 | 1,412 |
| Illinois | Residential Building Construction | 607 | 0 | 204 | 204 | 251 | 251 |
| Illinois | Specialty Trade Contractors | 7,686 | 0 | 572 | 572 | 865 | 865 |
| Illinois | Residential Trade Contractors | 3,263 | 0 | 243 | 243 | 367 | 367 |
| Illinois | All Residential Categories | 3,870 | 0 | 447 | 447 | 618 | 618 |
| Indiana | Construction | 11,715 | 99 | 1,731 | 1,632 | 2,333 | 2,234 |
| Indiana | Residential Building Construction | 1,720 | 99 | 604 | 505 | 742 | 643 |
| Indiana | Specialty Trade Contractors | 6,213 | 0 | 844 | 844 | 1,200 | 1,200 |
| Indiana | Residential Trade Contractors | 2,645 | 0 | 359 | 359 | 511 | 511 |
| Indiana | All Residential Categories | 4,365 | 99 | 963 | 864 | 1,253 | 1,154 |
| Iowa | Construction | 8,088 | 0 | 1,133 | 1,133 | 1,630 | 1,630 |
| Iowa | Residential Building Construction | 556 | 0 | 111 | 111 | 180 | 180 |
| Iowa | Specialty Trade Contractors | 4,409 | 0 | 640 | 640 | 892 | 892 |
| Iowa | Residential Trade Contractors | 1,874 | 0 | 272 | 272 | 379 | 379 |
| Iowa | All Residential Categories | 2,430 | 0 | 383 | 383 | 559 | 559 |
| Kansas | Construction | 5,347 | 0 | 966 | 966 | 1,406 | 1,406 |
| Kansas | Residential Building Construction | 628 | 0 | 270 | 270 | 343 | 343 |
| Kansas | Specialty Trade Contractors | 2,606 | 0 | 409 | 409 | 637 | 637 |
| Kansas | Residential Trade Contractors | 1,190 | 0 | 187 | 187 | 291 | 291 |
| Kansas | All Residential Categories | 1,818 | 0 | 457 | 457 | 634 | 634 |
| Kentucky | Construction | 5,419 | 19 | 913 | 894 | 1,344 | 1,325 |
| Kentucky | Residential Building Construction | 381 | 19 | 195 | 176 | 229 | 210 |
| Kentucky | Specialty Trade Contractors | 2,658 | 0 | 552 | 552 | 813 | 813 |
| Kentucky | Residential Trade Contractors | 1,079 | 0 | 224 | 224 | 330 | 330 |
| Kentucky | All Residential Categories | 1,460 | 19 | 419 | 400 | 559 | 540 |
| Louisiana | Construction | 9,345 | 0 | 1,403 | 1,403 | 2,081 | 2,081 |
| Louisiana | Residential Building Construction | 340 | 0 | 129 | 129 | 151 | 151 |
| Louisiana | Specialty Trade Contractors | 4,028 | 0 | 697 | 697 | 1,086 | 1,086 |
| Louisiana | Residential Trade Contractors | 1,181 | 0 | 204 | 204 | 318 | 318 |
| Louisiana | All Residential Categories | 1,521 | 0 | 333 | 333 | 469 | 469 |
| Maine | Construction | 1,916 | 0 | 188 | 188 | 345 | 345 |
| Maine | Residential Building Construction | 329 | 0 | 26 | 26 | 105 | 105 |
| Maine | Specialty Trade Contractors | 947 | 0 | 112 | 112 | 177 | 177 |
| Maine | Residential Trade Contractors | 488 | 0 | 58 | 58 | 91 | 91 |
| Maine | All Residential Categories | 817 | 0 | 84 | 84 | 196 | 196 |

2



**First-Line Supervisors of Construction Trades Workers Potentially Impacted by Changing the Overtime Threshold From $35,568 to $55,068 or $60,209 in 2024**

| State | Industry / Sub-industry | Total Employed | #Workers Under $35,568 | #Workers Under $55,068 | Impacted by $35,568 to $55,068 | #Workers Under $60,209 | Impacted by $35,568 to $60,209 |
|---|---|---|---|---|---|---|---|
| Maryland | Construction | 13,343 | 0 | 1,381 | 1,381 | 2,324 | 2,324 |
| Maryland | Residential Building Construction | 1,535 | 0 | 252 | 252 | 368 | 368 |
| Maryland | Specialty Trade Contractors | 8,284 | 0 | 867 | 867 | 1,467 | 1,467 |
| Maryland | Residential Trade Contractors | 3,034 | 0 | 318 | 318 | 537 | 537 |
| Maryland | All Residential Categories | 4,569 | 0 | 570 | 570 | 905 | 905 |
| Massachusetts | Construction | 12,096 | 0 | 204 | 204 | 718 | 718 |
| Massachusetts | Residential Building Construction | 1,071 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | Specialty Trade Contractors | 7,243 | 0 | 367 | 367 | 637 | 637 |
| Massachusetts | Residential Trade Contractors | 3,041 | 0 | 154 | 154 | 267 | 267 |
| Massachusetts | All Residential Categories | 4,112 | 0 | 154 | 154 | 267 | 267 |
| Michigan | Construction | 13,373 | 0 | 2,110 | 2,110 | 3,065 | 3,065 |
| Michigan | Residential Building Construction | 2,163 | 0 | 466 | 466 | 767 | 767 |
| Michigan | Specialty Trade Contractors | 6,996 | 0 | 1,318 | 1,318 | 1,868 | 1,868 |
| Michigan | Residential Trade Contractors | 3,008 | 0 | 567 | 567 | 803 | 803 |
| Michigan | All Residential Categories | 5,171 | 0 | 1,033 | 1,033 | 1,570 | 1,570 |
| Minnesota | Construction | 8,953 | 0 | 265 | 265 | 664 | 664 |
| Minnesota | Residential Building Construction | 628 | 0 | 74 | 74 | 105 | 105 |
| Minnesota | Specialty Trade Contractors | 4,966 | 0 | 292 | 292 | 489 | 489 |
| Minnesota | Residential Trade Contractors | 2,235 | 0 | 131 | 131 | 220 | 220 |
| Minnesota | All Residential Categories | 2,863 | 0 | 205 | 205 | 325 | 325 |
| Mississippi | Construction | 4,842 | 50 | 1,635 | 1,585 | 2,116 | 2,066 |
| Mississippi | Residential Building Construction | 257 | 42 | 147 | 105 | 179 | 137 |
| Mississippi | Specialty Trade Contractors | 2,101 | 0 | 758 | 758 | 963 | 963 |
| Mississippi | Residential Trade Contractors | 611 | 0 | 220 | 220 | 280 | 280 |
| Mississippi | All Residential Categories | 868 | 42 | 367 | 325 | 459 | 417 |
| Missouri | Construction | 7,511 | 0 | 690 | 690 | 1,304 | 1,304 |
| Missouri | Residential Building Construction | 401 | 0 | 168 | 168 | 241 | 241 |
| Missouri | Specialty Trade Contractors | 4,482 | 0 | 291 | 291 | 492 | 492 |
| Missouri | Residential Trade Contractors | 1,884 | 0 | 122 | 122 | 207 | 207 |
| Missouri | All Residential Categories | 2,285 | 0 | 290 | 290 | 448 | 448 |
| Montana | Construction | 4,049 | 0 | 506 | 506 | 754 | 754 |
| Montana | Residential Building Construction | 1,030 | 0 | 79 | 79 | 160 | 160 |
| Montana | Specialty Trade Contractors | 1,916 | 0 | 276 | 276 | 404 | 404 |
| Montana | Residential Trade Contractors | 1,271 | 0 | 183 | 183 | 268 | 268 |
| Montana | All Residential Categories | 2,301 | 0 | 262 | 262 | 428 | 428 |
| Nebraska | Construction | 4,512 | 0 | 739 | 739 | 1,119 | 1,119 |
| Nebraska | Residential Building Construction | 257 | 0 | 67 | 67 | 129 | 129 |
| Nebraska | Specialty Trade Contractors | 2,781 | 0 | 432 | 432 | 623 | 623 |
| Nebraska | Residential Trade Contractors | 1,212 | 0 | 188 | 188 | 271 | 271 |
| Nebraska | All Residential Categories | 1,469 | 0 | 255 | 255 | 400 | 400 |
| Nevada | Construction | 5,409 | 0 | 540 | 540 | 913 | 913 |
| Nevada | Residential Building Construction | 453 | 0 | 47 | 47 | 73 | 73 |
| Nevada | Specialty Trade Contractors | 3,987 | 0 | 381 | 381 | 642 | 642 |
| Nevada | Residential Trade Contractors | 2,161 | 0 | 207 | 207 | 348 | 348 |
| Nevada | All Residential Categories | 2,614 | 0 | 254 | 254 | 421 | 421 |
| New Hampshire | Construction | 1,803 | 0 | 103 | 103 | 284 | 284 |
| New Hampshire | Residential Building Construction | 267 | 0 | 35 | 35 | 53 | 53 |
| New Hampshire | Specialty Trade Contractors | 937 | 0 | 104 | 104 | 167 | 167 |
| New Hampshire | Residential Trade Contractors | 507 | 0 | 56 | 56 | 90 | 90 |
| New Hampshire | All Residential Categories | 774 | 0 | 91 | 91 | 143 | 143 |



