# EXHIBIT 9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| STATE OF TEXAS | CIVIL NO. 4:24-CV-499-SDJ LEAD CASE |
| PLANO CHAMBER OF COMMERCE, ET AL. v. | CIVIL NO. 4:24-CV-468-SDJ |
| UNITED STATES DEPARTMENT OF LABOR, ET AL. | |

## DECLARATION OF ANGELO I. AMADOR IN SUPPORT OF PLAINTIFFS' MOTION FOR EXPEDITED SUMMARY JUDGMENT

I, ANGELO I. AMADOR, ESQ., pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1) I am over the age of 18 and competent to make this declaration.

2) I submit this Declaration in support of Plaintiffs' Motion for Expedited Summary Judgment.

3) The statements in this declaration are true and within my personal knowledge and/or my review of Restaurant Law Center's records.

4) I am the Executive Director of the Restaurant Law Center ("RLC"), an independent 501(c)6 affiliated with the National Restaurant Association ("NRA") and state restaurant associations in all fifty states, Washington, DC, and the Commonwealth of Puerto Rico. In that capacity, I lead and manage all of the RLC's engagement in public affairs and public-policy-related matters at the federal, state, and local level.

5) The RLC is the only independent public policy business organization created specifically to represent the interests of the food service industry in the courts.

6) The RLC supports the restaurant and food-service industry across the United States. While the RLC is its own independent organization with its own Board of Directors, all members in good standing with the National Restaurant Association or one of the state restaurant associations is automatically a member of the RLC. As such, the RLC represents an industry that includes over one million restaurant and food-service outlets employing nearly 16 million employees, or approximately 10% of the workforce of the United States—including many exempt employees throughout the country. Still, our members are predominantly small businesses with nine in ten restaurants having fewer than 50 employees.

7) The RLC's main purpose is to support the restaurant industry, which is the second largest private sector employer, to develop and grow. The RLC does so through numerous channels, including through direct outreach efforts on behalf of our members, by hosting educational and informational meetings, seminars, and webinars, by submitting regulatory comments at the federal, state, and local level advocating for restaurant-friendly policies, and by helping our members navigate their legal and regulatory obligations.

8) The RLC also participates in litigation to provide courts with the industry's perspective on legal issues that have the potential to significantly impact its members and its industry at large. Thus, the RLC is bringing this action on behalf of itself and its members, who will be adversely impacted by the 2024 Overtime Rule when attempting to properly classify exempt employees.

9) During the comment period, I held webinars to educate our membership about the proposed requirements and gather information regarding their main concerns. I also co-drafted the comments submitted jointly by the RLC and the National Restaurant Association to the Department during the rulemaking on the 2024 Rule, which set forth RLC's concerns and the concerns of its members with the then-proposed Rule. A copy of these comments is attached to this Declaration as Exhibit A.

10) After enactment, I continue to receive feedback from members and continue to work on educating our members regarding the new requirements.

11) Many of RLC's members employ workers who were exempt prior to July 1, 2024, but are now non-exempt solely because of the 2024 Overtime Rule's July 1, 2024 increase in the EAP salary threshold, or will lose their exempt status as of January 1, 2025 because of the Rule's scheduled increase in the EAP salary threshold. Each of these members will suffer harms such as:

   a) Having to either increase salaries or reclassify workers as non-exempt under the FLSA. Then, as non-exempt employees, members will then have to either:

      i) Pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or

      ii) limit their hours to no more than forty hours per week and forego their services.

   b) Once paid, RLC members have no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

c) In addition, RLC members have expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers, and determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. RLC members will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule.

d) Reclassification of RLC members' employees as non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

12) For example, an RLC member restaurant operating Quick Service Restaurants in Texas recently signed a declaration stating that approximately 24 workers who were exempt under the FLSA prior to July 1, 2024, insofar as they primarily performed executive, administrative, and/or professional duties; were paid on a salary basis; and who earned at least $684 per week ($35,558 per year). Many of these employees routinely worked more than forty hours in a given workweek.

13) As of July 1, 2024, as a direct result of the increase in the EAP salary threshold increase contained in the 2024 Overtime Rule, one of this restaurant's employees lost their exempt status. They continue to perform exactly the same duties and continue to be paid on a salary basis. However, they are paid less than $844 per week ($43,888 per year). Their exempt status changed solely because of the July 1, 2024 increase in the salary threshold contained in the 2024 Rule.

14) The 2024 Overtime Rule further increases the EAP exemption to $1,128 per week ($58,656 per year) as of January 1, 2025.

15) As of that date, approximately 23 of this restaurant's employees will lose their exempt status because of the 2024 Rule. Each of these workers will continue to perform exactly the same duties and continue to be paid on a salary basis, but they will be paid less than $81,128 per week ($58,656 per year). Their exempt status will change solely because of the EAP salary threshold increase contained in the 2024 Overtime Rule.

