# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
| | § | |
| Plaintiff, | § | Civil No. 4:24-CV-499-SDJ |
| | § | LEAD CASE |
| PLANO CHAMBER OF COMMERCE, ET AL., | § | |
| | § | Civil No. 4:24-CV-468-SDJ |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES DEPARTMENT OF LABOR, ET AL., | § | |
| | § | |
| Defendants. | § | |

**BRIEF *AMICUS CURIAE* OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF PLANO CHAMBER OF COMMERCE *ET AL.*'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

The Fair Labor Standards Act ("FLSA") requires employers to pay overtime compensation when an employee works more than forty hours in a week. 29 U.S.C. § 207(a)(1). The statute includes an exemption, however, for employees who perform work in an "executive, administrative, or professional capacity." *Id.* § 213(a)(1) ("EAP" exemption). Under that statutory text, the employee's job duties determine whether he or she falls within the exemption. The Department of Labor ("DOL") has long used a salary threshold to screen out employees who clearly do not work in an executive, administrative, or professional capacity, and it has increased that salary threshold over the years. In 2017, this Court concluded that DOL had made the salary threshold too high, effectively replacing the statute's duties-based test with a salary-based one, and invalidated the DOL's rule. Eight years later, DOL attempts to do what this

Court already held it cannot: raise the salary threshold to a level that makes an employee's salary, not job duties, the determining factor for overtime pay.

The Chamber of Commerce of the United States of America ("Chamber") submits this *amicus* brief in support of the motion for summary judgment filed by Plaintiff Plano Chamber of Commerce and other business groups (the "Business Plaintiffs"), because the increased salary threshold for the EAP exemption violates the law and is arbitrary and capricious. This Court should vacate the rule. *See* 89 Fed. Reg. 32842 (Apr. 26, 2024) (the "2024 Rule").

The 2024 Rule made three changes to the salary level for the EAP exemptions. First, it raised the salary level from $684 per week to $844 per week effective July 1, 2024, based on the 20th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census Region (the South) and retail industry nationally. Second, the 2024 Rule raises the salary level from $844 per week to $1,128 per week starting on July 1, 2025, based on the 35th percentile of weekly earnings of full-time salaried workers in the South and the retail industry nationally. And third, the 2024 Rule implements a mechanism to automatically increase the salary level triennially at the 35th percentile of the lowest-wage Census Region, based on contemporary earnings data. The Final Rule is arbitrary, capricious, and otherwise contrary to law in numerous respects that disserve the nation's economy and DOL's own stated goals.

*First*, as this Court has already explained, the statutory text of the FLSA mandates that the EAP exemption inquiry focuses on job duties, not salary level. (*See* ECF No. 38 at 15–18.) Yet the 2024 Rule ignores this foundational framework and reverts to a salary-based test. This reversion improperly replaces salary as a screening tool and will force employers to either convert their EAP employees to hourly employees or significantly increase their salaries. By raising the salary level threshold to the 35th percentile of weekly earnings of full-time salaried workers in the

lowest-wage Census Region and deemphasizing job duties, DOL defies the statute and effectively eliminates consideration of whether millions of potentially qualifying EAP workers are exempt.

DOL justifies the 2024 Rule by claiming that the increase is necessary to ensure that fewer lower-paid white-collar employees are included in the exemption. In other words, the Rule is motivated almost completely by salary level, not duties. DOL argues that these lower-wage workers also perform significant amounts of nonexempt work, but this rationale is outdated and overlooks that a substantially greater proportion of the nation's labor force now performs exempt duties. And raising the salary level is especially hard to square with the justification for having a salary-basis requirement, which is to "screen[] out" those who are "obviously nonexempt" under the duties test. H. Weiss, *Report and Recommendations on Proposed Revisions of Regulations, Part 541*, at 7–8 (1949) ("1949 Weiss Report"). Raising the salary level ensures there is now a greater risk of screening out individuals who primarily perform exempt duties.

