UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | § | CIVIL ACTION No. 4:24-CV-00499-SDJ |
| *Plaintiff,* | § | LEAD CASE |
| | § | |
| | § | |
| PLANO CHAMBER OF | § | |
| COMMERENCE, *et al.,* | § | |
| | § | |
| | § | |
| *Plaintiffs,* | § | |
| v. | § | CIVIL ACTION No. 4:24-CV-00468-SDJ |
| | § | |
| UNITED STATES DEPARTMENT OF | § | |
| LABOR, JULIE A. SU, in her Official | § | |
| Capacity as United States Secretary of | § | |
| Labor, THE WAGE AND HOUR | § | |
| DIVISION OF THE DEPARTMENT OF | § | |
| LABOR, and JESSICA LOOMAN, in | § | |
| her Official Capacity as Administrator of | § | |
| the Wage and Hour Division, | | |
| *Defendants.* | | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Contents ............................................................................................................... ii

Table of Authorities ........................................................................................................... iii

Introduction ........................................................................................................................ 1

Statement of Issues ............................................................................................................ 3

Statement of Material Facts ............................................................................................... 4

Argument ........................................................................................................................... 10

I.    Texas Has Standing to Challenge the 2024 Overtime Rule ........................................ 10

II.   The Department of Labor Exceeded its Statutory Authority. ..................................... 12

     A.  The EAP Exception Turns on Duties, Not Salary. ........................................... 12

     B.  The New Salary Level Tests Violate the FLSA. ................................................ 14

     C.  Defendants Lack Statutory Authority to Impose a Salary Requirement
        Altogether. .......................................................................................................... 16

     D.  The Automatic Indexing Mechanism Violates the FLSA. ................................ 19

III.  The 2024 Overtime Rule Does Not Constitute Reasoned Rulemaking ...................... 20

     A.  The New Salary Level Tests Are Arbitrary and Capricious. ............................. 20

     B.  The Automatic Index Mechanism is Arbitrary and Capricious. ...................... 22

IV.  In the Alternative, the 2024 Overtime Rule Represents an Unlawful Delegation of
     Congressional Power ................................................................................................... 24

V.   Regardless, the Tenth Amendment Bars Congress from Applying the Salary Level Test
     to the States ................................................................................................................ 25

Conclusion ........................................................................................................................ 27

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agostini v. Felton,*
521 U.S. 203 (1997) ..................................................................................25

*Baptist Mem'l Hosp. - Golden Triangle, Inc. v. Azar,*
956 F.3d 689 (5th Cir. 2020) ..................................................................17

*BedRoc Ltd., L.L.C. v. U.S.,*
541 U.S. 176 (2004) ..................................................................................12

*Chevron USA Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ..............................................................................2, 17

*Christopher v. SmithKline Beecham Corp.,*
567 U.S. 142 (2012) ..................................................................................13

*Consumers' Research v. Fed. Commun. Comm'n,*
2024 WL 3517592 (5th Cir. July 24, 2024) ......................................24, 25

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.,*
779 F.3d 258 (5th Cir. 2015) ..................................................................10

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
140 S. Ct. 1891 (2020) ............................................................................. 20

*Dep't of Transp. v. Ass'n of Am. Railroads,*
135 S. Ct. 1225 (2015) (Thomas, J., concurring) ................................. 24

*Encino Motorcars, LLC v. Navarro,*
584 U.S. 79 (2018) ....................................................................... 5, 21, 23

*Evans v. U.S.,*
504 U.S. 255 (1992) ..................................................................................26

*Forrest Gen. Hosp. v. Azar,*
926 F.3d 221 (5th Cir. 2019) ..................................................................12

*Garcia v. San Antonio Metro. Transit Auth.,*
469 U.S. 528 (1985) ............................................................................25, 26

*Girling Health Care, Inc. v. Shalala,*
85 F.3d 211 (5th Cir. 1996) ......................................................................3

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ...........................................................................................26

*Gundy v. United States,*
    588 U.S. 128 (2019)........................................................................................... 24

*Hewitt v. Helix Energy Sols. Grp., Inc.,*
    15 F.4th 289 (5th Cir. 2021), *aff'd,* 598 U.S. 39 (2023) (Jones, J., dissenting) ........................14

*Inhance Techs., L.L.C. v. U.S. EPA,*
    96 F.4th 888 (5th Cir. 2024) .............................................................................12

*Jama v. Immigr. & Customs Enf't,*
    543 U.S. 335 (2005).........................................................................................18

*King v. Burwell,*
    576 U.S. 473 (2015) .........................................................................................16

*Loper Bright Enterprises v. Raimondo,*
    144 S. Ct. 2244 (2024) ............................................................................. *passim*

*N.Y. v. U.S.,*
    505 U.S. 144 (1992).........................................................................................26

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.,*
    595 U.S. 109 (2022) .........................................................................................12

*Nevada v. Dep't of Labor,*
    218 F.Supp.3d 520 (E.D. Tex. 2016) ................................................................. *passim*

*Nevada v. Dep't of Labor,*
    275 F. Supp.3d 795 (E.D. Tex. 2017) ................................................................ *passim*

*Pratt v. Harris Cty.,*
    822 F.3d 174 (5th Cir. 2016) .............................................................................3

*Printz v. U.S.,*
    521 U.S. 898 (1997)...........................................................................................26

*Simmons v. Himmelreich,*
    578 U.S. 621 (2016)...........................................................................................14

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
    566 U.S. 560 (2012) .........................................................................................13

*Tex. Med. Assn. v. U.S. Dept. of Health and Human Services,*
    2023 WL 4977746 (E.D. Tex. Aug. 3, 2023)...................................................23

iv

*U.S. Steel Corp. v. E.P.A.*,
    595 F.2d 207 (5th Cir. 1979) .................................................................23

*U.S. v. Koutsostamatis*,
    956 F.3d 301 (5th Cir. 2020) ...............................................................12

*VanDerStok v. Garland*,
    86 F.4th 179 (5th Cir. 2023), *cert. granted,* 144 S. Ct. 1390 (2024) ..........12

*W. Va. v. Env't Prot. Agency*,
    597 U.S. 697 (2022) ............................................................................16

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) .......................................................................24, 25

*Wirtz v. Mississippi Publishers Corp.*,
    364 F.2d 603 (5th Cir. 1966) (Burger, J., sitting by designation) ..................7, 16, 22

**Statutes**

5 U.S.C. § 553 .......................................................................................23

5 U.S.C. § 706 ................................................................................*passim*

16 U.S.C. § 497c(b)(3) .......................................................................... 20

29 U.S.C. 213(a)(19) ..............................................................................17

29 U.S.C. § 203(d), (x) ...........................................................................10

29 U.S.C. § 206(a) .................................................................................18

29 U.S.C. § 213(a)(1) .....................................................................*passim*

29 U.S.C. § 1083(c)(7)(D)(vii) ............................................................... 20

43 U.S.C. § 1337(a)(3)(C)(vii) ............................................................... 20

Pub. L. No. 93-259, 88 Stat. 55 ...............................................................18

52 Stat. 1060 ..........................................................................................4

52 Stat. 1067–68 .....................................................................................4

**Other Authorities**

29 C.F.R. §§ 541.600(a)(3) ......................................................................19

69 Fed. Reg. 22124 ........................................................................................... *passim*

81 Fed. Reg. 32391 (May 23, 2016) ................................................................. *passim*

84 Fed. Reg. 51230 (Sept. 27, 2019) .................................................................7, 22

89 Fed. Reg. 32842 (Apr. 26, 2024) ................................................................ *passim*

U.S. Const. amend. X ..............................................................................................25

The State of Texas ("Texas"), in its capacity as an employer directly subject to the regulation at issue in this litigation, hereby moves for summary judgment on all counts of its Complaint, *see* ECF 1, challenging the Department of Labor's ("DOL" or the "Department") final rule Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees, 89 Fed. Reg. 32842 (Apr. 26, 2024) ("2024 Overtime Rule"), and asks this Court to convert the preliminary injunction it granted Texas on June 28, 2024, ECF 38 (Slip Op.), into a final disposition of the merits, which declares the 2024 Overtime Regulation unlawful, sets it aside pursuant to 5 U.S.C. § 706(2), and awards permanent injunctive relief to Texas and nationwide.

