IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | § | CIVIL ACTION NO. 4:24-CV-00499-SDJ |
| *Plaintiffs,* | § | LEAD CASE |
| | § | |
| PLANO CHAMBER OF COMMERCE, *et al.,* | § | |
| *Cons. Plaintiffs,* | § | CIVIL ACTION NO. 4:24-CV-00468-SDJ |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES DEPARTMENT OF LABOR, JULIE A. SU, in her Official Capacity as United States Secretary of Labor, THE WAGE AND HOUR DIVISION OF THE DEPARTMENT OF LABOR, and JESSICA LOOMAN, in her Official Capacity as Administrator of the Wage and Hour Division, | § | |
| *Defendants.* | | |

### AMICUS BRIEF OF ARKANSAS AND 13 OTHER STATES IN SUPPORT OF THE STATE OF TEXAS'S MOTION FOR SUMMARY JUDGMENT

The Fair Labor Standards Act exempts employees who are employed in an "executive, administrative, or professional capacity"—so-called EAP employees—from overtime pay. 29 U.S.C. 213(a)(1). For decades the Department of Labor used a low salary threshold to screen out obviously nonexempt employees. But its new definition of EAP status, which increases the existing threshold by a third *after* adjusting for inflation, removes millions of employees from exemption who the Department concedes would otherwise satisfy its own job-duties test for exemption. That redefinition violates the statute. EAP status, by its terms, turns on an employee's duties, not his salary. Salary thresholds may, if set low enough, be a reliable proxy for employees who do not perform EAP duties, but the Department admits that isn't the case here; if it were, the new salary threshold wouldn't result in millions of formerly exempt employees becoming

non-exempt. The Department's rule violates the FLSA and must be vacated. And that unlawful rule directly impacts the amici States of Arkansas, Alabama, Georgia, Idaho, Indiana, Iowa, Louisiana, Mississippi, Montana, Nebraska, Ohio, Oklahoma, South Carolina, and West Virginia.

The Department doesn't claim that the EAP exemption is best read to impose a salary requirement; it merely claims the Court should defer to its choice to create one because the FLSA expressly delegates authority to define and delimit EAP status to the Department. But as the Supreme Court's decision overruling *Chevron* explains—and pre-*Chevron* FLSA cases interpreting similar delegations of authority illustrate—even when an agency has expressly delegated authority, courts review de novo whether agencies' exercise of that authority exceeds the scope of the delegation. Only after courts make that determination de novo is deference to the specifics of an agency's definitional line-drawing appropriate. Accordingly, this Court must decide de novo whether the Department has authority to redefine EAP status in terms of a predominantly salary-based test. And the answer to that question is clearly no.

## ARGUMENT

1. The Department of Labor's new definition of EAP status substantially increases the minimum salary threshold for qualifying as an EAP, disqualifying millions of employees from exemption on the basis of their salary alone. For 20 years, with the brief exception of the Department's invalidated 2016 rule, the salary threshold for EAP status was set at the 20th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census region. *See* Doc. 38 at 5, 8. That is, just a fifth of full-time salaried workers, even in the lowest-wage region, were screened out by the salary threshold. That test served the "modest purpose" of "screening out obviously nonexempt employees," 84 Fed. Reg. 51,230, 51,238 (Sept. 27, 2019), "thus tending to reduce litigation" about employees whose jobs wouldn't satisfy the Department's more

complex duties test even absent a salary threshold, *id.* at 51,237 (quoting Harry Weiss, *Report and Recommendations on Proposed Revisions of Regulations, Part 541*, 8 (1949)).

Under the Department's new rule, however, salary is no longer a modest screening device. Where past EAP definitions screened out just a fifth of employees in the lowest-wage Census region, the new rule's salary threshold is set at the 35th percentile of weekly earnings in that region—screening out over a third of employees. 89 Fed. Reg. 32,842, 32,845 (Apr. 26, 2024). The result is that three million workers who would otherwise be exempt from overtime by virtue of their duties will be non-exempt, *id.* at 32,843—resulting in transfers from employers to employees of $1.5 billion a year, *id.* at 32,844.

