**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

|  |  |
|---|---|
| STATE OF TEXAS,<br><br>            Plaintiff, | Case No. 4:24-cv-499-SDJ<br>(Lead Case) |
| PLANO CHAMBER OF COMMERCE *et al.*,<br><br>            Plaintiffs, | Case No. 4:24-cv-468-SDJ |
|       v.<br><br>U.S. DEPARTMENT OF LABOR *et al.*,<br><br>            Defendants. | |

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS AND REPONSE TO
    PLAINTIFFS' STATEMENTS OF MATERIAL FACTS ................................................. 3

I.     Statutory Background ................................................................................................. 3

II.    Pre-2024 Regulatory History ................................................................................... 5

III.   2024 Final Rule ........................................................................................................ 9

LEGAL STANDARD ....................................................................................................... 11

ARGUMENT .................................................................................................................... 12

I.     The Court Must Analyze Each Change to the Salary Level Individually ...................... 12

II.    The Department Has the Statutory Authority to Use a Minimum Salary Level to
      Help Define and Delimit the Exemption for EAP Employees. ...................................... 14

      A.     The Fifth Circuit has already upheld the Department's authority to use a
            salary level test .................................................................................................. 15

      B.     The salary level test is wholly consistent with the FLSA. ................................. 16

      C.     Congress has ratified the salary level test. ........................................................ 22

III.   The Wage Growth Update Is Lawful. ....................................................................... 25

IV.   The January 1 Salary Level Methodology Is Lawful ...................................................... 26

V.     The Updating Mechanism Is Lawful. ....................................................................... 31

VI.   The Department Engaged in Reasoned Decisionmaking ................................................ 35

VII.  The Rule Reflects a Lawful Delegation. ................................................................... 39

VIII. Texas's Tenth Amendment Argument Lacks Merit. ................................................. 43

IX.   Any Relief Must Be Tailored ....................................................................................... 45

CONCLUSION .................................................................................................................. 49

# TABLE OF AUTHORITIES

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States,*
   295 U.S. 495 (1935) ................................................................................................. 40

*Alabama v. Cardona,*
   No. 7:24-cv-533-ACA, 2024 WL 3607492 (N.D. Ala. July 30, 2024) .................. 12

*Alenco Commc'ns, Inc. v. FCC,*
   201 F.3d 608 (5th Cir. 2000) .................................................................................. 35

*Alliance. Texas Med. Ass'n v. U.S. Dep't Health & Hum. Servs.,*
   No 23-cv-40217, 2024 WL 3633795 (5th Cir. Aug. 2, 2024) ................................ 46

*Alstate Constr. Co. v. Durkin,*
   345 U.S. 13 (1953) .................................................................................................. 23

*Am. Iron & Steel Institute v. Occupational Safety & Health Admin.,*
   939 F.2d 975 (D.C. Cir. 1991) ................................................................................ 48

*Am. Power & Light Co. v. SEC,*
   329 U.S. 90 (1946) ............................................................................................ 41, 43

*Am. Stewards of Liberty v. Dep't of the Interior,*
   370 F. Supp. 3d 711 (W.D. Tex. 2019) .................................................................. 12

*Am. Waterways Operators v. Wheeler,*
   507 F. Supp. 3d 47 (D.D.C. 2020) .................................................................... 47, 48

*Amusement & Music Operators Ass'n v. Copyright Royalty Tribunal,*
   676 F.2d 1144 (7th Cir.) .................................................................................... 33, 34

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ................................................................................................ 12

*Big Time Vapes, Inc. v. FDA,*
   963 F.3d 436 (5th Cir. 2020) ............................................................................ 40, 41

*Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.,*
   419 U.S. 281 (1974) ................................................................................................ 35

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ................................................................................................ 48

*Cargill v. Garland,*
   57 F.4th 447 (5th Cir. 2023) (en banc) .................................................................. 46

*Central & S.W. Servs., Inc. v. EPA,*

220 F.3d 683 (5th Cir. 2000) ............................................... 46

*CFTC v. Schor*,
478 U.S. 833 (1986) ............................................................ 24

*Chamber of Com. of the U.S. v. CFPB*,
691 F. Supp. 3d 730 (E.D. Tex. 2023) ............................... 47

*Consumers' Research v. FCC*,
No. 22-60008, 2024 WL 3517592 (5th Cir. July 24, 2024) (en banc) ................................... 43

*Costanzo v. Tillinghast*,
287 U.S. 341 (1932) ............................................................ 24

*Data Mktg. P'ship LP v. U.S. Dep't of Labor*,
45 F.4th 846 (5th Cir. 2022) .............................................. 46

*Defense Council, Inc.*,
467 U.S. 837 (1984) ............................................................. 1

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ............................................................ 38

*Epsilon Elecs., Inc. v. Dep't of Treasury*,
857 F.3d 913 (D.C. Cir. 2017) ........................................... 13

*Fanelli v. U.S. Gypsum Co.*,
141 F.2d 216 (2d Cir. 1944) ................................... 15, 24, 42

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ..................................................... 38-39

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024) .................................................... 46, 47

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ........................................................... 12

*Garcia v. San Antonio Metropolitan Transit Authority*,
469 U.S. 528 (1985) .................................................... 43, 44

*Gill v. Whitford*,
585 U.S. 48 (2018) ............................................................. 48

*Global Van Lines, Inc. v. ICC*,
714 F.2d 1290 (5th Cir. 1983) ........................................... 34

*Gundy v. United States*,
588 U.S. 128 (2019) ........................................................... 40

*Hamilton v. Segue Software Inc.*,

232 F.3d 473 (5th Cir. 2000) .............................................. 11

*Hasie v. Off. of Comptroller of Currency of U.S.*,
633 F.3d 361 (5th Cir. 2011) ........................................ 35, 38

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944) .......................................................... 47

*Knapp v. U.S. Dep't of Agric.*,
796 F.3d 445 (5th Cir. 2015) .......................................... 35

*Labrador v. Poe*,
144 S. Ct. 921 (2024) ........................................................ 48

*Lewis v. Casey*,
518 U.S. 343 (1996) .......................................................... 48

*Lichter v. United States*,
334 U.S. 742 (1948) .......................................................... 40

*Long Island Care at Home, Ltd. v. Coke*,
551 U.S. 158 (2007) .................................................... 17, 18

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024) ............................................... *passim*

*Mayfield v. U.S. Dep't of Labor*,
693 F. Supp. 3d 712 (W.D. Tex. 2023) ......................... 16, 42

*MD/DC/DE Broads. Ass'n v. FCC*,
236 F.3d 13 (D.C. Cir. 2001) ........................................ 12, 13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .......................................................... 24

*Mistretta v. United States*,
488 U.S. 361 (1989) .................................................... 40, 42

*Mitchell v. Ky. Fin. Co.*,
359 U.S. 290 (1959) .................................................... 22, 23

*Nat'l Ass'n of Mfrs. v. SEC*,
105 F.4th 802 (5th Cir. 2024) ......................................... 13

*Nat'l Broadcasting Co. v. United States*,
319 U.S. 190 (1943) .......................................................... 41

*Nevada v. U.S. Dep't of Labor*,
218 F. Supp. 3d 520 (E.D. Tex. 2016) .............................. 8

*Nevada v. U.S. Dep't of Labor*,

275 F. Supp. 3d 795 (E.D. Tex. 2017) ............................................................ *passim*

*New York v. United States*,
    505 U.S. 144 (1992) ............................................................... 44

*Nuziard v. Minority Bus. Dev. Agency,*
    No. 4:23-CV-278-P, 2024 WL 965299 (N.D. Tex. Mar. 5, 2024) ........................................ 46

*Panama Refin. Co. v. Ryan*,
    293 U.S. 388 (1935) ............................................................... 40

*Perez v. Owl Inc.,*
    No. 22-12974, 2024 WL 3665313 (11th Cir. Aug. 6, 2024) ................................. 18

*Petroleum Commc'ns, Inc. v. FCC*,
    22 F.3d 1164 (D.C. Cir. 1994) .......................................... 48

*Prakash v. American Univ.*,
    727 F.2d 1174 & 1178 & n.19 (D.C. Cir. 1984) ........................................... 15

*Salinas v. United States*,
    522 U.S. 52 (1997) ............................................................... 44

*Sebelius v. Auburn Reg'l Med. Ctr.*,
    568 U.S. 145 (2013) ............................................................... 24

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ............................................................... 18

*Steiner v. Mitchell*,
    350 U.S. 247 & n.8 (1956) ........................................................ 23

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ........................................ 12, 48

*United States v. Jones*,
    132 F.3d 232 (5th Cir. 1998) ......................................... 41

*United States v. Mirza*,
    454 F. App'x 249 (5th Cir. 2011) (per curiam) ...................................... 41

*United States v. Texas*,
    599 U.S. 670 (2023) ............................................................... 46

*Walling v. Morris*,
    155 F.2d 832 (6th Cir. 1946) ........................................ 15, 24

*Walling v. Yeakley*,
    140 F.2d 830 (10th Cir. 1944) ........................................ 15, 21, 24, 42

*Whitman v. Am. Trucking Ass'ns*,

531 U.S. 457 (2001) ............................................................................ 40, 42

*Wirtz v. Miss. Publishers Corp.*,
    364 F.2d 603 (5th Cir. 1966) .................................................... *passim*

*Yakus v. United States*,
    321 U.S. 414 (1944) ............................................................................ 40

**U.S. Constitution**

Article III of the Constitution ................................................................. 46

**Statutes**

5 U.S.C. § 553 ........................................................................................ 34

5 U.S.C. § 702 ........................................................................................ 47

5 U.S.C. § 703 ........................................................................................ 45

5 U.S.C. § 706 ................................................................................... 1, 45

16 U.S.C. § 497c ................................................................................... 33

29 U.S.C. § 203 ............................................................................... 44, 45

29 U.S.C. § 213 .............................................................................. *passim*

29 U.S.C. § 1083 ................................................................................... 33

29 U.S.C. §§ 206(a)(1), 207(a)(1) ........................................................... 3

41 U.S.C. § 6701 ................................................................................... 23

42 U.S.C. § 1337 ................................................................................... 33

**Rules**

Fed. R. Civ. P. 56 .................................................................................. 11

**Regulations**

14 Fed. Reg. 7705 (Dec. 24, 1949) ..................................................... 7, 20

23 Fed. Reg. 8962 (Nov. 18, 1958) ......................................................... 20

28 Fed. Reg. 9505 (Aug. 30, 1963) ......................................................... 20

29 C.F.R. pt. 541 ................................................................................. 5, 6

29 C.F.R. § 541.5 ................................................................................... 13

29 C.F.R. § 541.601 ............................................................................... 11

29 C.F.R. § 541.607 ......................................................................... 31, 34

35 Fed. Reg. 883 (Jan. 22, 1970) ........................................................... 20

40 Fed. Reg. 7091 (Feb. 19, 1975) ......................................................... 20

69 Fed. Reg. 22,122 (Apr. 23, 2004) .............................................. *passim*

76 Fed. Reg. 23,110 (Apr. 25, 2011) ........................................................... 33

79 Fed. Reg. 63,317 (Oct. 23, 2014) ........................................................... 33

81 Fed. Reg. 32,391 (May 23, 2016) ........................................................ 6, 8

84 Fed. Reg. 51,230 (Sept. 27, 2019) ................................................. *passim*

88 Fed. Reg. 35,150 (May 31, 2023) ........................................................... 33

88 Fed. Reg. 62,152 (Sept. 8, 2023) ................................................. 9, 30, 38

89 Fed. Reg. 32,842 (Apr. 26, 2024) ................................................. *passim*

## Other Authorities

CPI Inflation Calculator,
  https://data.bls.gov/cgi-bin/cpicalc.pl?cost1=100.00&year1=196607&year2=202406 (last
  visited Aug. 7, 2024) ........................................................................... 26

Female Labor Act for Arkansas, Walter L. Pope & C.M. Buck, *Digest of the Statutes of
Arkansas*,
  ch. 108, §§ 9084-9090, 1921 .................................................................. 4

