IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS,** | § | CIVIL ACTION NO. 4:24-CV-00499-SDJ |
| *Plaintiffs,* | § | LEAD CASE |
| | § | |
| **PLANO CHAMBER OF COMMERCE,** *et al.,* | § | |
| *Cons. Plaintiffs,* | § | CIVIL ACTION NO. 4:24-CV-00468-SDJ |
| | § | |
| v. | § | |
| | § | |
| **UNITED STATES DEPARTMENT OF LABOR, JULIE A. SU,** in her Official Capacity as United States Secretary of Labor, **THE WAGE AND HOUR DIVISION OF THE DEPARTMENT OF LABOR,** and **JESSICA LOOMAN,** in her Official Capacity as Administrator of the Wage and Hour Division, | § | |
| *Defendants.* | | |

**BRIEF OF PROFESSORS DANIEL FARBER, JEFFREY LUBBERS, BIJAL SHAH, PETER M. SHANE, AND PETER STRAUSS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

Mark B. Samburg
D.C. Bar No. 1018533*
Carrie Y. Flaxman
D.C. Bar No. 458681
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-448-9090
msamburg@democracyforward.org
cflaxman@democracyforward.org

*Counsel for* amici curiae

*admitted *pro hac vice*

## **INTEREST OF *AMICI CURIAE***

*Amici* are law professors who teach and write in the fields of administrative law, regulation, and statutory interpretation. *Amicus* Daniel Farber is the Sho Sato Professor of Law at the University of California, Berkeley. *Amicus* Jeffrey Lubbers is Professor of Practice in Administrative Law at American University, Washington College of Law. *Amicus* Bijal Shah is Professor of Law and Provost Faculty Fellow at Boston College Law School. *Amicus* Peter M. Shane is the Jacob E. Davis and Jacob E. Davis II Chair in Law Emeritus at Ohio State University, Moritz College of Law. *Amicus* Peter Strauss is the Betts Professor of Law Emeritus at Columbia Law School.

As experts in their fields, *amici* have significant personal and professional interest in the jurisprudence of administrative law developing in a predictable and legally correct manner. With the ink on *Loper Bright Enterprises v. Raimondo*, 603 U.S. __ (2024), yet to dry, *amici* recognize that analysis of the decision and its import may be especially useful. Because this case also implicates several other important questions in *amici*'s areas of expertise, *amici* also write to discuss two additional issues which particularly concern the Rule at issue here. Specifically, *amici* write to explain 1) that the best—indeed, the only—reading of the Fair Labor Standards Act ("Act") authorizes the Secretary to incorporate a salary level test in defining and delimiting the overtime exemption for executive, administrative, and professional employees; and 2) that effectuating severance clauses like the one in this Rule is consistent with longstanding precedent.

## **INTRODUCTION AND SUMMARY OF THE ARGUMENT**

The Department of Labor has raised the threshold of the salary test for overtime exemption—just as it has done on eight prior occasions over the last eight-plus decades. And as with each of those prior updates to the salary test, this update will provide badly needed

protections to hard-working Americans. Plaintiff Texas characterizes the Department of Labor's "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees" Rule, 89 Fed. Reg. 32842 (Apr. 26, 2024) ("Rule") as little more than a Hollywood-style reboot of a failed predecessor. Tex. Pl. Mot. Summ. J. 1, ECF 48. On the contrary, the Rule is the ninth instance in a series of lawful and nonarbitrary updates to the salary test, each of which has been vital to the welfare of salaried workers.

The Rule relies on the Department of Labor's long-standing interpretation of its authority under the Fair Labor Standards Act. That interpretation is the only permissible reading of the statute, and it unquestionably authorizes the use of a salary test as part of the definition of executive, administrative, and professional employees. *Loper Bright* does not change that conclusion. In fact, it both underscores the importance of the Department of Labor having consistently interpreted the Act in this way since its 1938 passage and clarifies that Plaintiffs' disagreements with the Rule's specific salary test levels are disagreements with agency policymaking decisions, not challenges to the Department of Labor's statutory authority.

Finally, the Department of Labor was also plainly authorized to implement the Rule's automatic indexing provision, but if this Court concludes that that provision should be invalidated for any reason, it is severable from the Rule's remaining provisions.

