# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | § | |
|     *Plaintiff*, | § | |
| | § | |
| PLANO CHAMBER OF COMMERCE, *et al.*, | § | |
|     *Plaintiffs*, | § | CIVIL ACTION NO. 4:24-CV-00499-SDJ |
| | § | (LEAD CASE) |
| v. | § | |
| | § | |
| UNITED STATES DEPARTMENT OF LABOR, | § | |
| JULIE A. SU, in her Official Capacity as | § | CIVIL ACTION NO. 4:24-CV-00468-SDJ |
| United States Secretary of Labor, THE WAGE | § | |
| AND HOUR DIVISION OF THE DEPARTMENT | § | |
| OF LABOR, and JESSICA LOOMAN, in her | § | |
| Official Capacity as Administrator of the | § | |
| Wage and Hour Division, | § | |
|     *Defendants*. | § | |

---

**REPLY IN SUPPORT OF TEXAS'S MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGEMENT**

---

TABLE OF CONTENTS

**Page(s)**

Index of Authorities ............................................................................................... iii

I.    The Scope of Requested Relief is Proper. ........................................................ 2

    A.    Universal Vacatur under § 706 is Required in This Circuit. ................................. 2

    B.    Defendants' Reference to a Severability Clause Does Not Render the Rule Severable. ...................................................................................................5

II.   DOL Lacks Authority to Set a Minimum Salary Threshold. .............................. 6

III.  Even If DOL Could Consider Salary, the 2024 Overtime Rule Exceeds Statutory Limits. ....................................................................................... 11

    A.    The July 1, 2024, Increase Resembles a De Facto Salary-Only Test. ................... 11

    B.    The January 1, 2025, Increase Resembles a De Facto Salary-Only Test. .............14

    C.    The Updating Mechanism Contravenes Federal Law. ..........................................16

IV.   The 2024 Overtime Rule is Not a Byproduct of Reasoned Decision-making. .................18

    D.    The New Salary Tests Are Arbitrary and Capricious ...........................................18

    E.    The Automatic Index Provisions Are Arbitrary and Capricious. ......................... 22

Conclusion ...........................................................................................................23

Certificate of Service.............................................................................................. 24

INDEX OF AUTHORITIES

**Cases**

*Airlines for Am. v. Dep't of Transp.*,
   110 F.4th 672 (5th Cir. 2024) ........................................................................... 9

*Baltimore v. Azar*,
   439 F. Supp. 3d 591 (D. Md.), *aff'd*, 973 F.3d 258 (4th Cir. 2020) ...................... 6

*Braidwood Mgmt., Inc. v. Becerra*,
   104 F.4th 930 (5th Cir. 2024) ................................................................... 2, 4, 5

*Cargill v. Garland*,
   57 F.4th 447 (5th Cir. 2023) ............................................................................. 4

*Compare Nat'l Ass'n of Mfrs. v. SEC*,
   105 F.4th 802 (5th Cir. 2024) ........................................................................... 6

*Consumers' Research Cause Based Commerce, Inc. v. FCC*,
   109 F.4th 743 (5th Cir. 2024) ......................................................................... 10

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
   144 S. Ct. 2440 (2024) ...................................................................................... 4

*Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*,
   187 F.2d 789 (3d Cir. 1951) .............................................................................. 3

*Data Mktg. P'ship, LP v. U.S. DOL*,
   45 F.4th 846 (5th Cir. 2022) ............................................................................. 2

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) .............................................................................................. 4

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*,
   140 S. Ct. 1891 (2020) .................................................................................... 18

*EEOC v. Boeing Servs. Int'l*,
   968 F.2d 549 (5th Cir. 1992) ............................................................................. 7

*FDA v. Alliance for Hippocratic Med.*,
   602 U.S. 367 (2024) .......................................................................................... 4

*Hasie v. Office of Comptroller of Currency of U.S.*,
   633 F.3d 361 (5th Cir. 2011) ........................................................................... 21

*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007) .......................................................................................... 8

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct. 2244 (2024) ............................................................................. passim

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   103 S. Ct. 2856 (1983) .................................................................................... 21

*Murthy v. Missouri,*
   144 S. Ct. 1972 (2024) ............................................................................................................. 5

*Nasdaq Stock Mkt. LLC v. SEC,*
   38 F.4th 1126 (D.C. Cir. 2022) ............................................................................................... 5

*Nevada v. U.S. Dep't of Lab.,*
   218 F. Supp. 3d 520, (E.D. Tex. 2016) ..................................................................... 10, 13, 16

*Nevada v. U.S. Dep't of Lab.,*
   275 F. Supp. 3d 795 (E.D. Tex. 2017) ................................................................................ 1, 20

*Phillips Petroleum Co. v. Johnson,*
   22 F.3d 616 (5th Cir. 1994) ................................................................................................... 18

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.,*
   No. 6:20-CV-00176, 2022 WL 17489170 (E.D. Tex. Dec. 7, 2022) ....................................... 3

*Rest. Law Ctr. v. U.S. Dep't of Lab.,*
   No. 23-50562, 2024 WL 3911308 (5th Cir. Aug. 23, 2024) ............................................... 4, 9

*Tex. Med. Ass'n v. U.S. Dept. of Health and Human Servs.,*
   110 F.4th 762 (5th Cir. 2024) ............................................................................................. 2, 3

*Tex. Med. Assoc. v. U.S. Dept. of Health & Human Svcs.,*
   587 F.Supp.3d 528 (E.D. Tex. 2022) ..................................................................................... 22

*Texas v. EPA,*
   829 F.3d 405 (5th Cir. 2016) ................................................................................................... 5

*Texas v. U.S. Dep't of Lab.,*
   No. 4:24-CV-499-SDJ, 2024 WL 3240618 (E.D. Tex. June 28, 2024) ................................... 11

*Texas v. United States*, 691 F. Supp. 3d 763 (S.D. Tex. 2023) .............................................. 5, 6

*Thomas v. Tex. Dep't of Criminal Justice,*
   297 F.3d 361 (5th Cir. 2002) ................................................................................................. 12

*United States v. Texas,*
   599 U.S. 670 (2023) ................................................................................................................. 5

*V.I. Tel. Corp. v. FCC,*
   444 F.3d 666 (D.C. Cir. 2006) ................................................................................................. 3

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ................................................................................................................. 4

*Wirtz v. Mississippi Publishers Corp.,*
   364 F.2d 603 (5th Cir. 1966) ............................................................................................. 7, 12

**iv**

**Statutes**

29 U.S.C. § 213(a)(1) ............................................................................................8, 15

5 U.S.C. § 705 ...............................................................................................................3

5 U.S.C. § 706 ............................................................................................................... 6

5 U.S.C. § 706(2)(A) ....................................................................................................3

U.S.C. § 706(2) ........................................................................................................3, 4

**Other Authorities**

Harry Weiss, *Report and Recommendations on Proposed Revisions of Regulations* (1949) .................14

