# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
September 11, 2024
Lyle W. Cayce
Clerk

No. 23-50724

Robert Mayfield; R.U.M. Enterprises, Incorporated,

*Plaintiffs—Appellants*,

*versus*

United States Department of Labor; Martin Walsh, *Secretary, U.S. Department of Labor*,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:22-CV-792

_____

Before Wiener, Elrod, and Wilson, *Circuit Judges*.

Jennifer Walker Elrod, *Circuit Judge*:

For more than eighty years, the Department of Labor has defined the so-called White Collar Exemption in the Fair Labor Standards Act to include a minimum-salary requirement. Robert Mayfield challenges the latest rule, which updates the minimum salary necessary to fall within the Exemption, on the ground that promulgating any rule imposing a salary requirement exceeds the Department's statutorily conferred authority or else violates the nondelegation doctrine. The district court granted the Department's motion for summary judgment. Because the 2019 Minimum Salary Rule falls within

the Department's explicitly delegated authority to define and delimit the terms of the Exemption, and because that power is not an unconstitutional delegation of legislative power, we AFFIRM.

I

The Fair Labor Standards Act sets out a variety of standards and protections governing labor conditions. *See* 29 U.S.C. § 201, *et seq*. For example, it sets a minimum wage and requires overtime for work beyond forty hours per week. *Id.* §§ 206(a), 207(a)(1). Though the FLSA defines the workers to whom the statute applies broadly, *see id.* § 203(e)(1) (defining "employee" as "any individual employed by an employer"), it also contains a series of exemptions that exclude certain types of employees from that definition. Relevant here, the FLSA exempts "any employee employed in a bona fide executive, administrative, or professional capacity." *Id.* § 213(a)(1). That exemption is known as the "EAP Exemption" or the "White Collar Exemption, and it gives the Secretary of the Department of Labor the power to "define[] and delimit[]" the "terms" of the exemption. *Id.*

Though the EAP Exemption, like many of the other FLSA exemptions, defines qualifying workers through duties and job types, *see id.* § 213(a)(3), (5), (8), (10), (12), (15)–(19), DOL has repeatedly issued a minimum-salary rule that prevents workers from qualifying for the Exemption if their salary falls below a specified level. DOL has long justified its rules on the ground that the terms used in the EAP Exemption connote a particular status and prestige that is inconsistent with low salaries.[1] As the district court explained in its comprehensive history of DOL's various

---

[1] *See, e.g.*, U.S. Dep't of Labor, "Executive, Administrative, Professional . . . , Outside Salesman" Redefined: Report and Recommendations of the Presiding Officer [Harold Stein] at Hearings Preliminary to Redefinition 19 (1940).

No. 23-50724

minimum-salary rules, "[h]istorically, the Department has justified the use of a salary-level test by pointing to its effectiveness as a screen for an employee's actual duties."

In 2019, DOL issued a new version of what is known as the "Minimum Salary Rule," raising the minimum salary required to qualify for the Exemption from $455 per week to $684 per week, an increase of 50.3%. 84 Fed. Reg. 51230, 51231.  DOL is currently considering a proposed rule that would raise the minimum salary to $1,059 per week, a roughly 55% increase from the 2019 Rule.  88 Fed. Reg. 62152.

Mayfield sued DOL, claiming that the 2019 Rule exceeds DOL's statutorily conferred authority.  Mayfield is a small-business owner who runs thirteen fast-food restaurants in Austin, Texas.  According to Mayfield, his businesses succeed by offering high bonus payments to the best performing store managers.  He asserts that the Rule forces him to pay a higher salary to all managers regardless of performance, leaving him with insufficient funds to reward the best performers.

Mayfield does not argue that DOL lacks the authority to raise the minimum salary, nor does he maintain that the particular salary level DOL chose is invalid.  Rather, he argues that DOL lacks, and has always lacked, the authority to define the EAP Exemption in terms of salary level.

Mayfield and DOL filed cross-motions for summary judgment.  The district court granted DOL's motion and denied Mayfield's motion. Mayfield timely appealed.

II

We begin with two preliminary questions: whether our precedent dictates the outcome in this case, and if not, whether the major questions doctrine applies.

