# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

|  |  |
|---|---|
| STATE OF TEXAS,<br><br>    Plaintiff,<br><br>PLANO CHAMBER OF COMMERCE *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>U.S. DEPARTMENT OF LABOR *et al.*,<br><br>    Defendants. | Case No. 4:24-cv-499-SDJ<br>(Lead Case)<br><br>Case No. 4:24-cv-468-SDJ |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR
## CROSS-MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................ 4

I.     The Fifth Circuit in *Mayfield* Affirmed That the Use of a Salary-Level Test Is Consistent with the Department's Statutory Authority ........................................ 4

II.    Each of the 2024 EAP Rule's Provisions Is Lawful ....................................... 7

     A.     The wage growth update is lawful ..................................................... 7

     B.     The January 1 salary-level methodology is lawful ........................... 10

     C.     The updating mechanism is lawful ................................................... 14

III.    The 2024 EAP Rule Is the Product of Reasoned Decisionmaking ................. 17

IV.    Any Relief Must Be Tailored ......................................................................... 19

     A.     The Rule's salary-level provisions are severable ............................. 19

     B.     Any relief should be limited ............................................................. 21

CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Data Mktg. P'ship LP v. U.S. Dep't of Labor*,
    45 F.4th 846 (5th Cir. 2022) ........................................................................... 22

*Dep't of Homeland Sec. v. New York*,
    140 S. Ct. 599 (2020) ...................................................................................... 25

*FDA v. Alliance for Hippocratic Med.*,
    602 U.S. 367 (2024) ................................................................................. 23, 24

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
    695 F.3d 330 (5th Cir. 2012) ......................................................................... 24

*Gill v. Whitford*,
    585 U.S. 48 (2018) ......................................................................................... 23

*Global Van Lines, Inc. v. ICC*,
    714 F.2d 1290 (5th Cir. 1983) ....................................................................... 15

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944) ................................................................................. 22, 25

*Labrador v. Poe*,
    144 S. Ct. 921 (2024) .................................................................................... 21

*Lewis v. Casey*,
    518 U.S. 343 (1996) ....................................................................................... 23

*Long Island Care at Home, Ltd. v. Coke*,
    551 U.S. 158 (2007) ....................................................................................... 10

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) ......................................................................... 1, 4, 10

*Mayfield v. U.S. Dep't of Labor*,
    — F.4th —, 2024 WL 4142760 (5th Cir. Sept. 11, 2024) ........................ *passim*

*MD/DC/DE Broads. Ass'n v. FCC*,
    236 F.3d 13 (D.C. Cir. 2001) ........................................................................ 19

*Nasdaq Stock Mkt. LLC v. SEC*,
    38 F.4th 1126 (D.C. Cir. 2022) ..................................................................... 19

*Nat'l Ass'n of Mfrs. v. SEC*,
    105 F.4th 802 (5th Cir. 2024) ....................................................................... 19

*Nevada v. U.S. Dep't of Labor*,
    275 F. Supp. 3d 795 (E.D. Tex. 2017) ................................................... 11, 12

*Starbucks Corp. v. McKinney*,
  144 S. Ct. 1570 (2024) ................................................................................ 21, 22

*Tex. Med. Ass'n v. HHS*,
  110 F.4th 762 (5th Cir. 2024) .............................................................................. 22

*United States v. Texas*,
  599 U.S. 670 (2023) ............................................................................................. 22

*W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24, S. Atl. & Gulf Coast Dist. of the ILA, AFL-CIO*,
  751 F.2d 721 (5th Cir. 1985) ............................................................................... 25

**Statutes**

5 U.S.C. § 702(1) ....................................................................................................... 22

5 U.S.C. § 703 ............................................................................................................ 22

5 U.S.C. § 706 ............................................................................................................ 22

29 U.S.C. § 213(a)(1) .......................................................................................... *passim*

**Regulations**

29 C.F.R. § 541.600(a)(1) .......................................................................................... 21

69 Fed. Reg. 22,122 (Apr. 23,2004) .......................................................................... 8

84 Fed. Reg. 10,900 (Mar. 22,2019) ........................................................................ 13

84 Fed. Reg. 51,230 (Sept. 27,2019) .......................................................................... 7

89 Fed. Reg. 32,842 (Apr. 26, 2024) ................................................................... *passim*

**Other Authorities**

Comment from American Hotel & Lodging Association,
  https://perma.cc/8L94-K2GR ............................................................................... 7

Comment from Associated Builders and Contractors,
  https://perma.cc/D7EG-5ZHX ............................................................................. 8

Comment from National Association of Home Builders,
  https://perma.cc/J739-8SLA ................................................................................. 7

Comment from Restaurant Law Center and National Restaurant Association,
  https://perma.cc/43NP-ABYY ............................................................................... 7

## INTRODUCTION

Last week, a unanimous Fifth Circuit panel affirmed that "setting a minimum salary level for the EAP Exemption is within DOL's power to define and delimit the terms of that Exemption." *Mayfield v. U.S. Dep't of Labor*, No. 23-50724, — F.4th —, 2024 WL 4142760, at *7 (5th Cir. Sept. 11, 2024). The court recognized Congress's express delegation of authority to the Department to "defin[e] and delimit[]" the statutory terms "bona fide executive, administrative, or professional capacity." *Id.* at *1 (quoting 29 U.S.C. § 213(a)(1)). In light of that "uncontroverted, explicit delegation," under the Supreme Court's decision in *Loper Bright*, the court properly construed its role as determining whether the Department had exercised its discretionary authority "within the outer boundaries of that delegation." 2024 WL 4142760, at *4 (citing *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2268 (2024)). And the court readily concluded that the use of a minimum salary level, in tandem with a duties test, falls comfortably within the boundaries of the Department's authority both to define and to delimit the exemption. *See id.*

This holding undermines the principal arguments that undergird Plaintiffs' claims against the 2024 EAP Rule. There is no longer any doubt that the Department may use a salary-level test in defining and delimiting the EAP exemption. And Plaintiffs' briefs offer no substantive reason to conclude that any of the 2024 Rule's three distinct salary-level provisions—the wage growth update, the methodology update, and the triennial updating mechanism—exceeds the limits of the Department's authority as recently described by the Fifth Circuit.

