UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS | § § § | CIVIL NO. 4:24-CV-499-SDJ LEAD CASE |
| PLANO CHAMBER OF COMMERCE, ET AL. v. | § § § § | CIVIL NO. 4:24-CV-468-SDJ |
| UNITED STATES DEPARTMENT OF LABOR, ET AL. | § § | |

**MEMORANDUM OPINION AND ORDER**

The Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, generally requires covered employers to pay their employees at least the federal minimum wage and requires overtime pay to employees who work more than forty hours in a week. *Id.* § 206 (minimum wage); *id.* § 207 (overtime). But Congress has created several exemptions to these requirements. Relevant here, the FLSA includes an exemption for executive, administrative, and professional ("EAP") employees in the American workplace. The so-called "EAP Exemption" provides that the minimum wage and overtime requirements in FLSA Sections 206 and 207 shall not apply to "any employee employed in a bona fide executive, administrative, or professional capacity," as those terms are "defined and delimited" by agency regulations. *Id.* § 213(a)(1).

The FLSA's text does not specify any minimum salary for an employee to qualify for the EAP Exemption. Nor does the FLSA include any language concerning compensation level associated with the EAP Exemption. However, since the FLSA's enactment in 1938, the Department of Labor, which is charged with implementing

1

the FLSA, has promulgated various regulations defining and delimiting the EAP Exemption. Those regulations have always included a minimum salary level for EAP employees. And recently, the Fifth Circuit confirmed that the Department's authority to "define and delimit" the EAP Exemption includes the authority, within limits, to impose a salary-level test to qualify for the exemption. *Mayfield v. DOL*, 117 F.4th 611, 619 (5th Cir. 2024); *see also infra* Part I.A.iii.

At issue here is a rule recently issued by the Department that raises the minimum salary at which EAP employees are exempt from minimum wage and overtime pay under the FLSA—thereby changing the exemption statuses of millions of employees. 89 Fed. Reg. 32842 (Apr. 26, 2024) (codified at 29 C.F.R. §§ 541.0–541.710) (the "2024 Rule"). The 2024 Rule implements three, staged changes to the EAP Exemption. Each change increases the minimum salary level at which EAP employees may become exempt under the FLSA. First, the 2024 Rule raised the minimum salary level from $684 per week to $844 per week starting on July 1, 2024. 89 Fed. Reg. 32854. According to the Department, this change rendered about one million employees nonexempt who were previously exempt, with no change in their duties. *Id.* at 32843. Second, the 2024 Rule raises the salary level from $844 per week to $1,128 per week starting on January 1, 2025. *Id.* at 32971. The Department estimates that this change will render about three million additional employees nonexempt who were previously exempt, with no change in their duties. *Id.* at 32843. Third, the 2024 Rule implements a mechanism to automatically increase the salary level triennially based on contemporary earnings data. The first automatic change—

2

which would not require notice and comment—will occur on July 1, 2027. *Id.* at 32971. The Department estimates that these automatic updates will result in millions more employees becoming nonexempt. *Id.* at 32940.[1]

The State of Texas and a coalition of trade associations and employers ("Business Organizations")[2] contend that the 2024 Rule's changes to the salary level exceed the Department's[3] authority under the FLSA. The subject matter of this litigation is familiar to the Court. In 2017, the Court permanently enjoined a similar Department regulation—the "2016 Rule"[4]—concluding that it increased the minimum salary for the EAP Exemption to a level that "essentially ma[de] an employee's duties, functions, or tasks irrelevant if the employee's salary f[ell] below the new minimum salary level," and unlawfully "ma[de] salary rather than an employee's duties" the determinative factor for the EAP Exemption. *Nevada v. DOL,*

---

[1] Although the EAP Exemption exempts employees from both minimum wage and overtime requirements, this order primarily discusses the 2024 Rule's effects with respect to the overtime requirement.

[2] This group of Plaintiffs includes Plano Chamber of Commerce, American Hotel and Lodging Association, Associated Builders and Contractors, International Franchise Association, National Association of Convenience Stores, National Association of Home Builders, National Association of Wholesaler-Distributors, National Federation of Independent Business, Inc., National Retail Federation, Restaurant Law Center, Texas Restaurant Association (collectively, the "trade associations"), Cooper General Contractors, and DASE Blinds.

[3] Defendants include the Department; Julie A. Su, in her official capacity as Acting U.S. Secretary of Labor; the Wage and Hour Division of the Department; and Jessica Looman, in her official capacity as Administrator of the Wage and Hour Division. Defendants are collectively referenced as the "Department."

[4] 81 Fed. Reg. 32391 (May 23, 2016).

275 F.Supp.3d 795, 806–07 (E.D. Tex. 2017) (Mazzant, J.) ("*Nevada II*").[5] Texas and the Business Organizations contend that, like the 2016 Rule, the 2024 Rule exceeds the Department's authority because it increases the minimum salary for the EAP Exemption to a level that effectively displaces the duties-based inquiry required by the FLSA's text with a predominant salary-level test.

As a result of this displacement, Texas asserted that it would be irreparably harmed and moved for a preliminary injunction. (Dkt. #2). The Court found that the preliminary-injunction factors favored Texas and enjoined the Department from implementing and enforcing the Rule against Texas as an employer. *See Texas v. DOL*, No. 4:24-CV-499, 2024 WL 3240618 (E.D. Tex. June 28, 2024). Because the injunction was granted only as to Texas, the 2024 Rule's salary-level increase on July 1, 2024, applied to all other employers throughout the nation. As a result of this increased salary level, about one million employees' statuses changed.

After granting Texas's motion, the Court consolidated Texas's and the Business Organizations' cases and ordered the parties to submit cross-motions for summary judgment on the certified administrative record. Briefing is complete and the Court has conducted a hearing on the cross-motions.[6] For the following reasons,

---

[5] The Court first preliminarily enjoined the 2016 Rule, finding that it was likely unlawful and that the movants, a coalition of States, otherwise met the requirements for injunctive relief. *Nevada v. DOL*, 218 F.Supp.3d 520, 526–33 (E.D. Tex. 2016) (Mazzant, J.) ("*Nevada I*").

[6] In addition to the parties' briefing, the Court received and reviewed four amicus curiae briefs, including one from Arkansas and thirteen other States, as we well as one from the Chamber of Commerce of the United States of America.

4

the Court concludes that the motions for summary judgment filed by the Business Organizations, (Dkt. #46), and Texas, (Dkt. #48), should be granted, and the cross-motion filed by the Department, (Dkt. #57), should be denied.

## I. BACKGROUND

This case turns on whether the 2024 Rule's changes to the salary-level test exceed the Department's authority to "define and delimit" the terms of the EAP Exemption. The Court's consideration of this question is informed by the Department's 85-year history of administering the FLSA and with it the EAP Exemption. Since the FLSA was enacted, the minimum salary level has been raised nine times before the 2024 Rule.[7] The Department's approach to these changes may generally be divided into two periods: the period from 1938 to 2004; and the period from 2004 to now. The Court examines each in turn.

### A. The EAP Exemption from 1938–2004

Even though the text of the FLSA's EAP Exemption mentions no minimum salary component or requirement, the Department has considered salary in some capacity since its inception. Indeed, the Department has viewed salary level as a "completely objective and precise measure" that has served as an "aid in drawing the line between exempt and nonexempt employees." U.S. Dep't of Labor, *Report and Recommendations on Proposed Revisions of Regulations, Part 541 Harry Weiss, Presiding Officer* 9 (June 30, 1949) (the "*Weiss Report*").

---

[7] This count includes the 2016 Rule.

### i. Setting the minimum salary level before 2004

In 1938, the Department's initial rule exempted executive and administrative employees who made at least a minimum salary of $30 per week. 89 Fed. Reg. 32844. In 1940, the Department established a minimum salary level for professional employees. In addition, it created a three-part test for exemption status that governed all EAP employees. Under that test, an employee was exempt from overtime requirements if (1) his job duties primarily involve executive, administrative, or professional duties ("duties test"); (2) he is paid a predetermined and fixed salary ("salary-basis test"); and (3) his salary exceeds the minimum weekly amount set by the Department ("salary-level test"). 29 C.F.R. §§ 541.100 (executive), 541.200 (administrative), 541.300 (professional). This test remains in effect today.

The Department's early methodology for setting the minimum salary level used multiple sources of data and reference points.[8] When the Department updated the salary levels in 1940, for example, it maintained the salary level for executive employees, increased the salary level for administrative employees, and established a salary level for professional employees. In setting those rates, the Department considered private-industry surveys conducted by federal- and state-government agencies, experience gained under the National Industrial Recovery Act, and U.S. Government salaries to identify a salary level that reflected a reasonable "dividing

---

[8] *Overtime Exemptions in the Fair Labor Standards Act for Executive, Administrative, and Professional Employees*, Congressional Research Service 13 (2017), https://crsreports.congress.gov/product/pdf/R/R45007/4 (hereafter referenced as the "CRS Report").

line" between employees performing exempt and nonexempt work. U.S. Dep't of Labor, "*Executive, Administrative, Professional . . . , Outside Salesman" Redefined: Report and Recommendations of the Presiding Officer [Harold Stein] at Hearings Preliminary to Redefinition* 9, 20–21, 30–31 (Oct. 10, 1940) (the "*Stein Report*"); *see also* 84 Fed. Reg. 51230, 51235 (Sept. 27, 2019) (the "2019 Rule"). Based on its review of salaries paid in numerous industries and the percentage of employees earning below these amounts, the Department set the salary level for each exemption slightly below the average salary dividing exempt and nonexempt employees. 84 Fed. Reg. 51235.