**First-Line Supervisors of Construction Trades Workers Potentially Impacted by Changing the Overtime Threshold From $35,568 to $55,068 or $60,209 in 2024**

| State | Industry / Sub-industry | Total Employed | #Workers Under $35,568 | #Workers Under $55,068 | Impacted by $35,568 to $55,068 | #Workers Under $60,209 | Impacted by $35,568 to $60,209 |
|---|---|---|---|---|---|---|---|
| New Jersey | Construction | 8,582 | 269 | 1,290 | 1,021 | 1,625 | 1,356 |
| New Jersey | Residential Building Construction | 2,462 | 269 | 553 | 284 | 719 | 450 |
| New Jersey | Specialty Trade Contractors | 4,399 | 0 | 320 | 320 | 616 | 616 |
| New Jersey | Residential Trade Contractors | 2,189 | 0 | 159 | 159 | 306 | 306 |
| New Jersey | All Residential Categories | 4,651 | 269 | 712 | 443 | 1,025 | 756 |
| New Mexico | Construction | 4,080 | 12 | 821 | 809 | 1,259 | 1,247 |
| New Mexico | Residential Building Construction | 309 | 12 | 126 | 114 | 164 | 152 |
| New Mexico | Specialty Trade Contractors | 2,019 | 0 | 416 | 416 | 605 | 605 |
| New Mexico | Residential Trade Contractors | 751 | 0 | 155 | 155 | 225 | 225 |
| New Mexico | All Residential Categories | 1,060 | 12 | 281 | 269 | 389 | 377 |
| New York | Construction | 22,739 | 0 | 1,832 | 1,832 | 2,908 | 2,908 |
| New York | Residential Building Construction | 4,100 | 0 | 664 | 664 | 890 | 890 |
| New York | Specialty Trade Contractors | 11,849 | 0 | 1,341 | 1,341 | 1,731 | 1,731 |
| New York | Residential Trade Contractors | 5,625 | 0 | 637 | 637 | 822 | 822 |
| New York | All Residential Categories | 9,725 | 0 | 1,301 | 1,301 | 1,712 | 1,712 |
| North Carolina | Construction | 26,160 | 14 | 6,944 | 6,930 | 9,922 | 9,908 |
| North Carolina | Residential Building Construction | 4,574 | 0 | 1,364 | 1,364 | 1,906 | 1,906 |
| North Carolina | Land Subdivision | 82 | 14 | 56 | 42 | 59 | 45 |
| North Carolina | Specialty Trade Contractors | 12,693 | 0 | 3,517 | 3,517 | 4,942 | 4,942 |
| North Carolina | Residential Trade Contractors | 6,764 | 0 | 1,874 | 1,874 | 2,633 | 2,633 |
| North Carolina | All Residential Categories | 11,420 | 14 | 3,294 | 3,280 | 4,598 | 4,584 |
| North Dakota | Construction | 1,524 | 2 | 222 | 220 | 327 | 325 |
| North Dakota | Residential Building Construction | 30 | 2 | 7 | 5 | 10 | 8 |
| North Dakota | Specialty Trade Contractors | 556 | 0 | 67 | 67 | 100 | 100 |
| North Dakota | Residential Trade Contractors | 218 | 0 | 26 | 26 | 39 | 39 |
| North Dakota | All Residential Categories | 248 | 2 | 33 | 31 | 49 | 47 |
| Ohio | Construction | 15,156 | 110 | 2,140 | 2,030 | 3,088 | 2,978 |
| Ohio | Residential Building Construction | 1,318 | 110 | 479 | 369 | 613 | 503 |
| Ohio | Specialty Trade Contractors | 7,840 | 0 | 1,210 | 1,210 | 1,752 | 1,752 |
| Ohio | Residential Trade Contractors | 3,081 | 0 | 476 | 476 | 689 | 689 |
| Ohio | All Residential Categories | 4,399 | 110 | 955 | 845 | 1,302 | 1,192 |
| Oklahoma | Construction | 6,099 | 0 | 1,971 | 1,971 | 2,495 | 2,495 |
| Oklahoma | Residential Building Construction | 443 | 0 | 254 | 254 | 294 | 294 |
| Oklahoma | Specialty Trade Contractors | 2,946 | 0 | 1,081 | 1,081 | 1,356 | 1,356 |
| Oklahoma | Residential Trade Contractors | 1,365 | 0 | 501 | 501 | 628 | 628 |
| Oklahoma | All Residential Categories | 1,808 | 0 | 755 | 755 | 922 | 922 |
| Oregon | Construction | 7,974 | 123 | 821 | 698 | 1,307 | 1,184 |
| Oregon | Residential Building Construction | 1,287 | 123 | 385 | 262 | 514 | 391 |
| Oregon | Specialty Trade Contractors | 4,801 | 0 | 274 | 274 | 529 | 529 |
| Oregon | Residential Trade Contractors | 2,466 | 0 | 141 | 141 | 272 | 272 |
| Oregon | All Residential Categories | 3,753 | 123 | 526 | 403 | 786 | 663 |
| Pennsylvania | Construction | 20,782 | 0 | 2,607 | 2,607 | 4,031 | 4,031 |
| Pennsylvania | Residential Building Construction | 1,823 | 0 | 599 | 599 | 801 | 801 |
| Pennsylvania | Specialty Trade Contractors | 10,973 | 0 | 1,434 | 1,434 | 2,253 | 2,253 |
| Pennsylvania | Residential Trade Contractors | 4,655 | 0 | 608 | 608 | 956 | 956 |
| Pennsylvania | All Residential Categories | 6,478 | 0 | 1,207 | 1,207 | 1,757 | 1,757 |
| Rhode Island | Construction | 1,844 | 4 | 239 | 235 | 305 | 301 |
| Rhode Island | Residential Building Construction | 0 | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | Specialty Trade Contractors | 1,092 | 0 | 126 | 126 | 170 | 170 |
| Rhode Island | Residential Trade Contractors | 553 | 0 | 64 | 64 | 86 | 86 |
| Rhode Island | All Residential Categories | 553 | 0 | 64 | 64 | 86 | 86 |