16) With respect to each of the workers identified in paragraph 13 and paragraph 15, this employer will be require to either increase their salary or reclassify them as non-exempt under the FLSA. And, as non-exempt employees, this employer would now either:

   a) Pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or

   b) Limit their hours to no more than forty hours per week and thus forego their services. Once paid, this employer has no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

17) In addition, this employer has expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of these workers and determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services.

18) This employer will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule.

19) Reclassification of this restaurant's employees as non-exempt is likely to result in limited work hours, reduced pay, fewer opportunities for advancement, or some combination of all three with respect to each affected employee.

20) The example above is neither surprising nor limited to the state of Texas but repeated again and again in restaurants around the country.

21) Shortly after one of the RLC's webinars held in October 2023 explaining the DOL's overtime proposal, restaurateurs from across the country submitted comments with concerns similar to those highlighted in paragraphs 12, 13, 14, 15, and 16.

22) A restaurateur from Chicago, Illinois, stated in his comments that the implications of the overtime proposal "are profound and could significantly affect my restaurant and its dedicated workforce." He further stated that reclassification of current managers because of the proposed high thresholds would lead them to lose their incentive compensation opportunities, benefits, flexibility, and professional standing.

23) Another restaurateur from Shelby Township, Michigan, wrote that "the Department's proposal to index and automatically increase the threshold every three years would create confusion and uncertainty for both employers and employees and place unfair administrative and legal burdens on my restaurant that would make it difficult, if not impossible, to plan for and implement yearly salary increases without significantly disrupting regular business operations."

24) From Sarasota, Florida, another restaurateur wrote to "implore the Department of Labor to give profound thought to the adverse consequences that this final rule would

bring upon establishments like mine and the hundreds of thousands of managers and employees laboring in restaurants nationwide."

25) From Madeira, Ohio, another restaurateur wrote that the "Department's proposed change would increase the minimum salary for a white-collar overtime exemption from $35,568 to at least $55,068 - an increase of almost 55% from current levels (and potentially as high as $60,209, a nearly 70% jump). . . . This dramatic increase would be too significant for my restaurant to absorb, so many exempt employees would end up being moved back to an hourly rate."

26) The examples above are just a miniscule sample from the thousands of restaurants around the country dealing with the illegal 2024 Overtime Rule, but they provide evidence of the harm the 2024 Rule has already caused to RLC members and will continue to cause.

27) As stated, these and many of our other members have been or will be required to either increase the salary of those employees who have lost their exempt status solely because of the 2024 Overtime Rule or reclassify them as non-exempt under the FLSA. With respect to employees who have lost their exempt status because of the 2024 Overtime Rule, these members will have to either (a) pay them overtime at time-and-a-half their regular rate for any hours in excess of forty worked in a given workweek; or (b) limit their hours to no more than forty hours per week and forego their services. Once paid, RLC's members have no ability to recoup higher wages or overtime paid to employees, nor can it recover the loss of the services they would have provided when needed.

28) In addition, these and many of our other members have expended and will continue to expend payroll, accounting, and legal resources to assess the exempt status of each of

these workers and determine whether it makes sense as a business matter to increase their salary; incur the costs of overtime pay; or limit their hours to forty per week and forego their services. These and many of our other members will also have to expend resources to develop or expand scheduling and timekeeping systems for employees who will become non-exempt by virtue of the rule.

29) The most recent available data from the Department of Labor's own Bureau of Labor Statistics (BLS) is also very instructive in showing the immense extent of the impact the 2024 Overtime Rule is having on the restaurant industry. For "First-Line Supervisors of Food Preparation and Serving Workers," those that "directly supervise and coordinate activities of workers engaged in preparing and serving food," BLS shows that in May 2023 the median annual wage was $38,520.

30) As of May 2023, this group comprised 1,176,540 supervisors. Most of those, 906,050, were employed in "restaurants and other eating places" and the annual mean wages for those was still only $41,940. Again, below the new threshold.

31) In fact, fourteen states, including two of the top five with the highest employment level in First-Line Supervisors of Food Preparation and Serving Workers, Texas at 120,680 supervisors and Ohio at 46,900 supervisors, had annual mean wages reported in May 2023 of less than $39,770. The other twelve states included Alabama, Arkansas, Georgia, Idaho, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, New Mexico, Oklahoma, and West Virginia.

32) Another fifteen states still had annual mean wages in May 2023 for First-Line Supervisors of Food Preparation and Serving Workers above $40,000, but still below the threshold established on July 1, 2024, these included Florida, Indiana, Iowa,

Kansas, Michigan, Montana, Nevada, North Carolina, Pennsylvania, South Dakota, South Carolina, Tennessee, Utah, Wisconsin, and Wyoming.