*Second*, DOL fails to heed the admonition that "[t]he same salary cannot operate with equal effect as a test in high-wage and low-wage industries and regions, and in metropolitan and rural areas, in an economy as complex and diversified as that of the United States." H. Kantor, *Report and Recommendations on Proposed Revisions of Regulations, Part 541*, at 5 (1958) ("1958 Kantor Report"). While DOL looks to the 35th percentile of salaried employees working in the South, it overlooks that the South is a highly diversified economy and is not representative of the entire country. Average salary ranges deviate significantly based on location (rural versus metropolitan), employer size, and industry. Unlike salary, job duties are not subject to local variation. For example, comparatively lower salaries for employees working for small employers in rural areas in lower paid industries in the South will not suggest performance of nonexempt duties in the same way as it would for employees in large cities. In other words, the lower salaries earned by EAP

3

Case 4:24-cv-00499-SDJ    Document 47-1    Filed 07/25/24    Page 5 of 20 PageID #: 929

employees working in rural areas are better explained by a lower cost of living, lower taxes, and similar dynamics, as opposed to performing fewer exempt duties. DOL's one-salary-size-fits-all approach is arbitrary.

*Third*, the triennial updating mechanism will exacerbate the problems with the 2024 Rule by continually treating more otherwise-exempt employees as nonexempt based solely on salary. As a result of the 2024 Rule, employers in the South inevitably will reclassify at least some salaried employees to hourly not because their job duties have changed but simply because of their compensation levels. This will move employees currently *below* the 35th percentile out of the pool of employees analyzed to determine the 35th percentile going forward. At the same time, employers in the South will also likely *increase* the salaries of employees who are currently below the 35th percentile. In other words, lower-paid employees will be taken out of the pertinent pool of workers while some of the remaining workers will see salary increases simply because of compensation levels, not the real work being performed. Taken together, these dynamics will raise the 35th percentile line going forward. Thus, as the salary thresholds continue to climb upwards due to the triennial updates, the inquiry will increasingly turn on salary level, not job duties, which is exactly what the FLSA prohibits.

For these and other reasons, the Chamber submits that the Business Plaintiffs' motion for summary judgment should be granted in its entirety.

## **INTEREST OF *AMICUS CURIAE*[1]**

The Chamber is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies

---

[1] No counsel for a party authored this brief in whole or in part. No party, no counsel for a party, and no person other than Amicus, its members, or its counsel made a monetary contribution intended to fund the preparation or submission of this brief.

4

and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Business Plaintiffs' challenge to the 2024 Rule is important to *amicus* and its members because they rely every day on worker classification standards under the EAP exemption. To that end, *amicus* filed a comment to DOL's notice of proposed rulemaking, 88 Fed. Reg. 62152, opposing DOL's proposed changes to the salary levels for the EAP exemption. *Amicus* offers this brief to elaborate and offer its informed opinion on why the Business Plaintiffs should prevail on their motion for summary judgment.

## ARGUMENT

**I.     The 2024 Rule Is Arbitrary, Capricious, and Otherwise Contrary to Law**

DOL offers two principal grounds for the 2024 Rule. First, it asserts that the 2024 Rule will "fully restor[e] the salary level's screening function and account[] for the switch from a two-test to a one-test system for defining the EAP exemption. . ." 89 Fed. Reg. at 32843, 32848. Second, and relatedly, DOL contends the 2024 Rule is necessary to "account for earnings growth since the 2019 rule." *Id.* at 32843, 32849. Both justifications fail Administrative Procedure Act scrutiny, and either failure is sufficient to hold the 2024 Rule unlawful and set it aside. *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839-40 (D.C. Cir. 2006) (Kavanaugh, J.).

**A.     The 2024 Rule impermissibly substitutes salary level for job duties**

The FLSA requires employers to pay overtime to covered employees who work more than 40 hours in a week. 29 U.S.C. § 207(a). The FLSA, however, has over two dozen exemptions to

5

this requirement, *see id*. § 213, and "[t]hose exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 89 (2018).

As relevant here, the FLSA exempts "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). While other exemptions to the FLSA explicitly turn on how an employee is compensated, *see, e.g. id*. §§ 207(i) (commissioned employees working in retail or service establishments) & 213(a)(17)(D) (computer-related occupations), Section 213(a)(1) does not. It is duty-based. This difference in statutory language is presumed purposeful. *See Henson v. Santander Consumer USA, Inc.*, 582 U.S. 79, 86 (2017) (differences in statutory language "convey differences in meaning"). It is thus clear that Congress meant for Section 213(a)(1) to exempt EAP employees primarily because of the work they do, not solely the amount they earn per week. *See Nevada v. U.S. Dep't of Labor*, 275 F. Supp. 3d 795, 805 (E.D. Tex. 2017) ("[I]t is clear Congress defined the EAP exemption with regard to duties.").