## INTRODUCTION[1]

The Department of Labor has taken a page from modern Hollywood. It's pulled from its archive a failed regulatory property in the hopes of rebooting it and selling it to an inattentive audience. In 2016, DOL introduced a new regulation, which attempted to permanently displace the only test authorized by the Fair Standard Labor Act ("FLSA")—i.e. the duties test—when determining whether an employee qualified for the executive, administrative, and professional exemption ("EAP Exemption") to overtime pay.[2] Had it gone into effect, the regulation would have doubled the EAP Exemption's salary threshold, changing the status of millions of employees, irrespective of whether the employees worked in a bona fide EAP capacity. The regulation also would have introduced an automatic index mechanism to update the salary level on a triennial basis. Not only would this have eliminated the opportunity for notice and comment, but it would have ensured that the EAP Exemption remained out of reach for a substantial number of employees whom Congress decided should be exempt.

---

[1] The U.S. Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ushered in a sea change in how courts approach disputes over an agency's statutory authority. Texas believes that a live hearing would help this Court better navigate the implications of this decision, such as its impact on previous holdings issued by this Court and the Fifth Circuit. It therefore requests that this Court schedule oral argument on this motion.

[2] *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 81 Fed. Reg. 32391 (May 23, 2016) (the "2016 Rule").

The regulation was short lived, however. A coalition of States and private businesses—of which Texas was apart—brought a legal action to this Court, successfully challenging the changes as being in excess of DOL's statutory authority. *See, e.g.*, *Nevada v. Dep't of Labor*, 218 F.Supp.3d 520 (E.D. Tex. 2016) ("Nevada I") (granting preliminary injunction); *Nevada v. Dep't of Labor*, 275 F. Supp.3d 795, 807 (E.D. Tex. 2017) ("Nevada II") (granting summary judgment). Specifically, the Court found that "the Department's authority is limited by the plain meaning of the words in the [FLSA] and Congress's intent." *Nevada II*, 275 F. Supp. 3d. at 805. It then determined that Congress had "unambiguously intended" the exemption to turn on employees' duties, not salary. *Id.* The Court therefore concluded that while DOL could "establish the types of duties that might qualify an employee for the exemption," *Nevada I*, 218 F. Supp. 3d at 530, the agency lacked the authority to make compensation the predominate factor such that it supplanted a duty-based analysis. *Nevada II*, 275 F. Supp. 3d. at 805.

Not content with the reception its regulation received, DOL has since tried again. On April 26, 2024, DOL published a final rule, which is substantively similar to the one this Court deemed invalid. Like its predecessor, the 2024 Overtime Rule changes the methodology used to calculate the minimum salary level for the EAP Exemption. That, combined with the automatic index mechanism, which the 2024 Overtime Rule revives, results in a salary level test that "would essentially make an employee's duties, functions, and tasks irrelevant," *Nevada II*, 275 F. Supp. 3d. at 806, and result in a comparable number of bona fide EAP employees losing their exempt status. According to DOL, approximately 4.8 million workers employed in an executive, administrative, or professional capacity would lose their exempt status in Year 1 on account of the 2024 Overtime Rule. 89 Fed. Reg 32880. The stricken 2016 regulation would have affected 4.2 million. 81 Fed. Reg. 32405.

Like most remakes, the 2024 Overtime Rule is no more compelling than DOL's original screening. Indeed, it is far less so. In recent months, the U.S. Supreme Court overturned *Chevron USA Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and eliminated the deference courts were sometimes required to show agency interpretations of statutes. *See Loper Bright Enter. v.*

*Raimondo*, 144 S. Ct. 2244, 2273 (2024). Instead, courts have a duty to "independently interpret the statute and effectuate the will of Congress," even if their reading diverges from that of the agency. *Id.* at 2247. The *Nevada* Court applied *Chevron's* deferential framework to the 2016 Rule. It nonetheless held that the salary level test and the automatic index mechanism contravened the FLSA because DOL had raised the income threshold so high that it no longer acted as a plausible proxy for the job duties of an EAP employee. The language delineating the EAP Exemption has not changed in the interim.

In granting Texas's motion for preliminary injunction, this Court applied *Loper Bright* and agreed that an independent assessment of the FLSA's plain language indicated that the 2024 Overtime Rule likely exceeded the agency's authority because "[a]s was true of the 2016 Rule, the salary level thresholds imposed under the 2024 Rule 'effectively eliminate[d]' consideration of" an employee's duties. Slip Op. at 25 (quoting *Nevada II*, 275 F.Supp.3d at 807). It therefore held that Texas had established a likelihood of success on the merits and enjoined Defendants from implementing and enforcing against Texas: the July 1, 2024, salary level change; the January 1, 2025, salary level change; and the automatic triennial salary level change. Slip Op. at 35. Texas now requests, for the reasons set forth below, that this Court grant Plaintiffs summary judgment and make its preliminary injunction permanent.

## STATEMENT OF ISSUES

The issue is whether this Court should grant Texas summary judgment and (1) declare the 2024 Overtime Rule unlawful—specifically, the minimum salary threshold and the automatic index mechanism; (2) order that, under 5 U.S.C. § 706(2) of the APA, the 2024 Overtime Rule be set aside, *i.e.*, vacated; and (3) tailor permanent injunctive relief that prohibits Defendants from enforcing the 2024 Overtime Rule nationwide.

Summary judgment is warranted where, as here, there is no genuine dispute as to any material fact and plaintiffs are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Pratt v. Harris Cty.*, 822 F.3d 174, 180 (5th Cir. 2016) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Girling Health Care, Inc. v. Shalala,* 85 F.3d 211, 214 (5th Cir. 1996) ("We have

consistently upheld, without comment, the use of summary judgment as a mechanism for review of agency decisions.").

In the present case, Texas sets forth five separate legal grounds in favor of summary judgment:

I.     The 2024 Overtime Rule exceeds DOL's statutory authority under the FLSA in violation of the APA;

II.     The 2024 Overtime Rule is arbitrary, capricious, or otherwise contrary to law in violation of the APA;

III.     The 2024 Overtime Rule violates the Major Questions Doctrine;

IV.     The 2024 Overtime Rule is an unlawful delegation of congressional power, as interpreted by Defendants; and

V.     The Tenth Amendment precludes FLSA's application to the States.

This Court, in 2016, already held that a substantially similar rule was not based on a permissible construction of the FLSA. Since that time, the Supreme Court has confirmed that courts have a duty to review agency interpretations of the statutes they administer by independently examining each statute to determine its meaning. *Loper Bright*, 144 S. Ct. at 2263.

Texas need only meet its burden on one of its claims to warrant relief.

### STATEMENT OF MATERIAL FACTS

1.     Congress enacted the Fair Labor Standards Act ("FLSA") in 1938 during the Great Depression to establish baseline wage and hour standards. 52 Stat. 1060. To that end, the FLSA generally requires that covered employers pay their employees at least the federal minimum wage (currently $7.25 per hour) for all hours worked and overtime pay at one and one-half an employee's regular rate of pay for all hours worked in excess of a 40-hour workweek. *See generally id.; see also* 29 U.S.C. §§ 206, 207.

2.     When enacted, the FLSA contained a number of exceptions to the overtime requirement. 52 Stat. 1067–68; 29 U.S.C. § 213(a). These exemptions share a common theme: they cover trades, occupations, and professions. *See, e.g.*, 29 U.S.C. § 213(a)(1)–(19). Courts typically

have viewed these exemptions "as being "as much a part of the FLSA's purpose as the overtime-pay requirement." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 89 (2018).