As this Court held in its opinions in *Nevada v. Department of Labor* and in its preliminary-injunction opinion here, removing millions of otherwise non-exempt workers from the EAP exemption solely on the basis of their salary violates the EAP exemption. That exemption exempts "any employee employed in a bona fide executive, administrative, or professional capacity" from minimum wage and overtime requirements. 29 U.S.C. 213(a)(1). The terms of that exemption plainly "concern an employee's duties—not his salary." Doc. 38 at 19. However much an employee makes, if he is employed in one of the enumerated capacities, he is exempt. Set at a sufficiently low level, a salary threshold may serve as a reliable proxy for those duties and, by setting a bright-line rule, avoid unnecessary litigation about employees whose duties would not qualify for exemption. But by the Department's own admission, its new salary threshold does much more than that. Instead, it will make non-exempt millions of employees who *are* employed in an EAP capacity under the Department's duties test. Because the Department has no power to subtract from Section 213's exemptions and render millions of workers employed in an EAP capacity nonexempt, the Department's rule is invalid.

That is even clearer now that *Chevron* has been overruled.  When this Court held in *Nevada* that the Department of Labor could not make EAP "status depend predomina[nt]ly on a minimum salary level," 275 F. Supp. 3d 795, 806 (E.D. Tex. 2017), *Chevron* was still the law.  So in rejecting the Department's interpretation, this Court held—as it had to under *Chevron*— that the EAP exception unambiguously applied to employees who perform EAP duties regardless of salary, and that the Department's interpretation was not a reasonable interpretation of the statute.  *Id.* at 805-08.  But by the time the Court granted preliminary relief in this case, *Chevron* had been overruled.  *See* Doc. 38 at 12 (citing *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024)).  So, this Court explained, Texas's burden had become much lighter; it only needed to persuade the Court that, in the Court's "independent judgment," the Department had not "acted within its statutory authority."  *Id.* (quoting *Loper Bright*, 144 S. Ct. at 2273).  This Court held Texas was likely to succeed under that standard.

Yet the Department of Labor still claims that even though *Chevron* has been overruled, *Chevron*-style deference still applies to the EAP exception.  In supplemental briefing on *Loper Bright* to the Fifth Circuit in *Mayfield v. Department of Labor*, the Department has argued that while *Chevron* rested on a now-rejected presumption of implicit delegation to agencies to resolve ambiguities, *Loper Bright* allowed for the possibility of express delegations in particular statutes; that the EAP exemption contains an express delegation to the Department to define EAPs; and that courts therefore must uphold its definition unless it is clearly "foreclosed" by the statute.  Supplemental Brief for Appellees at 5, *Mayfield v. U.S. Dep't of Labor*, No. 23-50724 (5th Cir. July 15, 2024).

The Department is correct that the EAP exemption expressly delegates the authority to craft a specific definition of EAP status to the Secretary.  *Compare Loper Bright Enters.*, 144 S.

Ct. at 2263 & n.5 (citing 29 U.S.C. 213(a)(15)'s overtime exception, which exempts those employed on a casual basis in companionship services "as such terms are defined and delimited by . . . the Secretary," as an example of an "express[] delegat[ion]") *with* 29 U.S.C. 213(a)(1) (exempting employees employed in EAP capacities "as such terms are defined and delimited . . . by . . . the Secretary"). But finding an express delegation in a statute does not resurrect *Chevron* in miniature. Instead, if a statute delegates the authority to define a term to an agency, courts decide de novo whether the agency's definition is consistent with the ordinary meaning of that term. Only if the answer is yes do courts defer to the details of the agency's definitional line-drawing. That's what *Loper Bright* says, and that's what the Supreme Court's pre-*Chevron* cases interpreting similar express delegations in the same statute at issue here say.

*Loper Bright* acknowledged that when courts independently interpret statutes, they "may well" conclude that "the statute's meaning . . . [is] that the agency is authorized to exercise a degree of discretion." 144 S. Ct. at 2263. Specifically, "some statutes 'expressly delegate' to an agency the authority to give meaning to a particular statutory term." *Id.* (alteration omitted) (quoting *Batterton v. Francis*, 432 U.S. 416, 425 (1977)). And, as the Department will no doubt note, the Court listed as an example of an express delegation a FLSA overtime exception with similar "defined and delimited" language to the one at issue here. *Id.* at 2263 n.5 (citing 29 U.S.C. 213(a)(15)).