## INTRODUCTION

This past June, in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), the Supreme Court overruled *Chevron USA Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*'s familiar but now-defunct standard, if a court—reviewing a final agency action under the Administrative Procedure Act (APA), 5 U.S.C. § 706—determined that the statute invoked by the agency as authorizing the action is "silent or ambiguous with respect to the specific issue" at hand, the court would defer to the agency's interpretation if it "is based on a permissible construction of the statute." 467 U.S. at 843. However, as the Court reiterated in *Loper Bright*, *Chevron* deference has never been implicated where Congress "confer[s] discretionary authority on agencies," which "Congress may do . . . , subject to constitutional limits, and it often has." 144 S. Ct. at 2268. In such cases, the Supreme Court cautioned, courts are "to stay out of discretionary policymaking left to the political branches, [and] judges need only fulfill their obligations under the APA to independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Id.*

In *Loper Bright*, the Supreme Court confirmed that Congress's instruction to the Secretary of Labor to "define[] and delimit[]" through regulations certain provisions of the Fair Labor Standards Act (FLSA) of 1938 constitutes an express grant of discretionary authority to the Department of Labor. *Id.* at 2263 & n.5. Section 13(a)(1) of the FLSA—which exempts from both the FLSA's minimum wage and overtime protections "any employee employed in a bona fide executive, administrative, or professional capacity . . . as such terms are defined and delimited from time to time by regulations of the Secretary"—is one such provision. 29 U.S.C. § 213(a)(1). As such, the court's task under the APA is to "respect [the] delegation[] of authority, police the

outer statutory boundar[y] of the[] delegation[], and ensure that [the Department of Labor] exercise[s] [its] discretion consistent with the APA." *Loper Bright*, 144 S. Ct. at 2268. The 2024 rule and its minimum salary component fall within the "outer statutory boundaries" of the discretionary authority expressly delegated to the Secretary of Labor by Congress. For more than 85 years, the Department of Labor has exercised this discretionary authority by including a minimum salary level as one component of the test for identifying exempt executive, administrative, and professional ("EAP") employees. And the Fifth Circuit has upheld the use of a minimum salary as a component of the Department's FLSA regulations, and Congress has ratified that approach.

Each of the three adjustments to the minimum salary component in the 2024 EAP rule is a lawful exercise of the Department of Labor's express statutory authority to define and delimit the EAP exemption. First, the wage growth update, which took effect on July 1, 2024 (except with respect to Texas as an employer), applied current wage data to the salary level methodology that the Department has employed since 2004—that is, the 20th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census Region, currently the South, and/or in the retail industry nationally. Only Texas claims that the Department lacks authority to enact the wage growth update, and Texas's extreme position is foreclosed by circuit precedent and conflicts with the decision by another judge in this district on the Department's 2016 EAP rule.

Second, the salary level methodology change, which becomes applicable on January 1, 2025, changes the methodology used to calculate the minimum salary level to the 35th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census Region, currently the South. This methodology falls within the Department's statutory authority to define and delimit the EAP exemption.

Third, the triennial updating mechanism, which updates the minimum salary level using current data every three years without adjusting the underlying methodology, likewise falls within the outer boundaries of the Department's statutory authority. This updating mechanism ensures that the salary level continues to operate effectively as a component of the EAP exemption test as salaried worker earnings grow or diminish. The Department's authority to ensure the effectiveness of the salary level component flows from its authority to adopt a minimum salary component in the first instance.

Accordingly, Plaintiffs' claim that the 2024 EAP rule is contrary to the FLSA fails. And Plaintiffs' remaining arguments fare no better. Their arbitrary-and-capricious claim lacks merit because the Department adequately explained its choices in the 2024 EAP rule. Similarly, their constitutional claims must be rejected because the FLSA contains an intelligible principal that limits the Department's discretion, and the Tenth Amendment does not restrict the FLSA's application to the state of Texas.

For these reasons, the Court should grant Defendants' motion for summary judgment and deny Plaintiffs' motions for summary judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS AND REPONSE TO PLAINTIFFS' STATEMENTS OF MATERIAL FACTS

### I.    Statutory Background

1.  The FLSA generally requires covered employers to pay their employees at least the federal minimum wage (currently $7.25 an hour) for all hours worked, and an overtime premium of one and one-half times the employee's regular rate of pay for any hours worked over 40 in a workweek. *See* 29 U.S.C. §§ 206(a)(1), 207(a)(1). Among other exemptions, however, section 13(a)(1) of the FLSA exempts from both the minimum wage and overtime protections "any employee employed in a bona fide executive, administrative, or professional capacity . . . as such

3

terms are defined and delimited from time to time by regulations of the Secretary[]" of Labor (EAP exemption). 29 U.S.C. § 213(a)(1). The FLSA does not define "bona fide executive, administrative, or professional capacity," but instead expressly authorizes the Secretary of Labor to define and delimit these terms through regulation. *Id.*

2.   The EAP exemption is premised on the understanding that individuals employed in a bona fide executive, administrative, and professional capacity typically earn salaries well above the minimum wage and enjoy other privileges to compensate them for their long hours of work, setting them apart from nonexempt workers entitled to overtime pay. *See* Report of the Minimum Wage Study Commission, vol. IV, at 236, 240 (May 1981) ("Commission Report"); Stein Report at 19.[1] The exemption was based on provisions contained in the National Industrial Recovery Act of 1933 and state law precedents. Commission Report, vol. IV, at 240. Codes adopted under the National Industrial Recovery Act that exempted executive, administrative, and professional employees from maximum hour requirements typically included a salary requirement. *See* Stein Report at 20. Likewise, state wage-and-hour laws in effect around the time of the FLSA's enactment often included a salary requirement in their exemptions for executive, administrative, and supervisory employees. *See, e.g.*, Female Labor Act for Arkansas, Walter L. Pope & C.M. Buck, *Digest of the Statutes of Arkansas*, ch. 108, §§ 9084-9090, 1921, amended by Act 33, Laws 1937; Colorado Six-Day-Week Law, 1937 Colo. Sess. Laws 418; *see also* Stein Report at 20

---

[1] In 1940, 1949, and 1958, the Department published reports when it revised its part 541 regulations, which implement the EAP exemption. *See* Wage and Hour Division, U.S. Dep't of Labor, *Executive, Administrative, Professional . . . Outside Salesman Redefined: Report and Recommendations of the Presiding Officer [Harold Stein] at Hearings Preliminary to Redefinition* (Oct. 10, 1940) ("Stein Report"); Wage and Hour Division, U.S. Dep't of Labor, *Report and Recommendations on Proposed Revisions of Regulations, Part 541, Harry Weiss, Presiding Officer* (June 30, 1949) ("Weiss Report"); Wage and Hour Division, U.S. Dep't of Labor, *Report and Recommendations on Proposed Revision of Regulations, Part 541, Harry S. Kantor, Presiding Officer* (Mar. 3, 1958) ("Kantor Report").

(noting ten state wage-and-hour laws in effect in 1939 that exempted executive, administrative, and supervisory employees based on a salary qualification).

3.  When Congress amended the FLSA in 1949, it established that "[a]ny . . . regulation . . . of the Administrator of the Wage and Hour Division" then in effect under the FLSA—which, as explained below, included a salary level test for the EAP exemption—and not "inconsistent with the provisions of" the FLSA "shall remain in effect." Fair Labor Standards Amendments of 1949, 81 Cong., ch. 736, § 16(c), 63 Stat. 920. Beginning in the 1960s, Congress amended section 13(a)(1) several times to alter the scope of executive, administrative, and professional employees eligible for the exemption. *See* Pub. L. No. 87-30 § 9, 75 Stat. 65, 71 (1961) (adjusting for expansion of FLSA coverage to retail employees); Pub. L. No. 89-601 § 214, 80 Stat. 830, 837 (1966) (exempting teachers and academic administrative personnel); Pub. L. No. 101-583 § 2, 104 Stat. 2871 (1990) (instructing the Secretary to promulgate regulations exempting computer professionals). None of these amendments precluded use of a salary level test, nor instructed the Department to use a test for exemption based solely on job duties.

## II.    Pre-2024 Regulatory History

4.  For over 85 years, the Department's part 541 regulations generally have used three criteria to define and delimit the terms "bona fide executive, administrative, or professional capacity." *See* 29 U.S.C. § 213(a)(1). With some exceptions, for an employee to be exempt, (1) the employee's job must primarily involve executive, administrative, or professional duties (duties test); (2) the employee must be paid on a salary basis (salary basis test); and (3) the employee must receive a minimum salary amount (salary level test). *See* 29 C.F.R. pt. 541.

5.  The original 1938 regulations set the minimum compensation level at $30 per week for exempt executive and administrative employees. 3 Fed. Reg. 2518 (Oct. 20, 1938). The regulations also included a duties test. In order to be exempt, executive and administrative employees must

5

have performed certain duties also, which prohibited employers from claiming the EAP exemption for employees who performed "[a] substantial amount of work of the same nature as that performed by nonexempt employees of the employer." *Id*. Two years later, following extensive public hearings, the Department retained the $30 per week level for executive employees and established a $50 per week ($200 per month) salary level for administrative and professional employees. *See* 5 Fed. Reg. 4077 (Oct. 15, 1940); Stein Report at 1-2. During the hearings, the view that the Administrator lacked authority to use a salary level test "had little support," and stakeholders— including many employers—generally agreed on the desirability of a salary level test. *See* Stein Report at 5, 19.[2]

6. The Department has always paired the salary level test with a duties test that a worker also must meet to be subject to the EAP exemption. Under the duties test, the employee's job duties must primarily involve executive, administrative, or professional duties, as defined and delimited in the Department's regulations. *See* 29 C.F.R. §§ 541.100, 541.200, 541.300. Since 1940, the regulations also have required that the employee be paid on a salary basis, defined as a predetermined and fixed salary that is not subject to reduction because of variations in the quality or quantity of work performed. *See id.* § 541.602.

7. In 1949, the Department developed a two-tiered structure for assessing compliance

---

[2] This consensus has endured. *See* 89 Fed. Reg. 32,842, 32,850 (Apr. 26, 2024) ("the overwhelming majority of commenters [to the 2023 notice of proposed rulemaking (NPRM)] did not oppose the use of salary criteria in the part 541 regulations or address the Department's authority, and a number of employer representatives expressed general support for the use of earnings thresholds"); 84 Fed. Reg. 51,230, 51,238-39 (Sept. 27, 2019) ("commenters to the [2019] NPRM overwhelmingly agreed that the salary level should be increased"); 81 Fed. Reg. 32,391, 32,422 (May 23, 2016) ("a small number of commenters [to the 2015 NPRM] . . . suggested that the Department should eliminate the salary level test entirely[]"); 69 Fed. Reg. 22,122, 22,172 (Apr. 23, 2004) ("many commenters oppose[d]" the suggestion from "several commenters" to the 2003 NPRM to eliminate the salary level test).

with the salary level and duties tests. 14 Fed. Reg. 7705 (Dec. 24, 1949). Employers could satisfy either a "long" test based on the pre-1949 test, which combined a more rigorous duties test with a lower salary level, or a new "short" test, which combined a less rigorous duties test and a higher salary level. *Id.* at 7706; *see* 84 Fed. Reg. at 51,232. The long test contained a bright-line, 20% limit on the amount of time an employee could spend performing nonexempt work (such as manual labor or clerical tasks) and still meet the exemption. *See* 14 Fed. Reg. at 7706. The short test, in contrast, used a primary-duty test and did not limit the amount of time a higher-earning employee could spend on nonexempt duties and still be treated as exempt. *See id.*; *see also* Weiss Report at 22-23. In justifying the pairing of a higher salary level with the less rigorous short test, the Department explained that "the higher the salaries paid the more likely the employees are to meet all the requirements for exemption, and the less productive are the hours of inspection time spent in analysis of the duties performed." Weiss Report at 22-23. The Department retained the "long" and "short" test structure for the next five decades, updating the salary levels in 1958, 1963, 1970, and 1975.

8. In 2004, the Department revised the salary level and duties components of the EAP exemption regulations. 69 Fed. Reg. at 22,122. The passage of time had left the long test salary levels below the amount a minimum wage employee earned for a 40-hour week, and even the short test salary level was not far above the minimum wage. *Id.* at 22,164. The Department determined that "[r]evisions to both the salary tests and the duties tests [were] necessary to restore the overtime protections intended by the FLSA which [had] eroded over the decades." *Id.* at 22,122. The Department chose to simplify and streamline the regulations by replacing the separate long and short tests with a single "standard" test, which paired a "standard" salary level test of $455 per week with a "standard" duties test for executive, administrative, and professional

employees. *See id.* at 22,122, 22,126. The salary level was equivalent to the 20th percentile of weekly earnings of full-time salaried workers in the South and/or retail industry nationwide.