## **ARGUMENT**

I.  **The Act Clearly Authorizes the Inclusion of a Salary Test, and *Loper Bright* Poses No Obstacle.**

Plaintiff Texas ("Texas") argues that *Loper Bright* "has ushered in a sea change in how courts" are to approach agency interpretations of statutes. Tex. Pl. Mot. Summ. J. 1, ECF 48. While the overruling of the familiar two-step *Chevron* analysis may affect some agency interpretations of their authorizing statutes, it should not affect this case. In declaring that

3

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) "is overruled," *Loper Bright*, slip op. at 35, the Supreme Court has made clear that courts must now instead "exercise their independent judgment in deciding whether an agency has acted within its statutory authority," *id.*, rather than deferring to an agency interpretation "simply because a statute is ambiguous." *Id.*

But courts do not exercise that judgment in a vacuum—they are to determine a statute's "single, best meaning," *id*. at 22, "after applying all relevant interpretive tools." *Id.* at 23. And those interpretive tools include "properly resort[ing] for guidance" to the "body of experience and informed judgment," *Loper Bright*, slip op. at 16 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), reflected in agency statutory interpretations issued contemporaneously with a statute's enactment. *Loper Bright* does not imply that the "best reading" of a statute will necessarily restrict agency authority: to the contrary, it explains that the best reading of a statute "may well be that the agency is authorized to exercise a degree of discretion." *Id*. at 17. In this case, following *Loper Bright*'s instructions and determining the "best reading" of the relevant portion of the Act makes clear that the Department of Labor's interpretation of 29 U.S.C.A. §213 has been "the correct interpretation" *Loper Bright*, slip op. at 25, for decades.

   a. The best, and indeed only plausible reading of the Act authorizes the Department to include a salary test.

The Rule relies upon the Department of Labor's 86-year-old interpretation of the Act. That interpretation is simple: Congress's instruction that the statutory terms "bona fide executive, administrative, or professional capacity" be "defined and delimited" by the Secretary both authorizes the inclusion of a salary test in the regulatory definition of those terms and authorizes the Secretary to set the threshold for that test. 29 U.S.C.A. § 213(a)(1). This interpretation is not merely the "best reading" of the statute, *Loper Bright*, slip op. at 23, it is the *only* interpretation

4

consistent with the statute's text and with the lengthy regulatory and statutory history of the overtime exemptions.

      *i.*  *The text of the Act plainly authorizes the inclusion of a salary test.*

"[B]egin[] with the text[.]" *Ross v. Blake*, 578 U.S. 632, 638 (2016). The text of 29 U.S.C.A. § 213(a)(1) makes clear that Congress unambiguously intended to delegate substantial authority to the Secretary: the Act provides that "executive, administrative, or professional capacity" shall be "defined and delimited . . . by regulations of the Secretary," subject to certain enumerated limitations. *Id*. To "delimit" means "[t]o mark (a boundary); to fix (a limit)." *Delimit*, Black's Law Dictionary (11th ed. 2019). To "define" includes the extremely similar definitions "[t]o fix or establish (boundaries or limits)," and two additional definitions: "[t]o state or explain explicitly," or "[t]o set forth the meaning of (a word or phrase)." *Define*, Black's Law Dictionary (11th ed. 2019). Remaining mindful that "[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant," *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)) (internal quotation marks omitted), "defined" must, in the context of Section 213, mean one of the things that is distinct from "delimited," and the inclusion of "delimited" must be significant.[1]

"Congress chose general phrases to describe the exempted classes of employees and delegated to the Administrator the power and duty, by regulation, **to define and delimit those classifications by reasonable and rational specific criteria**." *Walling v. Yeakley*, 140 F.2d 830,

---

[1] Tellingly, despite their various exhortations of the primacy of textualism, *see* Tex. Pl. Mot. Summ. J. 12-14, ECF 48; Bus. Pl. Mot. Summ. J. 15-16, ECF 46, all plaintiffs ignore one of the basic principles of textual interpretation, offering no reading of the statute that gives meaning to the word "delimited."