*Nicholas Bagley, Remedial Restraint in Administrative Law,*
    117 COLUM. L. REV. 253 (2017) .................................................................3

**Rules & Regulations**

28 Fed. Reg. 9511 (Nov. 26, 1959) ......................................................................12

29 C.F.R. § 541.5 ...................................................................................................... 6

69 Fed. Reg. 22122 (April 23, 2004) .................................................... 13, 16, 17

81 Fed. Reg. 32446 (May 23, 2016) .....................................................................13

89 Fed. Reg. 32842 (Apr. 26, 2024) .............................................................. passim

The plain meaning of the Fair Labor Standards Act (FLSA) makes it clear that the proper inquiry into whether someone qualifies for the EAP Exemption must turn on that person's function and duties, not the compensation that person receives. Yet, despite the FLSA's unambiguous text, for decades, the Department of Labor (DOL) has slowly chipped away at Congress's stated policy: first, by instituting a salary test, and second, by ratcheting up the salary test so that it has become the predominate factor for a substantial portion of EAP employees.

The 2024 Overtime Rule represents the culmination of this trend. Not only does it adopt an aggressive methodology that is substantially similar to the one struck down by this Court in 2016, *see Nevada v. U.S. Dep't of Lab.*, 275 F. Supp.3d 795, 807 (E.D. Tex. 2017) (*Nevada II*), but it also reintroduces an automatic indexing mechanism, which would perpetually increase the salary cutoff every three years without opportunity for notice and comment.

Defendants, in their motion for summary judgment, have all but abandoned the pretense that these provisions find their basis in the statute. Their argument instead can be summarized by two lines from their brief:

> To be clear, Congress did not by the FLSA establish an exemption for "*any employee who works in an EAP capacity.*" *Contra* PI Order at 25 n.23 (quotation marks omitted). Instead, Congress created an exemption for any employee who works in a bona fide EAP capacity, *as those terms are defined and delimited by the Department of Labor*. 29 U.S.C. § 213(a)(1).

Dkt. 57 at 21. This is *Chevron* by a different name. What Defendants contend is that because the FLSA left a small "gap" for DOL to fill, the agency has full discretion to import a new metric, not contemplated by Congress, that has effectively supplanted the only test recognized by the statute for a substantial portion of workers: i.e. the duties test.

The days of judicial deference to an agency's self-interested interpretation have passed. As this Court recognized in its prior order, judges have an obligation to examine each statute and "exercise independent judgment in determining the meaning of [its] provisions." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 22632 (2024). Even when a statute delegates discretionary

authority to an agency, "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* at 2263.

Applying this standard here, it is apparent that DOL exceeded its authority. The agency has discretion only to establish the types of duties that might constitute EAP work. It does not have the power to create additional requirements that deliberately disqualify millions of bona fide EAP employees from the exemption because the agency believes that they should be paid more. Defendants contend that past rulemakings vindicate their approach, but all that indicates is that salary test was set low enough not to invite challenge. The 2024 Overtime Rule represents a departure both in degree and kind from its predecessors. It has removed all doubt that DOL gone past its limits.

For these reasons, Texas asks this Court to deny Defendants' motion, grant summary judgment in favor of Texas and the other Plaintiffs, and permanently set aside the 2024 Overtime Rule in its entirety, nationwide.

## I.   The Scope of Requested Relief is Proper.

### A.  Universal Vacatur under § 706 is Required in This Circuit.

On finding a rule violates the APA, "universal vacatur" under § 706 is "required in this circuit." *Tex. Med. Ass'n v. U.S. Dept. of Health and Human Servs.*, 110 F.4th 762, 780 (5th Cir. 2024); *see also Data Mktg. P'ship, LP v. U.S. DOL*, 45 F.4th 846, 859 (5th Cir. 2022) (the "default rule is that vacatur is the appropriate remedy"). Indeed, by its nature, the "scope" of vacatur under § 706 is "'nationwide . . . not party-restricted' and 'affects all persons in all judicial districts equally.'" *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930 (5th Cir. 2024) (quoting *In re Clarke*, 94 F.4th 502, 512 (5th Cir. 2024) and *Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024)).

Defendants argue that the § 706 cannot be read as providing remedies *at all*. They claim the APA does "not authorize the type of universal vacatur that Plaintiffs seek." Dkt. 57 at 45–46.

But the Fifth Circuit has recently considered—and rejected, this argument. *Tex. Med. Ass'n*, 110 F.4th at 779 (rejecting argument that the APA "may not authorize vacatur at all" and noting how vacatur is the remedy recognized by "[b]inding Fifth Circuit precedent"); *see also R.J. Reynolds Tobacco Co. Ass'n*, 110 F.4th at 779 (rejecting argument that the APA "may not authorize vacatur at all" and noting how vacatur is the remedy recognized by "[b]inding Fifth Circuit precedent"); *see also R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, No. 6:20-CV-00176, 2022 WL 17489170, at *21 (E.D. Tex. Dec. 7, 2022) (Barker, J.) (rejecting Federal Defendants' arguments against availability of vacatur under the APA); *Texas Med. Ass'n v. U. S. Dept. of Health and Human Servs.*, 2023 WL 1781801, at *13 (E.D. Tex. Feb. 6, 2023) (Kernodle, J.) (same). For good reason.

The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under that text, "'[s]et aside' usually means 'vacate.'" *V.I. Tel. Corp. v. FCC*, 444 F.3d 666, 671 (D.C. Cir. 2006). In fact, when Congress adopted the APA, "set aside" meant "to cancel, annul, or revoke." Black's Law Dictionary 1612 (3d ed. 1933). The APA "reflected a consensus that judicial review of agency action should be modeled on appellate review of trial court judgments." *Nicholas Bagley, Remedial Restraint in Administrative Law,* 117 COLUM. L. REV. 253, 258 (2017). Just five years after the APA's enactment, the Third Circuit explained that section 706(2) "affirmatively provides for vacation of agency action." *Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*, 187 F.2d 789, 790 (3d Cir. 1951).

This interpretation harmonizes the "set aside" authority with the rest of the APA. After all, it would be illogical for the APA to allow a court to "postpone the effective date of an agency action" during litigation, 5 U.S.C. § 705, but be powerless to terminate that action if the court

concludes the action is "unlawful," *id.* § 706(2).[1]

Defendants also argue that, despite vacatur being the "default" rule in this circuit, the Fifth Circuit "has treated universal vacatur as a discretionary equitable remedy, neither automatic nor compelled in every case." Dkt. 57 at 46. In support, they cite *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023). To be sure, the Fifth Circuit's en banc opinion in *Cargill* did remand to the district court, Dkt. 57 at 46, but only because "the parties ha[d] not briefed the remedial-scope question." *Cargill*, 57 F.4th at 472. But "[w]hat [Defendants'] short parenthetical citation to *Cargill* fails to capture is that just before the plurality decided that remand was appropriate given the lack of briefing, it recited plainly the proposition that is at odds with its argument: 'vacatur of an agency action is the default rule in this Circuit.'" *Braidwood Mgmt.,* 104 F.4th at 952 n. 102 (quoting *Cargill*, 57 F. 4th at 472).