No. 23-50724

A

DOL contends that Mayfield's arguments are foreclosed by *Wirtz v. Mississippi Publishers Corp.*, 364 F.2d 603 (5th Cir. 1966). In *Wirtz*, we considered whether the Minimum Salary Rule is an unjustified regulation "under [the FLSA] because [it is] not rationally related to the determination of whether an employee is employed in a 'bona fide executive . . . capacity.'" *Id.* at 608 (quoting 29 U.S.C. § 213(a)(1)). Because the FLSA gives DOL "broad latitude" to define the meaning of "bona fide executive," we "[could not] say that the minimum salary requirement is arbitrary or capricious." *Id.*

*Wirtz* does not control our analysis: there, we addressed whether the Minimum Salary Rule is arbitrary and capricious, but Mayfield argues that it exceeds DOL's statutory authority. The Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, clearly distinguishes between those two types of challenges, making them separate bases for setting aside agency action. *Compare* 5 U.S.C. § 706(2)(A) (arbitrary and capricious), *with id.* § 706(2)(C) (exceeding statutory authority). Holding that a rule survives a particular type of APA review does not determine how it fares under other types of review, even if both types of review raise similar issues.

B

We must next consider whether the major questions doctrine plays a role in our analysis. "[I]n certain extraordinary cases, both separation of powers principles and practical understanding of legislative intent make [the court] reluctant to read into ambiguous statutory text the delegation claimed to be lurking there. To convince [the court] otherwise, something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to clear congressional authorization for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (citation and internal quotation marks omitted).

There are three indicators that each independently trigger the doctrine: (1) when the agency "claims the power to resolve a matter of great political significance"; (2) when the agency "seeks to regulate a significant portion of the American economy or require billions of dollars in spending by private persons or entities"; and (3) when an agency "seeks to intrude into an area that is the particular domain of state law." *Id.* at 743–44 (Gorsuch, J., concurring) (citations and internal quotation marks omitted); *see also Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827, 844 (5th Cir. 2023) (applying the major questions doctrine because of the political significance of the issue).

But even once triggered, whether the doctrine is one interpretative tool among many or a clear-statement rule is the subject of ongoing debate.[2] We need not opine on that heady question because, as the district court ably put it, this case neither is one of vast political or economic significance under Supreme Court or Fifth Circuit precedent nor intrudes into an area that is the particular domain of state law.

While no case has set the threshold for "economic significance," the recent cases applying the doctrine based on economic significance have involved hundreds of billions of dollars of impact. *See, e.g.*, *Nebraska*, 143 S. Ct. at 2362 ($430 billion); *West Virginia*, 597 U.S. at 715 ($1 trillion by 2040). Here, the impact of the Rule is roughly $472 million in the first year, including both the costs of implementing the Rule and the transfers from employers to employees. While the Supreme Court's recent decisions by no means set the lower bound of economic significance, we think the gap

---

[2] *Compare Biden v. Nebraska*, 143 S. Ct. 2355, 2368–75 (2023) (applying the doctrine in conjunction with traditional interpretative tools), *and id.* at 2378 (Barrett, J., concurring) (explaining that the major questions doctrine is a textual tool that emphasizes context, not a substantive canon), *with West Virginia*, 597 U.S. at 724–32 (2022) (starting with the major questions doctrine and arguably treating it as a substantive canon), *and id.* at 735 (Gorsuch, J., concurring) (arguing that the doctrine is a clear-statement rule).

No. 23-50724

between the economic impact in those cases and this case too large to warrant applying the major questions doctrine here based on economic significance.³

We must also consider whether DOL seeks to regulate a significant portion of the American economy. The 2019 Rule removes 1.2 million workers from the Exemption who would otherwise be exempt. 84 Fed. Reg. 51238. Because 1.2 million workers is a small percentage of the overall workforce, regulating that number of workers does not trigger the major questions doctrine.

Turning to political significance, even if we assume that labor relations are a politically controversial topic, whether to use salary level to determine which employees should be exempt from various FLSA protections is not in line with the types of issues that have been considered politically contentious enough to trigger the doctrine. *E.g.*, *West Virginia*, 597 U.S. at 729–30 (how much coal-based energy generation the country should engage in); *see also Texas*, 78 F.4th at 844 (how to store nuclear waste). Nor is this a case in which the agency "newly uncover[s] [power that] conveniently enable[s] it to enact a program that . . . Congress considered and rejected multiple times." *West Virginia*, 597 U.S. at 731 (internal quotation marks omitted).