First, the wage growth update merely applies current wage data to the methodology used in the 2019 rule, which was first adopted in 2004. That methodology combined the equivalent of the *lower* historical salary level with the more lenient duties test, thereby broadening the EAP exemption relative to the Department's pre-2004 EAP regulations. None of the Plaintiffs challenge the underlying methodology of the wage growth update, nor could they after *Mayfield*. And the

result of vacating the wage growth update would be to require the Department to use *outdated* data in applying a salary-level methodology that is unquestionably lawful. There is no colorable argument that this is what the statute requires. Plaintiffs instead complain about a feature that is inherent to every salary-level update in the history of EAP regulations: that the increase in salary level changes the exemption status of some number of workers. Even assuming that this inevitable outcome has any bearing on the question of the Department's statutory authority, those workers represent only 1.8% of full-time salaried white-collar workers today, which underscores the modest nature of this update. The consequence of Plaintiffs' position—that the Department may not apply updated wage data to a lawful salary-level methodology—would be that the Department could *never* increase the salary level. But that cannot be true when the Department has the statutory authority to set a minimum salary level in the first instance.

Second, in challenging the January 1, 2025, methodology update, Plaintiffs fail to engage in any meaningful way with the Department's rationale and fundamentally misunderstand the way that salary-level tests are designed to work in tandem with duties tests. To reflect the Department's understanding of the "strong" "link between the job duties identified and salary," *Id.* at *5, a lower salary level has historically been paired with a more rigorous duties test and a higher salary level with a more lenient duties test. The 2004 methodology upended this balance by pairing the lower historical salary-level test with a more lenient duties test. In light of the business community's reliance on maintaining the familiar, more lenient duties test, the 2024 Rule seeks to strike a better balance than the previous methodology by continuing to use that duties test while raising the salary level from the 20th to the 35th percentile of full-time salaried worker earnings in the lowest-wage Census Region. Even so, this approach is conservative: historically, the higher salary level that was paired with the current lenient duties test averaged the 51st percentile of that data set. The January 1 methodology thus does not differ materially from the Department's historical approach,

and the Court should find this thoroughly reasoned methodology lawful.

Third, Plaintiffs similarly fail to engage with the Department's reasoning for implementing the triennial updating mechanism. The procedure for that mechanism is properly set out in the 2024 Rule, and the future triennial updates simply apply that procedure. The application of a procedure established by notice-and-comment rulemaking does not require a separate notice-and-comment rulemaking under the Administrative Procedure Act (APA). And the authority to ensure that the salary-level test remains effective falls comfortably within the Department's statutory authority to set a salary-level test in the first instance. Plaintiffs' arguments to the contrary are based on incorrect statistical and legal assumptions that the Department has previously addressed.

Further, although Plaintiffs may have preferred a different salary-level test, they do not come close to demonstrating that the Rule is arbitrary and capricious. The Department amply addressed the concerns that commenters raised, and the Rule is the product of thoroughly reasoned decisionmaking. As to the remaining claims, *Mayfield* squarely forecloses Texas's arguments under the major questions and nondelegation doctrines. And Texas failed even to mention its Tenth Amendment claim in its opposition brief, let alone respond to Defendants' arguments.

The Court should conclude that the 2024 EAP Rule is lawful in its entirety. But if it does not, any relief should be limited. Each of the Rule's three salary-level provisions, on which the parties have raised distinct arguments and which become applicable at different times, can operate independently of the others. And, more than two months after the wage growth update, most Business Plaintiffs present no evidence of harm to any individual members from that provision. Indeed, five Business Plaintiffs fail to demonstrate concrete injury from any aspect of the Rule, a prerequisite to judicial relief. Accordingly, if the Court were to find any relief appropriate, it should enjoin only those provisions of the Rule that it concludes are unlawful and only as to those Plaintiffs, while allowing the remainder of the Rule to remain in effect for all others.

**ARGUMENT**

**I. The Fifth Circuit in *Mayfield* Affirmed That the Use of a Salary-Level Test Is Consistent with the Department's Statutory Authority**

Plaintiffs principally contend that "[t]he FLSA does not authorize the [Department] to adopt a salary level test for the EAP exemption." Texas Opp'n at 6, ECF No. 66; *see* Bus. Pls.' Opp'n 8, ECF No. 65. The Fifth Circuit's recent decision in *Mayfield* squarely precludes that argument. The plaintiffs in *Mayfield* challenged the Department's 2019 EAP rule and argued that the Department lacked statutory authority to use a salary-level test in defining and delimiting the exemption. The Fifth Circuit unanimously rejected the plaintiffs' claim and "join[ed] four of [its] sister circuits in holding that DOL has the statutory authority to promulgate" a rule defining and delimiting the EAP exemption using a minimum salary level, in combination with a duties test. *Mayfield*, 2024 WL 4142760, at *6. Although this Court concluded at the preliminary-injunction stage that Texas was likely to succeed on the merits of its claims, it reached that conclusion without the benefit of *Mayfield*, which now makes clear that Plaintiffs' claims should fail on the merits.

In reaching its conclusion, the Fifth Circuit first recognized that section 13(a)(1) provides "an uncontroverted, explicit delegation of authority," such that the relevant question for courts is whether the Department's interpretation "is within the outer boundaries of that delegation." *Id.* at *4 (citing *Loper Bright*, 144 S. Ct. at 2268). That delegation "gives DOL the authority to 'define[] and delimit[]' the terms of the Exemption." *Id.* (quoting 29 U.S.C. § 213(a)(1)). In this regard, the court explained that "define" means to "set forth or explain what a word (or expression) means," and "delimit" means to "mark or determine (a limit or boundary)" of something. *Id.* (quoting Oxford English Dictionary (3d ed. 2015)).

Based on these two terms providing a clear delegation of discretionary authority to the Department, the court identified "two ways" in which a minimum salary level is "consistent with

DOL's statutorily conferred authority." *Id.* First, the Department "defines, in part, what it means to work in an executive, administrative, or professional capacity (namely, to earn at least a particular amount of money)." *Id.* This interpretation is "consistent with DOL's statutorily conferred authority," the court concluded, based on "the simple fact that a definition can rely on multiple types of characteristics." *Id.* As an example, the court pointed to the term "bachelor," which relies on both gender (male) and marital status (unmarried). *Id.* Here, analogously, the Department defined the terms "bona fide executive, administrative, or professional capacity" as relying on both job duties and salary. 29 U.S.C. § 213(a)(1). Second, the court explained, the minimum salary level can separately "be construed as an exercise of the power to delimit the scope of the Exemption"—i.e., the Department "sets a limit on what is otherwise defined by the text of the Exemption." *Mayfield*, 2024 WL 4142760, at *4. Under either construction, the Department's use of a minimum salary level "is within the scope of its authority." *Id.*

The *Mayfield* court was "not persuaded" by the plaintiffs' argument that "the statute only speaks of duties." *Id.* On the contrary, the court determined that "[u]sing salary level as a criterion for EAP status" has a "strong[] textual foundation." *Id.* It explained that the terms of section 13(a)(1), "particularly 'executive,' connote a particular status or level for which salary may be a reasonable proxy." *Id.* It also pointed to the "broader structure" of the FLSA, which "sets out a series of salary protections for workers that common sense indicates are unnecessary for highly paid employees." *Id.* The Fifth Circuit's decision thus forecloses Plaintiffs' arguments that the Department may consider only an employee's duties and "has no authority to impose a salary level test" in defining and delimiting the exemption. Tex. Opp'n at 11; *see* Bus. Pls.' Opp'n at 8.