In 1949, the Department developed a two-tiered structure in which employees could satisfy either a "long" test (combining a more-rigorous duties test with a lower salary level) or a "short" test (combining a less-rigorous duties test and a higher salary level). 14 Fed. Reg. 7705, 7705–07 (Dec. 24, 1949). As an example, for an executive employee to qualify for the exemption under the long test (and thus the lower salary threshold), that employee's "primary duty" had to be the management of an enterprise or a department or subdivision thereof.[9] 14 Fed. Reg. 7706. In addition, that employee had to "customarily and regularly" direct the work of two or more other employees and had to "exercise discretionary powers." *Id.* This employee was also expected to have the authority to hire and fire other employees, or to have their recommendations about change of status of other employees given particular

---

[9] "The term 'primary duty' means the principal, main, major or most important duty that the employee performs." 29 C.F.R. §541.700(a).

weight. *Id.* Finally, under the long duties test, an EAP-exempt employee could spend no more than 20% of his work hours each week on nonexempt work activities (i.e., work not closely related to the duties of a bona fide administrative, executive, or professional employee). *Id.* The less-stringent short duties test combined a higher salary threshold with the requirement that an exempt executive employee's "primary duty" was the management of an enterprise or a department or subdivision thereof; and the employee had to "customarily and regularly" direct the work of two or more other employees. *Id.* For an example executive employee, the two-duties-test regime worked as follows:

| The 1949 Rule: Duties-Test Regime for an Executive Employee | | |
|---|---|---|
| *Employee Salary Range* | *Long or Short Duties Test* | *Overtime Status* |
| $0–$54.99/week | Neither | Automatic overtime protections |
| $55–$99.99/week | Long Duties Test | Overtime exempt only if employee meets the long duties test |
| $100/week or greater | Short Duties Test | Overtime exempt only if employee meets the short duties test |

In establishing these new minimum salary levels, the Department evaluated salary data from state and federal agencies, including the Bureau of Labor Statistics (BLS), and considered wages in small towns and low-wage industries, wages of federal employees, average weekly earnings for exempt employees, starting salaries for college graduates, and salary ranges for different occupations such as bookkeepers, accountants, chemists, and mining engineers. *Weiss Report* at 10, 14–17, 19–20. The Department also examined data showing increases in exempt-

employee salaries since 1940, which it supplemented with nonexempt-employee-earnings data to approximate the "prevailing minimum salaries of exempt employees." *Id.* at 12. Recognizing that the "increase in wage rates and salary levels" since 1940 had "gradually weakened the effectiveness of the present salary tests as a dividing line between exempt and nonexempt employees," the Department considered the increase in weekly earnings from 1940 to 1949 for various industries, choosing to adopt new salary levels at a "figure slightly lower than might be indicated by the data" to protect small businesses. *Id.* at 8, 14–20.[10]

The Department's rulemakings in 1958, 1963, 1970, and 1975 maintained the same general approach of reviewing salary levels of exempt EAP employees and analyzing the minimum salaries they were paid compared to the higher salaries of nonexempt employees. The Department's focus in adjusting the salary-level test was to set the minimum salary level so that only a small percentage of bona fide EAP employees would be denied the exemption, while also ensuring that an adequate differentiation existed between the salaries of nonexempt workers and supervising exempt workers. During this period, the Department continued to note the importance of setting the minimum salary level at the lower end of the salary range for EAP employees and of considering regional, firm-size, and industry differentials in wage levels.

---

[10] The Department also justified its modest increases by noting evidence of slow wage growth for executive employees "in some areas and some industries." *Id.* at 14.

Beginning with the 1958 Rule, the Department also noted its goal of setting the salary thresholds at levels so that "no more than about 10 percent of those in the lowest-wage region, or in the smallest size establishment group, or in the smallest-sized city group, or in the lowest-wage industry of each of the categories would fail to meet the tests." U.S. Dep't of Labor, *Report and Recommendations on Proposed Revision of Regulations*, Part 541, Harry S. Kantor, Presiding Officer 6–7 (Mar. 3, 1958) (the "*Kantor Report*"). Thus, the salary-setting method applied by the Department in the 1958 Rule—the "Kantor Method"—established the principle that a minimum salary level should not disqualify more than 10% of EAP-exempt employees (as determined by passing the long duties test) in any of four categories: region, establishment size, city, or industry. To accomplish this goal, the Department used data collected by its Wage and Hour and Public Contracts division[11] of salaries paid to employees who met the applicable salary and duties tests, grouped by geographic region, broad industry groups, number of employees, and city size. *Kantor Report* at 6. These data were then supplemented with additional BLS and Census data that reflected income increases for white-collar and manufacturing employees for periods not covered by the Department's investigations. *Id.* at 6. The Department followed this approach when it considered and implemented salary-level increases in both 1963 and 1970. 84 Fed. Reg. 51236.

In 1975, rather than follow its prior approaches, the Department updated the 1970 salary levels based on increases in the Consumer Price Index with a downward

---

[11] Today, this division is known as the Wage and Hour Division.

adjustment "to eliminate any inflationary impact." 40 Fed. Reg. 7091, 7091 (Feb. 19, 1975). The new salary levels were intended to serve as interim levels "pending the completion and analysis of a study by [BLS] covering a six-month period in 1975." *Id.* Although the Department intended to increase the salary levels based on that study of actual salaries paid to employees, the process was never completed, and the "interim" salary levels remained in effect for the next twenty-nine years.

### ii. The fundamentals of a salary-level test that does not displace the duties test

As demonstrated in its first sixty years of its rulemakings, the Department recognized three fundamental, interrelated aspects of the salary-level test. Each helped ensure that the test did not displace the duties-based test required by the FLSA. First, the Department understood that the minimum salary level should be set deliberately low, as it was designed to "screen[] out the obviously nonexempt employees." *Weiss Report* at 7; *see also Stein Report* at 21 (noting that in some industries, the salary threshold "is an exceedin[g]ly small protection, indeed no protection at all"). As the Department recognized, "*[i]n an overwhelming majority of cases* . . . personnel who did not meet the salary requirements would also not qualify under other sections of the regulations as the Divisions and the courts have interpreted them," i.e., the duties test. *Weiss Report* at 8 (emphasis added).

Thus, the Department understood that, while the salary-level test, set at a sufficiently low level, could serve as a proxy for identifying workers who also would not meet the duties test, the Department could not adopt a test "based on salary alone." *Id.* at 23. Courts reached a similar conclusion, recognizing that although

11

salary information could be a "pertinent criterion" in "most cases," "a person might be a bona fide executive in the general acceptation of the phrase, *regardless of the amount of salary which he receives.*" *Walling v. Yeakley*, 140 F.2d 830, 832–33 (10th Cir. 1944) (emphasis added); *see also id.* at 832 (observing that, "[o]bviously, the most pertinent test for determining whether one is a bona fide executive is the duties which he performs").

Second, the Department also understood that setting the salary-level test "at a low level" meant that it had to look at wages in the lowest-wage region, the smallest-size business establishment group, the smallest-size city group, and the lowest-wage industry. Why was this important? Because, as the Department acknowledged, regulations of "general applicability," like the salary-level test, "must be drawn in general terms to apply to many thousands of different situations throughout the country." *Weiss Report* at 9. As the Department explained, "[t]o be sure, salaries vary, industry by industry, and in different parts of the country, and it undoubtedly occurs that an employee may have a high order of responsibility without a commensurate salary." *Weiss Report* at 11; *see also Stein Report* at 32 (explaining that "the [FLSA] applies to low-wage areas and industries as well as to high-wage groups. Caution therefore dictates the adoption of a figure that is somewhat lower, though of the same general magnitude"); *Weiss Report* at 14 ("Consideration must also be given to the fact that executives in many of the smaller establishments are not as well paid as executives employed by larger enterprises."); *Id.* at 15 ("The salary test for bona fide

executives must not be so high as to exclude large numbers of the executives of small establishments from the exemption.").

Consequently, to avoid improperly excluding millions of employees from the exemption, the Department recognized that "the same salary cannot operate with equal effect as a test in high-wage and low-wage industries and regions, and in metropolitan and rural areas, in an economy as complex and diversified as that of the United States." *Kantor Report* at 5. With these considerations in mind, in 1949 the Department set a salary level lower than the data indicated to account for lower-wage industries and small businesses. *Weiss Report* at 12–15. And in 1958, the Department set the salary level so that "no more than about 10 percent of those in the lowest-wage region, or in the smallest size establishment group, or in the smallest-sized city group, or in the lowest-wage industry of each of the [industry] categories would fail to meet the tests." *Kantor Report* at 6–7.

Third, the Department was cognizant of the limited purpose of the salary-level test. The EAP Exemption excludes from the FLSA's overtime requirements "any employee employed in a bona fide executive, administrative, or professional capacity," as those terms are "defined and delimited" by agency regulations. 29 U.S.C. § 213(a)(1). When the Department first began to implement the EAP Exemption, it acknowledged that, although Congress had granted it authority to define and delimit the exemption, it "is not authorized to set wages or salaries for executive, administrative and professional employees." *Weiss Report* at 11. "Consequently, improving the conditions of such employees is not the objective of the [Department's]

13

regulations." *Id.* To the contrary, the salary-level test was understood to merely assist in "distinguishing bona fide executive, administrative, and professional employees from those who were not intended by Congress to come within these categories." *Id.* Thus, the Department noted that any salary-level increase must have "as its primary objective the drawing of a line separating exempt from nonexempt employees rather than the improvement of the status of such employees." *Id.*

\*   \*   \*   \*

Taken together, the fundamental aspects of the salary-level test have included setting low minimum salary levels designed to exclude only obviously nonexempt employees, premised on wage-data for the lowest-wage region, the smallest-size business establishment group, the smallest-size city group, and the lowest-wage industry, applied by the Department in a manner consistent with serving only the purpose of separating exempt from nonexempt employees, not improving the status of such employees.

## B. The EAP Exemption from 2004 to the 2024 Rule

### i. The 2004 Rule

The Department's approach changed with the 2004 Rule. It discarded the long and short duties tests and replaced them with a single, "standard" duties test, setting a single standard salary level at $455 per week ($23,660 annually). 69 Fed. Reg. 22122, 22126 (Apr. 23, 2004) (the "2004 Rule"). The new standard duties test was similar to the short duties test but included an additional duty[12] from the long duties

---

[12] This additional duty was only for executive employees. The description above is thus only for executive employees. For administrative employees, the standard duties test

test. Thus, again using an example executive employee, the standard duties test requires that (1) an exempt employee's "primary duty" is the management of an enterprise or a department or subdivision thereof; (2) the employee "customarily and regularly" directs the work of two or more other employees; and (3) the employee has authority to hire and fire other employees, or their recommendations about change of status of other employees are given particular weight. 69 Fed. Reg. 22123.

When it created the 2004 Rule, the Department did not have available data on actual salaries paid to EAP-exempt employees as it had when devising the methodology used in the 1958 Rule and applied in its rulemakings from 1963 to 1975. CRS Report at 16. Instead, the Department used survey data from the Current Population Survey (CPS) to determine the minimum salary.[13] Recognizing that the CPS salary data covered both exempt and nonexempt workers, and that the Department had created a new standard duties test (as opposed to two tests with two different salary levels), it set the 2004 salary level at a point in the earnings distribution that would exclude from exemption about 20% of full-time salaried

---

required a primary duty of "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; combined with "the exercise of discretion and independent judgment with respect to matters of significance." 69 Fed. Reg. 22262. For professional employees, the standard duties test required their primary duty to be "the performance of work: (i) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or (ii) Requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor." *Id.* at 22265.

[13] The CPS is a monthly household survey conducted by the BLS to collect economic and demographic information on the population and is the source of the official monthly unemployment rate, among several other indicators. The CPS includes detailed information on earnings and occupations of respondents. *See generally* http://www.bls.gov/cps/.

workers in the South (lowest-wage region) and 20% of full-time salaried workers in the retail industry (lowest-wage industry). Thus, the Department set the salary level at the 20th percentile of all full-time salaried employees (exempt and nonexempt) in the South and the retail industry, not at the 10th percentile of exempt employees. As a result, the 2004 Rule changed the exempt status of about 1.3 million workers. 69 Fed. Reg. 22123.

The Department's 2004 Rule also created a new test under the EAP Exemption, known as the highly compensated employee ("HCE") test, based on the rationale that it need not apply the full standard duties test to employees who earn at least a certain amount annually—an amount substantially higher than the annual equivalent of the weekly standard salary level—because such employees "have almost invariably been found to meet all the other requirements of the regulations for exemption." 69 Fed. Reg. 22174 (quoting *Weiss Report* at 22). The HCE test combines a high compensation requirement with a less-stringent duties test. To meet the HCE test, an employee must earn annually at least the amount specified in the regulation and must customarily and regularly perform any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee. 29 C.F.R. § 541.601(a). The HCE test applies "only to employees whose primary duty includes performing office or non-manual work." *Id*. § 541.601(d). The Department initially set the HCE salary level at $100,000 per year. 69 Fed. Reg. 22269.[14]

---

[14] In doing so, the Department noted that, in its experience, "virtually every salaried 'white collar' employee with a total annual compensation of $100,000 per year would satisfy any duties test." 69 Fed. Reg. 22174.