**First-Line Supervisors of Construction Trades Workers Potentially Impacted by Changing the Overtime Threshold From $35,568 to $55,068 or $60,209 in 2024**

| State | Industry / Sub-industry | Total Employed | #Workers Under $35,568 | #Workers Under $55,068 | Impacted by $35,568 to $55,068 | #Workers Under $60,209 | Impacted by $35,568 to $60,209 |
|---|---|---|---|---|---|---|---|
| South Carolina | Construction | 8,613 | 123 | 2,366 | 2,243 | 3,434 | 3,311 |
| South Carolina | Residential Building Construction | 1,123 | 123 | 341 | 218 | 450 | 327 |
| South Carolina | Land Subdivision | 61 | 0 | 18 | 18 | 24 | 24 |
| South Carolina | Specialty Trade Contractors | 4,729 | 0 | 1,458 | 1,458 | 2,025 | 2,025 |
| South Carolina | Residential Trade Contractors | 2,127 | 0 | 656 | 656 | 911 | 911 |
| South Carolina | All Residential Categories | 3,311 | 123 | 1,015 | 892 | 1,385 | 1,262 |
| South Dakota | Construction | 1,772 | 0 | 191 | 191 | 329 | 329 |
| South Dakota | Residential Building Construction | 144 | 0 | 37 | 37 | 53 | 53 |
| South Dakota | Specialty Trade Contractors | 958 | 0 | 103 | 103 | 173 | 173 |
| South Dakota | Residential Trade Contractors | 430 | 0 | 46 | 46 | 78 | 78 |
| South Dakota | All Residential Categories | 574 | 0 | 83 | 83 | 131 | 131 |
| Tennessee | Construction | 11,447 | 9 | 3,545 | 3,536 | 4,670 | 4,661 |
| Tennessee | Residential Building Construction | 1,349 | 9 | 508 | 499 | 681 | 672 |
| Tennessee | Specialty Trade Contractors | 6,192 | 0 | 1,932 | 1,932 | 2,559 | 2,559 |
| Tennessee | Residential Trade Contractors | 2,508 | 0 | 782 | 782 | 1,036 | 1,036 |
| Tennessee | All Residential Categories | 3,857 | 9 | 1,290 | 1,281 | 1,717 | 1,708 |
| Texas | Construction | 62,191 | 0 | 17,064 | 17,064 | 23,590 | 23,590 |
| Texas | Residential Building Construction | 7,140 | 0 | 1,912 | 1,912 | 2,773 | 2,773 |
| Texas | Land Subdivision | 92 | 0 | 3 | 3 | 7 | 7 |
| Texas | Specialty Trade Contractors | 31,003 | 0 | 9,300 | 9,300 | 12,431 | 12,431 |
| Texas | Residential Trade Contractors | 11,027 | 0 | 3,308 | 3,308 | 4,421 | 4,421 |
| Texas | All Residential Categories | 18,259 | 0 | 5,223 | 5,223 | 7,201 | 7,201 |
| Utah | Construction | 10,365 | 0 | 1,361 | 1,361 | 2,030 | 2,030 |
| Utah | Residential Building Construction | 1,669 | 0 | 350 | 350 | 519 | 519 |
| Utah | Specialty Trade Contractors | 5,481 | 0 | 719 | 719 | 1,143 | 1,143 |
| Utah | Residential Trade Contractors | 3,839 | 0 | 504 | 504 | 801 | 801 |
| Utah | All Residential Categories | 5,508 | 0 | 854 | 854 | 1,320 | 1,320 |
| Vermont | Construction | 844 | 0 | 90 | 90 | 129 | 129 |
| Vermont | Residential Building Construction | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | Specialty Trade Contractors | 463 | 0 | 55 | 55 | 77 | 77 |
| Vermont | Residential Trade Contractors | 245 | 0 | 29 | 29 | 41 | 41 |
| Vermont | All Residential Categories | 245 | 0 | 29 | 29 | 41 | 41 |
| Virginia | Construction | 18,536 | 157 | 4,696 | 4,539 | 6,620 | 6,463 |
| Virginia | Residential Building Construction | 2,606 | 140 | 749 | 609 | 965 | 825 |
| Virginia | Land Subdivision | 51 | 17 | 22 | 5 | 23 | 6 |
| Virginia | Specialty Trade Contractors | 9,283 | 0 | 2,060 | 2,060 | 3,206 | 3,206 |
| Virginia | Residential Trade Contractors | 3,697 | 0 | 820 | 820 | 1,277 | 1,277 |
| Virginia | All Residential Categories | 6,354 | 157 | 1,591 | 1,434 | 2,265 | 2,108 |
| Washington | Construction | 17,825 | 0 | 786 | 786 | 1,536 | 1,536 |
| Washington | Residential Building Construction | 3,152 | 0 | 512 | 512 | 736 | 736 |
| Washington | Land Subdivision | 92 | 0 | 0 | 0 | 0 | 0 |
| Washington | Specialty Trade Contractors | 9,438 | 0 | 403 | 403 | 790 | 790 |
| Washington | Residential Trade Contractors | 5,154 | 0 | 220 | 220 | 431 | 431 |
| Washington | All Residential Categories | 8,398 | 0 | 732 | 732 | 1,167 | 1,167 |
| West Virginia | Construction | 2,709 | 0 | 475 | 475 | 692 | 692 |
| West Virginia | Residential Building Construction | 195 | 0 | 113 | 113 | 131 | 131 |
| West Virginia | Specialty Trade Contractors | 1,020 | 0 | 245 | 245 | 332 | 332 |
| West Virginia | Residential Trade Contractors | 392 | 0 | 94 | 94 | 128 | 128 |
| West Virginia | All Residential Categories | 587 | 0 | 207 | 207 | 259 | 259 |
| Wisconsin | Construction | 12,899 | 0 | 1,495 | 1,495 | 2,422 | 2,422 |
| Wisconsin | Residential Building Construction | 1,123 | 0 | 267 | 267 | 411 | 411 |
| Wisconsin | Specialty Trade Contractors | 7,552 | 0 | 972 | 972 | 1,517 | 1,517 |
| Wisconsin | Residential Trade Contractors | 3,381 | 0 | 435 | 435 | 679 | 679 |
| Wisconsin | All Residential Categories | 4,504 | 0 | 702 | 702 | 1,090 | 1,090 |