33) Only a handful of states had annual mean wages in May 2023 for these supervisors above the new July 1, 2024, threshold and even those would have restaurants negatively impacted by the increase. For example, while the annual mean wage reported in May 2023 for New Jersey was $51,350 for these supervisors, the 25th percentile—a quarter of the First-Line Supervisors of Food Preparation and Serving Workers—stood at $38,680.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 17th day of July 2024.

Angelo I. Amador, Esq.

# EXHIBIT A



November 7, 2023

*Submitted via www.regulations.gov*

Amy DeBisschop
Director
Division of Regulations, Legislation, and Interpretation
Wage and Hour Division
U.S. Department of Labor
200 Constitution Avenue, N.W.
Room S-3502
Washington, DC 20210

> **RE:**  **Proposed Rule Defining and Delimiting the Exemption for Executive, Administrative, Professional, Outside Sales, and Computer Employees RIN 1235-AA39**

Dear Director DeBisschop:

The Restaurant Law Center (the "Law Center") and the National Restaurant Association (the "Association") submit these comments in response to the above-captioned Notice of Proposed Rulemaking published by the Department of Labor ("DOL" or "the Department") in the *Federal Register* on September 8, 2023 (the "Proposed Rule"). For the reasons set forth below, the Association and the Law Center oppose the Proposed Rule and urge the Department to withdraw it.

The Law Center and the Association represent an industry with more than one million food service locations across the country. It is the leading business representative for the restaurant and foodservice industry, which employs more than 15 million workers. The industry is currently the nation's second-largest employer, employing almost one out of every ten Americans. The Law Center is a public-policy organization affiliated with the Association. It provides legal representation and

advocacy to protect the restaurant industry against overregulation at the local, state, and federal level. It works on behalf of restaurant owners, team members, and customers through both policy initiatives and regulatory advocacy.

The industry has a particular interest in the Department's Proposed Rule, as the industry is dominated by thousands of small businesses. Each of these businesses faces unique economic conditions and challenges in its local community. These conditions include the local wage scale, the availability and skill of local labor, and other localized costs and revenues. National and regional restaurant companies face the same variances, as they often consist of associations and franchises reflecting their local neighborhoods, populations, and economies.

For these reasons, the Law Center and the Association supported the Department's restoration in its 2019 final rule of the 2004 methodology for setting minimum-salary levels for the executive, administrative, and professional ("EAP" or "white collar") exemptions under the Fair Labor Standards Act ("FLSA"). The 2004 methodology recognized that salary levels serve only one valid function: to screen out employees who invariably fail to qualify under the duties tests. Salary levels should not and cannot substitute for those tests. In contrast, the Law Center and the Association opposed the Department's 2016 final rule, which departed from that methodology and instead used a formula that resulted in an unduly (and unlawfully) high salary threshold.

To the extent the current Proposed Rule adopts a formula very similar to that in 2016, we are again opposed. Summarized briefly, the Proposed Rule would, among other things:

- Increase the standard salary level from the current $684/week ($35,568 annually) to $1,158 per week ($60,209 annually), an increase of almost 70 percent;[1]

- Increase the highly-compensated employee ("HCE") threshold from $107,432 to $143,988 annually (a 34 percent increase); and

---

[1] In rolling out the Proposed Rule, the Department indicated that it would increase the salary threshold to $1,059 per week, or $55,068 annually—itself an increase of almost 55 percent. Upon closer examination, however, the Department suggests that if a final rule is promulgated in the first quarter of 2024, the salary threshold would in fact be $1,158 per week, or $60,209 annually, an increase of $24,641 per year, almost 70%. *See* 88 Fed. Reg. 62,153 n. 3. These comments assume that the Department will issue a final rule in the first quarter of 2024, and assume a final threshold in line with the Department's estimate.

- Index and automatically increase both the standard and HCE thresholds every three years thereafter.

Our comments address a series of substantive concerns the Law Center and the Association share with respect to the Proposed Rule, most notably:

First, the proposal sets the standard minimum-salary level too high. It calculates the salary level using a data set that includes some of the highest-wage jurisdictions in the country; these jurisdictions skew the final level, which will unfairly burden restaurants and other small businesses in lower-wage regions.

Second, the proposal likewise sets the salary level for highly compensated employees too high. It increases that level by more than a third, placing it out of reach for most small businesses. This error comes largely from the Department's decision to use a national data set, instead of a regional one. The Department can easily correct that error by using targeted regional data in the final rule.

Third, the proposal lacks any joint-employment safe harbor for restaurant franchisors who help their franchisees implement new wage-and-hour requirements. Many of our members are small franchise businesses with limited resources to invest in education and legal compliance. Yet, without a safe harbor, franchisors may refuse to step in and fill the gap. The Department has included safe harbors in prior rules; we urge it to do so again here.