### 1. An increasingly larger share of the American workforce performs exempt duties, refuting DOL's stated need to increase the salary level

As DOL has long acknowledged, the salary-basis requirement was designed to act as a proxy for the performance of exempt duties. Specifically, "[t]he salary tests in the regulations are essentially guides to help in distinguishing bona fide executive, administrative, and professional employees from those who were not intended by the Congress to come within these [EAP] categories." *See* 1949 Weiss Report at 11; *see also* 1958 Kantor Report at 2–3. Thus, the salary level cannot be set in a manner which would "defeat[] the exemption for any *substantial* number of individuals who could reasonably be classified for purposes of the Act as bona fide [EAP] employees." 1949 Weiss Report at 6, 9.

But this is exactly what the 2024 Rule does. When DOL first introduced the salary-basis requirement, the Nation's labor force was centered on manufacturing, agriculture, and other kinds

6

of manual work.[2]  This is no longer true, as the figure below illustrates, due to "a big shift toward professional and technical occupations and toward management."[3]



From 1980 to 2015, jobs requiring average or above-average levels of social skills, such as interpersonal, communications, or management skills, increased 83%; similarly, in this same period jobs requiring higher levels of analytical skills, such as critical thinking and computer use, increased 77%.[4]  "In sharp contrast, employment in jobs requiring higher levels of physical skills, machinery operation or tool manipulation, were almost static, increasing only 18%."[5]  To put that in perspective, overall employment in the economy increased 50% from 1980 to 2015.  The upshot

---

[2] *See* U.S. Dep't of Commerce, A Social-Economic Grouping of the Gainful Workers of the United States (1938), https://www2.census.gov/library/publications/decennial/1930/workers/workers-national.pdf (last visited, July 16, 2024).

[3] A. Naranjo and J. Vizcaino, "Shifting Times: the Evolution of the American Workplace," Federal Reserve Bank of St. Louis (Dec. 17, 2017), https://www.stlouisfed.org/publications/regional-economist/fourth-quarter-2017/evolution-american-workplace (last visited, July 17, 2024).

[4] *See* Pew Research Center, The State of America Jobs (Oct. 6, 2016), https://www.pewresearch.org/social-trends/2016/10/06/1-changes-in-the-american-workplace/ (last visited, July 15, 2024).

[5] *Id*.

7

is that employment in jobs requiring higher levels of social or analytical skills has significantly increased—that is, jobs that require the performance of exempt duties.

These trends are likely to continue. In May 2022 a U.S. Chamber survey examined the reluctance of workers who had lost their jobs during the pandemic to reenter the workforce; about half of the individuals surveyed (49%) were unwilling to take jobs that did not offer the opportunity for remote work, which necessarily involve less manual work, and over a third of younger adults (aged 25-34) were prioritizing acquiring new skills, education, or training before re-entering the job market.[6] With the rise of artificial intelligence, jobs requiring physical tasks are also "most susceptible to automation," whereas automation "will have a lesser effect on jobs that involve managing people, applying expertise, and social interactions, where machines are unable to match human performance for now."[7] In other words, moving forward there is likely to be an even *greater* percentage of the labor force performing exempt duties.

Against this backdrop, DOL now proposes to *increase* the salary threshold to *per se* exclude more workers from potential consideration of EAP status, even though there is now a comparatively greater likelihood that a worker performs exempt duties. Worse, by increasing the salary level to the 35th percentile of full-time salaried workers in the South, DOL seeks to peg salary at a significantly higher level than what was used for the now-defunct "long test." 89 Fed. Reg. at 32862. But given the economic shift to a larger percentage of employees performing exempt duties, it follows that DOL should not *increase* the salary level, as there is now a greater

---

[6] *See* U.S. Chamber of Commerce, Understanding America's Labor Shortage, https://www.uschamber.com/workforce/understanding-americas-labor-shortage (last visited, July 15, 2024).

[7] *See* J. Manyika, et al., Jobs Lost, Jobs Gained: What the Future of Work Will Mean for Jobs, Skills, and Wages, McKinsey (Nov. 28, 2017), https://www.mckinsey.com/featured-insights/future-of-work/jobs-lost-jobs-gained-what-the-future-of-work-will-mean-for-jobs-skills-and-wages (last visited, July 15, 2024).

risk of screening out individuals who primarily perform exempt duties because a greater portion of the American labor force perform exempt duties.