3.    Section 213(a)(1) of the enabling legislation contains what is commonly referred to as the "white collar" or EAP exemption. This exemption excludes from both minimum wage and overtime "any employee employed in a bona fide executive, administrative, or professional . . . capacity, or in the capacity of outside salesman (as such are defined and delimited from time to time by regulations of the Secretary) subject to the provisions of [the APA]." 29 U.S.C. § 213(a)(1).

4.    The FLSA makes no reference to a minimum salary requirement associated with the EAP Exemption.

5.    Despite Congress's silence regarding compensation, DOL has considered salary in some capacity since the statute's inception. *See* 69 Fed. Reg. 22124. These salary thresholds were purposefully kept low by DOL, as they were designed to "screen[] out the obviously nonexempt employees, making as an analysis of duties in such cases unnecessary." Harry Weiss, Report and Recommendations on Proposed Revisions of Regulations, Part 541, at 7–8 (1949)).

6.    DOL justifies its use of a salary threshold by characterizing compensation as a proxy for an employee's duties. *See, e.g.*, 81 Fed Reg. 32404; 89 Fed. Reg. 32844. DOL acknowledges that if it utilizes this metric, "[a]ny new figure recommended should also be somewhere near the lower end of the range of prevailing salaries for these employees." Weiss Report at 11–12. DOL has stated during multiple rulemakings that it lacks the power to adopt a "salary only" test. *See, e.g.*, 81 Fed. Reg. 32446, 69 Fed. Reg. 22173.

7.    In 2016, DOL departed from its decades-long policy of maintaining a relatively low salary threshold.  It raised the new cutoff from the 20th percentile of weekly earnings of full-time salaried workers in the lowest-wage census region, which is the South, to the 40th percentile. 81 Fed. Reg. 32404. The 2016 Rule also invented an index mechanism to automatically update the standard salary level threshold every three years. *Id.* at 32430. The FLSA contains no reference to

an automatic index mechanism.[3]

8.    In practice, the 2016 Rule would have more than doubled the then-existing salary requirement of $455 per week in the first year. DOL calculated "that the required standard salary level [would] be $913 per week, or $47,476 annually…" based on contemporary wage data *Id*. at 32405. DOL estimated that that, as a result of the rule, 4.2 million employees who met the standard duties test would no longer fall within the EAP exemption.

9.    Twenty-one states, including Texas, and a multitude of business organizations filed suit in this Court challenging the 2016 Rule. The lawsuits raised almost identical claims to the pending action. This Court specifically found that Texas and the other Plaintiff States had standing because they "faced imminent monetary loss that is traceable" to the final rule and redressable by the court. *Nevada I*, 218 F.Supp.3d at 526.

10.    Following expedited briefing, this Court granted summary judgment in favor of plaintiffs. It noted that DOL historically utilized a minimum salary level as a floor to "screen[ ] out the obviously nonexempt employees" but found that the 2016 salary level test contravened the FLSA's text and purpose because DOL raised the threshold so high that it no longer acted as a plausible proxy for the job duties of an EAP employee. *Nevada II*, 275 F. Supp. at 806.

11.    This Court explained that DOL "does not have the authority to use a salary-level test that will effectively eliminate the duties test as prescribed by Section 213(a)(1)." *Id.* at 805. "Nor does [it] have the authority to categorically exclude those who perform 'bona fide executive, administrative, or professional capacity' duties base on salary level alone." *Id.* at 806.

12.    The Court took particular note that "entire categories of previously exempt employees who perform bona fide executive, administrative, or professional capacity duties would now qualify for the EAP exemption based on salary alone." *Id.* It concluded that the increase "would essentially make an employee's duties, functions, or tasks irrelevant if the employee's

---

[3] Congress has expressly provided for automatic indexing in other statutes, such as cost of living increases for Social Security benefits in the Social Security Act, P.L. 106-554.

salary falls below the new minimum salary level." *Id.*

13.    DOL next attempted to amend its overtime regulations in 2019.[4] As part of the rulemaking process, DOL acknowledged the problems this Court identified with its 2016 Rule, noting that,

> By excluding from exemption, without regard to their duties, 4.2 million workers who would have otherwise been exempt because they passed the salary basis and duties tests established under the 2004 final rule, the 2016 final rule was in tension with the [FLSA] and with the Department's longstanding policy of setting a salary level that does not 'disqualify[] any substantial number of' bona fide executive, administrative, and professional employees from exemption.

DOL reaffirmed that salary level is "at most, an indicator of [employees'] duties." 81 Fed. Reg. 51238. The test was not meant to be a substitute for the analysis of employees' duties, except at relatively low levels of compensation where EAP employees are unlikely to be found. *Id.*

14.    Because of these findings, the overtime rule promulgated in 2019 represented a return to form. It retained the 2004 Rule's methodology for calculating the standard salary level— 20th percentile of weekly earnings of full-time salaried workers in the lowest-wage census region— but applied contemporary wage data, which put the minimum salary threshold at $684 per week ($35,568 annually). 84 Fed. Reg. 51235; *see also* 69. Fed. Reg 22171. DOL also elected to omit the mechanism to automatically increase the standard salary level.[5] 84 Fed. Reg. 51252.

15.    Even though DOL acknowledged in its 2019 rulemaking that the FLSA, regulatory precedent, and this Court's decisions in *Nevada I* and *Nevada II* counseled against a strict salary level test, DOL reversed course again in 2024, publishing the overtime rule that is the subject of this litigation. The 2024 Overtime Rule proposes three significant changes:

---

[4] *See* "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees," 84 Fed. Reg. 51230 (Sept. 27, 2019) (the "2019 Rule").

[5] The 2019 Rule was challenged in *Mayfield U.S. Dep't of Labor, No. 23-59724 (5th Cir.) (appeal pending, briefing completed),* on the ground that the FLSA does not authorize DOL to impose any minimum salary threshold for the EAP exemption. The district court declined to enjoin the rule, citing Wirtz v. Mississippi Publishers Corp., 364 F.2d 603 (5th Cir. 1966). The appeal from that decision is pending before the Fifth Circuit.

a.  It increases the salary level by applying updated wage data to the 2019 and 2004 methodology—*i.e.*, the 20th percentile of earnings of full-time salaried workers in the lowest-wage Census Region. This raises the salary threshold from $684 per week to $844 per week (or from $35,568 annually to $43,888 annually) starting on July 1, 2024. 89 Fed. Reg. at 32854.

b.  It institutes a new methodology, starting January 1, 2025, which bases the salary level on the 35th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census Region, as opposed to the 20th percentile. *Id.* at 32842. This will increase from $844 per week to $1,128 per week (or from $43,888 annually to $58,656 annually). 89 Fed. Reg. 32971.

c.  It implements a mechanism (akin to the one invalidated by this Court in *Nevada II*) that would automatically increase the salary level triennially based on contemporary earnings data. The first automatic change—which would not require Notice and Comment—will occur on July 1, 2027. *Id.* at 32973.

16.    Each of these changes will exclude from the white-collar exemption millions of currently exempt EAP workers solely on the basis of their salary. According to DOL's own estimates, the July 1, 2024, increase is projected to affect approximately one million workers, *Id.* at 32843; the January 1, 2025, increase, approximately three million workers, *Id.*; and the automatic index mechanism, millions more each three-year cycle.[6]

17.    Because of these changes, the salary level test no longer acts as a plausible proxy for the job duties of an EAP employee. Indeed, "of the 12.7 million full-time salaried white-collar workers who earn less than $1,128 per week," DOL concedes that, "38 percent—about 4.8 million

---

[6] DOL did not cite the total number of workers expected to be affected by the automatic index mechanism. Instead, it broke down the number by year. According to DOL the salary increases will affect 4.3 million workers in Year 1; 4.1 million in Year 2; 3.8 million in Year 3; 4.8 million in Year 4; 4.6 million in Year 5; 4.3 million in Year 6; 5.4 million in Year 7; 5.1 million in Year 8; 4.8 million in Year 9; and 6 million in Year 10. 89 Fed. Reg. at 32940. The automatic salary level adjustments occur in Year 4, Year 7, and Year 10. In each of these years, DOL expects a spike in the number of workers ousted from the EAP exemption. *Id.*

workers—meet standard duties test." 89 Fed. Reg 32880. Sixteen percent of all full-time salaried workers who meet the standard duties test earn below the salary level imposed by the new rule. *Id*.