Yet the Court hastened to add that even "[w]hen the best reading of a statute is that it delegates discretion[]" to an agency, a court's interpretation of such a statute should not be deferential. 144 S. Ct. at 2263. Instead, even when interpreting those statutes, "the role of the reviewing court . . . is, as always, to independently interpret the statute" and "fix[] the boundaries of the delegated authority." *Id.* (alteration omitted) (quoting Henry Monaghan, *Marbury and the*

5

*Administrative State*, 83 Colum. L. Rev. 1, 27 (1983)).  The Court made this point repeatedly throughout *Loper Bright*—saying that even when Congress does "confer discretionary authority on agencies," courts still must "independently identify . . . such delegations of authority [and] police the[ir] outer statutory boundaries," *id.* at 2268—and that "when a particular statute delegates authority to an agency," courts must "ensur[e] that the agency acts within" that delegation, *id.* at 2273.  Deference to how an agency exercises its delegated authority only arises after a court decides that an agency has acted within that authority in the first place.

What that means here is that—express delegation notwithstanding— this Court must decide without deference whether the Secretary's power to define EAP status includes the power to impose a predominantly salary-based test.  Only if the answer were yes could the Court defer to the particular salary limit the Secretary chose.  The Supreme Court's pre-*Chevron* FLSA cases aptly illustrate how this works.

As originally enacted, the FLSA contained an exception for individuals engaged in canning farm goods, but only if they were "employed within [those goods'] area of production (*as defined by the Administrator* [of the Wage and Hour Division])." *Addison v. Holly Hill Fruit Prods.*, 322 U.S. 607, 612 n.4 (1944) (emphasis added) (quoting 29 U.S.C. 213(a)).  Like the overtime exception here, that exception delegated the authority to define its key terms to the agency.  For the most part, the Administrator's regulations defined the "area of production" geographically, and the Supreme Court deferred to the specifics of those definitions.  For example, it upheld the Administrator's rule that all of the goods at a cannery must come from within 10 miles, reasoning that when "there is no mathematical or logical way of fixing [the line] precisely, the decision of the Administrator must be accepted unless . . . it is very wide of any reasonable mark." *Id.* at 611 (alteration omitted) (quoting *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S.

6

32, 41 (1928) (Holmes, J., dissenting)). Likewise, it upheld a definition that excluded cities from the area on the theory that the exception was intended to capture farmland workers. *See Mitchell v. Budd*, 350 U.S. 473 (1956).

However, when the Administrator attempted to stretch his authority by partly defining the "area of production" in terms of a cannery's number of employees, *see Addison*, 322 U.S. at 609, the Court pushed back. "The textual meaning of 'area of production,'" it explained, "calls for delimitation of territory," *id.* at 613-14, and "restricted the Administrator to the drawing of geographic lines," *id.* at 619. It didn't encompass distinctions "between smaller and bigger establishments within the zone of agricultural production," *id.* at 614, especially given that in other exemptions Congress expressly "referred to [the] quantity" of employees, *id.*

Notably, the Court didn't ask whether the statute was ambiguous, or whether the Administrator's reading was reasonable. If that had been the standard, it might have sided with the Administrator. For as the dissent explained, in gerrymandering large canneries out of the area, the Administrator *was* drawing geographic lines of a sort, *see id.* at 636 (Rutledge, J., dissenting), "between farm workers . . . and industrial labor," *id.* at 630, which was arguably the exemption's purpose. Instead, the Court simply asked whether the "textual meaning" of the statute, best read, allowed the Administrator to consider cannery size. *Id.* at 613; *see also id.* at 617, 618 (stating the Administrator's reading was "outside the bounds of the [statute's] normal meaning" and its "ordinary sense"). The Court explained why the Administrator wasn't owed deference on that point. Though the Administrator had delegated authority to define the area, "[t]he determination of the *extent* of authority given to a delegated authority by Congress is not left for the decision of him in whom authority is vested." *Id.* at 616 (emphasis added). That antecedent question about

7

whether the Administrator had the power to define the area in terms of cannery size was for the courts alone.

The interpretive approach in *Addison* confirms the correctness of this Court's interpretive approach in its preliminary-injunction ruling. *Addison* acknowledged that the Administrator had broad discretion to define the area of production so long as he stuck to geography, but it decided whether the Administrator could go beyond drawing geographical lines de novo. Likewise, this Court acknowledged that "the Secretary has broad latitude to define and delimit" EAP status, Doc. 38 at 19 n.15 (internal quotation marks omitted), so long as its definition "center[ed] on duties," *id.* at 20. But it appropriately reserved for itself the threshold legal question of whether the Secretary could predominantly define EAP status in terms of salary, explaining the Secretary's "definition and delimitation cannot be at odds with the text," *id.* at 19 n.15.