9.   In 2016, the Department published a final rule that, among other things, would have changed the methodology used to determine the minimum salary level, increasing the salary level from $455 to $913 per week. 81 Fed. Reg. at 32,391. That rulemaking was challenged in this district. The court enjoined the Department from implementing and enforcing the rule, and ultimately concluded that the rule's new methodology was impermissible. *Nevada v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520 (E.D. Tex. 2016); *Nevada v. U.S. Dep't of Labor*, 275 F. Supp. 3d 795 (E.D. Tex. 2017). But the court was careful in its summary-judgment opinion to recognize that, under binding Fifth Circuit precedent, "the Department has the authority to implement a salary-level test." 275 F. Supp. 3d at 805 & n.5 (citing *Wirtz v. Miss. Publishers Corp.*, 364 F.2d 603, 608 (5th Cir. 1966)).

10.   Although the Department appealed the *Nevada* decision, it asked the Fifth Circuit to hold the appeal in abeyance in light of new rulemaking that began after the change of administration. In 2019, the Department issued a final rule updating the EAP exemption regulations. 84 Fed. Reg. at 51,230. Commenters disagreed on how much to raise the salary level, but employee groups and employer representatives "overwhelmingly agreed that the salary level should be increased." *Id.* at 51,233, 51,239-40.

11.   In the 2019 rule, the Department updated the standard salary level by applying contemporaneous data to the methodology used in the 2004 rule. In this regard, the salary level of

$684 per week was set at the 20th percentile of earnings of full-time salaried workers in the lowest-wage Census Region (the South) and/or in the retail industry nationally. *Id.* at 51,237.[3]

### III.    2024 Final Rule

12.  On September 8, 2023, the Department published a notice of proposed rulemaking to update and revise the EAP exemption regulations. 88 Fed. Reg. 62,152 (Sept. 8, 2023). The Department received approximately 33,300 comments and issued its final rule on April 26, 2024. 89 Fed. Reg. at 32,842, 32,847. As in prior rules, the Department agreed with the "overwhelming majority" of commenters that, explicitly or implicitly, endorsed maintaining a role for the salary level in determining whether employees are employed in a bona fide executive, administrative, or professional capacity. *Id.* at 32,868. The Department disagreed with the small number of commenters asserting that a salary level test was unauthorized, reiterating in part its explanation from its 2019 rule that an employee's salary level "'is a helpful indicator of the capacity in which an employee is employed.'" *Id.* at 32,867 (quoting 84 Fed. Reg. at 51,239).

13.  The 2024 EAP rule makes three distinct adjustments to the standard salary level test. To account for the significant growth in salaried worker earnings since the Department last updated the salary level test more than four years ago, the 2024 EAP rule increased the salary level beginning July 1, 2024, by applying current wage data to the 2019 EAP rule's methodology for setting the salary level—*i.e.*, the 20th percentile of earnings of full-time salaried workers in the lowest-wage Census Region (the South) and/or in the retail industry nationally. *Id.* at 32,855. This results in a salary level of $844 per week. The Department observed that the salary level increase ($160 per week) attributable to the wage growth update is less than the $229 per week increase

---

[3] This minimum salary level currently applies to Texas in its capacity as an employer, due to this Court's preliminary injunction. PI Order, ECF No. 38.

implemented by the 2019 EAP rule, and the 23% salary level increase is less than the 24% growth in earnings for full-time wage and salary workers nationally that has occurred since the issuance of the 2019 EAP rule. *Id.* at 32,848-49, 32,855.

14.  Second, in the 2024 EAP rule, the Department also establishes a new methodology for setting the minimum salary level, which will become applicable January 1, 2025. That methodology sets the salary level at the 35th percentile of weekly earnings of full-time workers in the lowest-wage Census Region (the South). 89 Fed. Reg. 32,842.

15.  The Department sought to accomplish two objectives by using this methodology. First, the Department wanted to fully restore the salary level's function of screening obviously nonexempt employees from the exemption—a function requiring a salary level equivalent to at least the historic long test salary level ($942 per week using current data). *Id.* at 32,868-69. Second, the Department aimed to account for the shift in the 2004 rule from a two-test to a one-test system by selecting a methodology that would restore overtime eligibility for many individuals who perform substantial amounts of nonexempt work and historically would have been protected by the long test, while ensuring that exemption status for the vast majority of salaried white-collar workers will continue to depend on their job duties. The Department explained that its approach would more effectively identify who is employed in a bona fide EAP capacity and more reasonably distribute the impact of the shift to a one-test system between employers and employees. *Id.* at 32,870.

16.  The new methodology produces a salary level of $1,128, which the 2024 EAP rule makes applicable on January 1, 2025. *Id.* at 32,842.

17.  Third, the 2024 EAP rule also establishes a mechanism for updating the standard salary level and highly compensated employees (HCE)[4] total annual compensation threshold. Whereas a fixed earnings threshold becomes less effective over time as the data used to set it grows outdated, a fixed methodology remains relevant if applied periodically to contemporaneous data. 89 Fed. Reg. at 32,858. Through the updating mechanism, the Department will update the salary thresholds every 3 years by applying the methodologies in place at the time of each update to contemporaneous data. The mechanism is neutral in that it updates the thresholds for wage growth or decline by applying the same standard adopted through notice and comment rulemaking, simply reflecting the changes in the earnings data. *Contra* Plano Statement of Fact ¶ 8. Additionally, the Department may delay a scheduled update where economic or other conditions merit. 89 Fed. Reg. at 32,861. The Department's next update is scheduled to occur on July 1, 2027.

18.  On June 28, 2024, this Court preliminarily enjoined Defendants from enforcing the 2024 EAP rule against Texas as an employer but denied Texas's request for universal relief.[5]

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citing

---

[4] The HCE test, which the Department created in 2004 for certain highly compensated employees, combines a much higher compensation requirement with a minimal duties test. *See* 29 C.F.R. § 541.601; 89 Fed. Reg. 32,882.

[5] Significant portions of Plaintiffs' statements of material facts consist of argument and characterizations of various legal authorities, which are not appropriately understood as facts. Defendants respond to Plaintiffs' legal arguments below. Any facts that Plaintiffs identify that are inconsistent with Defendants' recitation of the facts with supporting authorities are denied.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Id.* "In the context of a challenge to an agency action under the [APA], summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review." *Am. Stewards of Liberty v. Dep't of the Interior*, 370 F. Supp. 3d 711, 723 (W.D. Tex. 2019) (cleaned up).

## ARGUMENT

The 2024 EAP rule is a lawful exercise of the Department's authority to define and delimit the FLSA's EAP exemption.

## I.    The Court Must Analyze Each Change to the Salary Level Individually.

In evaluating the merits of Plaintiffs' challenges, the Court must individually analyze the parties' legal arguments about (1) the wage growth update, (2) the January 1 methodology update, and (3) the future triennial updates, because each of these aspects is severable from the others and from the remainder of the 2024 EAP rule. Severability is a "preliminary issue" that the Court should address at the outset of its analysis. *E.g.*, *Alabama v. Cardona*, No. 7:24-cv-533-ACA, 2024 WL 3607492, at *11 (N.D. Ala. July 30, 2024). "Whether the offending portion of a regulation is severable depends upon [1] the intent of the agency and [2] upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001); *accord Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (vacating only "the portions of the final rule" the court decided were unlawful). *Cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) (noting that, "when confronting a constitutional flaw in a statute, . . . the normal rule is that partial, rather than facial, invalidation is the required course" (cleaned up)). When evaluating challenges to agency action,

courts in the Fifth Circuit must "adhere to the text of a severability clause" absent "extraordinary circumstances." *Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802, 815-16 (5th Cir. 2024) (vacating only portions of agency policy that plaintiffs had shown were unlawful).

First, an express severability clause in the 2024 rule, codified at 29 C.F.R. § 541.5, makes clear the Department's intent. Express severability clauses constitute evidence that an agency would have "adopted the same disposition regarding the unchallenged portion [of a rule] if the challenged portion were subtracted." *Epsilon Elecs., Inc. v. Dep't of Treasury*, 857 F.3d 913, 929 (D.C. Cir. 2017). In *National Association of Manufacturers*, the Fifth Circuit considered a challenge to the recission of a Securities and Exchange Commission (SEC) rule "regulating businesses that provide proxy voting advice to institutional shareholders of public corporations." 105 F.4th at 806. The court vacated the recission of the rule only in part, reasoning that "the severability clause in the [recission] dispels any doubt about what the SEC would have done if the recission of the [challenged provisions] were subtracted." *Id.* at 816. Here, the 2024 EAP rule's express severability clause declares the Department's intent that the rule's three provisions "are separate and severable and operate independently from one another." 29 C.F.R. § 541.5; *see also* 89 Fed. Reg. at 32,886 ("The Department intends that each of this rule's provisions be considered separate and severable and operate independently from one another."). The Department contends that each aspect of its rule is lawful. However, if the Court determines that one or more of the provisions are unlawful, "the Department intends that that all remaining provisions within that section, plus all other sections, remain effective and operative." 29 C.F.R. § 541.5.

Second, the wage growth update, the January 1 methodology update, and the future triennial updates could each "function sensibly" alone. *Nat'l Ass'n of Mfrs.*, 105 F.4th at 816; *see MD/DC/DE Broads. Ass'n*, 236 F.3d at 22. The wage growth update independently raised the

13

minimum salary level under a methodology that, as explained in section III below, screened from the exemption fewer workers than would the methodology that the Fifth Circuit blessed in *Wirtz*; that salary level can continue to function, as it has since July 1, 2024, even if the Court were to invalidate other aspects of the rule. *See Wirtz v. Miss. Publishers Corp.*, 364 F.2d 603, 608 (5th Cir. 1966). Similarly, the triennial updating mechanism can update the minimum salary level in July 2027 based on whatever methodology is in effect at that time, which could be, for example, the January 1 methodology or, if that has been invalidated, the 2019 methodology. Lastly, the January 1 methodology update is an independent policy that does not rely upon either the wage growth update or the updating mechanism.

The Court should conclude that the 2024 EAP rule is lawful in its entirety. But if the Court disagrees, it should declare only the specific offending portions of the rule unlawful and enjoin Defendants from enforcing only those aspects of the rule. *See infra* IX.

## II.    The Department Has the Statutory Authority to Use a Minimum Salary Level to Help Define and Delimit the Exemption for EAP Employees.

In the FLSA, Congress explicitly authorized the Department to "define[] and delimit[]" the terms "bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The Department has relied on this express statutory authority to include a minimum salary component in its EAP regulations since 1938. Only Texas argues that the Department lacks the statutory authority for *any* minimum salary level. This argument fails under controlling circuit precedent, misapplies the Supreme Court's decision in *Loper Bright*, and fails to account for Congress's ratification of a salary level test. The Department may rely on its statutory authority to include a minimum salary component in its EAP regulations, and each of the three distinct changes that the 2024 EAP rule makes to the salary level is a lawful exercise of the Department's authority and the result of reasoned decisionmaking.

14

### A. The Fifth Circuit has already upheld the Department's authority to use a salary level test.

Binding circuit precedent forecloses Texas's claim that the Department may not include a salary level test to help define and delimit the EAP exemption. In *Wirtz v. Mississippi Publishers Corporation*, the Fifth Circuit expressly rejected the contention that "the minimum salary requirement is not a justifiable regulation under Section 13(a)(1) of the Act because [it was] not rationally related to the determination of whether an employee is employed in a 'bona fide executive . . . capacity.'" 364 F.2d at 608. The court reasoned that "[t]he statute gives the Secretary broad latitude to 'define and delimit' the meaning of the term 'bona fide executive . . . capacity,'" and it rejected the argument "that the minimum salary requirement is arbitrary or capricious." *Id.* And the Fifth Circuit is not alone: every circuit court to consider the question has upheld the Department's use of a salary level test. *See Walling v. Yeakley*, 140 F.2d 830, 832-33 (10th Cir. 1944); *Fanelli v. U.S. Gypsum Co.*, 141 F.2d 216, 218 (2d Cir. 1944); *Walling v. Morris*, 155 F.2d 832, 836 (6th Cir. 1946), *vacated on other grounds*, *Morris v. McComb*, 332 U.S. 422 (1947); *Prakash v. American Univ.*, 727 F.2d 1174, 1177-78 & 1178 & n.19 (D.C. Cir. 1984).