5

831-32 (10th Cir. 1944) (emphasis added). By using "delimit" in addition to "define," Congress clearly authorized the Department of Labor to do more than merely establish specific regulatory definitions for the statutory terms. Empowering the Secretary to fix or establish boundaries or limits of the meaning of "executive, administrative, or professional capacity," when the Secretary is separately empowered to set forth the meaning of those terms must mean that the Secretary has either the power: 1) to determine the boundaries and limits of the population of people who qualify for the exemption; or 2) to determine the boundaries and limits of the criteria, information, and considerations that can be incorporated into the definition. Under either meaning, however, Congress's inclusion of "delimited" would be rendered superfluous by any reading of the Act that does not authorize the Department to include criteria besides simple descriptions of duties in the definitions. A salary test is just such a "delimiting" criterion.[2]

Further, Congress's decision to include a limitation on the scope and content of definitions the Department is authorized to promulgate is telling: Congress expressly provided that retail and service employees meeting certain conditions are to be considered executive or administrative employees, leaving the Secretary without contrary discretion. 29 U.S.C.A. § 213(a)(1). Based on the history of the regulatory scheme, there is a strong implication that Congress omitted additional limitations—especially a statutory prohibition on the use of a salary test—by deliberate choice, not inadvertently. *Cf. Barnhart v. Peabody Coal, Co.*, 537 U.S. 149, 168 (2003) ("the canon *expressio unius est exclusion alterius* does not apply to every statutory

---

[2] Plaintiffs note that the Act does not expressly provide for a salary test. Bus. Pl. Mot. Summ J. 5, ECF 46; Tex. Pl. Mot. Summ. J. 5, ECF 48. Nor, however, does the text of the Act expressly provide for inclusion of a duties test or any other specific criterion. The Act simply instructs the Department to define and delimit the relevant terms—the Department has done so, delimiting the relevant criteria to include both duties and salary, despite the Act not expressly requiring either.

list or grouping; it has force only when items expressed are members of an 'associated group or series,' **justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence.**") (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002) (emphasis added)).

> ii. *Loper Bright makes clear that the Court should consider the Department's long-standing interpretation in determining the best reading of the Act.*

"Courts may . . . seek aid from the interpretations of those responsible for implementing particular statutes . . . [as] a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Loper Bright*, slip op. at 16 (quoting *Skidmore*, 323 U.S. at 140) (internal quotation marks omitted). And that deference is "especially" appropriate in the case of "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time." *Id.*, slip op. at 17. If that instruction is to mean anything, it certainly must require that this Court resort for guidance to the Department's interpretation of the Act in this case.

The Act—including an instruction that "bona fide executive, administrative, [or] professional" would be "defined and delimited" by the Department of Labor—was finalized on June 25, 1938. 52 Stat. 1067 (1938). On October 20, less than four months later, the Department announced initial definitions of those terms, including a salary test for executive and administrative employees of $30 per workweek. 3 Fed. Reg. 2518-01 (Oct. 20, 1938). In the intervening 86 years leading up to the Rule, the Secretary changed the lower salary threshold for the determination of exempt status under the Act (*i.e.* the salary threshold associated with the "long" test until 2004, and the standard salary test thereafter) no fewer than eight additional

7

times.[3]  The Department immediately and contemporaneously interpreted the Act to authorize the inclusion of a salary test, and has not wavered from that interpretation for nearly nine decades.  If there were any doubt that the best reading of the Act authorizes the Rule, the persuasive effect of the agency's interpretation surely resolves it.

      Furthermore, Congress has clearly considered the inclusion of a salary test to be consistent with the Department's authority under the FLSA.  Since the first salary test in 1938, forty-four consecutive Congresses have chosen not to restrict, invalidate, or prohibit that approach.  In that time, Congress has frequently taken other action with respect to the FLSA, including amending Section 213 twenty times,[4] and making a total of ten amendments to the

---

[3] 5 Fed. Reg. 4077-1 (Oct. 15, 1940) (setting professional exemption minimum salary to $200 per month); 14 Fed. Reg. 7705-2 (Dec. 24, 1949) (creating "long" and "short" tests, raising administrative minimum salary to $75 per week, executive minimum salary to $55 per week, and professional minimum salary to $75 per week); 23 Fed. Reg. 8962-2 (Nov. 18, 1958) (raising administrative minimum salary to $95 per week, executive minimum salary to $80 per week, and professional minimum salary to $95 per week); 28 Fed. Reg. 9505-1 (Aug. 30, 1963) (raising administrative minimum salary to $100 per week, executive minimum salary to $100 per week, and professional minimum salary to $115 per week); 35 Fed. Reg. 883-3 (Jan. 22, 1970) (raising administrative minimum salary to $125 per week, executive minimum salary to $125 per week, and professional minimum salary to $140 per week); 40 Fed. Reg. 7091-2 (Feb. 19, 1975) (raising administrative minimum salary to $155 per week, executive minimum salary to $155 per week, and professional minimum salary to $170 per week); 69 Fed. Reg. 22122-01 (Apr. 23, 2004) (adopting single standard test and increasing minimum salary for all three categories to $455 per week); 84 Fed. Reg. 51230-01 (Sept. 27, 2019) (increasing minimum salary for all three categories to $684 per week).