Lastly, Defendants claim that "traditional equitable principles" counsel against vacatur, in part, since "Plaintiffs lack an Article III interest in interfering with an agency's regulation of third parties." Dkt. 57 at 46; *see also id.* at 47–48.[2] But that is wrong. Even setting aside clear Fifth Circuit precedent holding vacatur is not party-restricted, at this stage, equities give way to the text of the APA commanding courts "*shall*" set aside unlawful agency action. 5 U.S.C. § 706(2) (emphasis added); *Loper Bright* at, 2262 ("The text of the APA means what it says."); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,* 144 S. Ct. 2440, 2467 (2024) (Kavanaugh, J., concurring) ("The Government has contended that equitable relief is ordinarily limited to the parties in a specific case. Therefore, nationwide injunctions would be permissible only if Congress authorized

---

[1] And as a practical matter, in a world without vacatur, what recourse remains for a party harmed by a regulation but not directly regulated by it? For the unregulated party, an as-applied challenge is a non-starter. The only viable path is a facial challenge, with vacatur as the remedy. If the APA does not provide this relief, then the Supreme Court has decided several cases the wrong way. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 36, and n. 7 (2020); *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 486 (2001); *Board of Governors, FRS v. Dimension Financial Corp.*, 474 U.S. 361, 364–365 (1986).
[2] Even after *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2024), Dkt. 57 at 46, the Fifth Circuit has continued to find universal vacatur as the proper remedy for a successful APA challenge. *See, e.g., Rest. Law Ctr. v. U.S. Dept. of Lab..*, No. 23-50562, 2024 WL 3911308, at *11 (5th Cir. Aug. 23, 2024); *Tex. Med. Ass'n.*, 110 F.4th at 779.

them. But in the APA, Congress did in fact depart from that baseline and authorize vacatur."); *Braidwood Mgmt.,* 104 F.4th at 952 ("[W]e do not read out precedent to require consideration of the various equities at stake before determining whether a party is entitled to vacatur.").

In the end, to avoid this circuit's default rule of vacatur, Defendants present some of the "thoughtful arguments" against it that exist on "both sides of th[is] debate." *United States v. Texas*, 599 U.S. 670, 702 (2023) (Gorsuch., J. concurring). But the Fifth Circuit has chosen the side of universal vacatur. And until the Supreme Court holds otherwise, that continues to be the required relief here.

### B. Defendants' Reference to a Severability Clause Does Not Render the Rule Severable.

Defendants urge this Court to salvage some of the 2024 Overtime Rule with severability. Dkt. 57 at 13. In support, they reference a severability clause. *Id.* (citing 29 C.F. R. § 541.5). "But 'the ultimate determination of severability will rarely turn on the presence or absence' of a severability clause."' *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1145 (D.C. Cir. 2022) (citation omitted). Next, Defendants claim that the wage growth update, the January 1 methodology update, and the future triennial updates could each "function sensibly" alone. Dkt. 57 at 13–14. But beyond this cursory reference, Defendants make no effort to explain exactly *how* this court could go about tailoring the relief they seek. *Id*; *see also id.* at 47–48. And this Court is not required to parse through the Rule and do Defendants' heavy lifting for them. *See Murthy v. Missouri*, 144 S. Ct. 1972 (2024) ("Judge are not like pigs, hunting for truffles buried [in the record]."). Rather, this court should instead vacate the 2024 Overtime Rule "in its entirety" because Defendants didn't "brie[f] how [the court] might craft" a more limited remedy, even though that was their burden. *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016). This Court need not tailor the 2024 Overtime Rule when Defendants made no attempt to do so.

Still, the 2024 Overtime Rule fails the test for severability, which turns on whether the agency would have adopted the rule without the vacated provisions, and whether it would "function sensibly." *Texas v. United States* (*DAPA*), 691 F. Supp. 3d 763, 792–93 (S.D. Tex. 2023).

Defendants lose on both because they "make no developed argument." *Data Mktg. P'ship*, 45 F.4th at 859–60. Rather, there is "substantial doubt" that DOL would have adopted an emasculated form of the 2024 Overtime Rule. *Baltimore v. Azar*, 439 F. Supp. 3d 591, 615 (D. Md.), *aff'd*, 973 F.3d 258 (4th Cir. 2020). Defendants "have not explained how the provisions should be severed" or how the 2024 Overtime Rule would sensibly function. *Id.* "[I]t is not the judiciary's duty or role to write or rewrite regulations or rules." *DAPA*, 691 F. Supp. 3d at 793. Even assuming DOL can include a salary level test at all, the salary floor set by the wage growth update, the January 1 methodology update, and the future triennial updates are too high for these to be a meaningful proxy for duties. This is an issue that plagues the rule in its entirety.

And while Defendants cite *National Association of Manufacturers* for the proposition that the 2024 Overtime Rule should be severed, Dkt. 57 at 13, that case does not fit. Unlike the severability clause here, the severability clause the Fifth Circuit grappled with in that case noted explicitly which provisions of the challenged rule could operate independently. *Compare Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802, 815 (5th Cir. 2024) (citing severability portion of 2022 Rescission, 87 Fed. Reg. at 43,182–83), *with* 29 C.F.R. § 541.5. Thus, the entire Rule should be vacated, including the wage growth update, the January 1 methodology update, and the future triennial updates.

## II. DOL Lacks Authority to Set a Minimum Salary Threshold.

The FLSA does not authorize the Secretary of Labor (the Secretary) to adopt a salary level test for the EAP Exemption. In reviewing agency action under the APA, this "[C]ourt shall decide *all* relevant questions of law" and "interpret . . . statutory provisions." 5 U.S.C. § 706. "The APA thus codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their *own judgment*." *Loper Bright,* 144 S. Ct. 2244 at 2261 (emphasis added). In other words, under the APA courts start by reviewing a statute's text *de novo*—using the "traditional tools of statutory construction"—to "resolve statutory ambiguities." *Id.* at 2266. This interpretative question is a purely legal one to

be answered by this Court, with no deference afforded to DOL. *See Loper Bright*, 144 S. Ct. at 2261 ("[C]ourts, not agencies . . . decide '*all* relevant questions of law' arising on review of agency action."') (quoting 5 U.S.C. § 706) (emphasis added in original).[3]

The Secretary's authority under the FLSA to "define and delimit" EAP Exemptions is bounded by the ordinary meaning of the plain text of the statute. *Loper Bri*ght, 144 S. Ct. at 2266 (emphasizing that the bounds of delegated authority are established in the statutory text, which has a "fixed" and discernable "single, best meaning"). Defendants agree. *See* Dkt. 57 at 16 ("When a court considers the meaning of 'define and delimit' it is indeed 'bounded by the ordinary meaning of the plain text of the statute.'").