Finally, the Supreme Court's major-questions analysis turns in part on whether the agency has previously claimed the authority at issue. *West*

---

³ Mayfield urges us to look to the economic impact that could result from the broadest possible rule that is consistent with DOL's asserted authority rather than the impact of the rule that DOL actually promulgated. While the Supreme Court has occasionally considered the potential impact of the authority asserted, *see, e.g., Gonzalez v. Oregon*, 546 U.S. 243, 268 (2006) (considering other decisions the Attorney General *could* make based on the authority asserted), we think that the Supreme Court's more recent cases are a more reliable guide, and those cases look to the promulgated rule, *see, e.g., West Virginia*, 597 U.S. at 724–30 (analyzing the impact of the rule in question); *Nebraska*, 143 S. Ct. at 2372 (same).

*Virginia*, 597 U.S. at 721–23 (providing examples). Here, DOL asserts an authority that it has asserted continuously since 1938. While a particular minimum-salary rule could raise issues because of its size, Mayfield's argument is that any consideration of salary is improper. That means that even though the particular salary level in question here is novel, the assertion of authority to consider salary is not. As the district court explained, this is not an instance where the agency "discover[s] in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

### III

Having determined that the major questions doctrine does not apply, we turn to Mayfield's argument that the 2019 Minimum Salary Rule exceeds DOL's statutory authority. In *Loper Bright Enterprises v. Raimondo*, the Supreme Court clarified "the unremarkable, yet elemental proposition reflected in judicial practice dating back to *Marbury*" that "courts decide legal questions by applying their own judgment," even in agency cases. 144 S. Ct. 2244, 2261 (2024). Where, as here, Congress has clearly delegated discretionary authority to an agency, we discharge our duty by "independently interpret[ing] the statute and effectuat[ing] the will of Congress subject to constitutional limits." *Id.* at 2263. This means that we must "independently identify and respect [constitutional] delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Id.* at 2268. Doing so requires using "all relevant interpretive tools" to determine the "best" reading of a statute; a merely "permissible" reading is not enough. *Id.* at 2266.

No. 23-50724

A

Here, because there is an uncontroverted, explicit delegation of authority, the question is whether the Rule is within the outer boundaries of that delegation. *See id.* at 2268. We start with the text of the explicit delegation, which gives DOL the authority to "define[] and delimit[]" the terms of the Exemption. 29 U.S.C. § 213(a)(1). "Define" means to "set forth or explain what a word (or expression) means." *Define*, Oxford English Dictionary (3d ed. 2015); *see also Define*, Black's Law Dictionary (12th ed. 2024). "Delimit" means to "mark or determine (a limit or boundary)" of something. *Delimit*, Oxford English Dictionary (3d ed. 2015); *see also Delimit*, Black's Law Dictionary (12th ed. 2024).

Promulgating the Minimum Salary Rule can be construed in two ways, both of which are consistent with DOL's statutorily conferred authority. By promulgating the Rule, DOL defines, in part, what it means to work in an executive, administrative, or professional capacity (namely, to earn at least a particular amount of money). This tracks the simple fact that a definition can rely on multiple types of characteristics. For example, the definition of "bachelor"—an "unmarried man"—uses both gender and marital status. *Bachelor*, Oxford English Dictionary (3d ed. 2015). The Minimum Salary Rule can also be construed as an exercise of the power to delimit the scope of the Exemption. By promulgating the Rule, DOL sets a limit on what is otherwise defined by the text of the Exemption. On either construal of what DOL is doing when it promulgates the Rule, its action is within the scope of its authority.

B

Mayfield's arguments to the contrary are unavailing. He contends that the power to "define and delimit" the terms of the Exemption is only the power to further specify and enumerate the types of duties that qualify an

8

employee for the Exemption. On Mayfield's view, the Minimum Salary Rule arbitrarily imposes a new requirement that lacks a textual basis because the statute only speaks of duties. Any classification based on a characteristic other than duties, then, would exceed DOL's authority. In support of this view, Mayfield points to the fact that many FLSA exemptions are defined in terms of job duties and that other exemptions explicitly reference salary level, demonstrating that Congress knows how to impose such a requirement when it wants one.