To be sure, the Department's section 13(a)(1) authority "is not unbounded." *Mayfield*, 2024 WL 4142760, at *5. For example, had the Department included an additional "characteristic with no rational relationship to the text and structure of the statute," that "would raise serious

questions." *Id.* Nor could the Department include "a characteristic that differs so broadly in scope from the original that it effectively replaces it." *Id.*; *accord* Defs.' Mot. at 42, ECF No. 57 ("The Department could not, for example, rely on a salary level test without an accompanying duties test, because doing so would not fully account for the 'capacity' in which the employee was engaged."). This remains true, the court continued, if one characterizes the minimum salary level as "a proxy to determine who falls within the Exemption": "Using salary as a proxy for EAP status is a permissible choice because . . . the link between the job duties identified and salary is strong." *Mayfield*, 2024 WL 4142760, at *5. The court cautioned, however, that the Department may go too far if the chosen "proxy characteristic frequently yields different results than the characteristic Congress initially chose." *Id.* Nevertheless, the court readily concluded that this was "not the case" with the use of a minimum salary level. Thus, because it is within the Department's statutory authority to consider both duties and salary in defining and delimiting bona fide EAP capacity, the 2024 Rule's salary-level provisions fall comfortably within the bounds of that authority.

The *Mayfield* decision also precludes Texas's half-baked argument that the use of a minimum salary level "implicates the major questions doctrine." *See* Tex. Mot. at 16–17, ECF No. 48. The court explained that the Department, by using a salary-level test, does not come close to a sufficiently significant economic impact to implicate the doctrine; does not "seek[] to regulate a significant portion of the American economy"; does not implicate "the types of issues that have been considered politically contentious enough to trigger the doctrine"; and rests on an assertion of "an authority that [the Department] has asserted continuously since 1938." *Mayfield*, 2024 WL 4142760, at *3–4. And Texas has not attempted to argue that either the wage growth update or January 1 salary level set out in the 2024 Rule "raise[s] issues because of its size." *Id.* at *4. In any event, that argument would be meritless because the wage growth update and January 1 methodology change result in minimum salary levels well within the range of the historical salary-

level tests, for all the reasons explained in this brief and in Defendants' cross-motion. *Mayfield* therefore confirms that the 2024 Rule does not implicate the major questions doctrine.

*Mayfield* likewise squarely forecloses Texas's claim that section 13(a)(1) violates the nondelegation doctrine. The Fifth Circuit held that the Department's "authority to define and delimit the terms of the EAP Exemption is guided by an intelligible principle." *Id.* at *7. Specifically, the Fifth Circuit recognized that the statutory text and purpose both guide the Department's exercise of its discretion and the statute therefore satisfies the nondelegation doctrine. *Id.* Defendants are thus entitled to summary judgment on Texas's nondelegation claim.

## II. Each of the 2024 EAP Rule's Provisions Is Lawful

As all parties have done in their respective briefs, the Court must individually analyze the parties' legal arguments about each of the 2024 Rule's three distinct changes to the salary-level test: (1) the July 2024 wage growth update, (2) the January 2025 methodology update, and (3) the future triennial updates.

### A. The wage growth update is lawful

The July 2024 wage growth update effected a modest change, by applying current wage data to the methodology for setting the salary level that has been in place since the 2004 EAP rule. That methodology was carried forward in the 2019 rule, which *Mayfield* upheld.[1] If a meaningful

---

[1] Plaintiffs did not challenge that methodology under the 2004 or 2019 rules when they were promulgated. On the contrary, several of the Business Plaintiffs publicly supported the 2004 methodology in the 2019 rule, including some that referenced that support in their comments to the 2024 Rule. *See, e.g.*, 84 Fed. Reg. 51,230, 51,239–40 (Sept. 27, 2019) (American Hotel and Lodging Association and others viewed the 2019 methodology as "suitable and manageable"); Comment from Restaurant Law Center and National Restaurant Association at 2, https://perma.cc/43NP-ABYY ("the Law Center and the Association supported the Department's restoration in its 2019 final rule of the 2004 methodology for setting minimum-salary level"); Comment from National Association of Home Builders at 3 n.9, https://perma.cc/J739-8SLA ("NAHB supported this rulemaking—both when it was proposed in 2019 and issued as a final rule later that year"); *see also* Comment from American Hotel & Lodging Association at 4,

minimum salary level is lawful under section 13(a)(1)—and *Mayfield* holds that it is—then the salary level resulting from the July wage growth update undoubtedly is lawful. To conclude otherwise would effectively require the Department to apply outdated wage data to a lawful methodology. There is no sensible reason to conclude that the statute would mandate this outcome.

Plaintiffs take issue with this update based on a feature that is inherent to *every* salary-level update in the history of EAP regulations: it resulted in some number of workers who were previously exempt becoming nonexempt based on their salary. *See* Tex. Opp'n at 12; Bus. Pls.' Opp'n at 8. To be clear, Plaintiffs do not argue that this update results in a change in exemption status to an unprecedented number of workers, relative to previous EAP rules—because it does not: as Defendants explained, in terms of bald numbers, the 2004 and 2019 rules each affected more than one million workers. *See* 84 Fed. Reg. at 51,231; 69 Fed. Reg. 22,122, 22,123 (Apr. 23, 2004). And, for context, the 959,000 workers affected by the July 2024 wage growth update represent only 0.7% of the workers subject to the Department's FLSA regulations and 1.8% of full-time salaried white-collar workers in the United States today. *See* 89 Fed. Reg. 32,842, 32,891, 32,893 fig. 1, 32,934 tbl. 25 (Apr. 26, 2024). To the extent that Texas believes that the "salient fact" in determining the lawfulness of the update is its "impact on employees," Tex. Opp'n at 12–13, this relatively small shift in the number of nonexempt workers is not a significant impact. Nor can moving the needle by a mere 1.8%—again, by applying current wage data to a methodology that has been in place for two decades—reasonably be described as a departure from previous salary-level tests, much less as "effectively a salary-only test." *Id.* at 13.

---

https://perma.cc/8L94-K2GR ("any future increases . . . should utilize . . . the current methodology"); Comment from Associated Builders and Contractors at 6, https://perma.cc/D7EG-5ZHX (describing "the 2004 methodology" as "consistent with the Act").