In sum, although the 2004 Rule followed past practice by demarcating exemption status with a specific point on a wage distribution, the methodology diverged significantly from previous rules. Specifically, the 2004 Rule (1) established the minimum salary level on a wage distribution of all salaried employees, rather than on a distribution of exempt employees; (2) accounted for some—region and industry—but not all of the four-part criteria used in previous rules under the Kantor Method; and (3) used a different percentile—the 20th—than was used in previous rules. *See* CRS Report at 17.

### ii. The 2016 Rule

The Department's 2016 Rule retained the single-test structure but (1) increased the salary level from $455 per week to $913 per week (or from $23,660 annually to $47,476 annually) and (2) implemented a mechanism to automatically update the salary level triennially. 81 Fed. Reg. 32393, 32440.[15] This new salary level represented a jump from the 20th percentile to the 40th percentile of weekly earnings of full-time, salaried workers in the South. In the Department's view, this substantial increase was needed because, "in moving from a two-test to a one-test system, the 2004 rule exempted lower-salaried employees performing large amounts of nonexempt work who had historically been, and should continue to be, covered by the overtime compensation requirement." 89 Fed. Reg. 32863. The Department further explained that "[s]ince the standard duties test was equivalent to the short duties

---

[15] The Department also raised the HCE salary level to $134,004 per year. 81 Fed. Reg. 32393. However, the Department continued enforcing the 2004 Rule's $100,000-per-year level due to the invalidation of the 2016 Rule. 84 Fed. Reg. 51231.

test . . . a salary level in the short test salary range—traditionally 130 to 180 percent of the long test salary level—was necessary to address this effect of the 2004 rule." *Id.*[16] The 2016 Rule was expected to change the exempt status of about 4.2 million workers, not including those changed by the automatic triennial updates. 81 Fed. Reg. 32393.[17]

The Department's creation of an automatic-indexing mechanism in the 2016 Rule was a marked departure from its previous rulemakings. Such a scheme had been suggested in 2004: The Department expressly rejected it. At that time, the Department found "nothing in the legislative or regulatory history [of the FLSA] that would support indexing or automatic increases." 69 Fed. Reg. 22171. The Department further noted that "[a]lthough an automatic indexing mechanism has been adopted under some other statutes, Congress has not adopted indexing for the Fair Labor Standards Act." *Id.* The Department concluded that "adopting such approaches in this rulemaking is both contrary to congressional intent and inappropriate." *Id.* at

---

[16] The Department's statement that the standard duties test created in the 2004 Rule is "equivalent" to the short duties test is inaccurate, at least as to executive employees. As noted above, although the standard duties test is similar to the short duties test, it adds a significant requirement from the long duties test for executive employees—that such an EAP-exempt employee must have authority to hire and fire other employees, or that their recommendations about change of status of other employees must be given particular weight. 69 Fed. Reg. 22123.

[17] As with the 2004 Rule, the Department again used CPS data on all salaried workers, rather than exempt employees, to establish a wage distribution from which its salary-level test was derived. And in 2016, the Department used only one of the criteria from the four-part Kantor method, focusing solely on the lowest-wage Census region: the South. *See* CPS report at 16–17. That is to say, the 2016 Rule's salary-level test was not derived by considering the smallest-size business establishment group, the smallest-size city group, or the lowest-wage industry, as contemplated in earlier rulemakings.

22172. In short, in 2004 the Department plainly viewed an automatic-indexing mechanism as beyond its authority, reflecting a substantive change to the EAP Exemption that only Congress could effectuate.

Twenty-one states and a multitude of business organizations challenged the 2016 Rule in this Court. Ruling for the challengers, the Court first preliminarily enjoined the 2016 Rule, finding that the challengers were likely to show that the Rule was unlawful and that they would be irreparably injured if the Rule went into effect. *Nevada I*, 218 F.Supp.3d at 526–33. The Court later granted summary judgment for the challengers and held that the 2016 Rule was invalid. *Nevada II*, 275 F.Supp.3d at 805–08.

The Court explained that "Congress defined the EAP [E]xemption with regard to duties. In other words, Congress unambiguously intended the exemption to apply to employees who perform 'bona fide executive, administrative, or professional capacity' duties." *Id.* at 805. The Court went on to hold that, contrary to the FLSA's plain text and Congressional intent, the 2016 Rule "ma[de] overtime status depend predominately on a minimum salary level, thereby supplanting an analysis of an employee's job duties." *Id.* at 806; *see also id.* at 807 ("By raising the salary level in this manner, the Department effectively eliminate[d] a consideration of whether an employee performs 'bona fide executive, administrative, or professional' duties."). Because the Department was without power to displace the FLSA's duties-based test with an exclusive or predominate salary-level test, the Court concluded

19

that the 2016 Rule—including the automatic-update mechanism—was invalid. *Id.* at 807–08.

### iii. The 2019 Rule

After the Department's 2016 Rule was invalidated, it promulgated the 2019 Rule. *See* 84 Fed. Reg. 51230. The Department began by acknowledging certain shortcomings of its 2016 Rule, as identified and explained in *Nevada I* and *Nevada II*. Observing that it had "long used a salary level test as part of its method for defining and delimiting [the EAP Exemption]," the Department reaffirmed that the test should be used only to help identify and screen out "obviously nonexempt employees." *Id.* at 51237. The Department also recognized that "[a]n approach that emphasizes salary alone, irrespective of employee duties, would stand in significant tension with the [FLSA]." *Id.* The Department went on to explain why a "salary only" approach to the EAP Exemption runs afoul of the FLSA: "Section 13(a)(1) [of the FLSA] directs the Department to define and delimit employees based on the 'capacity' in which they are employed. Salary is a helpful indicator of the capacity in which an employee is employed, especially among lower-paid employees. But it is not 'capacity' in and of itself." *Id.*

The Department then candidly admitted its errors in the 2016 Rule:

By excluding from exemption, without regard to their duties, 4.2 million workers who would have otherwise been exempt because they passed the salary basis and duties tests established under the 2004 final rule, the 2016 final rule was in tension with the [FLSA] and with the Department's longstanding policy of setting a salary level that does not 'disqualify[]' any substantial number of' bona fide executive, administrative, and professional employees from exemption.

*Id.* at 51238. The Department further conceded that "[a] salary level set that high does not further the purpose of the [FLSA], and is inconsistent with the salary level test's useful, but limited, role in defining the EAP exemption." *Id.*

The Department then "reexamined the 2016 final rule in light of [the *Nevada I* and *Nevada II* decisions] and the salary level's historical purpose." *Id.* The Department noted that this Court's decisions "underscore[] that except at the relatively low levels of compensation where EAP employees are unlikely to be found, the salary level is not a substitute for an analysis of an employee's duties." *Id.* Rather, salary level is, "at most, an indicator of those duties." *Id.* The Department went on to conclude that, "[t]he salary level test's primary and modest purpose is to identify potentially exempt employees by screening out obviously nonexempt employees." *Id.*

Eschewing the 2016 Rule's dramatic changes to the EAP Exemption, the 2019 Rule retained the 2004 Rule's methodology for calculating the standard salary level, setting the salary level equal to the 20th percentile of weekly earnings of full-time, salaried workers in the South based on contemporary data. This update raised the salary level from $455 per week to $684 per week (or from $23,660 annually to $35,568 annually).[18] 84 Fed. Reg. 51289. Notably, unlike the 2016 Rule, the 2019 Rule did not include a mechanism to automatically increase the minimum salary level. The 2019 Rule rendered about 1.2 million workers nonexempt who had previously met the EAP Exemption. *Id.* at 51242.

---

[18] The Department also increased the HCE salary level from $100,000 per year to $107,432 per year. 84 Fed. Reg. 51289.

The 2019 Rule was challenged as an unlawful exercise of administrative power in *Mayfield v. DOL*, 117 F.4th 611 (5th Cir. 2024). The *Mayfield* plaintiffs asserted that the Department's use of any salary component in defining and delimiting the terms of the EAP Exemption is unauthorized by the FLSA. *Id.* at 614. As argued by the *Mayfield* plaintiffs, the Department's power to "define and delimit" the terms of the EAP Exemption "is only the power to further specify and enumerate the types of duties that qualify an employee for the Exemption." *Id.* at 618. The Fifth Circuit rejected this argument, noting that "the terms in the EAP Exemption, particularly 'executive,' connote a particular status or level for which salary may be a reasonable proxy." *Id.* The *Mayfield* court further explained that "[d]istinctions based on salary level are also consistent with the FLSA's broader structure, which sets out a series of salary protections for workers that common sense indicates are unnecessary for highly paid employees." *Id.*

The Fifth Circuit went on to observe, however, that the *Mayfield* plaintiffs' argument "raise[d] an important point: adding an additional characteristic is consistent with the power to define and delimit, but that power is not unbounded." *Id.* at 618–19. "A characteristic with no rational relationship to the text and structure of the statute would raise serious questions. And so would a characteristic that differs so broadly in scope from the original that it effectively replaces it." *Id.* at 619. The court went on to confirm that the Department could permissibly use salary as a proxy for EAP status because "the link between the job duties identified and salary is strong." *Id.* But the Fifth Circuit admonished that the use of a proxy characteristic

may not always be a permissible exercise of the power to define and delimit: "If the proxy characteristic frequently yields different results than the characteristic Congress initially chose, then use of the proxy is not so much defining and delimiting the original statutory terms as replacing them." *Id.*

In this regard, the court explained that "the words 'executive,' 'administrative,' and 'professional' each have meaning" and "[t]hat meaning both guides and limits [the Department's] power to 'define[] and delimit[]' them." *Id.* at 621. Thus, while the Department may enact rules that "clarify the meaning" of the EAP Exemption's terms or that "impose some limitations on their scope," it cannot enact rules that "replace or swallow the meaning those terms have." *Id.*

### iv. The 2024 Rule

The Department's 2024 Rule reflects a return to the approach it adopted in the 2016 Rule. The 2024 Rule makes three changes to the salary aspect of the EAP Exemption. Texas and the Business Organizations challenge all three changes as exceeding the Department's statutory authority. *First*, the 2024 Rule raised the salary level from $684 per week to $844 per week (or from $35,568 annually to $43,888 annually) starting on July 1, 2024. 89 Fed. Reg. 32854. This changes the minimum salary level to the 20th percentile of weekly earnings of full-time, salaried workers in the South and/or retail industry nationally based on contemporary data. *Id.* at 32855. "[A]pproximately 1 million employees" became nonexempt—i.e., eligible for overtime pay—as a result of this change. *Id.* at 32843.

*Second*, the 2024 Rule raises the salary level from $844 per week to $1,128 per week (or from $43,888 annually to $58,656 annually) starting on January 1, 2025. *Id.*

at 32971. This increase departs from the 2004 Rule's metric: starting on January 1, 2025, the salary level will be based on the 35th percentile of weekly earnings of full-time, salaried workers in the lowest-wage Census Region and/or retail industry nationally—not the 20th percentile. *Id.* at 32842, 32845. The Department expects that this change will result in an additional three million workers becoming nonexempt. *Id.* at 32843.