**First-Line Supervisors of Construction Trades Workers Potentially Impacted by Changing the Overtime Threshold From $35,568 to $55,068 or $60,209 in 2024**

| State | Industry / Sub-industry | Total Employed | #Workers Under $35,568 | #Workers Under $55,068 | Impacted by $35,568 to $55,068 | #Workers Under $60,209 | Impacted by $35,568 to $60,209 |
|---|---|---|---|---|---|---|---|
| Wyoming | Construction | 1,844 | 0 | 272 | 272 | 399 | 399 |
| Wyoming | Residential Building Construction | 443 | 0 | 0 | 0 | 57 | 57 |
| Wyoming | Specialty Trade Contractors | 824 | 0 | 217 | 217 | 281 | 281 |
| Wyoming | Residential Trade Contractors | 370 | 0 | 98 | 98 | 126 | 126 |
| Wyoming | All Residential Categories | 813 | 0 | 98 | 98 | 183 | 183 |
| Guam | Construction | 329 | 52 | 234 | 182 | 268 | 216 |
| Guam | Residential Building Construction | 154 | 48 | 132 | 84 | 154 | 106 |
| Guam | Specialty Trade Contractors | 41 | 0 | 29 | 29 | 33 | 33 |
| Guam | Residential Trade Contractors | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | All Residential Categories | 154 | 48 | 132 | 84 | 154 | 106 |
| Puerto Rico | Construction | 3,101 | 1,904 | 2,947 | 1,043 | 3,101 | 1,197 |
| Puerto Rico | Residential Building Construction | 1,143 | 545 | 1,143 | 598 | 1,143 | 598 |
| Puerto Rico | Specialty Trade Contractors | 999 | 661 | 945 | 284 | 996 | 335 |
| Puerto Rico | Residential Trade Contractors | 287 | 190 | 271 | 81 | 286 | 96 |
| Puerto Rico | All Residential Categories | 1,430 | 735 | 1,414 | 679 | 1,429 | 694 |
| Virgin Islands | Construction | 144 | 5 | 23 | 18 | 31 | 26 |
| Virgin Islands | Residential Building Construction | 41 | 1 | 7 | 6 | 9 | 8 |
| Virgin Islands | All Residential Categories | 41 | 1 | 7 | 6 | 9 | 8 |
| U.S. Total | Sector 23 - Construction | 582,894 | 3,268 | 95,438 | 92,170 | 140,578 | 137,310 |
| U.S. Total | Residential Building Construction | 74,623 | 1,842 | 16,989 | 15,147 | 23,864 | 22,022 |
| U.S. Total | Land Subdivision | 933 | 47 | 218 | 171 | 255 | 208 |
| U.S. Total | Specialty Trade Contractors | 313,934 | 661 | 52,238 | 51,577 | 76,469 | 75,808 |
| U.S. Total | Residential Trade Contractors | 147,036 | 190 | 23,599 | 23,409 | 34,875 | 34,685 |
| U.S. Total | All Residential Categories | 222,592 | 2,079 | 40,806 | 38,727 | 58,994 | 56,915 |

Note: The National Association of Home Builders (NAHB) relied primarily on data from the May 2022 Occupational Employment Statistics (OES, U.S. Bureau of Labor Statistics) to produce the above estimates. In particular, NAHB extracted state-level data on OES occupation code 47-1011 (First-Line Supervisors of Construction Trades and Extraction Workers) for the construction sector only. The OES data include total employment and the 10th, 25th, 50th, 75th and 90th percentiles for the distribution of annual wages in each category. These numbers were projected to 2024 using the percentage increase in total payroll employment and percentage increase in the Consumer Price Index between 2022 and 2024 from NAHB's short-term forecast as of 8-13-2023. NAHB then fit cubic splines through the five percentiles to estimate the shares of workers under a particular dollar threshold and multiplied total employment by this share to estimate the number of workers under the threshold. OES data do not distinguish residential from non-residential specialty trade contractors. To estimate the share of first-line supervisors in specialty trades employed specifically by residential specialty trade contractors, NAHB applied 2022 state-level data on employment by detailed industry from the Quarterly Census of Employment and Wages (also from the U.S. Bureau of Labor Statistics).

 

ADVOCACY GROUP

*William **P.** Killmer*
*Group Executive Vice President*

October 31, 2008

Alexander Passantino
Acting Administrator
Wage and Hour Division
U.S. Department of Labor
200 Constitution Avenue, N.W.
Suite S-3502
Washington, DC 20210

Re: Request for Opinion Letter

Dear Mr. Passantino:

The National Association of Home Builders ("NAHB"), founded in 1942, is a trade association representing more than 235,000 residential home building and remodeling industry members. NAHB also is affiliated with more than 800 state and local home builders associations around the country. NAHB's member companies construct about 80 percent of new housing units, and NAHB has been one of the largest engines of economic growth in the country.

On behalf of our members and affiliated associations, NAHB requests an opinion that employees of homebuilders who supervise construction of multiple new homes, townhomes, and/or condominiums each year are exempt from the overtime pay requirements of the Fair Labor Standards Act ("FLSA"), given their job duties as described below.[1]

## A.    FACTS

In the homebuilding industry, homebuilders rarely perform the actual construction of homes but instead hire various trade contractors to build the homes (e.g., electricians for wiring, roofers for the roof, carpenters for framing, etc.). Many homebuilders employ individuals whose primary functions are to supervise and manage the process of constructing homes, the contractor relationships and many of the administrative tasks associated with the construction process.

---

[1] Attached is a letter submitted by the law firm of Ford and Harrison on October 19, 2007, which also asks the Department of Labor to issue an opinion letter finding employees with similar duties to be exempt under the FLSA's administrative exemption.

1'.'fll  l 5" Suwl. N\/    WashingimL DC 20005 280U
(·'.(l'.') '.\66-852(, • (XOOJ:l6;.:.,)A2, ext. 852<, • i'ax  /2(12) ::'(,6-X097
E-mail: hlt:llmi rr(_?/lahb.cnm

While their titles (superintendent, builder, project manager, field manager, construction manager, assistant construction manager, etc.) and specific duties may vary from homebuilder to homebuilder, they all perform many, if not all, of the following functions:

- Managing all, or portions, of: the home-building process from receipt of the building permit to closing of the sale (frequently involving a number of homes at any time);

- Making recommendations or decisions regarding contractors and vendors, e.g, whether to use them in the future or terminate their services;

- Managing contractors, trades, and vendors, including initiating and approving change and purchase orders, withholding approval for payment for reasons including unsatisfactory or incomplete work, and/or back-charging contractors due to damage caused by them;

- Managing and determining when to modify benchmarks and timetables to ensure that contractors and vendors perform on schedule and on budget;

- Verifying that work has been completed and meets the standards required, which triggers progress payments to contractors and vendors;

- Identifying and mitigating issues with architectural plans and material lists when they cannot be well executed in the field or will not comply with building codes;

- Scheduling some or all aspects of construction projects, such as subcontractors, material deliveries, and inspections;

- Modifying and/or working with others to modify the building schedule to accommodate situations including material delivery delays, issues raised during or prior to inspections, closing date changes, and/or weather;

- Managing aspects of the daily logistics at the job site, including determining the timing of material delivery, location for storage of materials to avoid delays, vandalism, theft, injury and/or other problems at the job site;

- Ensuring that the work meets the quality specifications of the home builder and/or codes, laws, ordinances, and rules of the various geographic areas in which the homes are built;

- Performing occasional tasks that cannot practicably be performed by nonexempt employees, but are necessary to properly carry out his/her functions, e.g., performing a manual task to: (1) to meet a timeline or because of an inspection, rather than waiting hours for a subcontractor or non-exempt employee; or (2) demonstrate how work should be performed; and/or (3) audit or show the lack of quality of some work, e.g., by taking measurements.