Fourth, we oppose the Proposed Rule's inclusion of a triennial automatic "indexing" mechanism for the salary threshold. As a legal matter, the Department does not have the statutory authority to include such a provision in a final rule; as a practical matter, an automatic escalator provision will have profound substantive effects on the foodservice industry and its members.

Finally, we note at the outset that it would have been helpful for the regulated community to better assist the Department in gathering substantive information on the impact the proposed revisions would have on the nation's employers for the Department to have granted a longer comment period to allow for the data to be gathered and analyzed. The Department declined a request for an extension from hundreds of trade associations representing literally millions of stakeholders, noting that an extension was not necessary insofar as the Department had previously held "listening sessions" on this topic. Put simply, "listening sessions" on general ideas are no substitute for the robust notice and comment requirements mandated by law. The Department's failure to provide an adequate period for public comment only further undermines both the substantive and procedural validity of any final rule.

I.    **The Proposed Rule's Standard Salary Threshold Is Too High to Be of Practical Use in the Foodservice Industry, and Likely Violates the FLSA.**

The proposed standard exemption is higher than the exempt salary level set in almost every state in the union.  As a result, in these states, only the largest and highest-paying employers will have a realistic opportunity to avail themselves of the exemption. This ignores both the intent and historical function of the EAP salary threshold. Moreover, by setting the salary threshold inordinately high, the Proposed Rule essentially eliminates the role of the duties test, the primary means by which Congress meant exempt status to be evaluated. For both of these reasons the Department should withdraw and fundamentally rethink the Proposed Rule.

A.    **The Proposed Rule's Standard Salary Threshold Excludes an Inordinate Amount of Foodservice Industry Employees from the Exemption.**

As noted previously, the Law Center and the Association have long encouraged the Department to return to the methodology first used in 2004 and again in 2019 (updated for inflation) to set the minimum salary level for the EAP exemption.[2]  The 2004 methodology's chief virtue is its consistency with historical practice. Since 1940, the Department has included minimum salary levels in its definitions for the executive, administrative, and professional exemptions.[3] It has also emphasized that these levels play only a limited role. They screen out employees who, given their relatively low salaries, are unlikely to qualify for the exemptions under the duties tests.[4] In this way, salary levels save investigators and employers time by giving them

---

[2] *See, e.g.*, National Restaurant Ass'n Comments on RIN 1235-AA20 (Sept. 25, 2017), at 4 (advocating use of 2004 methodology).

[3] *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees; Final Rule, 69 Fed. Reg. 22122, 22166 (April 23, 2004) (tracking historical development of salary levels).

[4] *See* U.S. DEPT. OF LABOR, WAGE & HOUR & PUB. CONTRACTS DIV., REPORT AND RECOMMENDATIONS ON PROPOSED REVISION OF REGULATIONS, PART 541 UNDER THE FAIR LABOR STANDARDS ACT DEFINING THE TERMS "EXECUTIVE, ADMINISTRATIVE," "PROFESSIONAL," "LOCAL RETAILING CAPACITY," "OUTSIDE SALESMAN" 2–3 (1958) (stating that the salary levels "furnish a practical guide to the investigator as well as to employers and employees in borderline cases, and simplify enforcement by providing a ready method of screening out the obviously nonexempt employees"); U.S. DEPT. OF LABOR, WAGE & HOUR & PUB. CONTRACTS DIV., REPORT AND RECOMMENDATIONS ON PROPOSED REVISION OF REGULATIONS, PART 541 UNDER THE FAIR LABOR STANDARDS ACT DEFINING THE TERMS "EXECUTIVE, ADMINISTRATIVE," "PROFESSIONAL," "LOCAL RETAILING CAPACITY," "OUTSIDE SALESMAN" 8 (1949) (hereinafter "WEISS REPORT") (stating that the salary levels help prevent misclassification of "obviously nonexempt" employees); U.S. DEPT. OF LABOR, WAGE & HOUR & PUB. CONTRACTS DIV., EXECUTIVE, ADMINISTRATIVE, PROFESSIONAL . . . OUTSIDE SALESMAN" REDEFINED: REPORT AND RECOMMENDATIONS OF THE PRESIDING OFFICER

a quick, short-hand test; they do not supplant but rather supplement and streamline those tests.