DOL's intent in raising the salary level is not about utilizing salary as a proxy for exempt duties, but as a substitute for exempt duties. DOL, in the Commentary to the 2024 Rule, repeatedly criticizes the 2004 amendments because they "broadened the EAP exemptions" by purportedly lowering the salary threshold. *See, e.g.*, 89 Fed. Reg. at 32848. But if the focus is on job duties, then lowering the salary threshold should not matter, because even with a lower salary, employers still have the burden of proving that EAP employees were "employed in a bona fide executive, administrative, or professional capacity[]." 29 U.S.C. § 213(a)(1). The 2004 amendments were not a sea change; the only meaningful deviation from prior rulemakings was that the 2004 amendments made the focus *more* on job duties and less on salary level, consistent with congressional intent.

Indeed, contrary to DOL's position in the Commentary, the 2004 amendments to the duties tests did not merely adopt the "short" duties test and pair it with the salary level for the "long" test. For example, the pre-2004 "short" test for the executive exemption required only that the employee have a primary duty of managing the enterprise or a recognized department and regularly directing the work of two or more other employees.[8] The 2004 regulations added a third requirement: "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100 (2004). Thus, DOL in 2004 focused the inquiry on job duties, as the statute requires.

---

[8] 68 Fed. Reg. 15560 (Apr. 23, 2003).

9

In contrast, the 2024 Rule does not seek to refine the duties test, but rather elevates the importance of salary over job duties. As this Court rightly observed, DOL "once again seeks to implement sweeping changes to the EAP Exemption's regulatory framework, designed on their face to effectively displace the FLSA's duties test with a predominant, if not exclusive, salary-level test." (ECF No. 38 at 21.)

### 2. DOL's methodology is flawed, and it failed to consider key differences within the South Census Region

DOL has previously recognized the hazards of failing to account for the substantial wage variation in the national economy. Specifically, DOL explained:

> The same salary cannot operate with equal effect as a test in high-wage and low-wage industries and regions, and in metropolitan and rural areas, in an economy as complex and diversified as that of the United States. Despite the variation in effect, however, it is clear that the objectives of the salary test will be accomplished if the levels selected are set at points near the lower end of the current range of salaries.

1958 Kantor Report at 5.

Far from selecting a point "near the lower end of the current range of salaries," DOL chose to *increase* the salary level from the 20th percentile ($844) to the 35th percentile ($1,128 per week) of the South, which represents a roughly 65-percent increase from the salary level in place before the effective date of the 2024 Rule. Moreover, as the Chamber noted in its Comment to the NPRM,[9] any one Census region is too broad because each is complex and diversified. For example, salaries in major metropolitan areas of the "South" are not commensurate with salaries in rural areas. Based on the U.S. Census Bureau's Current Population Survey, the lowest 35th percentile salary in nonmetropolitan areas in the South is $943 per week, while it is $1,193 in

---

[9] *See* https://www.uschamber.com/employment-law/uscc-comments-on-defining-and-delimiting-the-exemptions-for-executive-administrative-professional-outside-sales-and-computer-employees (last visited, July 19, 2024).

10

metropolitan areas of over 1 million people.[10] Similarly, salaries in higher-wage industries (such as technology) are not commensurate with salaries in lower-wage industries (such as retail).[11] If the purpose of the salary requirement is to screen out those "obviously non-exempt," there is no justification for including the compensation of workers in higher-wage areas and industries, because their compensation will necessarily skew the baseline.

DOL provides no justification for assuming that the duties of potentially exempt employees differ based on where a job is located or why employers based in smaller population centers should be burdened more heavily than ones in larger population centers. There are many possible reasons for salary differences across areas, including cost-of-living differences or differences in local income tax rates. The 2024 Rule thus will arbitrarily cause many EAP employees to be classified as nonexempt merely because of the location of their work, as opposed to what duties they perform.

Use of the 35th percentile is also an outlier as compared to past DOL practice, which historically set the minimum salary level by considering salaries paid to employees working for the smallest-sized employers, in the smallest-population centers, and in the lowest-wage industries:

- In 1949, DOL set a salary level *lower* than the 20th percentile to account for lower-wage industries and small businesses. *See* 1949 Weiss Report at 12-15.

- In 1958, DOL set the salary level so that "no more than about 10 percent of those in the lowest-wage region, or in the smallest size establishment group, or in the smallest-sized city group, or in the lowest-wage industry of each of the categories would fail to meet the tests." 1958 Kantor Report at 7-8.