18.      The increase in the number of employees who qualify for overtime will impose substantial financial costs on employers, including Texas. DOL estimated during the rulemaking process that "[y]ear 1 costs for state and local governments would total $197.7 million, of which $98.9 million are direct employer costs and $98.8 million are payroll increases." *Id*. at 32968–69. Direct employer costs as includes regulatory familiarization costs, adjustment costs, and managerial costs. *Id*. at 32891.

19.      Although concentrated in Year 1, the financial fallout imposed on employers will endure beyond the 2024 Overtime Rule's initial implementation. The 2024 Overtime Rule exclaims that "[i]n subsequent years, state and local governments may experience payroll increases of as much as $183.7 million." *Id*. at 32969. The rule also contemplates ongoing managerial costs endured by employers: namely, developing work schedules and closely monitoring an employee's hours. *Id*. at 32910.

20.      Texas is the second largest government employer among the States. *See* U.S. Census Bureau, 2023 Annual Survey of Public Employment and Payroll (ASPEP): State Government Employment & Payroll Data column C (2023), https://www.census.gov/programs-surveys/apes/data/datasetstables/2023.html. At present, it is subject to the FLSA and therefore the overtime regulations that DOL promulgates pursuant to the statute.

21.      In its capacity as an employer, Texas pays a salary of less than $844 a week and less than $1,128 a week to certain of its employees working in a bona fide EAP capacity. If not vacated, the Texas Comptroller estimates that the 2024 Overtime Rule would change the exempt status of nearly 4,000 employees in Year 1 alone. *See* Miller Decl. ("Ex. A"). The resulting outlays will have ramifications on state agencies and the public services they provide. *See generally id*. at Ex. A ¶ 8.

22.      To avoid the irreparable harm the 2024 Overtime Rule would inflict on Texas and its residents, Texas initiated suit on June 3, 2024. It filed a motion for preliminary injunction that same day, asking this Court for relief before the 2024 Overtime Rule's effective date of July 1,

2024, which was when the first increase to the salary level was scheduled to occur. The motion was granted on June 28, 2024.

23.    The Court concluded that Texas was likely to succeed on the merits of its claim that the 2024 Rule exceeds the Department's statutory authority under the FLSA. Slip op at 26. Specifically, this Court found that "the EAP Exemption requires that exemption status turn on duties—not salary." *Id.* at 26. Yet, the 2024 Overtime Rule "effectively displace[s] the FLSA's duties test with a predominant, if not exclusive salary-level test." *Id.* at 21. The changes were therefore "likely 'in excess of statutory jurisdiction.'" *Id.* at 26. (quoting 5 U.S.C. § 706(2)(C)).

ARGUMENT

## I.    Texas Has Standing to Challenge the 2024 Overtime Rule.[7]

Congress expanded the FLSA in 1974 to include "a State, or political subdivision of a State" as a covered employer. 29 U.S.C. § 203(d), (x). Texas maintains that the FLSA's application to the States infringes on Texas's sovereignty, and therefore violates the U.S. Constitution, for the reasons articulated below and in its Complaint. *See infra* Part V; *see also* ECF 1 ¶¶ 140–62. However, Texas acknowledges that courts have read existing caselaw as permitting enforcement of the FLSA against the States. *See, e.g., Nevada II*, 275 F. Supp. at 802. Texas therefore is a direct object of the challenged regulation. *See, e.g., Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015) ("If a plaintiff is an object of a regulation there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.") (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)). It will be harmed if the 2024 Overtime Rule goes into effect.

---

[7] It is not clear from prior briefing whether Defendants contest Texas's standing. In their response in opposition to Texas's motion for preliminary injunction, Defendants argued that Texas would not suffer an *irreparable* injury before this Court had the opportunity to resolve the case on the merits. But they did not contend that the injury Texas asserted was deficient for Article III purposes. As a precaution, and in recognition that this Court has an independent obligation to confirm jurisdiction, Texas will outline its basis for standing.

Defendants did not contest Texas's standing in the 2016 litigation, which challenged similar regulations, promulgated pursuant to the same statute. *Nevada I*, 218 F.Supp.3d at 526.

10

Texas employs bona fide executive, administrative, and or professional employees who were previously exempt but will now qualify for overtime pay solely because of their salary.[8] *See generally* Ex. A. Absent permanent relief, Texas would be compelled to (1) raise its employees' salaries, (2) pay one-and-a-half times the employees' rates for any time worked over forty hours, or (3) forbid the employees from working over forty hours in a week in order to comply with revised standards. Not only would this impose sizeable economic costs on Texas agencies, but it would deprive Texas and its taxpayers of the benefit of the additional labor and services those employees would have performed but for the DOL's illegal action. *See generally* Ex. A.

In addition to these payroll expenses, the 2024 Overtime Rule would impose significant compliance and implementation costs on Texas. For one, state agencies would need to familiarize themselves with the regulations and then review, revise, and reissue their employment policies to account for the new standards. *See* 89 Fed. Reg. 32908–10 (assessing regulatory familiarization and adjustment costs). For another, state agencies would need to develop work schedules and closely monitor employees' hours to minimize or avoid incurring overtime. *See id.* at 32910–11 (assessing managerial costs). DOL estimated during the rulemaking process that "[y]ear 1 costs for state and local governments would total $197.7 million, of which $98.9 million are direct employer costs and $98.8 million are payroll increases."[9] *Id.* at 32968–69. Texas will bear much of that financial fallout to the detriment of its residents.

Texas, in short, faces an "imminent monetary loss that is traceable to the Department's Final Rule" and would be redressed if the Court determines the Final Rule to be unlawful. Texas meets all the requirements of Article III standing. *Nevada I*, 218 F. Supp. 3d at 526.

---

[8] The Texas Comptroller has identified 3,990 employees at 65 state agencies that will lose their exempt status by January 1, 2025, on account the revised salary test. *See* Ex. A.

[9] This is more than what was stated in the 2016 Rule that was struck down, which—by DOL's estimates, resulted in "costs for state and local governments totaling $115.1 million" in the first year alone, "of which $38.8 million are direct employer costs and $76.3 million are payroll increases." 81 Fed. Reg. 32546.

## II.    The Department of Labor Exceeded its Statutory Authority.

Like any administrative agency, DOL is a "creature[] of statute." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022). Accordingly, it "must point to explicit Congressional authority justifying [its] decisions." *Inhance Techs., L.L.C. v. U.S. EPA*, 96 F.4th 888, 893 (5th Cir. 2024); *see also Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 228 (5th Cir. 2019) ("The Constitution, after all, vests lawmaking power in Congress. How much lawmaking power? 'All,' declares the Constitution's first substantive word."). To determine whether a statute granted an agency the authority it claims, courts look to the statute's text. *VanDerStok v. Garland*, 86 F.4th 179, 188 (5th Cir. 2023), *cert. granted,* 144 S. Ct. 1390 (2024) ("How do we know when an agency has exceeded its statutory authority? Simple: the plain language of the statute tells us so."); *see also BedRoc Ltd., L.L.C. v. U.S.*, 541 U.S. 176, 183 (2004) (explaining that statutory interpretation "begins with the statutory text, and ends there as well if the text is unambiguous").