*Addison* also confirms the correctness of this Court's reading of the EAP exception. *Addison* held that in defining the area of production, the Administrator couldn't consider factors that were foreign to the ordinary meaning of "area." Likewise, this Court held that in defining EAP status, the Secretary can't predominantly rely on factors, like salary, that are foreign to the ordinary meaning of the EAP exemption's "operative terms." Doc. 38 at 19. Finally, *Addison*'s reliance on the contrast between overtime exceptions that did mention employer size and the area-of-production exception, which did not, also supports this Court's reading of the EAP exception. For the EAP exception, in which "any mention of salary" is "[g]laringly absent," *id.* at 17, contrasts with a number of exceptions that expressly refer to salary, sometimes in specific dollar amounts, *see* 29 U.S.C. 213(a)(6), (16), (17), (19). Just as "Congress referred to quantity when it desired to legislate on the basis of quantity," *Addison*, 322 U.S. at 614, Congress referred

8

to salary when it desired to legislate on the basis of salary. The Department's transformation of a duties-based exemption into a predominantly salary-based one is invalid.

2. At the preliminary-injunction stage, this Court acknowledged that were Texas to ultimately prevail in its APA challenge, the "default remedy" under Fifth Circuit precedent would be a "nationwide" vacatur. Doc. 38 at 32 n.28 (quoting *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 951, 952 (5th Cir. 2024)). The Court, however, limited the relief it granted at the preliminary-injunction stage to Texas because Texas had not offered evidence of harm to other employers. *Id.* at 32-33. At this stage of the case, such evidence is no longer needed for nationwide relief; while Section 705 of the APA "provides the Court with substantial discretion to fashion a preliminary remedy," *id.* at 32, "Section 706 . . . provides that a 'reviewing court *shall*' set aside unlawful agency action." *Braidwood Mgmt., Inc.*, 104 F.4th at 952 (quoting 5 U.S.C. 706(2)); *see also Corner Post, Inc. v. Bd. of Govs. of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2467 (Kavanaugh, J., concurring) ("The text of § 706(2) directs federal courts to vacate agency actions in the same way that appellate courts vacate the judgments of trial courts.").

However, were there any doubt, Texas is unsurprisingly far from the only employer harmed by the Secretary's unlawful action. Amici States are as well. Indeed, the rule's increase in the salary threshold hits States particularly hard because of the lower salaries they pay relative to the private sector. Where the rule affects approximately 15% of all workers, its increase in salary threshold captures 9,540 of the State of Arkansas's 30,504 workers, or approximately 31% of the State's workforce. *See* Ark. Dep't of Fin. & Admin., *Employee Compensation Overview* (Jul. 31, 2024), https://perma.cc/XW9U-R2ED. Removing so much of the State's workforce out of eligibility for EAP status would not only impose significant costs on the State in the form of increased wages, but also, by preventing those employees from working over 40 hours in a week

9

unless they are paid time-and-a-half, deprive the State "of the benefit of the additional labor those employees otherwise would have performed." Doc. 38 at 28.

## CONCLUSION

The Court should grant Texas's motion for summary judgment and vacate the Department's rule.

Dated: August 1, 2024

Respectfully submitted,

TIM GRIFFIN
  Arkansas Attorney General

NICHOLAS J. BRONNI
  Arkansas Solicitor General

ASHER L. STEINBERG
  Senior Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-1051
(501) 682-7395 (fax)
asher.steinberg@arkansasag.gov

*Counsel for Amici States of Arkansas, et al.*

**ADDITIONAL STATES REPRESENTED**

STEVE MARSHALL
Alabama Attorney General

CHRIS CARR
Georgia Attorney General

RAÚL R. LABRADOR
Idaho Attorney General

THEODORE E. ROKITA
Indiana Attorney General

BRENNA BIRD
Iowa Attorney General

LIZ MURRILL
Louisiana Attorney General

LYNN FITCH
Mississippi Attorney General

AUSTIN KNUDSEN
Montana Attorney General

MICHAEL T. HILGERS
Nebraska Attorney General

DAVE YOST
Ohio Attorney General

GENTNER DRUMMOND
Oklahoma Attorney General

ALAN WILSON
South Carolina Attorney General

PATRICK MORRISEY
West Virginia Attorney General

## CERTIFICATE OF SERVICE

I certify that on August 1, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

/s/ *Asher L. Steinberg*
Asher L. Steinberg