This Court has acknowledged that "*Wirtz*[] approv[ed] of the Department's salary thresholds that were in effect" in 1966. PI Order at 21, ECF No. 38. Moreover, another judge in this district has "recognize[d] *Wirtz* is controlling and stands for the proposition that the Department has the authority to implement a salary-level test." *Nevada*, 275 F. Supp. 3d at 805 n.5. For good reason. The Fifth Circuit in *Wirtz*, relying on the statutory language of the FLSA, held that the EAP regulations' salary requirement clearly accorded with the statute. 364 F.2d at 608 (rejecting the contention that the Department's use of a salary-level test "is not a justifiable regulation" because salary level is "not rationally related to the determination of whether an employee is employed in a 'bona fide executive . . . capacity'"). As another court recently

explained in rejecting a challenge to the 2019 EAP rule, the Fifth Circuit's decision in *Wirtz* was "expressly based on fidelity to the statutory text." *Mayfield v. U.S. Dep't of Labor*, 693 F. Supp. 3d 712, 718 (W.D. Tex. 2023).

**B.    The salary level test is wholly consistent with the FLSA.**

In addition to being foreclosed by circuit precedent, Texas's theory that the Department may not include a minimum salary component in defining and delimiting the EAP exemption fails following the Supreme Court's recent decision in *Loper Bright*. In the FLSA, Congress expressly authorized the Department to "define[] and delimit[]" the EAP exemption. 29 U.S.C. § 213(a)(1). And in *Loper Bright*, the Supreme Court specifically identified "define[] and delimit[]" as a phrase that expressly "delegates discretionary authority" on agencies. 144 S. Ct. at 2263 & n.5. The Court affirmed that Congress may make such delegations, "subject to constitutional limits." *Id.* at 2268. And where Congress has done so, the Supreme Court cautioned, courts are to "stay out of discretionary policymaking left to the political branches," and "independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Id.*

When a court considers the meaning of "define and delimit" it is indeed "bounded by the ordinary meaning of the plain text of the statute." Texas Mot. at 16. And the Supreme Court has already concluded that the "define and delimit" phrase in the plain text of the FLSA authorizes the Department "to exercise a degree of discretion." *Loper Bright*, 144 S. Ct. at 2263 & n.5. Indeed, the Supreme Court highlighted that statutory phrase as a paradigmatic example of Congress "expressly delegat[ing]" discretionary authority to an agency. *Id.* (citing 29 U.S.C. § 213(a)(15) (FLSA exemption that applies to "any employee employed . . . in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (*as such terms are defined and delimited by regulations of the Secretary*)").

There can be no dispute after *Loper Bright* that, by the phrase "define and delimit" in the FLSA, Congress granted *discretionary* authority to the Department. *Id.*[6]

The Supreme Court considered the specific FLSA exemption discussed in *Loper Bright* in *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007). In *Coke*, the Supreme Court recognized that, in directing the Secretary to "define[] and delimit[]" that exemption's terms, Congress had "explicitly" left "gaps" as to "the scope and definition" of the exemption's terms, and expressly granted the Department the authority "to work out the details" based on its expertise and consultation with stakeholders. *See id.* at 162, 165, 167-68. The Court made clear that such "details" were not minor—not limited, for example, to expounding upon only the job duties of a domestic worker employed to provide companionship services—but rather included questions such as whether the exemption should apply to companionship workers "paid by third parties." *See id.* at 167-68; *see also id.* at 165 ("The subject matter of the regulation in question concerns a matter in respect to which the agency is expert, and it concerns an interstitial matter, *i.e.*, a portion of a broader definition, the details of which, as we said, Congress entrusted the agency to work out.").

Like the FLSA exemption analyzed in *Coke* and cited approvingly in *Loper Bright*, the provision at issue here expressly delegates authority to the Department to "define[] and delimit[]"

---

[6] The amicus States' brief attempts to muddy the express holding in *Loper Bright*. State Am. Br. at 5, ECF No. 53. Although they concede that the EAP exemption "expressly delegates the authority to craft a specific definition of EAP status to the Secretary," *id.* at 4, the States maintain that this Court's review is *de novo*, *id.* at 5. This assertion is wrong because Congress's use of "define and delimit" grants the Department *discretionary* authority. Once a court identifies an express delegation that applies, as is clear here, the court's review is no longer *de novo*. *Compare Loper Bright*, 144 S. Ct. at 2261 & n.4 (describing ordinary APA review as "*de novo*"), *with id.* at 2268 (when Congress expressly delegates authority to agency, courts must "respect such delegations" and uphold agency's exercise of that discretionary authority so long as it falls within "the outer statutory boundaries of th[e] delegation[]").

statutory terms—here, the exemption for workers "employed in a bona fide executive, administrative, or professional capacity." *See* 29 U.S.C. § 213(a)(1). Congress, thus, "explicitly" left "gaps" as to "the scope and definition" of the exemption's terms, "entrust[ing] the agency to work out" the details. *Coke*, 551 U.S. at 162, 165, 167-68. In *Loper Bright*, the Supreme Court affirmed that when Congress grants agencies authority to prescribe rules in such terms, the agency has discretion to, for example, "fill up the details" of a statutory scheme. 144 S. Ct. at 2263. And, as the Supreme Court further reaffirmed in *Loper Bright*, a court fulfills its role under the APA by upholding the Department's approach to filling out the details, so long as the Department acted within "the outer statutory boundaries" of Congress's express delegation. *Id.* at 2268. Here, the Department's EAP exemption regulation must be upheld if it falls within "the outer statutory boundaries" of Congress's express "define and delimit" delegation. *Id.*

Further underscoring the Department's statutory authority to use a salary level test as one component of the criteria for the exemption, *Loper Bright* reaffirms that even when—unlike here—a statute does *not* expressly delegate authority to the agency, the "interpretations of those responsible for implementing" a particular statute "'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance' consistent with the APA." *Id.* at 2262 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Such respect for the agency's interpretation is "especially warranted when" the interpretation "was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Id.* at 2258; *see also id.* at 2262; *Perez v. Owl Inc.*, No. 22-12974, 2024 WL 3665313, at *7-8 (11th Cir. Aug. 6, 2024) (applying *Loper Bright* and *Skidmore* to conclude that DOL's consistent interpretation of the FLSA over the past 80 years was persuasive).

For nearly nine decades, since shortly after the FLSA's passage, the Department has consistently relied on a minimum salary component in defining and delimiting the EAP exemption. The Department has long understood the statutory phrase "bona fide executive, administrative, or professional capacity" to connote a status not attained by lower-wage workers. Stein Report at 5 (noting "wide agreement" among hearing participants recognizing that the language of section 13(a)(1) implies a "status" not attained by workers whose pay is close to the minimum wage); *id.* at 19 (explaining that the "term 'executive' implies a certain prestige, status, and importance"); Kantor Report at 2 ("[E]xecutive . . . impl[ies] a certain prestige, status, and importance[.]"). In that regard, a salary level test is "a valuable and easily applied index to the 'bona fide' character of the employment for which exemption is claimed," and helps to ensure that the EAP exemption does not "invite evasion" of the FLSA's minimum wage and overtime requirements "for large numbers of workers to whom the wage-and-hour provisions should apply." Stein Report at 5, 19.

Dictionaries contemporaneous to the FLSA's passage substantiate the Department's understanding. The term "capacity" encompasses "relation" "character," and "position." *Capacity*, Webster's New Int'l Dictionary 396 (2d ed. 1934). Each of these terms, when Congress enacted the FLSA, incorporated the concept of one's status. *See Position*, Webster's Dictionary 774 (5th ed. 1942) (connoting "[r]elative place, situation, or standing; specif[ically] . . . official rank or *status*" (emphasis added)); *Character*, Webster's Collegiate Dictionary (1942) (meaning "quality, position, rank or capacity; *status*" (emphasis added)); *Relation*, Funk and Wagnalls College Standard Dictionary (1943) (meaning "the position of one person with respect to another"). An employee's status, and thus their "capacity," involves their work duties, but also is understood to include their pay. *See* 84 Fed. Reg. at 51,237 ("Salary is a helpful indicator of the capacity in which an employee is employed[.]").

19

The statute's inclusion of the term "bona fide" reinforces the Department's longstanding interpretation of section 13(a)(1) as permitting a salary level test. This element requires an employer's "good faith," "sincerity," or "genuine[ness]." *Bona fide*, 1 Oxford English Dictionary (1933 ed.). The Department has long found that such good faith can be demonstrated through the salary the employer pays. *See* Stein Report at 5 (explaining that "the good faith specifically required by the act is best shown by the salary paid"); *id.* at 19. As both the 2019 and 2024 EAP rules affirmed, "salary level is helpful to determine who is not an exempt executive, administrative or professional employee." 84 Fed. Reg. at 51,237; *see* 89 Fed. Reg. at 32,867. In that regard, the salary level test ensures that the section 13(a)(1) exemption does not "invite evasion" of the minimum wage and overtime requirements for "large numbers of workers to whom the wage-and-hour provisions should apply." Stein Report at 19.

If there were any doubt that including a minimum salary component was within the outer boundaries of the Department's statutory authority, approximately 85 years of agency practice, including practice dating back to "roughly contemporaneous[] with enactment of the statute" would settle the question.[7] *See Loper Bright*, 144 S. Ct. at 2258. The Department has used a salary level test as a component of the EAP regulations since the FLSA's enactment in 1938. *See* 3 Fed. Reg. 2518 (Oct. 20, 1938). Although the applicable minimum salary level has changed over time, every administration has established or carried forward a salary level test in some form. *See* 5 Fed. Reg. 4077 (Oct. 15, 1940); 14 Fed. Reg. 7705 (Dec. 24, 1949); 23 Fed. Reg. 8962 (Nov. 18, 1958); 28 Fed. Reg. 9505 (Aug. 30, 1963); 35 Fed. Reg. 883 (Jan. 22, 1970); 40 Fed. Reg. 7091 (Feb. 19, 1975); 69 Fed. Reg. 22,122 (Apr. 23, 2004); 84 Fed. Reg. 51,230 (Sept. 27, 2019).

---

[7] This Court's order on Texas's preliminary-injunction motion, issued the same day as *Loper Bright*, did not address the Supreme Court's instruction in that case that courts consider agency practice, particularly practice contemporaneous with the enactment of the statute.

From 1938 to 2004, the minimum salary level was a component of the Department's "long test" (or its functional equivalent prior to 1949). *See supra* at 5-7. It was this long test salary level that the Fifth Circuit upheld in 1966. *Wirtz*, 364 F.2d at 608. The purpose of the long test salary level was to screen out employees who, due to their earnings, were "obviously nonexempt." 89 Fed. Reg. at 32,868 (quoting Weiss Report at 8). Consistent with the *Wirtz* decision, and that of every other appellate court to consider the issue, in every rule prior to 2019, employees who earned below the long test salary level were always screened from the exemption based on salary—even if they passed the applicable duties test. *Contra* PI Order at 22-23 (suggesting, without reference to those precedents, that this result is inconsistent with the statute). This was true from 1938 to 1949 under the salary level test that became part of the long test, from 1949 to 2004 under the long test, and from 2004 to 2019 under the standard salary level that was set equivalent to the long test level. 89 Fed. Reg. at 32,869. Each of these changes to the minimum salary level resulted in some previously exempt workers becoming nonexempt based on their salary. *E.g.*, 84 Fed. Reg. 51,230 (2019 rule affected the status of 1.2 million previously exempt employees); 69 Fed. Reg. 22,122, 22123 (2004 rule affected the status of 1.3 million previously exempt employees).