[4] 53 Stat. 1266 (1939); 63 Stat. 917 (1949); 70 Stat. 1118 (1956); Pub. L. No. 85-231 § 1, 71 Stat. 514 (1957); Pub. L. No. 86-624 § 21; 74 Stat. 417 (1960); Pub. L. No. 87-30 §§ 9, 10, 75 Stat. 71 (1961); Pub.L. No. 89-601, Title II, §§ 201 to 204(a), (b), 205 to 212(a), 213, 214, 215(b), (c), 80 Stat. 833 to 838 (1966); Pub. L. No. 89-670, § 8(e), 80 Stat. 943 (1966); Pub. L. No. 92-318, Title IX, § 906(b)(1), 86 Stat. 375 (1972); Pub. L. No. 93-259, §§ 6(c)(2), 7(b)(3), (4), 8, 9(b), 10, 11, 12(a), 13(a) to (d), 14 to 18, 20(a) to (c), 21(b), 22, 23, 25(b), 88 Stat. 61-69, 72 (1974); Pub. L. No. 95-151, §§ 4 to 8, 9(d), 11, 14, 91 Stat. 1249, 1250-52 (1977); Pub. L. No. 96-70, Title I, § 1225(a), 93 Stat. 468 (1979); Pub. L. No. 101-157, § 3(c), 103 Stat. 939 (1989); Pub. L. No. 103-329, Title VI, § 633(d), 108 Stat. 2428 (1994); Pub. L. No. 104-88, Title III, § 340, 109 Stat. 955 (1995); Pub. L. No. 104-174, § 1, 110 Stat. 1553 (1996); Pub. L. No. 104-188, § 2105(a), 110 Stat. 1929 (1996); Pub. L. No. 105-78, Title I, § 105, 111 Stat. 1477 (1997); Pub. L. No. 105-334, § 2(a), 112 Stat. 3137 (1998); Pub. L. No. 108-199, Div. E, Title I,

FLSA that the Congressional Research Service considers "major." Cong. Rsch. Serv., R42713, *The Fair Labor Standards Act (FLSA): An Overview* 18-21 (2023), https://crsreports.congress.gov/product/pdf/R/R42713. Despite this regular pattern of legislative activity, Congress has taken only a single action pertaining to regulatory inclusion of a minimum compensation test: mandating *inclusion* of such a test as part of a 1990 instruction that the Department of Labor promulgate new regulations to define and exempt a new class of technical employees. In its directive to the Department, Congress explicitly required such a test, and specified a different salary level than applied at that time for executive, administrative, or professional employees. Pub. L. No. 101-583 § 2, 104 Stat. 2871 (1990) (directing the Secretary to "promulgate regulations that permit computer systems analysts, computer programmers, software engineers, and other similar skilled professional works as defined" by the Secretary to qualify as exempt and requiring that "[s]uch regulations shall provide that if such employees are paid on an hourly basis they shall be exempt only if their hourly rate of pay is at least 6 ½ times greater than the applicable minimum wage rate").

Short of simply adopting the Department's long-standing regulatory salary tests as statutory text,[5] it is difficult to imagine Congress more clearly demonstrating its approval of the Secretary's continued use of a minimum compensation test (and its periodic adjustment upwards

---

§ 108, 118 Stat. 236 (2004); Pub. L. No. 113-277, § 2(g)(2), 128 Stat. 3005 (2014); Pub. L. No. 115-141, Div. S, Title II, § 201(a), 132 Stat. 1126 (2018).