Yet Defendants argue that since Congress has explicitly delegated the Secretary to "define and delimit" the EAP Exemptions, DOL has broad "policymaking" discretion to include a salary level test within those definitions. *Id.* This, Defendants argue, is simply a form of agency "gap filling" that courts must "respect" so long as DOL acted within the "outer statutory boundaries" of Congress's express delegation. *Id.* at 16, 18.

But *Chevron* deference under the guise of "respect" for an agency's extratextual gap filling is still *Chevron* deference. *See EEOC v. Boeing Servs. Int'l*, 968 F.2d 549, 556 n.7 (5th Cir. 1992) ("[W]e would not hold that a cat was a dog simply because a defendant called the cat a dog.") (citing William Shakespeare, *Romeo and Juliet*, act II, sc. ii ("What's in a name? That which we call a rose [b]y any other name would smell as sweet.")).

Defendants claim that *Loper Bright*, 144 S. Ct. at 2263 supports their argument. Dkt 57 at 17–18. Of course, the Court recognized that when expressly authorized by Congress, agencies can exercise "a degree of discretion," such as in giving meaning to statutory terms, citing *Batterton v.*

---

[3] The Fifth Circuit's decision in *Wirtz v. Mississippi Publishers Corp.*, 364 F.2d 603, 608 (5th Cir. 1966) (Burger, J., sitting by designation), Dkt. 57 at 15–16, does not affect this analysis. *Wirtz* involved a challenge on arbitrary and capricious grounds. *Wirtz* merely concluded that a weekly salary requirement was not "arbitrary and capricious." *Id.* at 608. It is pre-*Chevron* and—most importantly, pre-*Loper Bright* precedent that does not speak to whether the setting of a salary level test is precluded by the plain meaning of the statutory text.

*Fran*cis, 432 U.S. 416, 425 (1977), or to "fill up the details in a statutory scheme," citing *Wayman v. South*ard, 10 Wheat. 1, 43 (1825), in a way that gives agencies some "flexibility" regarding the scope and meaning of terms. And Congress has expressly delegated authority to the Secretary to "define and delimit" EAP Exemptions. *See* 29 U.S.C. § 213(a)(1); *Loper Bright*, 144 S. Ct. at 2263 n.5. But *Loper Bright* also makes clear that a reviewing court must *first* independently review, with no deference, the scope of an express delegation *before* determining whether an agency action is lawful. *Id.* at 2263.

To that end DOL's discretion, even though expressly granted, is valid only if DOL acts within the confines of its delegated powers. But an objective reading of the FLSA suggests that DOL's interpretive power is confined to specifying the types of *dutie*s that qualify an employee as exempt. *See* Dkt. 48 at 12–14. The authority does not extend to the regulation of employee salaries. In other words, no honest reading of *Loper Bright* endorses DOL's view that expressly delegated definitional authority to "define and delimit" terms dealing with *duties* gives the Secretary carte blanche to impose extratextual minimum salary rules.

*Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007) does not help Defendants' case. Dkt. 57 at 17–18. In *Coke*, the Supreme Court examined the FLSA exemption concerning employees engaged in domestic service to provide companionship services for those unable to care for themselves, as defined by the Secretary's regulations under 29 U.S.C. § 213(a)(15). The core issue was whether DOL violated the FLSA by clarifying that this exemption extended to workers employed by third parties. The Court, adhering to *Chevron*, only deferred to the agency after mooring the scope of DOL's authority to the FLSA's operative text. *See Coke*, 551 U.S. at 167 (focusing on the "statutory language"). By contrast, here, DOL seeks to skip this step and go straight to deference.

In other words, *Coke* involved a legitimate "interstitial matter," where the term "employed" had to be construed either to include or exclude third-party employment, a gap Congress perhaps left open for the agency to fill. *Coke*, 551 U.S. at 165. But here, DOL's position that the Secretary has the authority to impose salary requirements for the EAP Exemption lacks

*any* textual basis within the statute. Without any mooring to the text whatsoever, there is no gap to be filled. There is only the argument that the Secretary can "define and delimit" however they see fit regardless of the text. Because the setting of salary levels falls outside the boundaries of any authority Congress may have delegated under 29 U.S.C. § 213(a)(1), this court should vacate the rule. *See Loper Bright*, 144 S. Ct. at 2263 (noting that, where Congress has delegated discretionary authority to an agency, courts fulfill their role by "fix[ing] the boundaries of [the] delegated authority" (quoting Henry P. Monaghan, *Marbury and the Administrative State*, 83 COLUM. L. REV. 1, 27 (1983))).

Nor can DOL's longstanding reliance on a minimum salary component in defining and delimiting the EAP Exemption defeat the plain text of § 213(a)(1). Dkt. 57 at 18–19. To be sure, courts can consider agency "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time." *Loper Bright*, 144 S. Ct. at 2262. "But while longstanding agency practice might have the 'power to persuade,' it has never had the 'power to control.'" *Rest. Law Ctr. v. U.S. Dep't of Lab.*, 2024 WL 3911308, at *8 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, (1944)). In other words, the salary level test, "however longstanding, can[not] defeat the FLSA's plain text." *Id.* To hold otherwise would allow Defendants to "defeat [the] statute's text by 'adverse possession.'" *Airlines for Am. v. Dep't of Transp.*, 110 F.4th 672, 676 (5th Cir. 2024) (quoting *Rapanos v. United States*, 547 U.S. 715, 752 (2006) (Scalia, J.)).

Even setting that aside, DOL's purported "contemporaneous interpretations," Dkt. 57 at 19–20, fail on their own terms. Defendants claim that DOL "has long understood the statutory phrase 'bona fide executive, administrative, or professional capacity' to connote a status [and thus pay] not attained by lower-wage workers."' Dkt. 57 at 19 (citing Stein Report at 5). But this inference drawn by Defendants from the statute's operative terms is divorced from any ordinary, objective meaning. Take "capacity" for instance. Dkt. 57 at 19 ("The term 'capacity' encompasses 'relation', 'character,' and position.'") (citation omitted). According to Defendants, the words "relation," "character," and, "position" are understood to include "pay." *Id.* But in ordinary usage, these terms speak to the outward appearance of one's official

9

position or authority within a hierarchy.[4]

Defendants also misconstrue the meaning of the term "bona fide." *Id.* at 28. There is no dispute that "bona fide" requires an employee to be genuinely employed in an "executive, administrative, or professional capacity." Yet it is a stretch to assert that a worker's salary *alone* determines their genuine status as an EAP employee. In fact, the plain meaning of "bona fide" in conjunction with the other operative terms of EAP simply indicates that the employee must be performing duties that put him or her in an "executive, administrative, or professional" role. Simply put, after considering all the tools of statutory construction, the "single best meaning," *Loper Bright*, 144 S. Ct. at 2266, of the operative terms of the statute all "relate to a person's performance, conduct, or function without suggesting salary." *Nevada v. U.S. Dep't of Lab.* (*Nevada I*), 18 F. Supp. 3d 520, 529 (E.D. Tex. 2016); *see also* Dkt. 48 at 12–14, 16–18.