We are not persuaded. Using salary level as a criterion for EAP status has a far stronger textual foundation than Mayfield acknowledges. As DOL correctly points out, the terms in the EAP Exemption, particularly "executive," connote a particular status or level for which salary may be a reasonable proxy.[4] Indeed, the EAP Exemption is also frequently referred to as the "White Collar Exemption." Distinctions based on salary level are also consistent with the FLSA's broader structure, which sets out a series of salary protections for workers that common sense indicates are unnecessary for highly paid employees. *Cf. Hewitt v. Helix Energy Sols. Grp., Inc.*, 15 F.4th 289, 305 (5th Cir. 2021) (Jones, J., dissenting) (faulting an interpretation of a regulation implementing the EAP Exemption that allowed highly compensated employees to receive overtime because it was a poor fit with "a statute designed to elevate the workingman"), *aff'd*, 598 U.S. 39 (2023).

Mayfield's argument nevertheless raises an important point: adding an additional characteristic is consistent with the power to define and delimit,

---

[4] Mayfield appeals to the definitions of "executive," "administrative," and "professional," which he argues focus entirely on job duties and functions. In doing so, Mayfield ignores that the terms connote things not included in their definitions and that the degree of overlap between salary and the chosen terms makes one a reliable proxy for the other.

but that power is not unbounded.  A characteristic with no rational relationship to the text and structure of the statute would raise serious questions.  And so would a characteristic that differs so broadly in scope from the original that it effectively replaces it.

The same is true if one characterizes the Rule as DOL implementing a proxy to determine who falls within the Exemption.  Using salary as a proxy for EAP status is a permissible choice because, as we have explained, the link between the job duties identified and salary is strong.  That does not mean, however, that use of a proxy characteristic will always be a permissible exercise of the power to define and delimit.  If the proxy characteristic frequently yields different results than the characteristic Congress initially chose, then use of the proxy is not so much defining and delimiting the original statutory terms as replacing them.  That is not the case here.

Mayfield also argues that Congress knows how to impose a salary requirement when it wants to.  For example, application of the Baseball Exemption turns, in part, on whether the player surpasses a minimum weekly salary.  29 U.S.C. § 213(a)(19).  That argument is inapposite.  True, we "generally presume" that Congress acted "intentionally and purposely" when it "includes particular language in one section of a statute but omits it in another."  *Rodriguez-Avalos v. Holder*, 788 F.3d 444, 451 (5th Cir. 2015) (quoting *Brown v. Gardner*, 513 U.S. 115, 120 (1994)).  Here, however, the question is not whether the Exemption's terms should be interpreted to contain a salary requirement.  The question is whether the power conferred by the explicit delegation to "define[] and delimit[]" the terms of the statute allows DOL to impose a salary requirement.  Even if Congress acted intentionally by omitting a salary requirement from the EAP Exemption, that does not mean that the power it conferred excludes the option of imposing the requirement.

No. 23-50724

C

Finally, a note about *Skidmore* deference. In *Loper Bright*, the Supreme Court explained that "courts may . . . seek aid from the interpretations of those responsible for implementing particular statutes." *Loper Bright*, 144 S. Ct. at 2262 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Under *Skidmore*, the weight given to the agency's interpretation "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Id.* at 2259 (quoting *Skidmore*, 323 U.S. at 140). "The last factor, persuasiveness, is the touchstone in determining how much to defer to an agency interpretation." *Midship Pipeline, Co., LLC v. FERC*, 45 F.4th 867, 875 (5th Cir. 2022); *see also Rest. L. Ctr. v. DOL*, --- F.4th ---, 2024 WL 3911308, at *8 (5th Cir. 2024).