It is necessarily the case under any exemption test that includes a minimum salary level that some employees who pass the duties test yet earn below the salary level will be nonexempt; and it follows that any increase in the salary level will inevitably make some workers newly nonexempt because they earn more than the previous salary level but less than the new salary level. *See, e.g.*, 69 Fed. Reg. at 22,253; 84 Fed. Reg. at 51,242. Since 1938, every time the Department revised the salary level set in the EAP regulations, a group of employees who satisfied the duties tests became newly nonexempt solely because of the salary they are paid. This fact is one that both the *Wirtz* court and the *Mayfield* court must have understood as a matter of common sense. *Contra* Tex. Opp'n at 13. This inevitable fact is the only feature that Plaintiffs highlight in their attempt to distinguish the July 1 wage growth update from the 2019 rule, but it does not support their description of the wage growth update as "a de facto salary-only test," *id.* at 14.

Further, Plaintiffs' attacks on this update as excessive are unfounded. In its attempt to cast the 2004 methodology—used with the wage growth update—as less permissible than the two-test system that applied in 1966, for example, Texas fails to recognize that the 2004 methodology adopted a salary level equivalent to the *lower* of the two salary levels in the two-test methodology. *See* 89 Fed. Reg. at 32,868–69 (citing 69 Fed. Reg. at 22,167–71); Tex. Opp'n at 12–13. Moreover, the wage growth update results in a salary level that is nearly $100 lower than the equivalent of the low (long-test) salary level that applied in 1966. *See* 89 Fed. Reg. at 32,933. *Contra* Tex. Opp'n at 13 (baselessly suggesting that the wage growth update creates "effectively a salary-only test").

Aside from their general hand-waving about the number of affected employees, Plaintiffs offer no substantive reason why the salary-level methodology set out in the 2004 and 2019 rules— and carried forth with the July 1, 2024, wage growth update—is, in their view, unlawful. And it would make little sense to hold that the statute requires the Department to apply *outdated* data to

a salary-level methodology that itself falls within the Department's statutory authority.[2] But that would be the result of striking the wage growth update in the absence of any substantive reason for striking the underlying methodology. At bottom, if a meaningful minimum salary level is lawful under section 13(a)(1)—and *Mayfield* holds that it is—then the only plausible conclusion is that the July 1, 2024, wage growth update is lawful.

## B.  The January 1 salary-level methodology is lawful

The Department, exercising its expressly delegated discretionary authority, relied on its decades of experience with salary-level tests for the exemption, and reviewed approximately 33,000 comments, to develop a more effective salary-level methodology to become applicable on January 1, 2025. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 167–68 (2007) (respecting the agency's exercise of delegated authority to "work out the details of [the statute's] broad definitions" due to the agency's "thorough knowledge of the subject matter and ability to consult at length with affected parties"); *Loper Bright*, 144 S. Ct. at 2263 (emphasizing agency's "discretion" where Congress "'expressly delegate[s]' to an agency the authority to give meaning to a particular statutory term"); 89 Fed. Reg. at 32,847. As Defendants explained, the new methodology maintains the primacy of the duties test while increasing the salary level to help better identify which employees are employed in a bona fide EAP capacity. *See* Defs.' Mot. at 26–31. The methodology will fully restore the salary level's function of screening obviously nonexempt employees from the EAP exemption *and* will better account for the Department's shift to a one-test system for defining and delimiting the exemption than did the 2004 methodology. In

---

[2] Plaintiffs make no attempt to explain how restoring the 2019 salary level would make sense in light of the growth in wages since the 2019 rule. The 2019 salary level of $684 per week is now equivalent to only the 12th percentile of full-time salaried worker earnings in the South and retail industry nationally, *see* Defs.' Mot. at 26, and is $258 below the current equivalent of the long-test level ($942 per week).

doing so, the chosen methodology reinforces the critical role of the duties test, which will remain determinative of exemption status for most salaried white-collar employees.

Plaintiffs entirely fail to engage with the Department's thorough rationale for the chosen methodology, much less undermine its validity. The Business Plaintiffs provide less than a single page of argument (citing nothing) in response, refusing to grapple with the Department's rationale under the guise of not "belabor[ing]" the point. Bus. Pls.' Opp'n at 9. Instead, they—like Texas— throw out numbers divorced from context. They point out, for example, that the resulting salary-level increase would make an additional approximately three million workers nonexempt. *Id.* But they fail to note that this group constitutes less than 6% of full-time salaried white-collar workers (and only about 2% of workers subject to the Department's FLSA regulations). *See* 89 Fed. Reg. at 32,893 fig.1. And while they insist, without analysis, that this "creates a de facto 'salary only' test," Bus. Pls.' Opp'n at 9; Tex. Opp'n at 16, that charge finds no support in even the numbers that they cite. It is factually incorrect to state that the exemption "depend[s] predominately on a minimum salary level," Tex. Opp'n at 20 (quoting *Nevada v. U.S. Dep't of Labor*, 275 F. Supp. 3d 795, 806 (E.D. Tex. 2017)), when the *vast majority* of salaried white-collar workers earn a salary above the January 1 salary level and thus their exemption status is ultimately determined by the duties test, *see* Defs.' Mot. at 31 (citing 89 Fed. Reg. at 32,880).[3]

Plaintiffs' failure to engage with Defendants' rationale exposes an additional reason why the numbers they point to do not, on their own, carry significant weight when considering whether the new methodology is consistent with the Department's statutory authority: they fail to

---

[3] The Business Plaintiffs' invocation of the Department's projection of the number of nonexempt workers 10 years from now, Bus. Pls.' Opp'n at 9, is devoid of the same critical context. Further, it fails to account for the projected growth of the workforce in that time. For example, the workforce has significantly increased since 2016. In fact, the number of white-collar workers subject to the Department's FLSA regulations increased by more than 20% from 2016 to 2023. 89 Fed. Reg. at 32,898–99.

appreciate that the two-test system involved not only two salary-level tests but also two different duties tests. When the Department shifted from a two-test system to a one-test system in 2004, it paired the *lower* (long-test) salary level with the *more lenient* (short-test) duties test, creating a one-test system that drastically broadened the EAP exemption relative to EAP regulations of the preceding six decades.[4] *See* Defs.' Mot. at 28. In 2016, the Department aimed to equalize this imbalance by setting a new salary level in reference to the historical higher (short-test) salary level, while maintaining the familiar "standard" duties test (i.e., the more lenient short-test duties test). *Id.* That is the methodology that the *Nevada* court concluded relied too heavily on the salary-level test. *See Nevada*, 275 F. Supp. 3d at 807.