*Third*, like the 2016 Rule, the 2024 Rule implements a mechanism to automatically increase the salary level triennially based on contemporary earnings data. The first automatic change—which would not require notice and comment—will occur on July 1, 2027. *Id.* at 32971.[19] The Department estimates that these automatic updates will result in millions more employees becoming nonexempt. *Id.* at 32940.[20]

---

[19] The 2024 Rule also makes similar changes to the HCE test. On July 1, the salary level increased from $107,732 per year to $132,964 per year. 89 Fed. Reg. 32972. On January 1, 2025, the level will jump to $151,164 per year. *Id.* The Department anticipates that 292,900 workers will have their statuses changed in Year 1 as a result. *Id.* at 32891. And, as with the EAP Exemption, the HCE test will be updated every three years starting on July 1, 2027, to reflect current earnings data. *Id.* at 32972–73. One million workers are expected to have their statuses changed in Year 10 due to the triennial updates of the HCE salary level. *Id.* at 32938. Like the parties, the Court primarily discusses the 2024 Rule's changes to the standard salary level—not the HCE level. However, the increases to the HCE salary level likewise change the exemption statuses of millions of employees. The Court's analysis regarding the legality of the changes to the standard salary level applies equally to the Department's changes to the HCE level.

[20] According to the Department, the salary increases will affect 4.3 million workers in Year 1; 4.1 million in Year 2; 3.8 million in Year 3; 4.8 million in Year 4; 4.6 million in Year 5; 4.3 million in Year 6; 5.4 million in Year 7; 5.1 million in Year 8; 4.8 million in Year 9; and 6 million in Year 10. 89 Fed. Reg. 32940.

## II. STANDING

Although the Department does not challenge Plaintiffs' standing to sue, the Court is obligated to independently consider this Article III requirement. *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001) (Standing "goes to the constitutional power of a federal court to entertain an action, and th[e] court has the duty to determine whether standing exists even if not raised by the parties."). "Constitutional standing has three elements: (1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury." *Croft v. Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.E.2d 351 (1992)). Both Texas and the Business Organizations satisfy these requirements.

Texas and the Business Organizations sued on behalf of themselves as employers. They assert that the 2024 Rule injures them by forcing them to pay overtime to newly nonexempt employees or limit the hours that those employees work, thereby foregoing their services. Plaintiffs must also expend payroll, accounting, and legal costs to comply with the 2024 Rule. Since the 2024 Rule directly regulates Plaintiffs, they are "object[s] of [the] regulation," and "there is . . . little question that the action . . . has caused [them] injury, and that a judgment preventing . . . the action will redress it." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015) (quotations omitted).

The Department acknowledges that implementing the 2024 Rule will impose significant costs, especially for state and local governments:

> Based on the economic impact analysis of this final rule, the Department determined that Year 1 costs for state and local governments would total $197.7 million, of which $98.9 million are direct employer costs and $98.8 million are payroll increases. In subsequent years, state and local governments may experience payroll increases of as much as $183.7 million (in year 10 of the rule).

89 Fed. Reg. 32968–69. For the private sector, "[t]he Department estimates that the final rule will result in Year 1 costs . . . of approximately $2.7 billion, of which $1.3 billion are direct employer costs and $1.4 billion are payroll increases." *Id.* at 32969. "Direct employer costs" include "[r]egulatory familiarization,"[21] "[a]djustment," and "[m]anagerial"[22] costs. *Id.* at 32929. In Year 2, the Department anticipates another $641.5 million in total direct costs and approximately $1.1 billion in payroll increases. *Id.* at 32901, Table 4. Those numbers increase to $906.1 million and nearly $2.5 billion, respectively, in Year 10. *Id.* The Department does not dispute that at least some of these costs will be borne by Plaintiffs. Since these costs are traceable to the 2024 Rule, they are sufficient to establish injury-in-fact. And those injuries would be redressed by a favorable decision on the merits. Thus, Plaintiffs have standing to sue in their capacities as employers directly affected by the Rule.

---

[21] As to familiarization costs, the Department admits that it "assumes that all entities will incur some regulatory familiarization costs, even if they do not employ exempt workers, because all entities will need to confirm whether this rulemaking affects their employees." 89 Fed. Reg. 32908.

[22] The 2024 Rule specifically contemplates "ongoing managerial costs because the employer may spend more time developing work schedules and closely monitoring an employee's hours to minimize or avoid paying that employee overtime. For example, the manager of a newly nonexempt worker may have to assess whether the marginal benefit of scheduling the worker for more than 40 hours exceeds the marginal cost of paying the overtime premium." 89 Fed. Reg. 32910.

The trade associations, which comprise most of the Business Organizations, also assert associational standing to sue on behalf of their members. An association has standing to sue on behalf of its members when "(a) the association's members would otherwise have standing to sue in their own right; (b) the interests the association seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021) (quotations omitted).

The trade associations represent hundreds of thousands of businesses in diverse sectors throughout the United States. These businesses would have standing to sue in their own right for the same reasons Texas and the Business Organizations do. Further, the trade associations are suing to protect the interests of their members in not being subjected to costly and allegedly unlawful regulations, which is an interest germane to the associations' purposes. Finally, neither the claim nor the requested relief requires the participation of the members. Thus, the trade associations have associational standing to sue on behalf of their members, in addition to their standing to sue as employers.

### III. LEGAL STANDARD

**A. Summary Judgment**

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd ex rel. Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). When the only issues before the

Court are "pure questions of law"—as is the case here—summary judgment is an appropriate mechanism to resolve the dispute. *See Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350 (5th Cir. 2021) (quotations omitted); *see also Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 214 (5th Cir. 1996) (per curiam) ("We have consistently upheld, without comment, the use of summary judgment as a mechanism for review of agency decisions."). "When there are cross-motions for summary judgment, [courts] review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Texas v. United States*, 50 F.4th 498, 522 (5th Cir. 2022).

## B. Standard of Review

In *Loper Bright Enters. v. Raimondo*, the Supreme Court made clear that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 144 S.Ct. 2444, 2273 (2024). The exercise of such independent judgment, the Court explained, is rooted in the "solemn duty" imposed on courts under the Constitution to "say what the law is." *Id.* at 2257 (citing *United States v. Dickson*, 40 U.S. (15 Pet.) 141, 10 L.Ed. 689 (1841) (Story, J.); *Marbury v. Madison*, 5. U.S. (1 Cranch) 137, 177, 5 U.S. 137, 2 L.Ed. 60 (1803)).

The Court also observed that the exercise of independent judicial judgment to decide legal questions is embodied in the Administrative Procedure Act ("APA"), which "directs that '[t]o the extent necessary to decision and when presented, [a] reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.'" *Loper Bright*, 144 S.Ct. at 2261 (quoting 5 U.S.C. § 706). Likewise,

under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." *Id.* (quoting § 706(2)(A)). "The APA thus codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment." *Id.*

The *Loper Bright* Court recognized that a statute may authorize an agency to exercise a degree of discretion, and "some statutes 'expressly delegate[]' to an agency the authority to give meaning to a particular statutory term." *Id.* at 2263 (quoting *Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977)). The Court instructed that when a statute delegates discretionary authority to an agency, "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.*; *see also Mayfield*, 117 F.4th at 617 (same). Courts "fulfill[] that role by recognizing constitutional delegations, fix[ing] the boundaries of [the] delegated authority, and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Id.* (quotations omitted). "By doing so, a court upholds the traditional conception of the judicial function that the APA adopts." *Id.* at 2263.

## IV. DISCUSSION

### A. The 2024 Rule is an Unlawful Exercise of Agency Power.

Relying on the APA, Texas and the Business Organizations argue that the 2024 Rule's changes to the salary level and the implementation of an automatic-updating mechanism are "in excess of statutory jurisdiction, authority, or limitations" and are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." *See* 5 U.S.C. § 706(2)(A), (C)); *see id.* § 706(2) (requiring courts to "hold unlawful and set aside" such agency actions).[23]

As explained below, the Department exceeded the authority delegated by Congress, and thus summary judgment in favor of Plaintiffs is appropriate.

### i. Statutory Construction

"Administrative agencies are creatures of statute." *Nat'l Fed'n of Indep. Bus. v. OSHA.*, 595 U.S. 109, 117, 142 S.Ct. 661, 211 L.Ed.2d 448 (2022). Accordingly, they "must point to explicit Congressional authority justifying their decisions." *Inhance Techs., L.L.C. v. U.S. EPA*, 96 F.4th 888, 893 (5th Cir. 2024); *see also VanDerStok v. Garland*, 86 F.4th 179, 187 (5th Cir. 2023) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)). To determine whether a statute granted an agency the authority it claims, the Court looks to the statute's text. *VanDerStok*, 86 F.4th at 188; *see also BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004) (explaining that statutory interpretation "begins with the statutory text, and ends there as well if the text is unambiguous"). And when there is an ambiguity "about the scope of an agency's own power . . . abdication in favor of the agency is *least* appropriate." *Loper Bright*, 144 S.Ct. at 2266.

---

[23] Texas has also asserted claims that the 2024 Rule is invalid and/or may not be applied to Texas under the major-questions doctrine, the non-delegation doctrine, and the Tenth Amendment. *See* (Dkt. #1). Because the Court concludes that the Department exceeded its authority when it promulgated the 2024 Rule—which is sufficient to hold the Rule unlawful—the Court need not address Texas's additional theories.

### a. Defining the operative terms of the EAP exemption

The FLSA exempts from minimum-wage and overtime requirements "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Congress chose not to define the operative terms— "bona fide," "executive," "administrative," "professional," and "capacity." Rather, it delegated to the Department the authority to "define[] and delimit[]" those terms. *Id.* Under that authority, the Department created the current three-part test described above, which considers duties, method of payment, and salary. The 2024 Rule affects the salary portion of the three-part test. Thus, the question before the Court is whether the text of the EAP Exemption authorizes the Department to increase the minimum salary level as the 2024 Rule does, changing the exemption statuses of millions of employees. We begin with the text.

Courts construe undefined terms in accordance with their "ordinary meaning" when the statute was enacted. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566, 132 S.Ct. 1997, 182 L.Ed.2d 903 (2012). Dictionary definitions may serve to inform a term's ordinary meaning. *United States v. Radley*, 632 F.3d 177, 182–83 (5th Cir. 2011). An examination of the ordinary meaning of the EAP Exemption's undefined terms shows that they mainly focus on an employee's functions and duties, requiring that they fit within one of the three listed categories—"executive," "administrative," or "professional capacity."

To begin with, when the FLSA was enacted, "capacity" was defined as "[o]utward condition or circumstances; relation; character; position; as in the *capacity*

31

of a mason or carpenter." Webster's New Int'l Dictionary 396 (2d ed. 1934).[24] This ordinary meaning suggests a functional inquiry into the nature of an employee's duties within his workplace and industry, rather than his compensation. The Supreme Court's analysis of the same term, albeit in the context of another FLSA exemption, supports this interpretation. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 132 S.Ct. 2156, 183 L.Ed.2d 153 (2012). Construing the FLSA's outside-salesman exemption, the Supreme Court observed that "[t]he statute's emphasis on the 'capacity' of the employee counsels in favor of a functional, rather than a formal, inquiry, one that views an employee's responsibilities in the context of the particular industry in which the employee works." *Id.* at 161. In short, the term "capacity" refers to an employee's function or duties in the workplace.