- Ensuring and determining whether work done by vendors, trades, and subcontractors complies with their contractual obligations, e.g., the scope of work to be performed;

xander Passamano
ing Administrator
ge and Hour Division
Department of Labor

- Managing work to ensure that the project does not suffer unnecessary delays or cost overruns;

- Monitoring compliance with building code, environmental, and/or safety compliance by contractors and vendors;

- Overseeing on-site safety and security programs to avoid, problems including worksite thef1, vandalism, environmental issues, and potential injury;

- Acting as homebuilder's on-site representative with third parties, such as subcontractors, government inspectors, and/or customers.

Generally, these individuals do not supervise employees of the homebuilder. However, for the purpose of this opinion letter request, the Wage & Hour Division can assume that all of these homebuilder employees are paid on a salary basis which exceeds the required $455 per week.

In summary, these individuals are the representatives for the homebuilders in nearly all significant day-to-day matters regarding home construction, manage the home building process, and have the discretion to make independent judgments on matters of significance in performing their duties.

**B.      THE STATUTE AND REGULATIONS**

As DOL is aware, the FLSA requires covered employers to pay non-exempt employees at least the federal minimum wage for all hours worked and overtime pay at time and one-half the regular rate of pay for all hours worked over 40 hours in a workweek.

*Section 13(a)(J) of the FLSA provides an exemption fi·om both the minimum wage and overtime for "any employee employed in a bona fide executive, administrative, or professional capacity .. . (as such terms are defined and delimitedji,om time to time by regulations of the Secretary .. ..)."An employee qual(fies as an exempt administrative employee ifs/he meets all of the requirements setforth in the Department of Labor ("DOL") implementing regulations at 29 C.F.R. Part 541.*

To qualify as an exempt administrative employee under 29 C.F.R. § 541.200 *et. seq.,*      an employee must:

1)  Be compensated on a salary or fee basis at a rate of not less than $455 per week;

2)  Have a primary duty of performing office or non-manual work directly related to the management or general business operations of the employer; and

3)  Have a primary duty that includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

As is fully discussed below, the homebuilding individuals who work under a variety of titles (such as project manager, field manager, construction manager, but hereinafter referred to as

"construction supervisor"), and at various levels, perform the work detailed above, qualify for the administrative exemption under the FLSA.

## C.  DISCUSSION

### A.  <u>Primary Duty</u>

In order to qualify for the administrative exemption an employee's "primary duty" must involve the performance of office or non-manual work that is "directly related to the management policies or general business operations" of the employer. 29 C.F.R. § 541.200.

The construction supervisors do not perform manual work in the course of their day-to-day duties except on an exception basis. As such, there should be no question that the first requirement of the primary duty test is met.[2]

The second part of the primary duty test is that the work be directly related to the management or general business operations of the employer. This requirement refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business at issue (as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment). *See* 29 C.F.R. § 541.20l(a). As the regulations explain, work that is directly related to management or general business operations includes, but is not limited to, work in functional areas such as:

- tax
- finance
- accounting
- budgeting
- auditing
- msurance
- quality control

- purchasing
- procurement
- advertising
- marketing
- research
- safety and health
- personnel management

- human resources
- employee benefits
- labor relations
- public relations
- government relations
- legal and regulatory compliance
- computer network, internet and database administration

*See* 29 C.F.R. § 541.201 (b). This not an exclusive list of functional areas that may be directly related to management or general business operations. Rather, Section 541.201(b) "provides non-exclusive examples." 69 Fed. Reg. 22140 (Apr. 23, 2004).

The DOL has further explained that work relating to "servicing" the business includes "advising the management, planning, negotiating, representing the company, purchasing, promoting sales. and business research and control." 69 Fed. Reg. 22,122, 22,138 (Apr. 23, 2004).

---

[2] "Occasional, infrequently recurring tasks that cannot practicably be performed by nonexempt employees, but are the means for an exempt employee to properly carry out exempt functions and responsibilities, are considered exempt work." §541.707.

A comparison of the duties list performed by construction supervisors with the regulatory list of "administrative" functional areas reveals that the *majority, tf not all,* of duties performed by the construction supervisors are administrative.

*Management of Contractors and Vendors.* Construction supervisors spend the majority of their time managing and directing the work of subcontractors and vendors, whose crew sizes can number dozens of workers. Importantly, this agency has noted that an employee who supervises contractors may qualify for the administrative exemption. 69 Fed. Reg. 22,122, 22,135 (Apr. 23, 2004). And the regulations provide that "[a]n employee who leads a team of other employees assigned to complete major projects for the employer (such as purchasing, selling or closing all or part of the business, negotiating a real estate transaction or a collective bargaining agreement, or designing and implementing productivity improvements) generally meets the duties requirements for the administrative exemption, even if the employee does not have direct supervisory responsibility over the other employees on the team." 29 C.F.R. 541.203. In managing the work of vendors and subcontractors, the construction supervisors are responsible for scheduling the tasks and overseeing the work performed by the workers. The individuals can recommend and/or decide whether to retain or terminate the services of the contractors and vendors. They also can recommend or decide to withhold approval for payment to the contractors and vendors if they deem that their work does not meet the standards of their employer.

*Project Management.* Construction supervisors are also responsible for the overall management of the home building process; often from the receipt of the building permit until closing of escrow or portions thereof. This includes managing applicable benchmarks and timetables to ensure that contractors and vendors perform on schedule, within budget, and pursuant to the scope of work in their contracts. Construction supervisors also identify and work to mitigate issues, including problems with architectural plans and material lists that cannot be well executed in the field or will not comply with building code. They schedule some or all aspects of construction projects including subcontractors, material deliveries, and inspections, as well as modifying work schedules to accommodate delays due to material delivery delays, inspection issues, and weather. Construction supervisors manage the daily logistics of a job site, including determining the timing of material delivery, location for storage of materials to avoid delays, and other problems regarding deadlines. Additionally, they monitor the work of the subcontractors and address a myriad of other issues that may arise on a job site.

In scheduling the workday, these individuals must take into account such factors as material delivery delays, inspection issues, and weather and, if necessary, modify the work schedules to accommodate these factors. In determining how to modify a work schedule they must understand both the expectations of the customer and the business demands of their employer and modify a work schedule in a manner that maintains the overall time schedule and profitability of the project.

*Regulatory Compliance and Government Relations Representative.* The construction supervisor also is responsible for monitoring compliance with building code, environmental, and safety compliance by contractors and vendors. In addition, the construction supervisor acts as an on-

site representative for the homebuilder/employer with third parties, such as subcontractors and government inspectors.

*Quality Control.* The construction supervisor is responsible for ensuring that the work meets the quality specifications of the home builder. In this capacity, the construction supervisor also verifies that work has been completed to approve progress payments to contractors and vendors. The construction supervisor can withhold approval of the work, which results in the withholding of payments to the contractors and vendors for unsatisfactory and/or incomplete work.

*Oversight of On-Site Security Programs.* The construction supervisor is responsible for oversight of worksite conditions and security to avoid work.site injuries, theft, and vandalism.