Indeed, never in the FLSA's history prior to 2016 (with a single exception) has the Department failed to set the salary level at the low end of then-current salaries at the lowest-wage regions, the smallest size establishments, in the smallest-sized city group, or in the lowest-wage industry. Since 1940, the Department has consistently noted the importance of retaining a "comparatively low salary requirement" and setting a figure "somewhat lower" than the dividing line between studied salaried comparisons in particular jobs.[5] While Congress has granted the Department the authority to define and delimit the white collar exemptions, the Department's position has remained unchanged: "[a]ny increase in the salary levels from those contained in the present regulations must … have as its primary purpose the drawing of a line separating exempt from nonexempt employees rather than the improvement of the status of such employees."[6]

The Proposed Rule wholly abandons this principle, and instead has adopted an approach that will dramatically limit employers in the foodservice industry from availing themselves of the EAP exemption, an approach borne out by data of a majority of those in the industry who were forced, in the wake of the 2016 Final Rule, to reclassify at least some of their otherwise exempt employees back to the nonexempt, non-salary ranks.

As a practical matter, the Proposed Rule will produce the same result. For example, the median base salary in 2022 paid to crew and shift supervisors in the restaurant industry is $36,980.[7] Even those in the upper quartile at $47,250 would not qualify as exempt under the Department's proposed salary level of $60,209.[8] Similarly, the median base salary for restaurant managers is $60,140, while the lower quartile stands at $47,530.[9] These are employees who would meet the duties test but who would become non-exempt under the Proposed Rule solely because of the salary threshold.

---

AT HEARINGS PRELIMINARY TO REDEFINITION (1940) (hereinafter, "STEIN REPORT") (stating that the salary test would help identify employees "who obviously should be exempt" from those who were not).

[5] STEIN REPORT at 22.

[6] WEISS REPORT at 11; *see also* STEIN REPORT at 6.

[7] Bureau of Labor Statistics, Occupational Employment and Wage Statistics, 2022. Main page link: https://www.bls.gov/oes/current/naics3_722000.htm; Data download link: https://www.bls.gov/oes/special-requests/oesm22in4.zip

[8] *Id.*

[9] *Id.*

In some parts of the country, restaurant employers are likely to find that almost 100 percent of their employees who have sufficient managerial and professional duties to pass the duties test—including restaurant managers—would fall below the Department's proposed salary level and would need to be reclassified as non-exempt as a result. In these situations, the proposed salary level would not operate as a gatekeeper but would instead serve as an absolute elimination of the exemption in our industry in large portions of the country.

Similarly, for multi-state restaurant employers, a high proposed salary level would result in employees in the same job classification being treated differently based on where they live. Without lowering the proposed salary level, or, in the alternative, providing for regional salary-level determinations, even when positions meet the duties test, employers in the foodservice industry would likely have to reclassify positions where the nature of the industry or the regional economy cannot justify a salary increase.

Clearly, Congress cannot possibly have intended to create an exemption to benefit only employees and employers in certain regions of the country. Yet this is precisely what the Department would be doing by proposing a salary level at such a high level. The restaurant industry as well as the entire South and Midwest regions will be placed at a competitive disadvantage. Employers in urban areas or with high profits will be able to maintain exempt employees at a rate that far exceeds rural areas and the restaurant industry.

It is important to note that, particularly in the restaurant industry, salaried employees enjoy a number of benefits not available to hourly employees. Thus, in addition to getting paid a salary irrespective of whether they work 40 hours in a week, salaried exempt employees enjoy significant benefits in their employment, ranging from flexibility, paid vacation, paid holidays, retirement savings plan, and health insurance. If, as is likely the case, many of these employees will be reclassified as non-exempt under the threshold set forth in the Proposed Rule, these workers will lose the significant, tangible benefits their salaried, managerial positions afford them.

Finally, throughout the Proposed Rule the Department creates the impression that salaried employees feel they are being taken advantage of by virtue of their exempt status. In reality, employees often view reclassifications to non-exempt status as demotions, particularly where other employees within the same restaurant continue to be exempt. Most employees view their exempt status as a symbol of their success within the company. Far from being enthusiastic, our members have

described reclassified employees as feeling like they were being disciplined and distraught over being reclassified.

As a practical matter, it is clear that, at least with reference to the foodservice industry—the nation's second largest private-sector employer—the proposed threshold will exclude an unacceptably high number of employees who meet the duties test. The impact would be magnified in lower-wage and lower-cost regions throughout the country. If the Department feels the need to adjust the EAP salary exemption threshold—although there is nothing to suggest an adjustment is necessary or justified since the last salary adjustment in 2019—the Department should, at a minimum, reassess the Proposed Rule and recalculate an EAP exemption salary threshold in line with the 2004 methodology adjusting the salary level only as necessary for inflation.