- In 1963, DOL increased the salary level to "bear approximately the same relationship to the minimum salaries . . . adopted in 1958." 28 Fed. Reg. 7002, 7004 (July 9, 1963).

---

[10] *See* BLS, Labor Force Statistics from the Current Population Survey, https://www.bls.gov/cps/research/nonhourly/earnings-nonhourly-workers.htm (last visited, July 16, 2024).

[11] *See* BLS, Employment and Average Weekly Earnings By Industry, https://www.bls.gov/charts/employment-situation/employment-and-average-weekly-earnings-by-industry-bubble.htm (last visited, July 16, 2024).

11

- In 2004, DOL set the minimum salary level at the 20th percentile for salaried employees in the South region and retail industry, rather than at the 10th percentile as in 1958, to account for the proposed change from the "short" and "long" test structures and because the data included nonexempt salaried employees. 69 Fed. Reg. at 22168-69 & Table 3. The level also was based on salary data from 2002 (thus, the 20th percentile used was presumably lower than the 20th percentile of 2004) and excluded a number of exempt individuals whose salaries were presumably higher than average, such as certain professionals.

Not only does the 2024 Rule raise the percentile used to just below where this Court has already held is too high, *see Nevada*, 275 F. Supp. 3d at 807 (salary level based on 40th percentile of weekly earnings of salaried workers in South), it arbitrarily fails to discount for differences in the economy within the South, in contravention of DOL's historical practice.

### B. The 2024 Rule's automatic triennial updates will substantially increase the salary levels going forward

The 2024 Rule's automatic updating mechanism, which sets the salary level at the 35th percentile of the pay distribution of non-hourly workers in the South every three years, has been estimated by economists to result in more than a 9.1% increase in the salary level even if there is no wage inflation.[12] DOL estimates that over 4 million workers will be impacted by the 2024 Rule—that is, salaried employees who earn between $684 (prior threshold) and $1,128 (upcoming threshold). *See* 89 Fed. Reg. at 32843. Their salaries will either have to increase, or they will be deemed *per se* non-exempt based on salary alone. Of this 4 million, approximately 1.7 million are estimated to work in the South Region, which is significant because the salaries of fulltime employees in the South will be determinative for setting future salary levels under the Final Rule.

If all, or a portion, of these workers are reclassified to hourly employees, they will fall out of the distribution of workers that serve as the basis for the 35th percentile. In other words, the

---

[12] *See* S. Bronars, PhD, "The Department of Labor's Method for Automatically Updating the Salary Level for Overtime Exemptions Will Cause Increases That Exceed Growth in Wages and Salaries," Edgeworth Economics (May 15, 2024), https://www.edgewortheconomics.com/insight-DOL-method-updating-OT-cause-increases (last visited, July 16, 2024).

removal of all or some of the 1.7 million employees below the 35th percentile of the distribution inflates the 35th percentile of the remaining distribution. At the same time, if some of these employees' salaries are increased to comply with the 2024 Rule, this will also increase the average salary of the remaining pool. The result is that a smaller, higher-paid group of salaried workers will constitute the pool of workers from which the 35th percentile is drawn, thereby artificially inflating the 35th percentile line. Two economists have estimated that this will "push[] the 35th percentile of the remaining distribution up to the equivalent of the current 40th percentile without *any* wage inflation."[13]

The same pattern would continue: with each automatic increase, more employees, as an overall percentage, will likely be reclassified to hourly employees, further removing lower-paid employees from the universe of employees considered when calculating the 35th percentile. Thus, salary level will become increasingly more important, and the duties test correspondingly less important, for determining exempt status under the EAP exemptions.

Despite data showing that employers are likely to reclassify salary employees into hourly employees as a result of the 2024 Rule,[14] DOL dismisses these concerns as misguided, explaining "[t]he results of the Department's close examination of the impact of the 2004 salary level increase provide no evidence that salary level increases due to regular triennial updating will result in employers converting significant numbers of affected EAP workers to hourly pay status and thus

---

[13] *See* S. Bronars and D. Koster, "Important Implications of the DOL's Proposed Automatic Updating Mechanism," Edgeworth Economics, https://www.edgewortheconomics.com/publication-6501 (last visited, July 19, 2024).