Since its enactment in 1938, the FLSA has decreed that the statutory requirement to pay overtime "shall not apply" to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). But the FLSA does not define these terms. Rather, the FLSA authorizes the Secretary of Labor ("Secretary") to "define[] and delimit[]" those terms "from time to time by regulations . . . subject to the provisions of [the Administrative Procedure Act]." *Id.* But DOL's Rule runs far afield from the authority granted to it by Congress. It re-writes the FLSA so that salary is no longer a meaningful proxy for duties. Rather, as promulgated, the Rule sorts exempt and non-exempt workers based on salary *alone*. This turns the statute on its head. Under the plain text and structure of the FLSA, an employee's EAP status turns on duties, not salary. Thus, DOL's changes to the minimum salary level are "in excess of statutory jurisdiction," 5. U.S.C. § 706(2)(C), and the Rule should be vacated.

### A.    The EAP Exception Turns on Duties, Not Salary.

Start with the text. *U.S. v. Koutsostamatis*, 956 F.3d 301, 306 (5th Cir. 2020) (quoting Henry J. Friendly, Benchmarks 202 (1967) ("In statutory interpretation, [the court] has three obligations:

'(1) Read the statute; (2) read the statute; (3) read the statute!'")). The FLSA confers exempt status on "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1) (emphasis added). The operative terms "executive, administrative [and] professional" all "relate to a person's performance, conduct, or function without suggesting salary." *Nevada I* at 529. This reading of the statute stems from the "ordinary meaning," *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012), of those terms when the FLSA was enacted.

For example, "[t]he Oxford English Dictionary defines 'executive' as someone '[c]apable of performance; operative. . . [a]ctive in execution, energetic … [a]pt or skillful in execution.'" *Nevada I* at 529 (quoting Oxford Dictionary, 1933 Edition). Nothing in this definition speaks to an employee salary. Likewise, "Administrative is defined as '[p]ertaining to, or dealing with, the conduct or management of affairs; executive.'" *Id.* "[A]nd the dictionary defines 'professional' as "[p]ertaining to, proper to, or connected with a or one's profession or calling . . . [e]ngaged in one of the learned or skilled professions . . . that follows an occupation as his (or her) profession, lifework, or means of livelihood." *Id.* So like the term "executive," the plain meaning of the terms "administrative" and "professional" have no relation to salary or how much an individual is paid.

Also, the FLSA's use of the term "capacity" is telling. Because capacity refers to being placed in a specific "position, condition, character, or relation," the term "capacity" confirms the focus of the FLSA is on the employees' duties or functions. *Id.*; *see also* ECF 38 at 16. Accordingly, to be employed in the "capacity" of an "executive" means to work in the role of an executive— i.e., to perform executive duties in one's position. And to be employed in the "capacity" of an "administrative or professional" employee means to work in an administrative or professional position. *Cf. Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 161 (2012) (interpreting "capacity" as favoring a functional analysis that looks to employee's responsibilities).

Likewise, the term "bona fide" emphasizes the focus on the employee's functional duties. "The Oxford English Dictionary defines 'bona fide' as '[i]n good faith, with sincerity; genuinely." *Nevada I* at 529. Thus, the use of the phrase "bona fide," the text makes plain that the EAP

Exemption applies to employees who were genuinely performing EAP "tasks" in their employment, but not when employees are given a job title without commensurate EAP duties. *See* ECF 38 at 18; *see also Hewitt v. Helix Energy Sols. Grp., Inc.*, 15 F.4th 289, 314 (5th Cir. 2021), *aff'd*, 598 U.S. 39 (2023) (Jones, J., dissenting). ("[B]ona fide . . . emphasizes a focus on the employees actual duties . . . .").

Since the FLSA confers exempt status on "*any* employee employed in a bona fide executive, administrative, or professional capacity," § 213(a)(1) (emphasis added), "*any employee*" who satisfies the duties test under the FLSA is entitled to the EAP exemption—not just "most" or "some" employees who meet some compensation thresholds set by DOL. ECF 38 at 24–25; *see also Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016) ("[W]e presume Congress says what it means and means what it says."). And the text tells us an employee's EAP exempt "status cannot turn on salary. Period." ECF 38 at 23 n. 21; *see also Hewitt*, 15 F.4th 289 F.4th at 314 (Jones, J., dissenting) (the ordinary meaning of the EAP Exemption's text focuses on "duties not dollars").

In other words, to the extent DOL has authority to impose a salary threshold *at all* under the FLSA, *see infra* Part II-B, the threshold must—at minimum—bear a close relationship to exempt job duties. Yet here, as explained below, the salary thresholds imposed under the rule "effectively eliminate" consideration of whether an employee performs "bona fide executive, administrative, or professional capacity" duties in favor of what amounts to a salary-only test. See *Nevada II*, 275 F.Supp.3d at 807. The promulgation of this "de facto" salary only test dooms the Rule, and it should be vacated.

### B.  The New Salary Level Tests Violate the FLSA.

During the rulemaking process, DOL conceded that each of the three provisions Texas challenges excludes large numbers of bona fide EAP employees from the exemption simply because they make below a certain amount. DOL attempts to justify this disregard for the duties performed by employees earning less than $844 and $1,128 a week by asserting that the agency has "long recognized that the salary level test is a useful criterion for helping identify bona fide EAP employees." 89 Fed. Reg. 32844. The assertion, however, is unpersuasive. Not only does it

constitute an appeal to the authority of prior regulations rather than the statute, but the claim cannot be reconciled with DOL's own projections about the impact the 2024 Overtime Rule will have on the workforce. According to DOL, approximately one million employees, who currently meet the duties test, will lose their exempt status as a result of the July 1, 2024, salary level increase; approximately three million will lose their exempt status as a result of the January 1, 2025, increase. *Id.* at 32843. Millions more will roll off after each triennial salary adjustment. *Id.* at 32940.

By its own admission, DOL lacks the power to adopt a "salary only" test for the exemption. *See*, *e.g.*, 81 Fed. Reg. 32446 n.84 (a salary only approach is "precluded by the FLSA"), 69 Fed. Reg. 22173 (DOL "does not have authority under the FLSA to adopt a 'salary only' test . . ."). The plain language of the FLSA grounds the EAP Exemption to the duties that employees perform; the determination of whether an employee meets the exemption therefore must involve at least some consideration of the employee's duties. 69 Fed. Reg. 22173 ("The Department has always maintained that the use of the phrase 'bona fide executive, administrative or professional capacity' in the statute requires the performance of specific duties."). Yet as these numbers show, the 2024 Overtime Rule sets the salary threshold so high that it no longer acts as a plausible proxy for the job duties of an EAP employee. It instead resembles a de facto salary only test where employees' duties, functions, tasks, and activities no longer matter when determining their exempt status.

This Court only need look at its earlier decision in *Nevada II* to appreciate the tension between DOL's regulations and the statute. There, the Court noted that DOL historically utilized a minimum salary level as a floor to "screen[ ] out the obviously nonexempt employees." 275 F.Supp.3d at 806 (quoting *Harry Weiss, Report and Recommendations on Proposed Revisions of Regulations*, Part 541, at 7–8 (1949)). It concluded that such a practice was consistent with DOL's power to "define and delimit" the duties test so long as the threshold was near the lower end of the range of prevailing salaries for EAP employees. *Id.* Nevertheless, the court held that the 2016 salary level test contravened the FLSA because it would essentially make an employee's duties, functions, or tasks irrelevant." *Id.* at 806–807. So too here. The 2024 Overtime Rule will result in

a comparable number of bona fide EAP employees losing their exempt status. It has the same effect as invalidated 2016 Rule and should be vacated.