To be clear, Congress did not by the FLSA establish an exemption for "*any employee* who works in an EAP capacity." *Contra* PI Order at 25 n.23 (quotation marks omitted). Instead, Congress created an exemption for any employee who works in a bona fide EAP capacity, *as those terms are defined and delimited by the Department of Labor*. 29 U.S.C. § 213(a)(1). Congress's express grant of discretionary authority allows the Department to make policy judgments about the scope of EAP capacity, which necessarily affects the number of employees who fall inside or outside of the exemption. *Contra* PI Order at 25 n.23. *Cf. Yeakley*, 140 F.2d at 831 ("'Delimit' means 'to fix or mark the limits of: to demarcate; bound.'"). As explained, the Supreme Court in

21

*Loper Bright* directed courts to respect agency interpretations of "discretionary policymaking left to the political branches," particularly when those interpretations were made contemporaneously with the relevant statutes' enactment. 144 S. Ct. at 2268. The Department of Labor's authority to have a minimum salary component falls well within its discretion under *Loper Bright*, and accords as well with the Fifth Circuit's decision in *Wirtz*. If the Department's interpretation is within the bounds of the FLSA—which it is, for all the reasons explained—then the court's task is to "effectuate the will of Congress subject to constitutional limits." *Id.* at 2263.

### C.    Congress has ratified the salary level test.

Congress's ratification of a salary level component of the EAP exemption further reinforces the Department's longstanding interpretation and rebuts any suggestion that Congress's delegation of authority to the Department to define and delimit does not encompass authority to establish a salary level test. Congress has clearly understood the authority granted to the Department to include the authority to establish a salary level test. By 1949, the EAP exemption regulations, including a salary level test, had been in place for over a decade. "When Congress amended the [FLSA] in 1949 it provided that pre-1949 rulings and interpretations by the Administrator should remain in effect unless inconsistent with the [1949 statutory amendments]." *Mitchell v. Ky. Fin. Co.*, 359 U.S. 290, 292 (1959); *see* Fair Labor Standards Amendments of 1949, ch. 736, § 16(c), 63 Stat. at 920 (ratifying "[a]ny order, regulation, or interpretation of the Administrator of the Wage and Hour Division" then in effect under the FLSA). Congress was aware of the salary level test—and any debate surrounding its use—when it endorsed the Administrator's interpretations. During hearings preceding the 1949 amendments, Congress received divergent input from business groups and employee advocates. For example, the Chamber of Commerce urged that Congress—rather than the Secretary—should set the salary level, *see* H. Subcomm. No. 4 of the Comm. of Education and Labor, Minimum Wage Standards, vol. 2, at

1019 (Oct. 28, 1947); another employer organization asked that the "the salary limitation which is now included by the Administrator" "be stricken" because it "is wholly artificial," *see id.* vol. 2, at 1375; and an employee advocacy organization proposed statutorily increasing the salary level for exemption, *see id.* vol. 5, at 1071-72. Congress's knowing rejection of contrary views and ratification of the regulations imposing the salary level requirement reflect its "underst[anding]" of the FLSA's meaning. *See Steiner v. Mitchell*, 350 U.S. 247, 255 & n.8 (1956); *Alstate Constr. Co. v. Durkin*, 345 U.S. 13, 16-17 (1953) (declining to "repudiate an administrative interpretation of the [FLSA] which Congress refused to repudiate" in 1949).

Though Congress's 1949 ratification alone puts to bed any doubt about the Department's statutory authority to use the long test methodology to set a minimum salary component, in 1976 Congress again ratified the Department's EAP exemption regulations. That year, Congress amended the Service Contract Act, which governs benefits and other terms of employment for employees performing services for government contracts. *See* 41 U.S.C. § 6701. Congress excluded from the definition of "service employee" "any person employed in a bona fide executive, administrative, or professional capacity, as those terms are defined in part 541 of title 29, Code of Federal Regulations, as of July 30, 1976, and any subsequent revision of those regulations." Pub. L. No. 94-489, 90 Stat. 2358 (1976). In so doing, Congress ratified the Department's EAP exemption regulations, including its salary level test, which the regulations contained. *See* 41 U.S.C. § 6701(3)(C) (currently codified location); *see also* 122 Cong. Rec. 31,566, 31,576 (Sept. 21, 1976) (statement of Rep. Perkins) ("Bona fide executive, administrative[,] and professional employees are excluded from coverage by present departmental regulations. H.R. 15246 maintains this exclusion and does not alter the status quo with respect to any employees presently covered.").

Moreover, Congress has never taken any action to suggest that a salary level test is impermissible under section 13(a)(1). It has amended the FLSA many times since 1938, including at least three amendments to section 13(a)(1) itself. *See* Pub. L. No. 87-30 § 9, 75 Stat. 65, 71-74 (1961) (adjusting for expansion of FLSA coverage to retail employees); Pub. L. No. 89-601 § 214, 80 Stat. 830, 837 (1966) (exempting teachers and academic administrative personnel); Pub. L. No. 101-583 § 2, 104 Stat. 2871, 2871 (1990) (instructing the Secretary to promulgate regulations exempting computer professionals). None of these amendments called the Department's longstanding salary level test into question. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n.66 (1982).[8] Where, as here, "Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 159 (2013) (quoting *CFTC v. Schor*, 478 U.S. 833, 846 (1986)); *see also Costanzo v. Tillinghast*, 287 U.S. 341, 345 (1932) (a court "should give great weight" to the "failure of Congress to alter or amend [a statute], notwithstanding [a] consistent construction by the department charged with its enforcement" "even if [the court] doubt[s] the correctness of the [administrative] ruling").

---

[8] In hearings prior to the 1949 amendments to the FLSA, the Solicitor of Labor confirmed that the salary level test was upheld in *Walling v. Yeakley*, 140 F.2d 830 (10th Cir. 1944), and that the Department's part 541 regulations more broadly were upheld by other courts of appeals. *See* H. Subcomm. No. 4, vol. 3, at 2765. Given the Solicitor's testimony, Congress likewise was aware of, and did not disturb, the unanimous view of the courts of appeals that the salary test was lawful. *See Walling*, 140 F.2d at 832-33; *Fanelli*, 141 F.2d at 218; *Morris*, 155 F.2d at 836; *see also Merrill Lynch*, 456 U.S. at 382 n.66.

Additionally, Congress's repeated decision not to disturb the Department's salary level regulations is consistent with the FLSA's purpose. The minimum wage and overtime pay requirements of the FLSA are "among the nation's most important worker protections," 69 Fed. Reg. at 22,122, and the section 13(a)(1) exemption was premised on an understanding that the exempted workers typically earn salaries well above the minimum wage, *see* Commission Report, vol. IV, at 240. Nothing in the text, history, or purposes of the statute provides a basis to overturn the 85-year-old approach used by the agency charged with implementing the FLSA; to the contrary, all amply support it.

### III.   The Wage Growth Update Is Lawful.

The Department had the statutory authority to implement the wage growth update, which applied current data to the methodology of the 2004 and 2019 EAP rules, which set the minimum salary level equivalent to the 20th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census Region (the South), and/or in the retail industry nationally. The salary level produced by the wage growth update serves a "'modest' role," PI Order at 25 n.23 (quoting 84 Fed. Reg. at 51,238), using the existing 2019 rule's methodology to screen out some obviously nonexempt employees from the exemption.

*Wirtz* compels the conclusion that the wage growth update is lawful. In *Wirtz*, the Fifth Circuit held that the long test methodology produced a lawful salary level. 364 F.2d at 608. The long test methodology in effect at the time of *Wirtz* produced a salary level of $100 per week using contemporaneous data, and the long test methodology would produce a salary level of $942 per week today using current data. *See* 89 Fed. Reg. at 32,933. *Wirtz* controls for the Department's authority to have a minimum salary level of at least that amount. Because the minimum salary

resulting from the wage growth update is only $844 per week, Texas's argument that the salary level in the wage growth update is too high, Texas Mot. at 15, must fail.[9]

Given the growth in earnings since the 2019 EAP rule, the $684-per-week salary level that resulted from applying the 2019 methodology to then-current data no longer corresponds to the 20th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census Region and/or in the retail industry nationally. Rather, based on the most recent data used in the 2024 EAP rule, $684 per week salary level corresponds to approximately the 12th percentile of earnings of full-time salaried workers in the lowest-wage Census Region and retail nationally. *See* 89 Fed. Reg. at 32,848. By applying current data to the 2019 methodology, the wage growth update to $844 per week adjusted the salary level to return to its intended level.

Further underscoring the modest role of the 2024 EAP rule's wage growth update, the resulting increase to the salary level affected fewer than one million employees. 89 Fed. Reg. at 32,934 tbl. 25 (applying current data to the 2004/2019 methodology affected 959,000 exempt employees). By comparison, the 2019 rule's salary level increase affected 1.2 million previously exempt employees, and the 2004 rule's salary level affected 1.3 million previously exempt employees. *See* 84 Fed. Reg. at 51,231; 69 Fed. Reg. 22,122, 22,123 (Apr. 23, 2004).

## IV. The January 1 Salary Level Methodology Is Lawful.

The January 1 salary level methodology strikes a lawful balance between increasing the salary level to help better identify which employees are employed in a bona fide EAP capacity,

---

[9] Though the Department relies on wage data, rather than inflation data, to calculate the minimum salary level, Defendants note that $100 in July 1966 has the buying power of $966 in June 2024, adjusted for CPI inflation. *See* CPI Inflation Calculator, https://data.bls.gov/cgi-bin/cpicalc.pl?cost1=100.00&year1=196607&year2=202406 (last visited Aug. 7, 2024). Under any measure, the *Wirtz*-approved long test methodology would produce a higher minimum salary level than does the wage growth update.

and maintaining the primacy of the duties test. The methodology will fully restore the salary level's function of screening obviously nonexempt employees from the EAP exemption and will account for the Department's shift to a one-test system for defining and delimiting the exemption. At the same time, the chosen methodology reinforces the critical role of the duties test, which will remain determinative of exemption status for most salaried white-collar employees.

The Department's decision to increase the salary level in the EAP regulation is rooted in decades of experience with different salary methodologies. From 1949 to 2004, in applying the EAP exemption, the Department employed a two-test system: a "long" test and a "short" test. *See supra* Background. Employees who earned below the long test salary level were always screened from the exemption and entitled to the FLSA's minimum wage and overtime protections regardless of their duties, 89 Fed. Reg. at 32,869. Employees who earned between the lower long test salary level and the higher short test salary level were exempt only if they satisfied the more rigorous long duties test. *See id.* at 32,866. Employees who earned above the short test salary level were exempt as long as they met the less rigorous short duties test. *See id.* at 32,864.

One of the Department's objectives in setting the January 1 methodology was to fully restore the salary level's function of screening obviously nonexempt employees from the EAP exemption. This screening principle "has been at the heart of the Department's interpretation of the EAP exemption for over 75 years," *id.* at 32,868, and even the Business Organization Plaintiffs appear to concede that it is a valid salary level purpose. Pls. Plano Chamber of Commerce *et al.*'s Mot. for Expedited Summ. J. at 16, ECF No. 46 ("Business Mot.") (stating that the *Nevada* decision "rightly found that the Department's longstanding policy requires the minimum salary level to be used only as a floor to screen obviously nonexempt employees" (cleaned up)). From 1938 to 2019, all salaried white-collar employees who earned below the long test level—or in the

27

case of the 2004 rule, a salary level equivalent to the long test level—were screened from the exemption and entitled to the FLSA's protections, regardless of the duties they performed. 89 Fed. Reg. at 32,869. Setting the salary level below the long test level, as was done in the 2019 rule— because the 2004 methodology no longer matched the long test salary level based on contemporaneous data—departed from this history by enlarging the exemption to newly include some employees who earned less than the long test salary level. *Id.* As an initial step, the Department's January 1 methodology was intended to fully restore the salary level's screening function, ensuring that employees who were nonexempt because they earned less than the long test salary level are also nonexempt under the standard test. *Id.* This objective requires a salary level at least equal to the long test level—$942 per week. *Id.*

In addition to fully restoring the salary level test's screening function, the Department selected a salary level methodology that would account for the shift from a two-test system to a one-test system for determining who is employed in a bona fide executive, administrative, or professional capacity. Until 2004, workers earning between the long and short test salary levels were protected by the long duties test, which—unlike the short test—had strict limits on how much time employees could spend performing nonexempt work (such as stocking shelves or working a cash register) and still fall within the exemption from overtime protections. *See id.* at 32,864. In the 2004 rule, the Department broadened the EAP exemption by permitting the exemption of employees who earned between the long-test and short-test salary levels and would have been protected by the long duties test. *Id.* at 32,865. In contrast, the 2016 rule (by setting the salary level in reference to the short test) was criticized as making all employees earning between the long and short test salary levels exempt—including employees who performed very little nonexempt work and would have been exempt under the long duties test. *Id.* at 32,870.