[5] Congress did, in fact, adopt a minimum salary test in statutory text as part of Section 213 as part of the 2018 amendment exempting contract salaried baseball players compensated "at a rate that is not less than a weekly salary equal to the minimum wage . . . for a workweek of 40 hours." Unlike the amendment concerning computer workers, this change did not direct the Secretary to adopt implementing regulations—rather, Congress simply incorporated the salary test directly into the statute, clear evidence of congressional agreement with the Department's longstanding view that such a test can be an appropriate criterion of the determination of overtime eligibility.

to account for inflation) than by leaving it undisturbed for 86 years and providing explicit statutory instruction regarding the creation and level of a similar test for a newly defined class of employees. The answer to "the question that matters: Does the statute authorize the challenged agency action?" *Loper Bright,* slip op. at 29 is clearly that it does.

> b. *At their core, plaintiffs' arguments are disagreements with the Department's policymaking decision, and such decisions are beyond the scope of* Loper Bright.

The best, and indeed only plausible reading of the Act plainly empowers the Secretary to set a salary test as a criterion in determining overtime eligibility—and the *Loper Bright* inquiry ends there. The precise choices the Secretary has made within those contours: the level of the salary test or automatic future indexing, are questions of policy. The *Loper Bright* Court has cautioned that in such instances, courts are to "stay out of discretionary policymaking left to the political branches." *Loper Bright*, slip op. 26.

Perhaps recognizing that statutory text and 86 years of unbroken authority make implausible any claim that the Department lacks authority to include a salary test in their regulatory definitions, *but see* Bus. Pl. Mot. Summ J. 16-18, ECF 46, Plaintiffs have suggested that the Rule elevates the salary test to a point where it subsumes the regulatory definitions. Bus. Pl. Mot. Summ. J. 15-18, ECF 46; Tex. Pl. Mot. Summ. J. 14-16, ECF 48. Not so. Plaintiffs' principal basis for this argument is that another judge of this district invalidated a *different* rule raising the salary threshold on the grounds that it established a salary-only test. The logic and holding of that case, *Nevada v. DOL*, 275 F.Supp.3d 795 (E.D. Tex. 2017) ("*Nevada*"), are sufficiently tenuous to merit close examination before adoption here.

Most importantly, in the course of conducting its *Chevron* analysis, the *Nevada* court recognized that, prior to the 2016 Rule, "the Department has used a permissible minimum salary level as a floor." *Nevada*, 275 F. Supp. 3d at 806. In other words, the *Nevada* court recognized

that the Department could permissibly include *a* salary test in its definitions. But the court nevertheless held that the specific increase to the salary level in the 2016 Rule was not authorized by the Act. *Id*. In doing so, it failed to recognize that since the Department has the authority to set *a* salary test level, this was plainly a situation where Congress *did* "confer discretionary authority on [the] agenc[y]," *Loper Bright*, slip op. at 26, to set the actual salary level, a quintessential policy decision. The *Nevada* court's review of the Department's choice of salary level therefore should have been "deferential," *Loper Bright*, slip op. at 14 (characterizing Administrative Procedure Act standards for policymaking review), and should have been limited to arbitrary and capricious or abuse of discretion review. *Id.*; 5 U.S.C.A. § 706(2)(A). *Loper Bright* has not changed the deference due to agency policy decisions; in fact, it clarified it. *Id*. *See also FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (review for arbitrary and capricious agency action "is deferential, and a court may not substitute its own policy judgment for that of the agency. A court simply ensures that the agency has acted with a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision"). In light of that clarification, this Court should avoid the error of the *Nevada* court and afford proper deference to the Department's authority to make that policy decision.

  Moreover, the *Nevada* court's bare conclusion that the 2016 Rule served to establish the salary test as the sole test for overtime eligibility was both mistaken and based on meaningfully distinct facts from the Rule. The Rule would leave 7.4 million overtime-eligible employees above the salary threshold, 89 Fed. Reg. 32842, 32880, n. 243 (Apr. 26, 2024). Each of those 7.4 million people will be eligible for overtime *only* because of the duties they perform—if the Rule

11

in fact made the salary test the only test, they would be ineligible.[6] And on the other side of the salary threshold, the Rule's increase will extend overtime protections to 4 million employees solely on the basis of the salary test, 89 Fed. Reg. 32842, 32882 (Apr. 26, 2024)—far fewer employees than those for whom the duties test remains dispositive. The salary test cannot reasonably be said to be *the* test, nor even the *main* test, for determining overtime eligibility.[7]