Not only is such an expansive view of the authority to "define and delimit" unmoored from the text and structure of the FLSA, but it also cannot be squared with the major questions doctrine. Dkt. 48 at 16–17. Also, Defendants want what amounts to unfettered "gap-filling" discretion to set a salary threshold for the EAP Exemption. But if this were the case Defendants would run headlong into a nondelegation problem because no intelligible principle guides their discretion. *Id.* at 30–31. Indeed, since the plain text and ordinary meaning of the FLSA does not include salary *at all*, there is no limiting principle stopping the Secretary from setting the salary level as high as he or she wants it to. Simply put, there is no way to know how high the Secretary can set the salary level "because Congress never gave" us the "answers." *Consumers' Research Cause Based Commerce, Inc. v. FCC*, 109 F.4th 743, 762 (5th Cir. 2024).

At bottom, by claiming that this court should essentially end its analysis after finding an

---

[4] *See e.g.*, *Relation*, https://www.merriam-webster.com/dictionary/relation (last visited Aug. 27, 2024) ("[A]n aspect or quality (such as resemblance) that connects two or more things or parts as being or belonging or working together or as being of the same kind."); *Position*, https://www.merriam-webster.com/dictionary/position (last visited Aug. 27, 2024) (defining "position" as "social or official rank or status"); *Status*, https://www.merriam-webster.com/dictionary/status (last visited Aug. 27, 2024) (a "position or rank in relation to others").

express delegation, Defendants have it backwards. DOL may only exercise its policy discretion when it operates squarely within the bounds of its expressly delegated authority—that is, with fidelity to the text of the statute it purports to "define and delimit." But here, the best reading of the statute cabins DOL's role to defining the *duties* that qualify an employee as exempt—nothing more. Put differently, the authority to "define and delimit" EAP Exemptions does not give DOL the roving authority to impose an extratextual minimum salary rule through gap-filling, policymaking, or otherwise. *Texas v. U.S. Dep't of Lab.*, No. 4:24-CV-499-SDJ, 2024 WL 3240618, at *9 n.15 (E.D. Tex. June 28, 2024) ("While the Secretary has broad latitude to define and delimit the EAP Exemption, the definition and delimitation cannot be at odds with the text.") (quotations and citations omitted). Rather, this Court could only bless such an interpretation if it reflects the "best reading" of the FLSA statute. *Loper Bright*, 144 S. Ct. at 2247. It does not. Thus, DOL has no authority to impose a salary level test and the 2024 Overtime Rule should be vacated for that reason alone.

## III.   Even If DOL Could Consider Salary, the 2024 Overtime Rule Exceeds Statutory Limits.

Each of the challenged provisions in the Final Rule conditions an EAP employee's exempt status on their income. The FLSA, as argued above, does not permit DOL to consider salary when establishing which employees meet the EAP exemption. *See supra* Part-II. The regulations therefore exceed DOL's statutory authority ipso facto, and this Court need not continue its analysis. However, should this Court hold otherwise, the provisions are still illegal because they effectively replace the duties tests for a substantial portion of EAP employees. The updating mechanism fails for the additional reason that it contravenes DOL's statutory obligation to affirmatively amend the perquisites via notice and comment rulemaking.

### A.   The July 1, 2024, Increase Resembles a De Facto Salary-Only Test.

Defendants attempt to rescue the July 1, 2024, increase to the salary threshold by tying it to the Fifth Circuit's decision in *Wirtz v. Mississippi Publishers Corp*; that decision, however, is too shaky of a pier column to support the weight of DOL's illegal policy. *Wirtz* involved the narrow

question of whether the minimum salary requirement in effect in 1966 was arbitrary and capricious. 364 F.2d 603, 608 (5th Cir. 1966). It did not address whether a salary requirement exceeded DOL's statutory authority in the first place. *See Thomas v. Tex. Dep't of Criminal Justice*, 297 F.3d 361, 370 n.11 (5th Cir. 2002) (noting that "[w]here an opinion fails to address a question squarely, we will not treat it as binding precedent"). Nor did the one-sentence holding suggest that any minimum salary test promulgated by DOL would comply with the FLSA, much less the agency's obligation under the APA to conduct reasoned decision-making each time DOL updated its overtime regulations. *See* Dkt. 38 at 21 (noting that *Wirtz's* approval did not bless *any and all* salary thresholds (emphasis in original)). The Fifth Circuit's opinion was limited to the facts at hand.

DOL has since changed the methodology used to calculate salary level. When the Fifth Circuit considered *Wirtz*, DOL utilized a two-tier structure designed to identify workers employed in a hybrid capacity—that is workers tasked with both EAP and non-EAP duties. "[T]he regulations in place generally set the long test salary level at a level designed to exclude from exemption approximately the lowest paid 10 percent of salaried white-collar employees who performed EAP duties in lower-wage areas and industries," 89 Fed. Reg. 32845; the short test, meanwhile, had a salary level that was "significantly higher" but involved a much less rigorous duties test. *Id.* In 2004, DOL abandoned that model. It put in its place a single salary test that excludes anyone earning less than the 20th percentile of salaries in the lowest wage census region, which is the South. Defendants note in their brief that the single-test system is "less nuanced" than its predecessor. Dkt. 57 at 29. The higher amount also has the potential for capturing a larger number of employees who perform EAP duties.

*Wirtz* is silent about whether this new methodology—utilized by the July 1 increase— complies with the FLSA. Defendants, arguing to the contrary, suggest that the *Wirtz* opinion endorses a salary level of at least $942 per week because that is the modern-day equivalent of the $100 per week salary level effective in 1966. Dkt. 57 at 25; *see also* 28 Fed. Reg. 9511–12 (§ 541.117). However, even assuming Defendants' math is correct, the salient fact is not the salary amount per se, but rather its impact on employees who perform EAP duties. DOL has acknowledged during

multiple rulemakings that it lacks the power to adopt a "salary only" test for the exemption. *See*, *e.g.*, 81 Fed. Reg. 32446, 69 Fed. Reg. 22173. If DOL sets the salary level too high, based on the existing workforce and economy,[5] then the test no longer acts a close and accurate proxy for EAP duties and is effectively a salary-only test in excess of DOL's statutory authority.