One might ask what work *Skidmore* deference can do given the Supreme Court's statements that (1) statutes have a "best reading . . . the reading the court would have reached if no agency were involved," and (2) "[i]n the business of statutory interpretation, if it is not the best, it is not permissible." *Loper Bright*, 144 S. Ct. at 2266 (internal quotation marks omitted). Taking these statements together, it seems that either the agency's interpretation is the best interpretation (in which case no deference is needed) or the agency's interpretation is not best (in which case it lacks persuasive force and is not owed deference). We need not address that issue here because DOL's interpretation of the statute is "best" based on traditional tools of statutory interpretation and without reliance on deference of any kind. We note, however, that if *Skidmore* deference does any work, it applies here. DOL has consistently issued minimum salary rules for over

11

No. 23-50724

eighty years.[5] Though the specific dollar value required has varied, DOL's position that it has the authority to promulgate such a rule has been consistent. Furthermore, it began doing so immediately after the FLSA was passed. And for those who subscribe to legislative acquiescence, Congress has amended the FLSA numerous times without modifying, foreclosing, or otherwise questioning the Minimum Salary Rule.[6]

We join four of our sister circuits in holding that DOL has the statutory authority to promulgate the Minimum Salary Rule. *Prakash v. Am. Univ.*, 727 F.2d 1174, 1177–78 (D.C. Cir. 1984); *Fanelli v. U.S. Gypsum Co.*, 141 F.2d 216, 218 (2d Cir. 1944); *Walling v. Morris*, 155 F.2d 832, 836 (6th Cir. 1946), *vacated on other grounds sub nom. Morris v. McComb*, 332 U.S. 422 (1947); *Walling v. Yeakley*, 140 F.2d 830, 832–33 (10th Cir. 1944).

IV

Finally, we consider Mayfield's argument that the EAP Exemption, when interpreted to grant DOL the authority to issue the 2019 Minimum Salary Rule, violates the nondelegation doctrine because it lacks an intelligible principle to guide DOL's power to define and delimit the EAP Exemption's terms. As currently constituted,[7] the intelligible-principle test

---

[5] 3 Fed. Reg. 2518 (Oct. 20, 1938); 5 Fed. Reg. 4077 (Oct. 15, 1940); 14 Fed. Reg. 7705 (Dec. 24, 1949); 23 Fed. Reg. 8962 (Nov. 18, 1958); 28 Fed. Reg. 9505 (Aug. 30, 1963); 35 Fed. Reg. 883 (Jan. 22, 1970); 40 Fed. Reg. 7091 (Feb. 19, 1975); 69 Fed. Reg. 22,122 (Apr. 23, 2004); 81 Fed. Reg. 32,391 (May 23, 2016).

[6] Fair Labor Standards Amendments of 1949, Pub. L. No. 81-393, § 16(c), 63 Stat. 910, 920; Fair Labor Standards Amendments of 1961, Pub. L. No. 87-30, sec. 9, § 13(a)-(b), 75 Stat. 65, 71-74; Fair Labor Standards Amendments of 1966, Pub. L. No. 89-601, sec. 214, § 13(a)(1), 80 Stat. 830, 837; Act of Nov. 15 1990, Pub. L. No. 101-583, § 2, 104 Stat. 2871, 2871.

[7] The current formulation of the nondelegation doctrine has been called into serious question. In *Gundy v. United States*, three justices wrote that the intelligible-principle test, as applied by the Court, "has no basis in the original meaning of the

No. 23-50724

requires Congress to set out guidance that "delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Mistretta v. United States*, 488 U.S. 361, 372–73 (1989) (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). As the Supreme Court recently explained, "[t]hose standards . . . are not demanding," and the Supreme Court has only twice found an excessive delegation of power, doing so in each case because "Congress had failed to articulate *any* policy or standard to confine discretion." *Gundy*, 588 U.S. at 146 (internal quotations omitted); *see also Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022) (holding a delegation unconstitutional because Congress provided "*no guidance* whatsoever"), *aff'd* 144 S. Ct. 2117 (2024). Of course, "that does not mean we must rubber-stamp all delegations of legislative power." *Consumers' Rsch. v. FCC*, 109 F.4th 743, 759 (5th Cir. 2024) (alterations adopted) (quoting *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 443 (5th Cir. 2020)). To do so would be to "shy away from our judicial duty to invalidate unconstitutional delegations." *Id.* (alterations adopted) (quoting *Big Time Vapes*, 963 F.3d at 443)).