In the 2024 Rule, the Department—after determining that employers preferred to maintain the simpler (though less nuanced) one-test system—aimed to strike a balance between the two approaches it introduced in 2004 and 2016, respectively. To achieve this balance, the Department chose not to disturb the standard (lenient) duties test, with which employers are already well familiar. *See* 89 Fed. Reg. at 32,866. Instead, the Department developed a methodology that would increase the minimum salary level, but to a more modest degree than the 2016 rule's methodology (which, again, set a salary level in reference to the higher short-test salary level).

The Department determined that this increase was necessary in part to fully restore the historical screening function of the salary-level test, which requires a salary level at least equivalent to the long-test level ($942). Plaintiffs' contention that an increased salary cannot serve "as a screen for obviously nonexempt employees" because "[a]ny employee who meets the duties

---

[4] The Business Plaintiffs note that the 2004 methodology's salary level was based on a higher percentile, Bus. Pls.' Opp'n at 13, but focusing on that number alone is misleading. They fail to recognize that the salary amount produced in 2004 was equivalent to the long-test salary level (i.e., the lower historical salary level) despite the increase in the percentile, due to an accompanying change to the applicable data set to include nonexempt workers. *See* 89 Fed. Reg. at 32,871.

test" should be exempt, Tex. Opp'n at 14, is no more than a restatement of their argument against the use of *any* salary level.[5] Plaintiffs do not suggest that, in the 2024 Rule, the Department should have taken the alternative approach of changing the duties test, and for good reason: employers' reliance interest, among other factors, mitigated in favor of maintaining the familiar standard duties test that has been in place for decades.[6] *See* 89 Fed. Reg. at 32,866 & n.181.

Plaintiffs' attempts to paint the January 1 methodology as equivalent to the 2016 rule's methodology betray (at best) a fundamental misunderstanding of both. For example, Texas falsely claims that the 2024 Rule "seeks to fix the salary level above even [the] short test," Tex. Opp'n at 16, but this is easily disproven by the face of the Rule and the thorough explanation provided in Defendants' cross-motion. The 2016 rule set the salary level in reference to the short-test salary level, at the 40th percentile of full-time salaried worker earnings in the lowest-wage Census Region. *See* 89 Fed. Reg. at 32,873. The 2024 Rule, by contrast, raises the salary level to the 35th percentile of that data set. *See id.* This change—which results in a salary level closer to the low long-test salary level than to the high short-test salary level—represents a modest approach relative not only to the 2016 rule but also to the Department's historical two-test system.[7]

---

[5] Texas's complaint that the January 1 salary level serves as a "poor proxy for identifying non-EAP workers," Tex. Opp'n at 14, similarly misunderstands the relationship between the salary-level test and the duties test. *See also id.* at 15 (asserting, without support, that the Department "must tailor the salary test to be a near perfect match to duties"). The Department has long viewed the salary-level and duties tests as working together to effectively identify employees working in a bona fide EAP capacity.

[6] It is for this very reason that numerous employers have strenuously opposed a duties-only test. *See, e.g.*, 84 Fed. Reg. 10,900, 10,905 (Mar. 22, 2019). *Cf.* 69 Fed. Reg. at 22,172 (rejecting call from "several commenters" to eliminate the salary test, explaining in part that this would "require a significant restructuring of the regulations and probably the use of more rigid duties tests").

[7] Similarly, Plaintiffs' attempt to compare the number of employees that would have been affected by the 2016 rule with the number affected by the January 1 methodology change is misleading. *See* Bus. Pls.' Opp'n at 9. As an initial matter, the starting point for each of these changes was different: the 2024 Rule was the first EAP rule in which the Department updated a salary level that

Accordingly, the January 1, 2025, methodology—which restores the Department's historical understanding of the "link between" duties and salary, based on a "strong[] textual foundation," *Mayfield*, 2024 WL 4142760, at *5—falls comfortably within the outer bounds of the Department's section 13(a)(1) authority.

### C.  The updating mechanism is lawful

Plaintiffs' arguments against the triennial updating mechanism likewise fall short. Texas reiterates its argument that the statute does not provide for such a mechanism, Tex. Opp'n at 17, but it does not respond to the Department's sensible rationale for updating its definition and delimitation of the exemption in this way. As the Department explained, "the earnings thresholds are only an effective indicator of exempt status if they are kept up to date"; otherwise, "as wages for workers increase over time," "the thresholds become substantially less effective in helping identify exempt EAP employees." Defs.' Mot. at 32 (quoting 89 Fed. Reg. at 32,855). And pursuant to the "clearly delegated discretionary authority" in section 13(a)(1), *Mayfield*, 2024 WL 4142760, at *4, the Department surely has the flexibility necessary to ensure that its regulations remain *effective* and afford a measure of predictability to employers. In contending otherwise, Texas pulls out of context the Department's statement in 2004 that an updating mechanism is "both contrary to congressional intent and inappropriate." Tex. Opp'n at 17 (quoting 69 Fed. Reg. at 22,171–72). But, as the Department has explained, in the 2004 rule it was simply explaining that an inflation-based updating mechanism that unduly impacts low-wage regions and industries, such as one based on changes in the prices of consumer goods, would be inappropriate. 89 Fed. Reg. at

---

had been set *below* the low long-test salary level (the 2019 rule), and nearly half (1.8 million) of the 4 million workers affected by the 2024 Rule's salary-level change currently earn less than the long-test salary level. *See* 89 Fed. Reg. 32,863, 32,874, 32,882. Further, Plaintiffs ignore the more than 20% increase in the number of white-collar workers subject to the Department's FLSA regulations, from 37.4 million in 2016 to 45.4 million in 2023. *Id.* at 32,898–99.

32,857. This concern is not implicated in the 2024 Rule because the updating mechanism adjusts the salary level *only* to the extent that earnings data in the lowest-wage Census Region change. *Id.*

The Business Plaintiffs contend that the updating mechanism will lead to "an increase of 9.1% of the EAP threshold even in the absence of any wage inflation." Bus. Pls.' Opp'n at 11 (citing Stephen G. Bronars, "The Department of Labor's Method for Automatically Updating the Salary Level for Overtime Exemptions Will Cause Increases that Exceed Growth in Wages and Salaries," Edgeworth Insights (May 15, 2024)). This figure is taken from an October 2023 study cited in a comment by the Partnership to Protect Workplace Opportunity (PPWO), to which the Department responded in the Rule. The increase in the salary level that the study claims will occur is premised on the assumption that all workers in the South Census Region who become nonexempt will be converted from salaried to hourly status. But, as the Department explained, that assumption is wholly inconsistent with what has occurred under previous salary level increases that the Department examined. *See* 89 Fed. Reg. at 32,938. On the contrary, the Department "has found no evidence that previous changes in the salary level for exemption have resulted in a statistically significant increase in the percent of full-time white-collar workers paid on an hourly basis." *Id.* The Business Plaintiffs—several of whom are PPWO members—repeat this assumption without acknowledging the explanation in the Rule that it was inconsistent with empirical reality. *See* Bus. Pls.' Opp'n at 20. There is simply no basis for the figures on which they rely.