The terms "executive," "administrative," and "professional" are each consistent with a functional, duties-based inquiry. As this Court previously explained, each of those words focuses on "a person's performance, conduct, or function." *Nevada II*, 275 F.Supp.3d at 804. Then-contemporary dictionaries defined the term "executive" to mean "[d]esigned or fitted for, or pert[aining] to, execution, or carrying into effect," or as "[e]ffectual, active, or skillful in execution." Webster's New Int'l Dictionary 892 (2d ed. 1934).[25] "Administrative" was defined as "[o]f or pertaining to administration,

---

[24] *See also* 2 The Oxford Eng. Dictionary 89 (1933) (defining "capacity" as "holding power. . . . [A] position which enables, or renders capable. . . . Position, condition, character, relation.").

[25] *See also* 3 The Oxford Eng. Dictionary 395 (1933) (defining "executive" as one "[c]apable of performance; operative . . . Active in execution, energetic. . . . Apt or skillful in execution. . . . Pertaining to execution; having the function of executing or carrying into practical effect").

esp[ecially] management; executive." *Id.* at 34 (2d ed. 1934).[26] And "professional" was defined as "[o]f or pertaining to a profession, esp[ecially] a learned or skilled profession," or as "[c]haracteristic of or conforming to the technical or ethical standards of a profession or an occupation regarded as such." *Id.* at 1976 (2d ed. 1934).[27]

In short, the plain meaning of these terms makes clear that what matters is the functions or duties of the employee. Each definition describes tasks or conduct—e.g., "carrying into effect," "management," "conforming to the technical . . . standards,"—and likewise focuses on the nature of a person's "performance," "learning," and "skills," among other, similar attributes. Absent from these definitions is any mention of salary. Put simply, in the EAP Exemption, "Congress elected to exempt employees based on the capacity in which they are employed. It's their duties and not their dollars that really matter." *Hewitt v. Helix Energy Sols. Grp.*, 15 F.4th 289, 315 (5th Cir. 2021) (en banc) (Jones, J., dissenting).[28]

---

[26] *See also* 1 The Oxford Eng. Dictionary 118 (1933) (defining "administrative" as "[p]ertaining to, dealing with, the conduct or management of affairs; executive. . . . Of the nature of stewardship, or delegated authority. . . . An administrative body; company of men entrusted with management").

[27] *See also* 8 The Oxford Eng. Dictionary 1428 (1933) (defining "professional" as a person "[e]ngaged in one of the learned or skilled professions, or in a calling considered socially superior to a trade or handicraft. . . . That follows an occupation as his (or her) profession, life work, or means of livelihood. . . . That is trained and skilled in the theoretic or scientific parts of a trade or occupation . . . that raises his trade to the dignity of a learned profession").

[28] The majority opinion did not address the salary-level test under the EAP Exemption. Instead, it only considered whether an employee was a "highly compensated employee" when he was not paid on a "salary basis," as the regulation requires. *Hewitt*, 15 F.4th at 293.

Further, as this Court previously explained, "[t]he fact that 'bona fide' modifies the terms executive, administrative, and professional capacity suggests the exemption should apply to those employees who, in good faith, perform actual executive, administrative, or professional capacity duties." *Nevada II*, 275 F.Supp.3d at 805. As with its construction of the other EAP Exemption terms, the Court's reasoning was premised on the ordinary meaning of "bona fide" when the FLSA was enacted. *Id*. at 804–05 (noting that "bona fide" was defined to mean "[i]n good faith, with sincerity; genuinely") (quoting 1 The Oxford Eng. Dictionary 980 (1933)).[29]

The "bona fide" requirement is part of a phrase in the EAP Exemption, "'employee *employed in* a bona fide . . . capacity,' [that] emphasizes a focus on the employee's actual duties," rather than the employee's compensation. *Hewitt*, 15 F.4th at 314 (Jones, J., dissenting). Consistent with this understanding, Fifth Circuit cases have often characterized the EAP Exemption "as applying to those 'working in' a bona fide executive, administrative or professional capacity when describing the statute." *Id*. at 314 n.20 (citing *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 331–33 (5th Cir. 2000) (recognizing the exemption applies to employees "*working in* a bona fide executive, administrative or professional capacity" (emphasis added))); *Faludi v. U.S. Shale Sols., L.L.C.*, 950 F.3d 269, 273 (5th Cir. 2020) (same); *Cowart v. Ingalls Shipbuilding, Inc.*, 213 F.3d 261, 266 (5th Cir. 2000) (same). Thus, the "bona fide" requirement points to Congress's intent that the EAP Exemption apply to only

---

[29] *See also* Webster's New Int'l Dictionary 305 (2d ed. 1934) (defining "bona fide" as "[i]n or with good faith; without fraud or deceit; genuine").

employees who genuinely perform EAP "tasks" in their employment and that the EAP Exemption should not apply to employees who merely enjoy a lofty job title without commensurate EAP duties.[30]

### b. The Department's authority to define and delimit the operative terms of the exemption

The Court's inquiry into the meaning of the EAP Exemption's operative terms does not end with their "ordinary meaning" at the time the statute was enacted because the FLSA explicitly provides that the Department will "define[] and delimit[]" the terms of the EAP Exemption "from time to time by regulations . . . subject to the provisions of subchapter II of chapter 5 of title 5 [of the APA.]" 29 U.S.C. § 213(a)(1). As explained by the *Mayfield* court, the term "define" means to "set forth or explain what a word (or expression) means,"[31] and the term "delimit" means to "'mark or determine (a limit or boundary)' of something."[32] The Fifth Circuit has made clear that the Department's authority to "define and delimit" the EAP Exemption's operative terms may include, among other things, the creation of regulations imposing a minimum salary level for the exemption. Such regulations generally fall within the Department's power to define what it means to work in an

---

[30] Fifth Circuit precedent reflects a similar construction regarding the seaman exemption, which applies to "any employee *employed as* a seaman." 29 U.S.C. § 213(b)(6) (emphasis added); *see, e.g.*, *Dole v. Petroleum Treaters, Inc.*, 876 F.2d 518, 523 (5th Cir. 1989) (recognizing that the "italicized words mean something" and are not "mere tautology"; instead they "warn us to look to what the employees do" rather than "rest on a matter of a name, or the place of their work" (quoting *Walling v. W.D. Haden Co.*, 153 F.2d 196, 199 (5th Cir. 1946))).

[31] 117 F.4th at 618 (quoting *Define*, Oxford English Dictionary (3d ed. 2015)).

[32] *Id.* (quoting *Delimit*, Oxford English Dictionary (3d ed. 2015)).

EAP-employee capacity, or as a limitation on "what is otherwise defined by the text of the Exemption." 117 F.4th at 618.

However, the Department's authority to define and delimit the EAP Exemption's terms through the addition of a proxy characteristic like salary, which is not included in the statutory text, "is not unbounded." *Id.* at 618–19. As the *Mayfield* court recognized, "the words 'executive,' 'administrative,' and 'professional' each have meaning" and "[t]hat meaning both guides and limits [the Department's] power to 'define[] and delimit[]' them." *Id.* at 621. For example, while the Department may "impose *some* limitations on" the scope of the terms in the EAP Exemption, the Department cannot "enact rules that replace or swallow the meaning those terms have." *Id.* at 621 (emphasis added). As applied to minimum salary level, this occurs when the use of salary as a proxy "frequently yields different results than the characteristic Congress initially chose" because "then use of the proxy is not so much defining and delimiting the original statutory terms as replacing them." *Id.* at 619.

In addition, the frequency, the method, and the standard by which the Department may define and delimit the EAP Exemption are constrained by the latter portion of the applicable statutory text, which states that the Department will "define[] and delimit[]" the EAP Exemption's operative terms "from time to time by regulations of the [Department], subject to the provisions of subchapter II of chapter 5 of title 5 [of the APA.]" 29 U.S.C. § 213(a)(1). Beginning with frequency, "from time to time" suggests that the Department must, on occasion, define and delimit the EAP Exemption. While no specific interval is defined, the Court believes that the

Department's historical practice is instructive. The Department has averaged about nine years between regulations, with the 2024 Rule as the Department's tenth regulation changing the EAP Exemption since 1938. The time between regulations has ranged from as few as two years to as many as twenty-nine years.

As to how the Department may define and delimit the EAP Exemption, the Court finds that "by regulation" restricts the Department to doing so through the active process of rulemaking. And for the standard that the Department's rulemaking must comply with—5 U.S.C. Subchapter II, Chapter 5—the Court notes that this APA section includes Section 553, titled "Rule Making." Given that the Department can only define and delimit by regulation, and these regulations are governed by Section 553, it follows that the Department's regulations are subject to the notice-and-comment process. Thus, the FLSA contemplates that the Department will define and delimit the EAP Exemption through an active, repeated process, by passing regulations that comply procedurally and substantively with the mandates of the APA, including the notice-and-comment process.

In sum, while Congress has expressly delegated to the Department the authority to define and delimit the EAP Exemption, there are several limits on this authority:

- The terms capacity, executive, administrative, and professional all relate to an employee's functions or duties. The meaning of these terms "guides and limits [the Department's] power to 'define[] and delimit[]' them." *Mayfield*, 117 F.4th at 621. Thus, the Department "cannot enact rules that replace or swallow the meaning those terms have." *Id.*

- The term "bona fide" allows the Department to use a minimum salary level but only if that salary serves as a reasonable proxy for an employee's exemption status.

- The Department must define and delimit the EAP Exemption through active rulemaking by passing regulations that comply with the APA.

Mindful of these limitations on the Department's authority, the Court reviews the challenged components of the 2024 Rule.

### ii. The 2024 Rule's salary changes exceed the Department's authority.

Like the invalidated 2016 Rule, the Department's 2024 Rule contemplates sweeping changes to the EAP Exemption's regulatory framework, designed on their face to effectively displace the FLSA's duties test with a predominate—if not exclusive—salary-level test. And like the 2016 Rule's attempt to dramatically increase the minimum salary level from the 20th to the 40th percentile of full-time, salaried workers in the South, the 2024 Rule raises the minimum salary level from the 20th to the 35th percentile on January 1, 2025. 89 Fed. Reg. 32971.

As with the 2016 Rule, the 2024 Rule also seeks to install a mechanism that automatically updates the minimum salary requirements to even higher levels every three years. *Id.* at 32973. According to the Department, in the first year that the 2024 Rule is effective, more than four million employees all over the country will lose their exempt status. *See id.* at 32901, Table 4. In succeeding years, millions more employees will lose their exempt status. *See id.*; *id.* at 32940.

The Court concludes that the 2024 Rule is not based on a permissible construction of Section 213(a)(1). As was true of the 2016 Rule, the minimum salary level imposed by the 2024 Rule "effectively eliminates" consideration of whether an

employee performs "bona fide executive, administrative, or professional capacity" duties in favor of what amounts to a salary-only test. *See Nevada II*, 275 F.Supp.3d at 807. And, as this Court previously held, "[n]othing in Section 213(a)(1) allows the Department to make salary rather than an employee's duties determinative of whether a 'bona fide executive, administrative, or professional capacity' employee should be exempt from overtime pay." *Id*. at 807.