*Budget Management.* Finally, the construction supervisor is responsible for day-to-day management of the project so that the contractors and vendors perform within budget. As part of this duty, the construction supervisor must manage the work to ensure that the project does not suffer unnecessary delays or cost overruns. The construction supervisor also is responsible for initiating and approving change orders and purchase orders, and withholding approval, and hence, payment for unsatisfactory work. The construction supervisor also may backcharge contractors for supplies or damage the contractor caused. Although construction supervisors may not have final authority over all budget decisions, as they sometimes must coordinate with other employees, construction supervisors have significant decision-making authority on important budget decisions.

Based upon the job duties detailed above, the construction supervisors demonstrate that their "primary duty" involves the performance of non-manual work that is "directly related to the management policies or general business operations" As such, they meet the first set of requirements set forth in 29 C.F.R. § 541.200(a)(2).

DOL already has found a similar position to be exempt under the executive exemption, and noted that the position would likely also be found exempt under the administrative exemption. *See* DOL Op. Ltr. FLSA2007-3 (January 25, 2007) (citing to the Preamble to the Part 541 regulations which state that "an individual supervising subcontractors would not meet the executive exemption but could still meet the administrative exemption.").[3]  In June 2006, the Department

---

[3] In the January 2007 Opinion Letter, DOL found this identical position to meet the duties test for the executive exemption where the employee in this position also supervised employees. The daily job functions of the project superintendent discussed in that letter mirrored many of the same functions as the construction supervisor described above. Similar functions included supervising the day-to-day activities of the construction project and overseeing and supervising the work of subcontractors. As the Opinion Letter also reflects, the definition of "management" for purposes of the executive exemption includes such tasks as controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures, all duties performed by the construction supervisor described above. *See* 29 C.F.R. § 54 I. I 02. As such, to the extent that DOL does not find that all of the elements of the administrative exemption are satisfied here, DOL alternatively should find that the combination of the executive and administrative exemptions should apply to find these employees exempt. *See* 29 C.F.R. § 541.708 ("Employees who perform a combination of exempt duties as set fo1th in the regulations in this part for executive, administrative, professional, outside sales and computer employees may qualify for exemption."); *see also* 79 F.R. 22133 (Apr. 23, 2004) ("The Department agrees that management activities are not limited to supervisory f'unctions.  Accordingly, the final rule adds the management functions of 'planning and controlling the

vander Passanino
ing Administrator
ge and Hour Division
v Department of Labor
e 7 of 10

of Labor was asked for its opinion on three positions at a land-acquisition firm. One position, the property management agents, performs duties similar to those of the homebuilding employees. The property management agents are responsible for "dealing with government authorities, utility companies, contractors and other consultants", protecting the employer's investment in a property by keeping "the property safe from possible vandals and by making police reports in the event of vandalism", ensuring that "the consultants and contractors follow proper procedures" and once the project had been successfully bid working to "oversee and evaluate the work of all contractors". *See* Opinion Letter, FLSA2006-23.

Based upon these job duties, DOL found that the work of the property management agents qualified as management and general business operations and also fulfilled the discretion and independent judgment requirement. Therefore, the DOL opined that the position qualified for the administrative exemption of the FLSA pursuant to section 13(a)(l ).

Given that the majority of the functions performed by construction supervisors are identified as administrative by the regulations, the application of the production versus staff dichotomy should not defeat the application of the administrative exemption to these individuals. As DOL is aware, the production versus staff dichotomy draws the distinction between an employee whose primary duty is administering the business of the employer versus one whose primary duty is to produce the commodity that the business exists to produce. *See Gottlieb v. Const. Servs. & Consultants,* 2006 WL 5503644 *6 (S.D. Fla. July 24, 2006).

Courts have found that the dichotomy is merely illustrative and is of limited use outside of the manufacturing context. *See Roe-Midgett v.* CC *Servs.,* 512 F.3d 865, 872 (7th Cir. 2008). Courts have also noted that a rigid application of the production versus service dichotomy could act to frustrate the purpose and spirit of the entire exemption *See Webster v. Public School Employees of Washington, Inc.,* 247 F.3d 910, 916 (9th Cir. 2001). The dichotomy is "useful only to the extent that it helps to clarify the phrase 'work directly related to the management policies or general business operations.'" *Bothell v. Phase Metrics, Inc.,* 299 F.3d 1120, 1126 (9th Cir. 2002).

Importantly, while this Agency has declined invitations to eliminate the production versus staff dichotomy, it noted that the dichotomy is "a relevant and useful tool in appropriate cases" but is not, and has never been, the dispositive test for exemption. 69 Fed. Reg. 22,122, 22,141 (Apr. 23, 2004). The production-staff dichotomy only becomes determinative when the work "falls squarely on the production side of the line." *Id.*

The production versus staff dichotomy should not be applied here. Indeed, application of the production versus staff dichotomy to reach a conclusion that construction supervisors are not

---

budget' and 'monitoring or implementing legal compliance measures.' Further, the Department notes that management of processes, projects or contracts are also appropriately considered exempt administrative duties."). If an employee in this position performed manual work on more than an exception basis, however, but otherwise performed all the duties discussed above, the employee still would be exempt under a combination of the administrative and executive primary duty tests.

exempt would "frustrate the purpose and spirit of the entire exemption" exactly as both federal courts and this Agency have warned against. As noted above and discussed below, construction supervisors perform both the type (primary duty) and level (discretion and independent judgment) of duties required by 29 C.F.R. Part 541 to qualify for the administrative exemption. In fact, this Agency has found similar job duties to meet the primary duty test for the administrative exemption, and found construction supervisors who perform similar duties while supervising at least two full-time employees to be exempt executives. A few courts have applied the production versus staff dichotomy to similar positions to find that such employees are non-exempt "production" workers. The Agency should issue an opinion letter rejecting these cases. The production versus staff dichotomy "tool"  which is only illustrative and of limited use outside of the manufacturing context - should not be used to analyze the exempt status of construction supervisors; applying this "tool" to reach a conclusion that construction supervisors are not exempt requires this Agency and federal courts to ignore the actual regulatory language and other Agency guidance.

Even if the Agency applies the production versus staff dichotomy, construction supervisors are not production workers. Construction supervisors manage the production workers who are building the homes; they do not build the homes themselves. In *Gottlieb v. Construction Serv. & Consultants,* 2006 WL 5503644 (S.D. Fla. 2006), and *Carpenter v. Shoemaker Co.,* 2002 U.S. Dist. LEXIS 8566 (E.D. Pa. 2002), both courts found such workers to be "production workers" because the plaintiffs did not have responsibility for "formulating policy or making major decisions *(Gottlieb),* and because the plaintiff carried out the day-to-day construction aspects of the job *(Carpenter).*

As an initial matter, the *Gottlieb* analysis is flawed because the regulations state that, in addition to "formulating," exempt administrative duties also include affecting, interpreting and implementing management policies. 29 C.F.R. 54 l.202(a). Construction supervisors can affect management policies and do interpret and implement policies. In addition, the construction supervisors here, and as discussed more fully below, make major decisions every day on many issues that go beyond the "day-to-day construction aspects of the job.

As stated by the Court in *Carpenter,* a position that goes beyond the day-to-day construction aspects of a particular project and instead focused on the administrative functions related to the employer's business operations be deemed as performing "work of substantial impo1iance to the management or operation of the employer's business." 2002 U.S. Dist. LEXIS 8566 at *14-15. Here, this test is met. As demonstrated by duties detailed above, these positions go well beyond merely overseeing the daily work at the site. Instead, the individuals are carrying out major assignments for their employers including making decisions regarding policies, advising regarding regulatory and safety compliance issues, monitoring and adjusting the budget, and overseeing the work of the subcontractors and vendors.