### B.    The Proposed Rule's Salary Threshold Makes the Duties Test Irrelevant in Contravention of the FLSA.

As a legal matter, the Proposed Rule adopts a salary threshold higher than that which has previously been found to be unlawful under the FLSA. The Department's final rule promulgated in 2016 (the "2016 Final Rule") set the EAP exemption threshold at the 40th percentile of weekly earnings for full-time salaried workers in the lowest wage Census Region (the South). That rule raised the minimum salary level for the EAP exemption to $913 per week, or $47,476 annually—more than double the then-existing threshold. When this rule was challenged, the U.S. District Court for the Eastern District of Texas readily concluded that its unprecedentedly high minimum salary threshold essentially negated the "duties test" for the exemption in contravention of the FLSA. As the court explained:

> Specifically, the Department's authority is limited to determining the essential qualities of, precise signification of, or marking the limits of those "bona fide executive, administrative, or professional capacity" employees who perform exempt duties and should be exempt from overtime pay. ***With this said, the Department does not have the authority to use a salary-level test that will effectively eliminate the duties test as prescribed by Section 213(a)(1)*** … Nor does the Department have the authority to categorically exclude those who perform "bona fide executive, administrative, or professional capacity" duties based on salary level alone. In fact, the Department admits, "[T]he Secretary does not have the authority under the FLSA to adopt a 'salary only' test for exemption."

\*\*\*

The Final Rule more than doubles the Department's previous minimum salary level, increasing it from $455 per week ($23,660 annually) to $913 per week ($47,476 annually). This significant increase would essentially make an employee's duties, functions, or tasks irrelevant if the employee's salary falls below the new minimum salary level. ***As a result, entire categories of previously exempt employees who perform "bona fide executive, administrative, or professional capacity" duties would now qualify for the EAP exemption based on salary alone.*** [10]

In simpler terms, the court found that the 2016 Final Rule's salary threshold—which was significantly less than the salary level now set forth in the Proposed Rule—violated the FLSA by "essentially mak[ing] an employee's duties, functions or tasks irrelevant" for a wide swath of workers, in contravention of clear Congressional intent.[11] For the same reason that dramatic increase was struck down, the Department's attempt to set an even higher threshold less than ten years later, again negating the functions of the duties test, is likely to result in the same outcome.

The Department should take the court's prior admonition seriously and abandon the Proposed Rule. If the Department feels it necessary to update the EAP exemption salary level—which, after only three years, it is not—it should at a minimum use the methodology it employed in 2004 and 2019, adjusting for inflation, to provide for a limited increase in the salary threshold.

## II.    The Proposed Salary Level for Highly Compensated Employees Is Set So High As to Make the Exemption Effectively Unavailable for Many of Our Members.

As noted above, the Department proposes to raise the minimum salary for the highly compensated exemption from $107,432 to $143,988—an increase of more than one-third. When the Department last adjusted the HCE in 2019, it provided for an increase of roughly 7.4 percent over the existing standard. The Proposed Rule would increase the current standard to $143,988, a 34 percent increase, and would increase the gap in real dollars between the standard level and the HCE exemption from roughly $71,900 to almost $89,000. The Law Center and the Association urge the Department to reconsider. Both the proposed HCE salary level and the underlying methodology for calculating that level are flawed and unnecessarily disfavor small employers—including restaurants—particularly in lower-wage regions.

---

[10] *Nevada v. U.S. Department of Labor*, 275 F. Supp. 3d 795, 805 (E.D. Tex. 2017) (emphases added).
[11] *Id.* at 806.

First, the proposed salary level is so high that the exemption will become effectively useless for many of our members. In 2022, almost 80 percent of households report an income below the proposed threshold.[12] And households increasingly include more than two earners, with roughly 60 percent of married-couple households being dual income,[13] so the number of workers earning at that level is likely considerably lower.

The Department could not have intended that result. Since its adoption in the 2004 final rule, the Department has used the HCE exemption to provide investigators and employers with a "short-hand" means of identifying those highly-valued employees who are likely to perform exempt duties.[14] Both large and small employers have such employees. Both large and small employers, therefore, should have access to the short-hand test.

The Department's proposal, however, ignores that principle. Instead, it uses a national data set and pegs the highly compensated salary level to the 85th percentile.[15] That approach, unsurprisingly, inflates the proposed salary level by 34 percent. The Department offers no reason for such a dramatic increase. It does not claim that real salaries have risen that fast since the most recent adjustment of the HCE exemption only three years ago, nor does it assert that the current salary level has swept up otherwise nonexempt employees. The new level is, in short, a solution in search of a problem.

At a minimum, the Department should correct for this error by using the same data set it uses for the standard salary levels. That is, it should calculate any new HCE highly compensated level by using data from the South Census Region, rather than on a nationwide basis, to ensure that the HCE exemption is at least within reach of some employers in the lowest-wage regions in the country.