[14] *See, e.g.*, College and University Professional Association for Human Resources, Comment to NPRM, at 10 (Nov. 7, 2023) (citing survey data showing that educational institutes will "need to reclassify many currently exempt employees to hourly status, as institutions simply cannot afford to raise those employees' salaries to the proposed 2023 minimum of $60,209 per year"), https://www.acenet.edu/Documents/Comments-DOL-Overtime-Rule-110723.pdf

13

raising potential concerns about skewing future updates." 89 Fed. Reg. at 32860. But the comparison in impact between the 2004 and 2024 Rules is overstated in this instance. The 2024 Rule's increase in the salary level is significantly greater and affects many more salaried employees in different jobs with different duties than the workers affected by the comparatively modest salary-level increase in 2004. Consequently, evidence from earlier studies about the effects of salary level changes cannot simply be extrapolated to predict the outcomes of the 2024 Rule. This is especially so because the 2004 salary level was the first increase in almost three decades, and there was no reason for employers to expect another salary level increase within three years.

DOL's comparison to salary changes in California is also misplaced. *See* 89 Fed. Reg. at 32937–32938. California consistently has the highest average weekly wages out of any State,[15] making California a poor comparator to the *lowest*-wage Census Region because California employers will be the least affected by the increases in the 2024 Rule. In addition, California law requires employers to provide nonexempt employees with, among other things, overtime premiums when daily work hours exceed eight, double overtime premiums in certain instances, and meal and rest breaks. The law also implements a host of derivative penalties for wage-hour violations. *See* Cal. Labor Code §§ 510, 512; *see also id.* at §§ 201, 203, 2699. Thus, determining whether to classify workers as exempt in California involves a host of different compliance considerations, because of the myriad wage-hour requirements above what is required under the FLSA.

Moreover, California's exemption threshold requires payment of a salary at or above twice the full-time minimum wage, with full-time employment defined as 40 hours per workweek. *See*

---

[15] BLS, Percent Change in Average Weekly Wages by State, Total Covered Employment, https://www.bls.gov/charts/county-employment-and-wages/percent-change-aww-by-state.htm (last visited, July 16, 2024). Only the District of Columbia exceeds California.

Cal. Labor Code § 515(a).  This means that the salary level for EAP employees in California will *modestly* increase on a consistent basis, in lockstep with the minimum wage.  As such, "[t]he responses of employers in California to small and [consistent] increases" in salary level "are not particularly relevant or informative for projecting the response of Southern businesses to the 65% increase in the FLSA salary level on January 1, 2025" or to the automatic triennial updates thereafter.[16]

In short, by giving primacy to salary level, the 2024 Rule "makes overtime status depend predominantly on a minimum salary level, thereby supplanting an analysis of an employee's job duties."  *Nevada*, 275 F. Supp. 3d at 806.  The 2024 Rule thus "fails to carry out Congress's unambiguous intent" that job duties, not salary level, determine EAP status.  *Id*. at 807.

### C. The Final Rule Will Negatively Impact the Economy and Employees

DOL has not given appropriate weigh to the negative practical implications that will result from the 2024 Rule.  *First*, the 2024 Rule presumes that most U.S. businesses enjoy substantial profit margins and can easily afford to increase payroll costs.  Studies suggest the opposite is true: 99% of U.S. businesses are small businesses, and the average salary of a small business owner is just 16% over the annual mean wage in the U.S. (or $69,119).[17]  The 2024 Rule will put many of these employers in an untenable dilemma: either reclassify their salaried, exempt workers to

---

[16] *See* S. Bronars, "The Department of Labor's Method for Automatically Updating the Salary Level for Overtime Exemptions will Cause Increases that Exceed Growth in Wages and Salaries," Edgeworth Economics (May 15, 2024), *available at* https://www.edgewortheconomics.com/insight-DOL-method-updating-OT-cause-increases (last visited, July 16, 2024).

[17] *See* K. Main, "Small Business Statistics of 2024," Forbes.com (Jan. 31, 2024), https://www.forbes.com/advisor/business/small-business-statistics/ (last visited, July 17, 2024); *see also* U.S. Chamber of Commerce, Small Business Data Center, https://www.bls.gov/charts/county-employment-and-wages/percent-change-aww-by-state.htm (last visited, July 17, 2024).