### C. Defendants Lack Statutory Authority to Impose a Salary Requirement Altogether.

DOL has acknowledged any salary level rules it implements are "without specific Congressional authorization." 81 Fed. Reg. at 32341. And as shown above, the plain text of the statute makes the EAP Exemptions turn on duties, not salary. So where does DOL's supposed power to set salary thresholds come from to begin with? As stated above, Congress has expressly delegated authority to the Secretary to "define and delimit" EAP Exemptions. 29 U.S.C. §213(a)(1). But this authority, like any agency authority, is bounded by the ordinary meaning of the plain text of the statute, which is a legal question with no deference afforded to the agency. *Loper Bright*, 144 S. Ct. at 2266 (emphasizing that the bounds of delegated authority are established in the statutory text, which has a "fixed" and discernable "single, best meaning") (quoting *Wis. Cent. Ltd. v. U.S.*, 585 U.S. 274, 284 (2018)); *Loper Bright*, 144 S. Ct. at 2261 ("[C]ourts, not agencies. . . decide '*all* relevant questions of law' arising on review of agency action.'") (quoting 5 U.S.C. § 706) (emphasis added in original). And the plain reading of the operative text of the FLSA is that the Secretary is limited to promulgating rules clarifying *duties* that an employee must perform to qualify for an EAP Exemption.[10]

Not only is such an expansive view of the authority to "define and delimit" unmoored from the text and structure of the FLSA, but it also cannot be squared with the major questions doctrine. The major questions doctrine requires courts to reject claims that Congress conferred regulatory authority on subjects of "vast economic and political significance" in the absence of a clear statement. *W. Va. v. Env't Prot. Agency*, 597 U.S. 697 (2022); *King v. Burwell*, 576 U.S. 473 (2015) (stressing that when Congress wants to delegate rulemaking authority on important issues, it does

---

[10] The Fifth Circuit's decision in *Wirtz v. Mississippi Publishers Corp.*, 364 F.2d 603, 608 (5th Cir. 1966) (Burger, J., sitting by designation), does not affect this analysis. *Wirtz* involved a challenge on arbitrary and capricious grounds. *Wirtz* merely concluded that a weekly salary requirement was not "arbitrary and capricious." *Id.* at 608. It is pre-*Chevron* and—most importantly, pre-*Loper Bright* precedent that does not speak to whether the DOL's salary level requirement is precluded by the plain meaning of the statutory text.

so "expressly"). Here DOL's claimed authority to establish salary level requirements implicates the major questions doctrine because the setting of compensation requirements represents a matter of tremendous economic and political concern, affecting millions of salaried white-collar workers and imposing significant costs on Texas taxpayers. 89 Fed. Reg 32880; *id.* at *32968*–69; *cf. Nevada I* at 530 n. 5 (invoking the major questions doctrine in declining to give *Chevron* deference to DOL's construction of the "define and delimit" language).

Nor does DOL's view of its own authority find footing in the ordinary canons of statutory construction. *See Loper Bright*, 144 S. Ct. at 2266 (noting how "traditional tools of statutory construction" are used to "resolve statutory ambiguities," including ambiguities "about the scope of an agency's own power," where deferring to an agency's self-serving view of its own authority is "*least* appropriate") (emphasis in original). For example, DOL's assertion that it has carte blanche in instituting salary thresholds conflicts with the negative-implication canon. *See Baptist Mem'l Hosp. - Golden Triangle, Inc. v. Azar*, 956 F.3d 689, 694 (5th Cir. 2020) ("[T]he canon of *Expressio Unius Est Exclusio Alterius* . . . provides that expressing one item of [an] associated group or series excludes another left unmentioned.") (internal marks omitted); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107–11 (2012) (explaining the doctrine).

Congress knows how to include salary levels when it wants to. *See* 29 U.S.C. 213(a)(19) (baseball players must be paid a salary level equal or greater than what they would be earning if working "40 hours" a week at "minimum wage"). Significantly, when Congress thought there should be a specific compensation level test or threshold for an overtime exemption, it explicitly said that too.  *See* 29 U.S.C. § 213(b)(24) (providing that FLSA overtime requirements do not apply to certain types of employees at nonprofit educational institutions "if such employee and his spouse reside in such facilities, receive, without cost, board and lodging from such institution*, and are together compensated, on a cash basis, at an annual rate of not less than $10,000*. . . ") (emphasis

added).[11] And when Congress wants to impose other compensation requirements in the FLSA, it has done that as well. *See* 29 U.S.C. § 206(a) (requiring that non-exempt employees must be paid at least "$7.25 an hour"); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

DOL may also argue that while the FLSA does not explicitly confer salary level rulemaking power to DOL, it does not explicitly prohibit it either. That may be true. But there is no longer any basis for *presuming* agency authority from statutory silence, or from deferring *in any way* to DOL's views. Rather, it is this Court, not DOL, that gets the final say on the scope of the Secretary's rulemaking authority. *See Loper Bright*, 144 S. Ct. at 2266 ("[A]gencies have no special competence in resolving statutory ambiguities. Courts do."); *id.* at 2273("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."). And for the reasons above, the Secretary's authority is cabined to defining and delimiting rules relating to duties, not salary. "Period." ECF 38 at 23 n. 21.

Ultimately, DOL's policy discretion is confined to the clear limits of its delegated authority. Indeed, "the question that matters [is]: Does the statute authorize the challenged agency action?" *Loper Bright*, 144 S. Ct. at 2269. Here, the answer to that question is "no." Rather, an objective interpretation of the operative text restricts DOL to issuing regulations solely regarding the duties that qualify an employee as exempt. Thus, the DOL has *no* authority to create a salary level test for EAP exemptions. After *Loper Bright*, that ends the inquiry, and the Rule should be vacated on that basis alone.

---

[11] The omission of a similar compensation amount in 29 U.S.C. § 213(a)(1) further demonstrates that Congress did not mean to hinge an employee's EAP status on a particular pay or salary level. This is especially true since Congress enacted Subsection (b)(24) in the same 1974 legislation that purported to extend the entirety of the FLSA to the States. *See* Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, 88 Stat. 55.

### D.  The Automatic Indexing Mechanism Violates the FLSA.

In the same way that DOL's salary level test is unlawful, so too is the automatic indexing mechanism. The Rule mandates automatic updates on July 1, 2027, and every three years thereafter. 89 Fed. Reg. at 32971 (adding 29 C.F.R. §§ 541.600(a)(3)). Yet as shown above, *supra* Part II(C), nothing in the text of Section 213(a)(1) authorizes the Secretary to set salary thresholds *at all*, let alone grants the authority to implement an indexing system that is tied to the impermissible, extratextual salary test. Indeed, DOL has previously admitted the statute it derives its authority from says nothing about automatic indexing. *See* 81 Fed. Reg. 32431 (Section 213(a)(1) "does not reference automatic updating. . . ."); *see also* 69 Fed. Reg. 22171–72 ("Further, the Department [found] nothing in the legislative or regulatory history that would support indexing or automatic increases.").

Even if the salary level test were permissible, the indexing mechanism is beyond DOL's statutory authority. The language of 29 U.S.C. § 213(a)(1) expressly mandates that the DOL "define[] and delimit[]" the meaning of the "executive, administrative, or professional" categories "from time to time by regulations of the Secretary." In *Nevada II*, the court found that because the 2016 Rule's salary level test was unlawful, the automatic update mechanism designed to implement and modify it every three years must also be unlawful. *Nevada II,* 275 F.Supp.3d at 807–08. This makes sense. Nothing in the FLSA authorizes the DOL to automatically update the salary level test's minimum salary based entirely on indexing tied to average salary levels, with *no* taking account of actual duties performed in setting the new salary cutoff. Indeed, any automatic changes three years down the road will not have anything to do with changes in duties vis-à-vis pay. The indexing is tied a percentile of average salary levels for all salaried employees, *regardless of duties*—nothing more and nothing less.

Beyond that, DOL is constrained by the authority expressly conferred on it by Congress. Here, the only power granted by Congress is the authority to define and delimit the exemption "from time to time by regulations. "The inclusion of this phrase shows unequivocally that Congress desired the DOL to engage in the promulgation of regulations through the lawful rule-

making process from "time to time." A directive to revisit an issue "from time to time" is exactly the opposite of the DOL's "set it and forget it" approach here—i.e., going through the rule-making process *one time* and then putting it on autopilot.[12]

In the end, DOL does not have authority to implement an automatic indexing mechanism at all. But even if automatic indexing was authorized by the statute, it fails for the same reasons DOL's setting of a salary threshold does:  salary supplants duties for EAP Exemption status.