28

The Department's experience since 2004 shows that the standard one-test system is less nuanced than the two-test system, which allowed for finer calibration in defining and delimiting the EAP exemption than the previous two-test system. *Id.* at 32,866. Whereas a two-test system has four variables than can be adjusted (two salary levels and two duties tests), the one-test system has only a single salary level and a single duties test, necessarily yielding less nuanced results. *Id.* In a one-test system, the Department can adjust either the salary level or the duties test to better identify which workers are employed in a bona fide EAP capacity. *Id.* The benefit of the one-test system, however—as confirmed by many comments submitted to the Department in this and prior rulemakings—is its simplicity, which makes the test significantly easier for employers to understand and apply. *See id.* at 32,866 & n.181. In the 2024 rule, the Department thus maintained the existing one-test system but adopted a salary level methodology that would better identify which employees are employed in a bona fide EAP capacity by adopting a salary level falling between the levels used in the previous long and short tests. *See id.* at 32,870. This approach restores overtime protections for many employees who perform substantial amounts of nonexempt work and historically would have been protected by the long duties test, while at the same time permitting employers to use the exemption for many employees (earning between the long and short test levels) who would have been exempt under the long duties test. *See id.* at 32,865, 32,870, 32,873. This approach thus better distributes between employees and their employers the impact of the shift to a one-test system on employees earning between the long and short test salary levels. *Id.* at 32,870.

In developing the January 1 methodology and determining where to set the salary level between the long and short test levels, the Department elected to use the second-lowest of the earnings ventiles between the long test salary level (the 25th percentile of full-time salaried worker

earnings in the lowest-wage Census Region, equaling $942 per week) and the short test salary level (approximately the 51st percentile of this data set, equaling $1,404).[10] *See id.* at 32,873. This approach produces a salary level that is high enough above the long test salary level to ensure overtime protection for some lower-paid employees who were traditionally entitled to overtime compensation under the two-test system by virtue of performing large amounts of nonexempt work, and also low enough—as compared with higher salary levels, such as the 2016 methodology—to significantly shrink the number of employees performing EAP duties who are excluded from exemption by virtue of their salary alone. *Id.* The resulting salary level of $1,128 per week is below the midpoint between the long and short tests ($1,173), because the Department took a more conservative approach to account for employers' reliance interests. *See id.*

Plaintiffs' argument that the January 1 methodology excludes too many workers misses the mark. *Contra* Texas Mot. at 15-16; Business Mot. at 17-18. The Department intentionally selected a salary level methodology that ensures that the exemption status of the vast majority of salaried white-collar workers will continue to depend on their job duties. Data analyzed by the Department shows that about three-quarters of full-time salaried white-collar workers—nearly 33 million of the approximately 45 million full-time salaried workers subject to the FLSA—earn above the January 1 salary level. 89 Fed. Reg. at 32,878. When a salaried worker earns above the salary level, the worker's exemption status depends solely on whether or not they meet the duties test. The January 1 salary level, thus, has no impact on the exemption status of a significant majority of

---

[10] Whereas the Department previously set the salary level based on earnings deciles (*e.g.*, the 10th, 20th, or 40th percentile of earnings), in the 2024 rule the Department considered the earnings ventiles between the long and short test salary levels—*i.e.*, 30th, 35th, 40th, 45th, and 50th percentiles of full-time salaried worker earnings in the lowest-wage Census Region. *See* 89 Fed. Reg. at 32,873. This refinement enabled the Department to more precisely adjust the methodology for the salary level test. *See* 88 Fed. Reg. at 62,168.

white-collar workers, and therefore the resulting EAP exemption is far from "a salary-only test." *Contra* PI Order at 25.

Further dispelling any notion that the January 1 salary level excludes too many employees, a minority of salaried white-collar workers who earn below the salary level meet the duties test, whereas the substantial majority of the far-larger population of salaried white-collar workers who earn above the salary level meet the duties test. 89 Fed. Reg. at 32,880. As Texas acknowledges, only 38% of the full-time salaried white-collar workers who earn less than the January 1 salary level (who, as noted above, constitute only about a quarter of full-time salaried white-collar workers overall) meet the standard duties test. *Id.* at 32,880. In contrast, 77% of the nearly 33 million full-time salaried white-collar workers who earn above the salary level meet the duties test.

The January 1 salary level methodology, used in conjunction with the standard duties test, is therefore well within the bounds of the Department's statutory authority to define and delimit EAP capacity.

## V.    The Updating Mechanism Is Lawful.

Plaintiffs fare no better on their challenge to the Department's mechanism for triennially updating the earnings thresholds using current data. The 2024 rule provides that "[f]uture updates to the standard salary level and HCE total annual compensation threshold with current earnings data will begin 3 years after the date of the initial update (July 1, 2027), and every 3 years thereafter, using the methodologies in place at the time of the updates." 89 Fed. Reg. at 32,843. The Department can delay any such updates due to unforeseen economic or other conditions, through the publication of an NPRM in the Federal Register. *Id.* at 32,973; 29 C.F.R. § 541.607.

Plaintiffs' first argument against the updating mechanism simply repackages their challenge to the Department's authority to set the salary level in this rule. *See* Business Mot. at 19-20 (arguing that the updating mechanism exceeds the Department's statutory authority because it

concerns salary level, rather than duties); Texas Mot. at 19. As discussed above, the Department has the statutory authority to use a salary level test. *See Wirtz*, 364 F.2d at 608. The triennial updating mechanism simply "ensure[s] that [the salary level] continue[s] to work *effectively* in combination with the duties tests in defining bona fide EAP employees." 89 Fed. Reg. at 32,852 (emphasis added). As workers' wages increase over time, a fixed minimum salary based on outdated data risks becoming obsolete, thereby failing to fulfill the intended role of the minimum salary component in helping to determine whether a worker is employed in a bona fide EAP capacity. *See, e.g.*, *id.* at 32,853.

Plaintiffs next contend that the updating mechanism exceeds the Department's authority because Congress did not expressly provide for such a mechanism. *See* Business Mot. at 20-21; Texas Mot. at 19-20. But, as explained, rather than defining and delimiting the terms of section 13(a)(1) in the statute itself, Congress chose to delegate that authority to the Department. 29 U.S.C. § 213(a)(1). That express delegation necessarily includes determining what data should be applied to the tests that the Department develops pursuant to that authority. And "the earnings thresholds are only an effective indicator of exempt status if they are kept up to date"; otherwise, "as wages for workers increase over time," "the thresholds become substantially less effective in helping identify exempt EAP employees." 89 Fed. Reg. at 32,855. Accordingly, the authority to ensure that the minimum salary component remains effective flows from the authority to set that test in the first place. It would be illogical for Congress to expressly delegate to the Secretary the authority to define and delimit the scope of the exemption and yet implicitly preclude the Secretary from determining both which data to apply to the test she develops and at what intervals she must update the underlying data. *Contra* Business Mot. at 20. *Cf.* 89 Fed. Reg. at 32,856 ("it is not surprising

that the FLSA contains no specific reference to the indexing or automatic adjustments of [earnings] thresholds" because those "thresholds are established in the regulations," not in the statute).[11]

Plaintiffs point to unrelated statutes in which Congress provided for indexing certain data used in defining statutory terms and setting certain charges and payments. Business Mot. at 20-21 (citing 29 U.S.C. § 1083(c)(7)(D)(vii); 16 U.S.C. § 497c(b)(3); 42 U.S.C. § 1337(a)(3)(C)(vii)); Texas Mot. at 20 n.12 (same). But, in the examples Plaintiffs cite, the updates established in those statutory provisions apply to related *statutory* definitions and protocols, whereas here the updating mechanism applies to the *regulation's* earnings thresholds. Indeed, those examples only bolster the propriety of the Department's use of triennial updates to ensure the effectiveness of its regulation, by demonstrating that Congress has favored similar updating mechanisms in statutory definitions. Likewise, as observed in a comment submitted by a group of administrative law professors on the 2023 NPRM, such schemes are "a common feature of regulations pegged to monetary values, even when the relevant authorizing statutes make no specific reference to indexing or automatic adjustment." 89 Fed. Reg. at 32,856 n.134 (citing, *e.g.*, 79 Fed. Reg. 63,317 (Oct. 23, 2014) (establishing automatic inflationary adjustments to the minimum amount set by the regulation to define "adverse credit history"); 76 Fed. Reg. 23,110 (Apr. 25, 2011) (establishing automatic adjustments to the amount of "denied boarding compensation" airlines must pay affected passengers); 88 Fed. Reg. 35,150 (May 31, 2023) (adopting once-every-five year inflation adjustments to the revenue threshold for defining a "small business")); *see also Amusement &*

---

[11] Texas emphasizes that Congress delegated authority to the Department to issue regulations under section 13(a)(1) "from time to time." Texas Mot. at 19-20 (quoting 29 U.S.C. § 213(a)(1)). But the updating mechanism by no means "preclude[s] the Department from engaging in future rulemaking 'from time to time' if it determines that there is a need to change the underlying methodologies for setting the standard salary level or HCE total annual compensation threshold, the updating mechanism, or any other substantive change to part 541, as the Department did, for instance, in 1940, 1949, 1958 1975, 2004, 2016, . . . 2019," and 2024. 89 Fed. Reg. at 32,857.

*Music Operators Ass'n v. Copyright Royalty Tribunal*, 676 F.2d 1144 (7th Cir.) (upholding a Copyright Royalty Tribunal regulation establishing a royalty fee payable by jukebox operators and making it subject to future inflationary adjustments), *cert. denied*, 495 U.S. 907 (1982).

Plaintiffs further argue that the updating mechanism violates the notice-and-comment requirements of the APA. Business Mot. at 21 (citing 5 U.S.C. § 553(b), (c)); Texas Mot. at 23. But the triennial updates do not themselves "establish[] rules and procedures." Business Mot. at 21 (quoting *Global Van Lines, Inc. v. ICC*, 714 F.2d 1290, 1299 n.9 (5th Cir. 1983)). Rather, they apply updated data to the earnings thresholds and methodology established in the regulations, which were promulgated through notice-and-comment rulemaking. As the Department explained, "future updates would make no change to the standard (*i.e.*, methodology) by which the Department implements the FLSA, but rather merely ensure that the standard accounts for current economic conditions." 89 Fed. Reg. at 32,856. As the Department determined, the updating mechanism better "fulfills its statutory obligation to define and delimit the EAP exemptions by preventing the threshold from becoming obsolete." *Id.*; *see also id.* (it is "more rational for the Department to proffer a regulation that expressly accounts for the inevitably dynamic nature of every salary threshold . . . rather than to permit arbitrarily fluid macroeconomic conditions to dictate the threshold's true economic worth" (quotation marks omitted)). Nor will this mechanism "alter the Department's ability to engage in future rulemaking to change the updating mechanism or any other aspect of the part 541 regulations at any point." *Id.* at 32,857. Moreover, the Department retains the authority and flexibility to adapt to unforeseen circumstances by pausing any given update when necessary—and any such action would be taken through the publication of a notice of proposed rulemaking in the Federal Register. *Id.* at 32,973; 29 C.F.R. § 541.607.

## VI.    The Department Engaged in Reasoned Decisionmaking.

The Department clearly explained its reasoning for each of its changes to the EAP regulations. "The arbitrary and capricious standard is highly deferential," *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 453 (5th Cir. 2015) (quotation marks omitted), and "a court is not to substitute its judgment for that of the agency," *Hasie v. Off. of Comptroller of Currency of U.S.*, 633 F.3d 361, 365 (5th Cir. 2011). Here, the Department's explanations and justifications easily satisfy the APA's arbitrary-and-capricious standard, which "require[es] only that the agency articulate a rational relationship between the facts found and the choice made." *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 620 (5th Cir. 2000) (cleaned up); *see also Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"). Plaintiffs' contrary arguments lack merit.