II.     **The Automatic Indexing Provision of the Rule is Valid, but if this Court Determines Otherwise, it is Severable from the Remainder of the Rule.**

Both Business Plaintiffs and Texas devote considerable effort to opposing the Rule's automatic indexing mechanism, 89 Fed. Reg. at 32971 (to be codified at 29 C.F.R. §§ 541.600(a)(3)). To be clear, the Department stands on strong legal ground to promulgate that mechanism—it is a simple extension of the policymaking discretion to set the salary test threshold. The Department has set the salary threshold by reference to a specific percentile of

---

[6] These employees would be eligible for overtime under the so-called "duties test," *see Nevada*, 275 F.Supp.3d at 799, because they do not perform the duties of executive, administrative, or professional employees, as established by 29 C.F.R. §§ 541.100(a)(2), (3), and (4) (executive employees); 541.200(a)(2) and (3) (administrative employees), and 541.300(a)(2) (professional employees).

[7] Under the 2016 Rule, fewer workers (6.5 million) would have been eligible for overtime solely on the basis of the duties test, 81 Fed. Reg. 32391, 32465 (May 23, 2016), and more workers (4.2 million), *Nevada*, 275 F.Supp.3d at 806, would have gained overtime eligibility solely by virtue of the salary test. Those realities make clear that the 2016 Rule did not, in fact, make the salary test the only test. Even if this Court adopts the *Nevada* court's reasoning, however, the Rule here gives the salary test a decidedly smaller role than the 2016 Rule did. This decrease in impact on number of overtime-eligible workers is consistent with the fact that the Rule entails a smaller increase to the salary threshold than the 2016 Rule. The 2016 increase would have more than doubled the salary threshold, from $455 weekly to $913 weekly. 81 Fed. Reg. 32391, 32405 (May 23, 2016). The Rule here includes a smaller increase, both proportionally and in raw dollars, moving from a $684 weekly minimum to a $1128 weekly minimum. 89 Fed. Reg. 32842, 32941 (Apr. 26, 2024). And, although the Rule's $1128 weekly minimum is higher in raw dollars than the 2016 weekly level of $913, it reflects a lower percentile wage: the 2016 level was set at the 40th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census Region, 81 Fed. Reg. 32391, 32549 (May 23, 2016), while the proposed rule uses the 35th percentile of the same updated data. 89 Fed. Reg. 32842, 32971 (Apr. 26, 2024).

earnings—the 35th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census Region.  89 Fed. Reg. 32842, 32971 (Apr. 26, 2024).  That decision and those definitions remain unchanged by the operation of the automatic updates provision.  The future updates are merely a mechanism whereby the actual salary thresholds in use—that is, the specific dollar amounts—will continue to align with the Secretary's definition, and not a change to the decision or definitions in the Rule.[8]  A future Secretary can, of course, stop an automatic update by undertaking a rulemaking to set different salary thresholds.  89 Fed. Reg. 32842, 32973 (Apr. 26, 2024).  And because stopping any future update would constitute a future Secretary's decision to change the definitions of "executive, administrative, or professional" employees, doing so would in fact be possible only via a new rulemaking.

Nevertheless, should this Court determine for any reason that the automatic indexing mechanism is invalid, *amici* submit that the Rule's explicit severability provision, 89 Fed. Reg. at 32971 (to be codified at 29 C.F.R. § 541.5), confirms the authority of the Court to invalidate that provision while leaving the balance of the Rule undisturbed.

Administrative severability is well-established in American law.  In *K-Mart Corp. v. Cartier*, 486 U.S. 281 (1988), the Supreme Court severed a single invalid part of a regulation from the remainder of a rule—despite the absence of a severability clause in that case—because "severance and invalidation of [the] subsection will not impair the function of the statute as a

---

[8] Rather than articulating dollar amounts in the Rule, the Department could have simply set the salary thresholds by reference to specific earnings percentiles, and left them entirely fluid, rather than specifying known update periods.  Indeed, the Department could have omitted the actual dollar amounts and simply listed the earning percentile thresholds even for the salary test going into effect as of the Rule's effective date.  The automatic indexing mechanism simply defines the salary thresholds by reference to specific data—the salary percentiles—and prescribes a system to administer that definition in a manageable way rather than allowing it to change each time new salary data is reported.