The other problem with citing *Wirtz* is that the Fifth Circuit did not have before it evidence that the salary test operative in 1966 excluded a large number of individuals from the exemption in violation of the statute. The opinion therefore offers little insight into how this Court should proceed given the uncontested fact that nearly one million employees who meet the duties test will lose their exemption solely because their earnings fall below $844 per week. *See* 89 Fed. Reg. 32934 at tbl. 25 (calculating 959,000 affected workers). Defendants attempt to downplay this outcome by characterizing it as "modest," but the only reason why the change of status of 959,000 employees could even appear unassuming is because DOL double downed on its efforts to rewrite congressional policy and drafted a radical methodology, scheduled to take effect on January 1, 2025, which ousts 4 million from the EAP Exemption. *Id.*

The July 1 increase is not redeemed simply because the January 1 increase contradicts the statute more. In both instances, the increase relegates the duties test to irrelevancy in favor of the employee's compensation level for multitudes of bona fide EAP employees. That result cannot be reconciled with the FLSA, which describes the EAP Exemption purely in terms of the activities that employees perform. As this Court already recognized, the terms "executive, administrative [and] professional" all "relate to a person's performance, conduct, or function without suggesting salary." *Nevada I*, 218 F.Supp.3d at 529. The determination of whether an employee meets the

---

[5] In its amicus brief, the U.S. Chamber of Commerce explains how the workforces has evolved since the FLSA was enacted. "When DOL first introduced the salary-basis requirement, the Nation's labor force was centered on manufacturing, agriculture, and other kinds of manual work." Dkt. 47-1 at 6–8. Since then, there has been "a big shift toward professional and technical occupations and toward management"—or, in other words, towards duties that would be exempt under the EAP Exemption. *Id.* at 8 (quoting A. Monge-Naranjo and J. Vizcaino, "Shifting Times: The Evolution of the American Workplace," Federal Reserve Bank of St. Louis (Dec. 17, 2017)). It is against this backdrop that DOJ proposes to increase the salary requirement to exclude more workers from attaining EAP status.

exemption therefore must involve at least some consideration of the employee's duties. The July 1 adjustment, however, will eject 959,000 employees from the exemption who otherwise work in an EAP capacity. It functions as a de facto salary-only test, albeit to a lesser degree than the upcoming January 1 increase. It should be vacated as unlawful.

### B.  The January 1, 2025, Increase Resembles a De Facto Salary-Only Test.

The salary cutoff scheduled for January 1, 2025, differs in degree and kind from its predecessors. In prior rulemakings, DOL had attempted to set the salary cutoff low so to avoid denying an exemption to "any substantial number of individuals that could reasonably be classified" as an EAP employee—with varying degrees of success. Harry Weiss, *Report and Recommendations on Proposed Revisions of Regulations*, Part 541, at 9 (1949). The January 1 increase, in contrast, rejects this past practice by introducing a new methodology that deliberately captures a larger portion of white-collar workers who meet the EAP duties test. For these 4.8 million employees, "Nothing about [their] jobs will have changed. Their duties and salaries will be identical both before and after the increases." Dkt 38 at 22. The only difference is DOL's new regulatory framework that prioritizes income over an employee's performance, conduct, or function in violation of the statute.

In response, Defendants argue that it is a mistake to focus on the number of workers excluded from the exemption; the focus instead should be on the salary level's utility as a screen for obviously nonexempt employees. *See* Dkt. 57 at 30. Texas maintains that the EAP Exemption rests on duties, not compensation. Any employee who meets the duties test should qualify for the exemption, their salary notwithstanding. However, even if this Court were to adopt Defendants' premise, the evidence cited in the 2024 Overtime Rule demonstrates that the January 1 salary threshold makes a poor proxy for identifying non-EAP workers. According to the 2024 Overtime Rule, "of the 12.7 million full-time salaried white-collar workers who earn less than $1,128 per week, 38 percent . . . meet standard duties test." 89 Fed. Reg 32880. Put another way, the salary level mischaracterizes around two out of every five employees who make below $1,128 per week.

That is not a close or accurate proxy.

Defendants assert that this rate of failure is within acceptable limits because technically two out of five employees constitute "a minority of salaried white-collar workers who earn below the salary level." Dkt. 57 at 31. But this artful dodge is not supported by the statute. The FLSA states "*any* employee employed in a bona fide" EAP capacity merits the exemption. 29 U.S.C. § 213(a)(1). To the extent DOL is permitted to consider salary at all, DOL must tailor the salary test to be a near perfect match to duties. It does not have leave to oust from the exemption additional employees who DOL knows meets the duties test simply because other people at that salary level might not. If anything, the argument highlights DOL's misaligned priorities. Whereas the FLSA instructs DOL to classify workers based on the tasks they actually perform, DOL, through the January 1 increase, seeks to advance income as the predominate factor for as many employees as existing caselaw might allow. Had DOL's focus been on duties, then a lower salary threshold would not matter. Employers would still have the burden of establishing that exempt employees were hired in an EAP capacity.

The last strategy Defendants adopt is to cite DOL's past rulemakings that implemented some version of the salary test—the implication being that prior practice vindicates the 2024 Overtime Rule's inflated salary level. There are two major problems with this tack. *First,* post *Loper Bright*, an agency's interpretation of its enabling statutes does not receive any deference from the courts. For DOL to justify the January 1 increase, it must look to the FLSA, not erstwhile regulations. *See supra* Part II. *Second,* the methodology introduced by the January 1 increase departs dramatically from what became before. From 1949 to 2004, any employee that made between the short and long salary tests would still qualify for the exemption so long as they satisfied a more rigorous duties test. An individual was only excluded from the exemption on account of

income if their salary fell below the long test, which was intentionally kept low.[6] Now, DOL seeks to fix the salary level above even short test but makes no provision for employees who engage in pure EAP work.

Earlier regulations provide no refuge for the modification scheduled on January 1. The existing salary level already represented a jump in the salary test to account for the transition away from the two-tiered structure.[7] *See* 69 Fed. Reg. 22167. Moving the demarcation line higher only further severs whatever connection exists between compensation and EAP duties, as DOL's own numbers demonstrate. Defendants can point to no prior salary test, upheld by the courts, that excludes such a large percentage (and number) of full-time, salaried, white-collar workers. The closest equivalent—the short test—targeted employees hired in a hybrid capacity. Employees that made below that amount (but above the long test) could still qualify for the exemption if their duties met certain standards stipulated by DOL That option does not exist here. The methodology instead resembles the stricken 2016 Rule, which this Court enjoined because it amounted to a "de facto salary-only test." *Nevada I*, 218 F. Supp. 3d at 531. This Court should find the same here.

### C. The Updating Mechanism Contravenes Federal Law.

Should this Court determine that the July 1 and January 1 increases to the salary-level test run afoul of the FLSA, then the 2024 Overtime Rule's escalator provision falls by default since its only function would be to implement an illegal requirement. *See id.* at 532. The problems with the

---

[6] According to the 2024 Overtime Rule, the long test typically "exclude[d] the lowest-paid 10 percent of exempt EAP employees in low-wage industries and areas." 89 Fed. Reg 32845. Although the methodology introduced in 2004 utilized a different salary base than the long test, the Department acknowledges that the 2004 "standard salary level was comparable to the lower long test salary level used in the two-test system" albeit somewhat higher. 89 Fed. Reg 32845–46 n. 53; *see also* 89 Fed. Reg 32845 (quoting 69 Fed. Reg. 22167).