Here, as the district court correctly noted, there are at least two principles that guide and confine the authority delegated to DOL: the

---

Constitution, in history, or even in the decision from which it was plucked." 588 U.S. 128, 164 (2019) (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting). Justice Alito noted in his concurrence that he agreed that the Court should reconsider the doctrine, *id.* at 148–49 (Alito, J., concurring), and Justice Kavanaugh, who had not joined the Court when *Gundy* was decided, indicated in a subsequent writing that he too would reconsider the doctrine, *Paul v. United States*, 140 S. Ct. 342 (2019) (Kavanaugh, J., respecting the denial of certiorari). On the *Gundy* dissent's view, the test should be whether the statute only assigns the executive fact-finding duties, makes clear the facts to be considered and the criteria against which to evaluate them, and leaves all policy judgments to Congress, not the executive branch. *Gundy*, 588 U.S. at 166 (Gorsuch, J., dissenting). Of course, it is not our prerogative to decide cases based on what the Supreme Court might do. *Agostini v. Felton*, 521 U.S. 203, 237 (1997).

No. 23-50724

FLSA's statutory directive to eliminate substandard labor conditions that are detrimental to the health, efficiency, and general wellbeing of workers, 29 U.S.C. § 202(a), (b), and the text of the Exemption itself, *id.* § 213(a)(1). The guidance provided by these provisions is admittedly not straightforward, and the boundaries it delineates are neither clear nor uncontroversial. But as the Supreme Court has said, the existing standard is not demanding. *Gundy*, 588 U.S. at 146. Under that standard, both the FLSA's purpose and the text of the Exemption itself provide at least *some* guidance for how DOL can exercise its authority. Therefore, they are each independently sufficient to satisfy the nondelegation doctrine's requirements.

True, the Minimum Salary Rule determines *which* workers are protected by the FLSA. By contrast, the FLSA's purpose speaks to *what* workers should be protected from. But it nevertheless provides guidance. DOL can look to whether a particular group of workers is subject to the very problems the Act seeks to remedy to determine whether the Exemption should be clarified to include or exclude that group of workers.[8] *Cf. Hewitt*, 15 F.4th at 305 (Jones, J., dissenting). DOL is also constrained by the qualification that the FLSA should improve working conditions "without substantially curtailing employment or earning power." 29 U.S.C. § 202(b). So while the FLSA's purpose speaks to *what* workers should be protected from, it nevertheless guides and limits DOL's authority to enact a rule determining *which* workers require protection.

---

[8] The ability to effectuate the FLSA's purpose by determining which workers are and are not exempt from its protections may seem like a broad grant of authority, but it fits comfortably within a long line of cases blessing similarly broad intelligible principles that entrust the agency with effectuating a statutory purpose. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474–75 (2001) (collecting examples).

14

So too with the text of the Exemption itself. The words "executive," "administrative," and "professional" each have meaning. That meaning both guides and limits DOL's power to "define[] and delimit[]" them. DOL can enact rules that clarify the meaning of those terms or, as in the case of the Minimum Salary Rule, impose *some* limitations on their scope. By contrast, DOL cannot enact rules that replace or swallow the meaning those terms have. It is true that the Exemption's text does not provide a precise line for what is permissible and what is not. As we have discussed, a rule that uses a proxy to determine whether something falls within the Exemption poses the difficult question of how accurate the proxy must be to be permissible. And a rule imposing a new characteristic raises the question of whether that characteristic is sufficiently connected to the existing definition. But an intelligible principle is a guide, not a definitive guide, to what can and cannot be done. As such, the Exemption itself provides an intelligible principle for the power to define and delimit its terms.

The lack of clarity in both intelligible principles raises reasonable concerns, but they are concerns that are only legally relevant under a test that has been floated but never grounded in law. To require more is to ask for a level of specificity that the law does not currently demand. Thus, we join two of our sister circuits in finding that, under the existing test, DOL's authority to define and delimit the terms of the EAP Exemption is guided by an intelligible principle. *See Fanelli*, 141 F.2d at 218; *Walling*, 140 F.2d at 832–33.

\*   \*   \*

Because setting a minimum salary level for the EAP Exemption is within DOL's power to define and delimit the terms of that Exemption and because that power is guided by the FLSA's purpose and the text of the exemption itself, we AFFIRM.

15