Plaintiffs also reiterate their assertion that notice-and-comment rulemaking would be required to apply the triennial updates. *See id.* at 10–11; Tex. Opp'n at 17–18. But notice-and-comment rulemaking is required to "afford[] interested parties a fair opportunity to comment" when an agency "establish[es] rules and procedures"—which each triennial update plainly would not do. *Global Van Lines, Inc. v. ICC*, 714 F.2d 1290, 1299 n.9 (5th Cir. 1983). Rather, through the 2024 Rule, which was issued following notice and comment, the Department established the

"procedure[]"—how the triennial updates would work—and each triennial update would apply that procedure using a mechanism that was adopted through notice-and-comment rulemaking. Plaintiffs advance no convincing argument why these updates would each require separate notice-and-comment rulemaking. And they have no response to the point that similar updating mechanisms are "a common feature of regulations pegged to monetary values, even when the relevant authorizing statutes make no specific reference to indexing or automatic adjustment." Defs.' Mot. at 33 (quoting 89 Fed. Reg. at 32,856 n.134 (citing several examples)).

Moreover, nothing about the triennial updating mechanism alters the fact that the Department can continue to revisit the methodologies themselves—i.e., the salary-level methodology as well as the contours of the duties test—"from time to time by regulation," 29 U.S.C. § 213(a)(1), as the statute prescribes. *Contra* Tex. Opp'n at 17. And because future triennial updates do not require separate rulemakings, they do not contravene the statute's command that "any rule the Department promulgates defining and delimiting the contours of the EAP exemption must be done in accordance with the procedures set forth in the APA." Bus. Pls.' Opp'n at 10.

Finally, as the Department explained, the authority to implement a mechanism that will ensure that the salary-level test remains effective flows from the authority to set that test in the first place. It would be illogical for Congress to expressly delegate to the Secretary the authority to define and delimit the scope of the exemption and for the Department to have the authority to adopt a salary-level test based on a reasonable methodology—authority that *Mayfield* affirmed the Department has—yet implicitly preclude the Secretary from applying up-to-date wage data to that methodology at set intervals between rulemakings. Defs.' Mot. at 32. The updating mechanism is therefore a lawful exercise of the Department's discretionary authority under section 13(a)(1).

### III. The 2024 EAP Rule Is the Product of Reasoned Decisionmaking

As with their opening briefs, Plaintiffs again restyle their statutory arguments as redundant arbitrary-and-capricious claims, to which Defendants have thoroughly responded both above and in our cross-motion. *See* Defs.' Mot. at 35–39. As explained above, Texas's argument that the Department has strayed from the statutory text, Tex. Opp'n at 18–19, is foreclosed by *Mayfield*'s clear holding that the Department has discretionary authority under *Loper Bright* and that it appropriately exercises that authority by using a salary-level test in tandem with a duties test.

In asserting that the Rule rests on a "flawed premise," the Business Plaintiffs rely on their incorrect impression that the 2004 rule "increas[ed] the overall level of the minimum salary," based on the higher percentile used in setting that salary level. Bus. Pls.' Opp'n at 13. As explained above, however, the Department "validated its chosen methodology in the 2004 rule by showing that it produced the *same salary level* as the long test methodology," i.e., the lower of the two salary levels. 89 Fed. Reg. at 32,872 (emphasis added); *see supra* at 12 n.4.

Next, Texas repeats its charge that the Department did not adequately consider the *Nevada* decision, but its argument boils down to faulting the Department for the frequency with which it used the word "Nevada" in the rule and otherwise taking issue with specific aspects of the analysis that the Department did, in fact, provide. Tex. Opp'n at 20. Even assuming that the APA somehow required the Department to address a single district court decision striking a *different* methodology than the 2024 Rule sets out, the Department certainly met that requirement in the Rule. *See, e.g.*, 89 Fed. Reg. at 32,842, 32,846, 32,869. To the extent that Texas means to contend that the January 1, 2025, methodology is too similar to the 2016 methodology that *Nevada* vacated, that contention is unsupported. Indeed, in the 2016 rule, the Department explicitly declined to pair the standard duties test with a salary level below the higher short-test salary level, but the Department did just that in the 2024 Rule. *See id.* at 32,873; *see also supra* at 13. Plaintiffs ignore this significant

departure from the 2016 methodology, which illustrates how the Department's 2024 approach was informed by the *Nevada* decision invaliding the 2016 methodology. *Contra* Tex. Opp'n at 20. The Department further accounted for the *Nevada* decision by including in the 2024 Rule an analysis of the impact of the salary level on salaried white-collar workers—a key concern in the *Nevada* decision—which it had not done in the 2016 rule. *See* 89 Fed. Reg. at 32,877–82.

Plaintiffs' insistence that the Department did not sufficiently consider and address employers' reliance interests is unpersuasive. The Business Plaintiffs do not substantively respond to the Department's arguments on this point at all, other than to attempt to draw an undeveloped comparison between the 2024 Rule and the 2016 rule. *See* Bus. Pls.' Opp'n at 13. And Plaintiffs reduce the Department's consideration to a "handwaving citation," Tex. Opp'n at 21, entirely ignoring the significant substantive effect of the Department's consideration of employers' reliance interests. Namely, *because* of those interests, the Department both maintained the standard duties test with which employers are familiar and opted for a more conservative salary-level approach than it otherwise would have by setting the January 1 salary level *below the midpoint* between the long-test and the short-test salary levels. *See* Defs.' Mot. at 37. That the Department did not adopt Texas's preferred methodology simply does not mean that its rulemaking was arbitrary or capricious. And it cannot be the case that employers' reliance interests prohibit the Department from applying up-to-date data to lawful methodologies, otherwise it would *never* be able to change the salary level despite inevitable changes in wages over time.