In sum, because the EAP Exemption requires that an employee's status turn on duties—not salary—and because the 2024 Rule's changes make salary predominate over duties for millions of employees, the changes exceed the Department's authority to define and delimit the relevant terms. Therefore, these changes to the minimum salary level are "in excess of statutory jurisdiction," 5 U.S.C. § 706(2)(C), and Plaintiffs are entitled to summary judgment.[33]

### a. The July 2024 salary threshold increase

On July 1, 2024, the 2024 Rule raised the minimum salary level for the EAP Exemption from $684 per week to $844 per week (or from $35,568 annually to $43,888 annually). 89 Fed. Reg. 32854. This change increased the salary level to the 20th percentile of weekly earnings of full-time, salaried workers in the South and/or retail industry nationally based on contemporary data. *Id*. at 32855. "[A]pproximately 1 million employees" became nonexempt—i.e., eligible for overtime pay—as a result of this change. *Id*. at 32843. The Department implemented this salary-level increase

---

[33] Plaintiffs also argue that the 2024 Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of Section 706(2)(A) of the APA. However, the Court need not address that argument, as the Court's conclusion that the Department exceeded its authority is sufficient to hold the 2024 Rule unlawful.

even though its last salary-level increase, which took effect in January 2020, rendered about 1.2 million workers nonexempt who had previously met the EAP Exemption.

Before addressing the consequences of this change, it's helpful to examine the context of previous salary-level increases. The last two such increases were from the 2004 Rule and the 2019 Rule. The 2004 Rule was implemented after a gap of nearly thirty years (1975 to 2004) in which the Department had not addressed the minimum salary level. *See supra* at Part I.B.i. During that time, the federal minimum wage had more than doubled. This matters because the Department has used the minimum wage "as a reference point for the EAP salary threshold as early as the 1940 rule, when [the Department] noted that the assumption that bona fide executive employees earn 'compensatory privileges' would fail unless those employees earned 'substantially higher' than the federal minimum wage." CRS Report at 18 (quoting *Stein Report* at 19).[34]

As the Department has observed, in 1991 the federal minimum wage rose to $4.25 per hour (it had been $2.10 per hour in 1975), which then exceeded the long-duties-test salary level of $155 per week for executive and administrative employees and equaled the salary level of $170 per week for professional employees. 89 Fed. Reg. 32845. By 1997, the federal minimum wage had risen further to $5.15 per hour (where it remained in 2004), which not only exceeded the lower long-duties-test salary levels, but also approached the higher short-duties-test salary level of $250 per week. *Id.*

---

[34] *See also* 88 Fed. Reg. 62154 (the Department noting that "exempted workers typically earn salaries well above the minimum wage").

Thus, the 2004 Rule addressed significant salary shifts over nearly three decades with its new minimum salary level. Even still, the 2004 Rule's new minimum salary level only changed the exempt status of approximately 1.3 million workers. 69 Fed. Reg. 22123. The next salary-level increase occurred fifteen years later in the 2019 Rule. During this period, the federal minimum wage increased about 40%, from $5.15 per hour to $7.25 per hour. Yet the 2019 Rule's salary-level adjustment affected a similar number of workers—1.2 million.

The Department's decision to increase the minimum salary level in the 2024 Rule comes after only five years have passed since the last such increase. And for the first time in 85 years that increase comes when there has been no change to the federal minimum wage. The consequences are notable. According to the Department's data, before the July 2024 salary-threshold increase, about 20% of otherwise exempt employees (under the duties test) were classified as nonexempt for making less than the minimum salary level of $684 per week.[35] The Department further calculated that, for workers earning between $684 and $942 per week, 42% of such employees

---

[35] This number is calculated using figures and data provided in the 2024 Rule. Starting with the Department's Figure B, 4.8 million employees who make less than $1,128 per week meet the standard duties test. 89 Fed. Reg. 32880. The Department states that of the presently exempt workers, "just 4.0 million earn at or above the current $684 per week standards salary level but less than $1,128 per week . . . ." *Id.* at 32882. Subtracting those 4.0 million employees from the 4.8 million who make less than $1,128 per week leaves 800,000 employees who meet the standard duties test but make under the previous minimum salary level ($684). And in its Figure A, the Department represents that there are 4 million employees—both exempt and nonexempt—who make less than $684 per week. Thus, dividing the 800,000 employees who make less than $684 per week but would meet the duties test by the total number of employees in this salary bracket—4 million—the Department's data show that about 20% of these employees would pass the duties test but are nonexempt because they make less than $684 per week.

would meet the duties test.[36] The July 2024 salary-level increase moved the threshold for the exemption from $684 in weekly earnings to $844. Although the Department does not provide the percentage of employees earning between $684 and $844 per week (as opposed to $942) who would meet the duties test, based on the Department's data it is fair to presume that at least a third of such employees, and likely more than that, were rendered nonexempt by the July 2024 increase. This is shown by the graph below ("Estimated Percentage of Employees Who Meet the Duties Test at a Salary of $844 per Week").



<hr />

[36] The Department calculates that $942 in weekly earnings is equivalent to the threshold under the long duties test. 89 Fed. Reg. at 32869.

This is where the Court's understanding of "define and delimit" differs from the Department's, especially as to the "proxy characteristic" of salary.[37] Recall the fundamentals: a salary test *cannot* displace the duties test. Historically, the Department understood that such thresholds should be deliberately set low, as they were designed to only "screen[] out the obviously nonexempt employees." *Weiss Report* at 7–8; *see also Stein Report* at 21 (noting that in some industries, the salary threshold "is an exceedin[g]ly small protection, indeed no protection at all"). Indeed, *"[i]n an overwhelming majority of cases* . . . personnel who did not meet the salary requirements would also not qualify under other sections of the regulations as the Divisions and the courts have interpreted them," i.e., the duties test. *Weiss Report* at 8 (emphasis added).

Courts agreed, recognizing that although salary information could be a "pertinent criterion" in "most cases," "a person might be a bona fide executive in the general acceptation of the phrase, *regardless of the amount of salary which he receives*." *Walling*, 140 F.2d at 832–33 (emphasis added). And as aptly described more recently, in the EAP Exemption "Congress elected to exempt employees based on the capacity in which they are employed. It's their duties and not their dollars that really matter." *Hewitt*, 15 F.4th at 315 (Jones, J., dissenting).

---

[37] Because the percentage of employees who meet the duties test increases with salary, the linear interpolation in the graph ("Estimated Percentage of Employees Who Meet the Duties Test at a Salary of $844 per Week") underestimates the percentage of employees who meet the duties test but make less than $844 per week. As an example, for there to be 20% of employees who makes less than $684 per week, the percentage would be lower at the start point (0% at a salary of $0 per week) and higher at the end point (above 20% at a salary of $684 per week). So too with the employees who earn more than $684 but less than $942 per week.

When a third of otherwise exempt employees who the Department acknowledges meet the duties test are nonetheless rendered nonexempt because of an atextual proxy characteristic—the increased salary level—something has gone seriously awry. The Kantor Method applied by the Department for decades was based on the understanding that a salary-level test should not exclude more than about 10% of employees who meet the duties test. The Department's July 2024 increase more than triples this percentage. The Department cannot credibly maintain that a minimum salary level eliminating such a large percentage of employees who would otherwise qualify under the duties test is merely "screen[ing] out the obviously nonexempt employees." To the contrary, the proxy characteristic has effectively displaced the duties test for a significant percentage of otherwise EAP-exempt employees. *See Mayfield*, 117 F.4th at 621 (explaining that while the Department may "impose some limitations on" the scope of the operative terms in the EAP Exemption, it cannot "enact rules that replace or swallow the meaning those terms have"). The July 2024 increase thus exceeds the Department's authority under the FLSA.

### b. The January 2025 salary threshold increase

The centerpiece of the 2024 Rule's changes to the EAP Exemption is the minimum-salary-level increase to the 35th percentile of weekly earnings of full-time, salaried workers in the South (the "35th-Percentile Increase"). 89 Fed. Reg. 32847. The 35th-Percentile Increase, which is set to occur on January 1, 2025, will raise the minimum salary level from $844 per week to $1,128 per week (or from $43,888

annually to $58,656 annually). The change represents a 65% increase from the salary level in effect before the effective date of the 2024 Rule.

The effects of the 35th-Percentile Increase will be staggering. According to the Department, of the 12.7 million full-time, salaried white-collar employees who earn less than $1,128 per week, 38% (about 4.8 million workers) meet the duties test. 89 Fed. Reg. 32880. Thus, the new 35th-Percentile Increase will render nonexempt at least 2 of every 5 employees who meet the duties test, causing approximately three million EAP-exempt employees to become nonexempt on January 1. And those three million employees are in addition to the one million workers already improperly rendered nonexempt by the July 2024 increase, even though their duties have not changed. 89 Fed. Reg. 32934, Table 25.

If this sounds like something the Department has already admitted cannot be reconciled with the FLSA's text or the Department's own "longstanding policy," that's because it is. Here is what the Department said in 2019 about the similar, dramatic changes regarding salary thresholds it attempted to implement with the 2016 Rule that this Court invalidated:

> By excluding from exemption, without regard to their duties, 4.2 million workers who would have otherwise been exempt because they passed the salary basis and duties tests established under the 2004 final rule, the 2016 final rule was in tension with the [FLSA] and with the Department's longstanding policy of setting a salary level that does not disqualify[] any substantial number of bona fide executive, administrative, and professional employees from exemption.

84 Fed. Reg. 51238 (cleaned up). The Department further conceded that "[a] salary level set that high does not further the purpose of the [FLSA], and is inconsistent

with the salary level test's useful, but limited, role in defining the EAP exemption." *Id.*

Yet the Department has now returned to its 2016 Rule playbook, seeking to elevate the salary-level test and relegate the duties test. But as *Mayfield* makes clear, the Department cannot use a proxy characteristic (salary) to measure eligibility for the EAP Exemption when it will "frequently yield[] different results than the characteristic Congress initially chose," i.e., duties. The Department's attempt to do so in the 2024 Rule demonstrates that its use of the salary proxy "is not so much defining and delimiting the original statutory terms as replacing them." 117 F.4th at 619.

For its part, the Department suggests that the 35th-Percentile Increase "was necessary in part to fully restore the historical screening function of the salary-level test, which requires a salary level at least equivalent to the long-test level ($942)." (Dkt. #72 at 16). The Department also maintains that this change in salary level "represents a modest approach relative not only to the 2016 rule but also to the Department's historical two-test system." (Dkt. #72 at 17). These arguments are unpersuasive. In fact, the 2024 Rule is out-of-step with both the Department's past practices and the historical screening function of the salary-level test.