To find that these individuals do not satisfy the requirements for the administrative exemption would be contrary to the plain language of the regulations which provides that the employee's primary duty must be related to the "management" of the "employer or the employer's customers". 29 C.F.R. § 541.201(a). *See Kennec:61 v. Commonwealth Edison Co.,* 410 F.3d 365 (7th Cir. 2005)(holding that employees who plan, schedule, and coordinate activities necessary

to discover and rectify compliance problems qualify under the administrative exemption. "The mere fact that their advice and planning relates directly to plant operations is not enough to make them, personally the actual production employees."); *Shaw v. Prentice Hall Publishing, Inc.,* 151 F.3d 640 (7th Cir. 1998)(:finding an employee whose primary duty was to manage and coordinate projects and monitor and enforce internal deadlines set by upper management was qualified for the administrative exemption); *0 'Dell v. Alyeska Pipeline Service* Co., 856 F.2d 1452 (9th Cir. l 988)(finding that employees who represent the company before state inspectors, offer assistance to contractors in interpreting codes, and negotiate with field directors to correct discrepancies qualified for the administrative exemption).

### B. Discretion and Independent Judgment

To qualify for the administrative exemption an employee's primary duty must involve the exercise of independent judgment and discretion over matters of significance. The exercise of discretion and independent judgment includes comparing and evaluating a variety of possible courses of conduct and making a decision based on that evaluation. *See* 29 C.F.R. § 54 l .202(a). Agency regulations state that "matters of significance" refer to the level of importance or consequence of the work performed and that "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. *Id.*

As construction supervisors, these individuals are required to exercise discretion and independent judgment on a daily basis. They manage the construction process from receipt of the building permit through completion of the project or portions thereof, often with little or no supervision. The individuals perform major tasks such as creating a construction schedule, sometimes in conjunction with other employees, and ensuring that schedule is adhered to, recommending which contractors to terminate, and overseeing the quality of the contractors' work. They are responsible for setting benchmarks and timetables and ensuring that contractors perform on schedule and on budget. In the event they believe that the work is unsatisfactory they have the authority to withhold progress payments or recommend that the contractors be terminated.

The individuals serve as the primary point of contact between their employers, their customers, and the governmental inspectors on various issues. They have the authority to act as the representative of the company with the inspectors, subcontractors, and/or other third parties to ensure that the project complies with applicable regulations but still meets the project delivery dates. In addition, the individuals are responsible for managing the project within budget, which can range up to tens of millions of dollars. This includes the authority to order and/or send back materials and supplies. These determinations are commonly made at the individuals' discretion and are not generally dictated by guidelines or standards.

The Eleventh Circuit held that a "construction superintendent" exercised the "discretion and independent judgment" because he could order materials without approval, determine the answer to subcontractors questions and had the power to approve invoices and modify schedules, as here. *See Stevins v. Provident Const.* Co., 137 Fed. Appx. 198 (11th Cir. 2005) (finding the position satisfied the requirements of the professional exemption). The individuals here perform similar duties that also require significant independent judgment and discretion.

Finally, it is important to note that there are no established procedures for performing the functions of the position. A construction supervisor must utilize his or her experience, knowledge, and, most importantly, his or her judgment and good sense to address the myriad of often unpredictable and previously unknown problems that arise with any large scale construction project. As such, they meet the set of requirements set forth in 29 C.F.R. § 541.200(3).

## C.    Conclusion

We believe the common facts outlined above support a finding that industry practice of classifying homebuilding employees who supervise constructions of homes, townhouses, and/or condominiums as exempt administrative employees complies with the FLSA. For the reasons set forth above, we respectfully request that you issue an opinion affirming that such employees in the home building industry are exempt from the overtime pay requirements of the Fair Labor Standards Act.

Sincerely,

William P. Killmer

**U.S. Department of Labor**
Wage and Hour Division
Washington, D.C. 20210



**FLSA2018-10**

January 5, 2018

Dear **Name\***:

This letter responds to your request that the Wage and Hour Division ("WHD") reissue Opinion Letter FLSA2009-29. On January 16, 2009, then-Acting WHD Administrator Alexander J. Passantino signed the opinion letter as an official statement of WHD policy. On March 2, 2009, however, WHD withdrew the opinion letter "for further consideration" and stated that it would "provide a further response in the near future."

We have further analyzed Opinion Letter FLSA2009-29. From today forward, this letter, which is designated FLSA2018-10 and reproduces below the verbatim text of Opinion Letter FLSA2009-29, is an official statement of WHD policy and an official ruling for purposes of the Portal-to-Portal Act, 29 U.S.C. § 259.

I thank you for your inquiry.

Bryan L. Jarrett
Acting Administrator

Dear **Name\***:

This is in response to your request for an opinion regarding whether a project supervisor in the residential homebuilding industry qualifies for an exemption under section 13(a)(1) of the Fair Labor Standards Act (FLSA).\* You ask specifically whether the project supervisor qualifies as an employee employed in a bona fide administrative capacity. It is our opinion that the position is exempt from the minimum wage and overtime requirements of the FLSA.

You indicate that project supervisors are employed by homebuilding companies to supervise and coordinate the construction of residential homes. Often the homebuilding company will outsource the actual construction of the home to various subcontractors, and the project

---

\* Unless otherwise noted, any statutes, regulations, opinion letters, or other interpretive material cited in this letter can be found at www.wagehour.dol.gov.

supervisor will serve as the company's representative at the worksite in dealings with subcontractors, suppliers, customers, and government inspectors.  A project supervisor spends more than half of his/her time directing, scheduling, managing, and paying subcontractors and suppliers.  Additionally, the project supervisor reviews and modifies new home plans; interacts with building inspectors; ensures each home is ready for each required inspection; responds to customer concerns and complaints; reviews the initial home construction budget to ensure the estimates are reasonable; inspects the work of subcontractors and suppliers; tracks the home costs against original estimates as construction progresses; acts as the company safety inspector at the worksite; works with subcontractors to ensure compliance with all federal and state safety procedures and regulations; and takes appropriate and necessary action if an accident occurs.

Section 13(a)(1) of the FLSA exempts from its minimum wage and overtime pay provisions "any employee employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).  The exemption is determined not by occupational title or job classification, but rather by the duties and salary of the individual employee involved.  *See* 29 C.F.R. § 541.2.

The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the FLSA includes "any employee:"

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week ... exclusive of board, lodging, or other facilities;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.

Regarding the first requirement that the project supervisor is compensated on a salary or fee basis at a rate of not less than $455 per week, exclusive of board, lodging, or other facilities, you request that we assume the project supervisor meets this requirement and is paid accordingly. Therefore, we focus on whether the position also meets the primary duty test in determining whether the project supervisor qualifies for the administrative exemption.  To satisfy the primary duty test, the project supervisor's primary duty must include both the performance of office or non-manual work directly related to the management or general business operations of the employer and the exercise of discretion and independent judgment with respect to matters of significance.

As stated in 29 C.F.R. § 541.201(a):

To qualify for the administrative exemption, an employee's primary duty must be the performance of [office or non-manual] work directly related to the management or general business operations of the employer or the employer's customers ...  To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

Additionally, as stated in 29 C.F.R. § 541.201(b):

> Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network; internet and database administration; legal and regulatory compliance; and similar activities.