III.  **The Department Should Include a Joint-Employment Safe Harbor, So That Franchisors May Assist Restaurants Operating on a Franchise Model In Compliance.**

The Department should include in any final rule a "safe harbor" providing that an employer's assistance in compliance with the new rule will not be viewed as an

---

[12] U.S. Census Bureau, Income in the United States: 2022, Current Population Reports (Sept. 2023)
[13] Jeremy Horpedahl, U.S. Households Have a Lot More Income Than 1967, and It's Probably Not Just Because of the Rise of Dual Income Households (June 2022), available at: https://economistwritingeveryday.com/2022/06/22/us-households-have-a-lot-more-income-than-1967-and-its-probably-not-just-because-of-the-rise-of-dual-income-households/ (last visited Oct. 27, 2023).
[14] See 69 Fed. Reg. 22,173-74,
[15] See 88 Fed. Reg. 62,154.

indicator of "joint employment" under the FLSA. Many restaurants are small businesses operating on a franchise model. These businesses often lack legal, accounting, or human-resources departments. As they have few resources to invest in legal compliance and education, their best resources are their franchisors. But franchisors may hesitate to help them understand and implement the Department's new requirements out of fear of suggesting a joint-employment relationship.[16]

The Department could ease these fears by adopting a "safe harbor" for franchisors providing such help. A safe harbor would encourage franchisors to help franchisees implement the Department's new rules, and would improve compliance, reduce litigation, and further the Department's regulatory goals. As a model for structuring the safe harbor, the Department could look to its prior 2018 rule on association health plans.[17] There, the Department stated that "nothing in the final rule is intended to indicate that participating in an AHP sponsored by a bona fide group or association of employers gives rise to joint employer status under any federal or State law, rule, or regulation."[18]

That approach would work here as well. The Department should state in any final rule that no franchisor will be considered a joint employer solely because it educates a franchisee about the Department's new requirements or helps the franchisee implement those requirements. Nor are the franchisor's efforts evidence of a joint-employment relationship. The Department should make expressly clear that a franchisor's efforts to help a franchisee comply with the Department's requirements are simply irrelevant to any joint-employment analysis.

## IV.  The Department Does Not Have the Authority to Index the Salary Thresholds.

The Proposed Rule includes an "automatic escalator" provision which would, every three years, increase both the standard and HCE salary thresholds using the same methodologies used to update them to the proposed levels (*i.e.*, 35th percentile of full-time salaried employees in the lowest-wage Census Region for the standard threshold; 85th percentile of full-time salaried workers nationally for the HCE threshold). The Department believes that such a mechanism is "the most viable and efficient" way to ensure that these thresholds "keep pace with changes in employee pay."[19] While this may or may not be the case, what is absolutely clear is that the

---

[16] *See* 29 CFR 791.2 ("[J]oint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions…").

[17] 83 Fed. Reg. 28,912 (June 21, 2018), vacated on other grounds by *State of New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109 (D.D.C. March 2019).

[18] *Id.* at 28,935.

[19] 88 Fed. Reg. 62,154.

Department cannot avoid its obligations to engage in notice-and-comment rulemaking simply because notice-and-comment rulemaking takes resources or is not the most "efficient" means of updating these thresholds in the Department's view.

Congress has made clear how agencies should accomplish major policy changes in the Administrative Procedure Act, which contemplates that agencies will enact those changes through formal notice-and-comment rulemaking.[20] And, that requirement is expressly incorporated in the text of the FLSA itself, which provides that the Secretary may define and delimit the EAP exemption "*subject to* the requirements of the APA."[21] Indeed, it is precisely that reason why notice-and-comment rulemaking is appropriate here: to ensure that a federal agency cannot exceed the limits of its authority or otherwise "exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted in to law'" no matter how difficult an issue it seeks to address.[22]

When Congress authorized the Department to issue regulations under the Federal Labor Standards Act (FLSA), Congress did not, in 1938 or at any time since, grant the Department the authority to index its salary test. Congress could have expressly provided such authority if it desired the Department to have it; it has expressly permitted indexing in other statutes, including the Social Security Act and the Patient Protection and Affordable Care Act. Yet, despite full knowledge of the fact that the Department has increased the salary level required for the exemption on an irregular schedule, Congress has never amended the FLSA to permit the Department to index the salary level. Moreover, when Congress has amended the FLSA to increase the minimum wage, it similarly has not indexed that amount. Congress has demonstrated a clear intent that the salary level be revisited as conditions warrant, allowing the Department, and the regulated community, the opportunity to provide input into the appropriate level.

The Department recognized its lack of authority to index the salary test in the 2004 rulemaking:

> *Further, the Department finds nothing in the legislative or regulatory history that would support indexing or automatic increases.* Although an automatic indexing mechanism has been adopted under some other statutes, Congress has not adopted indexing for the Fair Labor Standards Act. In 1990, Congress modified the FLSA to exempt certain

---

[20] *See* 5 U.S.C. § 553 *et seq.*

[21] *See* 29 U.S.C. 213(a)(1) (setting forth requirement that exemption be defined and delimited in accordance with APA).