15

hourly, nonexempt workers and pass the overtime costs on to consumers by raising the price of goods and services, or increase salaries and pass on the added labor costs of the higher salaries to consumers as well.[18]

*Second*, employees who are reclassified from exempt to non-exempt lose considerable flexibility to achieve their desired work-life balance.  Exempt employees are typically afforded more flexibility in setting their own schedule, so long as the job gets done.  They are also more likely to be able to work remotely, which is a feature workers continue to cherish.[19]  On the other hand, hourly employees are typically tied to shifts and must clock in and out at specified times.  They are also more likely to be prohibited from working from home, due to the thorny issues of tracking hours worked by remote employees, which DOL has noted.  *See, e.g.*, DOL, Field Assistance Bulletin 2020-5 (Aug. 24, 2020).

*Third*, salaried workers are "substantially more satisfied than hourly workers" with their jobs.[20]  This is unsurprising: workplace cultures are better when employees have more freedom and feel a deeper connection to the company, but hourly employees may experience less freedom while their connection to the company may be more tenuous.  By significantly increasing the salary

---

[18] Congressional Budget Office, "The Effects on Employment and Family Income of Increasing the Federal Minimum Wage," at 2, 4 (July 2019) (noting that raising minimum wage would "[r]educe business income and raise prices as higher labor costs were absorbed by business owners and then passed on to consumers"), https://www.cbo.gov/system/files/2019-07/CBO-55410-MinimumWage2019.pdf (last visited, July 19, 2024)

[19] *See* K. Parker, "About a third of U.S. workers who can work from home now do so all the time," Pew Research Center (Mar. 30, 2023) (nothing that half of teleworkers wish they could work remotely more often than they currently do), *available at* https://www.pewresearch.org/short-reads/2023/03/30/about-a-third-of-us-workers-who-can-work-from-home-do-so-all-the-time/ (last visited, July 16, 2024).

[20] M. Brenan, "Hourly Workers Unhappier Than Salaried on Many Job Aspects," Gallup (Aug. 23, 2017), https://news.gallup.com/poll/216746/hourly-workers-unhappier-salaried-job-aspects.aspx#:~:text=Salaried%20workers%20are%20substantially%20more,29%25) (last visited, July 16, 2024).

threshold, and thereby inevitably forcing employers to reclassify some employees, the Final Rule will have the effect of stripping employees of the freedom and flexibility desired by many employees.

*Finally*, DOL overlooks the compliance costs associated with the 2024 Rule. The Supreme Court recently jettisoned the *Chevron* doctrine in part to prevent the kind of "regulatory whiplash" that occurs when agencies like DOL promulgate fundamental shifts in policy. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2288 (2024) (Gorsuch, J., concurring). This is especially detrimental to small businesses, which may not have the means to rely on a sophisticated legal department, and therefore "are the ones who suffer the worst kind of regulatory whiplash." *Id*.

In short, DOL has not given appropriate consideration to the profound adverse impact the 2024 Rule will have on the American economy, including forcing employees into hourly positions against their preference.

## **CONCLUSION**

For all the above reasons, the Chamber submits that the Court should grant the Business Defendants' motion for summary judgment.

DATED: July 25, 2024

Respectfully submitted,

By: */s/ Linda C. Schoonmaker*
Linda C. Schoonmaker
State Bar No. 17806300
SEYFARTH SHAW LLP
700 Milam Street, Suite 1400
Houston, Texas 77002
Telephone:  (713) 225-2300
Facsimile:   (713) 225-2340
lschoonmaker@seyfarth.com

Camille A. Olson
(Pro hac vice forthcoming)
Richard B. Lapp
(Pro hac vice forthcoming)
SEYFARTH SHAW LLP
233 S. Wacker Dr., Ste. 8000
Chicago, IL 60606
Telephone: (312) 460-5000
Facsimile: (312) 460-7000
colson@seyfarth.com
rlapp@seyfarth.com

Kyle D. Winnick
(Pro hac vice forthcoming)
SEYFARTH SHAW LLP
620 Eighth Avenue, 32nd Fl.
New York, NY 10018
Telephone: (212) 218-5500
kwinnick@seyfarth.com

A. Scott Hecker
(Pro hac vice forthcoming)
shecker@seyfarth.com
SEYFARTH SHAW LLP
975 F Street, NW
Washington, DC 20004
Telephone: (202) 463-2400
Facsimile: (202) 828-5393
shecker@seyfarth.com

**ATTORNEY FOR THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA**

## CERTIFICATE OF SERVICE

I, Linda C. Schoonmaker, hereby certify that on July 25, 2024, the foregoing was electronically filed with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

*/s/ Linda C. Schoonmaker*
Linda C. Schoonmaker