## III.    The 2024 Overtime Rule Does Not Constitute Reasoned Rulemaking

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency acts arbitrarily and capriciously when it departs sharply from prior practice without reasonable explanation or disregards either alternatives to its action or the affected communities' reliance on the prior rule. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). The 2024 Overtime Rule's salary level increases and automatic index mechanism meet that description.

### A.  The New Salary Level Tests Are Arbitrary and Capricious.

Defendants' current use of the 20th percentile of weekly earnings of fulltime salaried workers in the lowest wage Census Region, and in the retail industry nationally, is arbitrary and capricious. It bears no relation to the statutory requirement that "*any* employee employed in a bona fide executive, administrative, or professional capacity" is exempt from the Overtime Rule, regardless of salary. The minimum salary level that kicks in on January 1, 2025, based on the 35th percentile of weekly earnings of fulltime salaried workers in the lowest wage Census Region, and

---

[12] Beyond that, Congress clearly knows how to expressly authorize indexing when that is what it wants to do, including in the labor context. *See, e.g.,* 29 U.S.C. § 1083(c)(7)(D)(vii) (indexing amount of excess employee compensation related to "Minimum funding standards for single employer defined benefit pension plans"); *see also* 16 U.S.C. § 497c(b)(3); 43 U.S.C. § 1337(a)(3)(C)(vii). The absence of explicit language authorizing indexing in the EAP exemption's text, especially considering other indexing statutes, establishes that even if Congress had authorized a salary level test (which it did not), it never authorized indexing to evade the requirement to define and delimit the exemption "from time to time by regulation."

in the retail industry nationally, is also arbitrary and capricious for that reason—it bears no relation to the statutory requirement that "*any* employee employed in a bona fide executive, administrative, or professional capacity" is exempt from the Overtime Rule, regardless of salary.

The January 1, 2025, minimum salary level is arbitrary and capricious for additional reasons. *First*, it is based an invalid mathematical formula applied to the arbitrary and capricious 20th percentile rule and pre-2004 practice. Defendants essentially argue, as they did in the 2016 Rule, that the 2004 Rule used bad math when it eliminated the two duties tests with the two different minimum salary levels. Defendants' choice of the 35th percentile seems to be based on nothing more than the fact that the "short duties" salary level used to be approximately 149% of the "long duties" salary level, and 35 is close enough to 149% of 20 (it is 175% higher). But the 2004 Rule's 20th percentile level was based on an entirely different salary base than the pre-2004 "long duties" salary base, making this comparison irrelevant.

*Second*, the January 1, 2025, minimum salary level disregards the affected communities' reliance on the prior rule and will make millions of employees non-exempt, requiring either increases in salaries or overtime pay and additional paperwork. The methodology of the 2024 Rule increases the historical benchmark applied almost universally in the past by 75 years without meaningfully grappling with any reasoning for doing so. *See Encino Motorcars, LLC*, 136 S. Ct. at 2125–26 ("In explaining its changed position, an agency must . . . be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account . . . . [A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.").

But above all, when this Court set aside the minimum salary levels in the 2016 Rule, it was unconcerned about how DOL came up with that number. Rather the Court held that the minimum salary for the EAP Exemption—however derived— "essentially make[s] an employee's duties, functions, or tasks irrelevant if the employee's salary falls below the new minimum salary level." *Nevada II* at 806. In other words, *any* percentile would have failed unless it resulted in a salary level '"somewhere near the lower end of the range of prevailing salaries"' and that '"screen[ed] out

the obviously nonexempt employees."' *Nevada II* at 806 (quoting Weiss Report at 7–8, 11–12). So too here, this Court should set aside the 2024 Rule's minimum salary level because, like the 2016 Rule, it "would exclude so many employees who perform exempt duties, [which shows that Defendants] fail[ed] to carry out Congress's unambiguous intent." *Nevada II* at 807.

*Wirtz*, 364 F.2d 603, does not change this analysis. *Wirtz* involved a challenge on arbitrary and capricious grounds to the DOL's salary level test *in the 1963 regulation* (when the salary level was $100 per week).[13] That case did not present the statutory question at issue here, which is whether DOL may raise its previous minimum salary threshold to a level so high it can no longer serve as a plausible proxy for the statutory categories set forth by Congress. *See* ECF 38 at 20 (noting *Wirtz* "concluded that [DOL's] creation of a salary-level component falls within the bounds of the EAP Exemption's statutory text *when appropriately set*") (emphasis added). Indeed, the Rule increases the salary test even higher than the DOL's previous 2019 Rule, and further removes salary level from its role as a proxy in identifying non-exempt employees. In other words, it presents even more of a "de facto salary-only test." *Nevada I* at 531, with an even greater minimum salary percentile increase (20th to 35th) than was present in previous Rules. *See* 89 Fed. Reg. at 32971.

For these reasons, beyond being contrary to law, DOL's salary level tests are arbitrary and capricious. The Rule should be vacated.

### B.  The Automatic Index Mechanism is Arbitrary and Capricious.

The indexing mechanism is arbitrary and capricious for the same reasons it conflicts with the plain language of 29 U.S.C. § 213(a)(1). *See supra* Part II(D). With certain exceptions that do not apply here, the APA mandates that all agency rulemaking must undergo the notice and

---

[13] Even assuming *Wirtz* had grappled with whether DOL's salary level requirement is precluded by the plain meaning of the statutory text, *supra* n.10, "Wirtz's approval of the [DOL's] salary thresholds that were in effect over fifty years ago cannot be extended to bless *any and all* salary thresholds adopted by [DOL]." ECF slip 38 at 21 (emphasis in original).

comment process. 5 U.S.C. § 553. Further, when making a regulatory change, the agency is required to provide adequate reasons for its decision. *See Encino Motorcars, LLC*, 136 S. Ct. at 2125("The agency must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." (quotations omitted). An agency's failure to provide any analysis renders its actions invalid. *Id*.

The indexing method of the Rule aims to automatically adjust the salary level test every three years, circumventing the notice and comment process. Historically, the DOL aligned with the APA in maintaining that changes to the salary level test should be based on data. *See* 69 Fed. Reg. 22171 ("The salary levels should be adjusted when wage survey data and other policy concerns support such a change."). But now the salary level will rise mechanically every three years without critical examination of the necessity or justification for the increase, and without input from the States or other affected parties. Indeed, in prior iterations of the Rule, DOL did not hide its desire to use the automatic updates to salary level to dispense with "frequent rulemaking." 81 Fed. Reg. at 32400. Even though the salary level test is itself a shortcut around the statutorily required examination of the duties performed in the workplace, the DOL has seemingly decided that setting the salary level through notice and comment is still too arduous and "time" and "resource intensive." 81 Fed Reg. 32435; 89 Fed. Reg. 32858.

But the APA's notice and comment provisions must be followed regardless of whether an agency finds them inconvenient. *See U.S. Steel Corp. v. E.P.A.*, 595 F.2d 207, 214 (5th Cir. 1979) (discussing 5 U.S.C. § 553(b)(B)); *Tex. Med. Assn. v. U.S. Dept. of Health and Human Services*, 2023 WL 4977746, at *9 (E.D. Tex. Aug. 3, 2023) (finding agency "lacked good cause to bypass notice and comment."). Any increase in the salary level must be based upon the comments submitted and the facts and information existing at the time of the increase. The DOL cannot lawfully put salary level test on autopilot and effectively immunize itself from the APA notice and comment process. Because that it was the automatic index provision does, the Rule runs "contrary to law" and must be "set aside." 5 U.S.C. § 706(2)(A).