Texas's and the Business Organizations' arbitrary-and-capricious claims are yet another restyling of their statutory arguments, and accordingly these claims fail for the reasons Defendants explained above. The closest that Plaintiffs come to proffering a distinct argument is to suggest that the Department erred by not following the analysis of the *Nevada* district court. Texas Mot. at 21-22. But this suggestion is both inapposite and baseless. As an initial matter, the 2024 rule differs from the 2016 rule; most significantly, the Department adopted a salary level methodology—the 35th percentile of full-time salaried worker earnings in the lowest-wage Census Region—that it explicitly rejected in its 2016 rule because it would have produced a salary level below the short test level. *See* 89 Fed. Reg. at 32,873. Further, the question under the arbitrary-and-capricious standard is merely whether the Department reasonably considered the *Nevada* decision, and reasonably explained that consideration. It did both. The 2024 rule cited the *Nevada* decision repeatedly and discussed it at length, before adopting a new salary level methodology that differs

from the 2016 methodology. *Id.* at 32,842, 32,846, 32,869. The Department also responded to commenters who asserted that the "Department lacks statutory authority to update the thresholds in this manner," *id.* at 32,856, that "Congress did not provide for automatic updating of any of the earnings requirements under the FLSA," *id.*, and "that the 2016 methodology excluded too many employees from the exemption based on their salary alone," *id.* at 32,863. On all points—and certainly those points that Plaintiffs raise in their briefs—the Department engaged with the relevant statutory authorities and case law, including *Nevada*.

The Business Organizations' further arguments fare no better. First, the Department justified its decision to increase the HCE exemption threshold to $151,164. *Contra* Pls.' Mot. at 24. The HCE exemption provides a streamlined test for exemption for employees who are paid "an amount substantially higher than the annual equivalent of the weekly standard salary level [and who] will almost invariably pass the standard duties test." 89 Fed. Reg. at 32,882 (citing 84 Fed. Reg. at 51,249). The Business Organizations accuse the Department of failing to consider the burden caused by the need for employers to reevaluate the exemption status of highly compensated employees affected by the rule. Business Mot. at 24. But the Department expressly considered that concern, 89 Fed. Reg. at 32,884, including by incorporating a reasonable estimate of adjustment costs (in addition to ongoing managerial costs and transfers) associated with the increase in the HCE threshold into its economic analysis, *id.* at 32,910. And it found that the "only way to ensure that the HCE test serves its intended purpose—*i.e.*, serving as an efficient, streamlined test for employees who would 'almost invariably' meet the standard duties test"—was to raise the HCE

threshold. *Id.* at 32,884.[12] The Business Organizations' criticism that the HCE level is too high, Business Mot. at 24, is unpersuasive considering historical evidence: the percentile used to determine the HCE threshold in the 2024 rule is significantly lower than that in the 2004 rule, "which covered 93.7 percent of salaried workers nationwide," 89 Fed. Reg. at 32,883. The 2024 rule sets the HCE threshold equal to the 85th percentile of earnings of full-time salaried workers nationally. *Id.* at 32,884. This threshold is also below the 90th percentile methodology adopted in the 2016 rule, which would have produced an HCE threshold of $179,972 today. *Id.* at 32,934 tbl. 25.

The Department likewise sufficiently considered and addressed employers' reliance interests. *Contra* Business Mot. at 25; Texas Mot. at 21. In evaluating and responding to the evidence presented to the agency, the Department expressly considered employers' reliance interests, alongside other factors, when setting the updated salary level. 89 Fed. Reg. at 32,873 ("The Department believes that employer reliance interests should inform where the salary level is set between the long and short test levels[.]"). In fact, as explained above, the Department based the minimum salary methodology on the second ventile (the 35th percentile) between the historic long-test and short-test methodologies (instead of at the midpoint, which is higher), specifically because of the business community's reliance interests. *See id.* Though the Business Organizations would have preferred the Department to choose a different salary level methodology, the Department did not act arbitrarily and capriciously by choosing not to implement the Business Organizations' preferred approach; rather, what matters is that the Department actually considered

---

[12] Employees who no longer meet the HCE threshold will largely still be exempt by passing the standard duties analysis. *See* 89 Fed. Reg. at 32,884 ("The HCE test is [intended for] employees who are so highly paid that they will almost invariably pass the standard duties test;" while "the HCE test may exempt some employees who fail the standard duties test and would otherwise be entitled to overtime pay, such outcomes should be 'rare'"); *id.* at 32,898 n.335.

and addressed commenters' concerns. *Hasie*, 633 F.3d at 365 ("a court is not to substitute its judgment for that of the agency").

The Business Organizations further fault the Department for permitting only ten percent of nondiscretionary bonuses and incentive payments to count toward the minimum salary requirement. Business Mot. at 26. The Department did not make any changes to the treatment of bonuses and so Plaintiffs' argument is inapposite. *See* 88 Fed. Reg. at 62,169 ("The Department is not proposing any changes to how bonuses are counted toward the salary level requirement."). The cap on amount of nondiscretionary bonuses that can count toward the salary level is unchanged from the 2019 rule that Plaintiffs elected not to challenge. *See* 89 Fed. Reg. at 32,877. In endorsing the status quo, the Department maintained its position from the 2019 rule—the first rule that took effect that allowed certain bonuses to count toward the minimum salary level—that a ten-percent cap "appropriately modernizes the regulations to account for EAP compensation practices in a growing number of workplaces, while at the same time preserving the important role of the salary basis and salary level tests in identifying EAP employees, simplifying compliance, and preventing abuse." 84 Fed. Reg. at 51,258. Though the Business Organizations may wish that the Department revised the cap, their argument that the agency acted arbitrarily and capriciously with respect to this request fails.

Finally, Plaintiffs wrongly contend that the triennial updating mechanism is arbitrary and capricious because the Department has not adequately explained its departure from the decision not to implement an updating mechanism in its previous rulemakings. Business Mot. at 22; Texas Mot. at 23. But "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), and the Department more than fulfilled that obligation. *See generally FCC v. Fox*

*Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must merely "display awareness that it *is* changing position" and "show that there are good reasons for the new policy"). In the 2024 EAP rule, the Department explained that it decided "not to institute an automatic updating mechanism in the 2004 and 2019 rulemakings" but noted that it had never taken the position that it lacked authority to do so. 89 Fed. Reg. at 32,857; *contra* Business Mot. at 19-20. Further, the Department described in detail the reasons it declined to institute an updating mechanism in the previous rules, including a concern with "inflation-based updating mechanism" in the 2004 rule and a concern about preserving "flexibility" in the 2019 rule. 89 Fed. Reg. at 32,857. The Department addressed these concerns by adopting an updating mechanism that accounted for these concerns. *See id.* at 32,857; 32,860-61. Over several pages, the Department also explained why it decided to institute an updating mechanism in the 2024 EAP rule, including that such an approach "would allow for regular and more predictable updates to the earnings thresholds" than have occurred in the past, "which would benefit both employers and employees and would better fulfill the Department's statutory duty to define and delimit the EAP exemption by preventing the erosion of those levels over time." *Id.* at 32,858. The Department further explained that the updating mechanism will ensure that "the earnings thresholds will change only to the extent earnings data in the relevant data sets have changed, whether upward or downward as conditions dictate." *Id.* at 32,857. The APA requires no more.

**VII.  The Rule Reflects a Lawful Delegation.**

Texas also fails in its attempt to repackage its statutory-authority argument as a separate claim that section 13(a)(1), to the extent that it authorizes the Department to use a minimum salary component or updating mechanism, is an unconstitutional delegation of legislative authority. *See* Texas Mot. at 24. "[A] statutory delegation is constitutional as long as Congress lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the

delegated authority] is directed to conform." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (quotation marks omitted). The "intelligible principle" supplied "to guide the delegee's use of discretion," *id.* at 136, is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of th[e] delegated authority," *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 442 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2746 (2021).

These standards "are not demanding." *Id.* Although Congress has delegated authority since "the beginning of the government," the Supreme Court "has found only two delegations to be unconstitutional." *Id.* at 441-42, 446. One "provided literally no guidance for the exercise of discretion," and the other "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001) (citing *Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)). By contrast, in the almost 90 years since those two decisions—both from 1935 and both concerning the same statute—the Supreme Court has consistently upheld Congress's "ability to delegate power under broad standards," *Mistretta v. United States*, 488 U.S. 361, 373 (1989), and "ha[s] 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law,'" *Am. Trucking*, 531 U.S. at 474-75 (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)).

For example, the Supreme Court has upheld statutes, among others, authorizing the Secretary of War to determine and recover "excessive profits" from military contractors, *Lichter v. United States*, 334 U.S. 742, 785-86 (1948) (quotation marks omitted); authorizing the Price Administrator to fix "fair and equitable" commodities prices, *Yakus v. United States*, 321 U.S. 414, 420 (1944) (quotation marks omitted); authorizing the Federal Communications Commission to

regulate broadcast licensing as "public interest, convenience, or necessity" requires, *Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 225-26 (1943) (quotation marks omitted); and authorizing the Securities and Exchange Commission to ensure that a holding company's structure does not "unfairly or inequitably distribute voting power among security holders," *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104-05 (1946) (quotation marks omitted).[13]

Here, Texas does not even argue that section 13(a)(1) of the FLSA fails to "delineate[] the general policy" or "the boundaries of th[e] delegated authority." *Big Time Vapes*, 963 F.3d at 442 (quotation marks omitted). Instead, Plaintiff contends that the statute lacks an "'intelligible principle' . . . *that supports the salary-level test or the [updating] mechanism*." Texas Mot. at 25 (emphasis added). But this contention—that the salary level and updating mechanism exceed the "boundaries of th[e] delegated authority," *Big Time Vapes*, 963 F.3d at 442, which Texas's restricted interpretation limits to a "statutorily authorized duties test"—is wholly duplicative of Texas's argument that the FLSA does not authorize the Department to establish a salary level or updating mechanism. Texas fails to argue that the delegation of authority to define and delimit the scope of the exemption lacks boundaries to begin with. And for the reasons explained above, the use of a minimum salary level and updating mechanism falls well within the Department's statutory authority, and Texas's superficial nondelegation challenge likewise fails.

In any event, 29 U.S.C. § 213(a)(1) is unquestionably a constitutional delegation. Courts have consistently agreed that Congress's express grant of authority to the Department to "define[]

---

[13] The Fifth Circuit, too, has "upheld Congress's delegations." *Big Time Vapes*, 963 F.3d at 442 n.17; *see, e.g.*, *United States v. Jones*, 132 F.3d 232, 239-40 (5th Cir. 1998) (upholding delegation of authority to the Department of Justice to "define nonstatutory aggravating factors" to determine which offenders were "death-eligible" under the Federal Death Penalty Act); *United States v. Mirza*, 454 F. App'x 249, 256 (5th Cir. 2011) (per curiam) (upholding International Emergency Economic Powers Act delegation authorizing the President to declare a national emergency and limit certain types of economic activity related to that threat).

and delimit[]" the terms "bona fide executive, administrative, or professional capacity" falls well within the broad range of delegations approved by the Supreme Court and the Fifth Circuit. *See, e.g.*, *Walling*, 140 F.2d at 832 ("We think there can be no question that the power" to "define and delimit" the EAP exemption "was lawfully delegated"); *Fanelli*, 141 F.2d at 218 ("In conferring such authority upon the Administrator" to "define and delimit" the terms used in section 13(a)(1), "Congress acted in accordance with a long established tradition (frequently sanctioned by the Supreme Court), and did not unconstitutionally delegate powers vested in the legislative branch.").