13

whole, and there is no indication that the regulation would not have been passed but for its inclusion." *Id.* at 294.  Since that articulation, which "repurpose[d] the . . . statutory severability test," Charles W. Tyler and E. Donald Elliott, *Admin. Severability Clauses*, 124 Yale L. J.  2286, 2296 (2015), several courts have applied the test to find invalidated regulatory clauses severable.  *See, e.g.*, *Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 384 (D.C. Cir. 2021); *Virginia v. EPA*, 116 F.3d 499, 500-501 (D.C. Cir. 1997); *Davis Cnty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459-1460 (D.C. Cir. 1997); *Akiachak Native Cmty. v. Jewell*, 955 F. Supp. 2d 1, 5-6 (D.D.C. 2013); *CFPB v. The Mortg. Law Grp., LLP*, 182 F. Supp. 3d 890, 894-895 (W.D. Wis. 2016); *see also Ass'n of Washington Bus. v. Washington State Dep't of Ecology*, 195 Wash.2d 1, 18-19 (adopting *K-Mart* test as state law test).

In this case, the inclusion of "a severability clause can be seen as [the Department's] affirmative answer to the two components of the severability test: the agency (1) *intends* for the remainder to stay in effect; and (2) believes that the remainder is *workable*."  *Admin. Severability Clauses*, *supra* at 2297.

Even if a severability provision were lacking, the automatic indexing portion of the Rule clearly meets the *K-Mart* standards.  There is no indication that the Department of Labor would not have enacted the Rule absent that provision.  To the contrary, the Rule requires two distinct and specific salary level increases—one on July 1, 2024, and the other on January 1, 2025—without reference to automatic indexing, and expressly states its intent that each provision of the Rule be severable while explaining how the remaining portions of the Rule would function if any given part was invalidated.  89 Fed. Reg. 32842, 32885-32887 (Apr. 26, 2024).  *See AFL-CIO v. NLRB*, 466 F.Supp.3d 68, 98-99 (D.D.C. 2020) ("express severability provision . . . plainly demonstrates agency's actual intent regarding partial invalidation").

Where, as here, the agency "clearly intends that the regulation be treated as severable, to the extent possible, for it said so in adopting the regulation, [t]he question for the court . . . is whether the balance of the rule can function independently if shorn of its unconstitutional aspects." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001). Neither provision requiring specified changes to the salary test level in 2024 and 2025 depend on automatic indexing, and those changes would occur regardless of the presence or absence of the automatic indexing provision.[9] They not only can function independently of the automatic indexing provision, they *are* independent of the automatic indexing provision.

It is difficult to imagine a regulatory provision more obviously severable from a multi-element rule than the automatic indexing provision here. The agency has indicated its intent that it be severable in a detailed severability section, and the provision's presence or absence does not affect the operation of any other part of the Rule. Indeed, the Rule hewed closely to the advice of the Administrative Conference of the United States that, "[w]here the agency has determined that the rule's provisions would function independently, consider including a severability clause in the text of a rule and explaining the severability clause in the rule's statements of basis and intent." Charles W. Tyler and E. Donald Elliott, *Tailoring the Scope of Judicial Remedies in Administrative Law*, Administrative Conference of the United States, 14 (2018), https://www.acus.gov/sites/default/files/documents/tailoring-the-scope-of-judicial-remedies-in-administrative-law-final-report.pdf.

---

[9] The Rule also identifies updating the highly compensated employee salary threshold as a "[s]ignificant revision." 89 Fed. Reg. 32842, 32842 (Apr. 26, 2024). Although plaintiffs and *amici* do not address that portion of the Rule, it is another piece of the Rule that would take effect regardless of the status of the automatic indexing provisions.

## CONCLUSION

This Court should deny Plaintiffs' motions for summary judgment and grant the Department's cross-motion for summary judgment. If this Court invalidates the automatic indexing provision, it should treat that provision as severable from the remainder of the Rule.

Dated: August 15, 2024                  Respectfully submitted,

/s/ Mark B. Samburg
Mark B. Samburg
D.C. Bar No. 1018533
(admitted *pro hac vice*)
Carrie Y. Flaxman
D.C. Bar No. 458681
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-448-9090
msamburg@democracyforward.org
cflaxman@democracyforward.org

*Counsel for* amici curiae

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2024, the foregoing was electronically filed with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record:

/s/ Mark B. Samburg