[7] The 2004 Rule did not merely pair the short duties test with the salary level of the long test as Defendants imply. The 2004 Rule strengthened the duties test by imposing additional requirements for EAP employees. *See*, *e.g.*, 69 Fed. Reg. 22193–95. It also changed the salary base. "[I]nstead of investigating the lowest 10% of exempt salaried employees, an approach that depends on uncertain assumptions regarding which employees are actually exempt, the Department decided to set the minimum salary level based on the lowest 20% of all salaried employees." 69 Fed. Reg. 22167.

escalator provision do not end there, however. The mechanism also violates both the FLSA and the APA. The plain terms of 29 U.S.C. § 213(a)(1) authorize DOL to "define[] and delimit[]" the meaning of the "executive, administrative, or professional" categories "*from time to time by regulations*" (emphasis added). Defendants dismiss this language in a footnote, stating that the automatic updating mechanism "by no means 'preclude[s] the Department from engaging in rulemaking from time to time'" when the DOL deems it necessary. Dkt. 57 at 33 n. 11 (quoting 89 Fed. Reg. 32857). But this applies Congress's instruction the wrong way around. Congress contemplated that the EAP requirements would only change when DOL made an *active determination* that the economy and workforce warranted a rulemaking. The language does not permit DOL to set its discretion to 'define and delimit' the EAP Exemption on autopilot, with no obligation to revisit the methodology.

In addition, it is clear from Defendants' brief that Defendants do not view the triennial salary updates as "regulations" but rather characterize them as wage adjustments, which "apply updated data" to the salary threshold. Dkt. 57 at 34. If that characterization is accurate, then the mechanism fails for the additional reason that the FLSA only authorizes DOL to fine tune the exemption "by regulation." 29 U.S.C. § 213(a)(1). It neither expressly nor implicitly sanctions automatic wage adjustments. In fact, DOL has admitted that not only is the FLSA silent on this point, *see* 69 Fed. Reg. 22171 ("Further, the Department [found] nothing in the legislative or regulatory history that would support indexing or automatic increases."); 81 Fed. Reg. 32431 (noting that Section 213(a)(1) "does not reference automatic updating . . . ."), but that automatic increases to the salary test also would be "both contrary to congressional intent and inappropriate." 69 Fed. Reg. 22171–72. Defendants argue instead that its authority to promulgate automatic triennial updates "flows from the authority to set that test in the first place." Dkt. 57 at 32. But that argument is unpersuasive since the salary test itself is atextual. Congress would have had no reason to believe that an exemption anchored to EAP duties would grant DOL the power to robotically ratchet up a salary cutoff without notice and comment.

On the other hand, if the triennial salary updates constitute regulations, then the escalator

provision contravenes the APA by circumventing notice and comment procedures. Defendants stress that this mechanism will not "alter the Department's ability to engage in future rulemaking to change the updating mechanism," Dkt. 57 at 34 (citing 89 Fed. Reg. 32857), but this, again, reverses the process stipulated by Congress. Notice and comment is designed to provide a "'surrogate political process' that takes some of the sting out of [] inherently undemocratic and unaccountable regulatory rulemaking." *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1929 n. 13 (2020) (Thomas, J., concurring) (quoting Asimow, *Interim-Final Rules: Making Haste Slowly*, 51 ADMIN. L. REV. 703, 708 (1999). It allows affected parties to develop evidence in the record and influence the agency's final decision. The updating mechanism, in contrast, imposes recurring, substantive changes on regulated entities, but it imposes no corresponding obligation on DOL to invite and consider evidence that its methodology is obsolete before each successive salary cutoff takes effect. *Cf.* U.S. Chamber Amicus Br., Dkt. 47-1 at 6–8 (describing workforce's shift towards exempt work). Not only is this unfair to regulated parties, but it keeps DOL from having "the broadest base of information" from which to make its decision. *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 620 (5th Cir. 1994).

## IV.     The 2024 Overtime Rule is Not a Byproduct of Reasoned Decision-making.

The 2024 Overtime Rule's use of salary to expand the definition of EAP workers, and its installation of automated indexing to circumvent ordinary constraints on administrative rulemaking, are arbitrary and capricious.

### D.  The New Salary Tests Are Arbitrary and Capricious

Congress has authorized DOL to define and delimit the duties requisite to identify bona fide EAP employees, not to create a salary exemption that all but swallows the duties rule. Yet the 2024 Overtime Rule's increase of a salary floor, which this court has previously held could only be used if it screens out "obviously non-exempt employees," swallows an entirely new class of workers into the nonexempt category. *Nevada II*, 218 F.Supp.3d at 807. The 2024 Overtime Rule's new salary tests are therefore arbitrary and capricious.

18

Defendants defend the rule using an expansive view of DOL's  delegated authority:

> To be clear, Congress did not by the FLSA establish an exception for '*any employee who works in an EAP capacity.*'…Instead, Congress created an exemption for any employee who works in a bona fide EAP capacity, *as those terms are defined and delimited by the Department of Labor.*

Dkt. 57 at 21. This sweeping assertion of power is breathtakingly nonsensical. If correct, it would mean that even Congress did not know who it intended to exempt from overtime pay. Defendants invite this court to adopt a Schrodinger's Cat approach to the FLSA: all workers are both exempt and non-exempt until federal administrators peek inside the box and issue a rule that may or may not have anything to do with the plain meaning of the statutory text. The Court should reject DOL's approach, because literally nothing could be more arbitrary or capricious.

There is simply no basis in law, particularly after *Loper Bright*, to understand federal administrative authority as so completely untethered to statutory text. *Loper Bright*, 144 S. Ct. at 2261 ("The APA thus codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts will decide '*all* relevant questions of law' arising on review of agency action.") (Emphasis original). DOL cannot define EAP workers to include dolphins, because the terms, "executive," "administrative," and "professional" have plain textual meaning that set the guardrails for agency action. DOL's insistence that a congressional delegation of authority to delimit and define does not free it from these guardrails:

> When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits. The court fulfills that role by recognizing constitutional delegations, *fixing the boundaries of the delegated authority*, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries.

*Id.* at 144 S. Ct. at 2263 (internal quotations and citations omitted) (emphasis added). Defendants respond to the charge of unreasoned decision-making by asserting DOL's decision-making authority is boundless. That response contradicts binding Supreme Court precedent and is, itself, evidence of the arbitrary and capricious nature of the new salary tests.