Finally, the Business Plaintiffs repeat their claim that the Department did not meaningfully engage with their concerns regarding the total annual compensation level for highly compensated employees (HCE). Bus. Pls.' Opp'n at 14. They assert (without support) that if employers increase employees' pay to the new minimum level to maintain their exempt status, then employers will need to raise the pay of other employees (to maintain differences in compensation between

different levels of employees). *See* 89 Fed. Reg. at 32,913. But the Business Plaintiffs drastically overstate this concern: the 2024 Rule determined that only 2.2% of HCEs would get a pay increase to the new level. *See id.* at 32,921 tbl. 13. In addition, as the Department noted, employees who no longer meet the HCE threshold will largely still be exempt by passing the standard duties analysis. *See id.* at 32,884 ("The HCE test is . . . [intended for] employees who are so highly paid that they will almost invariably pass the standard duties test;" while "the HCE test may exempt some employees who fail the standard duties test and would otherwise be entitled to overtime pay, such outcomes should be 'rare'"); *id.* at 32,898 n.335.

Accordingly, the 2024 Rule is not arbitrary or capricious.[8]

## IV. Any Relief Must Be Tailored

### A.  The Rule's salary-level provisions are severable

Each of the 2024 Rule's three distinct changes to the salary-level test—the July 2024 wage growth update, the January 2025 methodology update, and the future triennial updates—is severable from the others and from the remainder of the Rule. *See* Defs.' Mot. at 12. Plaintiffs— who themselves advanced separate arguments regarding each of these distinct provisions—offer no coherent argument to the contrary. Instead, they merely note that the "presence . . . of a severability clause" is not determinative. Bus. Pls.' Opp'n at 6 (quoting *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1145 (D.C. Cir. 2022)); Tex. Opp'n at 5. Defendants agree on this point: the severability of a regulation's provisions generally "depends [1] upon the intent of the agency and [2] upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001); *see Nat'l Ass'n*

---

[8] Defendants note that, in its opposition brief, Texas does not mention its claim under the Tenth Amendment at all, let alone respond to Defendants' arguments as to why that claim fails. Accordingly, Defendants are entitled to summary judgment for the reasons explained in their cross-motion. *See* Defs.' Mot. at 43–45 (explaining why this claim lacks merit).

*of Mfrs. v. SEC*, 105 F.4th 802, 815–16 (5th Cir. 2024). The presence of the severability clause in this Rule speaks to the former—i.e., the Department's clear intent that the provisions be severable.

As to the second factor, Plaintiffs contend, without explanation or support, that the challenged provisions of the rule are too "intertwined" to function sensibly apart. Bus. Pls.' Opp'n at 7; *see* Tex. Opp'n at 6. This contention is puzzling considering that the challenged aspects of the Rule are *already* functioning sensibly apart, in light of the fact that the wage growth update became applicable more than two months ago (except as to Texas as an employer, *see* PI Order at 35, ECF No. 38). Similarly, the methodology update does not rely on the wage growth update to function sensibly, and indeed will take its place: on January 1, 2025, as a result of the methodology update alone, the minimum salary level will rise to $1,128. In addition to their separate timing, each of those updates serves a distinct purpose: the wage growth update was necessary to account for the considerable growth in wages since the Department last updated the salary level, whereas the methodology update restores the salary-level test's historical screening function and better accounts for the earlier shift from a two-test to a one-test system. *See supra* sections II.A, II.B.

The triennial updating mechanism likewise is independent from both the wage growth update and the methodology update: that portion of the Rule simply updates the salary level based on whichever methodology is operative. In that regard, the first of the triennial updates will occur in July 2027, regardless of whether the January 1, 2025, methodology or the 2004 methodology (on which the July 1 wage growth update relies) is in effect. The Rule explains how each provision of the Rule operates in these ways. *See* 89 Fed. Reg. at 32,886–87. Plaintiffs offer no substantive rebuttal explaining how these provisions, which become applicable at different times and serve different purposes, could be "intertwined" in any way, Bus. Pls.' Opp'n at 7, much less in such a way that would counsel ignoring the Department's clear intent that they be treated separately.

20

Moreover, to the extent that there is any basis for Texas's suggestion that citations to the Code of Federal Regulations are necessary to "note[] explicitly which provisions of the challenged rule could operate independently," Tex. Opp'n at 6, Defendants reiterate what the Rule makes clear: the July 1, 2024, wage growth update is codified at 29 C.F.R. section 541.600(a)(1), the January 1, 2025 methodology update at section 541.600(a)(2), and the future triennial updates at sections 541.600(a)(3) and 541.607(b)(1). The Court need not "parse through the Rule" or do any "heavy lifting" to treat these clearly separate provisions individually, as intended and, indeed, as makes both legal and practical sense. *Contra* Tex. Opp'n at 5.

### B.  Any relief should be limited

As this Court has recognized, equitable relief "should not be 'more burdensome to the defendant than necessary to [redress] the plaintiff's injuries.'" PI Order at 31 (quoting *Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring)). For the reasons Defendants explained in their cross-motion, even assuming that the APA authorizes vacatur of agency action, the Court should decline, as a matter of equitable discretion, to enter a universal vacatur of the Rule. Text and precedent both make clear that whether to enter vacatur—and the scope of any such relief— is constrained by equitable principles. And those principles limit proper relief to redressing the injuries of the named parties, thus foreclosing universal vacatur in this case.

**1.** The Supreme Court has recently reinforced this principle of interpretation, instructing that, "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024). And the Court explained that even seemingly mandatory statutory language—such as a directive "that an injunction 'shall be granted' if" certain conditions are met—will not "supplant the traditional equitable principles" governing

relief. *Id.* at 1577. "[S]uch an abrupt departure from traditional equity practice" as requiring relief no matter the equities requires "plain[er]" language than that. *Id.*

So too with the APA. As an initial matter, the APA itself provides for traditional forms of equitable actions and relief, such as "declaratory judgments or writs of prohibitory or mandatory injunction," 5 U.S.C. § 703, and explicitly preserves "the power or duty of the court to . . . deny relief on any . . . equitable ground," *id.* § 702. In light of the traditional equitable principles against which the statute was enacted—and which are explicitly incorporated into the statute—there is no sound reason to conclude that Congress did not merely authorize but compelled courts to abandon "the bedrock practice of case-by-case judgments with respect to the parties in each case" by adopting the unremarkable "set aside" language in section 706. *United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring).

Contrary to Plaintiffs' suggestions, this construction of the APA—as permitting, but not requiring, universal vacatur—is consistent with Fifth Circuit precedent. Although the Fifth Circuit has described vacatur of an unlawful agency action as the "default rule," *Data Mktg. P'ship LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859–60 (5th Cir. 2022), it did so prior to the Supreme Court's decision in *Alliance*. Recently, the Fifth Circuit repeated its holding on vacatur without discussing *Alliance*. *Tex. Med. Ass'n v. HHS*, 110 F.4th 762, 780 (5th Cir. 2024). Treating section 706 as requiring universal vacatur cannot be squared with the Supreme Court's instruction that a statutory provision authorizing remedies, especially equitable remedies, should be construed consistent with "the traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case."). The APA reinforces that longstanding rule by explicitly stating that its authorization of judicial review does not affect "the power or duty of the court to . . . deny relief on any . . . equitable ground." 5 U.S.C. § 702(1).