To begin with, other than the invalidated 2016 Rule, the 35th-Percentile Increase is a significant outlier compared to the Department's past practices. With few exceptions, the Department has historically set the minimum salary level for the EAP Exemption by examining the salaries actually paid to exempt employees and

setting the salary no higher than the 20th percentile in the lowest-wage regions, the smallest size establishment groups, the smallest-sized cities, and the lowest-wage industries. Thus, in 1949 the Department set a salary level lower than the 20th percentile to account for lower-wage industries and small businesses. *Weiss Report* at 12–15. And in 1958, the Department set the salary level so that "no more than about 10 percent of those in the lowest-wage region, or in the smallest size establishment group, or in the smallest-sized city group, or in the lowest-wage industry of each of the categories would fail to meet the tests." *Kantor Report* at 7–8. In 1963, the Department increased the salary level to "bear approximately the same relationship to the minimum salaries . . . adopted in 1958." 28 Fed. Reg. 7002, 7004 (July 9, 1963).

Following this trend in 1970, the Department adopted a minimum salary level for executives of $125 per week when the salary data indicated that "20 percent received less than $130 per week, whereas only 12 percent of such executive employees in the West and 14 percent in the Northeast received salaries of less than $130 per week." 35 Fed. Reg. 883, 884 (Jan. 22, 1970). The Department altered this practice in 2004.[38] It set the minimum salary level at $455 per week, the 20th percentile for full-time, salaried employees in the South and the retail industry, rather than at the 10th percentile of exempt employees as in 1958, to account for the change from the "long" and "short" test structure and because the data included

---

[38] As noted above, *see supra* at Part I.A.i, in 1975 the Department based an interim salary increase on the Consumer Price Index rather than a percentile, but also stated that the increase was not "to be considered a precedent." 40 Fed. Reg. 7091, 7092 (Feb. 19, 1975). The Department did not issue another rulemaking relevant to the minimum salary level for the EAP Exemption for nearly 30 years, until 2004.

nonexempt salaried employees. 69 Fed. Reg. 22168–69 & Table 3; *see also supra* at Part I.B.i. Finally, after the 2016 Rule was invalidated, the Department's 2019 Rule returned to its 2004 methodology: setting the minimum salary level at $684 per week (annualizing to $35,568)—equal to the 20th percentile of weekly earnings of full-time, salaried workers in the South and in the retail sector nationwide. 84 Fed. Reg. 51260 & Table 4. In short, although the Department's adoption of the 35th-Percentile Increase represents a resurrection of the failed rationale underlying its invalidated 2016 Rule, it is also a departure from past practices over the last 85 years.[39]

Equally flawed is the Department's assertion that the 35th-Percentile Increase merely seeks to fully restore the historical screening function of the salary-level test. The Department's own data refute this claim. Specifically, the Department argues that the salary level for the EAP Exemption must be at least as high as a salary level the Department claims is consistent with the Kantor Method—$942/week—to properly serve its function of screening obviously nonexempt employees (those who would also fail the duties test). The Court is skeptical of the Department's conclusion

---

[39] The 35th-Percentile Increase to the minimum salary threshold also represents a significant shift in the historical ratio between exempt and nonexempt employees' earnings. When the Department adjusted the minimum salary threshold in 2004 and 2019, it set the minimum salary to be slightly more than two times the annual minimum wage. Specifically, the minimum wage in 2004 was $5.15, which translates into an annual income of $10,712 (i.e., $5.15 x 2,080). When the Department re-set the minimum salary threshold in 2004 to $23,660, the minimum salary threshold represented roughly 2.2 times the annual income for a full-time, minimum-wage employee. Similarly, the minimum wage in 2019 was $7.25, and so a full-time, minimum-wage, nonexempt employee earned $15,080 per year (i.e., $7.25 x 2,080 hours). When the Department increased the minimum salary threshold in 2019 to $35,568, the minimum salary threshold was roughly 2.35 times greater than minimum-wage earnings. The 2024 Rule's increase to $58,656 represents a minimum salary that is nearly four times greater than annual, full-time, minimum-wage earnings.

that a minimum salary level of $942 per week is consistent with a proper application of the Kantor Method. But either way, the Department's data undermine rather than support its conclusion.

The 35th-Percentile Increase will render nonexempt all workers who earn less than $1,128 per week, including those who earn between $942 and $1,128 per week. If the salary level for EAP-exempt employees needed to be raised further to $1,128/week to screen out only obviously nonexempt employees, i.e., employees who would fail the duties test, the data would be expected bear that out. But that is not the case. The table reproduced below from the 2024 Rule ("Figure C") shows that about 51% of the employees rendered nonexempt by the salary increase who make between $942 and $1,128 per week meet the duties test and would otherwise be exempt.



89 Fed. Reg. 32881. And zooming out to a reproduction of the Department's breakdown of all employees subject to the EAP Exemption ("Figure B"), the Court

again finds a concerning percentage of employees who meet the duties test are improperly rendered nonexempt by the new salary level: 38%—about two out of every five employees.



*Id.* at 32880. It's also instructive to consider these two figures together. For the sake of argument, the Court will assume, as the Department suggests, that a minimum salary level of $942 per week is consistent with the Kantor Method. Subtracting the numbers from the first column in Figure C (Between $942 and $1,128) from the first column in Figure B (Below $1,128), shows the following: For workers earning below $942 per week, 2.6 million meet the standard duties test and 5.9 million do not. Thus, about 31% of employees who make under $942 per week are classified as nonexempt even though they meet the duties test. Point being, no matter how you slice the numbers, between 30% to 50% of employees will be improperly rendered nonexempt because of the 2024 Rule.

Under these circumstances, the Department's claim that the 2024 Rule is consistent with the Kantor Method is curious, given that the Rule "screens out" and excludes from the EAP Exemption at least *three times as many employees* who meet the duties test as the maximum percentage (10%) contemplated by the Kantor Method. *See supra* at Part I.A.i.[40] And as the Court has noted above, for employees who make between $942 per week and $1,128 per week (Figure B), the 35th-Percentile Increase will render nonexempt about 51% of employees who satisfy the duties test.

This sharp increase in the reclassification rate shows why the minimum salary level instituted by the 35th-Percentile Increase is not a reasonable proxy: it screens out substantial percentages of employees who meet the duties test, and for certain groups of workers, over half of the previously EAP-exempt employees are rendered nonexempt. The Department simply does not have the authority to effectively displace the duties test with such a predominant salary-level test.

### c. The Automatic Indexing Mechanism

The Automatic Indexing Mechanism created in the 2024 Rule, which contemplates an increase to the EAP Exemption's minimum salary level every three years, also exceeds the Department's authority. *See* 89 Fed. Reg. 32973 (29 C.F.R. § 541.607). Under the Automatic Indexing Mechanism, the Department effectively abdicates its role of defining and delimiting the EAP Exemption by regulation. In the

---

[40] Recall that the Kantor Method established the principle that the salary threshold would not disqualify more than 10% of exempt EAP employees (as determined through passing the long duties test) in any of four categories: region, establishment size, city, or industry. *See supra* at Part I.A.i.

first ten years of this abdication, about six million EAP employees will lose their exempt status. 89 Fed. Reg. 32938. Nothing in the EAP Exemption authorizes the Department to set its rulemaking on autopilot and evade the procedural requirements of the APA.

The FLSA directs the Department to revisit the EAP Exemption "from time to time by regulations of the Secretary subject to the provisions of [the APA]." 29 U.S.C. § 213(a). Thus, the Department is authorized to revise the regulations governing the duties and functions that may legitimately be encompassed within a "bona fide executive, administrative, or professional capacity." But there is no basis to conclude that the automatic revision to the minimum salary level contemplated by the 2024 Rule, which triggers every three years into the future, will have anything to do with changes in EAP-exempt employees' duties. Instead, the Automatic Indexing Mechanism is tied exclusively to a percentile of average salary levels for salaried employees, in a specific part of the country, regardless of duties. *See* 89 Fed. Reg. 32973 (29 C.F.R. § 541.607). Thus, the Automatic Indexing Mechanism is untethered to the operative terms of the EAP Exemption that concern an employee's job duties and functions, which Congress plainly intended to serve as the guiding principle for updating the EAP Exemption. As this Court previously observed, under the Automatic Indexing Mechanism, "on July 1, 2027, and every three years thereafter, millions more employees will have their statuses changed. Nothing about these employees' jobs will have changed. Their duties and salaries will be identical both before and after the increases. Rather, the only changes determining their statuses

and making them non-exempt will be increases to the minimum salary level . . . ." *Texas v. DOL*, 2024 WL 3240618, at *10. In short, on its face the Automatic Indexing Mechanism cannot be reconciled with the FLSA's applicable text concerning the Department's authority to define and delimit the operative terms of the EAP Exemption.

Notably, the Department previously recognized that it does not have authority to use indexing when setting the salary level under the FLSA's overtime provisions. When it implemented the 2004 Rule, the Department acknowledged that adopting automatic increases would be contrary to Congress's intent and otherwise improper, stating that "the Department finds nothing in the legislative or regulatory history that would support indexing or automatic increases. Although an automatic indexing mechanism has been adopted under some other statutes, Congress has not adopted indexing for the Fair Labor Standards Act[.] . . . The Department believes that adopting such measures in this rulemaking is both contrary to congressional intent and inappropriate." 69 Fed. Reg. 22171–72.

Reversing course from its 2004 position, the Department now asserts that its prior view was wrong and that, in fact, it may set adjustments to the salary threshold on autopilot because Congress has not expressly prohibited the use of such indexing in 29 U.S.C. § 213(a)(l). *See* 89 Fed. Reg. 32857. Not so. As the Fifth Circuit has made clear, courts "do not merely presume that a power is delegated if Congress does not expressly withhold it, as then agencies would enjoy virtually limitless hegemony[.]" *Contender Farms*, 779 F.3d at 269 (quotations omitted); *accord La. Pub. Serv.*

*Comm'n v. FCC*, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."). Accordingly, the Department's construction of the FLSA is not entitled to any form of interpretive deference "merely by demonstrating that 'a statute does not expressly *negate* the existence of a claimed administrative power (i.e., when the statute is not written in 'thou shalt not' terms).'" *Id.* (quoting *Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc) (emphasis in original)).

The Court also notes that Congress knows how to expressly authorize indexing, including in the labor context.[41] But neither 29 U.S.C. § 213(a)(l) specifically, nor the FLSA generally, provide indexing for wage rates. Congress has not indexed the minimum wage, 29 U.S.C. § 206; the hourly wage for computer employees, 29 U.S.C. § 213(a)(l7); or the annual compensation for "nonprofit parents," 29 U.S.C. § 213(b)(24).[42] There is also nothing in the regulatory history of the EAP Exemption that offers precedential support for the automatic increases proposed now. The absence of express statutory language authorizing indexing in Section 213(a)(l), particularly in light of other, similar provisions elsewhere in the United States Code,

---

[41] *See, e.g.*, 29 U.S.C. § 1083(c)(7)(D)(vii) (indexing amount of excess employee compensation related to "Minimum funding standards for single-employer defined benefit pension plans"); 43 U.S.C. § 1337(a)(3)(C)(vii) (indexing oil and gas leases).