We recently issued an opinion, Wage and Hour Opinion Letter January 16, 2009, in which we concluded that project superintendents employed by a commercial construction company qualify as exempt administrative employees because their primary duties appeared "to relate directly to the management or general business operation of [the employer], i.e., they are responsible for overseeing a commercial construction project from start to finish." (citing 29 C.F.R. § 541.201(a)-(c)). As we explained in Wage and Hour Opinion Letter January 16, 2009, recent decisions in the federal courts demonstrate that the application of these requirements is highly fact specific. *See Gottlieb v. Construction Servs. & Consultants, Inc.*, No. 05-14139, 2006 WL 5503644, at *6-7 (S.D. Fla. July 24, 2006) (project superintendents whose primary duty "involved producing the product their company existed to market" rather than servicing the company itself, and where "all 'matters of significance' were determined by [the project supervisor's] superiors" were not exempt administrators).

In *Gottlieb*, the project superintendent did not qualify for the administrative exemption because, in part, his duties were primarily to inspect the work of subcontractors to ensure compliance with the builder's plans to schedule the subcontractors and supplies to ensure they were both in place at the proper time. *See* 2006 WL 5503644, at *6; 29 C.F.R. § 541.203(g) ("[o]rdinary inspection work generally does not meet the duties requirements for the administrative exemption"); 29 C.F.R. § 541.202(e) ("the exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures, or specific standards described in manuals or other sources"). The fact that the project superintendent's work was important to the company, affecting its profitability and reputation, was not dispositive. *See Gottlieb*, 2006 WL 5503644, at *6 (*citing Sack v. Miami Helicopter Svc., Inc.*, 986 F. Supp. 1456, 1469 (S.D. Fla. 1997)); 29 C.F.R. § 541.202(f).

From your letter describing the project supervisor's duties, it appears that an overwhelming majority of his/her work is non-manual work directly related to the management or general business operations of the employer, a homebuilding company, and includes tasks such as budgeting, auditing, quality control, purchasing, procurement, safety and health, personnel management, human resources, labor relations, public relations, government relations, legal and regulatory compliance, and similar activities.

To begin, the actual manual work of constructing the home is outsourced to subcontractors and suppliers. As previously stated, the project supervisor supervises and coordinates the construction of the home and serves as the homebuilding company's representative at the worksite in dealings with subcontractors, suppliers, customers, and government inspectors.

In your letter, you indicate that the project supervisor spends more than half of his/her time directing, managing, scheduling, and paying subcontractors and suppliers. In discharging these duties, the project supervisor evaluates the quality and efficiency of the subcontractors' and suppliers' work, is authorized to stop their work to correct any observed deficiencies, and may require them to remove any of their employees from the worksite. If necessary, the project supervisor may recommend the dismissal of subcontractors and suppliers whose work is not satisfactory. When a particular subcontractor's contract is up for renewal, the project supervisor provides significant input as to who will be re-contracted for future services.

Additionally, the project supervisor reviews and modifies new home plans, making sure there are no conflicts between the plans and the actual construction of the home. The project supervisor ensures that each home meets all safety, quality, and legal requirements; ensures each home is ready for inspection; and negotiates the best solution for any issue that may arise with a building inspector, subcontractor, or supplier. Also, the project supervisor schedules the subcontractors and suppliers and commits the homebuilding company to pay when appropriate.

Furthermore, the project supervisor serves as each homebuyer's primary contact in dealing with the construction of the home and also meeting with prospective customers to explain the construction process. The project supervisor reviews the initial home construction budget to ensure the estimates are reasonable and tracks the construction costs against the original estimates once construction begins. Finally, the project supervisor is not typically subject to any on-site supervisors by any other company employee. It appears that, like the project superintendents in Wage and Hour Opinion Letter January 16, 2009, the project supervisors oversee the commercial construction project from start to finish, using a similar amount of discretion and independent judgment when carrying out their duties. The exercise of discretion and independent judgment implies that the project supervisors make independent choices concerning matters of significance, such as whether to depart from prescribed standards or permitted tolerances. *See* 29 C.F.R. § 541.202(a)-(c). Unlike in *Gottlieb*, the primary duties of the project supervisors seem to be more involved than just inspecting work to ensure compliance with the builders' plans and scheduling subcontractors and supplies. Therefore, it appears the project supervisor's primary duties meet the requirement of being office or nonmanual work directly related to the management or general business operations of the employer as stated in 29 C.F.R. § 541.200(a)(2) and further described in 29 C.F.R § 541.201.

As stated in 29 C.F.R. §541.202(a):

> To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. In general the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

Additionally, as stated in 29 C.F.R. § 541.202(b):

> Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to:

whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

"The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision.  However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level."  29 C.F.R. § 541.202(c).

It appears the project supervisor's primary duties involve the exercise of discretion and independent judgment with respect to matters of significance.  For example, in your letter, you indicate that the project supervisor has significant authority to adjust the construction process as necessary when, in his/her opinion, such a change is needed to meet any safety, quality, or legal requirements, or to ensure a high quality home is provided within the estimated budget, and to commit the homebuilding company to any payments that are required to complete such an alteration; to negotiate solutions to issues raised by the building inspector, subcontractors, or suppliers; to schedule subcontractors or suppliers; to stop their work when it is unsatisfactory; to order the removal of their employees when necessary; to recommend the dismissal of a subcontractor or supplier if appropriate; to commit the homebuilding company to any payments to subcontractors or suppliers for any work or building materials provided; and to stop payment to any subcontractor or supplier when appropriate.  Additionally, as previously stated the project supervisor serves as the homebuilding company's sole representative at the worksite and must deal with any issues, concerns, unforeseen events, or problems that may arise during the entire homebuilding process.  Thus, the project supervisor has the authority to formulate, affect, interpret, and implement management policies and operating practices; carry out major assignments in conducting the operations of the homebuilding company; perform work that affects business operations to a substantial degree; commit the employer in matters that have significant financial impact; waive or deviate from established policies and procedures without prior approval; negotiate and bind the company on significant matters; and investigate and resolve matters of significance on behalf of the company.  Therefore, it appears the project supervisor's primary duties meet the requirement of including the exercise of discretion and independent judgment with respect to matters of significance as stated in 29 C.F.R. § 541.200(a)(3) and further described in 29 C.F.R § 541.202.

It is our opinion that the project supervisor position is exempt from the FLSA's minimum wage and overtime requirements as an employee employed in a bona fide administrative capacity, provided that the salary basis requirement is met.

This opinion is based exclusively on the facts and circumstances described in your request and is given based on your representation, express or implied, that you have provided a full and fair description of all the facts and circumstances that would be pertinent to our consideration of the question presented.  Existence of any other factual or historical background not contained in your letter might require a conclusion different from the one expressed herein.  You have represented that this opinion is not sought by a party to pending private litigation concerning the issue addressed herein.  You have also represented that this opinion is not sought in connection with an investigation or litigation between a client or firm and the Wage and Hour Division or the Department of Labor.

We trust that this letter is responsive to your inquiry.

Sincerely,


Alexander J. Passantino
Acting Administrator

**\*Note: The actual name(s) was removed to preserve privacy in accordance with 5 U.S.C. § 552(b)(7).**