[22] *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (internal citations omitted).

computer employees paid an hourly wage of at least 6½ times the minimum wage, but this standard lasted only until the next minimum wage increase six years later. In 1996, Congress froze the minimum hourly wage for the computer exemption at $27.63 (6½ times the 1990 minimum wage of $4.25 an hour). In addition, as noted above, the Department has repeatedly rejected requests to mechanically rely on inflationary measures when setting the salary levels in the past because of concerns regarding the impact on lower wage geographic regions and industries. This reasoning applies equally when considering automatic increases to the salary levels. ***The Department believes that adopting such approaches in this rulemaking is both contrary to congressional intent and inappropriate.***[23]

The Department acknowledges as much in the current Proposed Rule, noting that it has previously determined "nothing in the legislative or regulatory history…would support indexing or automatic increases."[24] The Department was correct in 2004, and nothing has occurred in the interim to justify the opposite conclusion.

Setting aside the Department's lack of legal authority to institute these increases, their practical effect would be devastating and, again, wholly out of synch with Congressional intent. Indeed, should increases be tied to the 35th percentile, the minimum salary level will quickly skyrocket, entirely destabilizing Congressional intent that the salary should not be set at a level that excludes many employees who obviously meet the white-collar duties tests. As noted previously, by increasing the minimum salary level from $35,568 to over $60,000, employers will have to either: (a) reclassify employees as non-exempt, meaning they will be excluded from the BLS non-hourly data set; or (b) increase employee salaries to meet the new minimum salary requirement (thus raising the level of the target percentile upon which the base salary level is determined). If, as the Proposed Rule suggests, these increases are tied to a percentile of earnings, the net effect of these phenomena will be disproportionate increases in the salary threshold.

Our research readily indicates that this automatic increase will result in a "death spiral" of rapidly increasing thresholds which would render the EAP exemption obsolete in just a few years. As a new salary level becomes effective, the number of workers who report to the BLS that they are paid on a non-hourly basis will decrease as workers who fail the salary test in year one (and subsequent years) are reclassified as non-exempt. This will result in a dramatic upward skewing of

---

[23] 69 Fed. Reg. at 22,172 (emphasis added).
[24] 88 Fed. Reg. 62.177, citing 69 Fed. Reg. 22,171.

compensation levels for non-hourly employees. If the 35th percentile test is adopted, in the years following the proposal, the salary level required for exempt status would be so high as to effectively eradicate the availability of the exemptions in our industry. Indeed, as one economic analysis makes clear:

> Using the same methodology for the approximately 12 million full-time, non-hourly employees in the South Census region, where the salary threshold is determined, there are an estimated 1.4 million affected workers who earn between $684 and $1,059 per week and are expected to pass the duties test. If those workers are all reclassified to hourly employees, they will fall out of the distribution of workers that serve as the basis for the 35th percentile…The 35th percentile of the resulting distribution after workers are reclassified is $1,154. For comparison, $1,154 is the 40th percentile of the current distribution. ***Effectively, the Department's automatic update mechanism would increase the salary threshold by approximately 9.1% to the current 40th percentile within three years even if there was not ANY wage growth. If the recent inflation trend continues (13.6% over three years), the 9.1% increase due to the automatic update methodology would cause the threshold to reach $1,311 per week or about $68,175 per year.***[25]

Notice and comment rulemaking has achieved the purpose of the APA by ensuring vigorous public debate about the salary levels, including submission of salary information in its public comments, and regulatory history shows that the Department has routinely adjusted NPRM proposed salary levels in response to stakeholder comment in its final rules. Wholly setting aside the Department's lack of statutory authority to place the EAP exemption salary threshold on "autopilot" in the future, these facts, and the practical impact of an auto-escalation clause alone, make clear that the Department should abandon this ill-conceived effort.

---

[25] Steven G. Bronars, PhD & Deborah K. Foster, PhD, "Important Implications of the DOL's Proposed Automatic Updating Mechanism," Edgeworth Economics (Oct. 26, 2023) at 2-3 (emphasis added).

\* \* \*

On behalf of the Restaurant Law Center and the National Restaurant Association, I thank you for the opportunity to submit our comments and look forward to working productively with you on this important provision of the FLSA.

Sincerely,

Angelo I. Amador
Senior Vice President & Regulatory Counsel
National Restaurant Association
Executive Director – Restaurant Law Center
2055 L Street, NW
Seventh Floor
Washington, DC 20036
P: 202-331-5913
aamador@restaurant.org

Jordan Heiliczer
Director
Labor & Workforce Policy
National Restaurant Association
2055 L Street, NW
Seventh Floor
Washington, DC 20036
P: 610-731-6500
jheiliczer@restaurant.org

*We would like to thank outside counsel for his assistance in drafting these comments:*



James A. Paretti, Jr.
**Littler Mendelson, P.C.**
Workplace Policy Institute
jparetti@littler.com