IV.    **In the Alternative, the 2024 Overtime Rule Represents an Unlawful Delegation of Congressional Power.**

Nondelegation inquiries "always begin[ ]. . . with statutory interpretation" because the constitutional question is whether Congress has supplied a sufficiently intelligible principle to guide an agency's discretion. *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality op.). Should this Court determine that the statutory construction of § 213(a)(1) is broad enough to permit a salary level test, that very broad construction violates the nondelegation doctrine. Article One, Section One of the Constitution states, "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." The text does not permit delegation of those powers. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). The grant of power is exclusive to Congress and absolute. *See Dep't of Transp. v. Ass'n of Am. Railroads*, 135 S. Ct. 1225, 1241 (2015) (Thomas, J., concurring).

"Vague congressional delegations undermine representative government because they give unelected bureaucrats—rather than elected representatives—the final say over matters that affect the lives, liberty, and property of Americans." *Consumers' Research v. Fed. Commun. Comm'n*, 2024 WL 3517592, at *10 (5th Cir. July 24, 2024). If the Court determines that 29 U.S.C. § 213(a)(1) is so broad and ambiguous that the "clear statement" rule does not foreclose DOL's authority to impose a salary-level test and indexing mechanism, *cf. supra* Part II–C, D, the statute unconstitutionally delegates legislative authority. Any proposed salary-level test must come as a result of properly exercised legislative power. The Constitution's separation-of-powers structure does not allow DOL to impose upon the states a salary-level test that increases every three years and outstrips the statutorily authorized duties test when § 213(a)(1) speaks exclusively of "capacity" and "activities."

Some sort of guidepost or limiting factor must exist to cabin an agency's interpretation of Congress's delegated authority—otherwise, there would be no limits whatever, and Congress would be unconstitutionally delegating its legislative authority to the agencies. Congress must at least "'lay down by legislative act an intelligible principle to which the person or body authorized

to [act] is directed to conform.'" *Whitman,* 531 U.S. at 472 (citations omitted) (alteration in original). There is no 'intelligible principle' in the statute that supports the salary-level test or the indexing mechanism. And DOL should not be allowed to act as a fourth branch of government. *See Consumers' Research*, 2024 WL 3517592 at *32 (Ho, J., concurring) ("Our Constitution establishes three branches of government, not four."). Thus, under either the plain meaning of the statute or under separation of powers principles, the salary level test cannot stand.

## V.    Regardless, the Tenth Amendment Bars Congress from Applying the Salary Level Test to the States.

The Tenth Amendment provides that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or the People." U.S. Const. amend. X. DOL's new overtime rule violates the Tenth Amendment because it invades a core element of State sovereignty—setting the wages it pays its employees—and commandeers States to carry out federal policy. In *Nat'l League of Cities v. Usery*, the United State Supreme Court held that the Tenth Amendment limited Congress's power to apply the FLSA's minimum wage and overtime protections to the States because:

> One undoubted attribute of state sovereignty is the States' power to determine the wages which shall be paid to those whom they employ in order to carry out their governmental functions, what hours those persons will work, and what compensation will be provided where these employees may be called upon to work overtime.

426 U.S. 833, 845 (1976). DOL overtime rule infringes on the very core of state sovereignty recognized in *Usery*. Texas acknowledges that the Supreme Court overruled *Usery* in *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985). However, subsequent decisions have called *Garcia*'s continuing validity into question, and Texas makes this argument here to preserve it for review by a court with authority to overrule *Garcia* and reinstate *Usery. See, e.g., Agostini v. Felton*, 521 U.S. 203, 237 (1997) (noting that lower courts must follow precedent and allow the Supreme Court to overturn Supreme Court precedent).

Even were Texas to accept *Garcia* as the final word on whether "traditional" government

functions should offer guidance in determining the boundaries of federal and state power, *Garcia*, 469 U.S. at 554, the anti-commandeering doctrine still offers an opportunity for this Court to find that the Tenth Amendment bars the FLSA from imposing minimum wage and overtime requirements—or at least a salary level test—on the States.  "Whatever the outer limits of [state] sovereignty might be, one thing is clear: The Federal Government may not compel the States to enact or administer a federal regulatory program." *N.Y. v. U.S.*, 505 U.S. 144, 188 (1992). States cannot be dragooned or commandeered into enacting or administering federal regulatory programs at their own expenses. *See Printz v. U.S.*, 521 U.S. 898, 925-29 (1997). Here, DOL's overtime rule does precisely this—it dragoons States into administering a regulatory program at great expense to their budgets. This Court could find, without overruling *Garcia*, that the FLSA's overtime rule violated the Tenth Amendment under the anti-commandeering doctrine.

In addition, Supreme Court precedent has held that the Tenth Amendment requires a 'clear statement' when Congress intends to abrogate state power. The post-*Garcia* Court specifically held that where States present federal exercises of power that usurp traditional state authority, "we must be absolutely certain that Congress intended such an exercise." *Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991). '"[T]o give the state-displacing weight of federal law to mere congressional ambiguity would evade the very procedure for lawmaking on which *Garcia* relied to protect states' interests."' *Id.* (quoting L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 6-25, p. 480 (2d ed. 1988)). "This plain statement rule is nothing more than an acknowledgement that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Evans v. U.S.*, 504 U.S. 255, 291-92 (1992) (citing *Garcia*).

Although Texas believes the 'clear statement' rule should prohibit the application of the FLSA to the states altogether, it far more obviously prohibits the salary level test. In the aftermath of *Chevron*'s demise, courts will look to new statutory construction tools for evaluating the appropriate level of agency deference. The "clear statement" rule provides just such a tool. For the reasons argued above, *see supra* Part II–C, D, the plain language of the statute is a "clear

statement" *against* a salary level test, and at the very least a "clear statement" against a salary level test that excludes large numbers of bona fide EAP employees from the exemption and bears little relation to the duties the employees perform. The salary level test therefore also violates the Tenth Amendment because Congress has not expressly communicated its intention to impose a salary test on the States.

## CONCLUSION

For each of the reasons articulated above, Texas respectfully requests that this Court grant this motion for expedited summary judgment on all counts of Texas's Complaint; hold the 2024 Overtime Rule unlawful; vacate and set aside the 2024 Overtime Rule pursuant to 5 U.S.C. § 706 of the APA; permanently enjoin Defendants from enforcing the 2024 Overtime Rule against Texas and nationwide.

Date: July 25, 2024                     Respectfully submitted.

**KEN PAXTON**                          /s/*KATHLEEN T. HUNKER*
Attorney General                        **KATHLEEN T. HUNKER**
                                        Special Counsel
**BRENT WEBSTER**                       Tex. State Bar No. 24118415
First Assistant Attorney General
                                        **SUSANNA DOKUPIL**
**RALPH MOLINA**                        Special Counsel
Deputy Attorney General for Legal Strategy   Tex. State Bar No. 24034419

**RYAN D. WALTERS**                     **GARRETT GREENE**
Chief, Special Litigation Division      Special Counsel
                                        Tex. State Bar No. 24096217

                                        **MUNERA AL-FUHAID**
                                        Special Counsel
                                        Tex. State Bar No. 24094501

                                        OFFICE OF THE ATTORNEY GENERAL
                                         OF TEXAS
                                        Special Litigation Division
                                        P.O. Box 12548, Capitol Station
                                        Austin, Texas 78711-2548
                                        Tel.: (512) 463-2100
                                        Ryan.Walters@oag.texas.gov
                                        Munera.Al-fuhaid@oag.texas.gov
                                        Susanna.Dokupil@oag.texas.gov
                                        Kathleen.Hunker@oag.texas.gov

                                        **COUNSEL FOR STATE OF TEXAS**

**CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2024, a true and accurate copy of the foregoing Motion for Summary Judgment was electronically filed in the above-captioned matter with the Clerk of the Court, utilizing the CM/ ECF system, which served all counsel of record electronically.

/s/ *Kathleen T. Hunker*
Kathleen T. Hunker