"The statutory language [of section 13(a)(1)] itself is an intelligible principle that guides the Department in its rulemaking and limits its discretion," *Mayfield*, 693 F. Supp. 3d at 724, thereby marking the "boundaries of this delegated authority," *Mistretta*, 488 U.S. at 372-73—namely, that the Department may exempt from overtime protections only those employed in a "bona fide executive, administrative, or professional capacity," 29 U.S.C. § 213(a)(1); *see also Walling*, 140 F.2d at 832 (Congress set forth "specific criteria . . . by which employer and enforcement agency could determine . . . whether an employee fell within or without one of the exempted employments"). The Department could not, for example, rely on a salary level test without an accompanying duties test, because doing so would not fully account for the "capacity" in which the employee was engaged. 84 Fed. Reg. at 51,239. *Cf.* 89 Fed. Reg. at 32,842 (explaining the three distinct elements used to determine an employee's EAP exemption status). These meaningful textual limitations on the Department's discretion set section 13(a)(1) apart from the standardless delegation at issue in *Panama Refining* and *A.L.A. Schechter Poultry*. *See Am. Trucking*, 531 U.S. at 474 (explaining that those cases involved a statute that "provided literally no guidance for the exercise of discretion" and conferred vast regulatory authority with only the vague instruction to assure "fair competition"). So too are they distinguishable from the delegation

at issue recently in *Consumers' Research v. FCC*, which the Fifth Circuit perceived as "a hollow shell that Congress created for [the agency] to fill—so amorphous that no reviewing court could ever possibly invalidate any FCC action taken in its name." No. 22-60008, 2024 WL 3517592, at *16 (5th Cir. July 24, 2024) (en banc); *see id.* at *12, *16 (expressing nondelegation "concerns" regarding provision that allowed FCC to levy taxes on consumers without any "real constraint").

Because in section 13(a)(1) of the FLSA "Congress clearly delineate[d] the general policy, the public agency which is to apply it, and the boundaries of th[e] delegated authority," *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946), Defendants are entitled to summary judgment on Texas's nondelegation claim.

## VIII. Texas's Tenth Amendment Argument Lacks Merit.

Despite acknowledging Supreme Court precedent to the contrary, Texas asserts that the Tenth Amendment prevents the federal government from enforcing the 2024 EAP rule, and by extension the FLSA, against state governments. That argument is squarely foreclosed by *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985) (cited in Texas Mot. at 25). In *Garcia*, the Court held that there is no Tenth Amendment violation where a governmental employer "faces nothing more than the same minimum-wage and overtime obligations that hundreds of thousands of other employers, public as well as private, have to meet." 469 U.S. at 554. Consistent with *Garcia*, the federal government may subject state and local-government employers to the same standards that apply to private-sector employers. *See, e.g.*, William J. Rich, *Modern Constitutional Law* § 35:15 (3d ed. 2023) (*Garcia* "restored the previously accepted view that, as long as Congress acted within its enumerated powers, it could regulate state as well as private entities"). "*Garcia* controls the disposition of this issue." *Nevada*, 275 F. Supp. 3d at 802 (rejecting Tenth Amendment argument in challenge to 2016 EAP rule).

Texas meekly suggests that this Court has an "opportunity" to evade *Garcia*'s holding by finding that the 2024 rule commandeers the State into administering a regulatory program. Texas Mot. at 26. But Texas does not—and cannot—identify a program that the rule makes the State administer. Texas invokes *New York v. United States*, in which the Supreme Court held that Congress could not require state governments to oversee regulatory programs in their state to govern the disposal of radioactive waste. 505 U.S. 144, 176 (1992). But the 2024 rule, by contrast, does not require Texas to oversee other employers' compliance with the overtime pay requirements. Rather, the rule—like the FLSA—merely requires that the State, like any private employer, pay its own nonexempt employees time-and-a-half for time worked in a week above 40 hours. This generally applicable requirement survives constitutional scrutiny, even if it imposes some costs on Texas. *See Garcia*, 469 U.S. at 554.[14]

Texas's appeal to the clear statement rule is unavailing. That rule provides that when "a statute [is] susceptible of two plausible interpretations, one of which would have altered the existing balance of federal and state powers," the statute should be read to maintain the existing balance absent a clear indication from Congress. *See Salinas v. United States*, 522 U.S. 52, 59 (1997). That rule has no application here, "[b]ecause Congress's intention for the FLSA to apply to the States is unmistakably clear in the language of the statute." *Nevada*, 275 F. Supp. 3d at 803 (quotation marks omitted). Specifically, Congress stated that the FLSA applies to public agencies, 29 U.S.C. § 203(s)(1)(C), and public agencies include the "government of a State or political

---

[14] The crux of Texas's argument—*i.e.*, that imposing financial obligations upon a state, which may force it to make budgetary adjustments—is identical to the argument in the *Garcia* dissent, which the majority there declined to adopt. *See Garcia*, 469 U.S. at 557, 578 (Powell, J., dissenting) ("The financial impact on States and localities of displacing their control over wages, hours, overtime regulations, pensions, and labor relations with their employees could have serious, as well as unanticipated, effects on *state and local planning, budgeting, and the levying of taxes*." (emphasis added)).

subdivision thereof," 29 U.S.C. § 203(x).[15] Accordingly, under clear Supreme Court precedent, Defendants are entitled to summary judgment on Plaintiffs' Tenth Amendment claim.

## IX.    Any Relief Must Be Tailored.

For the reasons explained, Defendants are entitled to summary judgment on each of the Plaintiffs' claims. Should the Court disagree and find that Plaintiffs are entitled to summary judgment on at least some part of their claims, relief should (1) be tailored to the portions of the 2024 rule that the Court determines are unlawful and (2) run only to Plaintiffs.

Vacatur under section 706 would not be appropriate. The APA's provision for courts to "set aside" unlawful agency actions, 5 U.S.C. § 706(2), does not authorize the type of universal vacatur that Plaintiffs seek. As a matter of first principles, the "set aside" language in section 706(2) should not be read as authorizing remedies—which are governed by section 703 of the APA—at all. Section 703 states that "[t]he form of proceeding for judicial review" of agency action is either a "special statutory review proceeding" or, in "the absence or inadequacy thereof," any "applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or *habeas corpus*." 5 U.S.C. § 703. Because Plaintiffs do not purport to identify any applicable "special statutory review proceeding," section 703 affords them only traditional equitable remedies such as a prohibitory injunction. *See* S. Doc. No. 79-248, at 36–37 (1946) (referring to section 703 as governing remedies). In contrast, section 706(2) does not address remedies at all. Rather, section 706(2) is properly understood as a rule of decision directing the reviewing court to disregard unlawful "agency action, findings, and conclusions" in

---

[15] Texas provides no authority for its counter-textual suggestion, Texas Mot. at 26, that the clear statement rule may bar application of the minimum salary component even if the rest of the FLSA clearly applies to the State. But Congress clearly directed that the entire FLSA apply to state governments, without carving out any component. *See Nevada*, 275 F. Supp. at 803.

resolving the case before it, consistent with basic principles of judicial review. Universal vacatur is therefore not an available remedy under the APA. *See United States v. Texas*, 599 U.S. 670, 693-99 (2023) (Gorsuch, J., concurring); *Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-CV-278-P, 2024 WL 965299, at *41-43 (N.D. Tex. Mar. 5, 2024) (explaining that the "APA does not explicitly authorize vacatur").

Further, as the Supreme Court recently cautioned, a plaintiff generally has no cognizable Article III interest in interfering with an agency's regulation of third parties. *See FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 372 (2024) (explaining that, "[u]nder Article III of the Constitution, a plaintiff's desire to make a drug less available for others does not establish standing to sue."). Universal relief—whether an injunction or vacatur—would thus exceed the Court's Article III authority.

While the Fifth Circuit has described vacatur of an unlawful agency action as the "default rule," *Data Mktg. P'ship LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859-60 (5th Cir. 2022), it did so prior to the Supreme Court's decision in *Alliance*. Recently, the Fifth Circuit repeated its holding on vacatur without discussing *Alliance*. *Texas Med. Ass'n v. U.S. Dep't Health & Hum. Servs.*, No 23-cv-40217, 2024 WL 3633795 at *11 (5th Cir. Aug. 2, 2024). And even if the APA authorizes vacatur in some form, the Fifth Circuit has treated universal vacatur as a discretionary equitable remedy, neither automatic nor compelled in every case. *See Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality opinion) (concluding without contradiction from any member of the court that the district court could consider on remand "a more limited remedy" than universal vacatur, and instructing the district court to "determine what remedy . . . is appropriate to effectuate" the judgment), *aff'd*, 602 U.S. 406 (2024); *Central & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (declining to enter vacatur in favor of remand). Further, the Supreme

46

Court has explained that Congress's authorization for courts to issue a remedy "hardly suggests an absolute duty" to grant such relief "under any and all circumstances." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Rather, a statutory provision authorizing remedies, especially equitable remedies, should be construed consistent with "the traditions of equity practice." *Id.* ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case."). The APA reinforces that longstanding rule by explicitly stating that its authorization of judicial review does not affect "the power or duty of the court to . . . deny relief on any . . . equitable ground." 5 U.S.C. § 702(1).

Here, under traditional equitable principles, the Court should decline to vacate the entirety of the 2024 EAP rule and instead enjoin Defendants from enforcing against Plaintiffs those portions of the rule that the Court determines to be unlawful and for which Plaintiffs have demonstrated Article III standing. *See Chamber of Com. of the U.S. v. CFPB*, 691 F. Supp. 3d 730, 745 (E.D. Tex. 2023) ("Enjoining an agency from acting as to only the plaintiffs, rather than vacating agency action as to even non-plaintiffs, would be the narrower path[.]"), *appeal filed*, No. 23-40650 (5th Cir. Nov. 8, 2023). And such a specific injunction would fully redress any harms Plaintiffs have demonstrated they face. *See id.* In this regard, Plaintiffs lack an Article III interest in interfering with an agency's regulation of third parties. *See Alliance*, 602 U.S. at 374. Nationwide relief—whether an injunction or vacatur—would accordingly contravene Article III.

Finally, the Court should enjoin only the portions of the 2024 rule that it determines are unlawful. As explained above, the 2024 rule conclusively establishes the Department's intent that the rule be severable, and each of the challenged aspects of the rule can stand without the others. Partial relief is appropriate here because the challenged rule is "plainly divisible." *Am. Waterways Operators v. Wheeler*, 507 F. Supp. 3d 47, 78 (D.D.C. 2020). In *American Iron & Steel Institute*

*v. Occupational Safety & Health Administration*, for example, the D.C. Circuit considered a challenge to industry-specific regulations "designed to protect American workers from exposure to airborne lead in the workplace." 939 F.2d 975, 978 (D.C. Cir. 1991). Following the agency's lead, the court analyzed the challenged standards industry by industry and upheld the regulations for all but one of the industries. *Id.*; *see also Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1173 (D.C. Cir. 1994) (partial vacatur of cell service regulation in one pre-defined geographic region). The 2024 rule, like the rule at issue in *American Iron*, contains three independent policies that can be disaggregated. Accordingly, if the Court concludes any of the challenged policies are unlawful, it should also conclude the rule is "plainly divisible," *Wheeler*, 507 F. Supp. 3d at 78, and grant only partial relief, *see Sw. Elec. Power Co.*, 920 F.3d at 1033.

An injunction against, or vacatur of, the rule in its entirety would offend the principle that equitable relief "must not be 'more burdensome to the defendant than necessary to redress' the plaintiff's injuries." *Labrador v. Poe*, 144 S. Ct. 921, 927 (2024) (Gorsuch, J., concurring) (cleaned up). In *Labrador*, several justices cautioned courts "to take heed" of the limits on their equitable powers. *Id.* These limits on equitable relief are well established: "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" on their valid claims, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); equitable relief "must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 585 U.S. 48, 68 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)); *see Lewis*, 518 U.S. at 357 (reversing injunction to the extent it granted relief "beyond what was necessary to" redress the specific violations established by the plaintiff class). At the absolute most, the Court may enjoin Defendants from enforcing only those portions of the rule that it determines are unlawful against Plaintiffs.

48

## CONCLUSION

For the foregoing reasons, the Court should deny the Business Organizations' motion for summary judgment, ECF No. 46, deny Texas's motion for summary judgment, ECF No. 48, and grant Defendants' motion for summary judgment.


Dated: August 8, 2024                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

                                         JULIE STRAUS HARRIS
                                         Assistant Director, Federal Programs Branch

                                         /s/   *Brian Rosen-Shaud*
                                         BRIAN C. ROSEN-SHAUD
                                         CHRISTINE L. COOGLE
                                         Trial Attorneys
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L. Street, NW
                                         Washington, D.C. 20005
                                         (202) 305-7667
                                         brian.c.rosen-shaud@usdoj.gov