Defendants' defense of DOL's consideration of *Nevada I* and *Nevada II* fairs no better. They claim that DOL cited the case law "repeatedly," and discussed it "at length." Dkt. 57 at 35. But in the 132 pages of the 2024 Overtime Rule, the word "Nevada" appears six times; moreover, mere citation does not a reasoned decision make. DOL's discussion of the *Nevada* cases does not seriously engage with the implications of those decisions for the limitations on DOL's authority to create an expansive salary test that undermines the duties rigor. For example, the 2024 Overtime Rule describes *Nevada II* as "express[ing] concern that the 2016 rule conferred overtime eligibility based on salary level alone to a substantial number of employees who would otherwise be exempt." 89 Fed. Reg. 32848. *First*, this Court did not "express[] concern" that the 2016 Rule displaced the duties test with a salary test, it expressly held the 2016 Rule did just that, and therefore held the rule invalid. *Nevada II*, 275 F.Supp.3d at 806, 808. The 2024 Overtime Rule's dilution of *Nevada II*'s analysis—and result—plainly evidence DOL's failure to reasonably consider this Court's previous ruling.

*Second*, the 2024 Overtime Rule follows this observation of *Nevada II*'s holding by eliding the new salary tests' expansion of nonexempt workers, saying the salary tests "will reasonably distribute the impact of the shift by ensuring overtime protection for some lower-salaried employees without excluding from exemption too many white-collar employees solely based on their salary level." 89 Fed. Reg. 32848. DOL thus admits the new salary tests swallow additional EAP employees but fails to acknowledge that the new salary tests also swallow non-EAP employees, too. It is as if DOL has admitted the new salary tests swallow squares, without acknowledging the tests swallow all rectangles. Just as that geometric admission fails to account for equilateral sides, DOL's admission fails to account for the fact that its new salary tests swallow EAP and non-EAP workers without regard to their duties at all. This is precisely the result this Court ruled was contrary to Congress' intent: "[T]he Department creates a Final Rule that makes overtime status depend predominately on a minimum salary level, thereby supplanting an analysis of an employee's job duties." *Nevada II*, 275 F.Supp.3d at 806.

The January 1, 2025, minimum salary level is arbitrary and capricious because it ignores

affected communities' reliance on the prior rule. DOL's defense again suggests that a handwaving citation is sufficient to meet its obligations under the APA. This defense again fails. Defendants point to a single sentence in its 132-page rule as evidencing its "consideration" of reliance interests. Dkt. 57 at 37. But a single sentence is not evidence that DOL has articulated a satisfactory explanation for its action. Defendants' reliance on *Hasie* is of little help. *Hasie v. Office of Comptroller of Currency of U.S.*, 633 F.3d 361, 365 (5th Cir. 2011). Dkt. 57 at 38. Defendants cite this case for the proposition that, "a court is not to substitute its judgment for that of the agency."). *Id.* But that quote from *Hasie*, itself, cites to *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, which is pre-*Chevron* and pre-*Loper Bright*. Still, that case gives a much headier description of an agency's rulemaking obligations:

> Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered and explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 103 S. Ct. 2856, 2866–67 (1983) (internal quotations and citations omitted). The single sentence cited by DOL as evidence that it "considered" reliance objections meets none of these criteria.

Another example, notably not cited by Defendants, perfectly describes the short shrift DOL gave to affected members of the community expressing reliance concerns. The 2024 Overtime Rule acknowledged that stakeholders such as Catholic Charities USA and the National Council of Nonprofits "expressed concern about funding and reimbursement rates to meet potential new overtime expenses." 89 Fed. Reg. 32848. But DOL dismissed these concerns, saying it has "never had special rules for nonprofit or charitable organizations and employees of these organization are subject to the EAP exemption if they satisfy the same salary level, salary basis, and duties tests as

other employees." *Id.* This presents the same square-versus-rectangle sleight of hand: DOL elsewhere acknowledges that the reliance concerns arising from the 2024 Overtime Rule are hardly cabined to nonprofits, and yet waves these concerns off as if a serious address of reliance concerns would require fabrication of a brand-new rule specific to nonprofits. DOL had entirely failed to consider an important aspect of the problem, and its citation to a single sentence only proves the point.

### E.  The Automatic Index Provisions Are Arbitrary and Capricious.

Just as Defendants seek to shield the 2024 Overtime Rule's salary tests from judicial review, so too do they seek to insulate triennial rulemaking from mandatory notice and comment under the APA. The 2024 Overtime Rule's salary escalator provision constitutes an ongoing, automated exercise of administrative power that Defendants would have the Court believe is subject to no oversight—either by this Court or by those subject to the new rule's regulations. Defendants do not meaningfully engage with Plaintiffs' notice and comment arguments. *Cf.* Dkt. 48 at 22-23; Dkt. 57 at 34. Instead, Defendants assert—without citation—that the triennial exercise of agency power is not subject to notice and comment because it is not rulemaking. This argument fails for the reasons discussed above. *See supra* Part III.C.

Additionally, Defendants do not seriously consider the point of the notice and comment requirement: "to 'assure fairness and mature consideration of rules having a substantial impact on those regulated' and for the agency to 'disclose its thinking on matters that will affect regulated parties.'" *Tex. Med. Assoc. v. U.S. Dept. of Health & Human Svcs.*, 587 F.Supp.3d 528, 643 (E.D. Tex. 2022) (quoting *U.S. v. Johnson*, 632 F.3d 912, 931 (5th Cir. 2011)). Far from ensuring mature consideration, the escalator provision replaces such consideration with automation and thereby shields a federal agency from contemplation of additional information or newfound concerns. The automation allows for no consideration of drastic economic change, such as a recession, pandemic, the collapse of indices, or a return to the Gold Standard.

Although Defendants counter that automated escalation does not foreclose their ability to

address such calamity in future rulemaking, the potential to make changes does not disclose the rulemakers' thinking. If calamity strikes and the rulemakers elect to keep the escalation in place—even reasonably so—the inexorable triennial change does nothing to explain to the regulated why their rulemakers have elected to force this change despite a dramatically altered economic landscape. Our republic, of course, subjects its citizens to rules—but the point of a republic is that the rules are never beyond petition, alteration, or explanation. Defendants seek to put the automated escalation beyond these basic tenets of democracy, which is why the provision is arbitrary and capricious.

## CONCLUSION

For each of the reasons articulated above, Texas respectfully requests that this Court deny Defendants' motion, grant summary judgment in favor of Plaintiffs, and permanently set aside the 2024 Overtime Rule in its entirety, nationwide.

Date: August 29, 2024.

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Legal Strategy

**RYAN D. WALTERS**
Chief, Special Litigation Division

Respectfully submitted,

*/s/KATLEEN T. HUNKER*

**KATHLEEN T. HUNKER**
Special Counsel
Tex. State Bar No. 24118415

**GARRETT GREENE**
Special Counsel
Tex. State Bar No. 24096217

**MUNERA AL-FUHAID**
Special Counsel
Tex. State Bar No. 24094501

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Kathleen.Hunker@oag.texas.gov
Garrett.Greene@oag.texas.gov

**COUNSEL FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on August 29, 2024 and that all counsel of record were served by CM/ECF.

*/s/ Kathleen T. Hunker*

Kathleen T. Hunker

24