**2.** Crucially, as the Supreme Court recently cautioned, a plaintiff generally has no cognizable Article III interest in interfering with an agency's regulation of third parties. *See FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 372 (2024) (explaining that, "[u]nder Article III of the Constitution, a plaintiff 's desire to make a drug less available for others does not establish standing to sue"). Under Article III, therefore, "a plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury in fact.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). The Business Plaintiffs attempt to distinguish *Alliance* on its facts, Bus. Pls.' Opp'n at 16, but a plaintiff cannot exceed the limits of Article III regardless of the factual circumstances.

Notwithstanding these constitutional limitations, the Business Plaintiffs contend that they are "entitled" to universal vacatur of the entire 2024 Rule. *Id.* at 17. But they do not even attempt to argue that they have shown that each Business Plaintiff is entitled to relief, on behalf of itself and its members, as to each challenged provision of the Rule. For example, only three of the 13 Business Plaintiffs have adequately demonstrated that they have a named member who was affected by the wage growth update that went into effect more than two months ago, based on a change to the exemption status of employees who routinely work more than 40 hours per workweek.[9] Eight Business Plaintiffs do not allege harm to themselves or *any* individual members stemming from the wage growth update; thus, they are not "entitled" to any relief with respect to

---

[9] *See* Ex. 3-A ¶ 7, ECF No. 46-4 (International Franchise Association (IFA) member); Ex. 4-A ¶ 6, ECF No. 46-5 (National Association of Convenience Stores member); Ex. No. 7-A ¶¶ 6–8, ECF No. 46-8 (National Federation of Independent Businesses member). Two other Business Plaintiffs assert that they have a named member with at least one employee who became nonexempt on July 1, 2024, but they do not assert that any of those employees ever work more than 40 hours in a workweek, so they have not shown that they were actually affected by the wage growth update. *See* Ex. 6 ¶ 13, ECF No. 46-7 (National Association of Wholesaler-Distributors member); Ex. 9 ¶¶ 12–13, ECF No. 46-10 (Restaurant Law Center member).

that provision, even if the Court concludes that it is unlawful.[10] Four Business Plaintiff associations—including the lead plaintiff—fail even to name a single member, much less demonstrate injury to a named member stemming from any part of the 2024 Rule, which is the bare minimum required to demonstrate associational standing—and thus entitlement to *any* judicial relief—under Article III.[11] *See Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 (5th Cir. 2012) (for Article III standing, each plaintiff "organization must show an individual [member] who has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct" (cleaned up)).

Thus, to issue relief as to the members of ten Plaintiffs that have not shown an injury stemming from the wage growth update on that provision in particular, or to the five Plaintiffs that have not shown concrete injury stemming from any part of the Rule, would exceed the Court's Article III authority—just as any *universal* relief would, whether injunction or vacatur. *See Alliance*, 602 U.S. at 372. *Cf.* PI Order at 32–33 (limiting injunctive relief to Texas as an employer based on "evidence of its own injuries").

Similarly, Texas bluntly states that Defendants are "wrong" that it "'lack[s] an Article III interest in interfering with an agency's regulation of third parties.'" Tex. Opp'n at 4 (quoting Defs.'

---

[10] *See* Ex. 1-A ¶¶ 6–8, ECF No. 46-2 (American Hotel & Lodging Association member alleging no harm from wage growth update); Ex. 2 ¶ 4, ECF No. 46-3 (same as to Associated Builders & Contractors); *see also infra* note 11.

[11] *See* Ex. 5, ECF No. 46-6 (National Association of Home Builders failing to name a single member); Ex. 8, ECF No. 46-9 (same as to National Retail Federation); Ex. 10, ECF No. 46-11 (same as to Plano Chamber of Commerce). Plaintiff the Texas Restaurant Association and individual Plaintiffs Cooper General Contractors and DASE Blinds did not bother to submit declarations at all, so the Court has no evidence of harm to those Plaintiffs (or to any of the association's individual members), and those Plaintiffs therefore also fail to show that they would be entitled to *any* relief under Article III if the Court were to find any part of the Rule unlawful. *Cf.* Ex. 3 ¶ 5 (IFA stating that DASE, an IFA member and co-plaintiff, has "several currently exempt employees who will lose their exempt status if the Rule remains in effect" but providing no specific facts in support of that vague assertion).

Mot. at 46). But Texas does not assert any such interest with regard to third parties, and indeed it would be hard to conceive of one that could be asserted consistent with Article III. Texas relies vaguely on the text of section 706, but Congress enacted the APA against a background rule that statutory remedies must be construed in accordance with "traditions of equity practice." *Hecht Co.*, 321 U.S. at 329.

Further, this case presents the sort of circumstances that especially militate against universal relief. Two other challenges to the 2024 Rule are pending in other courts, including one in a different circuit. *See Ass'n of Christian Schools Int'l v. U.S. Dep't of Labor*, No. 24-cv-2618 (D.D.C.); *Flint Ave. LLC v. U.S. Dep't of Labor*, No. 24-cv-130 (N.D. Tex.). Granting relief beyond Plaintiffs (and members of Plaintiff associations that have demonstrated harm to individual members) risks conflicting rulings with other jurisdictions and condoning the "gamesmanship and chaos" that justices of the U.S. Supreme Court have warned against. *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring). This Court should "avoid rulings which may trench upon the authority of sister courts." *W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24, S. Atl. & Gulf Coast Dist. of the ILA, AFL-CIO*, 751 F.2d 721, 729 (5th Cir. 1985).

Here, under traditional equitable principles, should the Court find relief is warranted, it should decline to vacate the entirety of the 2024 EAP Rule and instead enjoin Defendants from enforcing against each set of Plaintiffs *only* those portions of the Rule for which those Plaintiffs have demonstrated legal harm and that the Court determines to be unlawful. Such a specific injunction would fully redress any harms Plaintiffs have demonstrated.

## CONCLUSION

For the foregoing reasons, the Court should deny the Business Plaintiffs' motion for summary judgment, ECF No. 46, deny Texas's motion for summary judgment, ECF No. 48, and grant Defendants' motion for summary judgment, ECF No. 57.

Dated: September 19, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JULIE STRAUS HARRIS
Assistant Director

*/s/ Christine L. Coogle*
Christine L. Coogle
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
202-880-0282
christine.l.coogle@usdoj.gov

*Counsel for Defendants*