[42] Congress previously considered, but did not enact, a proposal to index the salary level. *See* The Rebuild America Act, S. 2252, 112th Cong. (2012) (proposing to match the salary level to "the annual percentage increase in the Consumer Price Index for Urban Wage Earners and Clerical Workers").

confirms that Congress has not authorized the Department's attempt to use indexing as a means to place on autopilot its obligation to define and delimit the EAP Exemption, "from time to time by regulation."[43]

Automatically increasing the minimum salary thresholds every three years also violates the notice-and-comment rulemaking requirements of the APA. With certain exceptions that are not relevant here, the APA mandates that agency rules having the force and effect of law must go through the notice-and-comment process. *See* 5 U.S.C. § 553(b), (c). The "notice-and-comment provisions of the APA enable the agency promulgating a rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated." *Global Van Lines, Inc. v. ICC*, 714 F.2d 1290, 1299 n.9 (5th Cir. 1983). The Automatic Indexing Mechanism runs afoul of APA requirements expressly incorporated in the EAP Exemption. Specifically, under 29 U.S.C. § 213(a)(1), the only power granted to the Department by Congress is the authority to define and delimit the exemption "by regulations" promulgated "subject to subchapter II of chapter 5 of title 5"—the rulemaking

---

[43] The Court notes that the *Mayfield* court concluded that the Department could impose a salary test as part of its authority to define and delimit the operative terms of the EAP Exemption, even though Congress did not include a reference to salary in the FLSA's text. *Mayfield*, 116 F.4th at 619. In reaching this conclusion, *Mayfield* noted that, for example, the term "executive," naturally connotes prestige and a certain level of pay. It also noted that the Department had imposed a minimum salary level since the FLSA was enacted, without any reaction from Congress. An automatic-indexing mechanism, however, cannot be shoehorned into any definition or delimitation of the operative terms of the EAP Exemption, and such a mechanism has never been implemented in the 85-year history of the FLSA. Indeed, in 2004 the Department disavowed any authority to create an automatic-indexing mechanism, and in 2016 this Court struck down a Department regulation that attempted to implement such a mechanism. *Nevada II*, 275 F.Supp.3d at 808.

requirements imposed by the APA. 29 U.S.C. § 213(a)(1). Because the Automatic Indexing Mechanism contemplates that the salary-level test will automatically adjust every three years, it improperly evades notice and comment and other APA requirements explicitly required by the text of the FLSA.[44]

To justify the implementation of the Automatic Indexing Mechanism as consistent with the APA, the Department points to its own regulatory history. Specifically, the Department concludes that this history is "marked in many instances by lengthy gaps between rulemakings," which "underscore the difficulty with updating the earnings thresholds as quickly and regularly as necessary to keep pace with changing employee earnings and to maintain the full effectiveness of the thresholds." 89 Fed. Reg. 32858. In the Department's view, using the Automatic Indexing Mechanism will fix these problems by allowing it to "timely and efficiently update the standard salary level" without any further notice-and-comment rulemaking. *Id*.

This explanation is puzzling. It amounts to an acknowledgement that the Department has not engaged in rulemaking to define and delimit the operative terms of the EAP Exemption as often, or as effectively, as it should have over time—followed by the observation that such rulemaking, i.e., the Department's job, is "difficult."

---

[44] In addition to being unlawful, the Automatic Indexing Mechanism contravenes the Department's longstanding view that "the line of demarcation" provided by the EAP Exemption's salary threshold "cannot be reduced to a standard formula." 80 Fed. Reg. 38527. But that is precisely the effect of the Automatic Indexing Mechanism: it sets in motion the indexing of the threshold salary level for the exemption every three years, in perpetuity, using nothing more than "a standard formula."

These observations lead the Department to the interesting conclusion that the best way forward is not to engage in more frequent and thorough rulemaking, as one might expect. Rather, the Department believes it should shortcut this "difficult" work through the implementation of an automatic-increase mechanism—which, by its very nature, will simply increase the salary threshold every three years without any rulemaking or substantive analysis by the Department. Put another way, the Department endorses the Automatic Indexing Mechanism based on its conclusions that: (1) it hasn't done a bang-up job administering the EAP Exemption over the years; (2) its sporadic regulation has been driven by the difficulty of its task; so (3) the best way forward is to abdicate from more frequent and thorough rulemaking efforts by placing the regulation of the EAP Exemption on autopilot through the Automatic Indexing Mechanism. While this may be a satisfying solution for the Department, it is unlawful under the APA.

As it turns out, the APA's notice-and-comment provisions must be followed even when an agency finds them inconvenient. *See U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979) (discussing 5 U.S.C. § 553(b)(B)). Nor can the Department avoid its APA obligations simply because they take time and resources; an agency cannot "exercise its authority in a manner that is inconsistent with the administrative structure that Congress has enacted into law" no matter how difficult the issue it seeks to address. *See Brown & Williamson*, 529 U. S. at 125 (internal quotation marks and citations omitted). That means future regulation and adjustment of the minimum salary level must be based on a rulemaking process

consistent with the APA's requirements. This process includes examination of the existent facts and information available to the Department, together with the submission and review of comments. What the Department cannot lawfully do is put the EAP Exemption's minimum salary level on autopilot, effectively immunizing itself from the APA's procedural obligations and judicial review.

\*　　\*　　\*　　\*

Congress created the EAP Exemption for "*any employee* employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1) (emphasis added). The Court presumes that "Congress says what it means and means what it says." *Simmons v. Himmelreich*, 578 U.S. 621, 627, 136 S.Ct. 1843, 195 L.Ed.2d 106 (2016). The FLSA's duties-based test is clear: it applies to those employees "who, in good faith, perform actual executive, administrative, or professional capacity duties." *Nevada II*, 275 F.Supp.3d at 805. Not "some" or "most" of such employees who also earn a sufficiently lofty salary—all employees who satisfy the terms of Section 213(a)(1). "Congress elected to exempt employees based on the capacity in which they are employed. *It's their duties and not their dollars that really matter.*" *Hewitt*, 15 F.4th at 315 (Jones, J., dissenting) (emphasis added).

To be sure, the Department has the authority to define and delimit the operative terms of the exemption, which the Fifth Circuit has made clear includes the authority to consider salary as an objective measure of an employee's eligibility for EAP-exempt classification. But that authority "is not unbounded." *Mayfield*, 117 F.4th at 618–19. The Department may "impose some limitations on" the scope of the

EAP Exemption's operative terms, but it cannot "enact rules that replace or swallow the meaning those terms have." *Id.* at 621. Relevant here, this occurs when the use of a minimum salary level as a proxy characteristic "frequently yields different results than the characteristic Congress initially chose" because "then use of the proxy is not so much defining and delimiting the original statutory terms as replacing them." *Id.* at 619.

That's precisely the problem with the 2024 Rule. For significant percentages of EAP-exempt employees, encompassing millions of workers, the 2024 Rule's salary thresholds "effectively eliminate" consideration of whether an employee performs "bona fide executive, administrative, or professional capacity" duties in favor of what amounts to a salary-only test. *See Nevada II*, 275 F.Supp.3d at 807. But "[n]othing in Section 213(a)(1) allows the Department to make salary rather than an employee's duties determinative of whether a 'bona fide executive, administrative, or professional capacity' employee should be exempt from overtime pay." *Id.* at 807. Therefore, the Department's changes to the minimum salary level in the 2024 Rule exceed its statutory jurisdiction, 5 U.S.C. § 706(2)(C), and Plaintiffs are entitled to summary judgment.

## B. Remedy

Having concluded that the 2024 Rule exceeds the Department's authority and is unlawful, the Court must consider the appropriate remedy. Under the APA, the Court "shall . . . hold unlawful and set aside agency action" that violates the law. 5 U.S.C. § 706(2). In the Fifth Circuit, "vacatur under § 706 is . . . the 'default' remedy for unlawful agency action." *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952

(5th Cir. 2024); *see also Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 110 F.4th 762, 789 (5th Cir. 2024) (explaining that "[b]inding Fifth Circuit precedent recognizes" that "the APA empowers and commands courts to 'set aside' unlawful agency actions, allowing a district court's vacatur to render a challenged agency action void" (cleaned up)).

The Fifth Circuit has also clarified the scope of the vacatur remedy, explaining that "setting aside agency action under § 706 has nationwide effect, is not party-restricted, and affects persons in all judicial districts equally." *Braidwood*, 104 F.4th at 951 (internal quotation marks and citations omitted); *see also Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (explaining that "[n]othing in the text of . . . Section 706[] suggests that . . . ultimate relief under the APA needs to be limited to [the party] or its members"); *accord Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2463, 219 L.Ed.2d 1139 (2024) (Kavanaugh, J., concurring) (observing that the Supreme Court has affirmed "countless decisions that vacated agency action, including agency rules," and noting that "[t]hose decisions vacated challenged agency rules rather than merely providing injunctive relief that enjoined enforcement of the rules against the specific plaintiffs").

When an agency rule is set aside under Section 706(2), the Court may fashion the remedy in one of two ways: remand the rule with vacatur or remand the rule without vacatur. *See Texas v. United States*, 50 F.4th 498, 529–30 (5th Cir. 2022). The ordinary practice is to vacate and remand the rule. *See Data Mktg. P'ship v. DOL*,

45 F.4th 846, 859 (5th Cir. 2022); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019). As the Fifth Circuit has noted, "remand *without vacatur*" is appropriate only in "rare cases." *Rest. L. Ctr. v. DOL,*120 F.4th. 163, 177 (5th Cir. 2024) (internal quotation marks and citations omitted) (emphasis in original). Evaluating whether a "rare case" is presented "turns on two factors: (1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *United Steel*, 925 F.3d at 1287.

Here, the Department has not argued that either factor favors a remand without vacatur, and the Court finds that this exceptional remedy is not warranted. There is no likelihood that the Department can justify its decision on remand, given that the 2024 Rule plainly exceeds its authority under the FLSA. *See supra* Part IV.A.ii.a–c. And the Department has not pointed to any "disruptive consequences" that would call for remand without vacatur. Although the July 1 change to the EAP Exemption has gone into effect, the centerpiece of the 2024 Rule, the 35th-Percentile Increase, is not scheduled to go into effect until January 2025, and the Automatic Indexing Mechanism will not directly impact employees and employers until 2027. Further, any threat of disruptive consequences "cannot save a rule when its fundamental flaws 'foreclose [the agency] from promulgating the same standards on remand.'" *North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (quoting *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1261–62 (D.C. Cir. 2007)).

In sum, unlike at the preliminary-injunction stage when the Court had broad discretion to fashion appropriate preliminary relief, *see Texas*, 2024 WL 3240618, at *14–15 (citing 5 U.S.C. § 705)), the Fifth Circuit has made clear that district courts should generally "nullify and revoke" illegal agency action, *Braidwood*, 104 F.4th at 951. The Court finds that such relief is appropriate here. The 2024 Rule impacts millions of employees in every facet of the economy, as well as state and local governments, and will impose billions in costs to employers. And considering the volume and variety of the trade organizations' members who are entitled to relief, it would be impractical, if not impossible, to fashion party-tailored relief here. Therefore, consistent with controlling circuit precedent, the proper remedy is vacatur of the 2024 Rule and remand to the Department for "further consideration in light of this opinion." *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 945 (N.D. Tex. 2019).

## V. Conclusion

For these reasons, it is **ORDERED** that the Business Organizations' and Texas's Motions for Summary Judgment, (Dkt. #46, #48), are **GRANTED**. The 2024 Rule is hereby **SET ASIDE** and **VACATED**.

It is further **ORDERED** that Defendants' Cross-Motion for Summary Judgment, (Dkt. #57), is **DENIED**.

A final judgment will follow.

**So ORDERED and SIGNED this 15th day of November, 2024.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE